BEFORE THE

NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| In the Matter of: | |
| **ACE MASONRY, INC., d/b/a ACE UNLIMITED and BELLA MASONRY, LLC, alter egos,** | Case Nos.  3-CA-073540<br>3-CA-074523 |
| and | |
| **INTERNATIONAL UNION OF BRICKLAYERS and ALLIED CRAFTWORKERS, LOCAL NO. 3,** | |
| and | |
| **LABORERS INTERNATIONAL UNION LOCAL NO. 785,** | Case Nos.  3-CA-073549<br>3-CA-074531 |
| and | |
| **NORTHEAST REGIONAL COUNCIL OF CARPENTERS.** | Case No.  3-CA-079606 |

The above-entitled matter came on for hearing pursuant to Notice, before **GEOFFREY L.J. CARTER**, Administrative Law Judge, at the Ithaca City Hall, 108 East Green Street, 2nd Floor Conference Room, Ithaca, New York, on Monday, July 30, 2012 at 10:50 a.m.

<u>A P P E A R A N C E S</u>

**On Behalf of the General Counsel:**

    GREGORY LEHMANN, ESQ.
    BRIE KLUYTENAAR, ESQ.
    National Labor Relations Board, Region 3
    Albany Resident Office
    Leo W. O'Brien Federal Building, Room 342
    Clinton Avenue & North Pearl Street
    Albany, New York 12207

**On Behalf of the Respondent:**

    JASON B. BAILEY, ESQ.
    EDWARD SHEATS, ESQ.
    Sheats & Bailey, PLLC
    P.O. Bo 820
    9650 Brewerton Road
    Brewerton, New York 13029

**On Behalf of the Charging Parties Bricklayers and Laborers:**

    RICHARD D. FURLONG, ESQ.
    Lipsitz, Green, Scime, Cambria, LLP
    42 Delaware Avenue
    Buffalo, New York 14202

**On Behalf of the Charging Party Carpenters:**

    CURTISS T. JAMESON, ESQ.
    Kroll Heineman Carton, LLC
    Metro Corporate Campus I
    99 Wood Avenue South, Suite 307
    Iselin, New Jersey 08830

**I N D E X**

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---------|--------|-------|----------|---------|-----------|
| Lisa Bellavigna | 26 | -- | -- | -- | 94 |

E X H I B I T S

| EXHIBIT NUMBER | IDENTIFIED | RECEIVED |
|---|---|---|
| GENERAL COUNSEL'S | | |
| GC-1(a) through (cc) | 6 | 7 |
| GC-2 | 30 | 31 |
| GC-3 | 32 | 32 |
| GC-4 | 62 | 62 |
| GC-5 | 63 | 64 |
| GC-6 | 65 | -- |
| GC-7 & 8 | 70 | 72 |
| GC-9 | 71 | 72 |
| GC-11 | 74 | 76 |
| GC-12 | 85 | 86 |
| GC-13 | 86 | 90 |
| GC-14 | 87 | 90 |
| GC-15 | 89 | 90 |
| GC-17 | 91 | -- |
| GC-18 | 100 | 104 |
| GC-19 | 105 | 105 |
| GC-21 | 144 | 144 |

1

1              P R O C E E D I N G S

2                                  (Time Noted:  10:50 a.m.)

3      JUDGE CARTER:  On the record.

4      Alright.  The hearing will now come to order.  This is a

5  formal trial before The National Labor Relations Board in the

6  following cases Respondent Ace Masonry, Incorporated doing

7  business as Ace Unlimited and Bella Masonry, LLC, alleged alter

8  egos, and International Union of Bricklayers and Allied

9  Craftworks Local number 3, Laborers International Union Local

10  number 785 and Northeast Regional Council of Carpenters.  The

11  following case numbers apply:  3-CA-73540, 3-CA-74523, 3-CA-

12  73549, 3-CA-74531 and 3-CA-79606.

13      For those who are not aware my name is Geoffrey Carter.

14  I'm the Administrative Law Judge presiding over this hearing.

15  I'm assigned to the DC office of the Division of Judges.  So if

16  you have any communications about the hearing or pleadings to

17  file, those should be directed to the DC office and the same

18  goes for any extensions of time as may become appropriate.

19  Let's go ahead and take the appearances starting with the

20  acting General Counsel.

21      MR. LEHMANN:  Greg Lehmann, last name is L-E-H-M-A-N-N,

22  counsel for the acting General Counsel.

23      MS. KLUYTENAAR:  And Brie Kluytenaar, also counsel for the

24  acting General Counsel.

25      MR. FURLONG:  Richard Furlong, Lipsitz, Green, Scime,

1  Cambria, counsel for Bricklayers Local 3, Laborers Local 785,

2  Charging Parties.

3      MR. JAMESON:  Curtis Jameson with the law firm of Kroll,

4  Heineman, Carton, LLC representing Northeast Regional Council

5  of Carpenters.

6      MR. SHEATS:  Edward Sheats for the employer, Sheats and

7  Bailey.

8      MR. BAILEY:  Jason Bailey, co-counsel for the employer.

9      JUDGE CARTER:  And just for the record you are

10 representing both Respondents?

11     MR. SHEATS:  Both.

12     MR. BAILEY:  Both Ace and Bella, yes.

13     JUDGE CARTER:  Okay.  Alright.  And for the acting General

14 Counsel are there any formal papers to introduce?

15     MR. LEHMANN:  Yes, Your Honor.  I offer into evidence the

16 formal papers.  They've been marked for identification as

17 General Counsel's exhibit 1(a) through 1(cc) inclusive, 1(cc)

18 being an index and description of the entire exhibit.  This

19 exhibit has already been shown to all parties.

20         **(General Counsel's GC-1(a) through (cc) identified)**

21     JUDGE CARTER:  Okay.  Any objection?

22     MR. FURLONG:  No objection.

23     MR. JAMESON:  No objection, Your Honor.

24     MR. BAILEY:  None, Your Honor.

25     JUDGE CARTER:  Exhibit 1 for General Counsel will be

1   admitted without objection.  And I understand the parties have

2   reached some stipulations in this matter, Mr. Furlong?

3   **(General Counsel's GC-1(a) through (cc) received in evidence)**

4       MR. FURLONG:  Thank you, Your Honor.  The following

5   proposed stipulations have been accepted by the Respondents

6   jointly.  They include Respondents have produced services in

7   excess of $50,000 in the last 12 months.  Two, Respondents are

8   employer engaged in commerce within the meaning of the Act.

9       Three, the Bricklayers are a labor organization within the

10  meaning of the Act.  Four, the Laborers are a labor

11  organization within the meaning of the Act.  Five, Lisa

12  Bellavigna was backslash is both a supervisor and an agent of

13  Ace within the meaning of the Act.

14      Six, Henry Bellavigna was backslash is both a supervisor

15  and an agent of Bella within the meaning of the Act.  And then

16  number seven, on behalf of the Carpenters, the Carpenters are a

17  labor organization within the meaning of the Act.  No other

18  stipulations reached.

19      JUDGE CARTER:  Okay.  And for the agency, any objection to

20  that?

21      MR. LEHMANN:  No objections.

22      MR. JAMESON:  No objections, Your Honor.

23      MR. BAILEY:  None, Your Honor.

24      JUDGE CARTER:  Alright.  So those will be accepted into

25  the record.  And I'm going to be issuing a sequestration order

 1    in this hearing.  I'll go ahead and put that on the record.

 2    And as I described off the record that just means if you have

 3    any witnesses who are going to be testifying they should be

 4    outside the hearing room until it's their turn to testify, with

 5    the exception of a designated assistant of one of the parties.

 6    But I'll put the formal language of the order on the record.

 7         A sequestration order is being issued in this proceeding.

 8    That means that anyone who is expected to be called as a

 9    witness, other than someone who has been designated as an

10    essential assistant to the presentation of a party's case, will

11    be required to remain outside the courtroom whenever testimony

12    or other proceedings are taking place.  There is a narrow

13    exception to that rule that applies to witnesses who are

14    alleged discriminatees in this matter.  I don't think we have

15    any of those.

16         They may be present in the courtroom at all times other

17    than when another witness for the General Counsel or the

18    Charging Party is testifying about the same events that the

19    discriminatee will address in his or her testimony.  This order

20    also prohibits all witnesses from discussing their past or

21    expected testimony with any other possible witness.  Likewise,

22    counsel for a party may not disclose to any witness the

23    testimony of another witness.  The one exception for that is

24    whether -- when you're preparing some rebuttal testimony, and

25    in that instance counsel may inform his or her own witness of

1  the content of testimony given by another -- by an opposing

2  party's witness.  And obviously all counsel are responsible for

3  insuring that they and their witnesses comply with that order.

4      Now, as a general matter if a settlement becomes --

5  discussions are desired at some point during the trial just let

6  me know that and I'll give you some time to engage in any

7  discussions.  Sometimes as the trial goes forward your

8  impressions of your case may change and that may lead to some

9  fruitful discussions about settlement.  You also have a chance

10  to do that at the conclusion of the agency's case and also at

11  the conclusion of the trial.  And having said all that any

12  motions or other matters -- procedural matters before we start

13  with statements?

14      MR. LEHMANN:  Your Honor, I do have one on subpoena.  Mr.

15  Bailey or Respondents provided -- General Counsel issued a

16  subpoena back in early July, which is numbered from one through

17  55 paragraphs.  And on Friday Respondents mailed, and which my

18  office received, two boxes of subpoenaed documents, none of

19  which -- the subpoena -- the documents were just included in

20  the boxes.

21      They weren't identified as to which paragraph that any of

22  the documents belonged to.  And we're talking, you know, a

23  significant amount of documents.  And they also delivered

24  another subpoena -- or another box of subpoenaed records.  And

25  General Counsel is going to need to have some time to review

1  these documents and also maybe Mr. Bailey can look at the

2  second -- or the first two boxes that were provided to the

3  General Counsel and identify which documents go to which

4  paragraphs of the subpoena.

5      JUDGE CARTER:  And so what's your request?  I mean you're

6  requesting for time at this point in time to go through

7  materials before we take opening statements or some other

8  request?  Or --

9      MR. LEHMANN:  I mean at --

10     JUDGE CARTER:  -- do you want to do that over lunch hour?

11     MR. LEHMANN:  I'm going to need to and I'm able to --

12  we're able to move forward with our -- with opening statements

13  and calling our first witness, but after -- but before we

14  conclude our first witness we need to be given an opportunity

15  to look over the documents or at least be provided an

16  opportunity to recall the witness after we review the

17  subpoenaed documents.

18     JUDGE CARTER:  Alright.  And your first witness, how much

19  time is that person going to take, if you can estimate?

20     MR. LEHMANN:  A couple hours.

21     JUDGE CARTER:  Alright.  Let's do this then, let's go

22  ahead, and we'll take opening statements and we'll begin your

23  witness.  And then assuming that witness is that long we'll go

24  ahead, and we'll take a lunch break at some point and that'll

25  give you some time.  I'll take a full hour so you have time to

1  look over materials and confer with counsel about any questions

2  about what materials were disclosed.  And then we'll see if

3  there are any lingering issues after that.  Any other opening

4  matters?

5      MS. KLUYTENAAR:  Yeah.  General Counsel would move to

6  amend the complaint as set forth in the notice of intent to

7  amend.

8      JUDGE CARTER:  Alright.  And everyone received a copy of

9  the notice of intent to amend I take it?  Any objections from

10  counsel?

11      MR. JAMESON:  No.

12      MR. FURLONG:  No objection.

13      MR. BAILEY:  No objection.

14      JUDGE CARTER:  Alright.  So the amendment stated in the

15  notice of intent to amend will be accepted.  And with that I

16  think we're ready for opening statements.

17      MR. BAILEY:  Judge, just if I may?  If I can have everyone

18  identified?  I don't know who any of these people are.  So name

19  and title would be helpful, please.

20      JUDGE CARTER:  Okay.  I gather that some of these folks

21  are just observing, but I guess you want to insure that they're

22  not witnesses.  So we can accommodate that.  Can  you just

23  state your name and title?

24      MR. BLACK:  Stacey Black, membership development

25  coordinator for the International Brotherhood of Electrical

1  Workers at the Ithaca office.  And I'm purely here as an

2  observer.

3      MS. PALMER:  Ashley Palmer (ph), administrative assistant

4  for the Bricklayers and Allied Craftworkers in Ithaca and I'm

5  an observer.

6      MS. MORRIS:  Sandra Morris (ph), I'm the fund director of

7  the benefit funds for the Bricklayers Union here in Ithaca and

8  I'm an observer.

9      MR. STRINGER:  Scott Stringer, vice president for the

10  Bricklayer's union.

11      MR. HAYES:  Excuse me.  Kevin Hayes, membership

12  coordinator for the Bricklayers Local 3 New York, just as an

13  observer.

14      MR. MARSH:  David Marsh, business manager for Laborers

15  785.

16      JUDGE CARTER:  And you're observing or a witness?

17      MR. MARSH:  I'll be a witness.

18      JUDGE CARTER:  And are you -- you're a --

19      MR. MARSH:  I'm the primary witness for the Charging

20  Party, Mr. Scott is as well.

21      JUDGE CARTER:  Alright.  So I'm not sure how much of that

22  was picked up on the transcription, but just in case it was not

23  there are six people in the courtroom who are -- I guess five

24  observers and one witness.

25      MR. MARSH:  Bob Scott (ph) is a witness as well.

1      MR. SCOTT:  I am a witness as well, Your Honor.

2      JUDGE CARTER:  So four observers and two witnesses?

3      MR. MARSH:  Yes.

4      JUDGE CARTER:  And the two of the witnesses that are

5  present are apparently designated assistants for the case.

6  Alright.  Anything else?

7      MR. BAILEY:  No, Judge.

8      JUDGE CARTER:  Okay.  Alright.  First opening statement,

9  acting General Counsel.

10     MR. LEHMANN:  Good morning, Your Honor.  This case

11  involves two construction industry employers, Ace Masonry and

12  Bella Masonry, and their attempts to avoid compliance with the

13  collective bargaining agreements for three different unions

14  including the Bricklayers, Laborers and Carpenters.  The

15  evidence will establish that Respondents have failed and

16  refused to apply the terms and conditions of the current

17  collective bargaining agreements with these three unions,

18  including failing to apply the contractual benefits and fringe

19  benefit provisions to the appropriate bargaining unit employees

20  when they performed work for Respondents that covered the most

21  recent collective bargaining agreements.

22     This unilateral conduct violates section 8(a)(1) and (5)

23  of the Act.  The evidence will show that despite the denials in

24  the consolidated complaint, Ace Masonry entered into 8(f)

25  collective bargaining agreements with these union and various

1    employer associations.  They abided by the terms and conditions
2    of these contracts.  They agreed to be bound by these contracts
3    and/or future agreements unless timely notice of termination
4    was given.  Ace never provided notice that it was terminating
5    the collective bargaining agreements.
6         8(f) agreements are common in the construction industry.
7    As Your Honor -- as you know, 8(f) agreements bind an employer
8    for the length of the agreement after which there's generally
9    no further obligations in contrast with 9(a) agreements, unless
10   the employer binds itself through the language in the agreement
11   stating otherwise, such as rollover provisions that appear in
12   the agreement involved in this matter.  Ace continued to
13   operate as a union contractor until at least through December
14   of 2011.
15        Additionally, Respondent Ace has adopted the current
16   collective bargaining agreements by their conduct.  The
17   evidence will show that Ace was a union contractor since its
18   inception.  Ace held itself out as a union contractor,
19   performed jobs only a union contractor could perform, paid the
20   appropriate contractual wages, benefits, the submitted monthly
21   remittance forms and made timely increases into the funds.
22   However, at least since September 1, 2011 Ace stopped paying
23   contractual benefits and fringe benefits, but continue to
24   submit the remittance funds -- forms.
25        Also, around September 2011 Bella Masonry was formed,

1    which is alleged to be an alter ego of Ace.  The Board has

2    found that when determining whether one employer is an alter

3    ego of another the Board considers whether two enterprises have

4    substantially identical ownership, management, supervision,

5    business purpose, operation, customers and equipment, all of

6    which are present in this case.

7        Another allegation in this case involves an information

8    request.  At the time the request was made the Union certainly

9    had a reasonable belief that Bella was Ace's alter ego.

10    Respondents failed to provide any information pursuant to the

11    request for information that is relevant and necessary for the

12    Union to serve as the bargaining representative for unit

13    members.

14        As a result of Respondents' unlawful conduct, the acting

15    General Counsel is seeking an order requiring that Respondents

16    make whole with interest the contractual benefit and fringe

17    benefit funds established in the collective bargaining

18    agreement, make whole with interest to the bargaining unit --

19    or to the Bricklayers' unit employees, to the Laborers' unit

20    employees and to the Carpenters' unit employees of Respondents

21    who performed work covered under the terms of the collective

22    bargaining agreements.  The acting General Counsel is also

23    seeking a notice posting to employees.

24        JUDGE CARTER:  Mr. Furlong, are you giving a statement?

25        MR. FURLONG:  One minute, Your Honor.  Yes, Your Honor.

1    JUDGE CARTER:  Okay.

2    MR. FURLONG:  We incorporate and adopt, certainly, the

3    opening statement of the General Counsel.  On January the 19th,

4    in response to an information request, I received a response

5    from Mr. Bailey, counsel for both Bella as well as Ace Masonry,

6    which stated among other things and I quote "additionally,

7    Bella has no relationship with Ace".  And I ask that you keep

8    that phrase in your mind.

9    This is a quintessential alter ego case in which the union

10   contractor in the fall of 2011 phased out its operations

11   completely.  As it was phasing out its operations the same

12   management team started Bella Masonry as a non-union

13   contractor.  It is a quintessential alter ego case.

14   What you're going to hear is that the Bellavignas, Henry

15   who's sort of the patriarch, his son Bob, Bob's wife Lisa and

16   Bob Junior simply moves over from Ace over to Bella.  We intend

17   to bring employees who were union masons and union laborers who

18   are going to testify that they did not know they were working

19   for Bella until such time that they received Bella paychecks.

20   The paychecks themselves and the accounting look exactly the

21   same.

22   The office manager, Melissa Blanchard, is going to testify

23   she was the office manager for Ace one day, the next day for

24   Bella Masonry.  You're going to hear from customers.  You're

25   going to hear from customers who are going to say until we

1    received a subpoena for this proceeding here we did not know
2    that Bella was working on our project.  We had a contract with
3    Ace.  The customers were not told.
4        Every single aspect of Ace Masonry was moved over.  The
5    only thing they did was the changed the name and they started
6    to work out of Henry Bellavigna's house.  That was the only
7    change in operation.
8        The same employees who were union employees, same
9    management team, same customers, same equipment.  All in an
10   effort to get out of its union obligations.  You will also hear
11   from union representatives, who when they realized or started
12   to have a hint as to what was going on, met with the
13   Bellavignas and said hey, what's going on here?  And you have
14   Frank admissions from the Bellavignas we no longer want to be,
15   no longer can be a union masonry contractor, therefore we're
16   going non-union.  We don't have anything to offer you.
17       And then the charges and the information request came
18   forward.  This is an absolutely compelling case and I bring you
19   back to the statement from Mr. Bailey on January 19th "Bella has
20   no relationship with Ace."  You will realize at the completion
21   of the proofs that that is absurd and nor is it true.  We're
22   ready to proceed.
23       JUDGE CARTER:  Mr. Jameson?
24       MR. JAMESON:  Your Honor, the Carpenters adopt as their
25   own opening statement that of General Counsel and that of Mr.

1  Furlong.

2      JUDGE CARTER:  Very well.  Counsel for Respondents?

3      MR. BAILEY:  Thank you, Judge.  There is no grand

4  conspiracy here.  There is no intent to avoid union

5  obligations.  Opposing counsel's phrase is perfect.  He said

6  Ace phased out.  No, Ace didn't phase out.  It failed.

7      It made some bad business decisions.  It hit a bad

8  economy.  It was on the verge of bankruptcy.  They had over 100

9  employees at one time.  Some of -- most of those employees went

10  on to find other work.

11      Henry Bellavigna decided to start his own company.  And

12  we'll establish why he decided to do that a little later.  But

13  the only two threads if you will between Ace, which was run by

14  Lisa and Bella, which is run by Henry, is that they have the

15  same last name.  The other thread is that they work in the

16  great Ithaca area.

17      Well, they've lived here pretty much their entire lives.

18  Where are they supposed to go work?  Are they supposed to

19  relocate to an hour away?  Or can they start up a business --

20  Henry start up a business that he has known his entire life,

21  Masonry?

22      These are two very different companies.  Ace run by Lisa

23  Bellavigna.  She signed the contracts, she signed the change

24  orders, she signed submittals, she signed off on payroll, she

25  went and got the bonding, she signed off on insurance, she

1   dealt with the banks for lending and banking purposes.  Lisa,

2   no Bob, not Henry.

3        Ace has 100 employees or more at one time.  $17,000,000 in

4   revenue their greatest year.  They had bonding in excess of

5   $10,000,000.  Ace wasn't a masonry subcontractor.  It started

6   out that way, and then it great and expanded a great deal and

7   became essentially a GC.

8        And most of its own masonry work that it was doing after

9   that was masonry that they had as the GC.  They were not a

10  masonry subcontractor for the most part.  Compare that to

11  Bella.  Bella has no bonding.  It's a subcontractor.  It does

12  no GC work.

13       The public work that it does is 0% compared to Ace 80%.

14  Ace focused on commercial work.  99% of their work was

15  commercial.  Bella 80% they're doing residential work.  Ace

16  didn't' really do residential work.  Helping out a friend at

17  best.

18       Size of projects, Ace had a project in excess of

19  $7,000,000.  Bella, well, they're a little bit smaller,

20  $170,000.  You'll hear testimony that establishes all of these

21  facts.  You'll also hear testimony that Bella, it's intention

22  is not to become Ace.  It doesn't plan on attempting the same

23  jobs that Ace would attempt.

24       Its purpose is not to grow to 100 employees.  Its purpose

25  is to put a little extra money in Henry's pocket so he can

1  withstand retirement.  Bella, unlike Ace, is run by Henry
2  Bellavigna.  He signs the contracts, he signs the change
3  orders, he signs the submittals, he signs off for insurance, he
4  deals the bank, he okays payroll.
5      You'll hear Henry testify that he didn't start Bella to
6  avoid the Union.  He didn't start Bella at Ace's
7  recommendation.  He didn't start Bella at his son or his
8  daughter-in-law's recommendation.
9      He's been pro-union his entire life.  His entire
10  construction life has been pro-union.  You'll hear Henry
11  testify that he was willing to become a unit.  The Union has
12  never approached Henry, never.
13      So why did Henry start Bella?  Well, you'll hear that
14  before Henry started working with Ace, which was not at Ace's
15  inception, but years later -- a couple years later, he was
16  actually partially retired and he learned that through
17  retirement he doesn't have nearly enough money to live.
18  There's another major factor.  His wife passed away very
19  recently.  Henry's not the type of person that's going to sit
20  around.  And his plans for retirement involved his wife.
21      His wife is no longer here.  So what's he going to do?
22  He's going to start a company and make some money.  He's going
23  to start a company that he knows; a masonry subcontractor.
24      Now, we talked a moment ago about Ace failing.  You're
25  going to hear from Lisa that as Ace started to go downhill, as

1    the creditors started to call, as laborers -- or as their labor

2    force started walking off projects, she couldn't deal with it.

3    She became depressed.  She left Ace temporarily.  She wasn't

4    showing up Monday through Friday.

5        She still signed the contracts.  She'd show up maybe half

6    a day one day a week.  And through -- and this time period is

7    important, because as she goes into this phase Ace just

8    plummets.  It's like falling off a cliff.

9        And during this same period of time that's when Henry

10   realizes I'm on a sinking ship.  I need to survive.  I start a

11   company.  I'm going to start a masonry subcontracting company.

12       Now, they point to the fact that people from Ace shifted

13   over to Bella.  That's true in a sense.  Henry once worked for

14   Ace as an estimator and as a little bit of a senior project

15   manager or coordinator, but now he's the owner of the company.

16   His role is extremely different.  He's in charge of everything.

17   He signs off on everything.

18       You'll hear some testimony that Bob Bellavigna, who was

19   involved with Ace, he was married to Lisa, but he was also one

20   of the boots on the ground people for Ace.  He works for Bella,

21   but his role is much different.  He's out laying block again

22   for Bella.  He wasn't really doing that for Ace.

23       You'll hear some other testimony about Melissa Blanchard,

24   commonly referred to as Missy.  She worked for Ace.  She now

25   works for Bella, however her role is very different.

1    She went from being essentially a receptionist and a fill

2  in person to now she's Henry's right hand man.  She's doing AR,

3  she's doing accounts payable, she's doing payroll so that Henry

4  can sign off on it.  She's the jack of all trades.  She's

5  what's keeping Bella together other than doing the formal work,

6  the actual laying block.

7    Her role is very different.  And just because you have

8  some common employees does not make you an alter ego.  Thank

9  you, Judge.  Your Honor, if I may just find out who walked in?

10    JUDGE CARTER:  Earlier we identified the people present in

11  the courtroom and so if you can just state your name please?

12    MR. SMITH:  Charles Smith (ph) from the Carpenters.

13    JUDGE CARTER:  And you're present as an observer or a

14  witness?

15    MR. SMITH:  Observer.  Well, evidently eventually I'll

16  probably be a witness.

17    MR. JAMESON:  Your Honor, he may be a potential witness,

18  however he would be the authorized representative of the

19  Carpenters in these proceedings.

20    JUDGE CARTER:  Okay.  Very well.

21    MR. BAILEY:  Thank you, Judge.

22    JUDGE CARTER:  And there was procedural issue that was

23  raised off the record before we began or opened the proceedings

24  about the complaint and answer.  So Mr. Furlong, if you want to

25  put that on the record about the concern --

 1      MR. FURLONG:  Thank you, Your Honor.  The order further

 2   consolidating cases, and amended consolidated complaint and

 3   notice of hearing, which issued in July, does not in some

 4   respects narrow the issues and we would ask that there be

 5   clarification from the Respondents.  For instance, on paragraph

 6   six, which is not broken up into A and B, we've got a denial

 7   from the Respondents.  They deny both paragraphs six A and

 8   paragraph six B, which are not denoted as such.

 9      In addition, paragraph two C, which I guess is a

10   jurisdictional provision, was neither denied, admitted or no

11   knowledge of information, but we now have a stipulation on

12   that.  So that's taken care of.  Paragraph three, there is both

13   a denial as well as no knowledge or information to form a

14   belief.  We would ask for clarification on that; paragraph

15   three C.

16      Paragraph six, which is the supervisory status of the

17   various Bellavignas, there's no response at all for that

18   paragraph.  Obviously, that's key.  I believe, Your Honor,

19   those were my concerns.  I should state as well that there was

20   no response to paragraph 16, no response to paragraph 17 of any

21   nature.  And these absences of a response or the confusing

22   response carried forward from the original answer straight

23   through to the latest answer filed by the Respondents.

24      Well, 17 is about the -- whether the alleged ULPs affect

25   commerce.  And, you know, any -- so you wouldn't get an

 1  admission to that, but at least you have --

 2      MR. FURLONG:  You get a denial I'm assuming.

 3      JUDGE CARTER:  Right.  And they have a general denial in

 4  their answer.  So those two aren't really -- 16 and 17, those

 5  don't strike me as points for concern really.  I guess the --

 6  to clarify the record though, I guess for purposes of the

 7  proceeding, paragraph six, the supervisors, what is your

 8  position on the four --

 9      MR. BAILEY:  We would deny it, Your Honor.  And I believe

10  -- again, I don't have the paperwork in front of me, but I

11  believe there was a general denial involved and certainly we

12  would maintain that denial.

13      JUDGE CARTER:  Fair enough.

14      MS. KLUYTENAAR:  With respect to the ones who aren't

15  stipulated to?

16      MR. BAILEY:  Yes, exactly.  Other than the ones we just

17  stipulated to, with respect to Lisa with Ace and Henry with

18  Bella.  We would maintain that stipulation.

19      MR. LEHMANN:  Okay.  There's a third.  There's the

20  supervisory, the agency status, which you're denying, but what

21  about the job titles?

22      MR. BAILEY:  The job titles, I don't recall what you

23  listed as the job titles.

24      MS. KLUYTENAAR:  Let's go through it.

25      MR. LEHMANN:  Well, Robert P. Bellavigna, project

1  coordinator for Ace, project coordinator for Bella.

2      MR. BAILEY:  I would take issue with the characterization,

3  with the title.

4      MR. LEHMANN:  So you're denying both of those?

5      MR. BAILEY:  Yes.

6      MR. LEHMANN:  Robert A. Bellavigna, vice president/safety

7  coordinator/project manager of Respondent Bella.

8      MR. BAILEY:  I'm sorry, can you say that again?

9      MR. LEHMANN:  Vice president/safety coordinator/project

10  manager of Respondent Bella.

11      MR. BAILEY:  I would deny.

12      MS. KLUYTENAAR:  Would you be willing to make a

13  representation as to what their titles are or were?

14      MR. BAILEY:  I believe you'll hear some testimony about

15  that, yeah.

16      JUDGE CARTER:  Okay.  I think we've gotten as much as you

17  can get out of that at this point in time.  You know, obviously

18  it's better if you file a pretrial motion about these types of

19  pleadings rather than the day of trial.  Just -- you know, the

20  Respondent would file a motion for a bill of particulars if

21  there was some issue with the complaint.

22      Be that as it may we've gotten a little more information

23  about where things stand.  But I think we are at the point

24  where we're ready to go ahead and start taking some testimony.

25  But obviously during the breaks if counsel wants to confirm and

1   pinpoint some of these issues down a little further they can.

2        MR. LEHMANN:  Thank you, Your Honor.

3        MR. FURLONG:  Thank you.

4        JUDGE CARTER:  First witness?

5        MR. LEHMANN:  General Counsel calls Lisa Bellavigna.

6        JUDGE CARTER:  If you could stand and raise your right

7   hand, please?

8   Whereupon,

9                     LISA V. BELLAVIGNA

10  Having been first duly sworn, was called as a witness and

11  testified herein as follows:

12       JUDGE CARTER:  Please be seated.  Can you tell us your

13  full name, please?

14       THE WITNESS:  Lisa Vivian Bellavigna.

15       JUDGE CARTER:  And spell your last name.

16       THE WITNESS:  B-E-L-L-A-V-I-G-N-A.

17       JUDGE CARTER:  And counsel, you may inquire.

18                     **DIRECT EXAMINATION**

19  BY MR. LEHMANN:

20  Q    Are you currently employed?

21  A    I am not drawing a wage at the time, but I feel I'm still

22  owner of Ace Masonry doing business as Ace Unlimited.

23  Q    And what's your job title with Ace Masonry?

24  A    Sole owner, sole director, president.  I also put down

25  W.B.E. sometimes after my name.

1   Q    Which stands for what?

2   A    Women Business Enterprise in The State of New York.

3   Q    And when did Ace start?

4   A    May of 2002.

5   Q    Okay.  And Ace is still in existence right now?

6   A    Yes, it is.

7   Q    You taking on any new projects?

8   A    Not at this time.

9   Q    Okay.  You haven't filed any formal paperwork dissolving

10  Ace?

11  A    No.

12       MR. LEHMANN:  Your Honor, I'd like the record to reflect

13  that Respondent's have admitted the supervisory status and

14  agency status of Ms. Bellavigna and I'd like to request

15  permission to examine her under 611(c).

16       JUDGE CARTER:  Any objection?

17       MR. BAILEY:  None, Your Honor.

18       JUDGE CARTER:  You may so inquire.

19       MR. LEHMANN:  Thank you.

20  BY MR. LEHMANN:

21  Q    Now, Ace Masonry is a masonry contractor in the

22  construction industry, is that correct?

23  A    Yes.  When I first started Ace Masonry we were a

24  subcontractor and performing masonry work.

25  Q    Okay.  And you still do masonry work --

1    A    Yes.

2    Q    -- correct?  Okay.  And that includes masonry

3    subcontracting?

4    A    Yes.

5    Q    In fact, Ace had approximately 37 jobs in 2011?

6    A    Correct.

7    Q    And Ace did all of the masonry work on the jobs --

8    A    No.

9    Q    -- correct?  They didn't?

10    A    No.

11    Q    They do most of the masonry work on those jobs?

12    A    Most of the jobs in 2011, the 37 jobs, were -- Ace was the

13    general contractor, about 80%.

14    Q    Okay.  And when there was masonry work on those contracts,

15    Ace performed that masonry work, correct?

16    A    Yes.

17    Q    Okay.

18    A    Most of it.

19    Q    Alright.  And the -- and in 2011 you still were a masonry

20    subcontractor, correct?

21    A    Yes.

22    Q    Okay.  Just like you were in 2010?

23    A    Yes.

24    Q    2009?

25    A    Yes.

1   Q     2008?

2   A     Yes.

3   Q     Since your inception?

4   A     Yes, but can I say something?

5   Q     No.

6   A     No?

7   Q     You've answered the question.

8   A     Okay.

9         JUDGE CARTER:  But, you know, he's entitled to a yes or no

10  answer if that's what the question calls for, but then perhaps

11  other counsel may ask you other questions --

12        THE WITNESS:  Okay.

13        JUDGE CARTER:  -- may give you a chance for that.

14        THE WITNESS:  Alright.

15  BY MR. LEHMANN:

16  Q     You would agree with me that masonry is what Ace Masonry

17  is good at, right?

18  A     That's Ace's forte, yes.  Do you want me to grab it?

19  Q     Now, what geographical area does Ace cover?

20  A     The Finger Lakes region, upstate New York.  We've also

21  performed work in Pennsylvania.

22  Q     Okay.  I'm showing you what's been marked as General

23  Counsel exhibit 2.  And can you identify General Counsel's

24  exhibit 2?

25  A     It's my job contract list from jobs that were continued

1    from 2010 through 2011.

2                    **(General Counsel's GC-2 identified)**

3    Q    Well, through March 30th 2012.  At the very top.

4    A    Yes, it says from January 2010 to March 30th 2012.

5    Q    Okay.  And the -- most of this is self explanatory.  The

6    job end date, what does that refer to?

7    A    The job of completion date, most likely the last time

8    someone was on the jobsite performing work.

9    Q    The last day someone worked on the project?

10   A    Yes.

11   Q    Now, on the third page job number 11-33, there's a

12   reference to J-O-C.

13   A    Yes.

14   Q    What does J-O-C stand for?

15   A    It's a job for Cornell University.  It's a JOCS *(sic)*

16   program job.

17   Q    Okay.  And what does J-O-C stand for?

18   A    JOC is a program that Cornell decided to have contractors

19   bid on and basically -- I don't know if you're familiar with a

20   JOC program.  You basically have to put every item in your bid,

21   whether it be a screw in the wall to a beam in the building.

22   Okay?  So your estimate has to have everything detailed by this

23   program that you use to bid work.

24   Q    Okay.  I'm just asking what J-O-C stands for.

25   A    Honestly, I don't know.

1   Q    You don't know what it is?

2   A    I always call it JOCS *(sic)* program.  I really don't know.

3   Q    Okay.

4   A    I think it's job contracting.  I don't know.  I really

5   don't know.

6   Q    Now, in 2011 Ace had approximately 72 employees?

7   A    71 I believe.

8        MR. LEHMANN:  Okay.  Oh, Your Honor, I'd offer General

9   Counsel's exhibit 2.

10       MR. FURLONG:  No objection, Your Honor.

11       MR. JAMESON:  No objection, Your Honor.

12       MR. BAILEY:  None, Your Honor.

13       JUDGE CARTER:  Very well, exhibit 2 for General Counsel

14  will be admitted without objection.

15            **(General Counsel's GC-2 received in evidence)**

16       MS. KLUYTENAAR:  Mr. Bailey, do you have GC-3?

17       MR. BAILEY:  I do.

18       MS. KLUYTENAAR:  Okay.  Your Honor has a copy?

19       JUDGE CARTER:  I do not, but if you have one I'll take

20  one, but --

21       MS. KLUYTENAAR:  Yes, we do.  Sorry about that.

22       JUDGE CARTER:  -- I'm not critical at this point.

23  BY MR. LEHMANN:

24  Q    You recognize General Counsel's exhibit 3?

25  A    Yes, I do.

1    Q    And what is it?

2    A    It's a payroll records for -- from 1/1/11 to 3/30/2012.

3                    **(General Counsel's GC-3 identified)**

4    Q    Okay.  And the pay rate, what are those?

5    A    Hourly rate.

6    Q    The hourly rates?

7         MR. BAILEY:  Lisa, let him ask his question.

8         THE WITNESS:  Oh, I'm sorry.

9         MR. BAILEY:  That's okay.

10        MR. LEHMANN:  I'd offer General Counsel exhibit 3.

11        MR. FURLONG:  No objection.

12        MR. JAMESON:  No objection, Your Honor.

13        MR. BAILEY:  No objection, Your Honor.

14        JUDGE CARTER:  Very well, General Counsel's exhibit 3

15   admitted without objection.

16                **(General Counsel's GC-3 received in evidence)**

17   BY MR. LEHMANN:

18   Q    Now, I see the job title Robert P. Bellavigna, project

19   coordinator.

20   A    Yes.

21   Q    What is a project coordinator?

22   A    Project coordinator basically speaks to potential

23   customers, may give quotes, watches over the project, and talks

24   to project managers and superintendants regarding the jobs.

25   Q    Okay.  Anything else?

```
1   A    He basically confronts with me regarding jobs.

2   Q    Okay.  Does the project coordinator run the show?

3   A    No.

4   Q    He doesn't run any of the --

5   A    No.

6   Q    -- projects?

7   A    He's just a piece of the puzzle.

8   Q    Okay.  But a top piece of the puzzle, you'd agree with me

9   on that?

10  A    I would say that everybody was a top piece to the puzzle.

11  You have to have a team to perform the work.

12  Q    Okay.  He --

13  A    I think our field crew is the main benefit of having jobs

14  performed.

15  Q    Okay.  Mr. Bellavigna oversees the field operations?

16  A    Yes, he's the field supervisor.

17  Q    Okay.  And when you say field supervisor he has the

18  ability to hire employees?

19  A    No.

20  Q    Who does the hiring?

21  A    Our superintendents.

22  Q    Superintendents do the hiring?

23  A    Yes.

24  Q    So they can just hire and that's it or is there a chain --

25  A    No, there's a --
```

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 316
Wayne, New Jersey 07470
(973) 692-0660

 1  Q    -- he's got to go up?

 2  A    I'm sorry.

 3       MR. BAILEY:  That's okay.  Just so the record is clear,

 4  let him finish his answer (sic) and then can answer.

 5       THE WITNESS:  Okay.  Can you repeat the question?

 6       MR. BAILEY:  Or finish his question.

 7  BY MR. LEHMANN:

 8  Q    Is there a chain that after -- that goes up from the

 9  superintendents?  Is the project coordinator, by rank, project

10  coordinator above the superintendents?

11  A    Yes.

12  Q    Okay.  And so does it go up?  Does the hire go up?  Does

13  he have any sort of recommendation?

14  A    I don't know what you're asking, because as you asking

15  like pay wise or field of command?

16  A    Is he -- does he have any involvement in the hiring

17  process?

18  A    No.

19  Q    No involvement.  Okay.  If -- the superintendent does the

20  hiring, is that your testimony?

21  A    Yes.

22  Q    Okay.  And if the superintendent hires someone can the

23  project coordinator veto the hire?

24  A    No.

25  Q    They can't?

1   A    The project coordinator in my business didn't have that

2   capability.  If there was a problem with a person in the field

3   that was hired by a superintendent it would go over my desk

4   first.

5   Q    Okay.  Does the superintendent report to the project

6   coordinator?

7   A    Yes and me.

8   Q    Okay.

9   A    Both.

10   Q    Alright, both.  And when -- and by reporting, what do you

11   mean by reporting?

12   A    If there was, for example, somebody that got hurt on the

13   jobsite, we as a team would get together and be notified all at

14   once, meaning the chain of command is going to be the

15   superintendent on the jobsite, is going to call me directly.

16   Okay?  I might discuss it with the project coordinator or

17   project managers regarding the injury, and go from there and

18   take care of the issue.  But I think the chain of command

19   regarding project coordinator, the field supervision he would

20   oversee the job with the superintendents making sure that the

21   work is being done on schedule.

22   Q    Okay.

23   A    Okay?

24   Q    And there are job tasks on jobs, right?  There are jobs --

25   there are tasks to do with every job, correct?

1    A    Oh, I'm sure, yes.

2    Q    You're sure?  Well, you know that, right?

3    A    Well, yeah.  But what do you want to know?

4    Q    And the -- and the superintendents -- strike that.  Robert

5    P. Bellavigna is your husband, correct?

6    A    Yes, he is.

7    Q    Okay.  Alright.  Another job classification on your -- on

8    General Counsel's exhibit 3 is a project manager.

9    A    Yes.

10    Q    What does a project manager do?

11    A    A project manager comes to me regarding changes in the

12    field, change orders to be signed, field supervision.  He may

13    have to quote something within the job that's occurring that

14    might be a change.  He also uses a software tool called

15    Primavera to keep track of the job.  It's a data entry program

16    that basically tells you, you know, how the job is going if

17    it's inputted correctly by the project manager.  Sorry, I'm

18    losing my voice.

19    Q     And does the project manager have any involvement in

20    hiring employees?

21    A    Not our project managers, no.  Mainly our superintendents

22    would be the ones that would hire new employees.

23    Q    Do the -- how does the superintendent know they need to

24    hire employees?

25    A    They're the main person in the field that's overseeing the

1  job, overseeing all of the labor and all the labor forces.  So

2  they have to know who they need, manpower-wise, to perform the

3  work.  That's their job.

4  Q    And it's also their job to coordinate or discuss that with

5  the project coordinator, correct?

6  A    Not always, but in some cases, yes.

7  Q    Okay.  And also the project manager?

8  A    Yes.

9  Q    Okay.  And by rank, project coordinator is the highest by

10  rank?

11  A    No, not rate of pay.  Project managers were higher.

12  Q    Okay.  Project managers are higher than project

13  coordinators?

14  A    Yes.

15  Q    Okay.  But as far as overall responsibilities, project

16  coordinators are -- have a higher rank than the project

17  manager, correct?

18  A    Basically, project coordinator versus a project manager,

19  he's talking to customers and owners regarding new work.  Okay?

20  Project managers can do that too, but mainly project

21  coordinators are talking to owners regarding new work that we

22  want to bid on.

23       JUDGE CARTER:  And just so I understand that point, you

24  mean discussing with customers about new projects altogether or

25  while a project is in progress and then making an adjustment to

1    the existing project?

2        THE WITNESS:  No.  For example, if an owner up at Ithaca

3    College wants some new work performed, the project coordinator

4    would go up and discuss new work that we could bid on.  Okay?

5        JUDGE CARTER:  Okay.

6    BY MR. LEHMANN:

7    Q    Okay.  Now, I want to go back to what you just testified

8    earlier, as far as when I was asking you about the rank.  You

9    said that the project managers are paid more than the project

10   coordinator, is that your testimony?

11   A    Depending on how new the project manager is.  If you were

12   a junior project manager and learning project management you

13   had a lower rate of pay.

14   Q    Okay.

15   A    Years past we've had very highly paid project managers in

16   the field.  If you want to look for example -- well, can I do

17   that?  John Franzese was a very prominent project manager with

18   Ace.  And when he started he got $44.71 per hour versus the

19   field supervisor only getting $30 per hour --

20   Q    Okay.  But --

21   A    -- or project coordinator, however you want to --

22   Q    Who hires the superintendents?

23   A    Me.

24   Q    You do?

25   A    Yes.

1  Q    Okay.  And do you have any construction skill?

2  A    In my background I used to work for a management company

3  that did construction, either new renovations or patching of

4  old, existing buildings.

5  Q    Okay.  Do you have any construction skill though?

6  A    No.

7  Q    Okay.  You're not a mason?

8  A    No, I'm not in any trade.

9  Q    Not -- okay.  Not in the trade?

10  A    No.

11  Q    Alright.  And you certainly -- you would agree with me

12  when you're hiring a superintendent you're not doing that

13  alone, right?  You have to speak to somebody about that?

14  A    Most of our superintendents that were hired already knew

15  us as a company.  So they wanted to come on board.  Ace was

16  very -- in the past very prominent in --

17  Q    But the -- that's not answering the question.  Okay?

18  A    Okay.

19  Q    The question is when you're hiring the superintendents

20  you're conferring with somebody, correct?

21  A    Myself.

22  Q    You don't hire -- you testified that you don't have any

23  construction skill.  You're not a mason.  So --

24  A    Yes, I guess I would answer yes to that question.

25  Q    Okay.  And who would you --

1  A    I would talk to everybody in our whole team of Ace

2  Masonry.

3  Q    Okay.  And everyone --

4  A    Whether it be a project manager, a project coordinator, an

5  estimator.  If they knew this person's history coming on board

6  we would all discuss it.

7  Q    Okay.  And you all make recommendations amongst yourselves

8  --

9  A    Yes.

10  Q    -- right?  Okay.  And the estimator at Ace Masonry was

11  Henry Bellavigna, correct?

12  A    Yes.

13  Q    Okay.  And the project coordinator was Robert P.

14  Bellavigna, correct?

15  A    Yes.

16  Q    Okay.  So the three of you guys would confer with one

17  another.  You would recommend that a certain mason be hired on

18  as a superintendent, correct?

19  A    No.

20  Q    Okay.  Well, let's back up a little.

21  A    Okay.

22  Q    Alright.  You testified that you confer with your project

23  coordinator and your -- and the estimator when you're hiring

24  superintendent, correct?

25  A    Yes.

1 Q    Okay.  And the super -- or -- and the estimator is Henry

2 Bellavigna, correct?

3 A    One of the estimators.

4 Q    Okay.  Is -- he's the chief estimator though, correct?

5 A    Ken Wylde was also an estimator with Ace.

6 Q    Okay.  But the question is is Henry Bellavigna -- Henry

7 Bellavigna was the chief estimator at Bella, correct?

8 A    I don't know about Bella.

9      MR. BAILEY:  At Bella?

10 BY MR. LEHMANN:

11 Q    Or at Ace, sorry.

12 A    Yes, Henry was an estimator at Ace.

13 Q    Alright.  And there was only one project coordinator,

14 correct?

15 A    Yes.

16 Q    Alright.  And that was your husband Robert Bellavigna,

17 correct?

18 A    Yes.

19 Q    Okay.  And just so that the record --

20      MR. BAILEY:  Just for the sake of the record, instead of

21 going Robert P., do you want to refer to him as Bob?  Because

22 if you get a little loose and you just say Robert, there are

23 two Robert Bellavignas.  So I would suggest we pick something

24 and we'll go with it for the record.

25      JUDGE CARTER:  We'll try to keep that straight, but

1    counsel obviously the more clear you can be in your questions

2    the better.

3        MR. LEHMANN:  Okay.  Now -- and the three of you guys

4    confer when you're deciding who to hire as a superintendent,

5    correct?

6        THE WITNESS:  No, many of my employees confer regarding a

7    new hire.  There wasn't that many new hire that I had to

8    review.  Our superintendents do the hiring of the field crew.

9    If there's a new office personnel I would be the one to review

10   the resume and hire.

11   BY MR. LEHMANN:

12   Q    Okay.  Without any construction experience?

13   A    Yes.

14   Q    Correct?

15   A    I have 10 years of construction background.

16   Q    Okay.  Were you referring to an office employee when you

17   said that you would review their resume and hire them?

18   A    No, I wasn't.

19   Q    You were talking about a superintendent?

20   A    No.  If -- a superintendent really isn't an office

21   employee.  A superintendent is a union member that works in the

22   field.

23   Q    That's right.  And so you review their resumes by yourself

24   and hire them, after conferring with Henry and Bob?

25   A    No.

1      MR. BAILEY:  Objection.  That's a complete

2   mischaracterization of the testimony.  I mean he can try to

3   take her words and finagle them any way he wants, but she

4   didn't testify that she only spoke with Bob and Henry.  She

5   specifically said no, I speak with my team.  So --

6      MR. FURLONG:  Your Honor, this is argument.  This is not -

7   - he hasn't objected.  It's argument.

8      JUDGE CARTER:  I understand the nature of the objection.

9   We'll keep it -- the objection is sustained.  You can rephrase

10   the question.

11      MR. LEHMANN:  Do -- are there occasions where employees

12   are disciplined?

13      THE WITNESS:  Yes.

14   BY MR. LEHMANN:

15   Q    Okay.  And does the project coordinator have the authority

16   to discipline employees?

17   A    Usually a project manager.

18   Q    Usually the project manager?

19   A    Yes.

20   Q    On their particular project?

21   A    There have not been too many cases that we needed to

22   discipline our employees.

23   Q    Okay.  But there have been occasions when you've

24   discipline employees on their projects?

25   A    I've had to, yes.

1   Q    Okay.  And so has the project manager, correct?

2   A    Yes.

3   Q    Okay.  And the project managers, looking at General

4   Counsel's exhibit 3, would include Henry Bellavigna, correct?

5   A    Yes.

6   Q    Okay.

7   A    And more.

8        MR. BAILEY:  I would object to --

9        MR. LEHMANN:  That's not --

10       MR. BAILEY:  Just -- Your Honor, one, we're blanketly

11  referring to exhibit 3 -- General Counsel's exhibit 3, which

12  specifically is limited to a scope of time.  So let the record

13  reflect that as of January 1, 2011 through March 30th 2012 there

14  are a list of names that identify their title.  If he's asking

15  who the project managers are for a period of time, I'll

16  certainly allow her to ask (sic) it.  But the way it's phrased

17  as it is, I don't know what period of time he's referring to.

18       MR. LEHMANN:  Your Honor --

19       MR. FURLONG:  Well, the document speaks for --

20       MR. LEHMANN:  Right and --

21       JUDGE CARTER:  Well, I don't know if we need to --

22       MR. BAILEY:  But his question doesn't.

23       MR. LEHMANN:  I wasn't --

24       JUDGE CARTER:  Overruled, overruled.  If there's confusion

25  about that we'll take it up, but I don't see that as an issue

1   right now.  Overruled.

2   BY MR. LEHMANN:

3   Q    It's your testimony though -- testimony that project

4   managers have the authority to discipline, correct?

5   A    Yes.

6   Q    And in fact they have disciplined.  When it's been called

7   for on jobs project managers have disciplined employees,

8   correct?

9   A    Not only project managers, but superintendents and myself

10  also.

11  Q    Okay.  But that also includes project managers --

12  A    Yes.

13  Q    -- right?  And Henry Bellavigna was a project manager at

14  Ace Masonry, correct?

15  A    Yes, there were more though.

16  Q    Now, did you do -- did Ace Masonry do the bulk of their

17  hiring like in the spring time of any given --

18  A    No.

19  Q    -- construction year?  They kept employees year round?

20  A    It depended on the work throughout the year.

21  Q    Depended on the work throughout the year?

22  A    Yes, every year was different.  Sometimes winters were

23  more busier than spring.

24  Q    Okay.  And there were times where employees were -- worked

25  on one job and then were moved to another job, correct?

1  A    Sure.

2  Q    Okay.  And who would move -- who would tell X employee to

3  go from one job to another job?

4  A    Either the project managers or the project coordinator.

5  Are you just referring to like the superintendents though?  You

6  have to rephrase that question and ask it again.

7  Q    Okay.  Who -- you have one employee working at a Cornell

8  job.

9  A    Okay.

10  Q    Okay?  And there's another job that opens up a SUNY

11  Binghamton, okay, where that employee goes to SUNY Binghamton.

12  Who's directing that employee to go over to SUNY Binghamton?

13  A    The superintendent.  I'm sorry.

14  Q    Okay.  And who is telling the superintendent that an

15  employee needs -- is needed at SUNY Binghamton?

16  A    Usually the superintendents didn't need to be told where

17  employees need to go.  If they're overseeing the jobs they knew

18  where manpower needed to be.

19  Q    Okay.  You have a superintendent doing -- working on one

20  particular job?

21  A    No, superintendents can be doing several jobs at one time.

22  Q    Okay.  And does the superintendent have the confer that

23  they want one employee to come over to SUNY Binghamton from

24  Cornell?

25  A    No.

```
 1   Q    They just move it on their own?

 2   A    Yes, they can.

 3   Q    So what involvement does the project coordinator have?

 4   A    Regarding what?

 5   Q    Regarding moving employees from one job to another job.

 6   A    If the superintendent wants to discuss that with them it's

 7   his right to.

 8   Q    And the superintendent would go to the project coordinator

 9   and discuss that?

10   A    Mainly the project manager.

11   Q    Okay.  But they could go to the project coordinator?

12   A    Yes.

13   Q    Alright.  And in fact, over the years that's happened,

14   right?

15   A    I'm sure.

16        MR. BAILEY:  What's happened?

17        THE WITNESS:  Yeah.

18   BY MR. LEHMANN:

19   Q    Going to the project coordinator for moving one employee

20   to another job.

21   A    From time to time maybe.

22        JUDGE CARTER:  Is this something you have firsthand

23   knowledge about?

24        THE WITNESS:  (No audible answer)

25        JUDGE CARTER:  Is that a yes?
```

1      THE WITNESS:  Yes.  Do you want me to give you an example

2  or anything?

3      JUDGE CARTER:  No, I'll leave that to counsel.

4      THE WITNESS:  Okay.

5  BY MR. LEHMANN:

6  Q    Sure.  Give me an example.

7      MR. BAILEY:  Of what?

8      MR. LEHMANN:  Of where -- of an instance where you have

9  firsthand knowledge of a superintendent going over to the

10  project coordinator and talking about moving employees from job

11  to job.

12      THE WITNESS:  Usually the project coordinator and myself

13  are in the room.  That's why I would know that.

14  BY MR. LEHMANN:

15  Q    In the room?

16  A    Where the superintendent is asking both myself and the

17  project coordinator about that employee moving from job to job.

18  Q    Okay.  That wouldn't be an example.  Can you give me an

19  example?

20  A    Well --

21      MR. BAILEY:  Of what?

22      THE WITNESS:  -- that would be an example, because I was

23  in the room with the project coordinator and the

24  superintendent.  That's why I would know the knowledge of that.

25  BY MR. LEHMANN:

 1    Q    Okay.  And what was said during this time?

 2    A    There have been a few times that I have been in

 3    conversation with the project coordinator and the

 4    superintendent regarding employees and how do you feel this

 5    employee would do here and versus going there.

 6    Q    Okay.  And any recommendations being made by the project

 7    coordinator?

 8    A    I'm sure he's voiced his opinion, yes.

 9    Q    Okay.  And who has the final say?

10    A    I do.

11    Q    Okay.  You do?

12    A    Yes, I do.

13    Q    Alright.  With recommendations from both the

14    superintendent and the project coordinator?

15    A    Yes.

16         JUDGE CARTER:  There's --

17         THE WITNESS:  Sorry.

18    BY MR. LEHMANN:

19    Q    That was a yes?

20    A    Yes.

21    Q    Okay.  And we're talking about moving an employee specific

22    work location from one to -- one job to another job, correct?

23    A    Yes.

24    Q    Just so that I'm clear.  And when -- strike that.  Now,

25    your husband, Robert, has worked for Ace from 2002 --

1   A    Yes.

2   Q    -- from its inception?  And he worked -- he continued

3   working for Ace until December 16th 2011?

4   A    Sometime in December.  I don't know the exact date.

5   Q    Okay.  Well, I'm going to refer you to General Counsel

6   exhibit 3.

7   A    Okay.

8   Q    Okay.  And for Robert P. Bellavigna it says date last

9   worked December 16th 2011, correct?

10   A    Yes.

11   Q    And if I'm reading General Counsel exhibit 3 correct, he

12   was the only project coordinator, right?

13   A    Yes.

14   Q    Now, you would agree with me that you and Robert, your

15   husband, Robert P., ran Ace, correct?  You and your husband ran

16   Ace?

17   A    He was an employee of Ace Masonry since 2002.

18   Q    Okay.  But the question --

19   A    I was sole owner --

20   Q    But --

21   A    -- and I ran Ace.

22   Q    Okay.  But the question is you and Robert P. ran Ace

23   together, correct?

24        MR. BAILEY:  Objection, it's asked and answered.  She

25   explained how the company is run.  He can't beat her into

1  admitting.

2      JUDGE CARTER:  Overruled.

3      THE WITNESS:  Okay.  What was the question?

4      MR. LEHMANN:  Okay.  You and Robert P. ran Ace, correct?

5      THE WITNESS:  In what regard to you mean ran ace?

6  BY MR. LEHMANN:

7  Q    The two --

8  A    I did all of the bookwork, all of the accounting.  He

9  oversaw some of the field crew and he was an employee of Ace.

10 Q    Okay.

11 A    I mean if you want to ask that question I think you should

12 be more specific in what you mean by running Ace.

13 Q    Okay.

14     MR. FURLONG:  Objection, move to strike.

15     MR. BAILEY:  Well, the witness is --

16     JUDGE CARTER:  Overruled.

17     MR. BAILEY:  -- explaining the natural confusion that's

18 coming --

19     JUDGE CARTER:  Overruled.

20     MR. BAILEY:  -- with these questions.

21     JUDGE CARTER:  Overruled.  Counsel, overruled.

22     MR. LEHMANN:  You guys were in charge, correct?

23     MR. BAILEY:  Object.  What does he mean by in charge?

24 We're doing the same dance.  He's trying to get her to --

25     JUDGE CARTER:  I understand.

1    MR. BAILEY:  -- admit to something.  Just because he

2  doesn't like the answer doesn't mean you get it beat a witness

3  into admitting to something.

4    JUDGE CARTER:  Well, your witness just asked him to be

5  more specific about what he was asking about.  So he's trying

6  to do that now.  Overruled.

7    THE WITNESS:  Okay.  What were you asking again?

8    MR. LEHMANN:  The two of you guys were in charge --

9    MR. BAILEY:  Who are you guys?

10    MR. LEHMANN:  -- of Ace Masonry?

11    JUDGE CARTER:  The witness can answer the question if she

12  understands it.  Overruled.

13    MR. LEHMANN:  You and your husband were in charge of Ace

14  Masonry, correct?  Yes or no?

15    THE WITNESS:  My husband and I were a big part of Ace

16  Masonry, yes.

17                **CONTINUED DIRECT EXAMINATION**

18  BY MR. LEHMANN:

19  Q    Okay.  And when you say the two of you were a big part of

20  Ace Masonry, the two of you ran Ace, correct?

21    MR. BAILEY:  Objection, asked --

22    THE WITNESS:  No.

23    MR. BAILEY:  -- and answered.

24    THE WITNESS:  Sorry.

25    JUDGE CARTER:  Overruled.  The witness can answer the

1  question.

2       MR. LEHMANN:  Alright.  Okay.  I'm ready, Your Honor.

3       JUDGE CARTER:  Okay.  Well, we're still on the record.

4  BY MR. LEHMANN:

5  Q    So -- alright.  I'm still maybe not clear if I understood

6  the answer.  But what specifically did you do at Ace Masonry?

7  A    I ran the business in full regarding the overseeing the

8  whole business from the accounting standpoint, bookkeeping,

9  accounts receivables, accounts payables, overseeing what time

10  came in from the field supervisors.

11  Q    Okay.  So basically the office work; accounts payable,

12  accounts receivable.  And Robert P., what did he do?

13  A    He was a project coordinator that would -- I thought I

14  answered this.

15  Q    He would oversee the field, correct?

16  A    Yes, and he would also talk to customers about potential

17  work, and bid work, and quote work, new work.

18  Q    Okay.  So putting the two, the office work together and

19  the field work together, the two of you ran Ace Masonry,

20  correct?

21       MR. BAILEY:  How many times are we going to do this?  This

22  is ridiculous.

23       JUDGE CARTER:  Objection, sustained.  I think you're going

24  to have to argue that point based on the evidence you've got

25  and their respective responsibilities.

1      MR. LEHMANN:  Okay.

2  BY MR. LEHMANN:

3  Q    If someone said that the two of you ran Ace --

4      MR. BAILEY:  Gee, oh my God.  Really?  Really?

5      MR. LEHMANN:  Your husband Robert P. had the authority to

6  sign Ace's checks?

7      THE WITNESS:  He was a signer at one point in the

8  company's time --

9      MR. LEHMANN:  Okay.  And --

10      THE WITNESS:  -- of ownership.

11  BY MR. LEHMANN:

12  Q    And what point was that?

13  A    You'd have to look in the paperwork.

14  Q    Okay.

15  A    The resolutions.

16  Q    Okay.  Well, you're the owner of Ace Masonry, correct?

17  A    Yes, I am.

18  Q    So you would know who has the authority to sign checks on

19  behalf of Ace, correct?

20  A    Yes.

21  Q    Okay.  And in 2011 did Robert -- did your husband have the

22  authority to sign Ace's checks?

23  A    Yes.

24  Q    Okay.  And in 2010 he had the authority to sign checks?

25  A    Yes.

1   Q    How many bank accounts does Ace have?

2   A    Two.

3   Q    Is there a distinguishing -- is there a difference between

4   the two?  Is one for contracts and the other is --

5   A    No, they're both Ace checking accounts.

6   Q    They're both Ace checking accounts?

7   A    Yes.

8   Q    Now, Henry Bellavigna is your father-in-law?

9   A    Yes, he is.

10  Q    And he is Robert P.'s father?

11  A    Yes.

12  Q    And he worked for Ace from 2002, correct?

13  A    If he did I do not have a record of it.  I don't know when

14  Henry really started for Ace.  We had a different bookkeeping

15  company called L-A-P that did the payroll and I don't have any

16  payroll records showing when Henry actually started.

17  Q    Okay.  Well, when's the earliest that --

18  A    2004.

19  Q    2004 is the earliest that you can recollection?

20  A    Yes.

21  Q    Okay.  And he worked until October 14th 2011?

22  A    Yes.

23  Q    Okay.  You recall the last job that he worked on for Ace?

24  A    No, at the time I do not recall where Henry was in October

25  for the Ace jobs.  I don't think he was probably working on any

1    job.  He was probably estimating for the company.  Do I --

2         JUDGE CARTER:  You can't ask counsel --

3         MR. BAILEY:  I can't tell you.

4         JUDGE CARTER:  -- questions --

5         THE WITNESS:  Alright.  Well, there was a period of time

6    that I wasn't doing very good.  People were going to buy --

7    BY MR. LEHMANN:

8    Q    Okay.  Alright.  The --

9         MR. BAILEY:  Well, if he's going to ask the question let

10   her answer the question.

11        MR. LEHMANN:  Well, but the question was do you remember -

12   -

13        JUDGE CARTER:  Hang on a minute, counsel.  He has the

14   right to put another question to the -- to his witness, even if

15   she's in the middle of her answer.  Now, if any other counsel

16   want to give her a chance elaborate, you can when it's your

17   turn.  Overruled.

18        MR. LEHMANN:  So you can't remember the last job that he

19   worked on --

20        THE WITNESS:  No.

21   BY MR. LEHMANN:

22   Q    -- is that your testimony?  Alright.  He was the project

23   manager for Odessa Montour?

24   A    One of them.  Not very long.

25   Q    Okay.  There were more than one project managers for --

1   A   Yes.

2   Q   -- Odessa Montour?  Okay.  Now, the Odessa Montour job

3   that I was referring to, I'm going to refer you to General

4   Counsel exhibit 2, on the first page job number 10-08.

5   A   Yes.

6   Q   Is that the job that Henry was the project manager on?

7   A   Yes, he was a project manager on that job.

8   Q   And your son, Robert A. Bellavigna, also worked for Ace?

9   A   Yes.

10   Q   Okay.  And he's your son, correct?

11   A   Yes.

12   Q   And do you remember when he started working for Ace?

13   A   No, I do not.

14   Q   Okay.  He stopped working for Ace on November 7th 2011?

15   A   Yes.

16   Q   What's the earliest time you can recall your son working

17   for Ace?

18   A   Let's see, he was in high school, graduated in 2009.

19   Possibly he worked as a mason apprentice in 2008, but I'd have

20   to look back in my records to really find out that.

21   Q   And when you say apprentice you mean a union apprentice?

22   A   A mason apprentice is a union apprentice, yes.

23   Q   Okay.  And Melissa Blanchard, she also worked for Ace?

24   A   Yes, she did.

25   Q   And she was Ace's office manager?

1    A    Yes.

2    Q    And do you remember when she started working for Ace?

3    A    I know it was May, but I don't remember what year.

4    Q    Okay.  Could it be 2007?  May of 2007?

5    A    '08, '08.  I should look at this.  Hold on.  Does it have

6    a start date?

7    Q    I don't know what document you're looking at.  General

8    Counsel's exhibit 3?

9    A    Yes.

10    Q    Okay.  I don't see a start date on that.

11    A    No, I don't either.

12    Q    Okay.  So --

13    A    I know it was May 27th, but I don't know what year.

14    Q    And she -- her last day of employment at Ace was October

15    19th 2011?

16    A    Yes.

17        JUDGE CARTER:  Can estimate how many years Ms. Blanchard

18    has been with Ace?

19        THE WITNESS:  I would say she probably started in 2009.

20    May of 2009.  But it could have been 2008, but I think it was

21    2009.  I'm sorry.

22        JUDGE CARTER:  So at least two years?

23        THE WITNESS:  Yes.  That's when the computer comes in

24    handy.

25    BY MR. LEHMANN:

1  Q    What was Ms. Blanchard responsible for?

2  A    She basically answered the phones.  She was my

3  receptionist in every aspect of a receptionist's duties whether

4  it be filing or emailing someone, calling up somebody that I

5  asked to have her call about office employees' insurance

6  coverage or whatnot.  So she did a lot of office manager

7  details, you know?

8  Q    She was like an administrative assistant?

9  A    Yes.

10  Q    Okay.  She ordered supplies?

11  A    Yes.

12  Q    Drawings?  She ordered supplies and drawings --

13  A    Yes.

14  Q    -- right?

15  A    Okay.

16      MR. BAILEY:  Just when we say supplies, office supplies or

17  what are we referring to?

18      MR. LEHMANN:  What are you referring to when you said --

19      THE WITNESS:  Office supplies.

20  BY MR. LEHMANN:

21  Q    Office supplies?  Okay.  And she did -- did she do web

22  design?

23  A    Yes, I think she did.

24  Q    Okay.  And she maintained the website?  Did Ace Masonry

25  have a website?

 1    A    Yes, we did.

 2    Q    Okay.  And she maintained the website?

 3    A    Yes, she did.

 4    Q    And did she send off bid requests?

 5    A    She did the bid pro requests by fax.

 6    Q    Okay.  Alright.  And is there a subcontractor database?

 7    Did you guys have like a database of subcontractors?

 8    A    No.

 9    Q    Okay.  Or a vendors?  Do you have a vendor database?

10    A    Yes, we do.

11    Q    Okay.  And she was -- was she responsible for updating,

12    maintaining the vendor databases?

13    A    No, not always.  Sometimes I would do that.  Sometimes our

14    controller would do that.  Our project payroll officer would do

15    that in accounts payable.

16    Q    Okay.  And sometimes Ms. Blanchard would do that?

17    A    If I asked her to, yes.

18    Q    Okay.  And Randy Bell, are you familiar with Randy Bell?

19    A    Yes.

20    Q    And who is Randy Bell?

21    A    He was a superintendent for Ace Masonry.

22    Q    Okay.  And Derek Hager, are you familiar with Derek Hager?

23    A    Yes, I am.

24    Q    And who is he?

25    A    He's a superintendent for Ace Masonry.  He was.

1  Q    Okay.  And Richard Tracy?

2  A    Dick Tracy, yes, he was a superintendent for Ace too.

3  Q    Now, since 2002 Ace has been a union contractor, correct?

4  A    Yes, I don't think we became signatory until 2003, but we

5  always considered ourselves a union contractor.

6  Q    Okay.  So you've been -- you've always considered yourself

7  a union contactor, and that includes 2002 --

8  A    Yes.

9  Q    -- right?  All the way through at least December of 2011,

10 correct?

11 A    Yes.

12 Q    And you're familiar with the Laborers Union?

13 A    Yes.

14 Q    And you signed on to collective bargaining agreements with

15 the Laborers in 2002?

16 A    Yes.

17 Q    Okay.  And --

18 A    Or -- I'd have to see the record, but I don't know when it

19 was exactly.

20 Q    Okay.  But you signed on to the collective bargaining

21 agreement with the Laborers?

22 A    Yes.

23     MR. LEHMANN:  Your Honor, General Counsel's exhibit 3 was

24 received?

25     JUDGE CARTER:  It was.

1        THE WITNESS:  Thank you.

2    BY MR. LEHMANN:

3    Q    Okay.  I'm showing you what's been marked as General

4    Counsel exhibit 4.

5    A    Yes.

6    Q    This is a collective bargaining agreement.  Do you

7    recognize this agreement?

8    A    Yes.

9    Q    Okay.  And this is the collective bargaining agreement

10   that you signed?

11   A    Yes.

12              **(General Counsel's GC-4 identified)**

13        MR. LEHMANN:  Okay.  I'd offer GC-4.

14        JUDGE CARTER:  Any objections?

15        MR. FURLONG:  No objection.

16        MR. JAMESON:  No, Your Honor.

17        MR. BAILEY:  None, Your Honor.

18        JUDGE CARTER:  Very well, exhibit 4 for the General

19   Counsel admitted without objection.

20              **(General Counsel's GC-4 received in evidence)**

21   BY MR. LEHMANN:

22   Q    I'm showing you General Counsel exhibit 5.

23   A    Yes.

24   Q    Okay.  And this is the contract with the Laborers Local

25   1358?

 1  A    Yes.

 2              **(General Counsel's GC-5 identified)**

 3  Q    Okay.  And you recognize this document?

 4  A    Yes.

 5  Q    And the last page, that's your signature on the last page?

 6  A    Yes.

 7  Q    Is that your signature on the last page?

 8  A    Yes.

 9  Q    Okay.

10         JUDGE CARTER:  And maybe this is coming in your question,

11  but can you tell me the difference between number 4 and number

12  5?  Are these both the Laborers Union or some --

13         MR. LEHMANN:  They are, just different locals; Local 589

14  and Local 1358.  At this time, Your Honor, I'd like to make an

15  offer of proof that Local 589 is the Laborers local in Ithaca,

16  1358 is the Elmira and Corning.

17         JUDGE CARTER:  I see and are you offering proof on that

18  point or just --

19         MR. LEHMANN:  Yeah.

20         MR. FURLONG:  May I speak, Your Honor?

21         JUDGE CARTER:  You may.

22         MR. FURLONG:  By way of an offer of proof the Laborers are

23  going to put on Mr. Marsh who will explain that in 2008 the

24  Elmira, the Ithaca and the Binghamton locals were all

25  consolidated into a single local with a different number,

1    number 785.  So simply by way of background, at the time that

2    these contracts were negotiated you didn't have 785 yet.  They

3    had not been consolidated.  Simply to clear that up as we

4    progress I think Mr. Lehmann is going to put in all three

5    locals' contracts.

6         JUDGE CARTER:  Fair enough.

7         MR. LEHMANN:  I'd offer General Counsel's exhibit 5.

8         MR. FURLONG:  No objection.

9         MR. JAMESON:  No objection, Your Honor.

10        MR. BAILEY:  No objection to the exhibit, Your Honor.  I

11   would however point out with respect to his quote unquote offer

12   of proof, the documents, each of them specifically point out

13   their geographical jurisdiction.

14        MR. FURLONG:  Well, that's not contrary to my offer of

15   proof.  They consolidated and covered a larger geographic

16   jurisdiction.  And you'll hear it all from Mr. Mash.

17        JUDGE CARTER:  We'll see if that gets straightened out

18   once we get more testimony, but for now we'll admit the

19   document.  I take it there's no objection?

20        MR. BAILEY:  No objection, Your Honor.

21        JUDGE CARTER:  Very well.  Exhibit 5 of General Counsel

22   will be admitted without objection.

23             **(General Counsel's GC-5 received in evidence)**

24                    **CONTINUED DIRECT EXAMINATION**

25   BY MR. LEHMANN:

1    Q    I'm showing you what's been marked as General Counsel

2    exhibit 6.  Do you recognize this document?

3    A    Yes.

4    Q    Okay.  And this is the collective bargaining agreement

5    that you had with Local 7, which is down in Binghamton,

6    correct?

7    A    Yes.

8              **(General Counsel's GC-6 identified)**

9         MR. LEHMANN:  Okay.  I'd offer General Counsel's exhibit

10   6.

11        MR. FURLONG:  No objection.

12        MR. BAILEY:  I would just direct the witness' attention to

13   the final page of this to signature.  I don't see one.

14        MR. FURLONG:  That's proper for cross examination.

15        MR. BAILEY:  Or it's being offered.  I'm pointing out a

16   flaw.

17        MR. JAMESON:  Object to the characterization flaw, Your

18   Honor.

19        JUDGE CARTER:  Well, just a minute.  Alright.  So we've

20   got -- so I take it you're objecting based on the lack of

21   authentication of this --

22        MR. BAILEY:  Judge, I just want to make sure the witness

23   takes the time, reviews it and she's comfortable with it.

24        JUDGE CARTER:  Okay.  Fair enough.  So let me ask you,

25   this exhibit number 6 for General Counsel, do you recognize

1   this document even though it's not signed?

2       THE WITNESS:  I am wondering why my signature is not on

3   it.  So I am questioning the document also.  Because if I

4   signed a collective bargaining agreement my signature would be

5   on it.

6       JUDGE CARTER:  And which page are you looking --

7       THE WITNESS:  The very last page.

8       MR. BAILEY:  Bless you.

9       JUDGE CARTER:  I see there's a handwritten -- Ace Masonry

10  is handwritten but there's no signature by a representative of

11  Ace, is that --

12      THE WITNESS:  Correct.

13      JUDGE CARTER:  -- correct?  Putting that aside, do you

14  recognize the document?  And if you need a chance to look it

15  over, I'll give you time for that.

16      THE WITNESS:  No, I really do not recognize Local Union 7

17  and signing anything with them.

18      JUDGE CARTER:  Further questions?

19                  **CONTINUED DIRECT EXAMINATION**

20  BY MR. LEHMANN:

21  Q    You -- back in 2003 you did work down in Binghamton?

22  2003?

23  A    I'd have to look back in my jobs.

24  Q    Okay.  Based on your recollection is there ever a time

25  when you didn't do work down in Binghamton since 2002?

1   A    I'd have to look back in my job list to see if I preformed

2   work in Binghamton back in 2002.  I don't recall anything right

3   now.

4   Q    Okay.  If you did --

5   A    Yes.

6   Q    -- do work down in Binghamton in 2003 through 2006, you'd

7   be a -- you were a union contractor during that time, correct?

8   A    If we did perform work we were a union contractor, yes.

9   Q    Okay.  And during that time period if you did work down in

10  Binghamton you would have been signatory to this contract,

11  correct?

12  A    Not if I didn't sign it.

13  Q    Okay.

14      MR. FURLONG:  Well, that calls for a legal conclusion.

15  Obviously, you can have a verbal collective bargaining

16  agreement.  But in any event --

17      MR. BAILEY:  Or you can just let the witness answer.  Even

18  better.

19      JUDGE CARTER:  We have --

20      MR. FURLONG:  Well, no, it calls for -- I have --

21      MR. BAILEY:  Even better.

22      MR. FURLONG:  I have an objection.

23      JUDGE CARTER:  We have a question and an answer.  So if

24  you have further questions you can ask him when it's time for

25  your questions.

1        MR. FURLONG:  Okay.

2        MR. LEHMANN:  You've sent remittance forms in for Local 7,

3   correct?

4        THE WITNESS:  Yes.

5   BY MR. LEHMANN:

6   Q    Okay.  And what are remittance forms?

7   A    Benefit forms for the employees.

8   Q    Okay.  And who signs off on those?

9   A    The payroll manager.

10  Q    Okay.  And the payroll manager for Ace was who?

11  A    Well, it depended on what period of time, but Nicole

12  Morse.

13  Q    During this period of time?

14  A    What period of time?

15  Q    In 2003 through 2006?

16  A    I don't know.

17  Q    Okay.  Now, you're familiar with the Bricklayers Union,

18  correct?

19  A    Yes.

20  Q    And you signed on to a collective bargaining agreement

21  with the Bricklayers as well?

22  A    I'd have to see it.  I don't know what year, but I know

23  that it's expired as these have expired.

24  Q    Okay.  Your testimony is you don't remember signing on to

25  a Bricklayers' contract?

1  A    I'm sure I did, but I don't know what year.

2  Q    Okay.

3       MR. BAILEY:  Judge, if I can have two minutes?  There are

4  two non-party people that are supposed to show up as of 1:00

5  O'clock.  It doesn't seem like we're going to get to them at

6  1:00 O'clock.  I'd like to allow them to stay at their job and

7  make money if at all possible.

8       JUDGE CARTER:  Alright.  Well, let me ask for the agency

9  is there much more to your direct at this point for Ms.

10 Bellavigna?

11      MR. LEHMANN:  Yes.

12      JUDGE CARTER:  Alright.  Actually, this is a good time to

13 go ahead and take a break then.  So we'll go ahead and take a

14 lunch break.  Come back at 1:30.  And then obviously during the

15 break if counsel can confer about any subpoena document issues

16 and you can also contact your witnesses.

17      MR. BAILEY:  That's be great --

18      JUDGE CARTER:  Off the record.

19          **(Whereupon, a brief recess was taken)**

20

```
 1                   A F T E R N O O N   S E S S I O N
 2          JUDGE CARTER:  Back on the record.
 3          And we are ready for further questions from the acting
 4   General Counsel.
 5                   CONTINUED DIRECT EXAMINATION
 6   BY MR. LEHMANN:
 7   Q     I'm showing you what's been marked as General Counsel's
 8   exhibit 7, 8 and 9.
 9   A     I only have 7.  Thank you.
10          MR. LEHMANN:  Mr. Bailey, do you have 7, 8 and 9?
11          MR. BAILEY:  I do.
12          MR. LEHMANN:  Okay.
13   BY MR. LEHMANN:
14   Q     Do you recognize these documents?
15   A     Yes.
16   Q     Okay.  And the General Counsel exhibit 7 is the collective
17   bargaining agreement with the Bricklayers, correct?
18   A     Yes.
19                   (General Counsel's GC-7 identified)
20   Q     And general -- or General Counsel's exhibit 8 is your --
21   you signed that form, the employer association member form?
22   A     Yes.
23                   (General Counsel's GC-8 identified)
24   Q     Okay.  And the same question with General Counsel's
25   exhibit 9, you signed that form?
```

1  A    Yes.

2      MR. LEHMANN:  Okay.  I'd offer 7, 8 and 9.

3      MR. FURLONG:  No objection.

4      MR. JAMESON:  No objection.

5      MR. BAILEY:  I guess I don't know what 8 and 9 are.  I

6  mean are we going to be told what they are?

7      JUDGE CARTER:  Right.  I assume you'll be establishing

8  some kind of connection with these documents to your proof in

9  the case?

10     MR. LEHMANN:  Oh, actually I'm going to direct the --

11 BY MR. LEHMANN:

12 Q   Ms. Bellavigna, they are the last two pages in the -- in

13 General Counsel's exhibit 7.  8 and 9 are the signature pages

14 to 7.

15             **(General Counsel's GC-9 identified)**

16     MR. BAILEY:  Are we --

17     MR. LEHMANN:  33 and 34, 35 and 36.

18     MR. BAILEY:  It's not the last page and I don't know if

19 you're testifying to this or you're asking my client this.

20     MR. LEHMANN:  Well, it is the last page.

21     MR. BAILEY:  Which exhibit?

22     MR. JAMESON:  If you look at GC-7 the last two pages, page

23 33 and 34 and/or 35 and 36.

24     MR. BAILEY:  One is last, one is not last.  I'm just

25 trying to clarify it.

1    JUDGE CARTER:  We understand --

2    MR. LEHMANN:  Well, okay, right.

3    JUDGE CARTER:  But the --

4    MR. JAMESON:  Right.  So GC-8 would correlate --

5    JUDGE CARTER:  Counsel, I think we got it.

6    MR. JAMESON:  Alright.

7    JUDGE CARTER:  So we understand that these are purported

8  to be the last two pages that go along -- exhibit 8 and 9 for

9  General Counsel, do you recognize those two documents?

10    THE WITNESS:  Yes.

11    JUDGE CARTER:  And are they related in some fashion, if

12  you remember, to GC exhibit 7?

13    THE WITNESS:  It looks like they're identical in pages 33,

14  and 34, and 35 and 36 of what GC-7 was issued.

15    MR. LEHMANN:  Okay.  So I'd -- with that understanding I'd

16  offer GC-7, 8 and 9.

17    MR. BAILEY:  No objection.

18    JUDGE CARTER:  Exhibits 7, 8 and 9 for acting General

19  Counsel admitted without objection.  And this will apparent

20  from the documents themselves, but essentially what's going on

21  is exhibit 7 has two unsigned signature pages and then 8 and 9

22  are the signed versions of those two pages or four pages.

23    **(General Counsel's GC-7 through 9 received in evidence)**

24                   **CONTINUED DIRECT EXAMINATION**

25  BY MR. LEHMANN:


                    BURKE COURT REPORTING, LLC
                   1044 Route 23 North, Suite 316
                      Wayne, New Jersey 07470
                         (973) 692-0660

1   Q    You've familiar with the Carpenters Union?

2   A    Yes.

3   Q    And you signed -- excuse me.  And you signed onto

4   collective bargaining agreements with the Carpenters, correct?

5   A    Yes.

6   Q    Okay.  I'm showing you what's been marked as General

7   Counsel's exhibit 10 and General Counsel's exhibit 11.

8   A    Yes.

9   Q    And you recognize these documents as well?

10  A    This can't go with this book, so no.

11  Q    No, the question was do you recognize -- let's take these

12  one at a time.  Do you recognize General Counsel's exhibit 10?

13  A    Yes.

14  Q    Okay.  And you are a signator on this collective

15  bargaining agreement, correct?

16  A    No.

17  Q    Well, you might not have signed the -- the signature page

18  might not be attached with the Carpenters -- with GC-10, but

19  you're a signatory to GC-10, correct?

20  A    No.

21  Q    You're not a -- do you have -- have you signed a

22  collective bargaining agreement with the Carpenters?

23  A    Yes.

24  Q    Okay.  And which collective bargaining agreement with the

25  Carpenters did you sign?

1    A    It looks like GC-11 dated January 26th of '06.

2            **(General Counsel's GC-11 identified)**

3    Q    Okay.  Have you seen GC-10 before?

4    A    I'm not sure.

5    Q    Now, I'm going to direct your attention to the first

6    paragraph of GC-11.  The second sentence "the employer agrees

7    to be bound to the Council's collective bargaining agreement

8    with the Construction Trade Employers of South Central New York

9    effective May 1st 2006".

10   A    So this one is covering this agreement?  Is that what

11   that's stating?

12   Q    Well, yeah.

13   A    Well, then I would imagine this goes with GC-10.

14   Q    Okay.  So --

15   A    Why would I have signed it in January through?

16        JUDGE CARTER:  Well, just to be clear, you shouldn't

17   speculate on --

18        THE WITNESS:  I'm sorry, I'm sorry.

19        JUDGE CARTER:  If you know something to be true then --

20        MR. LEHMANN:  Okay.

21        JUDGE CARTER:  -- give that answer, but --

22        THE WITNESS:  Okay.  I will give the answer, sorry.

23   BY MR. LEHMANN:

24   Q    Okay.  So you do recognize General Counsel exhibit 10?

25   A    No.

1  Q     Okay.  You've never seen it before?

2  A     I'm not sure.

3        MR. LEHMANN:  Okay.  I would offer GC-10 and 11 at this

4  time.

5        MR. FURLONG:  No objection.

6        MR. JAMESON:  No objection.

7        MR. BAILEY:  I'll object.  There's no foundation.  She

8  said she doesn't know if she's ever signed it.  She doesn't --

9  I mean there is no foundation.

10       JUDGE CARTER:  Well, you're objecting to 10 I take it?

11       MR. BAILEY:  I'm objecting to 10, yeah.

12       JUDGE CARTER:  But as to 11?

13       MR. BAILEY:  As to 11 I guess I need to hear a little bit

14  more.  I don't know what it applies to.  He hasn't really

15  established a foundation for that one either, Judge.

16       JUDGE CARTER:  That one is a -- we've got her signature on

17  that form, and it references the Carpenters and then we don't

18  have the agreement that it references, but it certainly

19  references the Carpenters.  So --

20       MR. BAILEY:  To that extent yes, but without the agreement

21  how do we know what we're agreeing to?

22       JUDGE CARTER:  Well, that's going to be part of their

23  proof, but the document is still admissible.  So your objection

24  is overruled as to number 11, but I'll sustain the objection to

25  10, pending further evidence.  But for the record exhibit 11

1   will be admitted over objection.

2           **(General Counsel's GC-11 received in evidence)**

3               **CONTINUED DIRECT EXAMINATION**

4   BY MR. LEHMANN:

5   Q     Now, with respect to the Laborers, Ace never notified the

6   Laborers at any time that it was terminating the contract?

7   A     Not to my knowledge.

8   Q     Okay.  Or terminating the relationship?

9   A     No.

10  Q     And with the Bricklayers, Ace never notified the

11  Bricklayers at any time that it was terminating the contract?

12  A     I never notified the Bricklayers.

13  Q     Okay.  And the relationship continued?

14  A     The relationship with the Bricklayers Union?

15  Q     Yes.

16  A     With who?  Me?

17  Q     With Ace Masonry?

18  A     With Ace Masonry.  At what time?

19  Q     Continued all the way through December of 2011.

20  A     No.

21  Q     Well, Ace is still in business --

22  A     Yes.

23  Q     -- correct?  Okay.  So it continues all the way to today?

24          MR. BAILEY:  Objection, Your Honor.  I guess it calls for

25  a legal conclusion.  He's asked if she signed, he's asked if

1   she's terminated those agreements.  That's it.  As for whether

2   there's a legal relationship, that is a legal conclusion that

3   you have to make.

4        JUDGE CARTER:  She can answer if she knows and obviously

5   I'll have to weigh that as a factor in the overall analysis,

6   but overruled.

7        THE WITNESS:  Is there a relationship now with the

8   Bricklayers Union?

9   BY MR. LEHMANN:

10  Q    That's correct.

11  A    And myself or Ace?

12  Q    Uh-huh.

13  A    I have not closed my door and wrote a note, so I would say

14  yes, it still exists.

15  Q    Okay.  And Ace never notified the Carpenters at any time

16  that it was terminating the contract?

17  A    No.

18  Q    Or the relationship with the Carpenters either, correct?

19  A    No.

20  Q    No what?

21  A    Ace did not terminate.

22  Q    The contract or the relationship?

23  A    Correct.

24  Q    Now, in fact at least until the end of 2011 you held Ace

25  out as a union contractor, correct?

1   A     Yes.

2   Q     Okay.  And all the field employees were union members?

3   A     Yes.

4   Q     And they belonged to either one of the three bargaining

5   units, the Bricklayers, the Carpenters or the Laborers?

6   A     Yes.

7   Q     And you paid the appropriate contractual wages to the

8   employees?

9   A     Yes.

10   Q     Okay.  And that was all the way through present time?

11   A     No.

12   Q     Okay.  You paid the appropriate contractual wages through

13   December of 2011?

14   A     I paid -- what wages are you talking about?  Paying the

15   union benefits or my employees' work hours?

16   Q     The -- well, I'm taking one at a time.  The contractual

17   wages?

18   A     Yes.

19   Q     Okay.  And you submitted remittance forms on a monthly

20   basis?

21   A     Yes.

22   Q     To all three; the Carpenters, the Bricklayers and the

23   Laborers?

24   A     To my knowledge, yes.

25   Q     Okay.  And you -- from 2002 or 2003 you continued to apply

```
 1   the terms and conditions of the collective bargaining

 2   agreements to the work that was being performed by your

 3   employees, correct?

 4   A    Yes.

 5   Q    And when changes occurred in collective bargaining

 6   agreements throughout the years, you made those changes, you

 7   followed those changes, you implemented those changes?

 8   A    If the dues changed, yes.

 9   Q    Okay.  Not just the dues though, right?  The wages, if

10   they changed, you changed --

11   A    Yes.

12   Q    -- along with it, right?  All the way through December of

13   2011 --

14   A    Yes.

15   Q    -- right?  And if the -- so if the employer association

16   fees changed you made those changes all the way through

17   December of 2011, correct?

18   A    Employer association fees?

19   Q    Uh-huh.

20   A    Can you --

21   Q    You don't know what employer association fees are?

22   A    You mean the benefits for the package?

23   Q    No, fees that you paid the employer association.

24   A    The union rate?

25   Q    Fees that you -- fees that are in the collective
```

1    bargaining agreement that are referred to the employer

2    association, if those fees went up you made those changes and

3    you paid those changes also?

4    A    I don't know.  I --

5    Q    Okay.

6    A    If I knew more of what you were saying about what fees

7    then I could answer that.

8    Q    Okay.  I'll move on.  The shift differentials, you know

9    what shift --

10    A    Yes.

11    Q    You paid those -- you paid -- if there were changes from

12    2002 or 2003 all the way to December of 2011, if there were

13    changes in shift differentials you made those changes

14    appropriately, correct?

15    A    Yes.

16    Q    Okay.  And the same -- strike that.  Now, in fact you also

17    performed jobs that only a union contractor could perform,

18    correct?

19    A    Yes.

20    Q    And you're familiar with Cornell?

21    A    Yes.

22    Q    And Cornell has a private side and a public side, correct?

23    A    It has three sides I believe.

24    Q    Okay.  And what's the third side?

25    A    There's state side, private and endowed.  Three.

1  Q    Okay.  But on the endowed side, that's union only --

2  that's only -- that's union only work, correct?

3  A    I don't know.

4  Q    You don't know?  Okay.  So what example -- I mean you

5  testified that you performed jobs that only a union contractor

6  could perform.  What jobs are you referring to?

7  A    To answer your question we were a union contractor, yes.

8  Did we perform only union jobs?  I don't know.  Some were

9  private bids, some were primary that you had to be a union

10 signatory contractor.

11 Q    Okay.  Did you -- do you have any knowledge of whether or

12 not certain jobs at Cornell must be union?

13 A    No.

14 Q    You have no knowledge with that?

15 A    No, I really don't know.  I mean I don't have any

16 knowledge.  Some people are non-union that bid work there.

17 Okay?

18 Q    Okay.  You have a standing contract with Cornell, correct?

19 A    No.

20 Q    You don't have a standing contract?  At any time in 2011

21 did you have a standing contract?

22 A    We've had several contracts with Cornell, but they're not

23 ongoing right now.

24 Q    I understand that.  Did you have an on -- you had an on-

25 call contract with Cornell?

1    A    Yeah, that's the JOCS *(sic)* program.

2    Q    Okay.  I'm going to refer you to General Counsel exhibit

3    2.

4    A    Uh-huh.

5    Q    The last page, job 11-33.

6    A    Yes.

7    Q    The J-O-C McGraw Hall.

8    A    Yes.

9    Q    You're familiar with that job?

10   A    It's a job that we did for Cornell University at McGraw

11   Hall and it was through -- run through the JOCS *(sic)* program.

12   Q    Okay.  Are you familiar with that job?

13   A    No.

14   Q    Have you ever heard of that job before?

15   A    Yes.

16   Q    Okay.  But you're not familiar with the job?

17   A    No.

18   Q    You don't -- you can't testify how you even got the job?

19   A    I don't recall bidding on this job.  I'm sure it was run

20   through the JOCS *(sic)* program through Cornell University.  And

21   during September through December my involvement with Ace was

22   not right involved with the jobs as much, because I was going

23   through a hard time because my company was not doing well.

24       MR. FURLONG:  Your Honor, what do you say we take a five

25   minute break?

1        THE WITNESS:  I don't need a break.  You can go ahead.

2        MR. FURLONG:  You sure?

3        THE WITNESS:  Uh-huh.

4        JUDGE CARTER:  Let's forge ahead.

5    BY MR. LEHMANN:

6    Q    Now, you applied the collective bargaining agreements --

7    strike that.  The Laborers who performed work for you, you

8    applied the collective bargaining agreement to that work,

9    correct?

10   A    Yes.

11   Q    Okay.  The work that they were performing, the work that

12   was being performed?

13   A    They were skilled in their trade by their title, yes.

14   Q    Okay.  And the Bricklayers, you applied the Bricklayers

15   collective bargaining agreement to the work that the masons

16   were performing for Ace also?

17   A    I have to say no.  Sometimes masons would do something

18   that was carpenter oriented, you know, and it wasn't their

19   trade.  So they would perform something that had to do with

20   carpentry.  So I would be lying if I said yes.

21   Q    Alright.  So you'd follow the Carpenters contract then on

22   that work?

23   A    Do you understand what I'm saying?  Sometimes masons would

24   do something that was out of their scope of skilled trade work.

25   Q    Okay.  And you applied a collective bargaining agreement

1  to the work that they were performing?

2  A    I guess.

3  Q    Okay.

4      JUDGE CARTER:  What he's getting at is how did you pay

5  people.  Were you paying people according to their job title or

6  according to what --

7      THE WITNESS:  No, I paid by their rate of what their

8  skilled trade was.  If they were a journeyman carpenter they

9  got that rate.  If they did something that performed a masonry

10  act it would -- I would be lying to say they didn't do, you

11  know, their skilled trade.

12      JUDGE CARTER:  But that didn't matter.  You still paid

13  them the carpenter rate?

14      THE WITNESS:  Yes.

15      JUDGE CARTER:  Even if they worked outside of their trade

16  area?

17      THE WITNESS: Correct.  Yes.

18      MR. LEHMANN:  Okay.  Basically -- and just so that the

19  record is clear that applies for the Carpenters also?

20      THE WITNESS:  Yes.

21  BY MR. LEHMANN:

22  Q    And you also submitted monthly remittance forms to the

23  unions?

24  A    Yes.

25  Q    Okay.  And you submitted these remittance forms since

1   2002?

2   A    Yes.

3   Q    Okay.  And continuing all the way through December of

4   2011?

5   A    To my knowledge, yes.

6   Q    Okay.

7            **(Whereupon, a brief recess was taken)**

8         JUDGE CARTER:  Back on the record.

9         Further questions.

10        MR. LEHMANN:  I'm showing you General Counsel exhibit 12.

11        THE WITNESS:  Yes.

12  BY MR. LEHMANN:

13  Q    Do you recognize these documents?

14  A    Yes.

15  Q    And what are these?

16  A    These are benefit reports.

17  Q    And benefit reports to the Bricklayers?

18  A    Yes.

19            **(General Counsel's GC-12 identified)**

20  Q    Okay.  The international fund?

21  A    Yes.

22  Q    Okay.  And Ace or a representative from Ace filled these

23  out?

24  A    Yes.

25  Q    Either yourself or Ms. Blanchard?

1    A    Yes, and JaLynda, my controller.

2         MR. LEHMANN:  Okay.  I would offer General Counsel exhibit

3    12.

4         MR. FURLONG:  No objection.

5         MR. JAMESON:  No objection.

6         MR. BAILEY:  None.

7         JUDGE CARTER:  Exhibit 12 for General Counsel admitted

8    without objection.

9              **(General Counsel's GC-12 received in evidence)**

10   BY MR. LEHMANN:

11   Q    And I'm showing you what's been marked as GC-13.

12   A    Yes.

13   Q    Do you recognize these documents?

14   A    Yes.

15   Q    These are the remittance forms for the international for

16   the Bricklayers?

17   A    Yes.

18              **(General Counsel's GC-13 identified)**

19   Q    Signed by either yourself again or Ms. Blanchard?

20   A    And my controller.

21   Q    Right.  Is that correct?

22   A    Yes.

23   Q    Now, I'm going to refer you to General Counsel exhibit 14.

24   A    Yes.

25        MR. FURLONG:  Excuse me, Your Honor.  I don't have a copy

1   of 14.

2   BY MR. LEHMANN:

3   Q     Do you recognize these, General Counsel exhibit 14?

4   A     Yes.

5   Q     Do you recognize these?

6   A     Yes.

7   Q     Alright.  And this is the remittance forms for the

8   Laborers?

9   A     Yes.

10                  **(General Counsel's GC-14 identified)**

11  Q     Okay.  Now, I'm going to bring your attention to the

12  second -- okay.

13        MR. LEHMANN:  Your Honor, I think there was a -- at least

14  a copy in there.  There are two -- it appears that there are

15  two August forms.  They're the same form.  I only meant to

16  include one August form.  That's the second page.

17        JUDGE CARTER:  I see.  So the second page is copied twice.

18        THE WITNESS:  And the third page.

19        MR. LEHMANN:  Okay.  Actually two Septembers and two

20  Octobers.  My apologies.

21        JUDGE CARTER:  Well, that's fine.  If you -- we can still

22  discuss the exhibit and --

23        MR. LEHMANN:  Right.

24        JUDGE CARTER:  -- if you want to submit a cleaned up

25  version for the record when we get there.

1          MR. LEHMANN:  Alright.  Now, these are the remittance

2    funds for the locals -- local -- for Laborers Local 589?

3          THE WITNESS:  Yes.

4    BY MR. LEHMANN:

5    Q    Okay.  Now, I'm going to bring your attention to the

6    second page, the August 2011.

7    A    Okay.

8    Q    Well, first of all, before I -- these are handwritten by

9    Ms. Blanchard?

10   A    Yes.

11   Q    How did she know what to put the -- what dollar amounts to

12   put on these health and welfare fund, the pension fund, the

13   training fund, so on and so forth?

14   A    She should have received in July updated forms to go by

15   these amounts for fringe benefits.

16   Q    Okay.  And who would she have received them from?

17   A    Most likely Laborers Local 589.

18   A    Okay.  And when they -- she received that letter she then

19   put in the corresponding dollar amounts onto the remittance

20   form, correct?

21         MR. BAILEY:  Objection, calls for speculation.  I mean --

22         JUDGE CARTER:  She can answer if she knows.  Overruled.

23         THE WITNESS:  Can you ask the question again?  Sorry.

24         MR. LEHMANN:  The procedure when she gets that July letter

25   from the Laborers, she would then put those dollar amounts onto

1   the forms, correct?

2        THE WITNESS:  Yes.

3   BY MR. LEHMANN:

4   Q    Okay.  And the -- staying with the August 2011, the A-S-P

5   -- bring your attention all the way down to the bottom.

6   A    Yes.

7   Q    Where it's -- the construction industry is crossed out and

8   the initials A-S-P are inserted.

9   A    Yes.

10  Q    What does A-S-P stand for?

11  A    I don't remember.  It's been awhile since I've done these

12  forms.

13       MR. LEHMANN:  Okay.  I would offer --

14  BY MR. LEHMANN:

15  Q    Actually, I'm going to bring your attention to General

16  Counsel exhibit 15.

17  A    Yes.

18  Q    And you recognize these documents?

19  A    Yes.

20  Q    Okay.  This is the remittance forms that you submitted to

21  the carpenters?

22  A    Yes.

23               **(General Counsel's GC-15 identified)**

24       MR. LEHMANN:  Okay.  I would offer 13, 14 and 15.

25

1      MR. FURLONG:  No objection.

2      MR. JAMESON:  No objection.

3      MR. BAILEY:  I have some objection as to authenticity.

4  Some of these are not signed, with respect to 13.  With 14

5  they're signed apparently by Melissa Blanchard, not Lisa

6  Bellavigna.  15, the same objection.  Some are signed by

7  Melissa.  Others are not signed at all.

8      JUDGE CARTER:  Overruled.  These are all business records

9  based on what the -- based on the foundation we have.  The ones

10  that are not signed that goes to weight not admissibility.  So

11  the objection as to admissibility will be overruled and I'll

12  receive exhibits 13, 14 and 15 over objection.

13      **(General Counsel's GC-13 through 15 received in evidence)**

14  BY MR. LEHMANN:

15  Q    Now, you also -- in the collective bargaining agreements

16  there -- strike that.  You also submitted the dues

17  contributions to the unions also?

18  A    Yes.

19  Q    Okay.  And you did that from 2002, you submitted the dues

20  deductions to the Carpenters, and the Laborers and the

21  Bricklayers?

22  A    I don't think in 2002 I did Carpenters.

23  Q    Okay.  2003?

24  A    I don't know when, but yes, whenever I signed.

25  Q    Throughout -- all the way through December of 2011?

1    A    To my knowledge, yes.

2    Q    I'm showing your what's been marked as General Counsel's

3    exhibit 16.

4    A    Yes.

5    Q    Do you recognize this document?

6    A    No.

7    Q    You do not recognize this document?

8    A    No.

9    Q    Okay.  Well, who is JaLynda Ashmall?

10    A    She was my controller.

11    Q    Okay.  And you've never seen 16 before?

12    A    No.

13    Q    Okay.  Do you remember providing a check in the amount of

14    $2,509.51?

15    A    No, I don't remember that.

16    Q    I'm showing you what's been marked as General Counsel

17    exhibit 17.

18    A    Yes.

19    Q    Do you recognize this document?

20    A    No.

21    Q    Okay.  So when I say you recognize this document, you

22    don't recognize the first page.  Do you recognize the second

23    page of the document?

24    A    It's an Ace check stamped by me.

25            **(General Counsel's GC-17 identified)**

1   Q    Right.  Okay.  Your authorized signature there?

2   A    Yes.

3        MR. LEHMANN:  Okay.  I would offer General Counsel's

4   exhibit 17.

5        MR. FURLONG:  No objection.

6        MR. JAMESON:  No objection.

7        MR. BAILEY:  Object, lack of foundation.

8        JUDGE CARTER:  Sustained.  You can ask more questions and

9   lay a foundation for that document.  No, objection sustained.

10  BY MR. LEHMANN:

11  Q    Now, how long has Ms. Ashmall worked for your -- worked

12  for Ace Masonry?

13  A    I don't know when she was hired.  I think it was the end

14  of July, but I am not positive.

15  Q    Okay.  Had you seen her sign documents before?

16  A    She was my controller and she was not technically hired by

17  me.

18  Q    Okay.  Who was she hired by?

19  A    Some potential buyers that were going to buy into the

20  company wanted a controller and they hired her.  I did not have

21  anything to do with her hiring.

22  Q    So were these potential buyers, did they -- when you say

23  potential buyers, what does that mean?

24  A    My company was not doing well, and I was looking into

25  prospective people to buy into the company to help out matters,

```
 1   and have the company survive and they wanted to have a
 2   controller onboard.
 3   Q    Okay.  And she was paid by Ace?
 4   A    Yes.
 5   Q    You signed paychecks?
 6   A    Yes.
 7   Q    Her paycheck?
 8   A    Yes.
 9   Q    Okay.  And you've seen her sign documents before?
10   A    No, I haven't seen her sign any documents, but I know that
11   she did, because she was directed by the new team to do so.
12   Q    Okay.  Do you recognize this signature?
13   A    No, because I wasn't there at that time.
14   Q    Did you authorize Ms. Ashmall to sign documents for Ace?
15   A    Yes.
16        MR. LEHMANN:  Okay.  I would offer 16 and 17, based on
17   those follow up questions, again.
18        MR. BAILEY:  The same objection, Your Honor.  17 even more
19   so.  There is -- I'm sorry.  16 even more so.  There's
20   absolutely not signature from Lisa on anything.
21        JUDGE CARTER:  The ball has been advanced a little bit
22   closer to the foundation but we're still short a couple of
23   questions.  These types of payments of union dues, it hasn't
24   been that Ace has -- are you familiar with the process of Ace
25   making those payments to the Union?
```

1    THE WITNESS:  No, we would not type up anything like this

2    that would go with our regular benefit forms and turn it in.

3    So no.

4    JUDGE CARTER:  So as far as this process of a cover letter

5    and then attached a check for the amount of union dues for

6    whatever time period it is, you're not familiar with that

7    process?

8    THE WITNESS:  No, I never did it.

9    JUDGE CARTER:  Objection sustained.

10   MR. FURLONG:  Your Honor, although it's General Counsel's

11   proffered exhibit, it is Charging Party Laborers who I

12   represent.  May I ask a few voir dire questions?

13   MR. BAILEY:  Well, there's already been a ruling, Your

14   Honor.

15   JUDGE CARTER:  He's entitled to voir dire.  Overruled.

16   MR. FURLONG:  Thank you, Your Honor.

17                    **VOIR DIRE EXAMINATION**

18   BY MR. FURLONG:

19   Q    Ms. Bellavigna, when was LaJynda -- JaLynda Ashmall hired?

20   A    Sometime in July I think.

21   Q    And at the time of her hiring --

22   JUDGE CARTER:  July of what year?

23   THE WITNESS:  2011.

24   MR. FURLONG:  2011.  At the time of her hiring it becomes

25   clear to you what her duties would be as controller for Ace

1  Masonry?

2       THE WITNESS:  Yes.

3  BY MR. FURLONG:

4  Q     And what were those duties?

5  A     As a controller would oversee the books for the company

6  and the accounting.  And she basically took over a big portion

7  of what I used to do.

8  Q     Alright.  And would some of that include making payments

9  to the various labor organizations' trust funds or to the

10  organizations themselves?

11  A     Not normally.  I've never seen this letter before.

12  Q     Let me ask you this:  are you familiar with her signature?

13  A     No.

14  Q     Not this particular signature, but her signature in

15  general.  Have you even seen her signature before?

16  A     No.

17  Q     Alright.  So if you're look at her signature now it's the

18  first time you've ever seen it?

19  A     I would think that's JaLynda's signature, but I have not

20  seen it.

21  Q     Alright.  And why would you think that?

22  A     Because I don't think JaLynda would make that up.

23  Q     Alright.  That is your letterhead, "Ace relationship

24  unlimited, built on integrity and quality", at the time?  That

25  is your letterhead?

1    A    One of them.

2    Q    Okay.  And going to the second page on the Ace Masonry,

3    which has --

4    A    Where are you?

5    Q    The second page, excuse me, on General Counsel's exhibit

6    17.

7    A    Yes.

8    Q    That is your stamped signature?

9    A    Yes.

10    Q    Do you have any reason to doubt that that check was

11    tendered to Laborers Local number 785 over your signature?

12    A    No, I most likely stamped that check.

13    Q    Yourself?

14    A    Yes.

15    Q    Okay.  And if you most likely stamped that check yourself

16    did you understand that it was for payment of dues, as laid out

17    beneath your signature, to Local 785?

18    A    I signed that check as if it was going to Laborers Local

19    785.

20    Q    For the inscriptions listed below?  Am I correct on that?

21    A    For the inscriptions?

22    Q    Yes, dues from 2 backslash 11, 3 backslash 11.

23    A    I don't know if they were dues or fringes.

24    Q    But it was payments that were owed, at least as you

25    understood it, to Local 785?

1   A     Payments that were owed to 785, yes.

2   Q     And you certainly wouldn't have sent off a check for

3   hundreds of dollars if you didn't know what they were for,

4   correct?

5   A     At that time I wasn't doing to good, so I might not have

6   really know to be honest with you.

7   Q     Okay.  But we can agree that that is your signature?

8   A     Yes.

9   Q     Alright.

10  A     It's my signature stamp.

11       MR. FURLONG:  Your Honor, absent some evidence coming

12  forward from the Respondents that in fact this is a fabricated

13  document or in some fashion does not reflect LaJynda Ashmall's

14  *(sic)* signature, then I would move that it be received into

15  evidence.

16       JUDGE CARTER:  You need to have somebody who can testify

17  about this cover letter.  It has not been authenticated.  Now -

18  -

19       MR. FURLONG:  We have subpoenaed Ms. Ashmall.

20       JUDGE CARTER:  Then she can do it, but --

21       MR. JAMESON:  Your Honor, if I might?

22       JUDGE CARTER:  Hang on a minute.  Now, if you want the

23  checks by themselves that Ms. Bellavigna stamped you can have

24  those.  I mean she's admitted that she stamped those.  Now, you

25  have a linkage issue in terms of establishing what those checks

1  were for, but that's all we've got at this point.  And that's

2  as for General Counsel's exhibit 17.  So I don't know if you

3  want those separately or if you want to wait and see if you can

4  complete the record for the entire exhibit.

5        MR. FURLONG:  I'll defer.  It's not exhibit.  I'll defer

6  to General Counsel, but I would think Ms. Ashmall would be able

7  to identify her own signature.

8        JUDGE CARTER:  Alright.  Well, then for the record

9  exhibits 16 and 17 objection sustained, but obviously you have

10 the right to put on further evidence and prove it.  Now, Mister

11 --

12       MR. JAMESON:  Jameson, Your Honor.

13       JUDGE CARTER:  -- Jameson, you had a remark?

14       MR. JAMESON:  Well, I was going to ask Your Honor, the

15 witness has testified that this is her letterhead.  So it's at

16 least a business document and that would get you around the

17 hearsay rule.  We can argue later to tie up that the contents

18 on 17 exactly refer to -- because she names the check numbers.

19 Jacinda -- JaLynda identifies, by specific check numbers, the

20 remaining pages of 17.

21       JUDGE CARTER:  She testified that it's on letterhead.

22 That's not enough to establish -- get you past the hearsay

23 rule.  You need to have somebody who can explain the purpose of

24 these documents and the process by which they were retained.

25 You haven't done that.

1                    **CONTINUED DIRECT EXAMINATION**

2    BY MR. LEHMANN:

3    Q    Now, there came a time when Ace began getting into some

4    financial trouble?

5    A    Yes.

6    Q    And you got behind with the funds?

7    A    Yes.

8    Q    In fact, you've been -- you've gotten behind all three of

9    the funds --

10   A    Yes.

11   Q    -- right?  The Carpenters, Bricklayers and Laborers?

12   A    Yes.

13   Q    And all three unions have sent you letters addressing the

14   arrears in the funds?

15   A    I don't know if all three have, but I've received a lot of

16   mail regarding back dues.

17   Q    Okay.  And in fact you signed an affidavit of confession

18   of judgment for the Carpenters, correct?

19   A    I don't know what that is.  Is that the union agreement?

20   Q    Now, I'm showing you what's been marked as General

21   Counsel's exhibit 18.

22   A    Yes.

23   Q    You recognize this document?

24   A    Yes.

25   Q    And what is it?

1  A    Agreement between Ace and the unions.  The Carpenters
2  welfare pension affidavit of confession.
3              **(General Counsel's GC-18 identified)**
4  Q    And basically saying that you owe X amount of money?
5  A    That Ace owes --
6  Q    Right.
7  A    -- X amount of money.
8  Q    Okay.  And there was a court judgment on that?
9  A    I don't know.  I never received anything.
10  Q    Take a look at General Counsel's exhibit 19.
11  A    I have never seen this to my knowledge.
12  Q    Okay.  But you're aware that there was a judgment?
13  A    Yes, the Carpenters tapped into my back account and got
14  all the money out of one of my checking accounts.
15  Q    And your bank account you're referring to -- which bank
16  account are you referring to?
17  A    Tompkins Trust.
18  Q    That bank account?  Tompkins Trust bank account?
19  A    Yes.
20  Q    Okay.  And where is this?  You said -- you testified
21  earlier you had a second bank account?
22  A    Yes.
23  Q    Where is the second one located?
24       MR. BAILEY:  Objection, relevance.
25       JUDGE CARTER:  What is --

1    MR. LEHMANN:  Your Honor, I subpoenaed documents and I --

2    MR. BAILEY:  So grab the documents.

3    MR. LEHMANN:  -- vaguely remember seeing Tompkins Trust,

4    but I do not remember seeing another bank and --

5    MR. BAILEY:  Doesn't answer my objection, relevance.

6    MR. LEHMANN:  -- certainly it goes towards the alter ego;

7    the elements, the bank accounts and also my subpoenaed records.

8    MR. BAILEY:  It's thin, Your Honor.

9    JUDGE CARTER:  What's the theory for your relevance

10   objection?

11   MR. BAILEY:  Well, if we're trying to show alter ego

12   what's the point of knowing where her second account is?  I

13   don't see the point of finding out where her bank accounts are.

14   We're not looking to collect on anything right now.  They're

15   trying to establish an alter ego theory.  There is no relevance

16   as to where her second bank account is.

17   JUDGE CARTER:  You can rephrase it, but -- I'll sustain

18   the objection, but you can rephrase it to establish that they

19   are -- whether or not they're the same accounts, as opposed to

20   where they're located.

21   BY MR. LEHMANN:

22   Q    These -- the checking accounts, they're Ace checking

23   accounts?

24   A    Yes.

25   Q    Okay.  And the checking account is used for Ace business?

1    A    Yes.

2    Q    Okay.  To pay payroll?

3    A    Yes.

4        MR. LEHMANN:  Okay.  I mean I think it's relevant in as --

5    well, okay.

6    BY MR. LEHMANN:

7    Q    Who has the authority to sign on these bank accounts?

8        MR. BAILEY:  Time period?

9        MR. LEHMANN:  In 2011.

10       THE WITNESS:  On one resolution for the checking account,

11   my husband Bob Bellavigna.  And on the other one I'm the only

12   signer.

13   BY MR. LEHMANN:

14   Q    Okay.  And which checking account does your husband -- can

15   your husband sign checks on?

16   A    Tompkins Trust.

17   Q    Okay.  And only you can sign checks on the other bank

18   account?

19   A    Yes.

20       MR. LEHMANN:  Okay.  I still don't understand why -- how

21   that's -- how it's not relevant on the question.  The --

22       JUDGE CARTER:  I mean if they are -- if you establish that

23   they're the same accounts then that's the point of relevance.

24   The bank at which -- where the account is located, tell me what

25   the relevance of that is?

1      MR. LEHMANN:  Well, it goes towards -- if they've got the

2  same accounts as Bella Masonry I mean that would certainly go

3  towards the alter ego factors.

4      JUDGE CARTER:  Well, you understand what I said?  You can

5  show that they're the same accounts without establishing on the

6  record where the account is located, as long as we can identify

7  what account you're talking about.  I mean there's a Tompkins

8  Trust account we've established and there's a second account,

9  which is used by Ms. Bellavigna.  So if you can link that

10  second account to Bella in some kind of fashion then that's

11  part of your proof.  But right now I don't see the need to

12  establish the location of that account.

13      MR. LEHMANN:  Okay.  I would offer 18 and 19.

14      MR. FURLONG:  No objection.

15      MR. JAMESON:  No objection.

16      MR. BAILEY:  No objection to 18, Your Honor.  19 I have an

17  objection to.  Last time I checked a record -- a public record

18  needed to be certified.  This one does not appear to be

19  certified and it's clearly not a business record of Ace.  She's

20  never seen it before.  How can she be the person that admits

21  this into evidence?

22      MR. LEHMANN:  I would --

23      JUDGE CARTER:  Let's take the obvious one first.  So

24  exhibit 18 will be admitted without objection.  Your response

25  to the hearsay objection for 19?

1              **(General Counsel's GC-18 received in evidence)**

2         MR. LEHMANN:  I would ask that -- well, I would ask that

3    Your Honor take judicial notice of a court order in this case.

4         MR. BAILEY:  It's not a court order, Your Honor.  It's

5    signed by clerk, a county clerk.  There is no judge's signature

6    anywhere to be found on this.

7         MR. LEHMANN:  This is a judgment by confession and the

8    signature is from the county clerk.

9         MR. BAILEY:  Which is a public record which requires it to

10   be certified in order for it to be admitted into evidence

11   unless someone else is going to be here to testify to its

12   authenticity and it's admissible.  He hasn't produced that

13   witness.

14        MR. JAMESON:  Your Honor, if I might?  Looking at 19 you

15   see that it is signed by a clerk.  Without any denigration to

16   your post, Your Honor, judges' orders are not effective until

17   they're entered by the clerk on the docket and this is just one

18   of those judgments.  It's a form of an order entered by the

19   clerk.  Stamped, filed by the clerk.

20        And not all public records need be certified.  After all,

21   we could -- I don't know if this is the county seat of

22   Tompkins, but if we wanted to see the clerks records of

23   marriages or deceasements we can go down and look at the book.

24   Those are necessarily certified.

25        MR. BAILEY:  Judge, there's one other point that's worth

1  making.  There's a significant amount of handwriting on this

2  document.  I don't know -- I have no idea who's handwriting

3  that is.  And it goes to the actual amounts.  So unless this is

4  certified or unless I have someone testifying as to its

5  authenticity and admissibility, I don't know how it's accepted

6  into evidence.

7     JUDGE CARTER:  This is -- I understand the nature of the

8  objections.  I'm going to admit the document into evidence over

9  objection, but only the typewritten portions of the document,

10  because I don't have the -- so this will at least allow you to

11  show that there's a judgment that was entered against Ace for

12  this issue.  As to the amount and the handwritten entries on

13  there, you'll have to prove that by some fashion.

14     MR. LEHMANN:  Now --

15     JUDGE CARTER:  So for the record exhibit 19 is admitted

16  over objection with those restrictions.

17  **(General Counsel's GC-19 identified and received in evidence)**

18              **CONTINUED DIRECT EXAMINATION**

19  BY MR. LEHMANN:

20  Q    You would agree with me that there's no dispute that Ace

21  owes the unions' funds money, correct?

22  A    Correct.

23  Q    Okay.  And that would include Bricklayers?

24  A    Yes.

25  Q    The Laborers and the Carpenters?

1  A    Yes.

2  Q    In fact, you haven't been paying contractual benefits to

3  all three funds since at least September 1st 2011, correct?

4  A    That's wrong.

5  Q    That's wrong?

6  A    Uh-huh.

7  Q    Okay.  Let's take it one at a time.  You've been -- you

8  haven't been paying contractual benefits into the Bricklayers'

9  fund since September 1, 2011, correct?

10  A    I don't know.

11  Q    Okay.  Are you aware that you paid funds -- made payments

12  to the Bricklayers' fund after September 1, 2011?

13  A    I'd have to look into my records.

14  Q    Okay.  How about the Laborers?

15  A    I have made a payment to the Laborers.  I don't know what

16  local.  And it could have been this year, but I made a payment

17  to the Laborers local.

18  Q    Okay.  I'm going to show you -- bring your attention to

19  General Counsel exhibit 14.  Strike that.  Have you made

20  payments to the Carpenters' fund -- contractual payments to the

21  benefits fund for the Carpenters since September 1, 2011?

22  A    I don't know.

23  Q    Okay.  So you can't -- you don't remember -- strike that.

24  Have you allowed Ace's books to be audited?

25  A    Yes.

1    Q    By the Laborers?

2    A    I don't know if they worked for the Laborers.  It was

3    Joseph McCarthy (ph) I think his name is.

4    Q    And when did that audit take place?

5    A    I don't remember.  It was either in November or December.

6    I'm not sure.

7    Q    Of 2011?

8    A    Yes.

9    Q    Okay.  But you are aware that an audit took place?

10   A    Yes.

11   Q    Do you know who ordered the audit?  Do you know why an

12   auditor came and audited Ace's books?

13   A    No.

14   Q    You don't know?

15   A    No.

16   Q    Do you know that they were looking that you owned the

17   funds money?

18   A    I'm sure they were.

19   Q    Does Ace have an accountant?

20   A    Yes.

21   Q    Who is the accountant?

22   A    Green and Seifter.

23        MR. BAILEY:  For what period of time are you referencing?

24        MR. LEHMANN:  Well, yeah, now.

25        THE WITNESS:  Yes, Green and Seifter.

 1   BY MR. LEHMANN:

 2   Q    2011?

 3   A    We had Firley Moran involved in 2011 to do 2010.

 4   Q    Okay.  And when you say to do 2010 you're talking about

 5   the tax returns?

 6   A    Yes.

 7   Q    And is there a payroll system?  Does Ace have a payroll

 8   system?

 9   A    Yes.

10   Q    Okay.  And what's the payroll system?

11   A    It's based out of Ohio and it's a software program called

12   Foundation.

13   Q    Foundation?

14   A    Yes.

15   Q    And is there a time and attendance program?

16   A    No.

17   Q    Who is your workers -- in 2011 who was your Workers Comp

18   insurance carrier?

19   A    Selective I think.

20   Q    And was that for all the -- the whole year of 2011?

21   A    I believe so.

22   Q    Did Ace have any vehicles?

23   A    Yes.

24   Q    And what vehicles were they?

25        MR. BAILEY:  Again, the time period?

1  BY MR. LEHMANN:

2  Q    In 2011 did Ace have any vehicles?

3  A    Yes.

4  Q    Okay.  And what vehicles were they?

5  A    We had a 2004 Malibu, a 2005 Malibu, a Chevy van, an F-

6  450, the Mexican wagon.  It was called the Mexican wagon.  It

7  was a red van.  I believe my Denali was on Ace's, but I don't

8  know if it was 2011 or 2010.

9  Q    Your personal Delali (sic)?

10  A    Denali, uh-huh.  And a 2007 Dodge Ram.  That's all I can

11  think of.

12  Q    So in 2011 you had seven vehicles that were Ace vehicles?

13  A    I believe so.

14  Q    Okay.  Now, the 2004 Malibu who drove that vehicle?

15  A    Anybody and everybody.  I had a drivers list.  So anybody

16  that was on my drivers list could drive my Ace vehicles.

17  Q    Okay.  And the same question for the 2005.

18  A    Yes.

19  Q    Okay.  How about the Chevy van?

20  A    The same.

21  Q    Anyone could drive it?

22  A    Anyone that was on my insurance list as a driver.

23  Q    And who was the vehicle insurance through?

24  A    I think all of our -- I don't know if it was Inland

25  Marine.  I really don't recall the name of the policy and what

1    the vehicles were covered under.

2    Q    Would all seven vehicles be covered by Inland Machine

3    *(sic)*?

4    A    Yes, I believe so.  When they were owned by Ace.

5    Q    How about the F-450?

6    A    Yes.

7    Q    Anyone could drive that?

8    A    Anybody that was on my drivers list.

9    Q    Okay.  How many people are we talking about on this

10   drivers list?

11   A    Anywhere from 20 to 25.

12   Q    Okay.  How about the red van?

13   A    The same thing.

14   Q    And the Denali?

15   A    The same thing.

16   Q    And that was your -- the Denali was your --

17   A    Yeah.

18   Q    That was your personal vehicle?

19   A    Uh-huh.

20        JUDGE CARTER:  That was a yes?

21        THE WITNESS:  Yes, sorry.

22   BY MR. LEHMANN:

23   Q    And the Dodge van?

24   A    The Dodge van anybody could drive it but Henry purchased

25   it outright from the bank.

```
 1   Q    And Henry -- you mean Henry Bellavigna?

 2   A    Yes.

 3   Q    Okay.  Purchased the Dodge van, 2007 Dodge van?

 4   A    No, the 2007 Dodge Ram.

 5   Q    And he purchased that from a bank?

 6   A    Yes.

 7   Q    Tompkins Bank?

 8   A    Yes.

 9   Q    You remember when that was?

10   A    April of 2011 or July.  I don't know.  It's either April

11   or July.

12   Q    2011 or 2012?

13   A    It might even be 2010.  It might -- I think it was April

14   of 2011.  I really don't remember the exact time.

15   Q    Okay.  The 2004 Malibu, what happened with that vehicle?

16   A    The bank took it over, and they were going to auction off

17   all my things and they sold them.

18   Q    Okay.  How about the 2005 Malibu?

19   A    The same thing.

20   Q    The bank took possession of that?

21   A    Yes.

22   Q    How about the Chevy van?

23   A    Took possession.

24   Q    How about the F-450?

25   A    I believe the F-450 was purchased from the bank by Bella.
```

```
 1   Q     And when you say Bella, Bella Masonry is what you're
 2   referring to?
 3   A     Yes.
 4   Q     And the red van?
 5   A     As is the 2004 and 2005 Malibu, the same thing, the bank -
 6   -
 7   Q     The bank took possession?
 8   A     Yeah.
 9   Q     How about the Denali?
10   A     I purchased that I believe sometime in April 2011 outright
11   from the bank.  The bank had wanted us to start closing out
12   some loans and to sell our vehicles that we had loans with.  So
13   I bought mine from the bank for the remaining debt that was
14   owed on it and Henry bought the 2007 Dodge Ram from the bank
15   back in I believe April.
16   Q     Now, going back to the 2004 Malibu, when the bank took
17   possession over that, when was -- when did the bank take
18   possession of that?
19   A     I think it was in January.
20   Q     Of 2012?
21   A     Yes.
22   Q     And was that before or after Henry purchased the Dodge
23   Ram?
24   A     What was after or before?
25   Q     When the bank took possession over the 2004 Malibu, was
```

1   that before or after Henry purchased the Dodge Ram?

2   A     After.

3   Q     And did Henry write a check to Ace Masonry for the Dodge

4   Ram?

5   A     No.

6   Q     He wrote the check to Tompkins Bank?

7   A     I believe so.

8   Q     Who was your check made out to, Ace Masonry or the bank?

9   A     For the remaining of the balance for my --

10  Q     Denali.

11  A     -- Denali?

12  Q     Uh-huh.

13  A     I'd have to look back in my records, but I think I made

14  the payment personally.

15  Q     To who?

16  A     Tompkins Trust.

17  Q     Now, in 2011 Ace's suppliers -- strike that.  Are you

18  familiar with Hanson Aggregates?

19  A     Yes.

20  Q     Okay.  Is that an Ace supplier?

21  A     A vendor of Ace.

22  Q     In 2011?

23  A     I believe so.

24  Q     How about Kelmar Construction Sales?

25  A     The same thing.

1   Q    That's a vendor?

2   A    Yes.

3   Q    Okay.  And that's a supplier for Ace?

4   A    One of them, yes.

5   Q    How about Bock Brick?  Have you heard of Bock Brick?

6   A    Yes.

7   Q    Alright.  Is that also a vendor?

8   A    Yes.

9   Q    And that was a vendor for Ace?

10   A    Yes.

11   Q    Have you heard of Thermal Foams?

12   A    Yes.

13   Q    Is that also a vendor?

14   A    Yes.

15   Q    And that was a also a vendor for Ace?

16   A    Yes.

17   Q    Okay.  And Paragon Supply, Inc., are you familiar with

18  that?

19   A    Yes.

20   Q    And that's also a vendor?

21   A    Yes, of Ace.

22   Q    Of Ace.  Through your time with Ace over the years did you

23  do work for Ithaca College?

24   A    Yes.

25   Q    How about Cayuga Medical Center?

```
 1   A     It wasn't directly for Cayuga Medical.  I think we had a

 2   GC that we were working under.

 3   Q     Okay.  You performed work though on the medical center?

 4   A     Yes.

 5   Q     Okay.  And who was the GC on that job?

 6   A     I don't remember if it was G.M. Crisalli or who it was,

 7   but --

 8   Q     You said G.M. Perselli (sic)?

 9   A     G.M. Crisalli.

10   Q     Oh, okay.

11   A     I think it was them, but I really can't recall without

12   looking at my books.

13   Q     How about Wells College, you do any work for them?

14   A     Wells Fargo -- Wells College, I think we did.

15   Q     How about Morse Industrial Corp.?

16   A     Morse Chain?  I --

17   Q     Where's Morse Chain?

18   A     How do you spell it?

19   Q     M-O-R-S-E.

20   A     Morse Chain, not to my knowledge.  I don't remember doing

21   work up there.

22   Q     Okay.  How about Ithaca City Schools?

23   A     We worked for a GC.

24   Q     Ithaca BOCES?

25   A     Yes.
```

1    Q    Elmira Schools?

2    A    We worked for a GC, yes.

3    Q    At het Elmira Schools for the GC?

4    A    Elmira Free Academy I believe.

5    Q    And who was the GC on -- at the Elmira Free Academy?

6    A    I don't remember without looking it up.

7    Q    Okay.  Tonawanda Schools?

8    A    Towanda in Pennsylvania?

9    Q    In Pennsylvania.

10   A    Yes.

11   Q    The -- are you familiar with Gaetano Construction on the

12   Cayuga Medical Center job?

13   A    Was it Gaetano?  It might have been Gaetano.

14   Q    Okay.  And you recognize Gaetano Construction?

15   A    Yeah, they might have been the GC on the Cayuga Medical

16   job.

17   Q    Okay.  And this was the southwest addition?

18   A    I don't recall.  This is a long time ago.

19   Q    Okay.  How about Syracuse Schools?  Did you perform work

20   for the Syracuse Schools?

21   A    A branch of Syracuse maybe.

22   Q    Okay.

23   A    Can I say what school I'm thinking of?  Jamesville Dewitt.

24   Q    Jamesville Dewitt?  And that's part of the Syracuse School

25   system?

```
 1   A     I think so.

 2   Q     Okay.  How about Historic Ithaca?

 3   A     Yes.

 4   Q     Arnot Ogden, the hospital?

 5   A     Yes.

 6   Q     Arnot Ogden Hospital.  How about SUNY -- The City of

 7   Burlington up in Vermont?

 8   A     Yes.

 9   Q     How about SUNY Cortland?

10   A     Yes.

11   Q     Best Buy?

12   A     Yes.

13   Q     Barnes & Noble?

14   A     Yes.

15   Q     Galloway Plaza? Or Gateway Plaza?

16   A     Yes.

17   Q     Apologies.  Tompkins Trust Company?

18         MR. BAILEY:  For the sake of potentially speeding this up,

19   if we're dealing with an Ace document how about we just

20   authenticate it, and get it and make this a whole lot faster?

21   I mean Ace has done thousands of projects.  I don't want to

22   have to go through them all.

23         MR. FURLONG:  Actually, we're dealing with the Bella

24   website.  It's not an Ace document.

25         MR. LEHMANN:  The City of Ithaca?
```

1        JUDGE CARTER:  Okay.  So I guess there's no document

2    they're working from and they can ask their questions.  We'll

3    see how it goes.

4        MR. LEHMANN:  Just a few more.  The City of Ithaca you

5    performed work?

6        THE WITNESS:  The City of Ithaca I'm sure we did, but what

7    job?

8    BY MR. LEHMANN:

9    Q    Okay.  How about First Baptist Church?

10   A    I don't remember.

11   Q    How about The Town of Sempronius?

12   A    Yes.

13   Q    M&T Bank?

14   A    We may have.

15   Q    O'Connor Hospital?

16   A    In Delhi?  Yes.

17   Q    St. Lawrence University?

18   A    Yes.

19   Q    Mount Airy Resort and Casino?

20   A    Yes.

21   Q    Tioga Downs?

22   A    Yes.

23   Q    Offices of Schuyler County?

24   A    Yes.

25   Q    Now, Ace had forklifts.  Did Ace own any forklifts in

1   2011?

2   A     Yes.

3   Q     And concrete mixers?

4   A     Yes.

5   Q     Scaffolding?

6   A     Yes.

7   Q     Trailers?

8   A     Yes.

9   Q     Mixers?

10  A     Yes.

11  Q     What happened with that stuff?

12  A     In January the bank took all of our vehicles and all of

13  our tools.

14        JUDGE CARTER:  January of this year?

15        THE WITNESS:  Yes.

16  BY MR. LEHMANN:

17  Q     And it's true that Henry Bellavigna bought some of this --

18  some of these -- this equipment back?

19  A     It's true that Henry Bellavigna negotiated with the bank

20  to purchase the tools.

21  Q     And how do you know he negotiated with the bank?

22  A     Because I'm married to my husband and he did a lot of the

23  negotiating also.

24  Q     Your husband did?

25  A     Oh yeah.

1  Q    Okay.  And -- but you weren't present there?

2  A    No.

3  Q    Okay.  You guys -- you heard about it?  You guys talked

4  about it at home --

5  A    Yes.

6  Q    -- right?  You and your husband?

7  A    Yes.

8  Q    Okay.  And Henry was there too?

9  A    No.

10  Q    All three of your spoke about it?

11  A    No.

12  Q    Well, how do you know that Henry did some negotiating

13  also?

14  A    Because of my husband relaying that message to me.

15  Q    Okay.  You're equipment, the vehicles, or the forklifts,

16  the concrete mixers, did you mark those -- that equipment with

17  a special marking to identify it as a Ace -- as Ace equipment?

18  A    Out shop manager tried to keep up with doing that.

19  Q    And what color would -- or would it be a color, or like a

20  stencil or --

21  A    No, it would be a sticker if anything.

22  Q    Okay.  And what color was the sticker?

23  A    Silver I believe.

24  Q    You believe?  You don't know?

25  A    Not all the tools were labeled.

1    Q    Okay.  But the ones that were?

2    A    Yes.

3    Q    Okay.  Yes, it was silver?

4    A    Yes, to my knowledge it was silver.  Some things were

5    painted on.

6    Q    Now, did Ace provide cell phones to its employees?

7    A    No.

8    Q    Some of the employees?

9    A    Some of the superintendents had cell phones that we would

10    get receipts from them and then reimburse them for their cell

11    phone use.

12    Q    Did you have any contracts that Ace paid for the entire

13    contract and hand the cell phone over to the superintendent?

14    A    Not to my knowledge.

15    Q    Who would have knowledge of that?

16    A    I don't know.

17    Q    So there could be cell phone plans out there that Ace --

18    did Ace have cell phone plans?

19    A    I think throughout the duration of Ace being in business

20    there were cell phone plans, and then we would have the

21    superintendent buy out the contract and then reimburse them for

22    their use.

23    Q    Okay.  So the contract was in Ace's --

24    A    I don't know without looking back.  I really don't know.

25    Q    Okay.  And we're only talking about the superintendents,

1   right?

2   A    Most superintendents had cell phones to be contacted by,

3   yes.

4   Q    Okay.  And they were plans -- strike that.  Did your

5   husband -- did he have a cell phone?

6   A    Yes, he did.

7   Q    Okay.  And the plan was from Ace Masonry?

8   A    I don't know without looking it up.  I mean it might have

9   been under our name.  I don't know.

10  Q    Okay.  You wrote checks for Ace Masonry?

11  A    Yes, I did.

12  Q    Okay.  And you don't recall --

13  A    I signed the checks.

14  Q    And you don't recall if you --

15  A    Throughout --

16  Q    -- signed checks?

17  A    I mean if you tell me what year I'm going to say in 2011 I

18  don't recall any.  Okay?

19  Q    Who was the cell phone plans with?  What carrier?

20  A    I believe Verizon.  We also had Nextel.

21  Q    When you say we you mean Ace?

22  A    I mean the guys in the field.

23  Q    And I'm asking you Ace had cell plans or cell phone plans

24  with Nextel?

25  A    Yes.

```
1   Q     That was -- that were paid by Ace?

2   A     Yes.

3   Q     Okay.  The same with Verizon, that were paid by Verizon

4   (sic)?

5   A     Paid by Verizon?

6   Q     Or that were paid by Ace.  Verizon plans that were paid by

7   Ace.

8   A     I believe so, yes.

9   Q     And who got those cell phones?

10  A     Superintendents and project managers.

11  Q     Anyone else?

12  A     I don't remember.

13  Q     Okay.  And your husband?

14  A     Yes.

15  Q     Project coordinator?

16  A     Yes.

17  Q     Now, you're familiar with Bella Masonry?

18  A     Not really.

19  Q     Okay.  Well, you know that it's owned by Henry?

20  A     Yes.

21  Q     Okay.  And Mr. Bellavigna, Henry is your father-in-law?

22  A     Yes.

23  Q     And your husband works there?

24  A     Yes.

25  Q     Your son also works there?
```

```
 1    A     Yes.
 2    Q     In fact, your husband was working at both Ace and Bella in
 3    October 2011?
 4    A     No.
 5    Q     Where was your husband working in 2011?
 6    A     For Ace I believe through mid-December.
 7    Q     Okay.  And only Ace?
 8    A     Yes.
 9    Q     Didn't work for Bella?
10    A     Not to my knowledge.
11    Q     Okay.  How about your son?  Did he work --
12    A     I really don't know what he did.
13    Q     Okay.  Was your son working for both Ace and Bella in
14    October of 2011?
15    A     I don't know.  I wasn't involved.
16    Q     When you say I wasn't involved, wasn't involved with what?
17    A     I wasn't really involved with my company at that point of
18    time.  So I didn't know where every worker was.
19    Q     Okay.  And so when you weren't involved with your company
20    at that time your husband was running the show --
21    A     No.
22    Q     -- at that time.
23    A     My controller was pretty much running the show.
24    Q     Okay.  Well, your controller -- did you controller sign
25    checks?
```

1   A      No.

2   Q      Okay.  So it was only you and Bob?

3   A      I had to use my signature stamp on signing checks.

4   Q      Okay.

5          JUDGE CARTER:  So are we close to the end of Ms.

6   Bellavigna's direct or do you have much more?

7          THE WITNESS:  I've got a little bit more or not a little.

8   I mean --

9          JUDGE CARTER:  A ways to go yet?

10         MR. BAILEY:  Days.  A little is a lot?

11         JUDGE CARTER:  Alright.  Let's take a 10 minute recess and

12  we'll start up again at 3:30.  Off the record.

13                 **(Whereupon, a brief recess was taken)**

14         JUDGE CARTER:  Back on the record.

15         And ready for additional questions.

16  BY MR. LEHMANN:

17  Q      I'm showing you what's been marked as General Counsel's

18  exhibit 20.

19  A      Yes.

20  Q      Now, the audit -- the firm that did the audit is Joseph

21  McCarthy, correct?

22  A      Yes.

23  Q      Okay.  And that was the name that you had -- were trying

24  to think of earlier?

25  A      Yes.

```
 1   Q    Okay.  And you recognize this document?

 2   A    No.

 3   Q    Never seen this document before?

 4   A    I received so much in the mail and I basically turned a

 5   lot over to my counsel.

 6   Q    Okay.  Ace Masonry, you see the address there, 137 Cecil

 7   Malone?

 8   A    Yes.

 9   Q    And that is Ace's address?

10   A    That's Ace's official address, but Ace isn't there any

11   longer.

12   Q    Okay.  And when you say official address that's the

13   address for The Department of State?

14   A    Yes, I believe so.

15   Q    Okay.  The Department of State uses that address for a

16   statement of service?

17   A    I believe so.

18   Q    Okay.  And you haven't changed that with The Department of

19   State?

20   A    Not to my knowledge, no.

21        MR. LEHMANN:  Okay.  I would offer GC-20.

22        MR. FURLONG:  No objection.

23        MR. JAMESON:  No objection.

24        MR. BAILEY:  There's too many objections.  No foundation,

25   no authenticity.  It's clearly hearsay.  It's not a business
```

```
 1   record of Ace.  If they want to call someone from the empire,
 2   I'm sure they can probably make an effort to get it in, but she
 3   can't get it in.
 4        JUDGE CARTER:  It's not authenticated by this witness.  So
 5   on that basis, sustained.
 6        MR. LEHMANN:  Okay.
 7   BY MR. LEHMANN:
 8   Q    Now, Ace had a business relationship with Bella, correct?
 9   A    They were a subcontractor.
10   Q    Who was the subcontractor?
11   A    Bella to Ace.
12   Q    Bella to Ace?
13   A    Yes.
14   Q    How about Ace to Bella?
15   A    Yes.
16   Q    Okay.  And Bella performed work for Ace?
17   A    Bella signed a contract to perform work as a subcontractor
18   to Ace.
19   Q    Okay.  You familiar with Trinity Episcopal Church?
20   A    Yes.
21   Q    Okay.  And what is that?
22   A    It's a contract that I came in with William Lutz, the
23   father of Trinity Episcopal Church in August of 2011.
24   Q    And Ace bid on that job?
25   A    Yes.
```

1    Q    And Ace was awarded that job?

2    A    Yes.

3    Q    And Ace signed the contract with Trinity?

4    A    Yes.

5    Q    For $198,655?

6    A    I believe that's the right amount.

7    Q    Okay.  I'm going to refer you to General Counsel exhibit

8    2.

9    A    Yes.

10   Q    Job 11-32.

11   A    Yes.

12   Q    This is the job that -- this is the Trinity job?

13   A    Yes.

14   Q    Okay.  And this was for masonry work?

15   A    No, it was also for roofing.

16   Q    Also for roofing?

17   A    Yes.

18   Q    And so you had -- and who performed the roofing work?

19   A    Well, it's still ongoing.  Charles Evans is doing the

20   roofing.

21   Q    Charles Evans?

22   A    Yes.

23   Q    Okay.  And do you know if Charles Evans is a union roofer?

24   A    No, I don't.

25   Q    Okay.  And you subbed the job out to Bella?

1    A    The masonry portion.

2    Q    Why did Ace sub out the job to Bella?

3    A    It's not usual that Ace subbed out any masonry on any past

4    jobs.

5    Q    Okay.  Is that the reason why you did that in this case?

6    A    No, on this case Ace wasn't going to perform the work

7    because I couldn't get the manpower to stay in my company.

8    Q    Okay.  So if you could have had the manpower you would

9    have done the masonry work yourself?

10    A    If I was still active and could have had the manpower,

11    yeah, I'm sure Ace could have done the work.

12    Q    Okay.  And when did you sub this job out to Bella?

13    A    I don't know if it was -- October I think.

14    Q    October?

15    A    I believe so.

16         JUDGE CARTER:  2011?

17         THE WITNESS:  Yes, sorry.

18    BY MR. LEHMANN:

19    Q    And when you couldn't perform this job you approached

20    Henry, is that correct?

21    A    Actually, I think the church and I talked about it and I

22    said that I know a company that can perform just like Ace

23    basically could perform if I had the manpower to do the work.

24    Q    Okay.  And that's when you reached out to Henry?

25    A    I believe so.

 1   Q     And the two of you worked out the details?

 2   A     No, we signed an agreement together, a subcontract

 3   agreement.

 4   Q     Now -- and you provided that agreement to The National

 5   Labor Relations Board pursuant to a subpoena?

 6   A     I don't know if we provided that in that meeting or not.

 7   Q     You don't know if you provided --

 8         MR. BAILEY:  If I may just to speed things up, she's

 9   referring to the interview process.  He's referring to the

10   documents you just turned -- you gave to me --

11         THE WITNESS:  Oh, yes I did.

12         MR. BAILEY:  -- and we turned over.

13         THE WITNESS:  Yes, I did.  I thought you meant that

14   deposition.

15         MR. BAILEY:  No, different.

16         THE WITNESS:  Okay, sorry.

17         MR. LEHMANN:  Okay.  And did you provide that -- did you

18   turn that over to --

19         THE WITNESS:  Yes, I did.

20   BY MR. LEHMANN:

21   Q     Okay.  I haven't had a chance to look at the subpoena.

22   And you sub the Trinity job to Bella for 168,000?

23   A     Yes, I believe so.

24   Q     Okay.  Now, I did -- do you know what bank account the

25   168,000 was deposited in?  Was it in the --

1    A    The job is still ongoing.

2    Q    So you haven't received payment for it?

3    A    The jobs not done.

4    Q    Okay.  Did you pay Bella 168,000?

5    A    No, not yet.

6    Q    Okay.  Did Trinity pay you or Ace 198,000?

7    A    No.

8    Q    Has Trinity paid any money?

9    A    Yes.

10   Q    Okay.  And how much money have they paid Ace?

11   A    It's in your documentation.

12   Q    Okay.  But I only have one bank account, correct?

13   Subpoenaed records that -- the subpoenaed records that you

14   provided, you only provided records for one bank account?

15   A    No.

16   Q    You provided both bank accounts?

17   A    Yes.

18   Q    Are you familiar with SUNY Binghamton?  A job at SUNY

19   Binghamton?

20   A    Yes.

21   Q    And this was a masonry job as well?

22   A    Yes.

23   Q    And you subbed this job out to Bella?

24   A    No, Bella completed the punch list items on a time and

25   material basis.

1   Q      So there was no contract between you and Bella?

2   A      No, not to my knowledge.

3   Q      Okay.  Well, how did Bella get the job?

4   A      Basically, I asked Bella if they could finish the punch

5   list on a time and material basis.

6   Q      Okay.  So you gave the job to Bella?

7   A      Yes.

8   Q      Okay.

9          JUDGE CARTER:  Can you describe what that means, a time

10  and material basis?

11         THE WITNESS:  Time and material means you don't really

12  enter into a contract per say -- a subcontract agreement.  They

13  perform the work and then they show you what time is involved

14  and what materials they used.  And then you pay them after

15  their work is performed.

16         JUDGE CARTER:  Okay.

17         MR. LEHMANN:  And how much did you give Bella to perform

18  this job?

19         THE WITNESS:  I believe their portion of work on time and

20  material was over 20 grand.

21  BY MR. LEHMANN:

22  Q      And there's no contract?

23  A      No.

24  Q      Did you tell SUNY Binghamton that Bella was performing the

25  punch list on this job?

1    A    No.

2    Q    Why not?

3    A    I didn't talk to Faz (ph) about it.

4    Q    This is a public works job?

5    A    SUNY is a state job.

6    Q    Uh-huh.  You familiar with the Ithaca town hall?

7    A    Yes.

8    Q    And that is job 11-34 on General Counsel's exhibit 2?

9    A    Yes.

10    Q    And this job was a roof replacement?

11    A    I can't remember what it involved.  I think it was brick.

12    Q    On the roof?

13    A    No.  It was a contract that I entered with Hal Contracting

14    and basically I performed $12,000 worth of work before they

15    terminated my agreement.  And that's in your documentation.

16    Q    And this job was from September 16th 2011 to October 21st

17    2011?  11-34.

18    A    Thereabouts, yes.

19    Q    Okay.  Well, it says job end date is the date that the

20    last --

21    A    I'd have to verify it on --

22    Q    -- employee worked.

23    A    -- my timecard history.

24    Q    Okay.

25    A    Okay.

1   Q    Which --

2   A    That could be where project management was still involved

3   too.  Okay.

4   Q    Alright.

5   A    So anybody that's worked on that job.  It might not be

6   labor.  Okay?  Or manpower.

7   Q    That -- from Ace?

8   A    Yes, of course.

9   Q    That anyone has worked on that job from Ace.

10  A    This is an Ace job.

11  Q    Okay.  But the last date of work from an Ace employee was

12  October 21st 2011?

13  A    Yes, to my knowledge.

14  Q    Now, you testified that this was taken away from you

15  because you didn't have enough manpower?

16  A    No.  We were terminated.  There's a letter that states

17  that in the documentation.

18  Q    Okay.  Now, I'm going to refer you to General Counsel's

19  exhibit 2, job 11-37.

20  A    Yes.

21  Q    Are you familiar with the last job there?

22  A    Yes.

23  Q    Okay.  And this is the job that Ace performed for Bella?

24  A    Yes, on a time and material basis.

25  Q    Okay.  And do you know why Bella -- how did it come about

1   that Ace performed work for Bella on this job?

2   A    I really can't remember.  They came to us and asked if we

3   could perform it.  It's only a $3,720 job.  So we did it on a

4   time and material basis.

5   Q    Okay.  You can't remember why --

6   A    Like I said --

7   Q    You remember who --

8   A    -- back then I wasn't too involved.

9   Q    Okay.  You remember who approached you to perform this job

10  for Bella?

11  A    No.

12  Q    You don't remember who would have approached you from

13  Bella?

14  A    I would think the owner.

15  Q    You would think?

16  A    Yeah.  Like I said, I don't remember this timeframe.  And

17  from September to December I was not really coherent with my

18  jobs like I should have been.

19  Q    Okay.  Have you been approached by anyone else from Bella

20  to perform jobs?

21  A    No.

22  Q    Okay.  So how many jobs did you perform for Bella?

23  A    Only one.

24  Q    Okay.  So only one job to perform for Bella Masonry.  You

25  can't remember who approached you for that?

1   A     I know -- I'm sure Henry came to me, but like I said I

2   don't remember talking about this job.

3   Q     Okay.  And -- well, was there a time when you knew why you

4   performed this job for Bella?

5   A     Pardon?

6   Q     You remember providing an affidavit with The National

7   Labor Relations Board, during the investigation of these cases?

8   A     An affidavit?  That one that's here?

9   Q     No.

10  A     An affidavit with The National Labor Relations Board.  Oh,

11  my affidavit?

12  Q     Yeah.

13  A     Yes, I do.

14  Q     Okay.  So was there was a time when you knew why Henry

15  approached you and asked you to perform this job?

16  A     I can't recall right now, because I don't know, my mind is

17  going blank about this job for Bella, but whatever I said -- if

18  you want to refresh my memory that would be helpful.

19  Q     I'm going to direct your attention to the last page.

20  A     Okay.

21  Q     Paragraph 11.  The second sentence.

22  A     Bella --

23  Q     "Bella could not perform the work apparently as they

24  lacked a union relationship.  They could not work at Cornell

25  and as I recall".

1   A    Yes.

2   Q    Okay.  That's what it states.  Is that your signature at

3   the bottom?

4   A    Yes, it is.

5   Q    Okay.  And you were under oath when you signed this?

6   A    Yes, I was.

7   Q    Okay.  And it continues "I was contacted by Henry to enter

8   into a subcontract" --

9   A    I wasn't under oath when I signed this.  I signed --

10  Q    You weren't under oath when you signed this?

11  A    No, I signed this in April and this was in March when I

12  gave this.  Okay?

13  Q    Okay.  What dates do you have on the bottom there?

14  A    March 30th I gave -- I spoke in a deposition to the NLRB.

15  Q    Are there two signatures at the bottom of yours?

16  A    I believe that's a signature, yes.  Yes.

17  Q    Okay.  Where it says receive by is signed on the date and

18  then signed by Barney Horowitz, resident officer.  Is there a

19  signature there?

20  A    Yes.

21  Q    Okay.  And you signed -- you dated it 4/16/12, correct?

22  A    Yes.

23  Q    Okay.  So you were under oath when you signed this?

24  A    If I -- yes.  What I said is exactly the truth when I

25  signed this.

1    Q    Alright.

2    A    Okay?

3    Q    And so it was Henry who contacted you --

4    A    Yes.

5    Q    -- to perform that job and to do it because Ace was a

6    union contractor?

7    A    Yes, we were.

8    Q    Is there a contract for this?

9    A    I'm drawing a blank on this job.  I don't know.

10   Q    You don't know if there was a contract that was signed

11   between Bella Masonry and Ace Masonry?

12   A    If it was performed on time and material I seriously doubt

13   there was a contract.

14   Q    You remember receiving a letter from the unions, the

15   Laborers and the Bricklayers seeking, information relating to

16   the relationship between Ace Masonry and Bella Masonry?

17   A    I remember my husband received one and then Ace received

18   one.

19   Q    And when you say your husband, where did he get one?

20   A    I think to our home address.

21   Q    And Ace got one also?

22   A    Ace got one.  I believe I signed for it in February, like

23   February 20th.

24        MR. LEHMANN:  Off the record.

25        JUDGE CARTER:  Go off for a second.

1              **(Whereupon, a brief recess was taken)**

2       JUDGE CARTER:  On the record.

3       Further questions?

4  BY MR. LEHMANN:

5  Q    I'm showing you what's been marked as GC-21.

6  A    Yes.

7  Q    The first page, do you recognize that?

8  A    Yes.

9  Q    Okay.  And this was the letter that was sent from Mr.

10 Furlong seeking information between -- about the relationship

11 between Ace Masonry and Bella Masonry?

12 A    Yes.

13 Q    And there was a 79 questionnaire attached to this letter

14 on February 14th, correct?

15 A    Yes.

16 Q    What did you do with the information request when it was

17 sent to you?

18 A    It's in your documentation.  You wanted this back from me,

19 so I gave it back.

20 Q    Okay.  But what did you do when you received it?

21 A    Honestly, I started to answer the questions, and I started

22 to do it on my computer system at home and then I then I turned

23 it over to my attorney for guidance and asked him what I should

24 do.

25 Q    And your attorney was who at the time?

1    A    Jason Bailey.

2    Q    Okay.  And did you respond to the information request?

3    A    No.

4        MR. LEHMANN:  Mr. Bailey is there any way that we can

5    stipulate this document in?  The proceeding -- the next one is

6    to Henry and then the --

7        MR. BAILEY:  Short answer, no.

8        MR. LEHMANN:  -- emails and then -- excuse me?

9        MR. BAILEY:  No, no.

10        MR. LEHMANN:  No?

11        MR. BAILEY:  No.

12        MR. LEHMANN:  Okay.

13        MR. BAILEY:  You can certainly call Mr. Furlong and

14    through a business record I'm sure.

15        MR. FURLONG:  Well, actually, Judge, maybe we can take

16    judicial notice of this?  Okay?

17        MR. BAILEY:  Well, the other --

18        MR. FURLONG:  We -- hang on a second.  I didn't interrupt

19    counsel.  I expect not to be interrupted.  I have emails that

20    have gone to Mr. Bailey.  They're the last two pages.  And a

21    letter from Mr. Bailey on his letterhead refusing to answer the

22    questionnaire.

23        We should get a stipulation from Mr. Bailey that indeed

24    those are his emails as well as his letter of January the 24th.

25    And that's in this packet.  And that's the denial that we're

1  not going to answer the questionnaire that was supplied to my

2  clients.

3      MR. BAILEY:  Judge, the other issue I'd like to point out

4  is that the charges are dated January 30th 2012.  That's before

5  this letter was ever sent.

6      JUDGE CARTER:  Well, is there an amended version of the

7  complaint or charge that addresses the information request?

8      MR. BAILEY:  I'm sorry, Your Honor?

9      JUDGE CARTER:  I guess I'm not clear on -- I understand

10  what your point is, but I guess the complaint has always

11  included the information request or some aspect of it.  So I

12  guess I'm wondering whether there's some amended charge that

13  would include the information request.

14      MR. BAILEY:  An amended charge that would include the

15  information request?

16      JUDGE CARTER:  Or a charge that includes that, because

17  it's in the complaint.

18      MR. BAILEY:  Yeah, I'm not sure, Your Honor.  Not that I

19  can see.  The only -- there's a complaint claiming failed and

20  refused to provide.  It's signed by Mr. Furlong here on January

21  30th of 2012.

22      By the time he sent his letter he had already commenced

23  litigation.  He had already signed that complaint claiming in

24  his letter what he says is still ongoing.  But he had already

25  brought the charge by the time he signed and sent his letter.

1  He had placed it in litigation.

2       The subsequent amendments by Mr. Furlong do not relate to

3  a failure to provide information, Your Honor.  They relate to

4  alter ego, they relate to failing to bargain, but they do not

5  relate to failing to provide information.  Perhaps Mr. Furlong

6  is our witness?

7       JUDGE CARTER:  Well, I think -- well, just a minute.  The

8  -- so the charge -- let's assume that -- I looked at these

9  documents, but let's assume that you're accurate in stating

10  that the charge was filed after the 20 -- 13th -- January 13th

11  request, but not after the February 14th request.  I think

12  there's a fair argument that the February 14th request relates

13  back to the original charge insofar as this related allegation.

14       But the other question would be this:  you've got

15  testimony about the February 14th document, and the letter and

16  the attachments there to that being the request itself.  So

17  there's certainly a foundation for those materials.  We haven't

18  heard any testimony from the witness about these emails.  So I

19  don't have a basis for admitting those.

20       MR. FURLONG:  And that's where I would ask for a

21  stipulation from counsel that -- I mean otherwise we're left

22  with calling counsel as a witness, which we're prepared to do,

23  which means getting new counsel for the Respondents.

24       MR. BAILEY:  Actually, it doesn't.

25       MR. FURLONG:  Alright.  But once again I don't think

1   there's any dispute between the respective professionals at

2   this table that the emails going back and forth between counsel

3   are authentic and the letter from Mr. Bailey on his letter,

4   indeed over his signature, is authentic.  And there was a

5   categorical denial we're not sending you anything.

6       JUDGE CARTER:  Well, let's put it this way:  you may be

7   able to put one some evidence to get those materials in, but

8   right now you've got testimony -- so I don't know if you want

9   to table this until you present more evidence or whether you

10  want to go with what you've got, but you've got evidence that

11  supports admission of the February 14th letter and the questions

12  that were attached to it.  I don't know about the January 13th

13  letter and whether that was attached to the February 14th letter

14  or not.  We haven't heard testimony about that.

15      So you've gotten a record established by the witness for

16  probably 80% of these documents.  If you want the emails you're

17  going to have to prove that.  So I guess the question is you

18  have a motion to admit -- a request to admit these materials.

19  I don't know if we want -- if you want to table that pending

20  further evidence or whether you want to modify the exhibit or

21  what.

22      MR. LEHMANN:  We'll table that.

23      JUDGE CARTER:  Okay.

24      MR. FURLONG:  Your Honor, the February 14th letter to this

25  witness, which she acknowledged getting and eventually turning

1   over to her counsel, we're moving that in now with the

2   questionnaire.  As to the letter to Mr. Henry Bellavigna, we'll

3   deal with that when Mr. Henry Bellavigna takes the stand.

4        JUDGE CARTER:  Okay.

5        MR. FURLONG:  Alright.  So that's -- right now we are

6   going to move in the questions and the February 14th letter.

7        MR. LEHMANN:  So we'll modify the exhibit with just the

8   February 14th letter and the questionnaire.

9        JUDGE CARTER:  Okay.  So with that modification any

10  objection?

11       MR. BAILEY:  Same objection, Your Honor, lack of

12  foundation, lack of authenticity.

13       JUDGE CARTER:  Overruled.  So for the record exhibit 21 is

14  modified to include the February 14th letter and the

15  questionnaire will be admitted over objection.

16  **(General Counsel's GC-21 identified and received in evidence)**

17       MR. LEHMANN:  A brief moment.  I may be finished.

18       JUDGE CARTER:  Okay.

19       MR. LEHMANN:  Mr. Bailey, I do -- your January 24th letter

20  that's on your -- that's your letterhead?

21       MR. BAILEY:  Am I --

22       MR. LEHMANN:  Would you be willing to stipulate that

23  letter in?  The January 24th letter?

24       MR. BAILEY:  I think we've established that you've sent

25  the questionnaire.  She didn't respond to it.

1          MR. LEHMANN:  Okay.

2          MR. BAILEY:  That's the testimony.  I'm not stipulating to

3     this letter coming into.

4          MR. LEHMANN:  You're not going to stipulate that that's

5     your letterhead?

6          MR. BAILEY:  I don't see what the relevance is honestly.

7     She just testified that she didn't respond to it.  What does my

8     letter add?

9          MR. FURLONG:  Your Honor, I'm going to give Mr. Bailey the

10    benefit of the doubt that he sends letters that are relevant.

11    This is a letter that goes to whether or not they plan on

12    answering the information request.  It's on his letterhead over

13    his signature.

14          The only issue is whether or not it is authentic.  If

15    counsel is denying the letter on his letterhead over his

16    signature is not authentic well then he should state so.

17    Clearly it's relevant.

18          THE WITNESS:  Well, he's not required to stipulate.  Now,

19    I suppose if you have some authority for me taking judicial

20    notice of counsel's letter then let me see what it is.  But

21    right now I'm not going to -- I can't order him to stipulate to

22    letter into evidence.  I mean --

23          MR. BAILEY:  Judge, I would also add that the record is

24    being misrepresented.  If you read the letter it doesn't say

25    that Ace or Bella is not going to ever provide information.  It

1    doesn't say that.

2        MR. SHEATS:  It's a little troubling representation by Mr.

3    Furlong, Your Honor, because the letters doesn't say what he's

4    been telling you.

5        JUDGE CARTER:  Well, the letter speaks for itself and I

6    have no read it --

7        MR. FURLONG:  And it speaks for itself over counsel's

8    signature.

9        MR. SHEATS:  Actually, it's not my signature.

10        MR. FURLONG:  It's not?

11        MR. SHEATS:  It's not.  Well, I mean, Your Honor, I think

12    the point is do you want the letter in?  We're objecting.  They

13    -- it doesn't say what Mr. Furlong has been saying it says.

14    Black and white it is what it is.

15        JUDGE CARTER:  MR. FURLONG:  It says what it says --

16        MR. SHEATS:  And there's no relevance to this letter.

17        MR. FURLONG:  -- as you indicated.

18        MR. SHEATS:  If in fact it said what he claims it says

19    maybe it'd be relevant --

20        MR. FURLONG:  Judge --

21        Mr. SHEATS:  -- but it doesn't.

22        JUDGE CARTER:  Hang on a minute.  Let's take a deep

23    breath.  Alright.  So you've got it.  If you want the letter in

24    you're welcome to discuss it with counsel off the record after

25    we conclude today's proceedings.  And maybe you can get there

1   or maybe there's authority you have for my taking judicial

2   notice of this letter.  But right now let's go ahead and finish

3   with the witness.  You've already gotten in the other materials

4   that at least address the issue about the information request.

5        MR. LEHMANN:  Nothing further.

6        JUDGE CARTER:  Mr. Furlong, your witness.

7        MR. FURLONG:  Thank you, Judge.

8                    **DIRECT EXAMINATION**

9   BY MR. FURLONG:

10  Q    Ms. Bellavigna, I think you know I'm Richard Furlong and I

11  represent the Bricklayers and the Laborers in this proceeding.

12  I do not represent the Carpenters.  Let me ask you, are you on

13  any medication or anything that would in any way curtail your

14  ability to remember facts?

15  A    No, I honestly just was flabbergasted.  I couldn't think

16  straight at a moment.  But no, I'm on no medications.

17  Q    Okay.  And you got a good night's sleep last night so your

18  memory should be as good as it's capable of being?

19  A    No, I didn't sleep good at all.

20  Q    Okay.  That makes two of us.  Thank you for the answer.

21  I'd like to ask you a little bit about your background.  I

22  think we've heard some testimony through your response to

23  questions from the General Counsel.  You're married to Robert

24  Bellavigna, am I correct on that?

25  A    Yes, I am.

1    Q    Okay.  And his middle initial is?

2    A    P.

3    Q    Okay.  And your son is also Robert, am I correct?

4    A    Yes.

5    Q    And his middle initial is?

6    A    A.

7    Q    And both Robert P. and Robert A. are masons, correct?

8    A    By trade.

9    Q    By trade.  And I'll get into some of their background.

10   Now, Robert P.'s father is Henry Bellavigna?

11   A    Yes.

12   Q    Your father-in-law, correct?

13   A    Yes.

14   Q    Alright.  And Harry -- Henry Bellavigna -- we're going to

15   get into this later -- he's been in the masonry trade for

16   various contractors including Welliver and predecessors to

17   Welliver and Ace for roughly 50 years, am I correct on that?

18   A    I believe so, yes.

19   Q    And your husband, Robert P., for roughly 40 years?

20   A    No.

21   Q    Okay.  How long has he been in the masonry trade?

22   A    Well, being that he's 48 I would say when he was 18, so 30

23   years probably.

24   Q    30 years in the trade.  Okay.  And your son obviously less

25   experienced, right?

1    A    Yes.

2    Q    I want to go through some of your experience because

3    you're the sole owner and you -- your testimony is you ran Ace

4    Masonry.  Do you recall that testimony?

5    A    Yes.

6    Q    You're a graduate of Watkins Glenn Central High School?

7    A    Yes.

8    Q    Alright.  And then you received an honor certificate in

9    data processing from the Shyler, Shamong, Tiago Vocational

10    Technical (ph) area, right?

11    A    Yes.

12    Q    And this would have been in 1982?

13    A    Yes.

14    Q    And then you went to work for Alou Din *(sic)*, a medical

15    doctor, where you were an office receptionist from February of

16    '82 to '84, am I correct?

17    A    His name was Ala Din (ph).

18    Q    Okay.  He was a doctor?

19    A    Yes.

20    Q    Not a lot of masonry work done there, correct?

21    A    No.

22    Q    Alright.  And then from 1982 to '84 you also worked at

23    Sheean's Billing Service (ph) as a computer operator in Elmira,

24    New York, am I correct?

25    A    Yes.

1    Q    Any masonry work done there?

2    A    No.

3    Q    Alright.  And in February 1984 to April 1984, two months,

4    you worked for the Orthopedic Association of Steuben County as

5    a computer operator, am I correct?

6    A    Yes.

7    Q    Any masonry experience gained there?

8    A    No.

9    Q    Then you worked at Ithaca College from 1984 to 1988.  Do

10    you recall that job?

11    A    Yes.

12    Q    Alright.  And you worked as a computer operator in the

13    Job, J-O-B, Hall for Ithaca College, do you recall that?

14    A    Job Hall.

15    Q    Okay.  And you would agree with me that there was no

16    masonry experience gained there, am I correct?

17    A    Correct.

18    Q    Alright.  And then in 1988 to 1989 you worked at Citizen's

19    Savings Bank in the financial department, am I correct?

20    A    Yes.

21    Q    Working for the bank you did not gain any masonry

22    experience at all did you?

23    A    No.

24    Q    Alright.  And then you worked for the John E. Gardner Real

25    Estate property management team as an administrative assistant

1  from 1989 to 1991.  Do you recall that?

2  A     Yes.

3  Q     And as an administrative assistant you basically worked in

4  the office handling paperwork for this property real estate

5  management firm, am I correct?

6  A     Yes.

7  Q     Alright.  Did you go out and lay any block or do anything

8  like that as part of that job?

9  A     No.

10  Q     You gained no masonry experience working in that job,

11  isn't that correct?

12  A     Yes.

13  Q     Yes it's correct, right?

14  A     Yes.

15  Q     And then in -- from June to the present you work at

16  Hemlock Run Horse Farm in Watkins Glenn, New York where you

17  own, manage and maintain a house boarding farm, isn't that

18  correct?

19  A     Yes.

20  Q     And you currently do that, right?

21  A     Yes.

22  Q     Now, tell us some of the duties that are involved in

23  owning, managing and maintaining a horse boarding farm?

24  A     Basically I --

25        JUDGE CARTER:  Do we need to get into all that?  I mean is

1    your point -- is your only point that it doesn't involve any

2    masonry work?

3         MR. FURLONG:  No, my point is that that job currently is

4    ongoing and that she didn't have time to run Ace Masonry.  And

5    you'll hear it through other witnesses that she had virtually

6    no role with Ace Masonry.  It was being run by Henry and Bob P.

7         JUDGE CARTER:  Okay.

8         MR. FURLONG:  Okay?

9    BY MR. FURLONG:

10   Q    So back to the horse farm.  How many head of horse do you

11   have?

12   A    Right now?

13   Q    Yes.

14   A    Three.

15   Q    Alright.  And have you ever had more than three?

16   A    Yes.

17   Q    And during the time period say 2008 to the current did you

18   have more than three?

19   A    No.

20   Q    Okay.  So you've had three horses?

21   A    Yes.

22   Q    At the Hemlock Run Horse Farm?

23   A    Yes.

24   Q    Alright.  And you own that and you manage it.  What's

25   involved with managing that horse farm?

1  A    I'm partners with my husband on that horse farm.  And it's

2  basically turned into a beef farm.  So I don't really do

3  anything anymore.

4  Q    Okay.  What have you done?

5  A    Fed my horses, watered my horses.  All three horses are my

6  own.

7  Q    Okay.  And you board them, right?

8  A    No.

9  Q    Okay.  Do you board any other horses?

10  A    No.

11  Q    Alright.  But this is a business that you and your husband

12  run?

13  A    We're partners on it, yes.

14  Q    Okay.  And throughout the entire time period of 2000 to

15  the present you've had this Hemlock Run Horse Farm, right?

16  A    Yes.

17  Q    Alright.  No masonry work there, right?

18  A    Yes, there was.  We built the barn together, my husband

19  and I, and it's made out of masonry.

20  Q    Any -- have you had any commercial masonry work other than

21  building your barn with your husband?

22  A    Me laying --

23  Q    Yes.

24  A    -- bring and block?  Yes, I've laid brick and block

25  before.

1  Q     At the horse farm right?

2  A     No, at Ithaca when I lived at my residence.  We built a

3  partition wall out back of our house.

4  Q     So that -- from your time of graduation from Watkins High

5  School -- Watkins Glenn High School up to the time you started

6  Ace Masonry we've got a wall at your house and some block work

7  on your barn.  That's the extent of your masonry experience.

8  A     It's a huge barn.

9  Q     Okay.  That's the extent of your masonry experience?

10  A     No, I've also helped plaster, tile, sheet rock.

11  Q     In terms of the masonry.

12  A     Masonry, okay.  Tile, caulk, I've done all sort of helping

13  out with masonry

14  Q     Okay.  So we get --

15  A     I've held a trowel before if that's what your question is.

16  Q     You ever severed an apprenticeship in the Bricklayers

17  Union?

18  A     No.

19  Q     Okay.  Did you ever serve an apprenticeship in the

20  Laborers Union?

21  A     No.

22  Q     You ever serve an apprenticeship in the Carpenters Union?

23  A     No.

24  Q     Okay.  Have you ever held yourself out and for pay to work

25  as a bricklayer, a mason or a carpenter?

```
 1   A      No.

 2   Q      So now in May of 2002 you start a contracting business and

 3   the extent of your business -- of your experience is what

 4   you've just told us, right?

 5   A      Yes.

 6   Q      Alright.  And you hired some people, right?

 7   A      Yes.

 8   Q      And knowing of course that it's a competitive business as

 9   you know it to be, you hired some very experienced people to

10   help you out, am I correct on that?

11   A      Yes.

12   Q      Did you hire Henry Bellavigna?

13   A      Not in the beginning.

14   Q      Did there come a time when you hired Henry Bellavigna?

15   A      Yes.

16   Q      Alright.  And when was that?

17   A      As I stated earlier the records show 2004.  I don't know

18   when he actually started.

19   Q      And what did you hire Henry Bellavigna to do?

20   A      He was our estimator.

21   Q      Okay.  You have no experience or schooling in estimating

22   construction contracts do you?

23   A      No.

24   Q      Alright.  And that's why you hired Henry, right?

25   A      Yes.
```

1  Q    Alright.  Prior to Henry's coming on as an estimator you

2  say in 2004, who was during the estimating between 2002 and

3  2004?

4  A    Dave Traver.

5  Q    Dave Traver who's no longer with your business?

6  A    Correct.

7  Q    Alright.  But you weren't doing it?

8  A    Correct.

9  Q    Now, what you know about your father-in-law, Henry

10 Bellavigna, you said he's been in the business what, 50 years?

11 A    Yes.

12 Q    Okay.  Prior to the inception of Ace Masonry that would

13 then put him at about 40 years roughly a decade ago, correct?

14 A    I don't know.

15 Q    Well, if it's 10 years ago and he now has 50 years that

16 would put him at 40 years would it not, Ms. Bellavigna?

17 A    Yes, I would imagine.

18 Q    Alright.  And to your knowledge, as the owner or Ace

19 Masonry, was that a steady 40 years where he was doing every

20 aspect of masonry construction?

21 A    I don't know.  I wasn't -- before he worked at Ace I

22 wasn't involved with what Henry did.

23 Q    Okay.  So you were married to his son, am I correct?

24 A    Yes.

25 Q    Alright.  Did you, at a certain point, decide you needed

1  an estimator and you would bring on Mr. Henry Bellavigna?

2  A    I think at that point he was hired as an estimator, but we

3  already had Dave Traver.

4  Q    Okay.  And by the way, Dave Traver didn't leave until

5  about three years ago, am I correct?

6  A    I think the end of 2008.

7  Q    Yeah.  So Dave Traver wasn't replaced.  You simply brought

8  on Henry Bellavigna as a new estimator?

9  A    When Dave Traver was replaced we brought on Ken Wylde.

10  Q    Alright.  Putting aside -- we're going to get to Mr. Wylde

11  in a little while.  Alright?  Henry is brought on in 2004 is

12  your testimony, right?

13  A    Uh-huh.

14  Q    Okay.  And Mr. Bob P., your husband, Bellavigna, when was

15  he hired to Ace Masonry?

16  A    In 2002.

17  Q    So as you went about building this company of yours in

18  which you had, I think you would agree with me, very limited

19  business -- or very limited experience actually engaging in

20  commercial construction work, you started to hire people who

21  were experienced in commercial construction work, including

22  your father-in-law and your husband?

23  A    Actually, a lot of the people that were let go from

24  Welliver McGuire came on board with Ace.

25  Q    You hired them, right?

1    A    Yes.

2    Q    And you -- and by the way, Welliver McGuire for the record

3    is what?  A general contractor?

4    A    It was a subcontractor at that time too.

5    Q    My question to you is are they a general contractor?

6    A    They're also a C-M --

7    Q    Okay.  Are they one of the --

8    A    -- construction manager.

9    Q    -- biggest construction contractors in this area?

10   A    I don't know.

11   Q    You don't know?

12   A    No, there's many of them.

13   Q    Okay.  You've been in the business now running Ace Masonry

14   really as the powerhouse behind Ace Masonry for the last 12

15   years or 10 years, right?

16   A    10.

17   Q    Okay.  And you're not familiar with the status of Welliver

18   McGuire in the Ithaca, New York area?

19   A    I am very familiar with Welliver McGuire.

20   Q    Alright.  Is it a long standing contractor that does all

21   sorts of construction projects, building contracts?

22   A    Yes.

23   Q    Alright.  In fact, you've taken many subcontracts from

24   Welliver McGuire as Ace Masonry, am I correct?

25   A    And Ace Unlimited.

1   Q     And Ace Unlimited, which by the way is just Ace Masonry

2   doing business as Ace Unlimited, am I correct on that?

3   A     Yes, I was limiting myself to masonry so I expanded my

4   name to Ace Unlimited.

5   Q     Alright.  But it's not two companies.  It's one company

6   doing business as a second company?

7   A     The same federal ID number.

8   Q     So getting back to the hiring, you're going to go into

9   this business and you're going to start to hire people from

10  Welliver McGuire and perhaps other areas that actually know the

11  construction business, correct?

12  A     Yes.

13  Q     And you hire Henry, and you hire Bob and some other

14  people?

15  A     Yes.

16  Q     Including Dave Traver?

17  A     Yes.

18  Q     And those people remained with you performing estimating

19  and other types of tasks throughout this entire period that

20  we're talking about, 2002 up to the present?

21  A     Yes.

22  Q     And as your business grew you continued to hire more

23  skilled people who actually knew the construction business;

24  different superintendents, different project coordinators.  And

25  you hired them from other sources, am I correct on that?

1    A     Yes.

2    Q     Alright.  Now back to the issue of estimating if you

3    estimate a job right or you estimate a job wrong that can make

4    or break you on a project, am I correct on that?

5    A     Yes.

6    Q     Okay.  So you certainly valued Henry's skills in terms of

7    his estimating abilities?

8    A     Yes.

9    Q     Now Bob Bellavigna, and I speak of P, your husband, he

10   also has very broad estimating experience, does he not?

11   A     I -- yes.

12   Q     And he utilized that estimating experience for Ace

13   Masonry, did he not?

14   A     No.

15   Q     He never estimated jobs for Ace Masonry?

16   A     He was involved in estimating at times, not always there

17   for every bid.

18   Q     My question wasn't whether he was there for every bid.  My

19   question was Bob P., your husband, alright, as a -- he was a

20   project coordinator for Ace Masonry?

21   A     Yes.

22   Q     And he also estimated jobs are you -- am I correct on

23   that?

24   A     Yes.

25   Q     Okay.  In addition to Bob P., your husband, and Henry,

1  your father-in-law, you also hired other people around you who

2  knew the construction industry?

3  A    Yes.

4  Q    And it would be fair to say, Ms. Bellavigna, they knew the

5  construction industry a whole lot better and had more

6  experience than you did?

7  A    The construction business isn't only doing construction

8  outside.  It's running the office and also operating outside of

9  the office, watching field superintendents --

10  Q    I understand that.

11  A    -- and performing the work.

12  Q    And I'm looking at things like estimating jobs, running

13  crews, performing the work.  You had limited experience doing

14  any of that.

15  A    I've learned throughout the 10 years.

16       MR. FURLONG:  Alright.  Okay.  Can we go off the record

17  for a minute?

18       JUDGE CARTER:  We may.  Off the record.

19            **(Whereupon, a brief recess was taken)**

20       JUDGE CARTER:  Back on the record.

21       MR. FURLONG:  Thank you, Your Honor.

22  BY MR. FURLONG:

23  Q    Ms. Bellavigna, while he was with Ace Masonry, isn't it a

24  fact that Henry Bellavigna also served as a project manager on

25  Ace projects?

1   A     While who was with Ace?

2   Q     Henry.

3   A     Henry, yes.

4   Q     So he both did estimating as well as project management

5   work?

6   A     I would say percentage-wise he did more estimating than

7   project management.

8   Q     My question had nothing to do with the percentages.  My

9   question had to do he both, is that correct?

10  A     Yes.

11  Q     Alright.  And in fact he acted as a project manager on

12  educational, offices, retail, government and industrial

13  facilities, is that correct?

14  A     Yes.

15  Q     Okay.  And in fact your husband Bob P. also acted as a

16  project manager on countless construction projects including

17  educational, offices, retail, government and industrial

18  facilities?  Robert P.

19  A     Yes.

20  Q     Now, I want to talk for a moment about Robert P., your

21  husband.  He's got roughly 30 years in the construction

22  business?

23  A     Yes.

24  Q     Okay.  And he's not an electrician, right?

25  A     No.

1  Q    Okay.  He's not a roofer.  He's a mason.  In fact, he went

2  through the apprenticeship program for the masons did he not?

3  A    I believe so.

4  Q    And was -- and in fact was a union member for many years?

5  A    Yes.

6  Q    In fact, still remains as union member, isn't that the

7  case?

8  A    I -- it's up in the air right now.

9  Q    You don't know?  Okay.  How about Henry P. *(sic)*?  Let me

10  just back to Henry P. *(sic)*.  Did he -- was he a union member?

11  A    Henry A. used to be in the Union.

12  Q    Henry A., excuse me.  Henry A. used to be in -- and he's

13  now receiving -- to your knowledge -- and we can ask this of

14  him, but if you know you can answer it.  He's receiving a

15  pension from the Bricklayers Union?

16  A    I don't know.

17  Q    Alright.  Now, when you husband Bob P. was working for Ace

18  Masonry his tasks included overseeing all the field crews,

19  isn't that correct?

20  A    (No audible answer)

21  Q    And his tasks also included that he was part of the team

22  management that helped run Ace Masonry, am I correct on that?

23  A    Yes.

24  Q    Alright.  He also engaged in estimating.  We've already

25  covered that.  Am I correct?

1    A    Yes.

2    Q    And he also engaged in project coordinating.  We covered

3    that as well.

4    A    Yes.

5    Q    I want to ask you about some jobs.  And I know that

6    counsel for the General Counsel asked you about some jobs.  So

7    I want to ask you some further jobs.  Did Ace Masonry do work

8    at St. Lawrence University Art and Science Centers?

9    A    Yes.

10   Q    And did Ace Masonry do work at Trudeau Institute?

11   A    Yes.

12   Q    Did it do work at the Mount Airy Casino Resort?

13   A    Yes.

14   Q    Did it do work at a company called -- I'm sure I'm

15   pronouncing it correctly, but it was called Balvac Inc.?

16   A    We worked under Balvac as a subcontractor.

17   Q    Okay.  So Balvac is a general contractor?

18   A    Yes.

19   Q    The Steuben County Jail, did Ace do work there?

20   A    Yes.

21   Q    Bill Cook, what's Bill Cook?

22   A    Bill Cook Cadillac Oldsmobile, it's -- it was -- used to

23   be right down in Ithaca.  They sold cars.

24   Q    Did Ace Masonry do work there?

25   A    Yes.

1   Q     How about the Shoremont water facility, did you do work

2   there as Ace Masonry?

3   A     Yes.

4   Q     How about the Tompkins Trust county *(sic)* at various

5   locations -- I'm sorry, company.  I misspoke.

6   A     Yes.

7   Q     And Historic Ithaca I think was referred to earlier by the

8   General Counsel.  So you did work at these different facilities

9   as Ace Masonry?

10  A     Or Ace Unlimited.

11  Q     Or Ace Unlimited.  Alright.  We're going to get into the

12  general contracting thing in a moment.  Let's hold off on that.

13  I'm going to give you a telephone number.  I want you to tell

14  me if it's your husband's telephone number.  607-327-2948,

15  recognize that number?

16  A     No.

17  Q     You don't.  Did he have a cell phone when he was at Ace?

18  A     Yes.

19  Q     Do you recognize that as being his cell phone?

20  A     No.

21  Q     Okay.  Is it because it's not his phone or you don't

22  recognize it?

23  A     I don't recognize that number.

24  Q     That's fine.  Melissa Blanchard, do you recognize her

25  telephone number as area code 607-546-8077?  What that her

1   number at Ace?

2   A      No.

3   Q      Did she have a cell phone number?

4   A      Yes, she did.

5   Q      And do you recognize that as her Ace cell phone number?

6   A      No.

7   Q      Okay.  It's not or you don't recognize it?

8   A      I don't recognize that as her cell phone.

9   Q      Okay.  Before we move off of Melissa Blanchard, there came

10  a time when you hired Ms. Blanchard into Ace Masonry?

11  A      Yes.

12  Q      And that was about when?

13  A      May 27th of either 2009 or 2010.

14  Q      Where'd you hire her from?

15  A      She put in a resume and I interviewed her.

16  Q      And what were you looking for?  Like an office manager

17  type?

18  A      Yes, administrative aide.

19  Q      To basically be your right hand person to help you out on

20  your office duties?

21  A      Sure.

22  Q      Alright.  And General Counsel did talk about this, but I'd

23  like to get into it a little bit further, did Ms. Blanchard

24  answer telephone calls while she was at Ace Masonry?

25  A      Yes.

1    Q    And in fact if somebody called the main number there it

2    was more than likely that Ms. Blanchard would pick up?

3    A    Yes.

4    Q    And then direct the call?

5    A    Yes.

6    Q    If somebody entered the facility would she greet visitors?

7    A    Yes.

8    Q    You certainly had to distribute mail when mail came in.

9    If you had her distribute the mail to Mr. Bellavigna, or your

10   husband or Dave Traver or you, would she distribute the mail?

11   A    No.

12   Q    How would that work?

13   A    She would open the mail, paperclip it and it was only

14   viewed by me.

15   Q    Okay.  So that was the extent of her mail exposure was

16   opening it and then giving it to you?

17   A    Yes.

18   Q    Alright.  I think we were over this with General Counsel,

19   but just she would order office supplies and things of that

20   nature?

21   A    Yes.

22   Q    That was one of her duties for Ace Masonry.  And did you

23   assign those duties to her?

24   A    Yes.

25   Q    Did she have a job description by the way?

1    A    I believe it's in the documentation.

2    Q    So she did have one and you believe it's been provided?

3    A    I believe so.

4    Q    Did she also order drawings when you needed prints for

5    jobs?

6    A    Yes.

7    Q    And presumably that would be because the estimator -- one

8    of the estimators or you would direct her to do that, correct?

9    A    Correct.

10    Q    Okay.  She had a role with payroll and accounts payable,

11    didn't she?

12    A    Yes.

13    Q    Would you tell us about that role?

14    A    My nephew, Lee Smith, was let go in August of 2011 and I

15    taught Missy how to step up to the plate and start inputting

16    data entry.

17    Q    In terms of the payroll for the employees?

18    A    Yes.

19    Q    Alright.  Now, a number of the -- I'm going to get back to

20    her in a minute, but a number of the documents that were put in

21    by counsel for the General Counsel included remittance forms

22    sent to the various unions.  Do you recall that testimony?

23    A    Yes.

24    Q    And just so that we can back up a step, what is a

25    remittance form?

1    A    The benefits that are due on each employee for hours

2    worked.

3    Q    Okay.  And would these typical benefits be your health and

4    welfare, pension -- your health and welfare payments, your

5    pension payments, your annuity payments, any dues check off,

6    things like this?

7    A    Yes.

8    Q    Alright.  And it's fair to say, Ms. Bellavigna, that both

9    the Carpenters, the Bricklayers and the Laborers all had these

10   types of benefits due and owing under their collective

11   bargaining agreements?

12   A    Yes.

13   Q    And that there were remittance forms that were supplied by

14   the various trust funds to Ace Masonry that would be completed

15   on a monthly basis showing what was due and owing?

16   A    Yes.

17   Q    And it was Ms. Blanchard -- if we look at some of these

18   documents it was Ms. Blanchard who apparently complied them and

19   signed them on the bottom, many of the documents, is that

20   correct?

21   A    Yes, I taught her how to do that.

22   Q    Okay.  So it's your personal testimony and knowledge that

23   in fact she would also do that; fill out those forms and send

24   them in?

25   A    Yes.

1   Q    As part of teaching her how to do that work, because you

2   indicated you showed her how to do it, did you describe for her

3   how a collective bargaining agreement requires certain payments

4   for certain hours worked and that's how you do the

5   calculations?

6   A    I never explained it personally to her.

7   Q    Well, what's your understanding of how a remittance form

8   is filled out?

9   A    As that.

10  Q    Those are my words.  You give me your words.  How's it

11  done?

12  A    We pay benefits on employees' hours worked.

13  Q    Okay.  So in 2011 how would you know what a pension

14  contribution to say the Carpenters -- a carpenter working for

15  your firm would be?  How do you know what -- where would you

16  come up with that amount?

17  A    Every year the Carpenters Unions would update the

18  information according to what are the work was performed in.

19  And we updated our system according.

20  (Pause)

21      MR. FURLONG:  Alright.  Could you read back the last

22  question and answer, please?

23      JUDGE CARTER:  Just pose your question again.  This is an

24  old system with tapes and it's going to take too long to do all

25  that.

1      MR. FURLONG:  Thank you, Judge.

2  BY MR. FURLONG:

3  Q    So what was true for the Carpenters would also have been

4  true for the Bricklayers and the Laborers, am I correct?

5  A    Yes.

6  Q    So as different collectively negotiated rates would kick

7  in those rates would be altered and the person completing the

8  remittance forms would make the calculation accordingly?

9  A    Yes.

10  Q    And hopefully send the money in.  Sometimes that didn't

11  happen, am I correct?

12  A    Correct.

13  Q    And that included -- as part of those payments, that also

14  included dues checkoffs that would be due to each labor

15  organization; the Carpenters, the Bricklayers and the masons --

16  I'm sorry, not the Bricklayers -- the Laborers and the masons.

17  A    Yes.

18  Q    By the way, when we speak about the Bricklayers and the

19  masons we're talking about the same craft, right?

20  A    Yes.

21  Q    Two terms for the same craft.  I want to ask you a little

22  bit about some of these jobs that you subbed to Bella Masonry.

23  A    Okay.

24  Q    Now, it's your understanding certainly from speaking to

25  your husband that Bella Masonry really didn't get up and

1  started until really October or so -- September or October of

2  2011, is that correct?

3  A    I don't know when they first started work, but I believe

4  it was in October of 2011.

5  Q    Okay.  You ever have any discussions with your employees,

6  including your husband and your father-in-law, as to when Bella

7  was started?

8  A    No.

9  Q    Just never came up in conversation, huh?

10  A    I wasn't involved with Bella.

11  Q    Alright.  Well, we're going to get a little bit into the

12  subcontracts themselves, but would you agree with me that the

13  masonry business is very competitive?

14  A    Oh yeah.

15  Q    And there's a lot of union firms and a lot of union firms

16  vying for work?

17  A    I don't know if there's a lot of masonry firms that are

18  union.

19  Q    Well, in this area would you agree with me there's

20  probably 15 Tompkins County firms doing masonry work?

21  A    Union or non-union?

22  Q    Both.

23  A    Yes, maybe 15.

24  Q    Alright.  And as we go out into outlying counties of

25  course that exponentially increases, right, depending on the

1   county?

2   A    Yes.

3   Q    And if we go up into Rochester or Watertown, places Ace

4   has done work, of course now we're talking dozens and dozens of

5   masonry firms, am I correct?

6   A    I would imagine so.

7   Q    Alright.  Well, you're the president and the mover and

8   groover behind Ace Masonry.  So you would probably know there

9   are many.  Many --

10       MR. BAILEY:  Is there a question --

11       MR. FURLONG:  I'll withdraw that.

12       MR. BAILEY:  -- or do we just want an argument --

13       MR. FURLONG:  No, no, I'll withdraw it.

14       MR. BAILEY:  -- want to argue with the witness?

15       MR. FURLONG:  Counsel is absolutely correct.

16       JUDGE CARTER:  Sustained as to form.

17       MR. FURLONG:  Counsel is correct.  Alright.

18  BY MR. FURLONG:

19  Q    So there are many masonry firms out there vying for work,

20  right?

21  A    Yes.

22  Q    Alright.  The Trinity Church deal in which you

23  subcontracted work you said to Bella Masonry, do you recall

24  that?

25  A    Yes.

1   Q    Alright.  How big of a contract was that?

2   A    168,000.

3   Q    Alright.  And when you decided to sub that work to Bella

4   you subbed almost 100% of the work to Bella Masonry, did you

5   not?

6   A    About 80%.

7   Q    About 80%?  Alright.  And did you solicit bids from other

8   companies?

9   A    No.

10  Q    Alright.  You just went to this one company Bella Masonry

11  and had them sign a subcontract, am I correct?

12  A    Yes.

13  Q    Although there were dozens of companies that could have

14  performed that work you went to the one?

15  A    Yes.

16  Q    Alright.  So there was no general dodge report or anything

17  like that looking for subcontractors?

18  A    Correct.

19  Q    And you knew Bella was a brand new company with virtually

20  no tack experience and you subcontracted $168,000 contract to

21  them?

22  A    Virtually no track experience?

23  Q    When did Bella start?  Do you know?

24  A    I knew my family and their past.

25  Q    So you gave it to them because of family relations?

1   A    No.

2   Q    Okay.

3   A    I gave it because they know how to perform masonry work

4   and I trust them.

5   Q    Alright.  And Bella Masonry, if I were to tell you that

6   their articles of incorporation were filed in September of 2011

7   would that surprise you?

8   A    At the time I wasn't sure what was going on with Henry.  I

9   knew that Nancy had passed away and that he was ready to make a

10  move.

11  Q    Alright.  So you made -- so you subbed this work, roughly

12  80% of $168,000 contract.  Did you ask for a bond from Bella

13  Masonry to cover you?

14  A    My -- that job wasn't bonded for me so I wouldn't ask them

15  for a bond.

16  Q    Okay.  So if the defaulted on the job, true or not you

17  could get sued by the church.  You had a contract with the

18  church did you not?

19  A    If they defaulted on their contact *(sic)* I would have

20  terminated them.

21  Q    Right.  But you couldn't self perform because you

22  indicated that people were leaving you.  So you would have been

23  sued or potentially could have been sued by the church, but you

24  didn't request a bond did you?

25  A    No.

1    Q    To protect yourself?

2    A    No.

3    Q    Did you look into -- with Bella Masonry did you look into

4    what equipment they had, high lifts, mixers, all this sort of

5    thing, to see that they were a reputable company that would not

6    put you in the hole on this contract?

7    A    I'm a contractor.  I rent from rental agents all the time

8    to rent equipment.  So why would I think they'd be any

9    different?

10   Q    My question again was did you look to see what their

11   suitability was to perform a contract of this size?

12   A    No.

13   Q    Let me go to the SUNY Binghamton project.  You said that

14   Bella completed time and material work for Ace on the SUNY

15   Binghamton project.  Do you recall that?

16   A    Yes.

17   Q    Okay.  And are you aware did Ace put that work out for bid

18   for the time and material work performed by Bella?

19   A    I believe it was brought up with another contractor, yes.

20   Q    Who was the other contractor?

21   A    ACP.

22   Q    And who's ACP?

23   A    They're out of Dundee.

24   Q    Okay.  So out of the dozens of contractors as we go down

25   into the Binghamton area that could have performed this work,

1  you gave this contract to Bella Masonry?

2  A     Yes, I did.

3  Q     Run by your father-in-law and manned in large part by your

4  husband?

5  A     No, my husband was working for Ace.

6  Q     He was working for Ace.  Okay.  We'll get into that later.

7  Did you check whether or not they had workers who could perform

8  the work?

9  A     No.

10  Q     Okay.  Now, are you aware on state projects before a

11  contractor or a subcontractor can sub work they have to get

12  written permission from the owner -- the public owner?  Are you

13  aware of that state statute?

14  A     No.

15  Q     You're not?  You haven't seen it in state contracts?  In

16  every single New York state contract?

17  A     I don't recall it.

18  Q     Do you review state contracts?

19  A     Yes.

20  Q     Alright.  And you don't recall seeing a provision that

21  before any subcontractor is hired for any amount of work you

22  have to get written permission?

23  A     My contract was not with the state.  It was with the GC.

24  Q     Okay.  Any line down, you don't recall seeing that in any

25  of your contracts?

```
 1   A     No.

 2   Q     Okay.  Now, tell me about how Bella up in Burdett, New

 3   York ended up with this job at SUNY Binghamton.  Did you call

 4   Henry?  Did Henry call you?  How did that work?

 5   A     We needed to finish our punch list items and we were out

 6   of manpower.  So I asked Henry to perform the work on time and

 7   material.

 8   Q     When you say you were out of manpower, did you still have

 9   a collective bargaining agreement with the masons?

10   A     The Bricklayers Union, from what --

11   Q     Did you still have a contract with the masons?

12         MR. BAILEY:  Give her an opportunity to answer the

13   question.

14         MR. FURLONG:  It calls for a yes or no answer.

15         JUDGE CARTER:  He's entitled to put another question to

16   the witness.  Overruled.

17         THE WITNESS:  Okay.  Say the question again.

18         MR. FURLONG:  Did you have a contract with the masons at

19   that time?

20         THE WITNESS:  No, not a current one.  An expired one

21   possibly.  I don't know.

22   BY MR. FURLONG:

23   Q     Did you have a contract -- you don't know if you had a

24   contract with the masons union at the time of the SUNY project?

25   A     Looking at this paperwork, yes.
```

1    Q    Alright.  Did you call Mr. Stringer, or call Mr. Kackamus

2    (ph), or any other agent asking for workers to help you out?

3    A    No.

4    Q    Let's talk about the Laborers for a moment.  Did you have

5    a collective bargaining agreement with Local 785 at this time?

6    A    No.

7    Q    You did not have a collective bargaining agreement with

8    the Laborers --

9    A    No.

10   Q    --in the fall of 2011?

11   A    Not to my knowledge.

12   Q    Were you sending in the remittance forms in the form *(sic)*

13   of 2011 that have been received into evidence?

14   A    Yes.

15   Q    And did those cover the months of August, September,

16   October and November?

17   A    I believe so, yes.

18   Q    Okay.  And can you name me another instance where you've

19   sent in remittance forms to a trade that you did not have a

20   collective bargaining agreement with?

21   A    I've done that a lot of times.

22   Q    You ever send them into the electricians union?

23   A    No.

24   Q    You ever send them into the roofers union?

25   A    No.

1  Q    You ever send them in to any other union that you have not

2  had a collective bargaining relationship with?

3  A    Yes.

4  Q    Which union?

5  A    I can't recall, but I've not been signatory and I've sent

6  in reports to unions that I'm not signed with.

7       MR. FURLONG:  I would ask for judicial notice Taft-Hartley

8  does not permit that to happen.  You cannot send in

9  contributions unless there's a written agreement.

10      JUDGE CARTER:  I can't --

11      MR. FURLONG:  We'll argue it in the brief.

12      JUDGE CARTER:  I can't speak on that now.

13      MR. FURLONG:  Alright.

14 BY MR. FURLONG:

15 Q    What other unions have you sent trust fund contributions

16 to, on behalf of your workers, that you did not have a

17 collective bargaining agreement with?  I want you to name me

18 the unions and when you did it.  No, name then unions and then

19 we'll get into when you did it.

20      MR. BAILEY:  Object, it's irrelevant and I think she's

21 already pointed out that she doesn't remember who she sent them

22 to.

23      JUDGE CARTER:  He's entitled to explore this, the nature

24 of her response that she sent in payments to unions that aren't

25 -- where there are no CBAs.  We'll see where it goes.

1   Overruled.

2        MR. FURLONG:  Want me to repeat the question?

3        THE WITNESS:  Yes.

4        MR. FURLONG:  Ms. Bellavigna, your testimony earlier ago -

5   - a few moments ago was that you have sent in trust fund

6   contribution remittance forms to union with which you did not

7   have -- Ace Masonry did not have a collective bargaining

8   agreement.  Name those unions.

9        THE WITNESS:  I can't recall the name right now, but I

10  could get that information to you.

11  BY MR. FURLONG:

12  Q    Alright.  You are the president and had all oversight of

13  the paperwork in this company for the last 10 years, am I

14  correct?

15  A    Yes.

16  Q    Alright.  Now, with respect back to the Laborers, we can

17  agree, because the documents have been put in, that you were

18  sending in remittance forms through the fall of 2011.  That is

19  not disputed, correct?

20  A    Repeat the question.

21  Q    Sure.  You sent in remittance forms to the Laborers Taft-

22  Hartley funds, they pension, health and welfare and so on,

23  during the fall of 2011.

24  A    I'm not sure without looking in my records if I turned in

25  any or not.

1 Q    Okay.  The records that have been received into evidence

2 speak to that.  Did you, in the fall -- during the Binghamton

3 project -- the SUNY Binghamton project, did you call Mr. Marsh

4 or any other representative of the Laborers and say I can't

5 find laborers, send me some?  Did you do that?

6 A    No.

7 Q    Did you cause anybody else to do that?

8 A    I don't know.  I --

9 Q    You don't -- you can recall?

10 A    I wasn't really involved from September to December.

11 Q    Okay.  Who was stepping in your shoes and running the show

12 from September through December when you were basically not as

13 involved as you would have liked to been?

14 A    The controller JaLynda.

15 Q    And how about your husband or Mr. Bellavigna, Henry?

16 A    Had two project managers --

17 Q    Uh-huh.  And -- I'm sorry.  I didn't mean to cut you off.

18 Go ahead.

19 A    I had two project managers and my husband Bob Bellavigna.

20 Q    Okay.  And do you -- and give the experience -- the 30

21 years of experience of your husband, would he -- and the fact

22 that the holds a union book in the masons, would he know to

23 call the unions if he needs manpower?

24 A    Oh, yes.

25 Q    In fact, he's done it many times, right?

1    A    I don't know.

2    Q    Was it your -- alright.  I'll withdraw that.  Getting to

3    this issue, the shortage of manpower so you had to sub the work

4    out to Bella, is it safe to say you never accessed or you never

5    caused anyone else to access the trade unions looking for

6    manpower?  Is that safe to say?

7    A    Is it safe to say that I never accessed --

8    Q    You never --

9    A    -- the trade unions?

10   Q    Yeah, you never called over to Mr. Marsh or Mr. Stringer -

11   -

12   A    I did not, no.

13   Q    -- and you never caused anybody else to?

14   A    Not to my knowledge, no.

15   Q    Okay.  Now, by the way in these -- as the president of Ace

16   Masonry is it fair to say you're pretty familiar with the

17   collective bargaining agreements?

18   A    No, I don't read them.  I sign them and I don't memorize

19   them.  So no.

20   Q    Something as important as a collective bargaining

21   agreement you're not too familiar with?

22   A    No, I'm not.

23   Q    Okay.  Chances are Henry Bellavigna who worked for

24   Welliver and Bob P. who's worked for 30 years would be more

25   familiar with those contracts, correct?

1          MR. BAILEY:  Calls for speculation.

2          JUDGE CARTER:  She can answer if she knows.  Overruled.

3          THE WITNESS:  I don't know.

4    BY MR. FURLONG:

5    Q     Alright.  Are you aware that there are union

6    subcontracting clauses in these collective bargaining

7    agreements with the Carpenters, the masons and the Laborers

8    that prohibit subcontracting of work to non-union companies?

9    Are you familiar with those clauses?

10   A     No.

11   Q     Okay.  Has it been your understanding as the president of

12   Ace for 10 years that you are free to take union work to sub it

13   non-union and that wouldn't be a problem?  Is that your

14   understanding?

15   A     Just masonry work or any work?

16   Q     Masonry, Laborers' work or Carpenters' work.

17   A     And repeat the question again.

18   Q     Yeah.  Was it your understanding as the president of this

19   company that you started in 2002 that under the collective

20   bargaining agreements you were free to take bargaining unit

21   work that was union and sub it non-union without any

22   consequence?  You were free to do that under the contract.

23   What that you understanding of the contract?

24   A     Yes.

25   Q     Really?  Okay.  Did you ever read any of these collective

1    bargaining agreements?

2    A     No.

3    Q     Prior to the fall of 2011 when the SUNY Binghamton and

4    these other jobs went on, did you ever subcontract masonry

5    work?  Carpenter, mason or labor, did you ever sub that work to

6    non-union firms?

7    A     Yes.

8    Q     When and where?

9    A     I can't recall.  I'd have to look it up.

10   Q     Okay.  During the break -- we're going to take a break in

11   five minutes and then come back probably tomorrow, would you

12   track that down and find out what jobs you've subcontracted --

13   bargaining unit work you've subcontracted to non-union firms?

14   Will you bring that back tomorrow?

15       MR. BAILEY:  The documents have been produced.  I'm sure

16   you guys can find the answer.

17       MR. FURLONG:  No, the --

18       MR. BAILEY:  I'm not asking my client to give up all day

19   and all night to find an answer that you guys have in that box

20   right there.  I'm not going to ask her to do it.

21       MR. FURLONG:  Well, no one is asking your opinion,

22   alright?  Judge?

23       MR. BAILEY:  It's not an opinion.  It's a statement.

24       MR. FURLONG:  Judge --

25       JUDGE CARTER:  Alright.

1          MR. FURLONG:  -- the statement --

2          JUDGE CARTER:  Let's not argue across the table.

3          MR. FURLONG:  -- from the witness was I'd have to look at

4     the documents.  Prior to that the question was have you done

5     this.  The answer was yes.  I shouldn't have to find a needle

6     in a haystack.  If she had done this she should be able to find

7     it, and produce it and then we move on quickly.

8          MR. BAILEY:  Judge, the documents were produced in

9     responding to a subpoena.  They're organized in accordance with

10    the questions.  The answers are clearly right there.

11         JUDGE CARTER:  Let's start with the subpoenaed documents

12    and then go from there.  But we're not going to send the

13    witness on a search right now.

14         MR. FURLONG:  Okay.  So --

15         MR. LEHMANN:  Your Honor, may I?  Actually, I disagree

16    with his -- he provided -- and I think the record is clear.  I

17    just want to make sure it's absolutely clear.  I have not been

18    given a chance to look over the subpoenaed documents in full,

19    especially the third box that was provided today.  But the

20    first two boxes that were provided to my office on Friday were

21    not identified per the -- per paragraph in the subpoena.

22         JUDGE CARTER:  I understand.

23         MR. LEHMANN:  And I --

24         JUDGE CARTER:  You represented that before and I guess my

25    hope was that counsel would get together over that point over

1    lunchtime.  Now it's going to have to happen after we close up

2    for the evening.  But that's something that should happen as

3    you review the documents.  Let's continue with questioning now.

4                    **CONTINUED DIRECT EXAMINATION**

5    BY MR. FURLONG:

6    Q    So what we're left with then, Ms. Bellavigna, is you have

7    subcontracted union work non-union, but you can't recall when

8    you did that?

9    A    Yes.

10   Q    And do you know what year you might have done that?

11   A    No.

12   Q    Do you recall every putting any of the signatory unions,

13   the Carpenters, the Bricklayers or the Laborers on notice that

14   you were doing that?

15   A    No.

16        MR. FURLONG:  Let's move on.  Judge, we have five minutes?

17   Is that --

18        JUDGE CARTER:  Yeah, we're going to -- that's about right.

19        MR. FURLONG:  Okay.

20        JUDGE CARTER:  Five minutes.

21        MR. FURLONG:  Thank you.

22   BY MR. FURLONG:

23   Q    Let's move on to that Ithaca Town Hall project.  Do you

24   recall that project?

25   A    Is that the one that I couldn't really remember?  Oh, no.

1  That's the one for Hal Contracting, right?  Yes, Ithaca Town

2  Hall.

3  Q    You bid that as a subcontractor to a roofing contractor,

4  did you not?

5  A    Yes.

6  Q    And the name of the roofing contractor was what?

7  A    Hal.

8  Q    And this was a public works contract, correct?

9  A    Yes.

10  Q    And you indicated that Hal terminated Ace Masonry?

11  A    Yes.

12  Q    When did that occur?

13  A    The documents have the date.

14  Q    My -- I'm not asking for the documents.  Do you recall

15  when that occurred?

16  A    No.

17  Q    Do you recall the month in which it occurred?

18  A    No.

19  Q    Do you recall whether it was the summer or fall of 2011?

20  A    Fall.

21  Q    And how did you learn about the termination?

22  A    Received a letter.

23  Q    From who?

24  A    Hal.

25  Q    And what did they say to you?

1    A    That we were terminated.

2    Q    Okay.  And did it give a reason why you were being

3    terminated?

4    A    Yes, but I don't have the document in front of me.

5    Q    Do you recall now, without the document in front of you,

6    why you were terminated?

7    A    No.

8    Q    Did you have a contract with Hal?

9    A    Yes.

10   Q    And did you sue Hal for violation of that contract when

11   you were terminated?

12   A    No.

13   Q    Why not?

14   A    Because I understood at the time that the reason why we

15   were terminated is because we couldn't get enough manpower on

16   the job.

17   Q    Okay.  Back to the issue.  On the Ithaca Town Hall project

18   did you access any of the union halls to look for manpower?

19   A    No.

20   Q    Alright.  And if I told you that upon your exit from that

21   job that Bella Masonry immediately took over your work with the

22   same workers and the same equipment would that surprise you?

23   A    I wasn't involved.  So I wouldn't know.

24   Q    Do you have any knowledge of who completed the work after

25   you left?

1    A    I've heard Bella did.

2    Q    Okay.  And who told you that?

3    A    I've heard within last week and lately.

4    Q    But prior to last week you had no idea who actually took

5    that work from your company?

6    A    Yes, I did have knowledge that Bella finished out Ace's

7    portion of work that Ace couldn't perform.

8    Q    Okay.  And did you rent any equipment to Bella on that job

9    to utilize on that job?

10   A    I was in a rental agreement with Henry for renting some of

11   our tools.

12   Q    With respect to the Ithaca Town Hall did you rent

13   equipment to them to complete the job?

14   A    I don't think he used my equipment or tools for that job,

15   but I'm not sure.

16   Q    Do you know a mason named Dick Tracy?

17   A    Yes.

18   Q    Is he a superintendent?

19   A    Yes.

20   Q    Was he a superintendent for Ace Masonry?

21   A    Yes.

22   Q    Was he working at the time of the Ithaca Town Hall

23   project?

24   A    I don't know.

25   Q    So you don't know what employees were working and you

1   don't know what equipment may have been rented at that time?

2   A    No.

3   Q    Okay.  How about a gentleman named Scott Smith?  Do you

4   recall do you  know a gentleman named Scott Smith?

5   A    Yes.

6   Q    Is he a laborer?

7   A    Yes.

8   Q    Was he working for Ace Masonry at the time?

9   A    I'd have to look it up.  I don't know.

10  Q    If I told you Scott Smith and Dick Tracy went from Ace

11  Masonry payroll to Bella Masonry payroll without any gap in

12  time would that surprise you?

13  A    No.

14  Q    Did there come a time when Mr. Smith and Mr. Tracy quit

15  Ace Masonry?  Came and said Lisa, I'm quitting?

16  A    No, they didn't talk to me.

17       MR. FURLONG:  Okay.

18       JUDGE CARTER:  And so let's put a pause there.  Do you

19  have more questions?

20       MR. FURLONG:  Oh, I have a lot more, but maybe we'll

21  continue tomorrow.

22       JUDGE CARTER:  Yeah.  That's going to have to be the game

23  plan given our constraints.

24       MR. FURLONG:  Sure.

25       JUDGE CARTER:  Let's go ahead and we're going to go off

1   the record.  We'll resume tomorrow at 8:30 a.m. bright and

2   early.  During the overnight the same rules apply.  You can

3   discuss anything but the case and we'll pick it up again

4   tomorrow with the testimony.

5          THE WITNESS:  Okay.

6          JUDGE CARTER:  Thank you all.

7          THE WITNESS:  Thank you.

8              **(Whereupon, a brief recess was taken)**

9          JUDGE CARTER:  Back on the record.

10         Go ahead.

11         MR. LEHMANN:  I just -- I wanted -- I just wanted to be

12   clear, I haven't had a chance to look at the -- and this might

13   be overly cautious here, but we want to reserve the right to

14   recall Lisa Bellavigna if I find a document that I need to get

15   in through her testimony.

16         JUDGE CARTER:  Well, I don't know that we need to recall.

17   She's still on the stand.

18         MR. LEHMANN:  Okay.

19         JUDGE CARTER:  I assume you're going to look at documents

20   this evening.

21         MR. LEHMANN:  That's right.

22         JUDGE CARTER:  So that will be fine.  Off the record.

23   **(Whereupon, at 4:55 p.m., the hearing in the above-entitled**

24   **matter was closed.)**

# C E R T I F I C A T E

This is to certify that the attached proceedings done before the NATIONAL LABOR RELATIONS BOARD REGION THREE

In the Matter of:

**ACE MASONRY, INC., d/b/a ACE UNLIMITED and BELLA MASONRY, LLC, alter egos,**

and

**INTERNATIONAL UNION OF BRICKLAYERS and ALLIED CRAFTWORKERS, LOCAL NO. 3,**

and

**LABORERS INTERNATIONAL UNION LOCAL NO. 785,**

and

**NORTHEAST REGIONAL COUNCIL OF CARPENTERS.**

Case Nos. 3-CA-073540, 3-CA-074523, 3-CA-073549, 3-CA-074531, 3-CA-079606

Date:      July 30, 2012

Place:     Ithaca, New York

Were held as therein appears, and that this is the original transcript thereof for the files of the Board.

_____
Official Reporter

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 316
Wayne, New Jersey 07470
(973) 692-0660

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| In the Matter of:<br><br>**ACE MASONRY, INC., d/b/a ACE UNLIMITED and BELLA MASONRY, LLC, alter egos,**<br><br>and<br><br>**INTERNATIONAL UNION OF BRICKLAYERS and ALLIED CRAFTWORKERS, LOCAL NO. 3,**<br><br>and<br><br>**LABORERS INTERNATIONAL UNION LOCAL NO. 785,**<br><br>and<br><br>**NORTHEAST REGIONAL COUNCIL OF CARPENTERS.** | **Case Nos.  3-CA-073540<br>          3-CA-074523**<br><br><br><br><br><br><br>**Case Nos.  3-CA-073549<br>          3-CA-074531**<br><br><br>**Case No.   3-CA-079606** |

The above-entitled matter came on for hearing pursuant to Notice, before **GEOFFREY L.J. CARTER**, Administrative Law Judge, at the Ithaca City Hall, 108 East Green Street, 2nd Floor Conference Room, Ithaca, New York, on Tuesday, July 31, 2012 at 8:30 a.m.

<u>**A P P E A R A N C E S**</u>

**On Behalf of the General Counsel:**

    GREGORY LEHMANN, ESQ.
    BRIE KLUYTENAAR, ESQ.
    National Labor Relations Board, Region 3
    Albany Resident Office
    Leo W. O'Brien Federal Building, Room 342
    Clinton Avenue & North Pearl Street
    Albany, New York 12207

**On Behalf of the Respondent:**

    JASON B. BAILEY, ESQ.
    ED SHEATS, ESQ.
    Sheats & Bailey, PLLC
    P.O. Bo 820
    9650 Brewerton Road
    Brewerton, New York 13029

**On Behalf of the Charging Party Locals 3 & 785:**

    RICHARD D. FURLONG, ESQ.
    Lipsitz, Green, Scime, Cambria, LLP
    42 Delaware Avenue
    Buffalo, New York 14202

**On Behalf of the Charging Party NRCC:**

    CURTISS T. JAMESON, ESQ.
    Kroll Heineman Carton, LLC
    Metro Corporate Campus I
    99 Wood Avenue South, Suite 307
    Iselin, New Jersey 08830

## I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Lisa Bellavigna | 200 | -- | -- | -- | -- |
| | 255 | -- | -- | -- | -- |
| | 266 | 276 | 292 | -- | -- |
| | -- | -- | 303 | -- | -- |
| Henry Bellavigna | 319 | -- | -- | -- | -- |
| Henry Bellavigna (recalled) | 441 | -- | -- | -- | -- |

**E X H I B I T S**

| EXHIBIT NUMBER | IDENTIFIED | RECEIVED |
|---|---|---|
| GENERAL COUNSEL'S | | |
| GC-6 | -- | 261 |
| GC-21 | -- | 439 |
| GC-22 | 257 | -- |
| GC-23 | 262 | 263 |
| GC-24 | 263 | 265 |
| GC-25 | 263 | 265 |
| GC-26 | 365 | 369 |
| GC-27 | 371 | 388 |
| GC-28 | 388 | -- |
| GC-29 | 396 | 398 |
| GC-31 | 421 | 433 |
| GC-32 | 421 | 433 |
| GC-33 | 454 | 455 |
| CHARGING PARTY'S | | |
| CP-1 | 222 | 223 |
| CP-2 | 229 | 231 |
| CP-3 | 235 | 238 |
| CP-4 | 243 | 244 |

1

<u>P R O C E E D I N G S</u>

1
2                                                    **(Time Noted:   8:30 a.m.)**

3        **JUDGE CARTER:   On the record.**

4        And recalling the case of "Ace Masonry, Incorporated,

5   d/b/a as Ace Unlimited and Bella Masonry, LLC."  Charging Party

6   is the Bricklayers Union, the Laborers Union, as well as the

7   Carpenters Union, Case Numbers 3-CA-73540, 74523, 73549, 74531,

8   and 796060.  Administrative Law Judge Geoff Carter presiding.

9        Just go ahead and take the appearances once more.

10       MR. LEHMANN:  Greg Lehmann for acting General Counsel.

11       MS. KLUYTENAAR:  Brie Kluytenaar for acting General

12   Counsel.

13       MR. FURLONG:  Richard Furlong for Charging Party

14   Bricklayers Local 3 and Laborers Local 785.

15       MR. JAMESON:  Curtiss Jameson, Law Firm of Kroll Heineman

16   Curtain, representing the Carpenters.

17       MR. SHEATS:  Ed Sheats for Employer's.

18       MR. BAILEY:  Jason Bailey for Employer's.

19       JUDGE CARTER:  I guess, before we start taking more

20   testimony I have to begin today with a story.

21       So I'm having dinner last night and you know, I was sort

22   of, you know, wrapping up things, getting ready for the check,

23   and in I see walk one of our observers, the gentleman here,

24   what's your name, sir?

25       MR. SMITH:  Charles Smith.

1     JUDGE CARTER:  So he walks by me, he doesn't see me, I

2  don't think, but I'm waiting for the check to come and I hear a

3  booming voice, which I believe was either Mr. Furlong or Mr.

4  Jameson, one of the two.  And long story short, I overhear them

5  talking about my ruling about the -- Mr. Bailey's letter and

6  whether that should have been admitted into evidence.  So it

7  was G-rated, nothing -- no big deal.  But I think the words

8  were that 99 out of 100 judges would have let that in without a

9  discussion.

10     UNIDENTIFIED SPEAKER:  Now I know who it was that said it.

11     JUDGE CARTER:  So this is my dinner experience and you

12  know, I wrapped things up and left.

13     So anyway, I'm putting it on the record for two reasons.

14  First is a good reminder as I'm advising you protect yourself

15  at all times.  If you're going to talk about the case make sure

16  you know who's around you.

17     And second of all, it is technically an ex parte contact,

18  even though it's inadvertent, so it's on the record.  I don't

19  think it's a big deal but it's on the record.  And there is --

20     MR. BAILEY:  Judge, I just have one question.

21     JUDGE CARTER:  Yeah.

22     MR. BAILEY:  Where are you going to dinner tonight?

23     JUDGE CARTER:  Yeah.

24     MR. SMITH:  Sir, for the record, I did acknowledge you

25  when I walked by.

1    JUDGE CARTER:  Oh, I didn't notice you.  I didn't think

2  you were being rude, though.

3    But anyway, I've heard a lot worse, so not to worry on

4  that front, but it is -- since it's ex parte, in a sense, I

5  wanted to put that on the record.

6    MR. BAILEY:  Thank you, Judge.

7    JUDGE CARTER:  So anyway, having covered that detail,

8  where we left off, Mr. Furlong was still examining the Witness.

9    Ma'am, just remember you're still under oath from

10  yesterday.

11    THE WITNESS:  Yes.

12  (Whereupon,

13                          **LISA BELLAVIGNA,**

14  having been previously called as a witness by and on behalf of

15  the General Counsel and, after having been previously sworn,

16  was examined and testified as follows:)

17    JUDGE CARTER:  Do you need a minute to prepare?  Are you

18  still --

19    MR. FURLONG:  No, I'm all set, Judge.

20    JUDGE CARTER:  All set.  All right, further questions?

21                  **CONTINUED 611 (c) DIRECT EXAMINATION**

22  BY MR. FURLONG:

23  Q    Ms. Bellavigna, good morning.

24  A    Good morning.

25  Q    I think that we left off discussing some of the jobs at

```
 1    the tail end of the fall of 2011; do you recall that testimony?
 2    A    Somewhat, yes.
 3    Q    Just -- I just briefly want to go over a couple of them
 4    and move into some others.
 5         The Trinity Church, Charles Evans was the prime contractor
 6    and you were subbed to Charles Evans Roofing?
 7    A    No.
 8    Q    No?  At Trinity Church what were you doing?
 9    A    I was the GC.
10    Q    You were the GC?
11    A    Yes.
12    Q    Okay.  Was there any roofing work going on there?
13    A    There is ongoing -- roofing work going on right now.
14    Q    Maybe I misunderstood you.  So you were the GC at the
15    Trinity Church?
16    A    Yes.
17    Q    Okay.  And where is that Trinity Church located?
18    A    In Elmira.
19    Q    All right.  And do you have an opportunity to sub any work
20    there, at Trinity Church?
21    A    I subbed out the roofing part and the masonry part.
22    Q    Okay.  And the masonry part was subbed to who?
23    A    Bella.
24    Q    Okay.  And with respect to the S.U.N.Y. Binghamton job,
25    you had a subcontractor on that job to time and material work?
```

```
 1   A     Yes.

 2   Q     And that would have been who?

 3   A     Bella.

 4   Q     Okay.  And with respect to the Ithaca Town Hall project

 5   you did not sub it out, your contract was ended prematurely by

 6   the prime contractor and then Bella took over the work; that's

 7   your understanding?

 8   A     What job?

 9   Q     Ithaca Town Hall project.

10   A     Is that the Hale (ph) contract?

11   Q     I'm asking you.

12   A     I have to look in my notes.

13   Q     That's fine, if it helps refresh your recollection.

14   A     Ithaca Town Hall?

15   Q     Ithaca Town Hall project.

16   A     Yes.

17   Q     Okay.  And it's your understanding that Bella took over

18   that project immediately upon Ace's cessation of services on

19   that project?

20   A     We were terminated.

21   Q     Yes.  So is it -- my question is is it your understanding

22   that Bella took over immediately upon Ace's cessation --

23   A     Yes.

24   Q     -- of --

25         Okay.  And do you know how Bella got that job?
```

1  A    No.

2  Q    Okay.  So all you know is that you were -- Ace was

3  terminated and Bella took over and you don't know how Bella got

4  the job?

5  A    Correct.

6  Q    All right.  And I think we already went over it, but I'll

7  be very brief on it, even though your contract was ended prior

8  to its natural conclusion, prior to it's -- you completing the

9  work, you never sued the prime contractor or anything like

10  that?

11  A    No.

12  Q    I want to bring your attention to a job in Vestal, New

13  York in the fall of 2011.  Were you a subcontractor to Pike

14  Company (ph) on the Vestal job?

15  A    No.

16  Q    Were you a subcontractor at all on the Vestal job --

17  A    No.

18  Q    -- in the fall of 2011?

19     Were you a prime contractor?

20  A    No.

21  Q    Did you perform any work in Vestal, New York?

22  A    No.

23     JUDGE CARTER:  When?

24  BY MR. FURLONG:

25  Q    In the fall of 2011.

1  A    In Vestal?  No.

2  Q    Did you -- you did not do a senior citizen housing project

3  or something of that nature down in Vestal, New York?

4  A    No.

5  Q    Okay.  Do you know whether or not Bella did any work down

6  there?

7  A    Yes, they did.

8  Q    All right.  And how do you know that?

9  A    Hearsay.

10  Q    Okay.  Did you speak to your husband regarding the Vestal

11  job?

12  A    I've spoke recently about the Vestal job.

13  Q    Okay.  Do you know whether or not -- well, let me back up.

14  Did you speak to your father-in-law regarding the Vestal job?

15  A    No.

16  Q    Okay.  So it -- it would have just been your husband?

17  A    No, it was brought up with the NLRB testimony in March.

18  Q    Well, I'm asking you aside from whatever you may have

19  heard or told the NLRB, my question to you is you became that

20  Bella was doing a job in Vestal, New York; am I correct?

21  A    Yes.

22  Q    And that would have been in the late fall of 2011;

23  correct?

24  A    No, I didn't know anything about in the fall.

25  Q    Okay.  So you only found out about it during the course of

1   the investigation leading to these proceedings here?

2   A    Yes.

3   Q    All right.  And do you know whether or not Ace Masonry's

4   equipment was not that project?

5   A    No, I do not.

6   Q    Okay.  Do you know whether or not Robert P. Bellavigna,

7   your husband, was on that project working?

8   A    No.

9   Q    Okay.  No, he was not or no, you don't know?

10   A    No, I do not know.

11   Q    Okay.  And you live together; right?

12   A    Yes.

13   Q    You generally know where your husband is with respect to

14   his job duties?

15   A    Never.

16   Q    Never.  Okay.  And so you don't talk at home about where -

17   - what job he's working on or anything like that?

18   A    We try to avoid that.

19   Q    Okay.  Did you have any sort of a rental agreement in the

20   fall of 2011 with respect to equipment for a Bella job in

21   Vestal, New York?

22   A    Yes.

23   Q    Okay.  So how do you know you had a Vestal -- a rental

24   agreement but you know nothing about the job?

25   A    The rental agreement that it's Vestel, V-E-S-T-E-L, on the

1    rental agreement.

2    Q    And what did you rent to Bella?

3    A    Do you have the rental agreement?

4    Q    I'm asking you what did you rent to Bella?  You're the

5    president of the Company.

6    A    Some scaffolding, I believe a Lahl (ph).

7    Q    What -- how much did you charge for the scaffolding; do

8    you recall?

9    A    No.

10    Q    And what did you charge for the Lahl; do you recall?

11    A    Without looking at it it was like over three grand.

12    Q    Okay.  Who negotiated that rental agreement on behalf of

13    Ace Masonry?

14    A    Henry and I.

15    Q    On behalf of Ace Masonry.

16    A    Oh, on behalf of, I did.

17    Q    Okay.  And you negotiated with Henry?

18    A    Yes.

19    Q    Okay.  Were there proposals going back and forth as to

20    what you were going to charge for the equipment?

21    A    No.  Basically we had a chart of equipment to go by with

22    what -- in respect with what a rental company would get.

23    Q    All right.  Other than Bella Masonry, in the fall of 2011

24    were you renting equipment to any other masonry companies?

25    A    Not --

1   Q    And if so I would like you name --

2   A    Not to my knowledge.

3   Q    Okay.  So the only company that were (sic) renting

4   equipment to was Bella Masonry in the fall of 2011?

5   A    To my knowledge, yes.

6   Q    Okay.  Now, do you know who worked on that job in Vestal,

7   New York?

8   A    No.

9   Q    Okay.  Do you know whether or not -- did you rent any

10  trucks to take workers down -- Ace trucks to take workers down

11  to that Bella job?

12  A    No.

13  Q    Okay.  So if Ace trucks were utilized they were not paid

14  for; is that a fair conclusion?

15  A    Yes.

16  Q    Okay.  Now, I want to summarize, and I want to basically

17  put a time limitation on this of August of 2011 forward, other

18  than the Trinity Church job, other than we just spoke about

19  Vestal, which you said was a Bella job, other than the S.U.N.Y.

20  Binghamton job, other than the Ithaca Town Hall job, what other

21  jobs did you have ongoing?  Fall 2011.

22  **(Witness examines documents.)**

23  BY MR. FURLONG:

24  Q    Can you tell me without refreshing your recollection, off

25  the top of your head?

1    A    No.

2    Q    Okay.  You're the president of the Company?

3         MR. BAILEY:  I think we've established that.

4         MR. FURLONG:  All right.

5    BY MR. FURLONG:

6    Q    All right, you don't know --

7         MR. BAILEY:  You keep asking the same question but it's

8    been answered a number of times.

9    BY MR. FURLONG:

10   Q    Without refreshing your recollection or looking at

11   documents can you tell me what jobs, as president, you know the

12   Company, Ace Masonry, was doing?

13   A    Somewhat, yes.

14   Q    Tell me jobs other than the ones I mentioned that you were

15   doing in the fall of 2011.  Without looking at documents,

16   please.

17        JUDGE CARTER:  He wants you to not look at the document

18   here.

19        THE WITNESS:  Okay.  Well, I have to explain; a lot of

20   jobs are not closed out in the fall of 2011.  So we were trying

21   to closeout jobs, for example S.U.N.Y. Binghamton, a job in --

22   BY MR. FURLONG:

23   Q    What do you mean by "closeout a job"?  Explain that for

24   the record.

25   A    The project manager on that job was trying to close it

1    out.

2    Q    I don't know what "closeout" means; explain it to me.

3    A    You're submittals, final documents, closeout documents,

4    submitting all that, for several jobs; Odessa Montour Schools.

5    Q    Let's -- let me just -- aside from closeout jobs, the

6    paperwork, I'm talking about the actual performance of jobs

7    where block is being laid and other masonry tasks are

8    performed.  What jobs were going on?  I'm not talking about

9    closing out, as I understand the term, I mean actually

10   performing work with craftworkers.  What jobs other than the

11   one I just described?

12   A    49th Street.

13   Q    What was being done on 49th Street?

14   A    Honestly, I wasn't in the office, I just know that that

15   was one of the jobs that we were working on.

16   Q    49th Street, what was the -- you don't know the nature of

17   the project?

18   A    No, I do not.

19   Q    Okay.  And that was definitely in the fall of 2011?

20   A    Yes.

21   Q    All right.  49th Street in Ithaca?

22   A    No, it was in where they had flooding.  Down near

23   Binghamton.  I can't think of the town.

24   Q    Okay.

25   A    It starts with an "O."

```
 1   Q    Okay.  Did you ever visit the job site?

 2   A    Oswego -- Owego.  Owego.

 3   Q    Did you ever visit the job site?

 4   A    No.

 5   Q    Okay.  I'm going to come back to this, but did you visit

 6   the Trinity Church job site?

 7   A    Yes, I've been there.

 8   Q    Okay.  While it was ongoing?

 9   A    It's still ongoing.

10   Q    By Ace Masonry?  Or by who, Bella?

11   A    I'm the GC on the job.

12   Q    So Ace Masonry is still performing work on the Trinity

13   Church project?

14   A    I'm the GC.  I'm the acting GC, therefore I'm still an

15   entity and I have to be available at times.

16   Q    Okay.  So you've been to that job.  Were you at the

17   S.U.N.Y. Binghamton job?

18   A    The fall of 2011?

19   Q    Yes.

20   A    When?  No.

21   Q    Okay.  Were you at the Ithaca Town Hall job?

22   A    No.

23   Q    Okay.  Were you at the Cornell job that was let from Bella

24   back to Ace?

25   A    No.
```

1    Q    Let me go down a list of these jobs.  Were you at the

2    Sullivan Park Loose Concrete in Corning, New York project?

3    A    When?

4    Q    Were you ever at that project in the fall of 2011?

5    A    I was not at any projects the fall of 2011.

6    Q    Okay.  You testified earlier or yesterday that JaLynda

7    Ashmall --

8    A    Yes.

9    Q    -- basically started to do your job when you were out of

10   commission for a while?

11   A    No, she started in July.

12   Q    Oh, before you started to --

13   A    Umm-hmm.

14   Q    -- take a leave from the Company?

15   A    Yes.

16   Q    Now, overnight I looked her business.  Her business is

17   called Virtual Competition or something along those lines; are

18   you aware of that?

19   A    No.

20        MR. FURLONG:  Off the record for a minute?

21        JUDGE CARTER:  Off the record.

22              **(Whereupon, a brief recess was taken.)**

23        JUDGE CARTER:  Back on the record.

24        Any further questions?

25              **DIRECT EXAMINATION (continued)**

1  BY MR. FURLONG:

2  Q    Did you ever hear of a company called Virtual Completion?

3  A    No.

4  Q    And you don't know whether or not Ms. Ashmall has any

5  connection to Virtual Completion?

6  A    No.

7  Q    Have you ever been to the website

8  www.virtualcompletion.com?

9  A    No.

10 Q    If I told you that the website that she posts talk about

11 her being a full-service outsourced bookkeeping service, would

12 that be news to you or is that something that you're aware of?

13 A    News to me.

14 Q    Now, your job with Ace Masonry certainly was above and

15 beyond bookkeeping; was it not?

16 A    Yes.

17 Q    Tell me how it was above and beyond bookkeeping.

18 A    What do you need to know?

19 Q    Tell me everything that you did that would not fall in the

20 category of above and beyond bookkeeping.  She took your

21 position and she apparently held herself out as a bookkeeping

22 outsource service.  Above and beyond bookkeeping what did you

23 do for Ace?

24 A    I held project manager meetings.

25 Q    What else?

1   A    I went to superintendent meetings.  I talked to

2   supervisors regarding work, regarding job costing.  Made sure -

3   -

4   Q    Hold it right there, we're going to come back and I'll let

5   you continue it.  Are you aware whether or not Ms. Ashmall held

6   project management meetings?

7   A    No.

8   Q    You're not aware or she didn't?

9   A    I do not believe she did.

10  Q    Okay.  How about did she hold meetings with supervisors --

11  A    No.

12  Q    -- with respect to work?

13       Okay.  And you said something else; project manager

14  meetings, supervision and something else that you did.  What

15  else did you do?

16  A    What I just said.  What -- I don't know what I just said.

17  What did I just say?

18  Q    You -- project management, supervision, you met with

19  supervision.

20  A    Job costing.

21  Q    Job costing; is that a form of estimating?

22  A    No, job costing is going over job costs that are current.

23  Q    Okay.  What?

24  A    Jobs that we're working on.

25       I did a lot of paperwork regarding going over change

1    orders, contracts.

2    Q    All right, regarding change orders, first of all what is a

3    change order?

4    A    A change to the contract.

5    Q    Okay.  And you would --

6    A    Whether it's a deduct --

7    Q    -- approve these or not approve them; is that --

8    A    Yes.

9    Q    Okay.  And do you know whether or not Ms. Ashmall had any

10   experience going over change orders for masonry?

11   A    No, I do not believe she did.

12   Q    Okay.  So in your absence and her presence who was

13   performing the job costings, the project management, meeting

14   with supervision, looking at change orders; who was doing that?

15   A    It wasn't happening to my knowledge.

16   Q    It just sat there and was not getting done?

17   A    Basically all of our jobs, big jobs, were coming to a

18   close.

19   Q    Okay.  You still had jobs ongoing though; right?

20   A    Yes, little ones.

21   Q    Okay.  Your husband, Robert P. Bellavigna, if I were to

22   look at his résumé, he's familiar with job costings, meeting

23   with project managers, meeting with supervision, looking at

24   change orders; is he not?

25   A    Yes, he is.

1  Q    And he didn't do any of that in your absence, to your

2  knowledge?

3  A    To my knowledge, no.

4  Q    Okay.  Any other types of duties that you did, because I

5  want to compare what you did and what Ms. Ashmall is, who you

6  said pretty much took over for you when you were out, that was

7  your testimony yesterday.

8  A    I reviewed all the bid documents.

9  Q    Did she do that to your knowledge?

10 A    No.

11 Q    All right.  Did anybody do that, to your knowledge, in

12 your absence?

13 A    My estimator, Ken Wild (ph).

14 Q    Okay.  You also had Henry Bellavigna as an estimator in

15 the fall of 2011; didn't you?

16 A    Not for very long.

17 Q    Okay.  What else did you do?

18 A    I got bonding capability for the Company.

19 Q    You arranged bonding through a surety company?

20 A    Yes.

21 Q    All right.  And do you know if Ms. Ashmall did any of

22 that?

23 A    No.

24 Q    Okay.  Is it safe to say without going through an entire

25 laundry list of what you would do, that she really relegated

1    her duties to the bookkeeping aspect of your job?

2    A    Yes.

3    Q    All right.  And if those other duties were not attended to

4    or if somebody else did them or they were not attended to they

5    simply didn't -- they didn't get done?  Let me withdraw that,

6    that was poorly phrased.

7         If those duties needed to get done they didn't get done

8    because to your knowledge nobody stepped in and did them?

9    A    Yes.

10   Q    Now, I said I was going to circle back and now I want to

11   do that.  In addition to the jobs that Bella was involved with,

12   where they either let the job back to Ace, which was Cornell,

13   or the other jobs that we spoke to where they took over for you

14   -- from Ace Masonry, you mentioned on other job, 49 Front

15   Street (sic), did Ace Masonry complete that job?

16   A    Yes.

17   Q    Okay.  And with no involvement by Bella; right?

18   A    Not to my knowledge.

19   Q    All right.  And when to your knowledge did they complete

20   that project?

21   A    Sometime in the fall.

22   Q    Okay.  Any manpower problems on that project?

23   A    No.

24   Q    All right.  What other jobs were you doing?

25   A    Finishing up closeout jobs.

1  Q     Just basically punch list type stuff, putting --

2  A     Well, we --

3  Q     -- finishing touches on jobs?

4  A     -- we did the job up at Cornell, we did McGraw Hall,

5  S.U.N.Y. Binghamton --

6  Q     Let me talk about McGraw Hall; did you have any problems

7  with manpower on that job?

8  A     Not to my knowledge.

9  Q     Okay.  How many masons were on that project?

10  A     I would have to look.

11  Q     To the best of your knowledge.

12  A     I don't know.

13  Q     No clue as to how many masons were working.  How many

14  carpenters were in the job; do you know?

15  A     I would have to look.

16  Q     How about laborers; do you have any idea of roughly how

17  many laborers were on that project.

18  A     No, I do not.

19  Q     Did you visit the project?

20  A     No.

21  Q     Okay.  What other projects?

22  A     I can't think of any other.

23  Q     Okay. So with McGraw Hill you don't know of any manpower

24  problems.  With 49 Front Street you don't know of any.  But on

25  the other jobs you've indicated there were some man problems --

1  manpower problems that created troubles that forced you give

2  the work to Bella; that was your testimony yesterday?

3  A    Yes.

4  Q    Okay.  By the way, at its height or not long ago, in fact,

5  in 2010, Bella was running about 40 to 50 masons during its

6  peak season; wasn't it?

7       MR. BAILEY:  Wait, Bella or Ace?

8       MR. FURLONG:  Ace, my apologies.  It's easy to get them

9  mixed up.

10 BY MR. FURLONG:

11 Q    Ace was running about 40 to 50 masons.

12 A    In 2010?

13 Q    Yes.

14 A    I don't know without looking.

15 Q    Okay.

16 A    Every year differed.

17 Q    All right.  At its height at any year since 2002, its

18 inception, Bella was running about 40 to 50 masons a year?

19      JUDGE CARTER:  Again,  you mean Ace?

20      MR. FURLONG:  I meant Ace, my apologies.  It's not

21 intentional.

22 BY MR. FURLONG:

23 Q    Ace was running about 40 to 50 masons per year?

24 A    I would say 35.

25 Q    Okay.  And were you ever told by the Masons Union Hall

1    that they could not supply manpower for you?

2    A    I never talked to the Union Hall about manpower.

3    Q    Okay.  Mr. -- Bob P. would talk to the Union about

4    manpower; wouldn't he?

5    A    I don't know.

6    Q    Okay.  These were Union members that you employed?

7    A    For the field, yes.

8    Q    Yeah, okay.  So if you didn't talk to the Union Hall about

9    manpower and obviously the manpower arrived on your jobs, do

10   you have any knowledge as to how that manpower would arrive on

11   your projects?

12   A    Yes.

13   Q    How would that happen?

14   A    The superintendents always hired in and let go and laid

15   off.

16   Q    So they would call the Union Halls to your knowledge?

17   A    Yes.

18   Q    Okay.  And with respect to the laborers, what would be a

19   typical year in terms of the number of laborers that Ace

20   Masonry would employ?

21   A    I don't know without checking.

22   Q    Fair to say 15 to 20 typically through a season?

23   A    Fair.

24   Q    All right.  And with respect to carpenters it would

25   probably be about double that, maybe 30 carpenters?

1    A    No.

2    Q    How many?

3    A    I would say 20.

4    Q    Twenty carpenters on a typical year, all right.

5         Now, in the fall of 2011 when you had these manpower

6    problems, it's fair to say you were not running 30 -- with 30

7    masons, 15 carpenters, 20 laborers; isn't that the case?  These

8    were smaller jobs that we're talking about, St. Mary's, Cornell

9    and so on?

10   A    Yes, that's fair to say.

11   Q    Okay.  Did you used to go to pre-job meetings?

12   A    Once in a while, yes.

13   Q    Okay.  How many times in the last years have you gone to

14   pre-job meetings and where?

15   A    I would go to Cornell for some meetings.

16   Q    Okay.  Would Henry Bellavigna go to pre-job meetings?

17   A    No.

18   Q    Would Bob, your husband, go to pre-job meetings

19   A    What do you mean by "pre-job meetings"?

20   Q    Jobs that take place prior to the start of the job where

21   the customer's representative coordinates or the general

22   contractor coordinates the upcoming project.  Are you aware of

23   what a pre-job meeting is?

24   A    Yes, but we didn't call that.  Do you mean like a pre-bid?

25   Q    No, I mean a pre-job, after the bids have been awarded and

1  all the contractors are on site.

2  A    Usually the project manager would go to that that's going

3  to perform the job.

4  Q    And the project manager for Ace Masonry was typically your

5  husband?

6  A    John Franzese.

7  Q    Okay.  How about your husband; would he go to pre-jobs?

8  A    Not often.

9  Q    Okay.  And you went occasionally?

10  A    Yes.

11  Q    Okay.

12      MR. FURLONG:  Your Honor, we're going to -- this is our

13  first Exhibit, do you want it just Charging Party Laborer or

14  Charging Party, period?  Obviously we have three trades, two

15  counsel for them.

16      JUDGE CARTER:  Let me ask, are -- do you have any

17  exhibits, as well, Mr. Jameson?

18      MR. JAMESON:  I do not at this time, Your Honor.  I don't

19  anticipate any exhibits but I can't guarantee that as we delve

20  down deeper into the case.

21      JUDGE CARTER:  And are there different exhibits for

22  Laborers and Bricklayers or is it all -- does it matter if we

23  just --

24      MR. FURLONG:  It would not be different exhibits at this

25  point.

1    JUDGE CARTER:  Then just Charging Party is fine and then

2  we'll adjust it if we need to.

3    MR. FURLONG:  Okay.

4  **(Charging Party's Exhibit 1 marked for identification.)**

5  BY MR. FURLONG:

6  Q    Ms. Bellavigna, I've handed around and marked for

7  identification a two-sided document which purports to be the

8  résumé of Robert P. Bellavigna; would that be the same Robert

9  P. that you're married to?

10  A    Yes.

11  Q    Okay.  And did you have occasion to help put this résumé

12  together for submission to Cornell University with respect to

13  its JOC programs?

14  A    Yes.

15  Q    Okay.  And did you have an opportunity prior to submitting

16  it to Cornell to review it and make sure that it was accurate

17  in terms of your husband's job duties and history?

18  A    I believe Cornell had to review it, yes.

19  Q    No, my question is did you review it as part of a

20  submission that you made under cover letter to Cornell

21  University?

22  A    I don't remember if I reviewed it.

23  Q    You don't remember reviewing it?  Okay.

24    But you did testify a moment ago that you did have a role

25  in helping put this together for submission to Cornell?

1    A    Yes.

2    Q    All right.  I take -- I would like you, before I move to

3    admit it, I'm going to ask you to review it and you tell me if

4    there's anything on there that you believe not to be accurate?

5    A    In respects to the whole résumé?

6    Q    Yeah.

7    **(Witness examined the document.)**

8         MR. FURLONG:  Actually, Judge, before she reviews it I

9    should probably move it in procedurally, so I will at this

10   point to move it in.

11        JUDGE CARTER:  Okay.

12        MR. JAMESON:  No objection, Your Honor.

13        MR. BAILEY:  No objection.

14        JUDGE CARTER:  Very well, Exhibit 1 for Charging Party

15   admitted without objection.

16   **(Charging Party's Exhibit 1 received into evidence.)**

17        THE WITNESS:  All right.

18   BY MR. FURLONG:

19   Q    Accurate?

20   A    Yes.

21   Q    Okay.

22   A    To my knowledge.

23   Q    Okay.

24   A    Only thing I wouldn't know about is the seminars.

25   Q    Okay.  Putting aside the seminars, I want to direct your

1   attention about midway down the front page there where there's
2   an entry as to his job experience.  It says "Placement of all
3   supervision and manpower."  Do you see that?
4   A    Yes.
5   Q    I want you to give me as much description as possible as
6   to what that means with respect to your husband, "Placement of
7   all supervision and manpower."  Tell me what you understood
8   that to mean when you submitted it to Cornell?
9   A    "Supervision" in my opinion is superintendents.
10  Q    Okay.
11  A    Okay.  And respect to "manpower" the crew out in the
12  field.
13  Q    The masons, the carpenters, the laborers; right?
14  A    Anybody who worked under the superintendent?
15  Q    And anybody who worked for Ace Masonry?
16  A    No.
17  Q    Really?  Okay.  Who would it include other than employees
18  of Ace Masonry?
19  A    Just as I said, the superintendents and supervision,
20  discussing work with project managers.
21  Q    Well, let me ask you some specific names, all right?
22  A    Okay.
23  Q    Derek Hager; would it include Derek Hager?  "Placement of
24  all supervision and manpower," would that include Mr. Hager?
25  A    Yes.

1  Q    And he worked for Ace; right?

2  A    Yes, he did.

3  Q    And would it include Dick Tracy?

4  A    Yes, he was a superintendent, also.

5  Q    And he worked for Ace; right?

6  A    Yes.

7  Q    And would it include Scott Smith?  He was a laborer for

8  Ace?

9  A    Not as much Scott Smith.

10  Q    Okay.  Now, putting aside placement of all supervision,

11  how about manpower, all right, aside from supervision, would

12  manpower cover your carpenters, your laborers, your masons

13  employed by Ace Masonry?

14  A    Yes.

15  Q    All right.  So it's fair to say that the representation

16  that you made or you, in conjunction with your husband, to

17  Cornell University in 2010 when you were putting this proposal

18  together for the JOC's program, was that Robert P. Bellavigna

19  was responsible for placement of all supervision and manpower

20  at Ace Masonry?  I guess, that's what it says?

21  A    Supervision and manpower in my knowledge is what I just

22  explained.

23  Q    Okay.

24  A    Superintendents and workers, making sure that the

25  superintendents have the workers in the field.

1   Q    Right.  So on a tier -- if we were to do a tier diagram,

2   you would have Robert P. Bellavigna.  Beneath him would be your

3   superintendents and other supervision.  And beneath them the

4   workers, the employees, the craftworkers?  If I were to a crude

5   schematic that's what it would look like --

6   A    Yes.

7   Q    -- am I correct?

8        All right.  And who would be above Robert P. Bellavigna if

9   he's responsible for placement of all supervision and manpower?

10  A    The owner, me.

11  Q    You.  All right, good.  So everything on this right now,

12  as you look at it now two years later, it's 2012 -- and by the

13  way, you -- I don't think the record establishes it, you

14  submitted this in 2010 as part of a contract with Cornell for

15  its JOC programs; is that correct?

16  A    Yes.

17  Q    So everything now as you review it two years later does

18  look accurate?

19  A    Yes.

20  Q    Now, I want to get into some specifics again with respect

21  to Robert P. Bellavigna.  He worked Ace Masonry since 2002, up

22  to the present, which at this time was 2010, obviously we know

23  it went beyond that, as a project coordinator, and Counsel for

24  the General Counsel asked you some of his duties.

25       Without looking at this what did a project coordinator do

1    at Ace Masonry?

2    A    Please repeat that.

3    Q    Sure.  You have listed your husband as a project

4    coordinator at Ace Masonry from 2002 to the present; tell me --

5    A    No.

6    Q    He was not a project coordinator?

7    A    No.  I think he had other titles but I don't remember.

8    Q    All right.  Let me look at the work history that you put

9    together in your submission to Cornell.

10        First entry "Project coordinator" for Mr. Bellavigna, "Ace

11   Masonry, Inc., 2002 to the present."  You testified a few

12   moments ago that you worked with your husband putting this

13   together for submission.  What -- are you telling us in 2012

14   that that was inaccurate what you told Cornell?

15   A    You have to ask the me question again in regards to what

16   time frame.

17   Q    From 2002 to the present, which would have been 2010 when

18   you submitted or sought this work, you listed your husband as a

19   project coordinator for Ace Masonry.  Your words, not mine.

20   A    At this time --

21   Q    What did a project coordinator do?

22   A    -- when this was typed up for the JOC's program, yes, he

23   was project coordinator.

24   Q    Okay.  Okay, and it says to the right of that "Project

25   coordinator, Ace Masonry, 2002 to the present," suggesting at

1    the time of his hiring in 2002, he was a project coordinator,

2    '3, '4, '5, '6, all the way up to 2010 he was a project

3    coordinator for Ace Masonry.

4    A    Yes.

5    Q    All right.  Now, my question, which we haven't yet gotten

6    to, what did a project coordinator do for Ace Masonry?  What

7    did Mr. Robert P. Bellavigna do?

8    A    Basically all those bullets.

9    Q    Okay.  Anything else other than the bullets that you've

10   listed here?

11   A    Anything that I've testified before.

12   Q    Such as?

13   A    Whatever I testified before earlier, yesterday.

14   Q    I don't recall your testimony.  What else?

15        JUDGE CARTER:  He's entitled to specifics on your answers

16   to that one.  If you can recall.

17        THE WITNESS:  I can't recall.

18        MR. FURLONG:  Okay.

19   BY MR. FURLONG:

20   Q    Why don't we go to the "Qualifications" portion of his

21   résumé, right above the "Work History."  Take a moment to

22   review that, Ms. Bellavigna, and then I'm going to ask you, in

23   fact, was your statement to Cornell accurate and we be rest

24   assured that he did this work?

25   **(Witness examined the document.)**

1    A    Okay.

2    Q    Was it accurate?

3    A    Yes.

4    Q    So Mr. Bellavigna, Robert P., worked with 25 -- over 25

5    job sites, superintendents, staffed over 100 employees

6    different locations; right?  He did all of this; correct?

7    A    Yes.

8    Q    And he's worked for other large contractors, in fact, as a

9    masonry superintendent; from 1993 he worked for McGuire and

10    Bennett; right?

11    A    Yes.

12        MR. FURLONG:  I need to go off the record for a minute.

13        JUDGE CARTER:  Okay, off the record.

14            **(Whereupon, a brief recess was taken.)**

15        JUDGE CARTER:  Back on the record.

16            **611(c) DIRECT EXAMINATION (continued)**

17    **(Charging Party's Exhibit 2 marked for identification.)**

18    BY MR. FURLONG:

19    Q    Ms. Bellavigna, I've handed you two documents marked for

20    identification.

21        The first being a September 20, 2010 letter on Ace

22    letterhead.  It's a three page document and I direct your

23    attention to the third page where there's a signature.

24    A    Yes.

25    Q    Is that your signature?

1    A    Yes, it is.

2    Q    Okay.  And that's not a stamp, it's actually your

3    signature; am I correct on that?

4    A    Yes.

5    Q    And this letter purports to be or was sent to a Kate Kieli

6    at Corning, Incorporated, re: Letter of Interest; do you recall

7    this letter?

8    A    Yes.

9    Q    Okay.  And is it accurate to say that Ace Masonry was

10   attempting to secure a three-year agreement with Corning,

11   Incorporated, with respect to performance of masonry work?

12   A    Yes.  But Ace Unlimited.

13   Q    Ace Masonry, d/b/a Ace Unlimited?

14   A    Yes.

15   Q    All right.  And obviously we have your signature there.

16   Is it safe to say, as well, that you drafted this letter for

17   Corning's consideration?

18   A    Yes.

19   Q    And did you send the letter?

20   A    Yes.

21        MR. FURLONG:  I move that be received into evidence.

22        MR. LEHMANN:  No objection.

23        MR. JAMESON:  No objection.

24        MR. BAILEY:  No objection.

25        JUDGE CARTER:  Very well, Charging Party Exhibit 2

1   admitted without objection.

2   **(Charging Party's Exhibit 2 received into evidence.)**

3       MR. FURLONG:  3.

4       JUDGE CARTER:  2.

5       MR. FURLONG:  Oh, it's 2?  Made a mistake.  My error.

6   BY MR. FURLONG:

7   Q   Now, directing your attention to the second page you've

8   got some bullet points there describing the type of work you

9   do, that's at the top of the second page; do you see that,

10  tile, plaster --

11  A   Yes.

12  Q   -- fireproofing -- okay.  Masonry, concrete; right?

13      And then four or five bullet points down you indicate that

14  you are a Union general contractor; do you see that?

15  A   Yes.

16  Q   All right.  And was that true back when you wrote the

17  letter --

18  A   Yes.

19  Q   -- 2010?

20      And is it true that at that time you considered yourself

21  bound to the collective bargaining agreements of the Laborers,

22  the Bricklayers, and the Carpenters?

23  A   Yes.

24  Q   And that's why you represented it as a Union general

25  contractor; right?

1  A    Yes.

2  Q    And in fact, you repeated it down in the next paragraph,

3  third line down, you serve the industry as a Union general

4  contractor; right?

5  A    Yes.

6  Q    So there's no question at this point in 2010 you are -- or

7  you understood that you were bound to at least three collective

8  bargaining agreements with the crafts I just mentioned?

9  A    Yes.

10  Q    And you represented that to potential customers?

11  A    Yes.

12  Q    Okay.  Now, I want to go down to the paragraph that begins

13  at the bottom of page 2, "When someone asks me what sets Ace

14  Masonry, Inc., d/b/a, apart from its competitors," do you see

15  that?

16  A    Yes.

17  Q    And I want you to review that paragraph and the next

18  paragraph, actually the remainder of the letter, and then I'm

19  going to ask you if that's your verbiage.

20  **(Witness examined the document.)**

21  A    All right.

22  Q    You wrote that language, did you not?

23  A    No, I did not.

24  Q    Okay.

25  A    I had help.

1  Q    Okay.  Who helped you?

2  A    One of my project managers.

3  Q    Okay.  Who was that be -- who would that be?

4  A    Matt Franzese.

5  Q    Okay.  And you approved this language before signing your

6  name to it?

7  A    Yes, I did.

8  Q    All right.  And if I were to look at the Ace -- well, let

9  me backup.  Ace Masonry had a website; did it not?

10 A    Yes, it did.

11 Q    And when did it put the website up?

12 A    I don't remember.

13 Q    Okay.  And when -- did it take it down or is it still up?

14 A    No, I don't believe it's up.

15 Q    All right.  Do you know when you took it down?

16 A    I don't recall.

17 Q    Okay.  And if I were to look at that website would you

18 agree with me that your last three paragraphs in this letter

19 are word-for-word on that website as an introduction to the Ace

20 Masonry Company?

21 A    I don't remember.  I would have to see it.

22 Q    Okay.  You don't recall what was on the website?

23 A    No.

24 Q    All right.  Have you ever seen the Bella Masonry website?

25 A    No.

1    Q    Okay.  If I were to tell you that the Bella Masonry

2    website is word-for-word your last three paragraphs would that

3    surprise you?

4    A    Yes.

5    Q    Did anyone ever ask you whether or not another concrete

6    company -- another masonry company could use your verbiage on

7    its website?

8    A    No.

9    Q    And that includes Henry?  That includes your husband Bob?

10    Nobody asked permission to do it; correct?

11    A    Correct.

12    Q    All right.  And if we go down here where you say that your

13    team, meaning the Ace Masonry team, has over 430 combined years

14    of extensive construction experience that was true; right?

15    A    Yes.

16    Q    Would it surprise you to know that there's another masonry

17    company called Bella that has exactly 430 combined years of

18    construction experience?

19    A    I wouldn't know anything about it.

20    Q    Okay.  Do you know of any other masonry contractor that

21    has the exact amount of combined years of extensive

22    construction experience as Ace Masonry?

23    A    No.

24    Q    Okay.  Are you aware of any other masonry contractor,

25    other than Bella -- we'll put Bella aside because you indicated

1   you hadn't seen their website, which will get introduced later;

2   are you aware of any other contractor, masonry or otherwise,

3   that has utilized your language word-for-word on its website?

4   A    No.

5   Q    Okay.  And if you knew that another company was utilizing

6   your product, your words, would you be upset about it?

7   A    I would tell them about it.

8   Q    Tell what?

9   A    I would tell them that that's my words if I knew about it.

10  Q    And would you sue for -- well, that's -- asks for

11  supposition so I'll withdraw it.

12  **(Charging Party's Exhibit 3 marked for identification.)**

13       Okay, going to Charging Party Exhibit 3, take a moment to

14  review it.

15  A    Yes.

16  Q    Do you recognize this as an exhibit that was included with

17  other exhibits and submitted by you to the Corning, Inc.

18  company?

19  A    Yes.

20  Q    Okay.  And Corning, Inc., incidentally is a private

21  company, obviously, it's not a public entity; am I correct?

22  A    Correct.

23  Q    And by "private" I don't mean it's stock is privately

24  held, so that we're clear on that.  I'm talking about it is not

25  a government entity.

1   A    I have something that I'm not really supposed to talk

2   about Corning.  That's how serious Corning is.

3   Q    Okay.  Well, that's good but we're in a federal agency

4   hearing and you need --

5   A    Okay.

6   Q    -- to answer the questions; all right.

7   A    All right.

8        MR. BAILEY:  If she signed something that says she can't

9   respond to something she's not going to respond to it.

10       MR. FURLONG:  No, you're wrong.  When you're in --

11       Well, Judge, can we have a ruling on that?

12       JUDGE CARTER:  I actually don't know what this other

13  document that she signed is, but the basic question about

14  whether its public or private, I guess I'm not clear on how

15  that would violate any type of agreement about Corning.

16       MR. BAILEY:  I think we can take -- I think we're willing

17  to stipulate that -- whether it's a public or private.  I think

18  we can get past that and move on.

19       MR. FURLONG:  Okay.

20       MR. BAILEY:  Okay.

21       MR. FURLONG:  So we have a stipulation that it's a private

22  entity?

23       MR. BAILEY:  That's fine.

24       MR. FURLONG:  Good.

25  BY MR. FURLONG:

1  Q    So Ms. Bellavigna, with respect to the Ace Unlimited

2  rates, which include wages rates together with apparently

3  benefit rates and so on, you submitted this based upon your

4  collective bargaining agreements; is that correct?

5  A    I would have to see what went with my agreements when I

6  did this.  I don't know if this is the exact one.  We went

7  round and round with Corning in regarding rates.

8  Q    Let me back up.  I think your testimony a couple of

9  questions ago was that yes, you submitted this together with

10  your other exhibits to Corning for consideration by that

11  company to use Ace Masonry.

12  A    I guess retract that because I'm not sure if this is the

13  one that we submitted and it got approved.

14  Q    All right.  Do you recognize -- have you seen this

15  document before, that's captioned "Ace Unlimited Master Wage

16  Rate Sheet Form"?

17  A    I've seen a lot of these go by my desk.

18  Q    Have you seen this document?

19  A    I don't know.

20  Q    Okay.  Did you submit as part of your package to Corning,

21  Inc., did you submit wages that would apply to the different

22  crafts?

23  A    Yes.

24  Q    All right.  And were those wages, did they also include

25  benefits, Taft-Hartley benefits?

```
 1   A    I believe --

 2   Q    Pension, welfare?

 3   A    I believe so, yes.

 4   Q    All right.  And when you submitted and put together those

 5   tables, would they have been based upon the collective

 6   bargaining agreements of the various crafts; the carpenter, the

 7   mason and the laborer?

 8   A    I believe so, yes.

 9   Q    All right.

10        MR. FURLONG:  I'm going to move that this be received into

11   evidence.

12        MR. LEHMANN:  No objection.

13        JUDGE CARTER:  No objection.

14        MR. BAILEY:  No objection.

15        JUDGE CARTER:  Very well, Charging Party Exhibit 3

16   admitted without objection.

17   (Charging Party's Exhibit 3 received into evidence.)

18   BY MR. FURLONG:

19   Q    Are you familiar with the requirement in New York or even

20   with the Federal government to pay prevailing wages?

21   A    Yes.

22   Q    And it only applies on public -- for public entities; am I

23   correct?

24   A    Yes.

25   Q    So Corning being a private entity you would only pay these
```

1    rates if you intended or felt that you were bound to collective

2    bargaining agreements; is that correct?

3    A    Yes.

4    Q    Okay.  Let me talk for a minute about your assertion and

5    response to General Counsel's questions that Ace Masonry became

6    a general contractor at a certain point in time, doing business

7    as Ace Unlimited; do you recall that -- those --

8    A    Yes.

9    Q    -- assertions?

10         All right.  And when did that take place?

11   A    I believe December of 2006.

12   Q    Now, when that took place you were already a masonry

13   contractor; am I correct?

14   A    Yes.

15   Q    And as a masonry contractor you employed carpenters,

16   laborers and masons?

17   A    At that time, yes.

18   Q    All right.  You didn't employ electricians; right?

19   A    Not to my knowledge.

20   Q    After you became a "general contractor" did you employ

21   electricians directly?

22   A    No.

23   Q    All right.  Prior to becoming a general contractor when

24   you were Ace Masonry did you employ, say, roofers?

25   A    Not to my knowledge.

1    Q    Okay.  After you became a general contractor and held

2    yourself out did you employ roofers directly?

3    A    As a subcontractor hire roofers?

4    Q    No, did -- no, did you hire roofers on your --

5    A    Not to my knowledge.

6    Q    -- on your payroll --

7         All right.  Did you hire boilmakers on your payroll after

8    you became a general contractor?

9    A    No.

10   Q    All right.  Did you hire operating engineers on your

11   payroll after you became a general contractor?

12   A    Yes.

13   Q    Did you have a contract with the Operating Engineers

14   Union?

15   A    Not to my knowledge.

16   Q    Okay.  How many operating engineers did you hire?

17   A    I believe one.

18   Q    Okay.  And when was that?

19   A    In -- can I look at my job sheet?

20   Q    And who was it?

21        Sure.  Whatever you need, take a look.

22   **(Witness examined the document.)**

23        MR. BAILEY:  Lisa, just reference what document you're

24   looking at by the Exhibit.

25        THE WITNESS:  Okay, GC-2, Job 0929 Monroe County Crime

1    Lab.

2    BY MR. FURLONG:

3    Q    Okay, you hired an operating engineer?

4    A    Yes.

5    Q    Directly on your pay -- who was it?

6    A    I don't know.  I can't remember his name.

7    Q    Okay.  Other than that one job and one individual, did you

8    hire operating engineers when you went from "a masonry

9    contractor" or a general contractor?

10    A    I may have but I don't recall.

11    Q    All right.  Let's talk about plasterers.  Did you hire any

12    plasterers at the time that allegedly went from a masonry

13    contractor to a general contractor?

14    A    Isn't a form of plastering in the masonry?

15    Q    No, it's actually a separate trade within the building

16    trades.  Did you hire any plasterers?

17    A    No.

18    Q    And you didn't sign any contract with the Plasterers

19    Union; did you?

20    A    No.

21    Q    Okay.  How about sprinkler fitters; did you hire any

22    sprinkler fitters when you went from a masonry contractor to a

23    general contractor?

24    A    No.

25    Q    Okay.  How about any sheet metal workers?

1    A    No.

2    Q    HVAC workers; did you hire any of those workers when you

3    went from a masonry contractor to a general contractor?

4    A    Not to my knowledge.

5    Q    So it's fair to state, Ms. Bellavigna, that with respect

6    to who you hired and the nature of the work you self-performed,

7    it didn't change from when you went to a general contractor

8    from a masonry contractor?

9    A    Correct.

10   Q    Are you familiar with general contractor, say, Siminelli

11   Construction (ph)?  Are you familiar with Siminelli?

12   A    Yes.

13   Q    Okay.  And would you agree with me that Siminelli as a

14   general contractor hires all of the trades that I just

15   mentioned directly?  If you know?

16   A    I don't know for sure.

17   Q    Are you familiar with any other general contractors?

18   A    Not with that question.  I don't know what they do.

19   Q    Okay.  But we can agree that basically you hired the three

20   crafts before you went as a masonry contractor and then you

21   hired the three crafts after, and that was the limit of your

22   direct hire?

23   A    Yes.

24        MR. FURLONG:  Need another minute, please.

25        JUDGE CARTER:  Okay.

1          **(Whereupon, a brief recess was taken.)**

2          JUDGE CARTER:  Back on the record.

3          Further questions?

4          MR. FURLONG:  Thank you, Judge.

5          **611 (c) DIRECT EXAMINATION (continued)**

6     **(Charging Party's Exhibit 4 marked for identification.)**

7     BY MR. FURLONG:

8     Q    Ms. Bellavigna, I apologize for appearing as disjointed as

9     I really am, but I'm going back to the Corning submission that

10    you made back in 2010.  And with respect to page that has been

11    marked for identification as Charging Party 4, would you agree

12    with me that this was part of your submission to the Corning

13    Company for the three-year agreement?

14    A    No.

15    Q    You don't recall putting this into the Corning Company?

16    A    No.

17    Q    Okay.  Would you agree with me that you produced this New

18    York State Certified WBE document, including Number 7, for

19    submission to the Corning Company?

20    A    No.

21    Q    Have you ever seen this document before?

22    A    Yes.

23    Q    Where did you see it?

24    A    In the JOC's program for Cornell University.

25    Q    Okay.  Did you have a role in producing it and submitting

1   it Cornell University?

2   A    Yes.

3   Q    What role did you have?

4   A    Putting the bid together and preparing all the documents

5   for the bid for the JOC's program for Cornell.

6   Q    Okay.  And was that also in 2010?

7   A    Yes.

8        MR. FURLONG:  I move that this be received into evidence.

9        MR. LEHMANN:  No objection.

10       MR. JAMESON:  No objection.

11       MR. BAILEY:  It's fine, Your Honor.

12       JUDGE CARTER:  Very well, Exhibit 4 for Charging Party

13  admitted without objection.

14  **(Charging Party's Exhibit 4 received into evidence.)**

15  BY MR. FURLONG:

16  Q    Ms. Bellavigna, in looking at paragraph number 2 --

17  A    Yes.

18  Q    -- was that true when you submitted it to Cornell

19  University?

20  A    Do you mean the first bullet or the second bullet?

21  Q    I'm looking at number 2, "Ace Masonry, Inc., d/b/a,

22  signatory with the unions which consists of the Laborers,

23  Bricklayers and Carpenters."

24  A    Oh, I'm sorry.

25  Q    "Therefore complying with their agreements and contacting

1    business agents in regards to finding skilled trades people as

2    newly hired employees and always looking to fulfill my

3    obligation."  Do you see that?

4    A    Yes.

5    Q    "My" being your obligation; right?

6    A    Yes.

7    Q    All right.  Well, was that true when you submitted it to

8    Cornell?

9    A    Yes.

10    Q    Including the portion about being signatory with the

11    unions and complying with their agreements?

12    A    Yes.

13    Q    Those three unions mentioned?

14    A    Yes.

15    Q    As well as accessing the unions to find -- contacting the

16    business agents in regards to finding skilled trades people as

17    you needed them; right?

18    A    Yes.

19    Q    All right.  And I think we were in agreement from your

20    earlier testimony that you would make any attempt in the fall

21    of 2011 to contact business agents because of this purported

22    shortage of manpower?

23    A    That doesn't mean that Ace did not, that means that I did

24    not.

25    Q    That you did not, okay.

1  A    Correct.

2  Q    The beginning portion of paragraph 2, is "Ace Masonry,"

3  you're speaking for Ace with that paragraph?

4  A    Yes.

5  Q    Do you see that?  Okay.

6      Okay, in any event it was -- it reflected -- paragraph 2

7  reflected your practice and that's why you told Cornell about

8  it; correct?

9  A    Yes.

10  Q    Now, Ms. Bellavigna, you did testify about some audits

11  that were performed by Joseph McCarthy and Associates; do you

12  recall your testimony?

13  A    Yes.

14  Q    Okay.  And those audits, correct me if I'm wrong, were

15  performed on behalf of the Bricklayers and the Laborers?

16  A    I don't know, I wasn't there.

17  Q    Okay.  Did you hear about these audits?

18  A    Yes.

19  Q    All right.  And what is involved -- now, you're somebody

20  that obviously is a -- does a lot of financial work and so

21  forth, or at least you've testified to that; what's involved

22  with an audit of your company by one of the Union auditors?

23  A    They basically go through all of the -- the report forms

24  that are submitted to the unions and make sure that they cross-

25  reference with what has been submitted.

1    Q    Okay.  The come and look at your records; right?

2    A    Yes.

3    Q    And that they do that right in your office?

4    A    Yes.

5    Q    And you make available any of the records that the auditor

6    says he or she needs to assess what may be due and owing; if

7    anything?

8    A    Yes.

9    Q    All right.  And you've gone through various audits since

10   2002; correct?

11   A    Myself or the Company?

12   Q    the Company.  The Company.

13   A    Yes.

14   Q    Okay.  Including the one in -- at the end of 2011?

15   A    Yes.

16   Q    All right.  And would you agree with me that if you didn't

17   understand or it wasn't your understanding that you had a

18   collective bargaining agreement with the unions, you never

19   would allow the auditor acting on their behalf to access your

20   records, come into your office and do these calculations?

21   A    Yes.

22   Q    All right.  So it's safe to concluded, therefore, that you

23   understood certainly in the fall of 2011 that you had

24   collective bargaining agreements with the crafts who sent the

25   auditor into your office to look at the books?

1  A    I might not have had a signatory, but I feel as if I

2  submit the benefit sheets, yes.

3  Q    That you were bound to the collective bargaining

4  agreements?

5  A    Yes.

6  Q    Let me ask you a couple of questions before I get back

7  into the collective bargaining agreements.

8       Both you and Bella have denied the appropriateness of the

9  bargaining unit in both the Laborers and -- and I won't speak

10 for the Contractors (sic), certain counsel can do that, but for

11 the Laborers and the Bricklayers you've denied that the unit

12 set forth in the agreements are appropriate units.  Do you

13 understand what a bargaining unit is?

14 A    No.

15 Q    Okay.  Do you understand that each collective bargaining

16 agreement that you were bound to describes conditions for a

17 certain craft?

18      JUDGE CARTER:  Let me just ask, is that disputed at this

19 point, the appropriateness of the bargaining units?

20      MR. LEHMANN:  No, Your Honor.

21      MR. FURLONG:  It's been denied.

22      JUDGE CARTER:  Well, now -- we can clear that up, now.  So

23 it looks like there's -- if the bargaining units are accepted -

24 -

25      MR. FURLONG:  We're stipulating today?

1      MR. LEHMANN:  Paragraphs 7(a), (b) and (c).

2      MR. FURLONG:  It was on the proposed stipulations

3  yesterday and we didn't get a stipulation on that.

4      JUDGE CARTER:  Why don't we just take care of it now.

5      Looks like it has to be paragraph 12 and 13, I don't know

6  if you need to add one for Carpenters.

7      MR. JAMESON:  If they're going to -- if Ace will stipulate

8  to that then I'll piggy-back on

9  that, I'll ask that we be included.

10  **(Pause.)**

11      MR. SHEATS:  Just as a note, Your Honor, with regard to

12  the stip, the -- the issue yesterday on 12 and 13 was the

13  reference to "The Bricklayers CBA, Laborers CBA," without a

14  reference, a little more specifically to a particular document.

15      I mean, we've got documents in now that I assume are those

16  CBAs.

17      JUDGE CARTER:  Yeah.

18      MR. SHEATS:  And I think as attached to those it narrows

19  this as an item of stipulation.

20      JUDGE CARTER:  So essentially the bargaining units as

21  stated in the CBAs that are in the evidentiary record; you're

22  not disputing that those are appropriate bargaining units?

23      MR. SHEATS:  Correct.

24      JUDGE CARTER:  Okay.  So perhaps someone can say that more

25  artfully than I did.

1       MR. BAILEY:  I think you said it fine.

2       JUDGE CARTER:  But -- all right, so let me -- I'll try to

3  get it and see if can capture it all.

4       So at this point in time the Respondent's willing to

5  stipulate that the bargaining units set forth in the collective

6  bargaining unit agreements in the record for the Bricklayers,

7  the Laborers and the Carpenters are appropriate bargaining

8  units within the meaning of the Act; is that --

9       MR. FURLONG:  That's fine.  I think General Counsel has

10  something he may want to propose in addition to that.

11       MR. LEHMANN:  Yeah, I mean --

12       MR. FURLONG:  Based on further testimony.

13       MR. LEHMANN:  Well, first let's take care of that part.

14  Is that --

15       MR. BAILEY:  Yes.  Yes, Your Honor.

16       JUDGE CARTER:  Okay, so we can get that stipulation in.

17       MR. BAILEY:  Yes.  Yes.

18       JUDGE CARTER:  Now there's something else?

19       MR. LEHMANN:  Okay, and I would actually want a further

20  stipulation extending -- there is collective bargaining

21  agreements -- we started with the 2002 or 2003, the earliest

22  ones working forward and we're not there yet, but we have which

23  we will be introducing into the record, collective bargaining

24  agreements from 2006 to 2011, and then from 2011 to present and

25  moving forward.

1      JUDGE CARTER:  And are the bargaining units -- I mean, is

2  the definition of the bargaining unit different in any of those

3  agreements or is it just the same?

4      MR. LEHMANN:  It's the same.  There are mergers which

5  we'll explain through testimony, but they're basically the

6  same, yes.

7      JUDGE CARTER:  All right, I'll leave that counsel, I'm not

8  sure if I can --

9      MR. SHEATS:  Maybe if there's a mid-morning recess we can

10  look --

11      MR. LEHMANN:  I can show you the documents, absolutely.

12      MR. SHEATS:  -- and come to an ACORD on that.

13      JUDGE CARTER:  Okay.  At least we have a platform to work

14  from.

15      MR. FURLONG:  Yeah.  Save a lot of testimony, thank you,

16  Your Honor.

17  **(Pause.)**

18      JUDGE CARTER:  Mr. Furlong.

19      MR. FURLONG:  Thank you, Your Honor, back on the record.

20          **611(c) DIRECT EXAMINATION (continued)**

21  BY MR. FURLONG:

22  Q    Ms. Bellavigna, Counsel for the General Counsel asked you

23  yesterday about a whole series of projects, and I'm not going

24  to go through them again, but they began with Cornell, Ithaca

25  College, Cayuga Medical Center; do you recall that?

1  A    Yes.

2  Q    And some suppliers, Hanson Aggregates, Bock Brick and some

3  others; do you recall that?

4  A    Yes.

5  Q    Those were suppliers to you.  And with respect to the

6  projects, and I think we went through, and I'm eyeballing at

7  maybe about 40 different projects, but did you ever give

8  permission to any representative from Bella Masonry to list Ace

9  Masonry projects on its website that it did not perform?

10  A    No.

11  Q    Okay.  And the same would be true -- so if they did it

12  they just took it from Ace Masonry without your knowledge?

13  A    Yes.

14  Q    Okay.  And that would include pictures of projects that

15  they purport that Bella did that the proofs will show whether

16  or not they did them, if they took them from your website, that

17  you never gave them permission to do that?

18  A    Correct.

19  Q    All right.  And that would include references, job

20  references, and I can give you some names such as Tim O'Hara

21  (sic) from Schuyler County, Peter Paradise from Cornell

22  University, Dan Williams from Edger Enterprises; you never gave

23  permission to any contractor, including Bella, to use your

24  references on their website; am I correct?

25  A    Correct.

1   Q    Okay.  And are you aware of any contractor at all using

2   your track record for Ace Masonry to promote its business?

3   A    No.

4   Q    Okay.  There came a time when Melissa Blanchard left your

5   company.

6   A    Yes.

7   Q    All right.  She was a valued employee; right?

8   A    Yes.

9   Q    Do you know where she's working now?

10  A    Yes.

11  Q    Where?

12  A    Bella.

13  Q    Okay.  And to your knowledge, and she's going to testify

14  but I'm testing your knowledge now, did she advise you at a

15  certain point that she was leaving Ace to go elsewhere?

16  A    I don't recall.

17  Q    Okay.  Well, did you show up one day and Melissa Blanchard

18  simply wasn't there?

19  A    No.

20  Q    Okay.  So how did you come to learn that Melissa Blanchard

21  no longer was working for Ace Masonry?

22  A    She told me in August that she was looking for another

23  job.

24  Q    All right.  And she happened to land at Bella Masonry to

25  your -- is that your understanding?

1    A    Yes.

2    Q    Okay.  And did she tell you why she was looking for

3    another job?

4    A    She couldn't hack the pressure meeting and greeting people

5    and being office manager.

6    Q    Just she was burned out from that?

7    A    Yes.

8    Q    All right.  And did you give her any sort of severance pay

9    or any sort of package leaving Ace Masonry?

10   A    Not to my knowledge.

11   Q    She just left.  Did you ever receive any notification from

12   the unemployment -- New York State Unemployment Bureau that she

13   was drawing unemployment?

14   A    No.  Not to my knowledge.

15   Q    Okay.  Would you agree with me that her transition, as you

16   understand it, from Ace Masonry to Bella was seamless; there

17   was no gap in employment?

18   A    I don't know.

19   Q    Okay.  Just a couple more questions.  When you had your

20   site for Ace Masonry did you have pictures of some of your

21   employees, including Derek Hager, Richard Tracy, your husband?

22   A    Yes.

23   Q    Henry Bellavigna?

24   A    Yes.

25   Q    All these people had pictures on there?  Okay.

1    Are you aware of whether or not Bella has taken those

2  pictures and put them on its website?

3  A    I have no knowledge of it.

4  Q    Same question as I asked earlier; did you ever give Bella

5  permission to do that?

6  A    No.

7  Q    Okay.  And you're not aware of any other company, masonry

8  company that would utilize Ace Masonry pictures of its

9  employees on the second company's website?

10  A    Not to my knowledge.

11  Q    Okay.

12  **(Pause.)**

13    MR. FURLONG:  Nothing further, thank you, Ms. Bellavigna.

14    THE WITNESS:  You're welcome.

15    JUDGE CARTER:  Let's keep at it and go ahead and take the

16  acting General Counsel's additional questions.

17    MR. LEHMANN:  Yes.

18                    **611(c) DIRECT EXAMINATION**

19  BY MR. LEHMANN:

20  Q    Just want to go back to yesterday's testimony and draw

21  your attention to General Counsel's Exhibit 6.

22  A    Yes.

23  Q    And you testified yesterday that you hadn't seen this --

24  the last page.

25    MR. BAILEY:  Judge, just so I'm aware, it was my

1   understanding that the additional questions he was going to be

2   asking were with respect to subpoenaed documents, not rehashing

3   things that we had done yesterday or exhibits that we've

4   already discussed.  Essentially he's getting a second bite at

5   the apple.

6       MR. LEHMANN:  No.

7       JUDGE CARTER:  Well, the Witness is still on the stand, so

8   it's not unusual to have follow-up questions, but he may have

9   additional materials that may shed some light on this document

10  that was not admitted previously.  So we'll see where it goes.

11      Overruled.

12      THE WITNESS:  So can you ask your question, again, I'm

13  sorry?

14  BY MR. LEHMANN:

15  Q    You testified yesterday you hadn't seen that page, the

16  document.

17  A    Yes.

18  Q    Okay.  And do you remember receiving a subpoena from the

19  General Counsel?

20  A    Yes.

21  Q    And you supplied some information pursuant to that

22  subpoena?

23  A    Yes.

24  Q    Okay.

25      MR. LEHMANN:  Okay, can we go off the record for a second?

1     JUDGE CARTER:  Off the record.

2          **(Whereupon, a brief recess was taken.)**

3     JUDGE CARTER:  Back on the record.

4          **611(c) DIRECT EXAMINATION (continued)**

5   **(General Counsel's Exhibit 22 marked for identification.)**

6  BY MR. LEHMANN:

7  Q    I'm showing you a document or documents that you provided

8  pursuant to subpoena.

9     The paragraph number in the subpoena, I'm just going to

10  read it to you, "All collective bargaining agreements,

11  recognition agreements, or other agreements that were signed by

12  Respondent Ace, that involved the unions which were in effect

13  between May 6, 2002 to the present."  Do you remember that?

14  A    Yes.

15  Q    Okay.  And the documents that you have provided pursuant

16  to this subpoena are the -- one of the documents is the last

17  page of General Counsel's Exhibit 6; correct?

18  A    I don't know without looking at the book; do you have the

19  book?

20  Q    I'm showing you -- why don't you bring out General Counsel

21  Exhibit 6.

22  A    I've got it right here.

23  Q    Okay.  Turn to the last page.  And is that last page in

24  the documents that you provided to the General Counsel pursuant

25  to the subpoena?

1    A    I don't know.  I don't have the book.  Who's to say --

2    Q    Okay, the question is, is the last page of General

3    Counsel's Exhibit 6, did you provide that page --

4    A    Last page of G-6 (sic).

5    Q    -- to -- in the subpoena, document marked as --

6    A    Oh, you're asking if this page is in here?

7    Q    That's correct.

8    A    I'm sorry.

9    Q    Marked for identification as --

10        MS. KLUYTENAAR:  22.

11   BY MR. LEHMANN:

12   Q    -- 22.

13   A    Yes.

14   Q    Okay.  So you are aware of this collective bargaining

15   agreement?

16   A    All I had was these copies and I submitted them to you.  I

17   didn't have the books.

18   Q    Okay.

19   A    I gave those to counsel.

20   Q    Right.  And actually turn to the second page of General

21   Counsel Exhibit 22 that I gave you, and can you read that --

22   what that one sentence says?

23   A    "All copies of agreements, signature pages that involve

24   the unions."

25   Q    Okay.  Have the -- have been -- does it --

1  A    All others are with my attorney, Jason Bailey.

2  Q    Okay.  So you -- you provided to General Counsel pursuant

3  to the subpoena the last page of the document; correct?

4  A    I'm assuming it's the last page of the document, I don't

5  have the books in front of me.

6  Q    Okay.  Let's -- let's take our time.  You can review this,

7  General Counsel Exhibit 22, and compare them to the last page

8  of General Counsel Exhibit 6.

9  A    I'm assuming this is the correct book that was signed.

10     MR. BAILEY:  When you say "this" you're referencing the

11  Exhibit --

12     THE WITNESS:  GC-6.

13     MR. BAILEY:  -- GC-6, okay.

14     JUDGE CARTER:  Well, let's see if we can simplify this a

15  little bit.

16     The pages on Exhibit 22 for the General Counsel are not

17  numbered, but it looks like the --

18     THE WITNESS:  This one looks identical to this.

19     JUDGE CARTER:  All right, so --

20     THE WITNESS:  But how do I know if it goes to this book?

21     JUDGE CARTER:  Well, let's take one thing at a time.

22     So General Counsel Exhibit 22, the fifth page of that

23  exhibit has a signature page, which you see in front of you;

24  correct?

25     THE WITNESS:  Well, let's see if the facsimile is -- does

1    that have the same date?

2         JUDGE CARTER:  So the question is is the signature page

3    that you have in front of you the fifth page of Exhibit 22 for

4    General Counsel, the same --

5         THE WITNESS:  Yes.

6         JUDGE CARTER:  -- as the signature page in Exhibit 6, the

7    last page?

8         THE WITNESS:  Yes.  Page 15.

9         JUDGE CARTER:  Okay.  Further questions about that?

10   BY MR. LEHMANN:

11   Q    Okay, so it's the same.  And the rest of the collective

12   bargaining agreement was forwarded to who, your attorney, Mr.

13   Bailey?

14   A    No, just probably this page.

15   Q    Okay.  The second page of the submission, General Counsel

16   Exhibit 22 --

17   A    Yes.

18   Q    -- references that "All other collective bargaining

19   agreements," I don't have it in front of me, so --

20   A    It says "Signature pages."

21   Q    Okay.  All right.

22   A    Doesn't say the book.

23   Q    Doesn't say "Collective bargaining agreements have been

24   provided to Mr. Bailey"?

25   A    It says, "All copies of agreement signature pages that

1   involve the unions."

2   Q    Right, period.  Then what's the next line?

3   A    "All others are with my attorney, Jason Bailey."

4   Q    Okay.  And "others" meaning collective bargaining

5   agreement, itself?

6   A    No, any copies of agreements.  Any and all.

7   Q    That's right.

8   A    Even if they were blank I turned them in to Jason.

9   Q    Okay.  So with that testimony I would offer again General

10  Counsel Exhibit 6.

11       MR. FURLONG:  No objection.

12       MR. JAMESON:  No objection.

13       MR. BAILEY:  No objection, Your Honor.

14       JUDGE CARTER:  I think there's circumstantial evidence

15  that Exhibit 6 is a copy of the agreement, and hearing no

16  objection will admit Exhibit 6 without objection.  Exhibit 6

17  for General Counsel.

18  **(General Counsel's Exhibit 6 received into evidence.)**

19       MR. LEHMANN:  Can I take back General Counsel Exhibit 22,

20  please?

21       THE WITNESS:  So we're not submitting that?

22       JUDGE CARTER:  We'll see what happens with it.

23       MR. LEHMANN:  One moment, please?

24       JUDGE CARTER:  Okay.  We can stay on.

25  **(Pause.)**

1           **(Whereupon, a brief recess was taken.)**

2      JUDGE CARTER:  Back on the record.

3           **611(c) DIRECT EXAMINATION (continued)**

4  **(General Counsel's Exhibit 23 marked for identification.)**

5  BY MR. LEHMANN:

6  Q    Showing you what's been marked as General Counsel Exhibit

7  23.

8  A    Yes.

9  Q    You recognize this document?

10 A    Yes.

11 Q    And what is this?

12 A    We had a little packet full of every employee listed at

13 the time that I was handing these out, and this is a letter

14 from the president and a background of the project coordinator

15 and the background of the estimator.  One of our estimators.

16 Q    Okay.  Now, that letter that you just referenced to, that

17 was -- well, let me backup.

18      You testified you had -- Ace had a website?

19 A    Yes.

20 Q    Okay.  And the letter that you're looking at on the first

21 page of GC-23, is -- was the letter that was on the Ace

22 website; correct?

23 A    I don't recall.

24 Q    You don't recall, okay.  But that's your letter?

25 A    Yes.

1    Q    Okay.  And the -- turning to the second page, Robert, your

2    husband --

3    A    Yes.

4    Q    -- that description -- his job description there was also

5    on your web page?

6    A    I would assume so.

7    Q    Okay.  And then the third page involving --

8    A    Yes.

9    Q    -- Henry.

10   A    Yes.

11       MR. LEHMANN:  I would offer General Counsel Exhibit 23.

12       MR. FURLONG:  No objection.

13       MR. JAMESON:  No objection.

14       JUDGE CARTER:  Very well, Exhibit 23 for General Counsel

15   admitted without objection.

16   **(General Counsel's Exhibit 23 received into evidence.)**

17   **(Pause.)**

18       COURT REPORTER:  Do you want them marked?

19       MR. LEHMANN:  Yes, marked as General Counsel's Exhibit 24

20   and 25.

21   **(General Counsel's Exhibits 24 and 25 marked for**

22   **identification.)**

23   BY MR. LEHMANN:

24   Q    Now, I'm showing you what's been marked as General

25   Counsel's Exhibits 24 and 25.  We'll take each one separately.

1        GC-24; do you recognize that document?

2    A    No.  I think there's more to this.  Is -- did you find

3    more?

4    Q    Well --

5    A    I turned in more pages regarding this.

6    Q    Okay.  Well, why don't you tell me what that's from.

7    A    It's a bank resolution with the Bank of Tompkin's Trust

8    Company.

9    Q    Okay.  And who are the authorized signatures for Ace

10   Masonry?

11   A    My husband is only authorized to sign checks.

12   Q    Okay.  Does that say that?

13   A    No, but the other sheet does.

14   Q    Okay.  And who else is authorized?

15   A    Myself, Lisa V. Bellavigna.

16   Q    Okay.  And General Counsel Exhibit 25?

17   A    Yes.

18   Q    Do you recognize that document?

19   A    It's an insurance certificate.

20   Q    Okay.  And that's an insurance -- that's the insurance

21   company that Ace Masonry uses?

22   A    Apparently Bella.

23   Q    Why don't you describe the document.

24   A    It's an insurance certificate to perform work at Trinity

25   Episcopal Church.

1  Q     Okay.  And who's the insured?

2  A     Bella.

3  Q     Okay.  And who's -- and is Ace Masonry on that?

4  A     Yeah, they -- all my subcontractors have to give me proof

5  of insurance.

6        MR. LEHMANN:  Okay, so with that I would offer GC-25 -- 24

7  and 25.

8        MR. FURLONG:  No objection, Your Honor.

9        JUDGE CARTER:  No objection.

10       MR. BAILEY:  No objection, Your Honor.

11       JUDGE CARTER:  Exhibit 24 and 25 for General Counsel

12  admitted without objection.

13  **(General Counsel's Exhibits 24 and 25 received into evidence.)**

14       JUDGE CARTER:  So just to be clear that's -- Exhibit 25 is

15  a document that Bella, as a subcontractor, gave to Ace?

16       THE WITNESS:  Yes.

17       JUDGE CARTER:  Okay.

18       MR. LEHMANN:  Can I see GC-25, please?

19  **(Pause.)**

20       MR. LEHMANN:  Nothing further.

21       JUDGE CARTER:  Okay.  I'm planning on a recess at 10:30 so

22  go ahead and take a few more questions until we get there.

23       Mr. Furlong, did you have any questions based on these --

24       MR. FURLONG:  Nothing further, Judge.

25       JUDGE CARTER:  Okay, all right.  Mr. Jameson?

Case 6:12-cv-06556-DGL-MWP    Document 12-1    Filed 10/31/12    Page 266 of 1129

266

```
 1        MR. JAMESON:  Thank you, Your Honor.
 2                611(c) DIRECT EXAMINATION
 3   BY MR. JAMESON:
 4   Q    Mrs. Bellavigna --
 5   A    Yes.
 6   Q    -- if you could, I'm looking at CP-4, I'm not sure you
 7   need to look at it, but I'll represent -- you can look at it if
 8   you want.  I guess it's question 7 that Cornell poses to you,
 9   you answered -- answer it in four parts.
10        In the first part it says, "That Ace Unlimited, which is
11   of course Ace Masonry, d/b/a Ace Unlimited, is a full WBE
12   certification."  What's "WBE" for the record?
13   A    To be certified with the State of New York I applied my
14   company to be woman business enterprise with the State of New
15   York.
16   Q    Okay.
17   A    And I became certified in 2010.
18   Q    Why become WBE certified?
19   A    Honestly, I think it benefits the Company as a minority
20   aspect, to bid work as a minority.
21   Q    Okay.
22   A    And that was my goal but it didn't really help the Company
23   out.
24   Q    Okay.  And you believe that as a minority enterprise, in
25   this case a woman-owned business, that that might provide Ace
```

1    with an advantage in the bidding process?

2    A    Somewhat, yes.

3    Q    Okay.  I presume your husband is not a woman in this

4    state?

5    A    Correct.  Correct.

6    Q    You no longer know.

7    A    He's not a woman.

8    Q    It's not necessarily a given anymore.

9         MR. BAILEY:  We'll stipulate he's a male.

10        MR. FURLONG:  I was just going to say can we have a round

11   of stipulations from counsel on that?

12        THE WITNESS:  He's definitely a man to me.

13   BY MR. JAMESON:

14   Q    Okay, and we can stipulate that Henry is not a woman.

15   A    Correct.

16   Q    Okay.  Do you believe that your husband possess any other

17   minority characteristics?  Is he a racial minority?  I've never

18   met the man.

19   A    A racial minority?

20   Q    Correct.

21   A    You mean is he -- no.

22   Q    African-American, Puerto Rican, Eskimo?

23   A    No.

24   Q    Okay.  Do you believe Henry possess any minority

25   characteristics?

1   A   No.

2   Q   Okay.  Tell me about this 2007 Dodge Ram pickup.

3   A   Okay.

4   Q   What color was it?

5   A   White.

6   Q   Okay.  Extended cab?  Crew cab?  Straight cab?

7   A   I don't know.

8   Q   Okay.  Six-foot box?  Eight-foot box?

9   A   Probably an eight-foot.

10  Q   Okay.  Ace purchase this vehicle?

11  A   Yes.

12  Q   Did Ace purchase this vehicle new?

13  A   I don't remember.

14  Q   Okay.  Did Ace take a loan out to purchase the vehicle?

15  A   Yes.

16  Q   Did Ace put money down to purchase the vehicle?

17  A   I don't remember.

18  Q   Okay.  Do you remember the value of the loan?

19  A   No.

20  Q   Do you remember who the loan was with?

21  A   Tompkin's Trust.

22  Q   Tompkin's Trust, okay.  Did Ace -- you are Ace; correct?

23  A   Yes.

24  Q   Are there any other principles at Ace?

25  A   No.

1  Q    Okay.  When did you pass or enter a corporate resolution

2  authorizing Henry to purchase the 2007 Dodge Ram pickup?

3  A    When the bank told us we better get out of our notes and

4  start, you know, because -- oh, he knew that the -- the banker

5  knew that we weren't doing well.

6  Q    Okay.  In all the documents produced by you or through

7  counsel I have not seen a corporate resolution authorizing

8  Henry to purchase that Dodge Ram pickup.

9  A    Correct.

10  Q    Okay.  But I asked when did you pass a corporate

11  resolution and you said "When the bank told us to get out from

12  under our notes."

13  A    I didn't pass a corporate resolution or sign anything.

14  Q    Okay.  Well, the Dodge Ram pickup is an asset of the

15  Company; no?

16  A    Yes.

17  Q    Okay.  And presumably in order to obtain a loan, a note to

18  buy the pickup, every bank I'm aware of, would you agree,

19  requires you to put some money down to purchase that pickup?

20  A    I would think so.

21  Q    Okay.  So, for example, you have a $30,000 pickup, maybe

22  you put 10,000 down and financed the 20,000.  Ace made payments

23  from -- I assume if it's a 2007 pickup, you purchased it in

24  2007?

25  A    Actually, I think a trade-in was made.

```
 1   Q    Okay.  So you put money down in the form of equity in a

 2   trade, okay.  And you --

 3   A    Henry's personal vehicle was traded in.

 4   Q    But Henry's just an employee of Ace?

 5   A    But he's my father-in-law and I trust him very much.

 6   Q    Okay.  So Henry is now putting equity into Ace?

 7   A    No, because he had -- our controller at the time figured

 8   the value of his truck and deducted out of his W-4 at the end

 9   of the year.

10   Q    Okay.  So Henry put the value, whatever he traded in, his

11   personal vehicle, and that was taken by the controller at the

12   end of the year to offset against wages?

13   A    Yes.

14   Q    Okay.  And how did that work?

15   A    I don't remember because I was confused how the controller

16   pulled that off anyway.

17   Q    Because you wouldn't be offsetting against wages, you

18   would be enhancing Henry's wages; no?

19   A    I -- I believe that's -- you would have to ask Henry how

20   it happened.  I don't recall.

21   Q    But I thought you testified that you were the person in

22   the building, in the office doing the books --

23   A    Yes.

24   Q    -- of Ace?  I mean, that was your -- your bread and

25   butter?
```

1   A    Yes, but I also had controllers in the past working for

2   Ace.

3   Q    Okay.  And you don't recall any of that?

4   A    It was so long ago.

5   Q    Well --

6   A    I'm sorry.

7   Q    We're now in July 2012, it's a 2007 pickup, would you

8   agree at most five years old?

9   A    Yes.

10  Q    Most people keep their cars five, perhaps six years?  Some

11  three or four?

12       JUDGE CARTER:  Twelve.

13       THE WITNESS:  Yeah, I was going to say.

14  BY MR. JAMESON:

15  Q    And you don't remember the terms of financing a car five -

16  - at then four years, now five years?

17  A    No, I don't.

18  Q    Okay.  But so we have Henry potentially putting equity

19  into Ace in the form of a trade-in so that Ace can purchase a

20  working truck.  It was used for work purposes; correct?

21  A    Yes.

22  Q    Okay.  At the end of the year you believe that Henry was -

23  - some financial accounting was done to compensate Henry for

24  the value of that trade-in?

25  A    When?

1  Q    You said in 2007 or whenever the truck was purchased.

2  A    Whenever the truck was purchased, yes.

3  Q    Okay.  So now henry's square.  He owes you nothing, you

4  owe him nothing.

5  A    Yes.

6  Q    Okay.  So now why in 2011 is Henry walking off with the

7  2007 pickup for the value of what remains on the note with

8  Tompkin's Trust?

9  A    Basically because Henry deserved it as an employee and I

10  didn't need the vehicle.

11  Q    Okay.  Henry deserved it as an employee.

12  A    Yes.

13  Q    Did -- I mean, I've got GC-3 here, we may tire this

14  quickly but, did Carl Becker get a vehicle from Ace?

15  A    I don't recall Carl Becker.

16  Q    Okay.  Did Larry Emmerson get a vehicle from Ace?

17  A    No.

18  Q    Did Richard Jordan get a vehicle from Ace?

19  A    Can I stop you right here?

20  Q    Yeah.

21  A    Henry received the vehicle because I own Ace and I wanted

22  Henry to receive the vehicle, okay?

23  Q    Okay.  So back to my point, did you make a corporate

24  resolution authorizing it?

25  A    I told myself because I'm the only officer in the Company

1   that Henry deserves that truck and I'm going to give it to him.

2   He only received wages, very limited wages and he deserved it

3   as an employee.

4   Q    Okay.  Did you take, for accounting purposes, because Ace

5   appears to be fairly sophisticated, if Ace is putting -- I'm

6   sorry, if Henry's putting equity in to Ace and at the end of

7   the year your controller is balancing that out by doing

8   something with his wages, perhaps enhancing them to compensate

9   it, then at the end of the year for, I believe you said W-4

10  purposes, you would need to then reflect that on Henry's 2011

11  W-4; correct?

12  A    That may have happened, I don't recall.

13  Q    Okay.  So you took a valuation of the 2007 Dodge pickup at

14  the time of the transfer to Henry?

15  A    No.

16  Q    Okay.  Did you seek out an appraisal?

17  A    The controller might have done this.  I don't know.

18  Q    Okay.  Did you at least get on Edmunds.com or Cars.com to

19  value the truck at that time?

20  A    No.

21  Q    Okay.  Did you look at the value of the note, what -- the

22  balance of the note?  Let's say you take a note out in 2007 for

23  20,000, you make payments 2007 to April 2010, and 7,000 remains

24  on the note; did you look into that, how much remained on the

25  note?

1    A    I remember that Henry paid off the note.  I don't know how

2    much was left on the note, but he himself paid the truck off.

3    Q    Okay.  Did you record any of this in corporate documents,

4    financial documents?

5    A    It's probably on my system.

6    Q    Probably on your system?

7    A    Yes.  I know it is.  You have to take care of that.

8    Q    Okay.  At that time, April 2011, that truck, the 2007

9    Dodge pickup, had not yet been physically reposed by the bank;

10   correct?

11   A    Correct.

12   Q    Because you testified earlier that wasn't until January

13   2012 that different other vehicles were repossessed?

14   A    Correct.

15   Q    If it had not been physically repossessed by the bank had

16   it yet been legally repossessed by the bank through some sort

17   of order of forfeiture or receivership; anything of that

18   nature?

19   A    No.

20   Q    Okay.  So this was an Ace asset?

21   A    Yes.

22   Q    That you decided to bestow upon Henry for all his good

23   work and hard effort?

24   A    He paid the vehicle off, I think it was a fair deal.  I

25   don't see anything wrong with it.

1   Q    Okay.  Well, you think it's a fair deal but I asked you if

2   you appraised the truck.

3   A    No.

4   Q    If you even sought out an appraisal.

5   A    No.

6   Q    If you determined the value of the note relative to the

7   truck's value?

8   A    No.

9   Q    Okay.  So you think it was a fair deal but you have no

10  basis to say there was anything fair about it; do you?

11  A    In my opinion it was very fair.

12  Q    Okay.  Do you believe your husband was hard working for

13  Ace?

14  A    Yes.

15  Q    Did you let your husband purchase a vehicle from Tompkin's

16  Bank that was owned by Ace?

17  A    Most likely year's past.

18  Q    Most likely, okay.

19  A    What year are we referring to?

20  Q    Well, how about in 2011?

21  A    I don't recall.

22  Q    How about 2010?

23  A    Possibly.

24  Q    '9.

25  A    No.

1  Q    '8.

2  A    No.

3  Q    How about for any of the years prior rather than go down

4  them one by one?

5  A    Not to my knowledge.

6      MR. JAMESON:  Nothing further, thank you.

7      JUDGE CARTER:  Okay, let me ask before we take a break,

8  are you planning on questioning Ms. Bellavigna now or --

9      MR. BAILEY:  Limited and then obviously reserving most of

10  her testimony for my direct.

11      JUDGE CARTER:  Okay.  I'll leave the -- you know, counsel

12  do you want to take a break now or go ahead and wrap up her

13  testimony?

14      MR. BAILEY:  Well, I would prefer a few minutes, Your

15  Honor, just to go over what's been said this morning so I can

16  prep my cross.

17      JUDGE CARTER:  Sure.  All right, let's pick it up again at

18  10:35.  Off the record.

19            **(Whereupon, a brief recess was taken.)**

20      JUDGE CARTER:  Back on the record.

21      All right, we're back on the record and Mr. Bailey or Mr.

22  Sheats, any questions for the Witness?

23      MR. BAILEY:  Yeah.  Keeping it brief, I'm going to reserve

24  most of Mrs. Bellavigna's testimony for her direct.

25            **CROSS-EXAMINATION**

1  BY MR. BAILEY:

2  Q    Lisa, there's been a lot of testimony so I'm going to go

3  back and try to pick out certain points and get you to

4  elaborate on some of that, so I may test your memory and I'll

5  try to remind you as much as possible.

6       But yesterday you referred to a JOC's program; can you

7  tell me what that is?

8  A    I have it in front of me now so I know that its job order

9  contracting.  It's a program was established, I believe, in New

10  York State and got very popular with contracting and we were

11  introduced to it because Cornell wanted to use the program.

12  And it's a program that you have to -- any bolt, any nut, any

13  screw, whatever you want to say that goes into work performed

14  has to be estimated within the job.  And Cornell was quite

15  afraid to use that program because it was something new.

16       But we got a million dollar contract awarded to us in 2010

17  and on that job, I don't remember the job number without

18  looking it up -- 1032, we only were able to $9,961 worth of

19  work for that whole big contract.

20  Q    So you got awarded a contract that was valued at

21  approximately a million dollars?

22  A    Yes.

23  Q    In 2010?

24  A    Yes.

25  Q    And you performed how much work?

1    A    Only 9,000.

2    Q    And approximately when was that work?

3    A    I think that work, because they were so afraid to start

4    the project, occurred in 2011.

5    Q    Okay.  You also had elaborated -- well, you discussed a

6    little bit yesterday about Ace and your involvement with Ace

7    and how that changed in 2011, in the latter half of 2011.

8    A    Yes.

9    Q    Did the JOC's program or I should say the failure to get

10    all that work associated with that million dollar contract, did

11    that have any impact on your involvement with Ace?

12    A    Yes, it did.

13    Q    And can you elaborate for me?

14    A    We had anticipated getting that million dollar contract

15    worked into our contracts for 2011 or the later part of 2010,

16    and it didn't work for us, and when you have a goal set forth

17    to have a million dollar contract and you can't even perform 10

18    grand of it, it was quite devastating to my demise.

19    Q    And what do you mean?  I mean, I need to have you

20    elaborate.

21    A    Being that the economy crashed, and all that we were going

22    through, we weren't getting the work that we needed to keep the

23    money on the books and keep cash flow going.

24    Q    And so what does that mean for Ace?

25    A    It means that I'm not doing well and I'm not being able to

1    pay off vendors and Unions and debts that I owe.

2    Q    And yesterday we started getting into a little bit of how

3    that impacted you and you wanted to elaborate at one point but

4    you got cutoff, and I know that it will be tough, but can you

5    tell me how it impacted you personally?

6    A    I got pretty overwhelmed and I couldn't function at work

7    because I -- all I would do is just go in my office and just

8    start crying because I couldn't face people.  I was

9    embarrassed.  I felt like I was going to go bankrupt and there

10   was nothing I could do because normally I'm a very honest

11   person and I felt like I couldn't deal with the public

12   regarding payments.  It was quite overwhelming and I should

13   have seen a doctor but I couldn't even do that.  I just want

14   out.  I wanted out really, really bad.

15        And we tried to have perspective people come in and buy

16   into the Company, even buy me out, I wanted out so bad, and it

17   just didn't work.  We had people signed on the dotted line and

18   I was excited and -- in mid-July through the end of August it

19   was a go, and then it just all turned around in September of

20   2011.

21        I'm sorry.

22   Q    Do you need a break?

23   A    No, I'm okay.  I just wish I wasn't crying.  I'll try to

24   calm to down.  I -- I wasn't going to cry but I -- it's just

25   hard to talk about because it's embarrassing because my company

1   was very prominent and when the economy crashed I probably

2   should have run things different and let go of a lot of

3   employees, but I didn't know what to do.  I've never been

4   through it before.

5        We couldn't get the work either.

6   Q    What do you mean?

7   A    Like, we were bidding and I thought being a woman-owned

8   business would help in the bidding process, bidding work as a

9   minority --

10       THE WITNESS:  Thank you.

11       But it really didn't help out matters like I anticipated

12  it would.  And we -- I tried.

13       I think the people that wanted to buy in really felt like

14  if there could have been maybe two other people -- we had

15  employees come forward that were interested in buying into the

16  Company, and it just all came to a crash.

17       In August we had some work in Corning and some carpenters

18  walked off the job and that didn't help matters at all because

19  then you got the name out there that Ace isn't paying Union

20  dues and the employees are walking off the job site.  So it was

21  find -- it was hard to find people to closeout jobs and finish

22  work.

23       There was also a letter that I'm not familiar with, but my

24  son received it, and the Union wrote it, I don't know when, but

25  it was sometime in the period that I didn't work for Ace.  I

1    had stopped working for Ace in September of 2011.  I felt
2    overwhelmed because the new buyers that were perspective buyers
3    that wanted to come into Ace wanted a controller on board and I
4    felt like I was getting pushed out of my own company and this
5    letter didn't help matters because all of our workers received
6    the letter and they had a choice if they wanted to stay on with
7    Ace or if --
8         I really don't know what the letter said, I wish I had a
9    copy of it.  My son never signed it.  And I don't think my
10   husband ever received one, and he was in the Union.
11        But basically it put us out of business because we
12   couldn't get the workers to perform and we -- they were trusted
13   employees, good workers.
14   Q    You said carpenters walked off the Corning project.  Were
15   there any other instances where any other laborer walked off
16   Ace projects?
17   A    I don't recall, but like I said in September I was bad.  I
18   didn't want to see anybody, I didn't want to have any part.  I
19   know that's terrible to do and to let your company be run at
20   that point different people but I couldn't function.  And I
21   don't know what really happened.
22        It's been hard for me to answer these questions because I
23   wasn't really involved.  I still signed contracts and I would
24   try to make an effort to go in.  I would even go in at night
25   and -- and take care of things just so I could avoid employees

1    and vendors.  Any involvement really.  It was hard to deal

2    with.

3        I'm sorry.

4    Q    That's okay.  We can shift gears a little bit.

5    A    Okay.

6    Q    Who is Dave Traver?

7    A    Dave Traver is my ex-co-partner in Ace.

8    Q    Okay.  I'm going to need you to elaborate; tell me --

9    A    Okay.

10   Q    -- essentially how Ace started, where Mr. Traver came in,

11   why he came in.

12   A    Okay.  We -- when I started Ace I didn't really have the

13   background and knowledge in owning a masonry company and I

14   needed all the help I could get.  And I needed an estimator

15   full-time to estimate projects, and he used to work for Casey

16   Masonry.  He was part owner, a business owner, and I thought he

17   would be good to hire on to do estimating.  And when he came to

18   be interviewed he wanted to buy in, that was his interest in

19   the Company as he wanted to be part owner.  And --

20   Q    Can you give me a general timeframe?

21   A    It was in 2003, shortly after Ace started.  And he did buy

22   in, legally on paper, where -- in January of 2004, and he

23   really was an asset because he took all over a lot of things

24   that I was doing with this company called L.A.P. out of Ithaca.

25       They were doing my books at the time, they were our

1  bookkeepers.

2  Q    L.A.P. was Ace's bookkeepers?

3  A    Yes.

4  Q    Prior to Mr. Traver's arrival?

5  A    Yes.

6  Q    Okay.

7  A    And I said to Dave I don't want to have them doing our

8  books, I want to buy a program and do our own payroll in-house

9  and he was nervous, so it took a while for him to accept that

10 because he always wanted to do payroll outside of Ace, and I

11 said, no, we really need to do payroll in-house, so we can

12 grasp all the unions and all the different dues and get a real

13 big handle on it because when we had Paychex doing our payroll

14 it was just a headache to try to get all those benefits wrapped

15 up in the pay.

16      And so he was an asset because in the business part he

17 taught me the business of owning a business and to manage the

18 business and I don't think it was a wrong decision in hiring

19 him and having him be co-partner.

20 Q    And while we're on Mr. Traver, opposing counsel had

21 pointed to Exhibit GC-24, want you to get at the back of that.

22 A    Okay.

23 Q    It's the bank resolution.

24 A    Oh, okay.  I should have it numbered but I -- oh, I'm

25 sorry.

1  Q    That's okay, let me just hand you this one.

2  A    Okay.

3  Q    Okay?

4  A    Yes.

5  Q    Now, we were talking about Mr. Traver; did Mr. Traver

6  leave Ace?

7  A    Yes.

8  Q    And approximately when did that happen?

9  A    The end of 2008.

10  Q    Okay.  And when Mr. Traver left did the bank make any

11  recommendations to Ace about its bank accounts?

12  A    Yes, they said that I had to sign a new resolution and

13  they suggested that Bob be a signer in case anything happens to

14  me.

15  Q    What do you mean "in case anything happens to you"?

16  A    If I get hit by a truck --

17  Q    Okay.

18  A    -- and the business needed to have checks signed or if I

19  became ill of any sort, because I was sole owner of the

20  Company.

21  Q    So I want you to look closely at GC-24.

22  A    Umm-hmm.

23  Q    And can you tell me what authorities Bob had with respect

24  to Ace bank accounts?

25  A    Well, there's another part to this resolution, this is

 1   only a piece to the puzzle.  Dave Traver was leaving the end of

 2   December 2008, and the bank said you need to get this in order

 3   before he leaves, and Bob is only considered a signer.  He has

 4   no part in ownership of the Company, no title, he's just an

 5   authorized signer to sign a check if need be.

 6   Q    And I'm going to stand over your shoulder because I don't

 7   have a copy here.

 8   A    Okay.

 9   Q    If we look across from your signature and then across from

10   Bob's signature, there is a heading that says "Powers," do you

11   see that?

12   A    Yes.

13   Q    And for Bob's signature it's limited to what powers?  If

14   we reference above there, there's another "Powers" hearing.  If

15   we look at GC-24.

16   A    These are account numbers.

17   Q    okay.

18   A    Okay.

19   Q    But it references "Powers" and power's number 2 is what?

20   A    Oh, I'm sorry, sign and authorize checks, drafts,

21   withdrawal slips and any orders -- other orders for the payment

22   of money, whether by paper, electronic or any other means, even

23   if payable to the signer or used to discharge or reduce any

24   obligation of the signer.  Signatures required."

25   Q    Did it authorize -- did it authorize Bob to borrow money?

1    A    No.

2    Q    Did it authorize Bob to do anything else other than what

3    you just read?

4    A    No.

5    Q    And are you aware of any other resolution that allowed Bob

6    to do anything with respect to those accounts, other than the

7    description you just read?

8    A    No.

9         Excuse me.  I'm not going to cry anymore.

10   Q    That's okay.

11        Yesterday opposing counsel questioned you with respect to

12   several projects, I want to talk about two of them now and

13   we'll talk about all of them later on.  But I believe with

14   respect to Trinity --

15   A    Yes.

16   Q    -- and maybe even S.U.N.Y. Binghamton, there was a line of

17   questioning with respect to whether Ace sought out any other

18   bids or if it just got a quote or a bid from Bella; do you

19   remember talking about that at all?

20   A    Yes.

21   Q    And with respect to those contracts, Ace is the GC in both

22   situations?

23   A    Yes.

24   Q    With the owner?

25   A    Yes.

1  Q    And it's true that Ace had a schedule to complete, or I'm

2  sorry, to -- that it had to complete its work within; correct?

3  A    Yes.

4  Q    And time was of the essence with respect to both

5  projects --

6         MR. LEHMANN:  Objection, leading.

7         JUDGE CARTER:  It's cross-examination.

8         MR. LEHMANN:  It's not --

9         MR. FURLONG:  It's cross, but when it's been flipped on

10  611 it still has to be a direct question.

11         JUDGE CARTER:  It's a 611(c) witness so there's some --

12  it's not exactly cross, but overruled.  You can lead a little

13  bit.

14  BY MR. BAILEY:

15  Q    So do you understand my question?

16  A    No, a little bit.  Go back because when I get interrupted

17  I lose all track.

18  Q    With respect to Trinity and S.U.N.Y. Binghamton --

19  A    Yes.

20  Q    -- were the projects considered to be "time was of the

21  essence"?

22  A    Yes.

23  Q    And so it's -- what does that mean?

24  A    That means we had a job to complete in the timeframe that

25  it needed to be done.  A time was always of essence.  You have

1  a schedule to complete a job.  You need to perform.

2  Q    And would that schedule allow you to go out and seek 12

3  other bids?

4  A    No.

5  Q    So did you think it was prudent to request a quote from

6  Bella?

7  A    No.

8  Q    Were you comfortable with their work product?

9  A    Yes.

10  Q    And so did you think it was reasonable to enter into a

11  contract with them?

12  A    Yes.

13  Q    And was the value of those contracts fair and reasonable

14  for the work that they were to performing?

15  A    Yes.

16  Q    I want to have you look at Exhibit GC-25.

17  A    Okay.

18  Q    Can you remind us what that is, please?

19  A    It's an insurance certificate showing proof that my

20  subcontractor has insurance for the coverages stated.

21  Q    And who's it an insurance certificate between?

22  A    It's -- the insured would be my subcontractor, Bella

23  Masonry, LLC, and Ace Masonry.

24  Q    Why would you ask for this?

25  A    I --

1   Q    I'm sorry, why would Ace ask for this?

2   A    I always asked for insurance certificates.  When I'm

3   audited I have to go over that with the auditor and how proof

4   from every contract that they had updated certificates with the

5   requirements needed regarding the contract.  I had to show

6   proof of the contract and the insurance certificate.

7   Q    But why is that important for Ace?

8   A    It's important for Ace just to get through the audits, and

9   to make sure that there's coverages in place.

10  Q    And when you say --

11  A    And it doesn't fall back on Ace.

12  Q    What do you mean by that?

13  A    That his company is legitimate and that these exposures

14  that are listed, these limits are what are required to be on a

15  job site.

16  Q    Okay.  Lisa, there was some testimony with respect to a

17  horse farm that you own --

18  A    Yes.

19  Q    -- with Bob.

20  A    Yes.

21  Q    And although there was no testimony, opposing counsel

22  asserted that he was going to be offering testimony that the

23  horse farm kept you from running Ace.

24  A    No, it didn't.

25  Q    Why do you say that?

1   A    My job in the morning to take care of my own horses
2   probably was a 10-minute job every morning before I went to
3   work.
4   Q    And what about during -- throughout the day?
5   A    I never had to attend to the horses throughout the day
6   while I was at work.
7   Q    What about in the evening?
8   A    Mostly if the farrier needed to come I would schedule him
9   to come out on a weekend, so it never, ever interfered with my
10  Ace obligations.
11  Q    And I know this may be a tricky question because it's so
12  open-ended as to time, but what did your average day or week
13  consist of at Ace for you, from an hour stand point, and did it
14  change?
15  A    Oh, I would bring home work at night.  It was -- I was
16  considered salary, my hours were all the time, night or day.
17  Q    Do you think that the horse farm, your horse farm,
18  interfered with your ability to run Ace?
19  A    No, not at all.
20  Q    Okay.  Do you think it prevented you from attending to any
21  of your duties of Ace?
22  A    No.
23  Q    Not that long ago opposing counsel was talking about and
24  how it was a GC, but yet it didn't hire any employees that were
25  electricians, roofers, sprinkler fitters, and I think he

1  mentioned a few others.  Did Ace have any reason to hire any of

2  those people as employees?

3  A    No, if were the GC on a project and we needed work, for

4  example, like that, we would hire a subcontractor to perform

5  that type of work.

6  Q    So if there was electrical work that had to be done you

7  would subcontract with an electrician?

8  A    Yes.

9  Q    A roofer; same question.

10  A    Yes.  Same question again.

11  Q    Same answer?

12  A    Same answer, sorry.

13  Q    Yeah.  Same question with respect to sprinkler fitters.

14  A    Yes.

15  Q    And any other trade other than carpenters, masons or

16  laborers?  I mean, if you needed any work that didn't fit

17  within those three categories would you subcontract it out?

18  A    Well, sometimes regarding carpentry, we would hire a

19  carpentry outfit to do carpentry work instead ourselves, okay.

20  Q    But I'm saying other than -- other than with respect to

21  those three categories, if there was --

22  A    Yes.

23  Q    -- something that needed to be done on the project would

24  you subcontract that work out?

25  A    Yes.

1  Q    Okay.

2       MR. BAILEY:  Just one moment.

3  **(Pause.)**

4       MR. BAILEY:  I'm going to reserve the rest of Mrs.

5  Bellavigna's testimony for her direct.

6       JUDGE CARTER:  Okay.  Any redirect?

7       MR. LEHMANN:  Yes, thank you.

8                    **611(c) REDIRECT EXAMINATION**

9  BY MR. LEHMANN:

10 Q    Staying with the horse farm, how many horses do you have

11 again?

12 A    Three.

13 Q    Okay, three horses.  And I'm curious, it only takes 10

14 minutes to take care of three horses in the morning?

15 A    Yes.

16 Q    What do you do in the morning?

17 A    Basically their round bales are already in their round

18 bell bath feeder.

19 Q    Umm-hmm.

20 A    And they can eat a round bail within three weeks' time.

21 Q    Okay.

22 A    Okay.  So they're constantly getting what they need,

23 required food.  And in the morning I usually grain them, which

24 consists of scooping three scoops of grain in three bowls,

25 setting them under fence.  They know where their places are to

1  go.  And their water is in the winter time by the crypt or I

2  keep the water in this container that's constantly at full,

3  that's heated by electric plugged in.

4  Q    Okay.  How far is the barn from where you take care of the

5  horses or the -- is there a house on this -- at this place?

6  A    No.

7  Q    Okay.  It's just a horse farm?  Is there a main building

8  there that you go to before you visit or take care of the

9  horses?

10  A    The horse farm consists of a block building and the horse

11  pastures are around it, as are the cow pastures.

12  Q    Okay.  So it's just one building, you just go straight to

13  that building and then take care of the horses?

14  A    Yes.

15  Q    Okay.  And how far away is the horse farm from where you

16  live?

17  A    I would say 120 yards, maybe 150 at most, yards.

18  Q    Okay.  So it's in your back yard basically?

19  A    Yes.

20  Q    Okay.  And how much -- how much acreage is there?

21  A    For the horse farm or?

22  Q    Total.

23  A    Total of what acreage?

24  Q    Right, for the horse farm.

25  A    92.6 acres.

1  Q    Okay.  Now, turning your attention to General Counsel

2  Exhibit 25.

3  A    Yes.

4  Q    You said that you always have you subcontracts --

5  subcontractor provide you insurance liability forms.

6  A    Yes.

7  Q    Are you familiar with ACORD?  Who's the insurance

8  liability own on that?  I don't have it in front of me so I'm

9  doing it by memory; who's the company -- who's the insurance --

10 who's the liability insurance provider?

11 A    ACORD.

12 Q    ACORD, all right.  And you're aware of ACORD; correct?

13 A    It's -- it's basically this form most of the time when you

14 receive certificates.

15 Q    Okay.  But you're aware of ACORD?

16 A    No, not really.

17 Q    You're not aware of the ACORD, the liability company?

18 A    No.

19 Q    I thought you said that -- well, you testified that your

20 subcontractors, this stuff is very important and that your

21 require your subcontractors to give you written proof that they

22 have liability insurance; correct?

23 A    Yes.

24 Q    And you said that that's because otherwise -- and you said

25 that the liability company needed to be reputable because

1  otherwise it would fall on Ace; correct?

2  A    No, I basically was saying that as long as they have this

3  certificate of liability of insurance coverage and these

4  limitations then I was -- if I ever had an audit I would be

5  fine and covered.

6  Q    Okay.  But you never once called ACORD to find out who

7  ACORD is?  Is it a legitimate company?

8  A    No.

9  Q    So you don't even know if it's a real liability company?

10  A    These are basically the same insurance certificates I get

11  from ever subcontractor.  I provide these certificates when I'm

12  a subcontractor for general contractor, so why -- I didn't even

13  think to question ACORD.

14  Q    This -- the form is the same or -- I mean, is that -- so

15  you -- I just maybe you need some clarification.  You said that

16  you submit these certifications when you are -- when you're

17  asked by the GC's to provide this liability insurance; correct?

18  A    Yes.

19  Q    Okay.  And you submit the same form or --

20  A    No, my insurance company does.

21  Q    Right.  Submits the same -- the same information that's on

22  the form?

23  A    My insurance company, whenever I would tell them to submit

24  a certificate of liability insurance, whatever the contract

25  stated, I would give them a copy of that contract with the

1    limitations that the contract required and my insurance company

2    would print the certificate and send it to them.

3    Q    Okay.  And who's your insurance company?  Your liability

4    insurance company.

5    A    Liability?  Right now I don't have any.  Selective.

6    Q    2011.

7    A    Selective.

8    Q    It was Selective?

9    A    Yes.

10   Q    Okay.  But going back, you -- once you received this

11   certificate -- and this is a certificate for liability;

12   correct?

13   A    Yes.

14   Q    Okay.  And so once you received that from Henry you were

15   okay?  You considered yourself in the safety zone?

16   A    Yes.

17   Q    Okay.  Without doing any checking?

18   A    I -- I had an audit and the auditor said it was fine.

19   Q    Okay.

20   A    That's my check right there.  And I --

21   Q    Now, going back to your testimony on Trinity, you remember

22   when you signed the contract for Trinity?

23   A    Not really but I know I signed it.

24   Q    When you signed the contract did the job start right away?

25   A    Some work, I believe, started in November.

1 Q    Okay.  And you performed that work?

2 A    No.

3 Q    You didn't perform that work?

4 A    No.

5 Q    Okay.  If I were to tell you you signed the contract in

6 August of 2011, would that refresh your recollection?

7 A    With William Lutz, I did sign a contract in 2011, I

8 believe.

9 Q    Okay.  In August of 2011?

10 A    Yes.

11 Q    Okay.  And the work didn't start until November of 2011?

12 A    Yes, to my knowledge.

13 Q    Okay.  And two months isn't enough time to -- well, strike

14 that.

15      How long does it take you to get bids in?

16 A    It depends on when the bid is due.  Sometimes bids are

17 three weeks.  Sometimes they're one week.  It just depends on

18 the bid documents and what it -- what's required.

19 Q    Okay.  So and who sets the bid due date?

20 A    The owner.

21 Q    Okay.  And -- or the general contractor if they were to

22 sub it out?

23 A    No.  If a bid is due it's all up to the owner when you

24 want to bid the project.

25 Q    Okay.  But in this case you gave -- you subbed Trinity to

1    Bella; correct?

2    A    The masonry portion of Trinity, yes.

3    Q    Okay.  And you -- but you didn't take any other bids from

4    any other contractors -- masonry contractors?

5    A    Correct.

6    Q    Okay.  And your testimony was because there wasn't enough

7    time.

8    A    Yes.

9    Q    Okay.  But you could have set the time -- the time due

10   date on when the bids would come; correct?

11   A    No.

12   Q    You can't do that?

13   A    No.

14   Q    Okay.  You don't -- when you contract, when you sub as a

15   General Counsel -- or general contractor, you don't put a due

16   date on the bids, when bids are supposed to be due?

17   A    No.

18   Q    Going back to General Counsel Exhibit 24, the bank

19   resolution.

20   A    Yes.

21   Q    You had previously testified that in the tier system you

22   were the top and right below you was Robert, your husband;

23   right?

24   A    In what period of time are you referring to?

25   Q    2011.  2011.

1   A    Are you saying rate of pay?

2   Q    No, control of the Company.  Okay, you were at the top,

3   you were the owner.

4   A    Yes, I was the owner and controller.

5   Q    And underneath you in the hierarchy of management was your

6   husband, Robert; correct?

7   A    I would say that Robert in the timeframe that I --

8   September to December he had a big part.

9   Q    He had a really big part; didn't he?

10  A    I would say JaLynda had a bigger part.

11  Q    You would say that?

12  A    Yes.

13  Q    But JaLynda wasn't -- I mean, she on the -- was she an

14  authorized signer?

15  A    No.

16  Q    Okay.  So Bobby, though, he was the authorized signer of

17  checks?

18  A    Only checks.

19  Q    Okay.  But he really had control of the Company?  When you

20  went on leave from September through December of 2011, he had

21  control of the Company?

22  A    No.

23  Q    Okay.  Well, JaLynda, I remember your testimony yesterday,

24  she didn't oversee field employees; correct?

25  A    Correct.

1  Q    Okay.  And that was your husband's job; he's the one who

2  oversaw the field employees; correct?

3  A    Yes.

4  Q    Okay.  So if she didn't oversee the field employees and he

5  did, he -- you would agree with me that that's a larger portion

6  of the -- of Ace Masonry, overseeing 70 employees --

7       MR. BAILEY:  I would object, Your Honor.  The whole line

8  of questioning is certainly beyond the scope of where I went in

9  my cross.

10      JUDGE CARTER:  Overruled.  I mean, you did raise the issue

11  of the, I guess, his role as a signatory on this account, and

12  that at leads to the question of his role in the Company.

13      You can answer or you can pose it again.

14  BY MR. LEHMANN:

15  Q    So you would agree with me that being responsible for your

16  field employees, and you had a lot of field employees --

17  A    Not at that time, sir.

18  Q    Okay.  But you had more than 20; correct?

19  A    Not at that time.

20  Q    You didn't have 20 field employees in September through

21  December, 2011?

22  A    Oh, maybe all together.

23  Q    Okay, all together.

24  A    Yeah, but a period of time it was very, very limited.

25  Q    Okay.

1   A    I don't know exactly.

2   Q    Okay.  But he had control, whether it's five employees or

3   20 employees, he had control over the field employees; right?

4   A    He would talk to the field superintendents regarding work

5   and try to close out the project, yes.

6   Q    All right.  He was responsible for closing out the

7   projects?

8   A    No.

9   Q    He wasn't?

10  A    No, the project manager was.  I thought we went over all

11  this before.

12  Q    Okay.

13  A    I had project managers still working for me.

14  Q    Okay.

15  A    Okay.

16  Q    And before September of 2011 your -- the project -- who

17  did the project managers report to?

18  A    Myself.

19  Q    Okay.  And after September 2011 who did the project

20  managers report to?

21  A    They would contact me if need be.

22  Q    Okay.  But you're out of the loop after -- September

23  through December; that's what you just testified to.

24  A    I was not functioning like the owner should have.

25  Q    Okay.

1   A    But it doesn't mean that I wasn't still an owner.

2   Q    Okay.  So if they -- so your testimony is that the project

3   managers still reported to you after September?

4   A    Yes.

5   Q    Okay.  Even though you weren't at the office?

6   A    I have a phone.

7   Q    Okay.  But even though you tried to avoid your employees?

8   A    Yes.

9   Q    Okay.

10  A    You can --

11  Q    And the project managers called you, right, because you

12  have a phone?

13  A    Yes.

14  Q    Okay.  And you avoided their calls; correct?

15  A    No.

16  Q    Okay.  If they couldn't get a hold of you who were the

17  reaching out to?

18  A    Either the controller, if it was regarding anything that I

19  needed to talk about, she would contact me.  Or the project

20  coordinator.

21  Q    Okay.  And you only have one project coordinator and --

22  A    Yes.

23  Q    -- that was your husband; correct?

24  A    Yes.

25  Q    Okay.  And going back to General Counsel Exhibit 24, the

1  bank made a recommendation that you have a co-signer,

2  basically, and your husband was chosen; right?

3  A    No, she recommended that I have a signer to sign checks in

4  case I couldn't be there to sign.

5  Q    Right.  And -- and your husband, who was controller over

6  the field employees during that period, was the obvious choice;

7  correct?

8  A    He is my husband, yes.

9  Q    Okay.  Right.

10       MR. LEHMANN:  Nothing further.

11       JUDGE CARTER:  All right.

12       So Ms. Bellavigna, you've finished your testimony, at

13  least this installment of it.

14       MR. FURLONG:  Judge?

15       JUDGE CARTER:  Well, it's redirect.  If we go around again

16  it's going to open up the door for everyone else so --

17       MR. FURLONG:  Well, this is based on Mr. Bailey's

18  questions on the times of the essence.

19       JUDGE CARTER:  I understand, but it's redirect so you can

20  do that, but everyone else will have a shot also.

21       MR. FURLONG:  I understand that.

22       JUDGE CARTER:  Okay, go ahead.

23       MR. FURLONG:  Okay.

24                    **611(c) REDIRECT EXAMINATION**

25  BY MR. FURLONG:

1    Q    Ms. Bellavigna, you indicated that the reason that you

2    subbed the work out in Trinity and the S.U.N.Y. Binghamton job

3    was because time was of the essence on those jobs; do you

4    recall that testimony?

5    A    Yes.

6    Q    All right.  And you also indicated that you were

7    comfortable with the work product of Bella Masonry and that was

8    one of the reasons that you basically went right to them for

9    those subcontracts; do you recall that testimony?

10   A    Yes.

11   Q    Let's talk for a minute about the work product of Bella

12   Masonry.  This is in the fall of 2011; did you ask Bella

13   Masonry for a list of project that it had completed?

14   A    No.

15   Q    Okay.  When you subbed work as a general contractor,

16   correct me if I'm wrong, but you were always concerned about

17   the quality of the work that it -- that your subcontractors had

18   already performed; isn't that the case?

19   A    Yes and no.  Some contractors we really didn't have a

20   grasp on what they, you know, their background was and we would

21   hire them and then find out later on.  But --

22   Q    And that was a disaster when that happened; right?  You

23   weren't happy?

24   A    Correct.

25   Q    All right.  But with respect to the quality of the work

1   that Ace Masonry did as a general contractor it always wanted

2   responsible, proven --

3   A    Of course.

4   Q    -- contractors performing its subcontracting work; right?

5   A    Yes.

6   Q    All right.  And would you ever list or ask for references

7   on your subcontractors or anything like that?

8   A    No.

9   Q    A list of jobs that it had performed?

10  A    No.

11  Q    Because you were pretty familiar with the business; right?

12  A    Yes.

13  Q    Who does work and who does work in a quality way, all

14  right.

15       Now, in the situation with Bella, as of September of 2011,

16  they had performed no jobs as Bella Masonry; isn't that the

17  case?

18  A    What year?

19  Q    2011.

20  A    Yes.

21  Q    As of September when they were brought onto the job site

22  in Trinity, they were -- they had performed no jobs as Bella

23  Masonry, not a single job.

24  A    I don't know.

25  Q    Okay.  You never even bothered to ask, did you?

1    A    No.

2    Q    And you were comfortable giving the job to Bella Masonry

3    because you knew Henry, your father-in-law, and you knew Bob,

4    your brother -- or your, I'm sorry, your husband; right?  And

5    you knew some of the workers who would be working on that job;

6    Derek Hager and some of the others, Dick Tracy.  So you knew

7    who would be doing the job because they had worked for Ace;

8    correct?

9    A    No.

10   Q    Okay.  What attracted you to Bella Masonry of all the

11   possible subcontractors with no track record, how did you feel

12   comfortable giving $180,000 job, the Trinity job, to Bella

13   Masonry?

14   A    Because I trust my father-in-law and he has 50-some years'

15   experience in construction.

16   Q    Okay.  And so you realized that Bella Masonry, now being

17   run by Henry, you had worked with Henry since 2004 and you saw

18   him operate, you saw what he's capable of and so you decided,

19   "I'm not going any further, he's the guy for the job," right?

20   A    Yes.

21   Q    Okay.  And you also knew some of the workers that Henry

22   would be bringing on to that job site because obviously the

23   people actually laying the block and performing the craft work,

24   it's important that they be skilled --

25   A    No.

1   Q    -- am I correct?

2        You didn't have any idea about that?

3   A    No.

4   Q    Okay.  So really what this was about was giving it to

5   Henry Bellavigna, your father-in-law, who had worked with Ace

6   in the office with you for roughly the last 10 years or 8

7   years?

8   A    We --

9   Q    Yes or no?

10  A    What about it?

11  Q    My question is, it's based on Mr. Bellavigna's -- Henry

12  Bellavigna's relationship with you at Ace Masonry and that's

13  one of the reasons why you accepted a company with zero track

14  record, a company with zero track record as a subcontractor on

15  a $180,000 project?

16  A    Based on his past, yes.

17  Q    Okay.  And with respect to the S.U.N.Y. Binghamton

18  project, you brought them on, time of the essence.  You were

19  comfortable with Bella Masonry's proven track record, the

20  company, never mind Henry Bellavigna or Bob Bellavigna, the

21  company itself, you were comfortable with their proven track

22  record, which didn't exist in September, to bring them on to a

23  job for a State -- on a State S.U.N.Y. project?

24  A    Yes, they proved that to me.

25  Q    Okay.  Now, the issue of "time is of the essence" what

1  negotiations took place between you and Henry Bellavigna with

2  respect to the subcontract on the Trinity project?  Did you

3  look at prints together?

4  A    I believe there were some prints that I reviewed, but not

5  with Henry.

6  Q    Okay.  What actually -- how did that subcontract come

7  together where he gave you a price and said this was a fair

8  price?  I want to know the process by which you negotiated this

9  subcontract.

10  A    Basically we came into an agreement regarding the bid.

11  Q    Who's "we," you and Henry directly?

12  A    Yes.

13  Q    Where did this take place, in your office?

14  A    I think it was in Henry's office.

15  Q    Out in Burdette?

16  A    No.

17  Q    At Henry's office at -- while he was at Ace?

18  A    Yeah, because he came there to negotiate the price and

19  then we signed the contract.

20  Q    Okay.  So these negotiations took place.  Was it one

21  meeting?  Two meetings?  What was it?

22  A    One meeting.

23  Q    Okay.  Now Henry, obviously, since he was at Ace must have

24  known something about this project in order to work up a bid on

25  a fairly large masonry contract?

1    A    I don't know if he did or not.

2    Q    How did he -- how did he arrive, if you know, at his price

3    to you?

4    A    I don't recall.

5    Q    Okay.  So this process took place at the Cecil Malone

6    offices of Ace Masonry?

7    A    Yes.

8    Q    And it was a one-meeting process to your understanding?

9    A    Yes.

10   Q    All right.  And my question to you is given other masonry

11   contractors, or dozen or 15 in Tompkin's county going out, it's

12   your testimony here today that no other masonry contractor

13   could have come in and given you a price like Henry gave you a

14   price under the same process?

15   A    I know that -- that Henry gave me a good price and I

16   agreed on it.

17   Q    Okay.

18   A    And usually when you're a general contractor you agree on

19   a good price.

20   Q    My question once again --

21   A    Yes.

22   Q    -- is, the process that Henry went through on behalf of

23   Bella Masonry in the Ace Masonry office, that process, it's

24   your testimony there, could not have been replicated by any

25   other potential subcontract?

1    A    No.

2    Q    And why is that?

3    A    Because this particular job was very intricate and I know

4    that Henry's background and knowledge could have performed the

5    work that needed to be done on the church, and they have proved

6    to me today that they did exactly what I wanted them to.

7    Q    So you knew from Henry's track record working for Ace

8    Masonry that he would carry that over to Bella and you were

9    therefore comfortable?

10    A    I was -- yes.

11    Q    All right.  And this was a one-meeting negotiation as you

12    recall in the office at Ace Masonry?

13    A    Yes.

14    Q    Okay.  And you made no other phone calls to any other

15    contractors to see if you could get a better price?

16    A    Not to my knowledge.

17    Q    All right.  Same thing with S.U.N.Y. Binghamton project?

18    A    Not to my knowledge.

19    Q    You made no other phone calls?  I think we've been over

20    that, but in terms of --

21    A    Yes.

22    Q    -- you felt comfortable?

23        Now, the S.U.N.Y. Binghamton project was time and

24    material; right?

25    A    Yes.

1   Q   So time and material you get paid by what you do.  Any

2   contractor can do time and material; am I correct?

3   A   I think that any -- yeah.

4   Q   Yeah, okay.  And so why didn't you call any other

5   contractors as opposed to simply awarding this contract

6   directly with a single bidder, Bella Masonry?

7   A   I don't know.

8   Q   Okay.  Dave Traver, remember his -- your testimony about

9   Mr. Traver?

10   A   Yes.

11   Q   You're involved in some litigation with Mr. Traver right

12   now?

13   A   No.

14   Q   Okay.  You settled your litigation?

15   A   Yes.

16   Q   Okay.  There was litigation regarding the ownership of the

17   Company?

18   A   Yes.

19   Q   Okay.  And you testified about being ashamed and

20   embarrassed about the business going under and so forth.

21   A   Still am.

22   Q   Okay.  With respect to the money that was in the business,

23   the business was failing I think was your testimony or at least

24   it was -- all right.

25       You and your husband built a big lakeside house within the

1   last year; did you not?

2   A    No.

3   Q    Have you built a residence within the last year?

4   A    No.

5   Q    Within the last two years?

6   A    No.

7   Q    Have you built any structure on a lake?

8   A    No.

9   Q    None?

10  A    No.

11  Q    Okay.  Where do you reside?

12  A    Vansant Hollow Road.

13  Q    Okay.  And when was that built?

14  A    1972.

15  Q    Okay.  Do you own any other facility -- any other

16  residences or buildings?

17  A    No.

18  Q    In New York State?

19  A    No.

20  Q    None?  Okay.  Does your husband?

21  A    No.

22  Q    Okay.  You realize you're under oath?

23  A    Yes.

24  Q    Okay.  Does Ace -- did Ace build any residence or building

25  up on the lake?

```
 1   A    Not to my knowledge.

 2   Q    But you would know as president, obviously if Ace built --

 3   A    What lake?  What are you talking about?

 4   Q    Okay, Seneca Lake.

 5   A    No.

 6   Q    Okay.  The carpenters walked out on a job down in Corning?

 7   A    Yes.

 8   Q    Okay.  Did the bricklayers walk out?

 9   A    I don't recall.

10   Q    Well, certainly you would have heard of it if there was a

11   general strike; would you not?

12   A    I don't recall the masons walking off.

13   Q    Okay.  How about the laborers, did they walk off?

14   A    I don't remember.

15   Q    Would you have heard about it if the laborers walked off?

16   A    Maybe they did.  I don't recall.

17   Q    All right, you don't know?  You never heard of the

18   laborers walking off the job; did you?  Isn't that correct?

19   A    To my knowledge, yes.

20        JUDGE CARTER:  Just so I don't lose the point, do you know

21   why the carpenters walked off that job?

22        THE WITNESS:  Yes, there were a lot of rumors flying

23   around with other contractors saying that their dues are not

24   being paid and Ace aren't -- is not paying your dues, and they

25   all basically walked off the job after they heard it.
```

```
 1        They were very upset.  That they knew about it, even
 2   though as a company I was very up front with the employees and
 3   telling them that we were having hardships but we were trying
 4   to have somebody buy in.
 5        JUDGE CARTER:  Further questions?
 6        MR. FURLONG:  Just wrapping it up.
 7   (Pause.)
 8   BY MR. FURLONG:
 9   Q    Just a couple more questions, Ms. Bellavigna.  Back to the
10   Trinity Church project, that project was really just beginning
11   when you subbed the work out Bella Masonry, the masonry work;
12   was it not?
13   A    To my knowledge, yes.
14   Q    Virtually, the whole contract was still in front of you,
15   meaning to be performed?
16   A    Yes.
17   Q    Okay.  And Bella had performed work in this general area
18   of 180, $190,000 many jobs in the past; correct?
19        MR. BAILEY:  Wait, Bella or Ace?
20        MR. FURLONG:  Ace.
21   BY MR. FURLONG:
22   Q    Ace had performed many jobs in the past with respect to
23   jobs about 180, $190,000; correct?
24   A    Yes.
25   Q    Okay.  And always came in on time?
```

1   A    Came in on time; what do you mean?

2   Q    Performed the contract on time, within the time

3   limitations set forth in the contract?

4   A    I don't think any contract ever ended on schedule, no.

5   Q    So being late then was really nothing out of the ordinary?

6   A    Well, you have punch list items at the end --

7   Q    Yeah.

8   A    -- and that does take a while and it's not really

9   scheduled.

10  Q    Okay.

11       MR. FURLONG:  Nothing further.  Thank you.

12       MR. JAMESON:  Nothing, Your Honor.

13       JUDGE CARTER:  All right, any follow-up with this?

14       MR. BAILEY:  Nothing, Your Honor.

15       JUDGE CARTER:  All right, any follow-up?

16       All right, we reached the finish line for this

17  installment.  You may be recalled.

18       THE WITNESS:  Thank you.

19       JUDGE CARTER:  But the same rules apply, as a general

20  matter.  You're obviously free to go or to remain as an

21  assistant for the case, but just don't discuss your testimony

22  with any of the other possible witnesses.

23       THE WITNESS:  Okay.

24       JUDGE CARTER:  Thank you.

25       THE WITNESS:  Thank you.

1   **(Witness excused.)**

2       MR. LEHMANN:  Mr. Bailey, I was looking over my records.

3   General Counsel Exhibit 10, which is the Carpenters contract --

4       MR. BAILEY:  Yes.  Are we on the record?  Off the record?

5       JUDGE CARTER:  We're still on.

6       MR. BAILEY:  Okay.

7       MR. LEHMANN:  The one that got -- that we just got

8   admitted, General Counsel 6, the line of testimony on the

9   Carpenters contract, you have the contract.  Can we stip GC-10

10  in?

11      MR. BAILEY:  I guess you got to be a little bit more clear

12  with what you're requesting; I'm sorry.  I guess I don't

13  understand.

14      MR. LEHMANN:  That it be received.  I mean, you have

15  the -- you have the contracts that were provided to you.

16      The subpoena -- the subpoena response said that here's

17  what -- basically --

18      MR. BAILEY:  Wait, let me, maybe I can short circuit this.

19      MR. LEHMANN:  Yeah.

20      MR. BAILEY:  Are you saying that from a previous exhibit,

21  where she went through that whole process of here are all the

22  signature pages --

23      MR. LEHMANN:  Right.

24      MR. BAILEY:  -- here are the corresponding agreements --

25      MR. LEHMANN:  Right.

1     MR. BAILEY:  -- you're saying that one of those signature

2  applies to this?

3     MR. LEHMANN:  One of the -- no.  But it -- well, the

4  signature page that applies to the contract's already in.

5     MR. BAILEY:  Okay.

6     MR. LEHMANN:  It's General Counsel's Exhibit 14.

7     MR. BAILEY:  Okay.

8     MR. LEHMANN:  But what the subpoena document said that you

9  had all the other documents, all the other collective

10  bargaining agreements.

11     MR. BAILEY:  Oh, I see what you're saying, yeah.

12     MR. LEHMANN:  Okay.  And so I'm trying to offer this.  I

13  would offer this at this time that it be received because

14  you -- as Lisa had sent the collective bargaining agreements --

15     MR. SHEATS:  He -- but he referenced 14; I had that down

16  as payroll reports.

17     MR. JAMESON:  It's actually GC-11.

18     MR. BAILEY:  GC-11.

19     MR. JAMESON:  I think 11 might be the corresponding --

20     MR. LEHMANN:  Yeah, I'm sorry.

21     MS. KLUYTENAAR:  Compliance form.

22     MR. JAMESON:  Yeah.  Actually that's --

23     MR. LEHMANN:  My apologies.  My handwriting is --

24     MR. BAILEY:  That's okay, mine is the same way.

25     MR. LEHMANN:  It is an "11."

1    **(Pause.)**

2        MR. BAILEY:  11, I'm not trying to be unduly

3    uncooperative, the problem is that this is -- 10 is not is

4    signed by anyone.  And 11 is not a signature page to 10, okay.

5    11 is a separate, I believe, a separate document, its own legs

6    so to speak.

7        Do you have -- do you have a 281-2006 signed, I guess is

8    the question?

9        MR. LEHMANN:  You do have it.

10        JUDGE CARTER:  You're not near a microphone, just so you

11    know, so when you're --

12        MR. LEHMANN:  You do have it.  It's -- it's hard to

13    explain, it's on this page.

14        MR. BAILEY:  Yeah.  Of 10?

15        MR. LEHMANN:  Yeah.  Yeah, of 10.

16        MR. SHEATS:  Should we go off?

17        MR. BAILEY:  Yeah, I would think so --

18        MR. SHEATS:  Because we're going to be bumping around.

19        MR. BAILEY:  It's a waste of tape.

20        MR. SHEATS:  We're trying to achieve the same goal, I

21    think.  I just want to make sure the record's right.

22        JUDGE CARTER:  We'll go off.

23        **(Whereupon, a brief recess was taken.)**

24        JUDGE CARTER:  Back on the record.

25        Does the Agency have another witness?

1       MR. LEHMANN:  Yes, Henry Bellavigna.

2       JUDGE CARTER:  Sir, if you can stand, please?  Raise your

3  right hand.

4  (Whereupon,

5                          **HENRY BELLAVIGNA,**

6  having been called as a witness by and on behalf of the General

7  Counsel and, after having been duly sworn, was examined and

8  testified as follows:)

9       JUDGE CARTER:  Please be seated.  Can you state your full

10  name, please?

11      THE WITNESS:  Henry Bellavigna.

12      JUDGE CARTER:  You may inquire.

13                    **611(c) DIRECT EXAMINATION**

14  BY MR. LEHMANN:

15  Q    Good morning.

16  A    Good morning.

17  Q    May I call you Henry -- only Henry?  Okay, I would

18  normally call you Mr. Bellavigna, but I don't want the record

19  to be -- okay, so otherwise, I --

20      Good morning.  You currently employed?

21  A    At Bella Masonry.

22  Q    And do you own Bella?

23  A    Yes, I do.

24  Q    Okay.  And what is your job title with Bella Masonry?

25  A    Sole manager.

1  Q    You're also the president?

2  A    I guess if you want to call it present.

3  Q    Okay.

4  A    It says sole manager on paperwork.

5  Q    And you're also the project manager for Bella?

6  A    I'm a project, yeah, manager.  Estimator.

7  Q    Estimator?

8  A    Yeah.

9  Q    When did you start Bella Masonry?

10  A    I started it September 21st of 2011.

11  Q    Okay.

12      MR. LEHMANN:  At this time, Your Honor, I would like to

13  request permission to examine Mr. Bellavigna under 611(c).

14      JUDGE CARTER:  You may so inquire.

15  BY MR. LEHMANN:

16  Q    Now, you're familiar with Ace Masonry?

17  A    Yes, I am.

18  Q    And you were an estimator for Ace?

19  A    Yes, I was.

20  Q    And what -- what were your job duties as an estimator?

21  A    What were my job duties as an estimator?

22  Q    Yeah, what did you do as an estimator?

23  A    Review what's out there for bidding purposes through many

24  different sources.  Put together bid lists.  What I mean by

25  that is subcontractors that we're going to ask to do bids, do

1    the estimate.

2    Q    Anything else as an estimator?

3    A    No.  Once in a while you would have to call subcontractors

4    so --

5    Q    Maybe if you had specific questions about what they were

6    requesting be bid on; right?

7    A    Yeah.

8    Q    Okay.  And as a project manager -- or you were also a

9    project manager?

10   A    Yes, I was.

11   Q    Okay.  As a project manager what were your duties as a

12   project manager?

13   A    It depended on the project and the size of the project,

14   but basically overseeing the project or projects that was

15   running at the time.

16   Q    Okay.  And you --

17   A    Making sure the superintendent or foremen were doing what

18   was supposed to be done according to job specifications.

19   Q    Okay.  And specifically work?

20   A    Hmm?

21   Q    Specifically work?

22   A    Specifically work?

23   Q    Yeah.  When you said "make sure that the superintendents

24   were doing what they were supposed to be doing" --

25   A    Yeah, doing -- because particularly if we were doing a

```
 1   masonry job or it was on a general contracting job.
 2   Q    Right.
 3   A    It changed but --
 4   Q    Okay.
 5   A    -- making sure the work was done the way it was supposed
 6   to be done.
 7   Q    Being performed?
 8   A    Yeah.
 9   Q    And if the work wasn't being performed correctly would you
10   have any responsibilities on that?
11   A    Would I have --
12   Q    Correcting it?
13   A    Sure, I would put them on notice.
14   Q    You would put them -- your own employees, you would put
15   them on notice?
16   A    Well, it depends.  Now, if you're talking my own employees
17   or are we talking about a sub?
18   Q    Okay, I'm only talking about Ace employees, all right.
19   A    Okay.
20   Q    So as a project manager who are -- who are you overseeing?
21   What employees are you overseeing as a project manager?
22   A    All that are on that site.
23   Q    Okay.  Just tell me all.
24   A    A foreman or a superintendent.
25   Q    Okay.  Anyone else?
```

1   A      No.

2   Q      What about the regular employees?

3   A      The regular employees, no.  The superintendent or the

4   foreman, they would be working under them.

5   Q      Okay.  So the employee -- the field employees would report

6   to the superintendent --

7   A      The foreman, and then he would report to the

8   superintendent if that was the case.

9   Q      Okay.  And so if a job -- if something wasn't being done

10  properly and you noticed it who would you tell?  You're

11  pointing, you have to specifically --

12  A      Lisa Bellavigna.

13  Q      Okay.  But you're, as the project manager, I mean, you

14  would agree with me that the project manager pretty much runs

15  the whole show on that particular project; right?

16  A      Umm-hmm.

17  Q      From --

18         JUDGE CARTER:  Was that a "Yes"?

19         THE WITNESS:  Yes.

20  BY MR. LEHMANN:

21  Q      From the work that is being performed, right down to the

22  employees and the field employees who are performing the job;

23  right?

24  A      In a roundabout way, yes.

25  Q      Okay.  And so my question is if something -- you saw that

1  something wasn't being performed correctly what would you do

2  about it, if anything?

3  A    I would talk to the superintendent about it, why are we

4  doing it?  Or whatever the situation was.

5  Q    Whatever it is, okay.  And in those -- and have those

6  instances --

7  A    Sometimes.

8  Q    -- happened as a project manager?

9  A    Sometimes, sure.

10 Q    Things happen; right?

11 A    Sure.

12 Q    And you can tell somebody to fix whatever's wrong; right?

13 A    If -- yes.  Yes.

14 Q    Okay.  And if -- and if they don't fix it what can happen

15 if they don't fix it?

16 A    If they don't fix it?

17 Q    Right.

18 A    I would go to Lisa Bellavigna.

19 Q    Okay.  And what --

20 A    Make sure it happened.

21 Q    Okay.  And what happens if it didn't get fixed, what would

22 happen?  Would you make a recommendation?

23 A    Would I make a recommendation?

24 Q    Yeah.

25 A    Yeah.

```
 1   Q    I mean, as the project manager.
 2   A    Yeah.  Sure.  Absolutely.
 3   Q    You make a recommendation to either --
 4   A    I don't want him on my project next time.
 5   Q    Right.  Okay.  Or discipline an employee or something;
 6   right?
 7   A    That wouldn't be my responsibility to discipline a -- that
 8   would the owner's, Lisa Bellavigna.
 9   Q    Okay.  But I understand she would make the ultimate
10   decision, but you would have the authority to make a
11   recommendation, "I want this field employee to be disciplined"?
12   A    Yeah.
13   Q    Okay.
14   A    Yes.  Right.
15   Q    And in fact, it has happened as -- while you've been a
16   project manager from time to time throughout your career with
17   Ace Masonry?
18   A    Yes.
19   Q    Okay.  As the project manager when you -- you were the
20   project manager on the Odessa Montour project, correct, for
21   Ace?
22   A    At the start was.
23   Q    Okay.  And that's not a small project; right?
24   A    No, it's not a small project.
25   Q    Do you remember how big it was?
```

```
 1   A    Dollar wise?

 2   Q    Yeah.

 3   A    Not exactly.  I think --

 4   Q    Okay.  2.9 million?

 5   A    May have, yeah.

 6   Q    Okay.  And that's not a small project?

 7   A    No.

 8   Q    It's a pretty large project?

 9   A    Yeah.

10   Q    A lot of stuff going on?

11   A    Yeah, there was.

12   Q    A lot of responsibility?

13   A    It was.

14   Q    And a lot of employees were working on that job?

15   A    Yes.

16   Q    Okay.  And the number of employees, whose decision is it

17   to say we need 20 employees to work on this job?

18   A    Well, let me step back.  Like I said, I was only on this

19   project for a short time.  My wife had passed away, so that

20   changed very quickly.  So I -- on that job I can't tell you

21   where all the -- how many were on the job completely at all the

22   times.  When I was there --

23   Q    Right.

24   A    -- it was in the very early stages.

25   Q    Okay.  But you were there at the early stages when the
```

1    initial hiring for employees to come on to that job occurred?

2    A    They were employees of Ace's that were on other jobs

3    before that.

4    Q    Okay.  And did you have the authority to then say I want

5    five -- these five employees to be moved over to Odessa Montour

6    so they can work on that particular job?

7    A    No.

8    Q    You didn't?  Who had the authority to do that?

9    A    Lisa Bellavigna.  And we -- this would be -- normally

10   would be talked about at one of our weekly job meetings.

11   Q    Okay.

12   A    In the office.

13   Q    All right.

14   A    Who was going where and who could be moved.

15   Q    And who would attend these meetings?

16   A    The superintendents.

17   Q    Anyone else?  The project manager?

18   A    Project manager, superintendent.

19   Q    Superintendents?

20   A    Yeah.

21   Q    Who else?

22   A    And Lisa Bellavigna and there was Melissa Blanchard would

23   take notes generally.

24   Q    Okay.  Okay, anyone else?

25   A    No.

1  Q    Okay.  Your son -- and your son --

2  A    My son, yeah, he would be there.  Not every one, but --

3  Q    Okay.  And let's identify your son, Robert; that's Robert

4  P.?

5  A    Robert P.

6  Q    Bellavigna.

7  A    Bellavigna.

8  Q    Okay.  And he was at these project management --

9  A    Most of them, yes.

10  Q    Okay.  And so the superintendents, yourself and your son

11  would talk about how many employees that needed to be --

12  A    Who you -- on what jobs, yes.

13  Q    Okay.  And then are you making a recommendation to Lisa or

14  are you -- I mean, who -- what's --

15  A    It's just -- we --

16  Q    -- how does it break down where --

17  A    -- we all had a conversation.  All talked about, well, I

18  think we could have Randy Bell or this one here.  He's more fit

19  for this job.  What do you think?  Can it be moved to not?

20  Q    Okay.

21  A    It was a general consensus.

22  Q    Okay.  And --

23      MR. BAILEY:  Make sure he finishes his question before you

24  start answering, otherwise it becomes very confusing on the

25  tape.

1        THE WITNESS:  Okay.

2        MR. BAILEY:  Okay.

3        MR. LEHMANN:  Thank you, Mr. Bailey.

4    BY MR. LEHMANN:

5    Q    And so -- and so through that process you basically were

6    telling employees, Mr. Hager or Scott -- you're familiar with

7    Scott Smith?

8    A    Sure.  I've spent a --

9    Q    Field -- right a laborer.

10   A    A little bit.

11   Q    Right.  Okay, but you're -- you could -- you would tell

12   field employees, you would assign field employees to work on a

13   particular job; right?  Moving --

14   A    I would not assign employees to be put on a particular

15   job.

16   Q    Okay.  But when you're in this meeting -

17   A    Yes.

18   Q    -- and you just testified that you would want "X" employee

19   to go to Odessa Montour, for an example --

20   A    No.  Yeah, for certain -- certain employees for a certain

21   reason.

22   Q    Right.

23   A    Maybe they're better at restoration.  This is a

24   restoration job.  You know, we would talk about it, can he be

25   moved?  Maybe he can't be moved.

1    Q    Okay.

2    A    So then we would have to call the Hall and hire somebody

3    else or whatever.  But --

4    Q    Okay.  And that is -- and that was what was discussed at

5    these meetings?

6    A    Correct.

7    Q    Yourself, the superintendents, and your son, Robert?

8    A    And project managers.

9    Q    Right.  Yourself, as the project manager for Odessa

10    Montour?

11    A    And all the project managers.

12    Q    Okay.  And, including you?

13    A    Including me.

14    Q    Right.  All right, and you guys would decide if someone's

15    really good at -- at whatever, he would go work -- you can move

16    them to a particular job; correct?

17    A    If they could be moved?  If I wouldn't move them?

18    Q    If they could be moved.  I mean who --

19    A    I would ask -- yeah, can -- okay, then I would say to

20    Lisa, can they be moved?

21    Q    Did the field -- did the field employees decide what jobs

22    they were going to work on?

23    A    No.

24    Q    No.

25    A    No.

1  Q    You guys -- you, maybe along with you son, but you had the

2  authority to tell "X" field employee to work on a particular

3  job?

4  A    Yes.

5  Q    All right.  And -- all right.  And then they would

6  actually go work on that -- at Odessa Montour, for an example?

7  A    Yes.

8  Q    And for the most part when an employee is moved on to --

9  at the Odessa Montour project, they're there for a week?

10  A    (No audible response.)

11  Q    You have to verbalize something.

12  A    It could be a -- it could be a day.

13  Q    It could be a day?  It could be a week?

14  A    Could be a month.

15  Q    Could be a month, okay.  Now, did you -- do you have the

16  authority to actually hire or ask that a certain individual be

17  hired at Ace Masonry?

18  A    Yes.

19  Q    Okay.  And you -- if you wanted an individual to be hired

20  you -- who would you -- how would that get done?  Walk me

21  through the process.

22  A    I would go to Lisa and ask that he be hired.

23  Q    Okay.  And approximately how many times did that happen

24  while you were working for Ace Masonry?

25  A    Oh, I couldn't tell you the amount of times.

1   Q   Okay.

2   A   So it would be a guess.

3   Q   Okay.

4   A   Many times.

5   Q   Many times, all right.  And so you would make the

6   recommendation or can this person be hired and --

7   A   Can we move from another job, whatever.

8   Q   Right.  Right.  And that person would be hired?

9   A   Yes.

10   Q   Right.  And you would make -- all right, strike that.

11       Now, you started Bella Masonry on, did you say September

12   22nd?

13   A   21st, I think it was.

14   Q   21st, of 2011?

15   A   Yes.

16   Q   Okay.  And you -- when did you stop working for Ace

17   Masonry?  Do you remember?

18   A   It was early in October.

19   Q   Early in October?

20   A   Yeah.

21   Q   Okay.  Around October 24 -- or October 14th?

22   A   Could be.  I don't remember the exact day.

23   Q   Okay.  Could it have been after October 14th?

24   A   I don't think so, no.

25   Q   All right.  Now, what was the last job that you worked on

```
 1   for Ace?

 2   A    The last job that I worked on for Ace?

 3   Q    Yeah.

 4   A    Was Odessa Montour.

 5   Q    And you were working on Odessa Montour in August of 2011?

 6   A    Yes.

 7   Q    And September of 2011?  Also in September of 2011?

 8   A    No.

 9   Q    Okay.

10   A    No, I --

11   Q    So what were you doing for Ace Masonry --

12   A    I was doing estimates when I came back.

13   Q    Okay.  Do you remember the last few estimates that you --

14   the last few bids that you provided for Ace Masonry?

15   A    No, I don't.  There's too many of them that -- to remember

16   exactly.  I couldn't tell you which one was exactly at the end.

17   Q    Do you remember any of them at the end?

18   A    No.

19   Q    Okay.  When you say "too many" how would you -- what do

20   you mean by "too many"?

21   A    You could make -- work on two or three a week.

22   Q    Umm-hmm.

23   A    Depends on what the sizes of them are.  I -- one thing as

24   an estimator you learn to put them on the side to go to the

25   next one, otherwise you just start getting it all screwed up,
```

```
 1    what you were looking at, what you weren't.  So --
 2    Q    Okay.  Okay, now, your son, Robert, he works for Bella,
 3    also; correct?
 4    A    Yes, he does now.
 5    Q    And he's Bella's project coordinator?
 6    A    He's Bella's project coordinator, correct.
 7    Q    Okay.  And that's the same job that he did at --
 8    A    One of them.
 9    Q    -- at Ace Masonry?
10    A    Yeah, that's one of his jobs.  He also lays block, too.
11    Q    Okay.  But as the project coordinator he did the same job
12    at Ace as he's doing at Bella?
13    A    In a very smaller way.
14    Q    Okay.
15    A    I mean, with Ace it was more detailed than what we are.
16    We're just a small masonry contractor now.
17    Q    Okay.
18    A    That's why he's able to lay block all summer.
19    Q    All right.  But the duties of the project coordinator are
20    the same at Bella as he was doing at Ace, regardless of --
21    regardless of the size, the duties itself were the same?
22    A    No.
23    Q    They're not?
24    A    No.
25    Q    So what is he doing differently at Ace that he's doing at
```

1  Bella?  As a project coordinator --

2  A    Yeah.  Yeah.

3  Q    -- can you name the differences?

4  A    The differences?

5  Q    Yes.

6  A    He's mostly dealing with our -- help moving our equipment

7  or rental equipment or doing orders, ordering the stuff that he

8  needs on a job.

9       MR. FURLONG:  Can I just have a clarification; is this Ace

10  or Bella that you're referring to now?

11       THE WITNESS:  I'm talking about Bella.

12       MR. FURLONG:  Bella.  All right.

13       THE WITNESS:  Where with Ace he had a lot more things to

14  look out for.  Communication with a lot of clients, you know,

15  with Ace, which he doesn't have now.

16       MR. LEHMANN:  Okay.

17  BY MR. LEHMANN:

18  Q    Tell me what he -- and we're talking about your son;

19  right?  The project coordinator?

20  A    Yeah.

21  Q    All right.  For Ace, what were his duties as a project

22  coordinator?

23  A    I don't know, you'll have to ask Lisa Bellavigna.

24  Q    I'm asking you, sir.

25  A    I don't know.

```
 1   Q    Okay.

 2   A    I was only a worker there.

 3   Q    Okay.  You -- but you weren't just a worker, though, at

 4   Ace Masonry?

 5   A    I was an estimator.

 6   Q    Okay.  And you were also a project manager.

 7   A    Yeah.

 8   Q    Right?  With the authority --

 9   A    Yeah.

10   Q    -- to hire people?  Authority to discipline people?

11   A    (No audible response.)

12   Q    You have to say a response.

13        MR. BAILEY:  I don't think he -- that's a

14   mischaracterization.  He never said he had the authority to

15   hire people.

16        MR. LEHMANN:  I'm ask --

17        MR. BAILEY:  He went to Lisa.  That's a

18   mischaracterization.

19        MR. FURLONG:  Actually, I don't think it's a

20   mischaracterization.

21        MR. BAILEY:  It is.  He said he made a recommendation to

22   Lisa.

23        MR. FURLONG:  The record will speak for itself, but he was

24   very clear that he made hiring decisions.  He did go to Lisa

25   but he made hiring decisions.
```

1     MR. BAILEY:  But he didn't have the authority to hire

2  people.

3     JUDGE CARTER:  All right, I'm -- on the point.  Can you

4  just rephrase your question?

5     MR. LEHMANN:  Okay.

6  BY MR. LEHMANN:

7  Q    You weren't just a regular employee at Ace Masonry,

8  though; right?  You were the project manager?

9  A    I was a project manager at times.

10  Q    Right.

11  A    And I was an estimator at times.

12  Q    Right.

13  A    I was hired --

14  Q    But as a --

15  A    -- as an estimator.

16  Q    As a project manager, though, you were responsible for, at

17  least, the $2.9 million job?

18  A    Correct.

19  Q    Right.  So you weren't just a regular employee; correct?

20  A    There were regular project managers, they had other

21  project managers that could do the same.

22  Q    All right.  Right, you -- Okay.  You -- how long have you

23  been in the construction industry?

24  A    Many years.

25  Q    Okay.

1   A    Fifty plus years.

2   Q    Okay.  And so my question is as project coordinator what

3   did Robert, your son, what were his duties?

4   A    And as I said he did not work for me, he worked for Lisa,

5   and she set the responsibilities for Robert, not me.

6   Q    Okay.  You did work for Ace for at least eight years;

7   right?

8   A    Correct.

9   Q    Okay.  And during that time you saw him --

10  A    I might have --

11  Q    Sir?  Sir, I'm asking a question.

12  A    Yes.

13       JUDGE CARTER:  Wait for the question, then you can answer.

14  BY MR. LEHMANN:

15  Q    You -- and during that time period your son worked as a

16  project coordinator from -- for at least eight years?

17  A    Correct.

18  Q    Okay.  And you observed your son working for eight years?

19  A    Yes.

20  Q    Okay.  What did you see him do for eight years?

21  A    I seen Robert as a coordinator oversee superintendents,

22  oversee foreman depending on the job.  Seen him put submittals

23  together, submittal packages together that had to go to the

24  architects and engineers.  Seen him have communication with

25  clients.  That's about what I've seen over the years.

1   Q     You also saw him make placement of all supervision?

2   A     I also seen him make placement of all supervision?

3   Q     Right.

4   A     No.

5   Q     No?

6   A     No.

7   Q     And manpower?

8   A     No.

9   Q     No?  You also saw him scheduling of all work with job

10  superintendents?

11  A     Seen him scheduling of work with the job superintendents,

12  yes.

13  Q     Explain that.  What does that mean, "Scheduling all work

14  with job superintendents"?

15  A     Scheduling the -- going through the project schedules and

16  if he had enough help on the jobs to do certain phases of it.

17  Q     Okay.

18  A     And you know, meet the time schedule.

19  Q     Okay.  And if he didn't have enough help on a particular

20  job what would you see him do?

21  A     Normally that would come up during one of the project

22  meetings and as a group of project managers and Lisa, they

23  would talk about it and see how they were going to correct it.

24  Q     Okay.  And you guys would move employees around?  Move

25  employees --

```
 1   A     Not "you guys."

 2   Q     Okay.  Who?

 3   A     Lisa would move the people around.

 4   Q     Okay.  But you, when I say "you guys" everyone in this

 5   meeting --

 6   A     The team.

 7   Q     -- the superintendents -- and superintendents, the bottom

 8   tier; correct?

 9   A     The foreman is the bottom tier.

10   Q     Okay.  But foremens (sic) aren't in this meeting; right?

11   A     Sometimes.

12   Q     okay.  But for the most part you testified superintendents

13   really were at the --

14   A     Yeah.

15   Q     -- so they're bottom.  So superintendents working up;

16   right?

17   A     Umm-hmm.

18   Q     Superintendents -- that was a "Yes"?

19   A     Yes.

20   Q     Project manager; right?

21   A     Yes.

22   Q     Then a project coordinator?

23   A     Yeah.

24   Q     Right.  Then Lisa?

25   A     Yeah.
```

```
 1   Q    The owner.  The president?

 2   A    Yes.

 3   Q    Right?

 4   A    Yes.

 5   Q    Okay.  And as a team you guys would be moving people

 6   around; right?

 7   A    Correct.

 8   Q    All right.  So if -- and you would agree with me that you

 9   have the authority to recommend certain individuals being

10   hired; right?  You just testified to that.

11   A    Umm-hmm.

12   Q    And if you -- that was a "Yes"?

13   A    That was a "Yes."

14   Q    Okay.  You might want to take your hands -- so that the

15   recording can pick up your responses.

16   A    Yes.

17   Q    Okay.  And so if you had the authority to make a

18   recommendation that certain people be hired, Robert, your son,

19   who was above you, had the same authority; right?

20   A    Correct.

21   Q    Okay.  And in fact, over his time working for Ace Masonry,

22   he actually did hire employees; right?  Made those

23   recommendations?

24   A    Made the recommendation.

25   Q    Right.  And he made the recommendations to Lisa and those
```

1    employees were hired; right?

2    A    Sometimes.

3    Q    Right.  Okay, but they didn't -- sometimes, but they were

4    hired?  He made a recommendation and they were hired; right?

5    You have to --

6    A    Not always.

7    Q    Is that -- okay.  But sometimes?

8    A    Sometimes.

9    Q    Okay.  And how many "sometimes"?

10    A    I never kept track of it.

11    Q    Was it more -- more than you or less than you?

12    A    More than me or less than me?

13    Q    Right.  You said you had -- you recommended that certain

14    employees be hired, many employees, you couldn't even count the

15    number of employees, and so my question to you is your son, did

16    he recommend that certain employees be hired more than you did

17    or less than you did or about the same?

18    A    More than I did.

19    Q    Okay.  Now, going back to project -- your son, the project

20    coordinator for Bella, okay, he for -- for Bella, I just want

21    to make sure that we're testifying about Bella, had -- when a

22    project comes in, still have these same project meetings?

23    A    No.

24    Q    You didn't?

25    A    No.

1  Q    How -- what meetings, if any, would take place when you

2  got a project in?

3  A    Depends what you call a meeting.  Usually, if you want to

4  say between him and I, that's a meeting or it's a conversation,

5  we talk about --

6  Q    Talk about what?

7  A    The project.

8  Q    The project.  And what would you talk about as far as the

9  project?

10  A    Schedule, when we would start it, what do you think we had

11  to get submitted on it, and we would talk back and forth and

12  between us we would get it coordinated.

13  Q    Okay.  Would similar topics of the meetings that you had

14  at Ace, would those be discussed at Bella?  These Bella

15  meetings between you and your son?

16  A    No.

17  Q    Not -- well, I mean, at Ace, you just got done testifying

18  that --

19  A    And Ace is a big company.

20  Q    -- you would talk about the projects.

21       I understand, but the project itself, you would talk about

22  the project at Ace; right?

23  A    (No audible response.)

24  Q    So in Bella when you and your son --

25       JUDGE CARTER:  Wait a minute.  Wait a minute.

1    Again, you gave a non-verbal response; what was --

2    THE WITNESS:  I'm waiting for the question.

3    JUDGE CARTER:  Okay, let's --

4 BY MR. LEHMANN:

5 Q    You spoke about the project at Ace; right?  At these

6 meetings, superintendent, yourself?

7 A    Yes.

8 Q    Right.  And you spoke about the projects at Bella, between

9 you and your son; correct?

10 A    Yes.  Yes.

11 Q    Okay.  And during these discussions you spoke about how

12 many employees needed to be hired; right?

13 A    That could be one of the questions, yes.

14 Q    Okay.  In fact, that was generally on each project that

15 Bella was one of the first questions, how many employees do we

16 need to have work on this job; right?

17 A    Along with some others, yes.

18 Q    Okay.  And you would -- well, what are the other topics

19 that --

20 A    First of all, to get the project started, you know, what

21 did we have to do for submittals.

22 Q    Umm-hmm.  Okay.  Continue.

23 A    Do we have a signed contract?  Do we have the proper

24 insurance?

25 Q    Okay.

1    A    Okay.

2    Q    Continue.

3    A    And then we would get into what do we need, equipment, to

4    be rented or purchased to get the -- complete the job.

5    Q    Okay.  And when you --

6    A    And manpower.

7    Q    Right, and then the manpower.  Okay, now just -- let me

8    just stop you for one second.  You -- this conversation is

9    going on between you and your son; right?

10    A    Correct.

11    Q    Anyone else in these discussions?

12    A    Not as a rule.

13    Q    Okay.  So it's just the two of you, all right.  And now,

14    going to the manpower, what -- so how would it -- how would it

15    come out that certain individuals -- certain people needed to

16    be hired for this particular job?  Whatever the job is at the

17    time.

18    A    How would it come up?

19    Q    Yeah.  How would -- what's the -- tell me the conversation

20    between you and your son --

21    A    Yes.

22    Q    -- that --

23    A    I would say, hey, I think, we need two masons and a

24    laborer on this job.

25    Q    Okay.  And what would your son say?

1    A    Who do -- who do we have available?  Is there anybody

2    available?  And it depends what the response was.

3    Q    Okay.  And -- well, what generally is his response?  I

4    mean, would he agree?  Would he make recommendations?  Tell me

5    what is his role in that?

6    A    What his role is in that?

7    Q    Yeah.

8    A    Is to make sure that I'm satisfied with -- before he

9    starts with the job and how we're going to proceed with this

10   project and how many people we're going to have on it.

11   Q    Okay.  And who would actually do -- I mean, how -- where

12   would you get the employees?  In -- when you first started

13   September/October, where were you getting the employees?

14   A    Well, the first job that I did was in October.  I mean

15   actually doing work was in October.

16   Q    Okay.

17   A    Okay.

18   Q    And what job was that?

19   A    The first one would have been, let me think a minute here,

20   it would have been the Vestal Hills.

21   Q    That was your first project?

22   A    Yes.

23   Q    Vestal Hills?

24   A    Vestal Hills.

25   Q    Okay.  And so that was the first project -- so how did it

```
 1   come out that employees needed to be hired for this job?
 2   A    Let me think about that one.  Vestal Hills, church
 3   project, my son didn't work for me --
 4   Q    Okay.
 5   A    -- at that time.
 6   Q    Okay.  When did your son start with Bella?
 7   A    He started about third week of December, I think.
 8   Q    Third week of December?
 9   A    Yeah.
10   Q    Okay.  So how did the employees get hired for the Vestal
11   Hills job, your very first project?
12   A    Well, we had to go back a ways, when I decided that Ace
13   was failing and I was going to start a company.  I gathered
14   some of the employees together, told them where I was going and
15   if they would be interested, okay.  There might have been six
16   or eight --
17   Q    In what time period are we talking about?
18   A    -- of the employees --
19   Q    I'm sorry, what was the -- I, actually, I thought you were
20   finished so I spoke.  What was your ending -- what was the last
21   comment that you made?
22   A    So we talked about -- you know, we sat around, we talked,
23   see if they had interest in working for Bella.
24   Q    Okay.
25   A    If Ace failed, and the consensus with most of them was
```

1   yes, they would be interested.

2       JUDGE CARTER:  And just to be clear, your last remark was

3   that was a group of six to eight employees?

4       THE WITNESS:  Yeah, there was -- I'm going by memory, it

5   was six or eight of Ace's employee that were around the table;

6   laborer, carpenter and the rest were most of them, I think,

7   were masons.

8   BY MR. LEHMANN:

9   Q    Okay, and what time period are we talking about?

10  A    What do you mean "time period"?

11  Q    When --

12  A    When did it happen?

13  Q    When did this -- when was this --

14  A    Just as I was leaving Ace.

15  Q    Just as you were leaving Ace?

16  A    Yeah.

17  Q    And you left Ace on October 14th?

18  A    October?

19  Q    I'll help your recollection.

20  A    All right.

21  Q    You want to refer to General Counsel Exhibit 2?

22       JUDGE CARTER:  Maybe 3.

23  BY MR. LEHMANN:

24  Q    3; General Counsel's Exhibit 3.

25  A    CP-3?

```
 1        JUDGE CARTER:  No, it's GC-3.  Here's a copy.

 2        THE WITNESS:  Okay.

 3   BY MR. LEHMANN:

 4   Q    You want to look at the last column, it says "Date Last

 5   Worked," find your name, it says "October 14, 2011"?

 6        JUDGE CARTER:  You're name's going to be in the first

 7   page --

 8        THE WITNESS:  Yeah.  Okay.

 9   BY MR. LEHMANN:

10   Q    Okay, so this meeting with these six to employees

11   around -- occurred around this time?

12   A    Yes.  Somewhere around that.

13        JUDGE CARTER:  All right, let's put that on the record.  I

14   mean, does this exhibit refresh your memory about when you left

15   Ace?

16        THE WITNESS:  Yeah, it's saying the date.  I think it's --

17   it's got to be correct.

18        JUDGE CARTER:  Well, it says October 14, 2011; does that

19   sound accurate to you?

20        THE WITNESS:  Yes, it does.

21        JUDGE CARTER:  Okay.

22   BY MR. LEHMANN:

23   Q    And so it was around this time period?

24   A    Correct.

25   Q    Okay.  And where was this meeting?
```

```
 1   A    At the Ace office.

 2   Q    And who were these employees?  Can you name them?

 3   A    I cannot name everyone.  It was Dick Tracy, there was a

 4   Phil Bond, Chuck Maral (ph), Derek Hagar, Steve Roland.

 5   Q    Anyone else?

 6   A    That's the names I can remember right off the top of my

 7   head.

 8   Q    Okay.  And this -- this meeting took place where in the

 9   Ace -- now, when you say "Ace office," you're talking Cecil

10   Malone?

11   A    Yes, I am.

12   Q    Okay.  And where in this Ace office are you talking?

13   A    I gathered them in the warehouse one evening before I was

14   leaving and see if they had interest.

15   Q    Okay.  Was your son at this meeting?

16   A    My son was not at that meeting.

17   Q    Okay.  How about your grandson?

18   A    Yes, he was.

19   Q    Your grandson was there?

20   A    Yes, he was.  Yes, he was.

21   Q    And your grandson is, just for identification, Robert A.

22   Bellavigna; correct?

23   A    Correct.  Correct.

24   Q    And he is -- he works at Respondent -- or at Bella Masonry

25   now?
```

```
 1   A     Yes, he does.

 2   Q     And we'll get to him later.

 3   A     Yeah.

 4   Q     All right.  So he was at this -- he was at this meeting,

 5   also?

 6   A     Yeah.

 7   Q     But your son was not?

 8   A     I don't remember him being there, no.

 9   Q     Could he have been there?

10   A     Yes, he could have been at that meeting.  He could have

11   been.

12   Q     Okay.  You -- I mean thinking back at the meeting --

13   A     I think so.

14   Q     -- your recollecting --

15   A     I think so.

16   Q     -- that he was also there?

17   A     Yeah.

18   Q     Okay.  And what was -- well, what was their -- the

19   employees' responses?  What was -- what were the responses that

20   were being said?

21   A     Yeah, the conversation was probably they're going to be

22   out of work and I was starting a company, interested in

23   starting a company, and could I call on you, count on you?

24   They're all good employees and all they -- all of them said

25   yes.
```

1   Q    Okay.  Did they sign anything?

2   A    Not --

3   Q    On that day?

4   A    Not at that point, no.

5        JUDGE CARTER:  Let me just put a pause here.  We're at the

6   part probably where we should take a lunch break.  Did you have

7   a final thought before we break?

8        MR. LEHMANN:  No.

9        JUDGE CARTER:  All right, so we'll go ahead and take a

10  lunch recess and pick it up at 1:30, and then we'll resume.

11       Mr. Bellavigna, the same rules apply, as a witness you can

12  discuss anything but the case during the break.  And we'll pick

13  it back up in an hour.

14       THE WITNESS:  Okay.

15       JUDGE CARTER:  Off the record.

16       **(Whereupon, at 12:30 p.m., a luncheon recess was taken.)**

1                  <u>A F T E R N O O N   S E S S I O N</u>

2                                          (Time Noted: 1:37 p.m.)

3          **JUDGE CARTER:  Back on the record.**

4          We are back after the lunch break.  And we were -- left

5     off with the General Counsel's examination of Mr. Bellavigna.

6          So you may continue.

7          MR. LEHMANN:  Thank you.

8              **611(c) DIRECT EXAMINATION (continued)**

9     BY MR. LEHMANN:

10    Q    Now, when we left off we were talking about the meeting

11    that you had the Ace offices with the employees, your grandson

12    Rob A., Robert P. was also there?

13    A    Yes.

14    Q    Do you remember that?

15    A    Yeah.

16    Q    All right.  And what was said at this meeting?

17    A    That I would be starting up a new company, masonry

18    company, I just wanted to know if they were interested in being

19    employees.

20    Q    Okay.  And all -- all the employees, the six to eight

21    employees, plus your grandson, these were all union members?

22    A    Yes, they were.

23    Q    Union employees?

24    A    Yes, they were.

25    Q    Okay.  Okay, and anything else?

1  A    No.

2  Q    And they didn't sign anything at this point?

3  A    No, they did not.

4  Q    No employment applications?

5  A    No.  I didn't have the company formed yet.

6  Q    You -- and do you remember when this meeting took place?

7  A    It was before I left, so that week of the 14th, I guess,

8  somewhere in through there.

9  Q    Week of the 14th?

10  A    Yeah.

11  **(Pause.)**

12  Q    Okay, and Bella was formed at the end of the September,

13  September 22nd, 23rd?

14  A    21st, yeah.

15  Q    Okay.  So is it possible that this was meeting was --

16  happened before September 22nd or was it -- you're certain it

17  was after September 22nd?

18  A    Oh, no I'm -- I misspoke.  No, this meeting -- no, this

19  meeting was after.  It was when I left.  Yeah, no.

20  Q    After September 22nd?

21  A    Yes.  Yeah, it was the week of October 14th, I think.

22  Q    Okay.  Robert -- I'm going to back to Robert, your son.

23  A    Yeah.

24  Q    Now, as a project coordinator at Bella you have -- you

25  have these conversations, the two of you, where you're

 1    discussing the projects that are coming -- that are coming up?

 2    A    Umm-hmm.

 3    Q    Right?  And you're talk -- and you're also discussing how

 4    many men are needed for -- the manpower for the job?

 5    A    Yeah, whatever.

 6    Q    All right.  And who actually sits down with these -- with

 7    the employees and asks them and hires them?  Who --

 8    A    Sits down with them and hires them?

 9    Q    Yeah.

10    A    I guess at that point I would be doing the hiring.

11    Q    In October?

12    A    Yeah.  I -- I guess I would do the hiring.

13    Q    You did all the hiring in October?

14    A    Yeah.  Yeah.

15    Q    And you spoke to every single employee that worked for

16    you?

17    A    Oh, yeah.  Yeah.

18    Q    Okay.

19    A    Yeah.

20    Q    And did there come a time when that changed?  That it

21    wasn't you that was hiring the employees, it was your son,

22    Robert?

23    A    Not until after he got there, and he didn't get there

24    until, like I said, sometime in the December, mid-December,

25    third week in December, somewhere along --

```
 1   Q    Okay.

 2   A    -- like that.

 3   Q    And then when he came on board as a project coordinator he

 4   started doing that stuff?

 5   A    Yeah.

 6   Q    The hiring of the employees?

 7   A    Yeah.

 8   Q    And from that point forward he did all the hiring?

 9   A    Yeah, he's basically taking care of the hiring, yeah.

10   Q    Okay.  And have you or Robert, your son, has he had the

11   occasion to lay someone off?

12   A    Sure.

13   Q    Okay.  And he actually did lay someone off?

14   A    Yeah.

15   Q    For Bella Masonry?

16   A    Yeah.

17   Q    Okay.  And who was that?

18   A    Names?

19   Q    Names.

20   A    Can I look at some records?

21   Q    No.

22   A    Some notes?

23   Q    Can you remember off the top of your head?  Is it more

24   than one?

25   A    Yeah.  I think --
```

```
1    Q    More than one employee was laid off?

2    A    Yeah.  Yeah.

3    Q    More than one?

4    A    Yeah.  There was a few of them.

5    Q    All right.  You just can't remember the names?

6    A    Yeah.

7    Q    Okay.  More than five?

8    A    No.  No.

9    Q    No more than five, but more than one?

10   A    Yeah.

11   Q    Okay.  And he actually laid them off.  Has he had occasion

12   for Bella to discipline employees?  Has anyone needed to be

13   disciplined?

14   A    Not that I'm aware of.

15   Q    Has he -- if someone did need to be disciplined he would

16   have the authority to go ahead and discipline them?

17   A    Yes, he would.

18   Q    Okay.  And he tells -- I assume you would agree with me

19   that he will tell someone what job to go to?

20   A    Umm-hmm.

21   Q    What job to work at?

22   A    Umm-hmm.

23   Q    What to do?

24   A    Yeah.

25   Q    Specifically what to do?
```

1    A    Yeah.

2    Q    All right.  And that's their job?  That's their

3    full-time -- or that -- not their full-time, that's what they

4    do for Bella, he directs them to the -- to perform their tasks?

5    A    Umm-hmm.  Correct.

6    Q    And he has -- and he does that with all the employees

7    there?

8    A    All the field employees.

9    Q    All the field employees?

10   A    Yes.

11   Q    Okay.  And we're talking Bella Masonry?

12   A    Yes, we are.

13   Q    Now, your son is also the vice-president of Bella Masonry?

14   A    What's that?

15   Q    He's also the vice-president of Bella?

16   A    Robert?  No.

17   Q    Robert, your son.

18   A    No, my grandson is named as a vice-president in charge of

19   safety.

20   Q    Okay.  We'll get to your grandson in just a minute.

21   A    Yeah.

22   Q    So -- okay, so it's your testimony -- has your son ever

23   been the vice-president of Bella?

24   A    I don't know.  Sometimes you put stuff on advertisements.

25   I don't remember it being -- him listed as the vice-president.

1    Maybe he has, but --

2    Q    Okay.  But this is your company; right?

3    A    Yes, it is.  Yeah.

4    Q    Okay.

5    A    But it's a name.  I run the Company.

6    Q    Okay.  But a title --

7    A    What's a title?

8    Q    Okay.  So you don't recall your son being listed anywhere

9    as the VP?

10   A    He might be listed as the VP of field coordination or

11   field construction or something like that.

12   Q    Okay.  So he would be the VP?

13   A    Yeah.  Yeah.

14   Q    All right.  So if he's listed as the VP the he is the VP?

15   A    Yeah.

16   Q    Okay.  And forgive me if I've already asked this question

17   because I think I have but, he -- Robert started working for

18   Bella on December 12th?

19   A    December -- somewhere in the third week, I think.  It was

20   more towards the 18th or somewhere around in there.

21   Q    Okay.  Of December?

22   A    Of December.

23   Q    2011?

24   A    2012.

25   Q    Well, that hasn't happened.

```
 1   A     2011.  I'm sorry, 2011.

 2   Q     Okay.

 3   A     Yeah.

 4   Q     Now, your grandson, Rob A., he is -- what titles do --

 5   does your grandson hold?

 6   A     He's vice-president.  And he's also in charge of safety

 7   for the Company.

 8   Q     Okay.  Is he also the project manager?

 9   A     Is he also a project manager?

10   Q     Is he also a project manager?

11   A     He's also a project manager, yeah.

12   Q     For Bella?

13   A     Yeah.  He's also a bricklayer.

14   Q     Now, as the project manager, what are his duties?  Is he

15   the only project manager?

16   A     He's the only project manager right now, yeah.

17   Q     Okay.  And you were in the room when Lisa was testifying;

18   correct?

19   A     Yeah.

20   Q     Okay.  And you heard a lot of testimony about what a

21   project manager does at Ace?

22   A     Yeah.

23   Q     Okay.  Is that the same as the -- the project manager, the

24   duties as they are at Bella?

25   A     No.
```

1  Q    Okay. Explain.

2  A    Explain?

3  Q    How are they different?

4  A    This is a small company. It's only, as a project

5  manager/superintendent, whatever you want to call it, he

6  oversees a job with a couple of people, is in charge of that

7  job when he goes. And he might be in charge of two jobs at

8  some time. But I think most of the time he's working with his

9  tools. But he's the lead guy.

10 Q    Okay. So as being the project manager, he also can

11 tell -- do people -- do field employees report to him?

12 A    Yes. The ones that are under him on that job, yes.

13 Q    All right. And he can tell them what jobs to do?

14 A    Umm-hmm. Yeah.

15 Q    Okay. And where to go? At a specific time where to go?

16 A    Yeah. Yeah.

17 Q    When to show up?

18 A    Yeah.

19 Q    Okay. And now, does he -- is he also present at the

20 meetings that you have with your son when you're discussing the

21 projects?

22 A    Not always. No. I don't think he's been at those. We've

23 had some other meetings that he was present at, but not --

24 nothing to do with that.

25 Q    Okay. And just so that I'm clear, Bella is a masonry

1   contractor?

2   A     Yes.

3   Q     Okay.  And -- okay.  As the vice-president of Bella

4   Masonry, what duties does your grandson -- what is he

5   responsible for as the vice-president?

6   A     Safety.  Safety on the projects.

7   Q     Okay.  Can you explain that?

8   A     Yeah, he's to make sure that everybody is -- that's on our

9   job is trained.

10  Q     Umm-hmm.

11  A     Okay.  And he visits the site when he's there.  He does

12  his scaffold inspections, whatever safety requirement is to be

13  done on the job; that's his responsibility and report back to

14  me if there's something wrong.

15  Q     Okay.  And has there been occasion when something's been

16  wrong?

17  A     No.  No.

18  Q     Whether with employees unsafe or anything else?

19  A     No.  No, there hasn't.

20  Q     Any other duties he has as the vice-president?

21  A     No.

22  Q     As a project manager has he come to you and asked you to

23  hire one of his friends?

24  A     No.

25  Q     Any other employee --

```
 1   A     No.

 2   Q     -- that he's asked you to hire?

 3   A     Asked me to hire?

 4   Q     Yeah.

 5   A     No.

 6   Q     Okay.  Does he have any responsibility for disciplining

 7   employees?

 8   A     The need hasn't come up.  Could he?  Yes, he could.

 9   Q     He could if it came up?

10   A     Yeah.

11   Q     All right.  Now, when you say he has the authority that he

12   could if it ever comes up, have you had any discussions with

13   him about disciplining employees or is it just understood that

14   if he needs to discipline somebody he can just go ahead and

15   discipline?

16   A     If he's -- when he's on the project he's in charge of that

17   project, make sure it happens, and he can discipline as

18   necessary.

19   Q     Okay.  Right then?  Doesn't have to run it by you or

20   anything?

21   A     No.  Not that.

22   Q     Okay.  Melissa Blanchard, she works for Bella?

23   A     Yes, she does.

24   Q     All right.  And she is the office manager?

25   A     Yes, she is.
```

1  Q    And she started working for Bella on October 20th?

2  A    Could be the 20th.  17th, 18th, 20th, somewhere in there.

3  Yeah.

4  Q    Okay.  And that's 2011?

5  A    That's 2011, yeah.

6  Q    Okay.  And she still works at Bella?

7  A    Yes, she does.

8  Q    And she's responsible for payroll?

9  A    She's responsible for everything that happens in that

10  office, just about.

11  Q    Okay.  Payroll?

12  A    Payroll.

13  Q    Accounts payable?

14  A    Accounts payable.

15  Q    Accounts receivable?

16  A    Accounts receivable.

17  Q    And she's -- and you said she's responsible for

18  everything; you would agree with me that it's important that

19  she's accurate, right?

20  A    Umm-hmm.

21  Q    In what she does?

22  A    Yeah.

23  Q    Okay.  Payroll, accounts receivable.  In fact, you would

24  agree with me that Blanchard has an eye for detail?

25  A    Yeah.

```
 1   Q    You would agree with that statement?

 2   A    Yeah.  Yes, she does.  That's why she's there.

 3   Q    Bella also employed -- are you familiar with Randy Bell?

 4   A    Yes, I am.

 5   Q    Derek Hagar?

 6   A    Yes, I am.

 7   Q    Richard Tracy?

 8   A    Yes.

 9   Q    All employees of Bella?  Former employees of Bella?

10   A    Former employees, yeah.

11   Q    Okay.

12   A    Randy Bell is still working for Bella.

13   Q    Randy's still working for Bella?

14   A    Yeah.

15   (General Counsel's Exhibit 26 marked for identification.)

16   Q    I'm showing you what's been marked as General Counsel

17   Exhibit 26.

18   A    Yes, I see it.

19   Q    Do you recognize that document?

20   A    Yes.

21   Q    List of employees?

22   A    Yeah.

23   Q    Who work for Bella?

24   A    Umm-hmm.

25   Q    Okay.  I'm going to have you look at their -- at the first
```

1  page on the top line and I'm just going to go through just so

2  that the record's complete.  The "X Reference Number," that's

3  an employee number?

4  A    Umm-hmm.

5  Q    Okay.  And then "Date."

6        JUDGE CARTER:  That was a "Yes"?

7        THE WITNESS:  What's that?  Yes.

8        JUDGE CARTER:  As my grandma used to say, "umm-hmm's" not

9  a word, so we can't transcribe that, so it has to be "Yes" or

10  "No."

11        THE WITNESS:  Yes.

12        JUDGE CARTER:  All right, thank you.

13  BY MR. LEHMANN:

14  Q    And then the job description.  "Cost Code," what is "Cost

15  Code"?

16  A    When we do an estimate we put a code with it so we know

17  what -- what to charge it to.

18  Q    Okay.  And then "TYPE REG," is that "regular"?

19  A    Regular.

20  Q    Okay.  And then scrolling down there "HOLOF," what is

21  that?

22  A    "HOLOF"?

23  Q    Going down --

24  A    Oh.

25  Q    -- staying in the same column, working all the way down,

1  "HOLOF," what does that stand for?

2  A    I don't know.

3  Q    You don't know?

4  A    No, I don't.

5  Q    Okay.  All right, continuing over on the top line of that,

6  the "Trade," what is "Trade" referring to?

7  A    What they belong to.  Are they with the Masons, Laborers,

8  Carpenter.

9  Q    Oh, so it trade union is --

10  A    Yeah.

11  Q    -- read at once?

12  A    Yes.

13  Q    Or is it two different columns?

14  A    No.

15  Q    Okay.  That's one column?

16  A    That's one column.

17  Q    All right.  And then the "Time Card," what is that?  Is

18  that weekly?

19  A    That's a daily time card.

20  Q    Okay.  Well, staying in that same column, what is the

21  "Week"?  Does it - that just means "Week"?

22  A    That means week.

23  Q    And then the -- same column, "DJQ."

24  A    I don't know what that is.

25  Q    Okay.  All right, and then I'll bring your -- now I'm

```
 1    going to bring your attention to page 4.  For -- now, this is
 2    for Robert A. Bellavigna.  The date 12/5/2011, if you scroll --
 3    if you go -- look all the way across to the column "Type," and
 4    there's "FRG."  What does "FRG" stand for?
 5    A    Page?  What page did you say?
 6    Q    Page 4.
 7    A    Yeah.  And your -- okay.  What item are we on?
 8    Q    The date that's for Chesapeake Athens Office, 12/5/2011.
 9    If you look under the column "Type" you see "FRG."
10    A    Oh, down here there's one, yeah.  I don't know what that
11    is.
12    Q    You don't know what that is?
13    A    No.
14    Q    Could that be "fringes"?
15    A    I don't know what it is.
16    Q    This is your document; right?
17    A    Yes.
18    Q    You provided this for -- to the subpoena?
19    A    This is Melissa Blanchard's charge.  I don't know what
20    that document -- that verbiage means.
21    Q    Okay.  So Blanchard -- Ms. Blanchard would be the person
22    to ask?
23    A    Absolutely.
24    Q    Okay.
25         MR. LEHMANN:  I would offer General Counsel Exhibit 26.
```

1        MR. FURLONG:  No objection.

2        MR. JAMESON:  No objection, Your Honor.

3        MR. BAILEY:  None, Your Honor.

4        JUDGE CARTER:  Very well.  Exhibit 26 for General Counsel

5    admitted without objection.

6    **(General Counsel's Exhibit 26 received into evidence.)**

7    BY MR. LEHMANN:

8    Q    Now, these are all former Ace employees, correct, on all

9    the employees listed in General Counsel Exhibit 26?

10   A    No.

11   Q    Okay.  Can you -- can we -- let's go through each one.

12   You -- first one is yourself; you obviously were an Ace -- a

13   former Ace employee.

14   A    Yeah.

15   Q    And I'm just going to go -- Robert Bellavigna?  Robert A.

16   Bellavigna, he was a former Ace employee?

17   A    (No audible response.)

18   Q    Robert P.?

19       JUDGE CARTER:  You answer to the last question was?  I'm

20   not sure the recorder picked that up.  So Rob A., was he a

21   former Ace employee?

22       THE WITNESS:  Yes, he was.

23   BY MR. LEHMANN:

24   Q    Why don't you look at the -- General Counsel's 26 and tell

25   me which employees were not former Ace employees?

```
 1   (Witness examined the document.)

 2   A    I'm not sure about Jason R. Dempsey.  Douglas Myles.

 3   That's' it.

 4   Q    Okay.  All the others were former Ace employees?

 5   A    Yeah.

 6   Q    Okay.  And they were doing the same work at Bella as they

 7   did at Ace?

 8   A    Yes.

 9   Q    Ace employees?

10   A    Yes.

11   Q    Okay.  And Bella Masonry has a website; correct?

12   A    It has a website.

13   Q    Okay.  And you, I take it you've been on the website?

14   A    No, I haven't.  I never touch --

15   Q    You never have been on the website?

16   A    I don't touch a computer, so I couldn't tell you.

17   Q    Okay.  So you have -- does any -- well, how did you know

18   that there was a website?

19   A    Because I heard employees talking about it.

20   Q    Okay.

21   A    My -- between Melissa and my son in Florida, they put the

22   website together for me.

23   Q    Okay.  And when they were doing that they told you they

24   were putting a website of Bella Masonry; right?

25   A    Yeah, it was going under Bella Masonry, yeah.
```

1    Q    Right, okay.  So at the time it's being created you're --

2    you're aware that there's a Bella Masonry being created and

3    that it's going to be out -- being held out to the public?

4    A    Never seen it.

5    Q    I understand that you've never seen it.

6    A    Yeah.

7    Q    Okay.  But you knew that there was -- that a website was

8    being created and that they were going to put it out to the

9    public?

10   A    Yes.

11   Q    Okay.  All right.

12   **(General Counsel's Exhibit 27 marked for identification.)**

13        Now, I'm showing you what's been marked as General

14   Counsel's Exhibit 27.  Why don't you go ahead and look through

15   that.  And tell me when you're ready.

16   **(Witness examined the document.)**

17   A    Yes, I'm ready.

18   Q    Okay, now it starts off a letter from yourself.

19   A    Okay.

20   Q    Did you draft this letter?

21   A    No.

22   Q    You didn't draft this letter?

23   A    No.

24   Q    It says it's a letter from you.

25   A    So?  It's advertisement.

1  Q    Okay.  So you never wrote the words, "When someone asks me

2  what sets Bella apart"?

3  A    No.

4  Q    Okay.  Do you know who might have written that?

5  A    Probably my son and Melissa but I would -- I'm guessing at

6  the point who would have had input in it.  They might have

7  talked to me about certain aspects of it, too, but --

8  Q    Okay.  Well, do you remember?

9  A    I don't remember.

10  Q    Do you remember having a conversation with your son or

11  Melissa where they said, "Hey, we want to put a letter from the

12  president out on the website"?

13  A    Oh, I'm sure.  But exact verbiage, no.  And I'm sure a lot

14  of this came from our brochure -- company brochure, also.

15  Q    Okay.  You have a company brochure?

16  A    Yes, we do.

17  Q    Was that provided during -- for the -- from the subpoena?

18  For the subpoena that --

19  A    I don't remember.

20  Q    Okay.  Do you remember receiving a subpoena?

21  A    Yes.

22  Q    Okay.  And you responded to that subpoena?

23  A    Yes.

24  Q    Okay.  Do you --

25  A    Do I remember --

1  Q    -- remember -- okay.  Do you remember putting in a
2  brochure from Bella in the subpoenaed documents?

3  A    No, I don't.

4  Q    But there is a Bella brochure out there?

5  A    Yes, there is.

6  Q    Okay.  And it as created from the start?

7  A    It was created from the start?

8  Q    The brochure was created or drafted back in September of
9  2011?

10 A    No, it was drafted many years ago.

11 Q    Many years ago?

12 A    Yeah.

13 Q    Okay.  Well, who -- who were you employed by many years
14 ago where you drafted up the brochure?

15 A    Many companies, but that brochure that I put together
16 started with McGuire & Bennett.

17 Q    Umm-hmm.

18 A    Okay.  And there's probably bits and pieces.  Well, I know
19 that the cover is, a lot of it.

20 Q    Umm-hmm.

21 A    Okay.  Because I was in charge of it then.

22       For Ace, I went to Lisa at some point, don't ask me what
23 year, we put together an Ace brochure.

24 Q    Okay.

25 A    And a lot of the same stuff, because a lot of the same

1    materials, the jobs that I've worked on in the past, my

2    history, their new history, whatever.

3    Q    Okay.

4    A    I took all -- all mishmashed.

5    Q    All intermixed?

6    A    It's advertisement.

7    Q    Right.

8    A    And I did the same thing when I started Bella.

9    Q    Okay.

10   A    Put a brochure together between all of us.

11   Q    All the same; right?

12   A    A lot of the same things, yeah.

13   Q    All right.

14   A    You know, I would just change them around to fit --

15   Q    Yeah.

16   A    -- what the situation was.

17   Q    Okay.  And that's just not --

18   A    If it says general contracting that went.  If it was just

19   masonry contracting or you know, what the verbiage was.

20   Q    It was all the same though?

21   A    All the same clients, yes.

22   Q    Right.  Not only the same clients, same vendors?

23   A    We're in the same geographical area, so why not the same

24   clients and --

25   Q    Okay.  Same -- and the same employees, too?

```
 1   A     Yeah.

 2   Q     Why not?

 3   A     Absolutely.  Yeah.

 4   Q     Right.  Okay, and all of these are the -- strike that.

 5         Now, first case, staying with the "Letter from the

 6   President," the second paragraph talks about "Our team has over

 7   430 combined years."

 8   A     You mentioned that before.

 9   Q     Excuse me?

10   A     I said you mentioned that before in another statement.

11   Q     What are you --

12   A     When you were talking to Lisa about it.

13   Q     Okay.

14   A     You said it was 430.

15   Q     All right.  But I haven't mentioned that to you?

16   A     No.

17   Q     Okay.  And now, at the very bottom there's a date, October

18   26, 2011 on the document.

19   A     Umm-hmm.  Okay.

20   Q     Okay.

21         MR. LEHMANN:  I just would like the record to reflect you

22   don't a document but yet you're answering the question.

23   BY MR. LEHMANN:

24   Q     You see at the very bottom, right-hand corner --

25   A     Yeah.
```

1  Q     -- October 26, 2011?

2  A     Yeah.

3  Q     Okay.  So that was the date that this website was actually

4  printed up.

5  A     Okay.

6  Q     Who is -- or who would be included in 430 combined years?

7  A     People that work for the Company.

8  Q     Okay.  Name them.  Yourself?

9  A     Yeah.

10 Q     Okay.  Who else, as of October 26th.

11 A     I couldn't name all of them.  Like I said, this is

12 advertisement, okay.  It was put together as advertisement.

13 I probably had the same amount of powers when I did it with Ace

14 and it never got changed.  They copied stuff that was

15 inaccurate.

16 Q     Okay.

17 A     A hundred percent.

18 Q     Okay.  The sentence says, "Our team has over 430 combined

19 years of extensive construction experience."

20 A     Okay.

21 Q     That would include yourself?

22 A     Include myself.

23 Q     Robert Bellavigna, your son?

24 A     My grandson.  Not at that point, Robert wasn't working for

25 us.

1  Q    So wouldn't include your son?

2  A    No.

3  Q    So it includes yourself --

4  A    My grandson and whoever was working for us.

5  Q    -- includes your grandson; how many years had your

6  grandson --

7  A    Four.

8  Q    Four, okay.  So your grandson -- let's go back a second to

9  your son.

10 A    Yes.

11 Q    You said your son hadn't been working as of October 26,

12 2011?

13 A    Right.

14 Q    Okay.  I'm going to have you turn to --

15 A    Pictures?

16 Q    Not pictures.  Written words.

17 A    Okay.

18 Q    Page 3 of 7.  Now, it goes page 1 of 2, then 1 of 4, and

19 then 1 of 7, and I want to direct your attention to page 3 of

20 7.

21 A    Yeah.

22 Q    Okay.  And at the bottom there is a picture.

23 A    Yeah.

24 Q    And who is that picture of?

25 A    That's my son, down at the bottom.

1  Q    Okay.  And it has him working for Bella on October 26,

2  2011.

3  A    Like I said, it's advertisement.  We talked about coming

4  to work for me when he was done, but he's not officially

5  working yet.  It's advertisement.

6  Q    Okay.

7  A    That's all I can --

8  Q    And do you routinely misrepresent in your advertisements

9  information?

10  A    To who?

11  Q    About the Company?

12  A    People change all the time.  Do I take a company brochure,

13  all the -- I got -- there's other people; how about all the

14  other people that are named in here that no longer work for

15  Bella?

16  Q    Okay.  But --

17  A    Do I change the brochure?

18     MR. FURLONG:  Objection, move to strike the answer.  This

19  is an argument from the Witness.  He's not answering the

20  question.

21     THE WITNESS:  No, do I move and change the brochure?

22     JUDGE CARTER:  Just a second.  You know, this comes up in

23  every trial.  There's no such thing as striking the answers.

24  It's on the transcript, it's going to be on the transcript.  It

25  may get limited weight and we'll see how it goes.  But we're

```
 1   not going to erase it from the transcript.  So --
 2       MR. FURLONG:  Well, with all due respect, Your Honor, I
 3   mean, a judge can strike an answer based on the judge's
 4   discretion.  It is done.
 5       JUDGE CARTER:  Sure.
 6       MR. FURLONG:  Okay.
 7       JUDGE CARTER:  Your objection's overruled.
 8   BY MR. LEHMANN:
 9   Q   Your son.
10   A   Yes.
11   Q   Okay.  The question that I asked was that do you routinely
12   misrepresent information on your advertisements?
13   A   Routinely, no.  No.
14   Q   Okay.
15   A   Does it happen?  Yes.
16   Q   Yeah, it does happen.  For you it happens?
17   A   Yeah, for me it happens.
18   Q   Okay.
19   A   Yeah.
20   Q   And but you're saying it's not routine; is that you're --
21   A   We -- that's all I'm saying, is you can't change your
22   brochure every time you change an employee that you have in
23   your brochure; do you?
24   Q   Well, this isn't a brochure.
25   A   Well, this is a website, but --
```

1    Q    This is a website.

2    A    -- that I already I didn't put it together, so --

3    Q    Right.  And you -- but in this instance you weren't

4    changing employees, you were adding something that you're

5    claiming wasn't working for Bella?

6    A    That's right, he wasn't working for me -- for Bella yet.

7    Q    Okay.  Yet he's, there's a representation out to the

8    field --

9    A    That's right, it's wrong.

10    Q    Okay.

11    A    Yeah.

12    Q    And I'll -- actually, you can stay on the same page.  Rob

13    A. Bellavigna, was he working -- was your grandson working on

14    October 26th?

15    A    Yes.

16    Q    Okay.  And flipping to page "Melissa Blanchard."

17    A    Yes.

18    Q    On October 26th.  Randy Bell, he's the next --

19    A    Yes.

20    Q    He was employed there?

21    A    Yeah.

22    Q    Okay.  And Derek Hagar?

23    A    Yes.

24    Q    On October 26th?

25    A    Yes.

1   Q    And Richard Tracy?

2   A    Yes.

3   Q    Okay.  He was employed there?

4   A    Yes.

5   Q    Okay.  And was your grandson working at Bella (sic) at the

6   same time on October 26th?

7   A    October 26th?

8   Q    Was he working at Bella and Ace at the same time on

9   October 26th?

10  A    Not that I'm aware of.

11  Q    Okay.  He was only working for Bella?

12  A    He was only working for Bella.

13  Q    On October 26th?

14  A    Yes.

15  Q    All right.  Same question for -- same question for Randy

16  Bell; was he working for Bella only or Ace and Bella on October

17  26th?

18  A    As far as I'm aware only Bella.

19  Q    And Derek Hagar?

20  A    Same, only Bella.

21  Q    Only Bella.  And Richard Tracy?

22  A    Yes, only Bella as far as I'm aware.

23  Q    Okay.  Now, the discussions that you had -- now, you said

24  your son -- you have a second son?

25  A    Umm-hmm.

1   Q    And he lives in Florida?

2   A    Yes, he does.

3   Q    Okay.  And Melissa Blanchard.  Before they put this out

4   onto the web did they tell you they were doing that?  Did they

5   say, okay, today's the day that we're going to do it?  Or it

6   just was there?

7   A    It just was there as far as I know.  As far as I remember

8   it was just there.

9   Q    And turning to 2 of 4, so that's one-, two-, three-, four,

10  the fourth page in.

11  A    Umm-hmm.

12  Q    The "Clientele List," you would agree with me that these

13  are Ace clients?  Ace customers?

14  **(Witness examined the document.)**

15  A    Most of them.

16  Q    Okay.  Which ones are not?

17  A    Well, there is, like I said to you, this came from the

18  brochure, okay, that I did many years ago.

19  Q    I just -- sir, I just asked you which clients are not --

20  A    Okay.

21  Q    -- Ace's clients.

22  A    Okay.  Okay.  That are not Ace's clients?

23  Q    Not Ace's clients.

24  A    I'm not aware that Wells College is.

25  Q    Okay.

1  A    Morse Industries, I'm not aware that that is.  At that

2  point those two.

3  Q    Okay.  Everyone else was an Ace client?

4  A    Was an Ace client.

5  Q    Okay.  And the five pictures that are to the right of

6  "Clientele" --

7  A    Yeah.

8  Q    -- those are all pictures from Ace jobs?

9  A    I don't know what -- there's some of them I don't even

10  what they are, what project they are, but there is some of them

11  that are Ace jobs, yes.

12  Q    Okay.  Let -- from -- starting from the top, is that an

13  Ace job?

14  A    I -- I think that St. Lawrence University, but I'm not

15  positive.

16  Q    Okay.  How about the second one?

17  A    The next one, I don't know what that picture is of.

18  Q    All right.  Third picture?

19  A    I don't know what that picture is.

20  Q    Fourth picture?

21  A    It's not familiar to me.  It could be an Ace picture but

22  it's not familiar to me.

23  Q    Last one?

24  A    It would help if I could read what it said on top of that

25  one.  I am not aware of that picture.  I don't know whose that

1    it.  I can't even tell you what it's a picture of.

2    Q    Okay.

3    A    The last one.  I can't read the writing on it.  But --

4    Q    The "Clientele List," what jobs have Bella performed for

5    these clients?

6    A    Are you asking Bella as a company or just Henry?

7    Q    On that -- Bella as a company.  This is Bella Masonry

8    website.

9        JUDGE CARTER:  You mean as a GC or as a sub?

10   BY MR. LEHMANN:

11   Q    General contractor.

12   A    Bella, itself, none of these probably.

13   Q    Okay.

14   A    Like I said it was -- it's advertisement.  It's history

15   that I've done in the past.  Not as Bella, as Henry.

16       MR. BAILEY:  Henry, you've got to listen to his question.

17   He said as a GC for Bella.

18       THE WITNESS:  Oh, GC.  Not a GC.

19       MR. LEHMANN:  I --

20       MR. FURLONG:  That wasn't the question.

21   BY MR. LEHMANN:

22   Q    Excuse me?

23   A    Bella is not a GC.  It's a masonry contractor.

24   Q    All right.  As a -- as a masonry contractor --

25   A    Yes.

1  Q    -- what clients have you -- has Bella Masonry performed

2  for these clients?

3  A    Cornell is one.

4  Q    Okay.

5  A    The City of Ithaca.  And that's it.

6  Q    When you said City of Ithaca, that was Ithaca City

7  Schools?

8  A    No.

9  Q    Where is the City of Ithaca?

10      JUDGE CARTER:  It's under Tompkin's Trust Company.

11 BY MR. LEHMANN:

12 Q    Okay, so two?

13 A    Umm-hmm.

14 Q    And the Cornell University that you referenced to, that

15 actually was subbed over to Ace Masonry; that job?

16 A    Umm-hmm.  Umm-hmm.

17 Q    Okay.

18      JUDGE CARTER:  That was a "Yes"?

19      THE WITNESS:  Yes.

20 BY MR. LEHMANN:

21 Q    Do you have a cell phone?  Do you have a cell phone?

22 A    Yes, I do.

23 Q    Okay.  And what's your cell phone number?

24 A    327-1511.

25 Q    Okay.  And how long have you had that cell phone?

```
 1   A     How long have I had the cell phone?  Probably three, four
 2   years.  Three or four years.
 3   Q     Three or four years?
 4   A     Yeah.
 5   Q     And is that -- was that cell phone provided to you from
 6   Ace Masonry?
 7   A     The number was.
 8   Q     Okay.  You -- the number was?
 9   A     The number was, yeah, with Ace.
10   Q     Okay.
11   A     And then when I left I had it -- had the number and
12   everything turned over in my account.
13   Q     Okay.  And is that a Bella telephone or cell phone or is
14   that your own personal cell phone?
15   A     That's my own cell phone.
16   Q     Okay.  And so Ace -- when you were working for Ace, was it
17   an Ace cell phone?
18   A     Yes.
19   Q     Did they provide it to you?
20   A     Yes.
21   Q     Okay.  And now it's your own personal?
22   A     Yeah, I have an account with --
23   Q     That's -- that's how people get ahold of you for -- for a
24   job?  For Bella?
25   A     They can if they have it, otherwise it's basically through
```

1    the -- our office number.

2    Q    Okay.  Do you know your grandson's cell phone?

3    A    No.

4    Q    Okay.  I want you to direct your attention to the -- all

5    right, well, have you called your grandson on his cell?

6    A    On his cell?  No.  No, I haven't.

7    Q    Okay.  Does he have a cell?

8    A    I think he does, yeah.

9    Q    And it's provided by Bella Masonry?

10   A    You would have to ask Melissa, I don't know the detail at

11   this point.

12   Q    Do you know if you -- if Bella Masonry owns any cell --

13   has any cell plans?

14   A    Yes, they have with Verizon.

15   Q    With Verizon?

16   A    Yeah.

17   Q    Do you know how many plans?

18   A    No.

19   Q    And who would know?

20   A    Melissa Blanchard.

21   Q    Have you called your son on his cell?

22   A    Yes.

23   Q    Do you know the number?

24   A    Yes.

25   Q    Okay.  What is it?

```
 1   A    327-2949.

 2   Q    Okay.  And that -- is that a provide -- a cell phone

 3   that's provided by Bella Masonry?

 4   A    I don't really know.

 5        MR. LEHMANN:  I would offer General Counsel's Exhibit 27.

 6        MR. FURLONG:  No objection.

 7        MR. JAMESON:  No objection.

 8        MR. BAILEY:  No objection, Your Honor.

 9        JUDGE CARTER:  Exhibit 27 for General Counsel admitted

10   without objection.

11   (General Counsel's Exhibit 27 received into evidence.)

12   BY MR. LEHMANN:

13   Q    Now, Bella Masonry is a masonry contractor?

14   A    Yes, it is.

15   Q    Okay.

16   (Pause.)

17   (General Counsel's Exhibit 28 marked for identification.)

18   BY MR. LEHMANN:

19   Q    I'm showing you what's been marked as General Counsel's

20   Exhibit 28.

21   (Witness examined the document.)

22        Have you seen that document?

23   A    I -- have I seen it?  It doesn't look familiar to me at

24   this point.

25   Q    You haven't -- you haven't seen it?
```

1  A    No.  This is stuff that Melissa takes care of.  I have not

2  seen it.

3  Q    Okay.  All right, well, I would like to make the -- the

4  document was provided pursuant to a subpoena that the General

5  Counsel issued in response to paragraph 51 of the subpoena.

6      So you've never seen that document before?

7  A    No, I haven't.

8  Q    Okay.  And that -- the document -- you -- who -- did you

9  respond to this subpoena?

10  A    No, Melissa and counsel did.

11  Q    Okay.  And that's Melissa Blanchard?

12  A    Yes.

13  Q    Okay.  And it's your testimony that you've never seen that

14  document before?

15  A    That's correct.

16  Q    Okay.  Would you -- now, the document is a liability

17  insurance form?

18  A    Umm-hmm.  Umm-hmm.

19  Q    Okay.  And the insured is Bella Masonry?

20  A    Umm-hmm.

21  Q    And the certificate holder is Robert and Lisa Bellavigna?

22  A    Umm-hmm.

23  Q    Do you have any knowledge as to why that document -- why

24  the liability was taken out?

25  A    What job is it for?  I -- I'm -- it doesn't have a job?

1   Q    Do you -- well, the question -- okay.  It's not a job,

2   it's actually a general liability policy --

3       MR. BAILEY:  Your Honor, I don't know how far we can

4   explore this?  If he doesn't know what the document is, he

5   doesn't know what the document is.

6       JUDGE CARTER:  We'll see if this leads anywhere, but you

7   know, that is a significant obstacle.  Overruled.

8       MS. BELLAVIGNA:  If I may interrupt?

9       MR. LEHMANN:  No.

10      MR. BAILEY:  No, you may not.  You can't.

11      MS. BELLAVIGNA:  Sorry.

12      THE WITNESS:  One thing, thinking about it, this could be

13  for Bob and Lisa's home burned some time back and we did

14  masonry work --

15  BY MR. LEHMANN:

16  Q    Okay.  When?

17  A    On the chimney.  His last month.  That's for that.

18  Q    And you're guessing?

19  A    I'm guessing.  I mean, I'm -- we did work.  There's a job

20  number set up for it.  Now, that's the only thing that would

21  make sense.

22  Q    Okay.  The document is dated April of 2012; correct?

23  A    I'm looking for the date.  Yeah, 4/10.  Yeah.

24  Q    Okay.  Now, bringing your attention to the bottom of the

25  document it's dated -- it's back dated to September of 2011?

1  A    Where do you see that again?  Where do you see it

2  backdated anywhere?

3  Q    Is there a -- I don't have the document in front of me.

4  Is the term of the policy dated -- backdated to September of

5  2011?

6      MR. FURLONG:  Your Honor, this is a very important

7  document; can we get some copies made so that everybody can

8  follow this dialogue?

9      JUDGE CARTER:  We can take a minute to do that.

10     MR. FURLONG:  Okay.  Thank you very much.

11     JUDGE CARTER:  Go off the record.

12         **(Whereupon, a brief recess was taken.)**

13     JUDGE CARTER:  Back on the record.

14     All right, so everyone now has a copy of Exhibit 28 for

15  General Counsel.

16     Any further questions?

17     MR. LEHMANN:  Yes.

18         **611(c) DIRECT EXAMINATION (continued)**

19  BY MR. LEHMANN:

20  Q    Now, this document is -- the general liability, includes

21  general liability, commercial general liability, automobile

22  liability in an umbrella.

23  A    Right.

24  Q    And the policy effective is backdated to September 22,

25  2011.

1    A    Umm-hmm.

2    Q    What do you know about this?

3    A    That's -- that's when we started the Company.

4    Q    Okay.

5    A    Close to when we started the Company through the years.

6    All I can say that, that's when the policy started and that's

7    when it's --

8    Q    Okay.  And it's taken out for Robert and Lisa Bellavigna.

9         MR. BAILEY:  Is there a question?

10   BY MR. LEHMANN:

11   Q    Correct?

12        MR. JAMESON:  Your Honor, just to make clear for the

13   record, if we could, General Counsel's referring to a box in

14   the lower left that is titled "Certificate Holder."

15        JUDGE CARTER:  Okay.

16        THE WITNESS:  I --

17        JUDGE CARTER:  Do you recall the last question?

18        THE WITNESS:  What's your last question?

19   BY MR. LEHMANN:

20   Q    It was made out for Robert and Lisa Bellavigna; correct?

21   A    That's what it says there.

22   Q    Okay.  And my question is do you know anything about why

23   this was taken out?

24   A    No, I don't.

25   Q    Robert and Lisa Bellavigna.

1  A    No, I don't.

2  Q    Okay.  Now you said just a moment ago that it was when we

3  created -- or when we started the Company, Bella Masonry.  When

4  you said "we" who were you referring to?

5  A    Oh, actually I meant me.  When I started the Company

6  that's what I -- because it as a -- you asked me the date and I

7  thought it was 21st, 22nd of September.  So that's the policy

8  duration for the year.

9  Q    Umm-hmm.

10  A    But what is this doing down here?  I can't tell you.

11      JUDGE CARTER:  Just for the record, the "this" that Mr.

12  Bellavigna referred to was the entry in the lower left box

13  regarding Robert and Lisa Bellavigna.

14  BY MR. LEHMANN:

15  Q    Do you -- do you have any question looking at this

16  document that this is not a -- that this is a true or not a

17  true liability insurance policy?

18  A    I don't know.  I would be lying to tell you, so I don't

19  know why it's like it is.

20  Q    You're familiar with ACORD; right?

21  A    Yes, I am.

22  Q    Okay.  In fact, that's who you use for your --

23  A    Correct.

24  Q    -- liability insurance?

25  A    Correct.

1    Q    Right?

2    A    Right.  I'm saying the dates up here are right on this

3    side, but I don't know why this is down here.  I can't answer

4    you that.

5    Q    Did Bella Masonry have another liability insurance policy

6    under your name, Henry Bellavigna?

7    A    Another one?

8    Q    Yeah.

9    A    I have one, so --

10   Q    Okay.  And this wouldn't be it; right?

11   A    I assume so.  I don't know.  I don't know why that's like

12   it is.  I don't know where -- why it is like it is.

13        MR. LEHMANN:  Okay, I would offer General Counsel Exhibit

14   28.

15        MR. FURLONG:  No objection.

16        MR. JAMESON:  No objection.

17        MR. BAILEY:  I don't know how it could be offered.  He

18   doesn't know what it is.  He's never seen it before.

19        MR. LEHMANN:  Your Honor, it was provided pursuant to a

20   subpoena request, paragraph --

21        THE WITNESS:  Yeah.

22        MR. BAILEY:  Well, I appreciate that that's your

23   testimony.  However, we don't have a witness that know -- has

24   any knowledge of this document.

25        JUDGE CARTER:  The fact that it is, you know, offered

1  pursuant -- or was received in response to a subpoena doesn't

2  get you to the point of being -- it being authenticated.  So

3  that, you know, maybe the office manager can do that for you

4  when the time comes.  And I gather she's going to be called as

5  a witness but right now we don't somebody to authenticate it.

6  So objection sustained.

7  **(Pause.)**

8      MR. LEHMANN:  Your Honor, I -- on -- we want to revisit

9  General Counsel's 28.

10      In the <u>subpoena</u> <u>duces</u> <u>tecum</u>, it -- we issued the subpoena

11  to Mr. Bellavigna and the Custodian -- and/or the Custodian of

12  Record, and this should at least go in, be admitted into

13  evidence as an exception to the hearsay rule, as a business

14  record.

15      JUDGE CARTER:  It's not -- hearsay's not the issue.  The

16  issue is authenticity.  And you have to have the custodian of

17  the record, sounds like, authenticate it for you.

18      MR. LEHMANN:  Okay.  Can I -- I at least whoever's in --

19  or whoever -- can I least have the custodian of record identify

20  who -- who the custodian is?

21      JUDGE CARTER:  He already testified that Ms. Blanchard --

22      THE WITNESS:  Melissa Blanchard.

23      JUDGE CARTER:  -- Ms. Blanchard was the person who put

24  together the --

25      MR. LEHMANN:  Ms. Blanchard.

1        JUDGE CARTER:  -- who did the response to the subpoena.

2    **(General Counsel's Exhibit 29 marked for identification.)**

3    BY MR. LEHMANN:

4    Q    I'm showing you what's been marked as General Counsel

5    Exhibit 29.  Do you have that?

6    A    Yes, I have it.

7    Q    Okay.  And now, this is from the Bella website and it's --

8    it was printed on November 14, 2011?

9    A    Yes.

10   Q    Okay.  And I'm going to bring your attention to the back,

11   back there of the document -- back of the document, page 2 of 6

12   where you have pictures of Robert A. Bellavigna, grandson, and

13   your son there at the bottom going into 3 of 6.

14   A    Umm-hmm.

15   Q    Listed as the vice-president, project coordinator.

16   A    Umm-hmm.

17   Q    What document are you looking with our left hand?

18   A    The one before that.

19   Q    Okay.  General Counsel Exhibit 28?

20   A    Yeah.

21        JUDGE CARTER:  He's looking at 27.

22        MR. LEHMANN:  27.

23        THE WITNESS:  Okay.

24   BY MR. LEHMANN:

25   Q    Okay, and now that you're on General Counsel Exhibit 27,

1  now that you have that open to, I assume it's open to --

2  A    To the same page.

3  Q    -- to the same page, you'll see that the "VP" has been

4  added in the November exhibit from the October exhibit;

5  correct?

6  A    It says "VP" on both of them.

7  Q    It says "VP" on both?

8  A    Yeah.

9       JUDGE CARTER:  Which person are you referring to?

10      MR. LEHMANN:  Son, Robert P.

11      THE WITNESS:  Oh, son.

12      JUDGE CARTER:  You have to turn the page to see the write

13  up for Robert P.

14      THE WITNESS:  Okay.

15  BY MR. LEHMANN:

16  Q    Right, that's been added -- his --

17  A    Yeah.

18  Q    -- job position of "vice-president" has been added?

19  A    Verbiage has been added, yeah.

20  Q    Okay.  What other verbiage?

21  A    The "VP" has been added as verbiage.  Like I said, he's no

22  officer in the Company.  It's a title.

23  Q    Okay.

24  A    That's all I can tell you.

25  Q    Yeah.  And that was on November 14, 2011?

1  A     Yes.

2         MR. LEHMANN:  I would offer General Counsel Exhibit 29?

3         MR. FURLONG:  No objection.

4         MR. JAMESON:  No objection.

5         MR. BAILEY:  No objection.

6         JUDGE CARTER:  Exhibit 29 for General Counsel admitted

7  without objection.

8  **(General Counsel's Exhibit 29 received into evidence.)**

9  BY MR. LEHMANN:

10  Q     Does Bella Masonry have any checking accounts?

11  A     Have we have a checking account? (sic)  Yes, we do.

12  Q     Okay.  And who's -- what's the bank?

13  A     Chemung Cannel Trust Company.

14  Q     Okay.  And how many checking accounts does Bella have?

15  A     One.

16  Q     And who can sign?  Can you sign?

17  A     Myself and Melissa Blanchard.

18  Q     Anyone else?

19  A     No one else.

20  Q     Who's your vehicle insurance policy through?

21  A     The company.

22  Q     What company?

23  A     It's through our company insurance.  What's the name of

24  it?

25  Q     Yeah.

```
 1   A    You have to talk to Melissa Blanchard, I don't know.
 2   She -- that's part of her job.
 3   Q    How about your Worker's Comp carrier; who's that?  Who's
 4   the policy through?
 5   A    Perry & Carroll.
 6   Q    Do you have payroll service provider?
 7   A    No, Melissa Blanchard.
 8   Q    How about time and attendance?
 9   A    Melissa Blanchard.
10   Q    Now, you purchased a truck from Ace back in 2011?
11   A    I purchased a truck from Ace?  Yes.
12   Q    Okay.  And that was August of 2011?
13   A    Yes.
14   Q    And what kind of truck was that?
15   A    2007 Dodge.
16   Q    Okay.  And you have a sign on -- do you have a sign on the
17   truck?
18   A    Now?  Yes.
19   Q    Okay.  And what does the sign say?
20   A    Bella Masonry.
21   Q    Has that same truck ever had a Ace Masonry sign on it?
22   A    Yes, it has.
23   Q    And you still use that?  Do you still use it today?
24   A    Yes, I do.
25        MR. BAILEY:  You mean the truck?
```

1  BY MR. LEHMANN:

2  Q    Yes, the truck.

3  A    The truck, yes.

4  Q    You also purchased equipment that was previously owned by

5  Ace; correct?

6  A    Yes, I have.

7  **(Pause.)**

8      MR. JAMESON:  Your Honor, can we take a quick break?  I

9  just need two minutes, I want to see GC and Rich?

10      JUDGE CARTER:  All right, we start again at 3:00, so if

11  you need to use the restroom or something that's fine.

12      MR. LEHMANN:  Okay, Judge.

13      JUDGE CARTER:  Off the record.

14          **(Whereupon, a brief recess was taken.)**

15      JUDGE CARTER:  Back on the record.

16      And we're back on the record.  Any further questions from

17  the AGC?

18          **611(c) DIRECT EXAMINATION (continued)**

19  BY MR. LEHMANN:

20  Q    You're familiar with Hale Contracting?

21  A    Yes, I am.

22  Q    And --

23      MR. FURLONG:  I didn't hear that.

24      THE WITNESS:  Yes, I am.

25      MR. FURLONG:  Thank you.

```
 1   BY MR. LEHMANN:

 2   Q    And that's a customer of Bella?

 3   A    That is a customer of Bella.

 4   Q    Okay.  And also that was a customer of Ace?

 5   A    Yes.

 6   Q    Hale Contracting?

 7   A    Yes.

 8   Q    Okay.  ACP; do you recognize that?

 9   A    Yes.

10   Q    Okay.  What does "ACP" stand for?

11   A    Architectural and something Concrete.

12   Q    Okay.  The "P"?

13   A    Architectural --

14   Q    Any idea?

15   A    AC -- no.  No.

16   Q    Okay.  And that was -- that's Bella's customer?

17   A    Yes.

18   Q    Client?

19   A    Yes.  Bella's?

20   Q    Yes, Bella's customer?

21   A    Yes.

22   Q    Okay.  And that was the same customer for Ace, also?

23   A    I'm not sure about that one.

24   Q    Okay.

25   A    I'm not positive.
```

1    Q    You're not sure now?

2    A    I'm not sure now if they were a customer of Ace's or not.

3    Q    Okay.  Was there ever a time when you were sure?

4    A    No.

5    Q    Okay.  How about Frey & Campbell?

6    A    Fry & Campbell, they were subcontractors, yes.

7    Q    Frey & Campbell a customer of Bella?

8    A    I don't remember.

9    Q    For Bella?

10   A    For Bella, I don't remember if they were a customer of

11   Bella's.  Frey & Campbell.  I just --

12   Q    Okay.

13   A    Doesn't ring a bell right now.

14   Q    Okay.  You're familiar with Frey & Campbell, though?

15   A    Yes, I am.

16   Q    Okay.  And were they an Ace customer?

17   A    Yes, they were.

18   Q    Okay.  Now, I'm going to direct your attention to Trinity

19   Episcopal.

20   A    Yes.

21   Q    Are you familiar with -- you had a job at Trinity?

22   A    Yes.

23   Q    And that was a masonry job?

24   A    Masonry restoration.

25   Q    And you still have that job as ongoing?

```
 1   A    Yes, it is.

 2   Q    And you received this job from Ace?

 3   A    Yes, I have.

 4   Q    And you've used Ace employees on this job?

 5   A    I think most of them, yes.

 6   Q    Okay.  And how did Ace employees get on to this job?

 7   A    They had been working for me.

 8   Q    You told them to go to this job?

 9   A    Did I tell them to go to that job?  Yes.

10   Q    You personally?

11   A    Don't know that for a fact, no.

12   Q    Well, who else would have told them to go to the job?

13   A    The -- probably could have been Robert.

14   Q    Which Robert?

15   A    Bob Bellavigna, my son.

16   Q    Your son?

17   A    Yeah.

18        Can I say something?

19   Q    No.

20   A    Okay.

21   (Pause.)

22   Q    Now, you are aware that the Trinity Church project was

23   ongoing, at least around November 8th of 2011?

24   A    Yes.

25   Q    Right?
```

1    Okay.  And did -- did you -- you're familiar with the

2  Bricklayers?

3  A    Yes, I am.

4  Q    All right.  The Laborers?

5  A    Umm-hmm, yes, I am.

6  Q    Carpenters?

7  A    Yeah.

8  Q    And did you apply the Union's collective bargaining

9  agreements on this job on the Trinity Episcopal Church?

10  A    What do you mean "did I apply"?

11  Q    Well, did you pay fringes?  Fringe benefits --

12  A    I paid --

13  Q    -- to the employees?

14  A    I paid prevailing wage to the employees.

15  Q    Okay.  Did you pay fringe benefits to these employees?

16  A    Yes.  Yes.

17  Q    And you would -- you didn't pay the fringe benefits into

18  the Union's funds?

19  A    Correct.

20  Q    You gave them a separate check?

21  A    Yes.

22  Q    And that's -- I'm going to bring your attention to General

23  Counsel Exhibit 26, page 4; 4 of 25.  Looking for the Trinity

24  Episcopal Church job on December 6, 2011; do you see that?

25  A    Trinity Church, yeah, what about it?

1  Q    December 6, 2011.  Moving along that same line, "FRG,"

2  fringe, for 966.15

3  A    Yeah.

4  Q    Those are the fringe -- the fringes that you paid your

5  grandson on that job; correct?

6  A    Like I said, you have to talk to Melissa.  Appears that

7  way.  This is her --

8  Q    It appears that way?

9  A    It appears that way reading this.

10 Q    Okay.  You --

11 A    The --

12 Q    -- you remember paying fringes on this job?

13 A    Yes.

14 Q    Okay.  And do you see any other reference to a dollar

15 amount that would otherwise show up as fringe -- fringes?

16 A    Not on that line I don't.  Yeah.

17 Q    Okay.  You also paid the Union rate on the Trinity

18 Episcopal job?

19 A    I paid prevailing wage, right.

20 Q    Do you know if Trinity Episcopal is a private job or a

21 public job?

22 A    It's a private job.

23 Q    Okay.  And what do you pay prevailing wages on?

24 A    Hmm?

25 Q    Do you pay them on private jobs?

1   A    Not generally.

2   Q    Okay.  Not generally?

3   A    No.

4   Q    Or never?

5   A    No.  No, never.

6   Q    Okay.  And this is a private job?

7   A    Umm-hmm.

8   Q    Okay.  So you didn't --

9        JUDGE CARTER:  That's a "Yes"?

10       THE WITNESS:  Well, there's the -- did not pay prevailing

11  wage rates looking at the figures that I'm seeing here.

12  Doesn't appear that way.

13  BY MR. LEHMANN:

14  Q    Okay, you paid the Union rate on this job?

15  A    I paid whatever is supposed to be paid on this job.

16  Q    Okay.  And that was the Union rate?

17  A    You'll have to ask Melissa to back it up, how did does --

18  this is --

19       Like I said before, I do not take care of payroll.

20  Q    Okay.  But you hired Robert Bellavigna, your grandson?

21  A    So?

22  Q    Right?

23  A    Right.

24  Q    So --

25  A    Yes.

1  Q    All right.

2  **(Pause.)**

3     Okay, I'm going to bring your attention to the S.U.N.Y.

4  Binghamton job; you're familiar with that?

5  A    Umm-hmm.

6  Q    Okay.

7     JUDGE CARTER:  That's a "Yes"?

8     THE WITNESS:  What's that?  Yes.

9  BY MR. LEHMANN:

10  Q    And that was also a masonry job?

11  A    That was a masonry job, yes.

12  Q    Okay.  And you received that job also from Ace?

13  A    Yes, I did.

14  Q    And you used Ace employees on this job, as well?

15  A    Yes, as I remember.  Yes.

16  Q    Okay.  And on this job, just like any other job that the

17  Ace employees has performed, they were doing the same work?

18  A    As I remember, this is the T&M job.

19  Q    A punch list?

20  A    A punch list job.

21  Q    Okay.  They were doing the same work?

22  A    The only reason I took the job was I was over at Vestal

23  Hills, which is right now the street from it, and I moved some

24  of the help over there to finish that punch list for them.

25  Q    Okay.

1    A    So, yes.

2    Q    Okay.  So the -- but the question was they were performing

3    the same work --

4    A    Yes.

5    Q    -- as they did for Ace at Bella?

6    A    Yes.

7    Q    Right?

8         Okay.  We'll get to the Vestal job --

9    A    Yeah.

10   Q    -- in just a couple moments.

11        And the Ithaca Town Hall; you're familiar with that job?

12   A    Yes, I am.

13   Q    And that was an Ace project that Bella ended up with?

14   A    Yes.

15   Q    And how did Bella end up with the Ithaca Town Hall job?

16   A    Ithaca Town Hall job?  Through Hal Roofing (ph).  I had

17   been doing work with Hal budgeting some projects and we were

18   aware of one another and he asked me if I would finish it.

19        JUDGE CARTER:  Just a point of curiosity and I apologize,

20   is that this building or is that a different building?

21        MR. FURLONG:  This is the City.  City.

22        MS. BELLAVIGNA:  Different building.

23        MR. FURLONG:  City.

24        JUDGE CARTER:  City Hall.  It's a different Town Hall?

25        THE WITNESS:  Yeah.

1        JUDGE CARTER:  Okay.

2   BY MR. LEHMANN:

3   Q    And you also -- on this job also used Ace employees --

4   A    Yes, I did.

5   Q    -- on this job, as well?

6   A    Yeah.

7   Q    Okay.  And again, they performed the same work that they

8   had for Bella as they had for Ace?

9   A    Correct.  Yes.

10       MR. BAILEY:  And just a point of clarification for the

11  record, when you say "use Ace employees," do you mean they were

12  currently Ace employees or former Ace employees?

13  BY MR. LEHMANN:

14  Q    They work -- they were current Ace employees.

15  A    No, they were not.

16  Q    Okay.  So your testimony is that the employees who worked

17  for Ithaca Town Hall were only Bella employees?

18  A    At that time, yeah, they worked for me.

19  Q    Okay.

20  A    They are former Ace employees.

21  Q    And only Bella?

22  A    And anybody else that would hire them.

23  Q    Okay.  I'm going to bring your attention to General

24  Counsel Exhibit 26, "Richard Tracy."

25       MR. BAILEY:  Do you have a page number to make it a little

1  easier?

2  BY MR. LEHMANN:

3  Q    Page -- the last page.  Mr. Tracy worked for Bella on, the

4  document shows, October 18th, 19th and 20th; is that correct?

5  A    Also says the -- yes.

6  Q    Okay.  How did Mr. Tracy end up on the Ithaca Town Hall

7  job?

8  A    I hired him.

9  Q    You told him to go to that job?

10  A    Yes.

11  Q    And he was only working for Bella on the 18th, 19th and

12  20th?

13  A    That's what it says here.  Could have been laid off.  I

14  can't tell you right now.  That's --

15  Q    Okay.  I'm going to show you General Counsel's Exhibit 3,

16  the second page -- the second page, "Richard Tracy."  It says

17  that he worked for Ace through November 18, 2011; correct?

18  A    That's what he said, yeah.  That's what this document

19  says, yeah.

20  Q    That's an Ace document.

21  A    That's an Ace document, yeah.

22  Q    Okay.  So it's your testimony that he was only employed

23  with Bella at that time, yet you have this document that says

24  he's employed with Ace --

25  A    Can I look at a -- can I look at a folder?

1    Q    You cannot.

2    A    Okay.  Then I can't speak for Ace.  I don't know.  That's

3    all I can tell you, is for Bella he worked on those three days.

4    Q    Okay.  Okay, and this was a -- this was a Bella job --

5    A    Correct.

6    Q    -- right?

7    A    Yeah.

8    Q    On October 18th, 19th and 20th; right?  Bella job?

9    A    Yes.

10   Q    Not an Ace job?

11   A    Right.

12   Q    All right.  I'm going to show you General Counsel's

13   Exhibit 2.  The third page, the Ithaca -- job 11-34, Ithaca

14   Town Hall.

15   A    Umm-hmm.

16   Q    Job ended for Ace on 10/21/2011; correct?

17   A    That's what it says here for Ace, yeah.

18   Q    Okay.  All right, so it was an Ace job till 10/21/2011,

19   but yet Mr. Tracy --

20   A    But what --

21   Q    -- excuse me.  Excuse me.

22   A    What does it mean "ended"?

23   Q    But Mr. Tracy --

24        JUDGE CARTER:  Wait for the question.

25   BY MR. LEHMANN:

1    Q    -- was working for Bella on October 18th, 19th and 20th at

2    the same job.

3    A    Umm-hmm.

4    Q    Correct?

5    A    Yes, that's what it's saying.

6    Q    And these are -- this is Bella Masonry's time card,

7    General Counsel Exhibit 26?

8    A    Oh.

9    Q    That's the time card list?

10   A    On 26 it is, yes.

11   Q    Okay.  Do you have any belief that this -- that the time

12   card list that you provided is inaccurate?

13   A    I would have to ask Melissa Blanchard.

14   Q    Cornell, you did -- you performed a job or you asked Ace

15   to perform a job for you at Cornell?

16   A    Correct.

17   Q    And --

18   A    Yes.

19   Q    -- you -- and you asked them -- Ace, Ace Masonry to

20   perform that job because you weren't a Union contractor?

21   A    And they were doing work on the site right at that time,

22   yes.

23   Q    Okay.  But you asked -- the question was you asked Ace to

24   perform this job because you couldn't perform it?

25   A    Yes.

```
 1   Q    Okay.  And it was because Ace was a Union contractor?

 2   A    Yes.

 3   Q    All right.  And was this a job that you bid on?

 4   A    No, I did a T&M.

 5   Q    Okay.  So how did you --

 6   A    Oh, did I bid on it?

 7   Q    Yeah.

 8   A    Yeah, this is -- yeah.  Yes, I did.

 9   Q    This is a job that you bid on?

10   A    I bid on, yeah.

11   Q    Okay.

12   A    Yeah.

13   Q    And this job that you bid on was a Union job only?

14   A    I bid on it, it was a Union job only?  Yes.

15   Q    Okay.  And so you bid on the Union job?

16   A    Umm-hmm.

17   Q    And you got the bid?

18   A    Umm-hmm.

19   Q    And --

20        JUDGE CARTER:  Is that -- that's a "Yes"?

21        THE WITNESS:  Yes.

22   BY MR. LEHMANN:

23   Q    So you provided the -- are the documents in the -- are

24   there bid documents?

25   A    No, there was no bid documents.
```

```
1   Q    So this is just verbally?

2   A    Yeah.

3   Q    Who did you speak to?

4   A    I think it was Fran Birdsaw (ph) from McCarthy.

5   Q    Okay.  Just so --

6   A    Just a small little $3,000 job.

7   Q    Okay.  So you -- so you spoke to Fran, Union only job, but

8   you end up getting the bid?

9   A    Umm-hmm.

10  Q    Okay.  So you're holding yourself out as a Union

11  contractor; correct?

12  A    Yes.

13  Q    Okay.  So you called up Fran.  You said I'm a Union

14  contractor.  You got the bid at Cornell?

15  A    No, I did not.

16  Q    That's not?  You just testified that you held -- were

17  holding yourself out as a Union contactor.

18  A    No, I -- I was holding myself out.  I bid a Union job.

19  Q    Okay.  But the question that you answered "Yes" to was you

20  were holding yourself out as a Union contractor.

21  A    No --

22  Q    You --

23  A    -- to that answer.  I -- if that's how you're saying.

24  Q    Never held yourself out as a Union contractor?

25  A    I can't answer it that way because it's -- there's a story
```

1   to this that's not being said, so --

2   Q     Right.  But it's true; you have held yourself out -- held

3   Bella Masonry as a Union contractor; yes or no?

4   A     No.

5   Q     You have never held yourself out as a Union contractor?

6   A     No.

7         MR. BAILEY:  We going to ask that four more times?  I

8   mean, he says "No."

9   BY MR. LEHMANN:

10  Q     Yet you're going -- yet you're doing --

11        MR. LEHMANN:  Is there an objection?

12        MR. BAILEY:  Yeah, there is an objection, asked and

13  answered.

14        MR. LEHMANN:  Okay.

15        JUDGE CARTER:  All right.

16        MR. LEHMANN:  Well, not to me.

17        JUDGE CARTER:  The question has been asked and answered,

18  so let's move on.  You can argue the point later.

19  BY MR. LEHMANN:

20  Q     Okay, I'm going to have -- direct your attention to

21  General Counsel's Exhibit 27, page 4 of 7.  This is in the bio

22  for your son, "Union Affiliation" on 4 of 7, "The Bricklayers

23  Local 17."

24  A     What page are we getting on?

25  Q     4 of 7.

```
 1        MR. FURLONG:  That was kind of near the middle, towards
 2   the end.
 3        MR. BAILEY:  Under "Training and Certificates."
 4        THE WITNESS:  Okay.
 5   BY MR. LEHMANN:
 6   Q    It says -- that "BAC" is Bricklayers?
 7   A    Yeah.
 8   Q    It says "Union Affiliation"?
 9   A    Yeah.  But I'm trying to see what it all goes to.
10   Training.  Oh, that's under Robert.
11        JUDGE CARTER:  That's who he's asking about.  He's asking
12   about Robert P.
13        THE WITNESS:  Yeah, okay.
14   BY MR. LEHMANN:
15   Q    "Union Affiliation," right, "BAC" --
16   A    Yeah.
17   Q    -- is the Bricklayers --
18   A    Yeah.
19   Q    -- Local 17?
20   A    Says -- says under "Training and Certification."  Yeah,
21   he --
22   Q    Actually, that's not -- no, it says that "Union
23   Affiliation."
24   A    Local 17, yes.
25   Q    Local 17, okay.
```

```
 1  A    Yes.

 2  Q    Turn to 5 of 7, Randy Bell.

 3  A    Yeah.

 4  Q    Same thing at the bottom, "Union Affiliation, BAC Local

 5  17."

 6  A    Yeah.

 7  Q    "BAC" is the Bricklayers?

 8  A    Yeah.

 9  Q    Okay.  Turn to the next page.

10  A    Yeah.

11  Q    Derek Hagar, middle of the page, "Union Affiliation, BAC

12  Local 11."

13  A    Umm-hmm.

14  Q    Right?

15  A    Yeah.

16  Q    Turn to the next page.

17  A    Yeah.

18  Q    Mr. Tracy, "Union Affiliation, BAC Local 3."

19  A    Yeah.

20  Q    If Cornell was a Union job you wouldn't have gotten the

21  job unless you represented that you were a Union contractor;

22  correct?

23  A    No.

24       JUDGE CARTER:  No, meaning that's not correct, or no,

25  meaning that you wouldn't have gotten the job?
```

1      THE WITNESS:  No, this is saying that these people are

2  affiliated with the Union, not Bella Masonry at this point.

3  BY MR. LEHMANN:

4  Q    Okay, but the question was you -- the Cornell job was a

5  Union job.  Union only job, and you got the bid.

6  A    Yes, I understand that.  I got the bid.

7  Q    Right.  And so you represented to Cornell that you were a

8  Union contractor; correct?

9  A    No, I don't think so.

10     JUDGE CARTER:  All right, I think you've gotten as much as

11  you can get out of that one.

12     MR. LEHMANN:  Okay.

13  BY MR. LEHMANN:

14  Q    Then why did you sub it to Ace?

15  A    Because they were on the site.  Plain and simple.

16  Q    Okay.  Not because they were a Union contractor?

17  A    Yeah, they were a Union contractor and they were right

18  there.

19  Q    Umm-hmm.

20  A    Why go through the hassle of anything.  I can make a few

21  dollars and they can do the job.

22  Q    Why not?

23  A    Why not?

24  Q    In fact, you made a couple thousand dollars on it; didn't

25  you?

```
 1   A     Yeah.

 2   Q     Campus Road Economy Paving; does that job sound familiar?

 3   A     Campus Road Economy Paving?  I -- somewhat, yeah.  I

 4   remember -- I remember Ace having a job up there.

 5   Q     When did Ace have a job at Campus Road?

 6   A     I don't know, I just remember the name.  That they had a

 7   job up there.

 8   Q     Okay.  The customer name was -- or the customer was

 9   Economy Paving?  Do you recollect that?

10   A     I think so.

11   Q     And the contract amount was 3200?

12   A     I don't remember.

13   Q     Okay.  Do you remember which employees worked on this job?

14   A     No, I don't.

15   Q     Can you -- on your payroll, can you -- General Counsel's

16   Exhibit --

17   A     26?

18   Q     -- 26, yeah.  I can't find any employees who worked at the

19   Campus Road Economy Paving job, but I might be missing

20   something.  Can you -- can you look through General Counsel

21   Exhibit 29?

22         MS. KLUYTENAAR:  26.

23   BY MR. LEHMANN:

24   Q     26, and see if you can identify any employees who worked

25   on this Campus Road job?
```

1        MR. BAILEY:  Sorry, I may have missed something.

2        THE WITNESS:  Yeah, I --

3        MR. BAILEY:  Didn't he say that it was an Ace job?

4        THE WITNESS:  Ace job.  That's what I'm saying.  Why am I

5    looking at Bella?

6    BY MR. LEHMANN:

7    Q    The Campus Road Economy Paving is an Ace job?

8    A    As far as I remember.  I don't remember it as being a

9    Bella job, but I could be -- I just can't remember it.

10   Q    Is -- let me direct your attention to General Counsel

11   Exhibit 2.  General Counsel Exhibit 2, at the last page, Job

12   Number 11-27.

13   A    Okay.

14   Q    Is that the -- is that the job that you're referring to?

15   A    That's the one I think we're referring to.

16   Q    Okay.  And that was an Ace job?

17   A    That was an Ace job.  I don't remember it as under Bella.

18   Q    Do you have any Bella employees -- do you know or did you

19   have Bella employees working this Campus Road job?

20   A    I don't remember it.

21   **(Pause.)**

22        MR. LEHMANN:  Can I have a moment, Your Honor?

23        JUDGE CARTER:  Okay, we can go off for a second.

24            **(Whereupon, a brief recess was taken.)**

25        JUDGE CARTER:  Back on the record.

1      And ready for additional questions from General Counsel.

2           **611(c) DIRECT EXAMINATION (continued)**

3    **(General Counsel's Exhibits 31 and 32 marked for**

4    **identification.)**

5    BY MR. LEHMANN:

6    Q    The -- there was an investigation in the charges in this

7    matter; correct, Mr. Bellavigna?

8    A    Yeah.

9    Q    What was that?

10   A    Yes.

11   Q    Yes, okay.  And during the investigation the Region sent

12   your counsel a list of questions; correct?  Do you remember

13   that?

14   A    Yes.

15   Q    Okay.  And that -- and I'm showing you what's been marked

16   for identification as GC-31.

17   A    Yes.

18   Q    And on March 14, 2012 your -- Mr. Bailey responded to the

19   Region's request, GC-31; correct?

20   A    Correct.  Yes.

21   Q    And so that -- and that is General Counsel's 32, and you

22   have both in front of you?

23   A    Yes.

24   Q    Okay.  I want you to, looking at 31, to go to Question 18.

25   A    Yes.

1  Q    "A list of all projects performed by Bella to date listing
2  name of customer and value of contract."

3      MR. BAILEY:  Are you going to ask him to read from this
4  before it's admitted?

5      MR. LEHMANN:  I'm just asking a question.  That's what
6  says.

7      MR. BAILEY:  Well, actually, you referenced a specific
8  question and answer, and the document isn't admitted.  So I'm
9  asking you, are you asking to --

10     MR. FURLONG:  Is this an objection or is this a quizzing
11  by one counsel of another?

12     JUDGE CARTER:  I gather -- I gather this is an objection
13  to the -- or publishing of the content of the document before
14  it's admitted, which is a fair point.

15     So if you want to have the Witness identify it and then go
16  ahead and get it admitted and then question about the contents
17  that would be fine.

18     Or maybe stipulate to it.  I don't know.

19     BY MR. LEHMANN:  Okay, over a stipulation that this was
20  provided by Mr. Bailey.

21     JUDGE CARTER:  I'm sorry?

22     MR. LEHMANN:  Is -- is the ruling that I can't ask a
23  question; I have to offer it before I ask the question?

24     JUDGE CARTER:  Well, there's an objection to the materials
25  of this coming in without it being admitted, which is a fair

1    objection.  So you need to go ahead and get it admitted and

2    then have him discuss it.

3        Now, I'm not sure what Counsel's position is on this,

4    whether he wants to stipulate or admit that these are, you

5    know, authentic documents that he -- that came from his firm or

6    whether he's going to make you put him on the stand to do that

7    for that purpose, or something else.  But --

8        Try to get it in.

9    **(Pause.)**

10        MR. LEHMANN:  Okay, all right so I would -- I would move

11    and ask for a stipulation that the responses that were provided

12    in the Position Paper and on Bella Masonry letterhead were in

13    response to the questions that were presented from the Region

14    to Mr. Bailey, himself.

15        MR. BAILEY:  I'm not stipulating.

16        MR. LEHMANN:  Okay.  And -- well, I would offer General

17    Counsel Exhibit 31 and 32.

18        MR. BAILEY:  I object.  No authentication.  No foundation.

19    Hearsay.  The Rules clearly allow for interrogatories, bill of

20    particulars; this is neither.

21        If he wanted to ask those questions in that formal way and

22    have it certified or have it verified by Henry, he could have

23    done that.

24        MR. LEHMANN:  This is --

25        MR. BAILEY:  These are neither of those.

1          JUDGE CARTER:  Well, let's get the -- hearsay is not

2    really an issue.  It would be an admission by a party opponent.

3          Now, authenticity, you know, your call as to how you want

4    to proceed.  I mean, you know, if you want to not stipulate

5    that these are authentic, then his options are to see if Mr.

6    Bellavigna recognizes these documents and kind of authenticate

7    them.  Or he can call you as a witness and see if you can

8    authenticate them.

9          MR. BAILEY:  There's a third option I would submit, Judge,

10   that he could call Melissa Blanchard who was likely the person

11   that put this stuff together.

12         JUDGE CARTER:  Well, it's General Counsel's case, he'll

13   decide how he wants to proceed with it.

14         MR. BAILEY:  Very well, Your Honor.

15         MR. LEHMANN:  So are you -- Mr. Bailey, are you --

16         JUDGE CARTER:  He's not going to stipulate for whatever

17   reason --

18         MR. LEHMANN:  -- that this is a letter that you sent the

19   Region?

20         MR. BAILEY:  I'm sorry?

21         MR. LEHMANN:  You're not going to stipulate that this is a

22   letter that you sent the Region during this investigation?  Is

23   that your letterhead?

24         MR. SHEATS:  We stipulate to facts.  Your Honor, I -- in

25   30 years I've never heard this happen from an opposing counsel.

1    JUDGE CARTER:  The question was --

2    MR. SHEATS:  There's an objection on the record and you

3  know, if they want to -- they could have proposed a stipulation

4  of fact.  They never did that.

5    JUDGE CARTER:  Well, I think we're -- the only issue that

6  requires a stipulation, if that's where we're going with this,

7  is whether these are authentic documents, because hearsay is

8  not an issue.

9    Now, you know, if you all want to be difficult about

10  whether it's authentic, then --

11    MR. BAILEY:  Well, Judge, I think there's also a relevance

12  issue.  What's the point of a letter from me?

13    MR. LEHMANN:  Your Honor --

14    MR. BAILEY:  We have Henry right here.  Ask him any

15  question you want.

16    JUDGE CARTER:  No, it's -- they're trying to put this

17  document in, at least the Position Paper as an admission by a

18  party opponent to prove up statements that -- representations

19  that the Respondents may have made that may be probative.

20    MR. BAILEY:  Well, what's the proffered admission?

21    JUDGE CARTER:  We haven't gotten there yet --

22    MR. BAILEY:  Okay.

23    JUDGE CARTER:  -- because we have an objection to that

24  coming in.  So --

25    MR. FURLONG:  There's also extensive case law, Judge, that

1    a letter by a party as part of an investigation can be used

2    against that party.

3        JUDGE CARTER:  I don't think there's any --

4        MR. FURLONG:  Board case law.  You may not even need to

5    reach that.  The real question is, is Mr. Bailey going to

6    stipulate that the letter that's in everybody hand on his

7    letterhead was written by Mr. Bailey?

8        Now, I guess if there's not a stipulation we're left with

9    calling him to the stand, as we are with the other documents,

10   and if we want to bring this hearing to a conclusion, we really

11   shouldn't play those games.  That's the position of the

12   Charging Parties.

13       MR. BAILEY:  Oh, it's a game?  Oh, okay.  All right.

14   We'll get there.

15       MR. LEHMANN:  Your Honor?

16       JUDGE CARTER:  Hang on a minute.

17       Mr. Jameson, you had something?

18       MR. JAMESON:  To get at least around GC-32, as I read it,

19   would this not be a declaration against interest by the agent

20   of Bella, and the agent in this case being Sheats & Bailey, and

21   the proffer is, as anyone can read on the fourth page, there's

22   a job, Campus Road Economy Paving, which Bella is listing as

23   one of its own jobs, so therefore it, through its agents, has

24   declared -- has made a declaration against interest.  And as I

25   remember the Federal Rules, that gets you around a document's

1    challenge to authenticity.

2        JUDGE CARTER:  A declaration against interest gets you

3    past hearsay.  But I'm not sure --

4        MR. BAILEY:  Around hearsay.

5        MR. JAMESON:  And I think also authenticity when it's a

6    declaration against interest.

7        MR. BAILEY:  It's a hearsay objection -- that's a hearsay

8    issue.

9        MR. JAMESON:  Declarations are a little stronger when

10   they're against interest.

11       JUDGE CARTER:  Well, I need to see some authority on that.

12       But let's get to the point.  The ball's in your court.

13   You can deal with Mr. Bellavigna.  You can put Mr. Bailey on

14   the stand if that's how we have to do it.

15       MR. BAILEY:  Let's break it up.  Judge, if I can make a

16   suggestion?  Why don't we break up Exhibit 32, remove my

17   letter, and you have the Questionnaire on its commerce

18   information, and then you have what appears to be a document

19   that was printed on Bella Masonry letterhead and attached Bella

20   Masonry organizational documents.  Just a suggestion.

21       JUDGE CARTER:  If the General Counsel wants to do that

22   then they can but I'm not require them to.

23       MR. LEHMANN:  Yeah, and I wouldn't agree to that because

24   there's no indication of where it came from.

25       JUDGE CARTER:  I'm not clear on why you're not agreeing

1    that it's authentic.  But you know, if you want to insist that

2    they meet their proof on that, we'll do it.  That's fine.  But

3    that may involve putting you on the stand.

4    **(Pause.)**

5        MR. LEHMANN:  Your Honor, at this time I would make a

6    motion to suspend Mr. Bellavigna's testimony and I would call

7    Mr. Bailey to the witness stand.

8        JUDGE CARTER:  Okay.  Fair enough.

9        Mr. Bellavigna, you're going to take a short break from

10   your testimony.  Could you just have a seat right there?

11   **(Witness excused.)**

12       JUDGE CARTER:  And Mr. Bailey, you're being called as a

13   witness.

14       MR. BAILEY:  Judge, if I can make just one more point?

15   This is part of discovery.  I mean, the case -- the litigation

16   had already been commenced.  It references the case numbers.

17       MR. SHEATS:  And the representation was made it was during

18   the investigation, which is not a truthful representation.

19       The letter responds to -- cites cases in litigation, so

20   they're asking for discovery.  So you're asking a lawyer to

21   testify, to identify a transmittal letter for pre-trial

22   discovery, and that's I think a tad unprecedented.

23       If this was something during the investigation, I don't

24   know, maybe.  But it's in response to discovery requests.  And

25   he made his own choice on how to request it.  He did it by a

1   letter request, not by interrogatories or any other document.

2       JUDGE CARTER:  The Board law is pretty well established

3   that this position papers can be admitted as an admission by

4   the party opponent, so that's not really -- that's actually

5   binding authority upon me, so that objection or that theory is

6   not going to fly.

7       MR. SHEATS:  It's not a position paper.

8       JUDGE CARTER:  This, Exhibit 32, has all the trappings of

9   a position paper, and indeed, was response -- in response to a

10  request for a position paper.

11      MR. BAILEY:  I don't think so.

12      JUDGE CARTER:  Exhibit 31 is a request for a position

13  paper at the end of the first paragraph.

14      And then Exhibit 32 references the -- Exhibit 31, and is

15  in response to it, in the first paragraph.

16      MR. SHEATS:  And I'm just trying to help understand for my

17  own benefit here, but the first paragraph of Exhibit 31 says "A

18  position is not considered full cooperation."  Is that what

19  you're referring to, Sir?

20      JUDGE CARTER:  It says, "I would ask that a position paper

21  address and supply the following information."  First

22  paragraph, Exhibit 31.  First page.

23      MR. SHEATS:  Okay, it's after that.  Hang on.

24      **(Pause.)**

25      JUDGE CARTER:  Now, you can argue the weight of these

1   documents when the time comes.  And you know, maybe this --

2   maybe they don't carry any weight.  But, you know, that's a

3   point for argument.

4        But you know, I'll give you another minute to think this

5   over, but we're about to swear Mr. Bailey in as a witness.

6   **(Pause.)**

7        MR. BAILEY:  Judge, for the sake of, I guess, saving time

8   we'll stipulate to authenticity of the letter.  To my letter.

9   I should say the Sheats & Bailey letter.

10       JUDGE CARTER:  So Exhibit 32?

11       MR. BAILEY:  Well, the first two pages.  I can't stipulate

12  to the authenticity of the rest of this document.  It's not

13  something that I prepared.  Or had any involvement with, other

14  than --

15       JUDGE CARTER:  These are documents that were sent with

16  your letter, because I guess your letter says "enclosures"?

17       MR. BAILEY:  Correct.  But --

18       MR. LEHMANN:  Your Honor?

19       MR. BAILEY:  -- it's not something that I created on a

20  Bella letterhead.

21       MR. JAMESON:  At this time I would like to have Counsel on

22  the stand because my first question of him, if not asked by my

23  esteemed colleagues, would be where did he get these documents

24  that he attached to send to the NLRB?  I think that's very

25  probative and we'll get -- and is he in the habit of sending

1    documents that aren't authentic or that he believes may not be

2    authentic to a Federal agency?

3         Let's get him on the stand.  He's been -- he's had 10

4    minutes to do this.

5         JUDGE CARTER:  Yeah, I think you're starting to split

6    hairs.  This -- if you want to stipulate to authenticity of

7    your cover letter that's going to include the enclosures.

8    That's how it's going to be if you're stipulating.

9         MR. BAILEY:  Well, Judge, that's -- like I said, Missy

10   can -- would be able to discuss the authenticity of the rest of

11   it, so that's fine.

12        MR. SHEATS:  That's not what he's suggesting.

13        MR. LEHMANN:  And I would like to --

14        MR. BAILEY:  No, no, that's what I'm saying.

15        MR. LEHMANN:  -- and I would like to state on the record

16   that there's one last exhibit that was attached to the original

17   position paper, and that's already actually in evidence right

18   now as the payroll, General Counsel's Exhibit --

19        MS. KLUYTENAAR:  26, I think.  26.

20        MR. LEHMANN:  26.

21        JUDGE CARTER:  I'm saying -- you're saying that that was

22   also attached to this letter; is that what you're saying?

23        MR. LEHMANN:  Yeah.  But it's already in evidence.

24        JUDGE CARTER:  All right, let's move forward.  I've heard

25   an agreement that Exhibit 32 is authentic and so with that

1    representation by counsel, and the fact that it is an admission

2    by a party opponent, that document is admissible.

3        Now, I don't know if you need Exhibit 31, but --

4        MR. LEHMANN:  I'm offering 32.  You have to have 31 to

5    read 32, so I would offer 31, as well.

6        JUDGE CARTER:  All right.  Well, Exhibit 31 is referenced

7    in Exhibit 32, so those go together.  So I'll find that Exhibit

8    31 is authentic and that 32 is in response to it.

9        So you're offering those two for admission?

10        MR. LEHMANN:  Yes.

11        JUDGE CARTER:  All right, any objection to that?

12        MR. FURLONG:  No objection, Judge.  But since we're taking

13    a break from the -- Mr. Bellavigna's testimony and Mr. Bailey

14    was going to take the stand, maybe I can get into my letters

15    they sent on the information requests as to whether they're

16    authentic?

17        JUDGE CARTER:  Well, I understand your point.  Let's take

18    care of these two exhibits first, though.

19        MR. FURLONG:  Okay.

20        JUDGE CARTER:  Any objection to 31 and 32?

21        MR. FURLONG:  No objection.

22        MR. JAMESON:  No objection, Your Honor.

23        MR. BAILEY:  No objection, Your Honor.

24        JUDGE CARTER:  All right, Exhibit 31 and 32 for General

25    Counsel will be admitted without objection.

1    **(General Counsel's Exhibits 31 and 32 received into evidence.)**

2    JUDGE CARTER:  Now, Mr. Furlong, you had a point?

3    MR. FURLONG:  I would like to call Mr. Bailey to the stand

4    while we're taking a break so we can authentic letters similar

5    on Sheats & Bailey letterhead, as well as the e-mails.

6    MR. BAILEY:  Your Honor, can a party go one at a time

7    instead of parties intertwining their cases here?

8    I mean, if he has documents when he's -- the Witness is

9    his, he can -- I mean, he can ask him.  But General Counsel's

10   asking the questions now.

11   MR. FURLONG:  Well, we can take the witnesses out of order

12   any way that the Judge decides.  And the Witness -- the current

13   witness, Mr. Bellavigna, was excused from the stand.  And since

14   Mr. Bailey was going to take the stand why don't we just

15   complete that to complete our record?  Because otherwise we

16   would just do it later on.

17   Why don't we take care of it now, or admit that the Sheats

18   & Bailey letterhead, in fact, is Mr. Bailey's writing and

19   letter.

20   JUDGE CARTER:  All right, remind me what exhibit that was?

21   MR. JAMESON:  GC-21, Your Honor.

22   MR. FURLONG:  It had a January 24th letter for Mr. Bailey

23   to the Unions.  And then a series of e-mails back and forth

24   from Mr. Bailey to me.

25   MR. BAILEY:  I'm sorry, Judge, I thought he was proposing

1    a new document.  A new exhibit.

2         MR. FURLONG:  No.

3         MR. BAILEY:  I didn't know he was referencing 21.

4         MR. FURLONG:  We held this back.

5         JUDGE CARTER:  Right.  21, we -- there were portions of

6    this document that were not admitted because of this issue.

7         MR. BAILEY:  Right.

8         MR. FURLONG:  Correct.

9         MR. BAILEY:  The letter in question there are in.  That's

10   what my notes say.

11        MR. FURLONG:  Yes, the letter to Lisa Bellavigna.

12        MR. BAILEY:  Umm-hmm.

13        MR. FURLONG:  At the two addresses is in.  The

14   Questionnaire is in.  Then there was an argument, if you

15   recall, regarding whether or not the charge was filed before

16   the Questionnaire was tendered and so on and so forth.  We did

17   not reach the Sheats & Bailey letter to me, or rather to the

18   clients of the 24th.  And then the e-mails that are attached to

19   the back of that.

20        JUDGE CARTER:  All right, so --

21        MR. BAILEY:  Judge, they are to his clients.

22        Call your clients.  I mean --

23        JUDGE CARTER:  He's talking about -- he's talking about

24   your January 24, 2012 letter.

25        MR. BAILEY:  I realize that.  It's addressed to his

1   clients.  So if he had a problem -- if he was concerned about

2   getting a specific letter in and he had a method for doing

3   that, i.e. his own clients, why not have his clients here?

4        MR. FURLONG:  Because the client can't stipulate to the

5   authenticity of the letter.  They were recipients of --

6        MR. BAILEY:  They don't need to --

7        MR. FURLONG:  -- the letter.

8        MR. BAILEY:  They don't need to --

9        MR. FURLONG:  Excuse me, I didn't interrupt you.

10       MR. BAILEY:  -- stipulate to authenticity.

11       MR. FURLONG:  They cannot stipulate to the authenticity of

12   the letter.

13       There was a dispute yesterday for the authenticity.  I

14   offered a stipulation and Mr. Bailey refused to stipulate.  So

15   I would like to put him on the stand now and ask him, "Did you

16   write that letter and send it to the gentlemen who are

17   addressed in the letter?"  It will take a second.

18       JUDGE CARTER:  All right.  And I think that that's the

19   same issue we just encountered.

20       I guess there are several ways to accomplish that and one

21   of them might be calling some, for example, his client.  But

22   another one might be calling you since this the letter that

23   went out under your name.

24       Now, again, you know, you're right to make him -- make the

25   Government and the Charging Party meet their burden of proof,

 1  but you know, if want to insist that you're going to stipulate,

 2  then they have a right to put you on the stand and see if this

 3  is -- these are -- this is your letter and these are your

 4  emails.

 5      MR. BAILEY:  Judge, I would also point out that the letter

 6  is copied to Henry.  There's been no line of questioning to

 7  Henry as to whether he was involved in any way with this

 8  letter.

 9      MR. FURLONG:  I have to -- I have to ask the person who

10  wrote the letter, "Did you write the letter?"  Not a recipient

11  of the letter because there could still be some sort of a

12  denial that "I never sent the letter.  Somebody made it up on

13  my letterhead."  As absurd as that may be sound I may be faced

14  with that.

15      MR. SHEATS:  Well, moving forward we may have to ask that

16  the same be granted.  And if this is this Court's evidentiary

17  ruling as a topic, with regard to e-mail and correspondence to

18  Mr. Furlong --

19      JUDGE CARTER:  I'm not sure what -- you lost me there; I'm

20  not sure what your point is.

21      MR. SHEATS:  Well, the Court seems to be ruling as a

22  matter of law, general law, that any letter from an attorney

23  during the course of a case in litigation is admissible, okay,

24  which is the effective of the Court's ruling.

25      And my point is simply to put the Court on notice that we

1  will be doing the same, particularly with regards to some e-

2  mail exchanges probably with Mr. Furlong.

3       JUDGE CARTER:  Well, we'll get there when we get there.

4  And not that I'm agreeing with your characterizations of my

5  ruling --

6       MR. SHEATS:  Understand.

7       JUDGE CARTER:  -- but if you have e-mails that are from

8  Mr. Furlong that you think are probative of some issue that's

9  relevant to the case, we'll take it up when we get there.

10      But --

11      MR. SHEATS:  I guess --

12      JUDGE CARTER:  -- your point about --

13      MR. FURLONG:  And I can assure the Court, and I will

14  stipulate ahead of time, that if there's an e-mail over my name

15  I will stipulate to its authenticity.  Period.

16      JUDGE CARTER:  Okay.  We'll get there when we get there.

17      MR. FURLONG:  Okay, I'm not going to play that game of

18  "No, make me prove that I sent the e-mail."

19      MR. SHEATS:  I guess, my other question is, the January

20  24, 2012 letter is being offered for what purpose?

21      MR. FURLONG:  There was a claim that the charge was filed

22  prior to the letter.  This completes the record.  And the e-

23  mails themselves that pre-date the letter, also should complete

24  the record.

25      JUDGE CARTER:  You know, that point goes to the weight of

1    the document, as opposed to the admissibility.

2        But -- and your point about, you know, Mr. Bellavigna

3    being on the cover letter does not address the e-mails,

4    which --

5        MR. FURLONG:  Right.

6        JUDGE CARTER:  -- these have a tagline of coming from your

7    e-mail address.

8        MR. FURLONG:  Can we ask Counsel to take the stand, Your

9    Honor, so I can ask him these questions?

10       JUDGE CARTER:  Well, I guess, I'll give him a minute to

11   decide what --

12       MR. FURLONG:  Okay.

13       JUDGE CARTER:  -- their game plan is.

14       MR. SHEATS:  Again, I -- from what was discussed about the

15   January 24 letter yesterday is a little bit different than what

16   Mr. Furlong's characterizing it as today.  Because I believe

17   yesterday it was couched that it was some type of a refusal to

18   bargaining.

19       JUDGE CARTER:  Well --

20       MR. SHEATS:  And now he's saying, no, I'm kind of changing

21   my mind and it has something to do with the timing of the

22   filing of the charges, okay, which is new.  And if that's all

23   that that letter is being proffered for, is to show the timing

24   of that letter relative to when charges were filed, I don't

25   know that it's relevant.

1    JUDGE CARTER:  Well, I think, if I could -- you know, the

2  way I understand it, is that it's actually the e-mail

3  correspondence that has a statement about whether or not the

4  Respondents were going to be responding to the information

5  request.

6    And then this letter of January 24 then is the conclusion,

7  if you will, that back and forth about that issue.

8    MR. SHEATS:  Okay.

9    JUDGE CARTER:  So I understand what you're saying in terms

10  of how it may have been characterized or misstated before, but

11  that's my understanding of what the purpose is.  And that's

12  certainly relevant.

13    So am I putting on -- Mr. Bailey on the stand or are we

14  stipulating that these are the e-mails and your cover letter

15  authentic?

16    MR. BAILEY:  We'll stipulate to authenticity, Your Honor.

17    JUDGE CARTER:  Okay.  All right, so they're authentic,

18  then again they can be used as submissions by a party opponent

19  and therefore admissible.  And obviously, the parties can argue

20  the weight that they carry.

21  **(General Counsel's Exhibit 21 received into evidence.)**

22    MR. FURLONG:  We going to include as -- together as an

23  entire GC-21, Your Honor?

24    JUDGE CARTER:  You know, I don't have -- however you want

25  to do it.

1        MR. FURLONG:  I think that makes sense.

2        MR. SHEATS:  It ought to be.

3        JUDGE CARTER:  That's fine.

4        MR. SHEATS:  All right.

5        JUDGE CARTER:  Now, I guess that leaves this January 13th

6   letter which you haven't asked Mr. Bellavigna about, so I don't

7   know if you want to do that or --

8        MR. JAMESON:  Yeah, you can look at it.  It's just mine.

9        JUDGE CARTER:  Because Exhibit 21 has the information

10  request of Mr. Bellavigna, which I guess could be -- that could

11  be addressed to Mr. Bellavigna, this letter here.  Is that your

12  game plan?

13       MR. LEHMANN:  Yes.

14       MR. FURLONG:  I don't have a game plan.  Once it's

15  authenticated in, yes.

16       JUDGE CARTER:  Okay.  We'll take that up.  So that's the

17  last piece of the exhibit that has not been addressed.

18       So with those clarifications and you know, it makes life

19  interesting, but we got there.

20       All right, Mr. Bellavigna?  You can't say your lawyers

21  aren't fighting for you.

22       MR. BAILEY:  "Fighting" is a unique word, Your Honor.

23       JUDGE CARTER:  All right, so Mr. Bellavigna's resumed the

24  stand and we will resume with his testimony.

25  (Whereupon,

1                        **HENRY BELLAVIGNA,**

2      having been previously called as a witness by and on behalf of

3      the General Counsel and, after having been previously sworn,

4      was examined and testified as follows:)

5                  **CONTINUED 611(c) DIRECT EXAMINATION**

6      BY MR. LEHMANN:

7      Q     Okay, so you have documents GC-31 and 32 in front of you?

8      A     Yes, I do.

9      Q     Okay.  And 31(18) asks "A list of all projects performed

10     by Bella to date, listing name of customer and value of

11     contract."

12           And in the submission, in GC-32, you stated, "Campus Road

13     Economy Paving," correct?

14     A     Correct.

15     Q     All right.  And so this is an Ace job that Bella is

16     claiming as theirs?  Correct?

17     A     Why are you saying this is an Ace job?

18     Q     You're the one who testified that this is an Ace job.

19     A     Then I misspoke, it's a Bella job.  I said I must have

20     misspoke, it's here on my letterhead --

21     Q     Okay.

22     A     -- saying that this --

23     Q     Okay.  So I want you to refer to General Counsel Exhibit

24     26.  GC-26, please.

25     A     Yeah.

1  Q    And I had asked you before, so I'm going to ask you again,

2  what employees -- this is your payroll; right?

3  A    Okay, yeah.

4  Q    Okay.  A document you've already said you don't think

5  there's -- you have no belief that -- that there's nothing

6  wrong with this.  Where are the employees listed on your

7  payroll for the Campus Road Economy Paving?

8  A    I don't see them on here.

9  Q    Okay.  All right, so -- so you've got an Ace job that you

10  are claiming to be a Bella job?  They're not -- you don't have

11  any employees on GC-26.

12  A    I don't see them on there.

13  Q    Okay.  Performing work at Campus Road for Economy Paving?

14  A    But that could -- okay.  Yes.

15  Q    Correct?

16  A    Correct, I don't see them on there.

17  Q    And referring you to General Counsel Exhibit 2, third

18  page, the job 11-27, you've already identified as the Economy

19  Paving as the same job that you stated -- that is stated in the

20  position paper, GC-32; correct?

21  **(Witness examined the document.)**

22  A    It appears that way, yes.

23  Q    Okay.  Now, remember the testimony that I asked you about,

24  whether ACP was an Ace contractor or an Ace customer?  You said

25  you couldn't remember?

1  A    Yeah, that's right.

2  Q    Okay.  And then I asked you if there was a time when you

3  did remember and you said no; remember that testimony?

4  A    Yes.

5  Q    Okay.  I'm going to refer you to Number 19 on GC-31 asks,

6  "Whether Bella provided service for any of Ace's customers, if

7  known, and the names of those customers."

8      And your response on General Counsel Exhibit 32 was, "Hale

9  Contracting, ACP, and Frey & Campbell."  Is that correct?

10 A    That's correct.

11 Q    All right.  So ACP was a -- an Ace customer; correct?

12 A    Correct.

13 Q    All right.  And I'm also going to bring your attention to

14 the testimony that you provided earlier on the meeting that you

15 had at Ace on or about October 14th; do you remember that

16 testimony?

17 A    Yes.

18 Q    Six to eight employees?

19 A    Yeah.

20 Q    Okay.  And Robert, your son, is there; right?

21 A    He was at -- he wasn't an employee.

22 Q    No, of Bella.

23 A    Of Bella.

24 Q    I understand that.

25 A    Yeah.

1  Q    That's what your testimony is?

2  A    Yeah.

3  Q    Although the website doesn't reflect that; correct?  The

4  website doesn't reflect that he wasn't an employee at the time?

5       All right, we'll come back to that.

6  A    Yeah.

7  Q    The -- so you have a meeting that you attended, your son

8  attended, your grandson attended and six to eight employees, on

9  or about the 14th; correct?

10  A    Umm-hmm.  Right.

11  Q    Remember that testimony?

12  A    Right.  Yes, I do.

13  Q    All right.  Now, the question on GC-31, Number 29, "Did

14  Henry Bellavigna or Robert Bellavigna tell any Ace employees,

15  including Ace foreman, that they were starting a new company

16  called Bella and asked the employees to work for Bella?  If any

17  of these employees left Bella's employment, what -- what the

18  reason for their departure?"

19       Your answer, "Henry, no.  Bob told Ace employees that Ace

20  was shutting down and that Henry was starting his own company."

21  Is that correct?

22  A    Repeat that.  I didn't --

23  Q    Actually, you don't have --

24       MR. LEHMANN:  I would like the record to reflect that you

25  don't have a document in your hand, okay.

1   BY MR. LEHMANN:

2   Q    General Counsel Exhibit -- which would you like me to

3   repeat?

4        MR. BAILEY:  The question you just asked him.

5        THE WITNESS:  The question you just asked.

6        MR. LEHMANN:  Okay.

7   BY MR. LEHMANN:

8   Q    Well, it was Number 29 from GC-31 --

9   A    GC-31.

10  Q    -- states --

11  A    I've got it in my hand.

12  Q    That's the Questionnaire.

13       JUDGE CARTER:  Let's make sure he has the document that

14  you're referring to.

15       THE WITNESS:  Here's 32 and 31.  Yeah, go ahead.

16  BY MR. LEHMANN:

17  Q    States, "Did Henry Bellavigna or Robert Bellavigna tell

18  any Ace employees, including Ace foremen, that they were

19  starting a new company called Bella and asked the employees to

20  work for Bella.  If any of these employees left Bella's

21  employment, what the reason for their departure?"

22       And your answer was "Henry, no.  Bob told Ace employees

23  that Ace was shutting down and that Henry was starting his own

24  company."  Correct?

25       JUDGE CARTER:  Well, first of all, it's a pretty -- the

1   response that you're referring to is in Exhibit 32; correct?

2       MR. LEHMANN:  Correct.

3       JUDGE CARTER:  And so where is it located in that exhibit,

4   so he can refer to it?

5       MR. LEHMANN:  Page --

6       MR. JAMESON:  Five or six in, Your Honor.

7       MR. LEHMANN:  Page 4 or 5.

8       MR. JAMESON:  Sixth.  The answer to 29 is on the sixth

9   page of GC-32.

10      MR. LEHMANN:  Page 6.

11      THE WITNESS:  Okay, now, what's your question?

12  BY MR. LEHMANN:

13  Q   Okay, question from GC-31 and your answer was, which is

14  indicated on GC-32, "Henry, no.  Bob told Ace employees that

15  Ace was shutting down and that Henry was starting his own

16  company."  That's what you stated; correct?

17  A   That's what I stated, correct.

18  Q   All right.

19  **(Pause.)**

20      Another job that you had for Bella is Basic Science, Frey

21  & Campbell -- or Basic Science, and the customer was Frey &

22  Campbell?  Fry and Campbell.

23  A   Fry and Campbell.

24  Q   Is that correct?

25  A   That's correct.

1  Q    Okay.  And can you look on Bella's payroll, GC-26, and I

2  can't find employees who performed the work at that job, but I

3  might be missing something.  So can you look through General

4  Counsel's Exhibit 26, Bella's time card list, and see if you

5  can find Basic Science, which was the Frey & Campbell job.

6  **(Witness examined the document.)**

7  A    I don't see them on there, either.

8  Q    Okay.  Is this another job that -- Basic Science was

9  another Ace job; correct?  This was an Ace job, Basic Science?

10  A    Is it on my list?

11       MR. BAILEY:  The sixth page in.

12       THE WITNESS:  Basic Science.  What do you mean it was

13  another Ace job?

14  BY MR. LEHMANN:

15  Q    I'm asking you, that was an Ace job, just like Campus Road

16  was an Ace job, Basic Science was an Ace job?

17  A    It's on this list, so -- and this was prepared by Melissa.

18  I'll guess you'll have to ask her what mistakes she made here.

19  Q    Well, we'll -- when the time comes --

20  A    Yes.

21  Q    -- we'll ask Melissa.

22  A    Yeah.

23  Q    Ms. Blanchard.  But I'm asking you, Campus Road is also on

24  this list.  You've testified --

25  A    I started --

1    Q    -- that's an Ace -- sir?

2    A    I see it.

3    Q    Campus Road is on the list.

4    A    Yeah.

5    Q    And you've testified that that's an Ace job, okay.

6         Basic Science, you -- you've looked and you've reviewed

7    the payroll records or the payroll list and you can't find --

8    A    I can't find it on there.

9    Q    -- any employees who are working the Basic Science job.

10   And my question to you is that the Basic Science job is an Ace

11   job; correct?

12   A    No, I don't know if there's a mistake made in this

13   paperwork.

14   Q    Okay.  But you've testified that you didn't think there

15   was anything -- that there was nothing that would give rise

16   that there -- that this record, the Bella record, the time

17   card, was anything but accurate; right?  You've already

18   testified to that.

19   A    It should be correct.

20   Q    That's right.

21   A    But, it's got to be checked out.

22   Q    Okay.  And you said that we're going to have to ask Ms.

23   Blanchard --

24   A    Yeah.

25   Q    -- and of course, if the time comes we will.  But you also

1  indicated that Ms. Blanchard is accurate; correct?  What she

2  does?

3  A    Yes, she is.

4  Q    Right.  And she's got an eye for detail?

5  A    Yeah.  But everybody makes mistakes.

6  Q    Okay.

7  **(Pause.)**

8      So looking at General Counsel's Exhibit -- the position

9  paper, 32, page 6, and reviewing 18, Number 18, "Contracts,"

10  okay, starting from the top, Campus Road; that was an Ace job;

11  correct?

12  A    No.  Like I said, it could be a mistake.  I don't know.  I

13  guess -- check it out.

14  Q    Okay.  You said that about Basic Science.

15  A    Yes.

16  Q    And you testified that Campus Road was an Ace job.  And

17  you said that --

18  A    I said I can't find it on this thing.

19  Q    That's right.  And then when I asked --

20  A    But that doesn't make either one of them right.  It's got

21  to be checked out.  It could be a mistake.

22  Q    Okay.

23  A    Okay.

24  Q    And then when I asked you, you stated that Campus Road was

25  an Ace job when you said -- when I asked "Correct," you said

1    "Yes."  And then --

2        MR. BAILEY:  So why are we asking it again, then?

3    BY MR. LEHMANN:

4    Q    And then we referred to General Counsel Exhibit 2 and you

5    said, referring to the job 11-27, that is the Campus Road

6    Economy Paving job.  That is your testimony?  That was your

7    testimony.

8    A    Well, then it was wrong.  Okay?

9    Q    Okay.  Just like the misrepresentations on the website;

10   correct?

11   A    Yes.

12   Q    Okay.  All right, moving down, Trumans Methodist Church.

13   A    Trumansburg Methodist Church, yes.

14   Q    A Bella job?

15   A    Yes.

16   Q    Basic Science, we're not sure.  You have no employees that

17   are working --

18   A    Not listed there.

19   Q    -- that are working for Basic Science?

20   A    Yeah.

21   Q    Chesapeake Office; Bella job?

22   A    Bella job.

23   Q    All right.  Trinity Episcopal.

24   A    Bella job.

25   Q    From Ace; right?

```
 1   A    Right.

 2   Q    Okay.  Vestal Hills.

 3   A    Yeah, Bella job.

 4   Q    Okay.  T&M Wegmans.

 5   A    Yeah, Bella job.

 6   Q    Bella job?  What is "T&M" stand for?

 7   A    Time and material.

 8   Q    Time and material?

 9   A    Yes.

10   Q    Okay.  And the ERCF-T&M --

11   A    Yeah.

12   Q    -- that Cornell?

13   A    That's Cornell, yeah.

14   Q    Okay.  That's the job that was Union only that you bid on,

15   that you got, and then transfer over or subbed to Ace --

16   A    Ace.

17   Q    -- Correct?

18   A    Correct.

19   Q    All right.  And T&M Alice Street?

20   A    Yeah.

21   Q    ACP?

22   A    ACP.

23   Q    That's a Bella job?

24   A    That's a Bella job.

25   Q    And then the BSC punch list T&M.
```

1   A     That's a Bella job.

2   Q     That's a Bella job, but it was subbed from Ace?

3   A     Correct.

4   Q     And Ithaca Town Hall --

5   A     Yes.

6   Q     By the way, that "BSC," that's the -- what does the "BSC"

7  stand for?  That's the S.U.N.Y. Binghamton job?

8   A     S.U.N.Y. Binghamton job.

9   Q     Okay.  And then the Ithaca Town Hall.

10   A     Yes.

11   Q     Bella job?

12   A     Bella job.

13   Q     But Ace had performed work on that; correct?

14   A     Correct.

15   Q     And that's the same job that Mr. Tracy was working on

16  October 18th, 19th and 20th for Bella Masonry; correct?

17   A     It appears that way.

18   Q     Okay.  And that was the same job, Ithaca Town Hall, that

19  Ace claims it had until --

20   A     21st of October.

21   Q     -- October 21st.

22   A     Yeah.

23   Q     Of 2011.

24   A     Yeah.

25   Q     Okay.  And in fact, Mr. Tracy was still employed with Ace

1   at the time; correct?

2   A    I don't know.

3   Q    In October of 2011, Mr. Tracy was employed with Ace?

4   A    That's what Ace paperwork said.  I'm saying he worked with

5   us according to this paperwork.

6   Q    Okay.  Let's go to the Vestal Hills job.  Remember that

7   job?

8   A    Yeah.

9   Q    Now, where is Vestal Hills?  Where is -- where was the job

10  located?

11  A    Down in Owego.

12  Q    Down in Owego?

13  A    Yes.

14  Q    That's the county?  Is it near Binghamton?

15  A    Yeah, it's near Binghamton, yeah.

16  Q    And you used Ace equipment on this job; correct?

17  A    I rented, leased Ace equipment, yes.

18  Q    Okay.  From Ace?

19  A    From Ace.

20  Q    And Pooler was the --

21  A    General contractor.

22  Q    Excuse me?

23  A    Pooler was the general contractor.

24  Q    Okay.  Now do you remember how employees -- did you tell

25  employees to go to Vestal Hills?

1  A    Did I tell employees to go to Vestal Hills?

2  Q    Yeah.

3  A    Yes.

4  Q    Okay.  Nobody else told them to go to Vestal Hills?

5       MR. BAILEY:  Calls for speculation.

6       JUDGE CARTER:  You can answer if you know.

7       THE WITNESS:  Not that I -- not that I'm aware of.

8       MR. LEHMANN:  Okay.

9  **(Pause.)**

10 BY MR. LEHMANN:

11 Q    Now, I just want to make sure your testimony; your

12 testimony is that your son is not employed with Bella on

13 October 4, 2011; correct?

14 A    Correct.

15 Q    Okay.  And --

16 **(General Counsel's Exhibit 33 marked for identification.)**

17 BY MR. LEHMANN:

18 Q    Showing you what's been marked as General Counsel Exhibit

19 33.  Do you recognize this document?

20 A    Yes.

21 Q    And this is the -- this is -- well, why don't you tell us

22 what General Counsel's 33 is.

23 A    Subcontractor agreement.

24 Q    With who?

25 A    With Pooler.

1  Q    For what job?

2  A    For the Vestal Hills project.

3  Q    Okay.  And that's the project down in Binghamton?

4  A    That's correct.

5  Q    Okay.  And --

6      MR. LEHMANN:  All right, I would offer 33.

7      MR. FURLONG:  No objection.

8      MR. JAMESON:  No objection.

9      MR. BAILEY:  No objection, Your Honor.

10     JUDGE CARTER:  Mr. Bellavigna, just to be clear, this

11 is -- is this your signature at the bottom of the first page?

12     THE WITNESS:  That -- that is.

13     JUDGE CARTER:  Exhibit 33 for General Counsel admitted

14 without objection.

15 **(General Counsel's Exhibit 33 received into evidence.)**

16 BY MR. LEHMANN:

17  Q    Okay, now, I'm going to refer you to the second page.

18  A    Umm-hmm.

19  Q    The handwritten up top, at the top there, under your

20 letterhead, it's handwritten "bob.bellavigna@gmail.com" right?

21  A    I see it up there, yeah.

22  Q    Okay.  Okay, and the date of the letter is September 28,

23 2011; correct?

24  A    Umm-hmm.

25  Q    In fact, if you actually look at the date --

```
 1       JUDGE CARTER:  Before we move on, was that a "Yes"?
 2       THE WITNESS:  Yes.
 3  BY MR. LEHMANN:
 4  Q    In fact, if you look at the date, looks like the "8" was
 5  handwritten in, as opposed to typed; correct?
 6  A    Correct.
 7  Q    Okay.  And you -- you signed this subcontracting
 8  agreement; right?
 9  A    I signed the contract, yes.
10  Q    Right.  And you submitted the Bella Masonry bid, scope of
11  work; right?
12  A    Yes.
13  Q    Okay.  And do you have any idea how the "8" got changed
14  from a typewritten to a handwritten "8"?
15  A    No, I don't remember.  I'm just -- look, it's on every
16  page.
17  Q    It is on every page.  It's on at least the first --
18  A    It's on the first -- yeah, it's on every page, the date.
19  Q    Okay.  Now, the --
20  A    I'm just trying to --
21  Q    You've seen this document before; correct?
22  A    I've never noticed the dates being changed or -- I'm just
23  trying to remember some of these things because some of the
24  things have been changed and I'm trying to, like, the third
25  page included -- and it looks like somebody initialed and it
```

1    changed it and put a date.  I just --

2       I initialed each one down at the bottom so I got to say to

3    myself that I must have reviewed it.

4    Q    Right.

5    A    There's just some handwriting on this that's different

6    than -- it's not mine.  There's some that is but --

7    Q    Okay.  If I bring you -- your attention to page 4, also,

8    where it's "Sincerely."  This form, starting with the

9    masonry -- underneath "Bella Masonry" starting with "Masonry

10   quotation" for whatever, and then it has in bold "Price for

11   foundation block."  And then it has "Sincerely" and a

12   signature.  This was Ace's form; correct?

13       JUDGE CARTER:  I just want to make sure I'm on the right

14   page.  This page 4 of the exhibit?

15       MR. LEHMANN:  Page 4 of the exhibit.

16       JUDGE CARTER:  And so it has the price for the foundation

17   block in an elevator?

18       MR. LEHMANN:  Right.  And my question is -- or --

19       THE WITNESS:  Oh, you mean --

20       MR. LEHMANN:  -- was is that this is --

21       THE WITNESS:  Which for, this up here or down at the

22   bottom, that "4"?

23       MR. BAILEY:  I think it's the "4" on the bottom of the

24   page.

25       THE WITNESS:  The bottom of the page.  Yeah.  What are you

1    telling me -- asking me now?

2    BY MR. LEHMANN:

3    Q    All right, it appears, you would agree with me, on page 4

4    of our document, GC-33, it appears that above "Bella Masonry"

5    there was something there that was redacted or taken out;

6    correct?

7    A    There's something over it, yeah.

8    Q    There was something that was removed or --

9    A    No, it's just not -- it's light.  There's something

10   written in there.

11   Q    Okay.  All right.  Do you -- you've seen -- now, I'm

12   staying with page 4, you've seen this format before; correct?

13   A    The format before?

14   Q    Yeah.

15   A    Yeah.  What about it?

16   Q    You said "Yes" to that?

17   A    Yes.

18   Q    Okay.  And because -- and this is the same format that Ace

19   Masonry used in 2011?

20   A    It could be.

21   Q    Okay.  Let's back up.  I asked you if you've seen this

22   format and you said yes.  Where have you seen this format?

23   A    I'm talking right here.  I'm looking at it.

24        Would you ask me if it was an Ace format?  No.

25   Q    Okay.

```
 1   A    Could it be?  It possibly could.  Maybe it was.

 2   Q    Okay.

 3   A    It's just a plain format.  It's just --

 4   Q    Okay.  Mr. Bellavigna?

 5   A    Yes.

 6   Q    You -- for Ace --

 7   A    For Ace.

 8   Q    -- you were the chief estimator; correct?

 9   A    Yeah.

10   Q    Okay.  And you have made masonry quotations before;

11   correct?

12   A    Absolutely.

13   Q    Absolutely.  And so you know what Ace's format is when you

14   provided a masonry quotation for Ace Masonry; correct?

15   A    There isn't always the same format that one estimator does

16   from the other.

17   Q    Okay.

18   A    A lot of them will change in the letter, and who typed it

19   up for me.

20   Q    Okay.  I'm on -- understand that completely.  But I'm

21   talking about you sir.

22   A    Yes.

23   Q    The format that you used for Ace Masonry --

24   A    Yeah.

25   Q    -- okay?
```

1   A    Looks like a Bella format, yes.

2   Q    Looks like an Ace format?

3   A    An Ace format, yes.

4   Q    An Ace format?

5   A    Yes.

6   Q    Correct.

7   A    Yes.

8   Q    Now, I'm bringing your attention down to the bottom where

9   it says "Bella Masonry, LLC."

10  A    Correct.

11  Q    And it looks like something was there first and "Bella"

12  went -- was -- went over it; correct?

13  A    No.

14  Q    Okay.  All right, turning to page 2.

15  A    Yes.

16  Q    Under your -- under the heading, the "Bella Masonry," it's

17  handwritten "bob.bellavigna@gmail.com," correct?

18  A    Yeah.

19  Q    That's your son's e-mail address; correct?

20  A    I don't know.

21  Q    You don't know?

22  A    I -- no, I don't know his e-mail address.

23  Q    Okay.

24  A    I don't do e-mails.

25  Q    All right.  You sent this on September 28, 2011; correct?

1    If you look at the top of page 2?

2    A    Yeah.  Yeah, that's the date.

3    Q    It says that.

4    A    Umm-hmm.

5    Q    And this is your document, this is your -- Bella Masonry,

6    and the cross out -- "1" is crossed out, "3" has handwriting,

7    that's your handwriting.

8    A    No, it's not.

9    Q    That's not your handwriting?

10   A    That's not my handwriting.  Or either this is "bob" there,

11   that's not my handwriting.  That's what I'm saying.  On page 3,

12   that's not my handwriting.

13   Q    On page 3 that's not your handwriting?

14   A    No, that's not my handwriting.

15   Q    Okay.

16   A    It's got -- somebody else signed it and dated it.  That's

17   not my handwriting.

18   Q    How about page 4?

19   A    Page 4.

20   Q    "Start October 17th."

21   A    No, that's not my handwriting.

22        You want to see my handwriting?  Go to page 5 and down

23   there -- x-billing, 100 percent, bu-da-ba-da, that's my

24   handwriting.

25   Q    That's your handwriting?

```
 1   A     That's my handwriting.  The other is not my handwriting.

 2   Q     Okay.  So who was employed --

 3   A     What's that?

 4   Q     -- with Bella Masonry on September 28, 2011?  Who was

 5   employed by Bella Masonry on September 28, 2011?

 6   A     I was.

 7   Q     Anyone else?

 8   A     No.

 9   Q     Okay.  So who else's --

10   A     I don't know.  That's what I'm saying to you.  That's not

11   my handwriting.

12   Q     Do you recognize this document?

13   A     I recognize the document, but that's --

14   Q     You've seen this document?

15   A     -- not my handwriting.

16   Q     And on --

17   A     There's some of this been added and changed on there.

18   Now, some of them have even been signed.

19   Q     Okay.  You --

20   A     And a little date next to it.

21   Q     All right.  You started the Vestal job prior to December

22   2011; correct?

23   A     Yes.

24   Q     Okay.  And --all right.  The Vestal Hills job, you told

25   the employees to go to that job?
```

1    A    Yes, I did.

2    Q    All right.  The employees that you sent to Vestal Hills,

3    did they fill out employment applications?

4    A    Yes.  Absolutely.

5    Q    And you provided that --

6    A    Yes.

7    Q    -- through the subpoena?

8    A    If it was asked, yes.

9    Q    Okay.  And you had the employees who worked at that -- on

10    the Vestal Hills project, did you have any discussion with them

11    on their wage rates?

12    A    I had a meeting with the people at Vestal Hills and -- I

13    had a meeting -- two meetings with the employees in October.  I

14    think was around the 18th, one around the -- about a week later.

15    Maybe it was the 14th and 24th, somewhere in there.  I had it a

16    couple weeks apart.  And once I had them sign, everyone that

17    was there sign a piece of paperwork saying on a prevailing wage

18    rate job you will be paid the prevailing wage rate, whatever it

19    was, depending where it was.  And other than that this is what

20    you're going make if we're not on a prevailing wage rate.

21    Q    Okay.  And other than that -- and that document also

22    included the Union rate?

23    A    Also included -- there was prevailing wage rate.

24    Q    Right.

25    A    And an open-shop rate.

1  Q    That was an open-shop rate?

2  A    Yeah.  There was two for --

3  Q    Okay.  All right, so you -- tell me about the -- now, are

4  you -- you said the October 14th date?

5  A    Yeah, I'm shooting dates.  Somewhere about that time in

6  October and one a couple, a week and a half or so later.

7  Q    Okay.  And the October 14th date, that was the meeting that

8  you had at Ace?

9  A    No, no, this was the meeting I had at my office.

10 Q    October 14th?

11 A    October whatever the date was.  I shouldn't speak out of

12 there.  And you have -- should have a copy of the affidavits, I

13 think, where they signed and it should have the date.

14 Q    Okay.  And we might get to that if I have it.

15 A    Okay.

16 Q    But I'm asking you, you just testified about two

17 meetings --

18 A    I had two meetings, and I won't give you -- in October.

19 Q    Two meetings in October?

20 A    October.

21 Q    Fair enough.  The first meeting in October, where was

22 that?

23 A    I had one meeting that was in Ace's office, okay.  And

24 then I had two meetings, sit-down meetings in my office.

25 Q    Okay.  So there were three?

1   A    Yes.

2   Q    All right.

3   A    The first thing was to get together, seeing if they were

4   even, you know, like I said, if they were willing to work for

5   Bella.

6   Q    Okay.  And just so that the record is clear --

7   A    Yes.

8   Q    -- this is the same meeting that you, when you submitted

9   in the position paper --

10  A    Yeah.

11  Q    -- you stated "Henry, no," meaning you weren't there, you

12  didn't talk to the employees about starting Bella, it was --

13  A    I was there.  I didn't say I spoke to them.  I was there.

14  Q    So you were at a meeting?

15  A    Yeah.  And --

16  Q    At Ace?

17  A    Yeah.  And Bob said that Henry's going to start a new

18  company, are you interested in working with him.

19  Q    Okay.

20  A    Yeah.

21  Q    So Bob is --

22  A    And it didn't go --

23  Q    -- speaking on behalf of Bella Masonry --

24  A    No, he's not.

25  Q    -- on October 14th?

1  A    No, he was in his office.

2  Q    Okay.  Let's to the -- now, it will be this second

3  meeting.  You said there were three meetings in October.

4  A    There was -- yeah.

5  Q    The second meeting --

6  A    Yeah.

7  Q    Where was the second meeting?  You said in your office?

8  A    In my office.

9  Q    What office?

10  A    Only had one office, in my home.

11  Q    Okay.  That's your home office?

12  A    Yeah.

13  Q    And you don't remember when it was in October?

14  A    No.  I don't.

15  Q    Okay.

16  A    I know there was two meetings.

17  Q    All right.

18      JUDGE CARTER:  All right, we're going to have to put a

19  pause here because we've reached the kick-out time for the

20  building.

21      MR. BAILEY:  The witching hour.

22      JUDGE CARTER:  So we'll have to stop there.

23      Okay, Mr. Bellavigna, you're going to be taking a break

24  with your testimony.  You're free to discuss other matters over

25  the course of the evening, but not the case.

1        THE WITNESS:  Okay.

2        JUDGE CARTER:  So we'll go off the record and pick it up

3   at 8:30 tomorrow.

4        Off the record.

5   **(Whereupon, at 1:15 p.m., the hearing in the above-entitled**

6   **matter was closed.)**

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 316
Wayne, New Jersey 07470
(973) 692-0660

## C E R T I F I C A T E

This is to certify that the attached proceedings done before the NATIONAL LABOR RELATIONS BOARD REGION THREE

In the Matter of:
**ACE MASONRY, INC., d/b/a ACE UNLIMITED and BELLA MASONRY, LLC, alter egos,**

and

**INTERNATIONAL UNION OF BRICKLAYERS and ALLIED CRAFTWORKERS, LOCAL NO. 3,**

and

**LABORERS INTERNATIONAL UNION LOCAL NO. 785,**

and

**NORTHEAST REGIONAL COUNCIL OF CARPENTERS.**

Case No.   3-CA-073540, 3-CA-074523, 3-CA-073549
           3-CA-074531, 3-CA-079606

Date:      July 31, 2012

Place:     Albany, New York

Were held as therein appears, and that this is the original transcript thereof for the files of the Board.

_____
          Official Reporter

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 316
Wayne, New Jersey 07470
(973) 692-0660

**BEFORE THE**

**NATIONAL LABOR RELATIONS BOARD**

In the Matter of:

**ACE MASONRY, INC., d/b/a ACE** **Case No.** **3-CA-073540**
**UNLIMITED and BELLA MASONRY,** **3-CA-074523**
**LLC, alter egos**

and

**INTERNATIONAL UNION OF**
**BRICKLAYERS AND ALLIED**
**CRAFTWORKERS, LOCAL 3,**

and

**LABORERS INTERNATIONAL UNION,** **3-CA-073549**
**LOCAL 785,** **3-CA-074531**

and

**NORTHEAST REGIONAL COUNCIL OF** **3-CA-079606**
**CARPENTERS**

The above-entitled matter came on for hearing pursuant to

Notice, before **GEOFFREY L. J. CARTER**, Administrative Law Judge,

at Ithaca City Hall, 108 East Green Street, 2nd Floor Conference

Room, Ithaca, New York, on Wednesday, August 1, 2012, at

9:00a.m.

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 316
Wayne, New Jersey 07470
(973) 692-0660

<u>**A P P E A R A N C E S**</u>

**On Behalf of the General Counsel:**

      GREGORY LEHMANN, ESQUIRE
      BRIE KLUYTENAAR, ESQUIRE
      National Labor Relations Board, Region
      Albany Resident Office
      Leo W. O'Brien Federal Building, Room 342
      Clinton Avenue & North Pearl Street
      Albany, New York 12207

**On Behalf of the Respondent:**

      JASON B. BAILEY, ESQUIRE
      Sheats & Bailey, PLLC
      P.O. Box 820
      9650 Brewerton Street
      Brewerton, New York 13029

**On Behalf of the Charging Party:**

      RICHARD D. FURLONG, ESQUIRE
      Lipsitz, Green, Scime, Cambria, LLP
      42 Delaware Avenue
      Buffalo, New York 14202

      CURTISS T. JAMESON, ESQUIRE
      Kroll, Heineman, Carton, LLC
      Metro Corporate Campus 1
      99 Wood Avenue South, Suite 307
      Iselin, New Jersey 08830

**I N D E X**

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---------|--------|-------|----------|---------|-----------|
| HENRY BELLAVIGNA | 474 | -- | -- | -- | -- |
| (recalled) | 493 | 560 | 562 | -- | -- |
| | | | | | |
| RICHARD TRACY | 568 | -- | -- | -- | -- |
| | 568 | -- | -- | -- | -- |
| | 587 | 599 | 609 | 610 | -- |
| | | | | | |
| SCOTT SMITH | 613 | -- | -- | -- | -- |
| | 622 | -- | -- | -- | -- |
| | | | | | |
| MELISSA BLANCHARD | 629 | -- | -- | -- | -- |
| | 670 | -- | -- | -- | -- |
| | 695 | 701 | 704 | -- | -- |
| | -- | -- | 705 | -- | -- |
| | | | | | |
| ROBERT BELLAVINA | 708 | -- | -- | -- | -- |

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 316
Wayne, New Jersey 07470
(973) 692-0660

## E X H I B I T S

| EXHIBIT NUMBER | IDENTIFIED | RECEIVED |
|---|---|---|
| GENERAL COUNSEL'S | | |
| GC-21 | -- | 560 |
| GC-28 | -- | 512 |
| GC-34 | 478 | 480 |
| GC-35 | 480 | 488 |
| GC-36 | 574 | 575 |
| GC-37 | 743 | 745 |
| RESPONDENT'S | | |
| R-1 | 600 | -- |
| CHARGING PARTY'S | | |
| CP-5 | 595 | 597 |
| CP-6 | 706 | 707 |

1

1                    P R O C E E D I N G S

2                              (Time Noted: 8:40 a.m.)

3       ADMINITRATIVE LAW JUDGE CARTER:  On the record.

4       We're recalling the case of Ace Masonry, Incorporated,

5   doing business as Ace Unlimited and Bella Masonry, LLC, alleged

6   alter egos, Case Numbers 3-CA-73540, 74523, 73549, 74531 and

7   79606.  This is a matter before the National Labor Relations

8   Board, Administrative Law Judge Jeff Carr presiding.

9       Let's go ahead and take the appearances.

10      MR. LEHMANN:  Greg Lehmann for acting General Counsel.

11      MS. KLUYTENAAR:  Brie Kluytenaar for acting General

12  Counsel.

13      MR. FURLONG:  Richard Furlong for Charging Party for

14  Laborers Local 3 and Laborers Local 785.

15      MR. JAMESON:  Curtiss Jameson for the Carpenters.

16      MR. BAILEY:  Jason Bailey for the Employers.

17      JUDGE CARTER:  Any procedural matters before you resume

18  with the witness?

19      MR. LEHMANN:  No, Your Honor.

20      JUDGE CARTER:  Okay.  All right, we'll go ahead and

21  presume with Mr. Belavigna's testimony and further questions

22  from the acting General Counsel.

23  Whereupon,

24                    **HENRY BELLAVIGNA,**

25  having been previously sworn, was recalled as a witness and

1   testified as follows:

2       MR. LEHMANN:  Yes.

3           **CONTINUED DIRECT EXAMINATION 611(c)**

4   BY MR. LEHMANN:

5   Q    You are familiar with the Basis Science job, correct?

6   A    Correct.

7   Q    And where was the Basis Science job performed?

8   A    Cornell University.

9   Q    And was that also a union only contract?

10  A    No.

11  Q    Okay.  Do you remember when the job was performed?

12  A    Exact date, no, I do not.  I should be in the records

13  though.

14  Q    Do you know which employees worked there?

15  A    Not without looking at the time cards.

16  Q    Okay.  I refer you to General Counsel Exhibit 26, and

17  could you look through the time cards and tell me which

18  employees worked at the Basic Science Center?

19  **(Pause)**

20      THE WITNESS:  I don't see them listed here.

21  BY MR. LEHMANN:

22  Q    You don't see any employees listed there?

23  A    I don't see them listed.

24  Q    For the Basic Science job?

25  A    No.

1    Q     Do you remember your first job as Bella Masonry?

2    A     No, no, there's been too many jobs.

3    Q     Excuse me?

4    A     No, I do not.  There's been too many jobs.

5    Q     Okay.  I'm going to refer you to General Counsel Exhibit

6    32, and direct your attention to the fourth page, number 18.

7    **(Pause)**

8    BY MR. LEHMANN:

9    Q     Those 11 jobs listed were the only jobs as of March, 2012,

10   correct?

11   A     If that's what it states, yes.

12   Q     Okay.  General Counsel Exhibit 31, number 18 states, "A

13   list of all projects performed by Bella to date", listing name

14   of customer and value of contract.  General Counsel's 31 is

15   dated February 28th, so as of February 28, 2012 you've only had

16   11 projects, correct?

17   A     That's what this says, but I didn't prepare this, Melissa

18   --

19   Q     Okay, but that's what that says, correct?

20   A     Yes.

21   Q     Okay.  And which of these 11 jobs was your first job?

22   A     I don't remember which was the first job.

23   Q     Okay.  Take a moment and look at the list --

24   A     I'm looking; I don't remember which was the first job.

25   **(Pause)**

1    BY MR. LEHMANN:

2    Q    You're familiar with purchase order forms?

3    A    Yes, I am.

4    Q    Okay.  And you use them when you purchase items?

5    A    Hopefully, most of the time, sometimes the guys in the

6    field forget them, but we try to keep after them with it.

7    Q    Okay.  But when you use them it's to purchase items?  When

8    you personally -- have you personally used the purchase order?

9    A    No, no.

10   Q    You've never used the purchase order?

11   A    I might have wrote up a purchase order --

12   Q    Okay.

13   A    -- yes, but I'm saying, no, generally Melissa would use

14   the purchase order when she's talking to the supplier.

15   Q    Okay.  Well, let's stay with you personally.

16   A    Yes.

17   Q    You've filled out purchase order forms?

18   A    I have.

19   Q    Okay.  And it's to purchase items?

20   A    To purchase items.

21        MR. BAILEY:  Do you mean with Ace or Bella or either?

22        MR. LEHMANN:  Let's stay with Ace.

23   BY MR. LEHMANN:

24   Q    You use purchase order forms for Ace?

25   A    Yes.

1   Q    Okay.  And it was to purchase items for Ace?

2   A    Yes.

3   Q    Okay.  I mean, that's the -- all right, strike that.

4        Now, with Bella have you used the purchase order form for

5   Bella?

6   A    Yes.

7   Q    Okay.  And is there any other reason why you would use a

8   purchase order form, or is the only reason really to use it for

9   the purchasing of items?

10  A    Purchasing.

11  Q    Purchasing items?

12  A    Yes.

13  Q    Okay.

14  **(Pause)**

15       MR. LEHMANN:  Can I have just a moment?

16       JUDGE CARTER:  Okay.  Off the record.

17            **(Whereupon, a brief recess was taken.)**

18  **JUDGE CARTER:  Back on the record.**

19       Further questions?

20       MR. LEHMANN:  Yes.

21  BY MR. LEHMANN:

22  Q    You -- you're the estimator for Bella?

23  A    Yes, I am.

24  Q    Okay.  And you -- you've -- you bid on -- you have job

25  bids?

```
 1   A     Yes, I have.

 2   Q     Okay.  And you bid jobs in access of 170,000, correct?

 3   A     Correct.

 4   Q     Many, right?

 5   A     Yes.

 6   Q     Okay.  In excess of 500,000?

 7   A     Some.

 8   Q     Okay.  In excess of a million dollars?

 9   A     Possible, I can't remember exactly, it could be, yes.

10   Q     Okay.  So -- all right.

11   (Pause)

12         (General Counsel Exhibit 34 marked for identification.)

13         MR. LEHMANN:  I'm showing you what's been marked as

14   General Counsel Exhibit 34.

15                    (Witness reviews document.)

16   BY MR. LEHMANN:

17   Q     Do you recognize these?

18   A     Yes, I do.

19   Q     And what are they?

20   A     They are bid quotes for different projects.

21   Q     Okay.  For --

22   A     For Bella Masonry.

23   Q     Okay.

24         MR. LEHMANN:  I'd offer General Counsel Exhibit 34.

25         JUDGE CARTER:  No objection?
```

1      MR. JAMESON:  No objection.

2      JUDGE CARTER:  General Counsel 34 for acting General

3 Counsel admitted without objection.

4      **(General Counsel Exhibit 34 received in evidence.)**

5      MR. LEHMANN:  Your Honor, we should note how many pages

6 are on that Exhibit I think.  There are two, three, four, five

7 pages.

8      JUDGE CARTER:  It's a five page exhibit.

9 BY MR. LEHMANN:

10 Q    Yesterday we left off when you were testifying about three

11 meetings, correct?  In October of 2011, do you remember that

12 testimony?

13 A    Yes.

14 Q    Okay.  And do you remember the dates of these meetings?

15 A    No, I don't.

16 Q    Okay.  Still in October of 2011?

17 A    As far as I remember it was all October.

18 Q    Okay.  And at any of these meetings did employees sign

19 anything?

20 A    Yes, they did.

21 Q    Okay.

22 **(Pause)**

23 BY MR. LEHMANN:

24 Q    Now, did you have the employees sign the forms before they

25 began working for you?

```
 1    A    No, they had already been working.

 2    Q    Okay.

 3         (General Counsel Exhibit 35 marked for identification.)

 4         MR. LEHMANN:  I'm showing you what's been marked as

 5    General Counsel Exhibit 35.

 6    BY MR. LEHMANN:

 7    Q    Do you recognize these documents?

 8    A    Yes.

 9    Q    This is a five-page document?

10    A    Yes, it is.

11    Q    Okay.  And these employees -- this is Bella Masonry?

12    A    This is for Bella Masonry.

13    Q    These are the rates for -- that Bella Masonry paid these

14    employees?

15    A    Yes.

16    Q    Okay.

17         MR. LEHMANN:  I'd offer GC-35.

18         JUDGE CARTER:  No objection?

19         MR. JAMESON:  No objection.

20         MR. BAILEY:  Just a little more, Your Honor, just a simple

21    question.  What is it?  He didn't even establish that.'

22         JUDGE CARTER:  He's making a procedural point about the

23    predicate for having it admitted into evidence.

24         MR. LEHMANN:  Your Honor, I'm going examine the Witness

25    about the wage rates, and that's how they ended up working for
```

1  Bella Masonry.

2      JUDGE CARTER:  You'll get there.  I think it's just a

3  matter of asking -- you know, as a way to kind of complete the

4  record as a predicate for getting it admitted.

5      MR. LEHMANN:  Okay.

6      JUDGE CARTER:  And there are a couple of ways to do that,

7  I mean, generally speaking you would want to ask the Witness

8  whether this is a clear and accurate representation of what was

9  used by Bella.

10     MR. LEHMANN:  Okay.

11 BY MR. LEHMANN:

12 Q    You recognize this document, right?

13 A    Yes, I do.

14 Q    Okay.  And did you see -- taking for example the first

15 page, Mr. Bell, did you see Mr. Bell sign this?

16 A    Did I see Mr. Bell sign it?  Yes, I did.

17 Q    Okay.  And you've reviewed this document with Mr. Bell?

18 A    I reviewed the document with Mr. Bell, yes.  It was talked

19 about in front of everybody that was at the meeting.

20 Q    And does this document accurately reflect the document

21 that you provided to Mr. Bell that he signed?

22 A    The document I supplied to him?  I don't remember

23 supplying anything to him other than what he signed.

24 Q    Just this, right?

25 A    Yes.

1   Q    Okay.

2   A    For the project they were on at the time.

3   Q    Okay.  And what project was that?

4   A    It was a combination of a couple at that time.  I stated

5   earlier that there was two meetings, the first meeting that --

6   the second meeting that was scheduled it came up that some of

7   the guys could not attend because the project held them up so

8   it wasn't much of a meeting, we waited till the third meeting

9   and had most of the people there.

10  Q    Okay.  I only asked you what document this was --

11  A    Yeah.

12  Q    -- what job they were working on when you had them sign

13  this job --

14  A    They were on several jobs.

15  Q    Mr. Bell was on several jobs at this time?

16  A    The day -- are you asking the day he signed this what job

17  he was on?

18  Q    Yeah, yeah.

19  A    I don't remember.

20  Q    Okay.

21  A    You have payroll records --

22  Q    Okay.

23  A    -- that would reflect that.

24  Q    You only had 11 jobs, right?

25  A    People move -- sometimes they could move to two jobs on

1   the same day by one of the foremen, I don't know.

2   Q    Okay.  And where was this third meeting?

3   A    At my office.

4   Q    And your office is located where?

5   A    Burdett, New York.

6   Q    Okay.  So you had employees -- and were all these

7   employees at your office in Burdett?

8   A    Yes, they were.

9   Q    For the third meeting?

10  A    Yes.

11  Q    All these employees were there?

12  A    These employees.

13  Q    They were all there?

14  A    Yes.

15  Q    And the rates on here, for instance Randy Bell, 3178, do

16  you know how these rates came about?

17  A    There were an agreed upon rate.

18  Q    Okay.  Do they look familiar to you?

19  A    Yes.

20  Q    Do you recognize the rates?

21  A    Yes.

22  Q    And they're union rates, right?

23  A    They are rates that I agreed on.

24  Q    Okay, that's not the question though.  The question is

25  they're union rates, right?

1  A    I don't know if they're union at this point.  I don't know

2  what the union rate was.  This is an agreed upon rate.

3  Q    Okay.  And when you say "agreed upon" --

4  A    Maybe it's more than the union rate, I don't know.

5  Q    Okay.  And when you say "agreed upon" agreed upon with

6  who?

7  A    With the employees.  We talked about that before.

8  Q    Okay.  And the employees and who?  And yourself?

9  A    Melissa and myself and the employee.

10  Q    Okay.  So Melissa is present at this meeting when you're

11  negotiating the wage rates with these employees?

12  A    At some of them.  Do you want to ask exactly which one I

13  don't know, but I know --

14  Q    Okay.  We'll I'm asking you which one.  Which one --

15  A    I don't know exactly which one.

16  Q    Was Ms. Blanchard present when you negotiates this rate

17  with Randy Bell?

18  A    I don't know that.

19  Q    Was Ms. Blanchard when you negotiated the wage rate with

20  Mr. Bond?

21  A    I don't know that.

22  Q    Was Ms. Blanchard present when you negotiated the rate

23  with Mr. Hager?

24  A    Was Ms. Blanchard present when you negotiated the rate

25  with Mr. Morrow?

```
 1   A     I don't know that.

 2   Q     And was Ms. Blanchard present when you negotiated the rate

 3   with Mr. Tracy?

 4   A     I don't know that.

 5   Q     Okay.  And these are union rates, right?

 6         MR. JAMESON:  Asked and answered.

 7         MR. LEHMANN:  Okay.

 8   BY MR. LEHMANN:

 9   Q     How long have you been a union member?

10   A     Many years.

11   Q     Okay.  And you're familiar with the collective-bargaining

12   agreements?

13   A     Yes, I am.

14   Q     With the Bricklayers?

15   A     Yes.

16   Q     With the Laborers?

17   A     Yes, I am.

18   Q     With the Carpenters?

19   A     Yes.

20   Q     Okay.  And Ace has always been a union contractor, right?

21   A     I'm not familiar with the rates with Ace.

22   Q     Not the question.  The question was Ace Masonry was always

23   a union contractor, right?

24   A     Ace Masonry was always a union contractor, right.

25   Q     Correct?
```

1   A    Right.

2   Q    All the way through all of December, including December,

3   2011, correct?

4   A    As far as I know, yes.

5   Q    Okay.  And in November of 2011 Mr. Bell was -- on November

6   9th was he still working at Ace Masonry?

7   A    November 9th?

8   Q    Uh-huh.

9   A    No.

10      MR. LEHMANN:  Okay, all right, can we go off for one

11  moment?

12      JUDGE CARTER:  Yes.

13  **Off the record.**

14          **(Whereupon, a brief recess was taken.)**

15      **JUDGE CARTER:  Back on the record.**

16      JUDGE CARTER:  Any further questions?

17      MR. LEHMANN:  Okay.

18  BY MR. LEHMANN:

19  Q    Was Mr. Hager employed with Ace Masonry on November 9,

20  2011?

21  A    I think so, I'm not correct, I guess I'd had to look at

22  the payroll records to see.

23  Q    Okay.  How about Mr. Morrow?

24  A    I'd have to look at the payroll records to see.  I don't

25  think so.

1    Q    How about Mr. Tracy?

2    A    I'll look at the records and see what it says on the

3    dates.

4    Q    Okay.  Now, the rates that you negotiated with these

5    employees, the non-prevailing wage that's private?

6    A    That's private work, yeah.

7    Q    Okay.  And the prevailing wage is union?  That's union?

8    A    That's prevailing wage rate, it could change from

9    different areas, depends where the project is.

10   Q    Okay.  So it's public work?

11   A    Yes.

12   Q    All right.  And the fringe -- if you add the prevailing

13   wage and the fringe you get the total of 43.73 for Mr. Hager?

14   A    For that area, whatever area it was.

15       MR. BAILEY:  Judge, just for a point of clarification for

16   the record.  I don't think the document is actually moved into

17   evidence and we're reading from it.  Are we going to move it

18   into evidence?  Are we going to ask the simple question what

19   this document is?  We haven't even got there.

20       MR. LEHMANN:  I would offer General Counsel Exhibit 35.

21       MR. BAILEY:  And I won't stipulate because I haven't even

22   heard the simplest of question as to what is this.

23       JUDGE CARTER:  No, he's testified that this -- these are

24   wage rates that he's negotiated with the employees.  I mean it

25   obviously wasn't response to a single question, but that

1    records been made.  Are you making an objection or --

2        MR. BAILEY:  With that, Your Honor, I will stipulate.

3        JUDGE CARTER:  All right.  So Exhibit 35 for General

4    Counsel be admitted without objection.

5        **(General Counsel Exhibit 35 received in evidence.)**

6    BY MR. LEHMANN:

7    Q    And that total of 43.73 that's the union rate, correct?

8    A    It's the prevailing wage rate.

9    Q    Right.  That's -- which is a union rate, correct?

10   A    Correct.

11   Q    All right.  So if you went nonunion you'd be saving $12,

12   correct?

13   A    No.

14       JUDGE CARTER:  Actually I think it's 11.95.

15   **(Pause)**

16   BY MR. LEHMANN:

17   Q    Did you pay Derek Hager fringe benefits?

18   A    As far as I know everybody got paid benefits.

19   Q    Everyone got paid fringe benefits?

20   A    Fringe benefits, yes.

21   Q    All right.  And have you -- I direct your attention go

22   General Counsel 26.

23   **(Pause)**

24   BY MR. LEHMANN:

25   Q    The top of page 19 there's employee totals for Mr. Hager,

1    FRG, that's fringe, 2406.90, right?

2    A    I see it.

3    Q    That's stands for fringes.  You paid him in a separate

4    check in the amount of $2406.90?

5    A    That's what it appears.

6    Q    Okay.  In a separate check, correct?

7    A    I don't know that for a fact.  I think so but I'm not

8    positive.

9    Q    All right.  That's what it states; do you have any reason

10   to doubt your own records?

11   A    No, I don't.

12   Q    Okay.

13   **(Pause)**

14       MR. LEHMANN:  I want to direct your attention to General

15   Counsel Exhibit 21.

16   **(Pause)**

17       MR. LEHMANN:  I'm going to turn -- direct your attention

18   to the January 13, 2012 letter.

19   **(Pause)**

20   BY MR. LEHMANN:

21   Q    Do you recognize that letter?

22   A    I remember seeing it.

23   Q    Okay.  And the attached questionnaire also?

24   **(Pause)**

25       THE WITNESS:  Yes.

1      MR. LEHMANN:  Okay.

2  BY MR. LEHMANN:

3  Q    And I'm going to direct your attention to the January 24th

4  letter from Mr. Bailey, you recognize that letter also?

5  A    Yes.

6  Q    Okay.  You received -- you also received a copy of the

7  January 24th letter.  Besides the -- you answered the last?

8      MS. KLUYTENAAR:  He didn't answer.

9      THE WITNESS:  Yes, I did.

10      MR. LEHMANN:  Okay.

11  BY MR. LEHMANN:

12  Q    And now --

13      JUDGE CARTER:  Just to be clear you're saying yes you did

14  what?

15      THE WITNESS:  Answer his question if I've seen this

16  letter.

17      JUDGE CARTER:  Well, he also asked if you receive a copy

18  of the January 24th letter.

19      THE WITNESS:  I suppose I did, I don't remember right off

20  the top of my head, I don't see why I wouldn't.  Yeah, it says

21  it on the bottom.

22      JUDGE CARTER:  But you have seen it before?

23      THE WITNESS:  Yes.

24      JUDGE CARTER:  Okay.

25  BY MR. LEHMANN:

1  Q    Now, did you provide -- you didn't provide the union with

2  any of the requested items, 1 through 79, correct?

3  A    I -- Melissa Blanchard filled out the paperwork, I could

4  not tell you that.

5  Q    You couldn't say whether you provided this information or

6  not?

7  A    Correct.

8  Q    Okay.  And who would?

9  A    Melissa Blanchard.

10  Q    Well, to your knowledge did you provide the union with

11  document --

12  A    To my knowledge, no.

13  Q    Excuse me?

14  A    To my knowledge, no, I don't know.

15  Q    You don't know or you didn't?

16  A    I don't know.

17  Q    Would you have authorized Ms. Blanchard to provide

18  documents responsive to 1 through 79?

19  A    Yes.

20  Q    You would have?

21  A    I would have.

22  Q    All right.  And you don't know if she did?

23  A    I don't know.

24  Q    I'm going to direct your attention to the second to the

25  last page.  The e-mail from Mr. Bailey to Mr. Furlong dated

1    January 19, 2002, it states that, "As for the questions that

2    were sent Bell will not preparing responses to that

3    questionnaire."

4    A    Okay.

5    Q    Okay.  Do you have any doubt in the representation made by

6    your attorney, Mr. Bailey?  Do you have any reason to doubt the

7    representation by Mr. Bailey?

8    A    No, I do not.

9    **(Pause)**

10    MR. LEHMANN:  I'm going to redirect your attention to the

11    January 24th letter from Mr. Bailey.

12    BY MR. LEHMANN:

13    Q    You testified earlier that you received a copy of this

14    letter.  The letter states, the second to last sentence,

15    "Additionally Bella Masonry, LLC has no intention of becoming a

16    signatory with your union."  Did you ever contradict that at

17    any point?

18    A    Yes, I have.

19    Q    You have?

20    A    Yes.

21    Q    Okay.  And when did you contradict that?

22    A    Exactly the date I don't remember, but it was a meeting

23    that we had with the unions.

24    Q    Do you remember when that meeting took place?

25    A    No, I don't.

1    MR. LEHMANN:  Nothing further, Your Honor.

2    JUDGE CARTER:  All right.  Mr. Furlong?

3    MR. FURLONG:  I do have a few questions for Mr.

4  Bellavigna.  Can we take a few minute break, Your Honor, and

5  I'll resume?

6    JUDGE CARTER:  Okay.  Let's go ahead and take a --

7    MR. FURLONG:  9:30?

8    JUDGE CARTER:  Just a couple of minutes?

9    MR. FURLONG:  Yes.

10    JUDGE CARTER:  We'll do 9:35.

11  **Off the record.**

12           **(Whereupon, a brief recess was taken.)**

13    **JUDGE CARTER:  Back on the record.**

14  And Mr. Furlong.

15    MR. FURLONG:  Thank you, Your Honor.

16  Mr. Bellavigna, good morning.

17    THE WITNESS:  Good morning.

18    MR. FURLONG:  I think you've been in the room so you know

19  who I am, I do represent, obviously, the Laborers Local 785 as

20  well as Bricklayers, Local 3.  I'm going to be asking you some

21  questions.  If there's anything that you don't understand and

22  want me to rephrase it simply ask and I'll be happy to do it.

23                     **DIRECT EXAMINATION**

24  BY MR. FURLONG:

25  Q    Are you on any medication or have any reason to believe

1  that your memory would be compromised in any way?

2  A    I'm on some medications but nothing that should bother my

3  memory.

4  Q    Okay.  Would you take a look at GC Exhibit 35, which is

5  the packet of forms signed by the Ace employees?

6  A    Yes.

7  Q    Okay.  And I think you testified in response to General

8  Counsel's questions that these were -- these individuals were

9  Ace employees who had then gone to work at Bella Masonry, is

10  that correct?

11  a    Yes.

12  Q    Okay.  Now, I want you to simply straighten out some

13  things, I think the record so far is a little confusing, on the

14  nature of this form.  You've been in the construction industry

15  now 50 plus years working for firms such as McGuire, Bennett,

16  Well ever, McGuire, it's successor, Ace Masonry and now Bella,

17  am I correct?

18  A    You're correct.

19  Q    All right.  And if that -- with the exception of Bella

20  you've worked for union contractors your entire life, am I

21  correct on that?

22  A    You're correct.

23  Q    In fact you held and still hold a Bricklayers union book

24  for decades?

25  A    Yes.

1    Q    All right.  And you're receiving a Bricklayer pension?

2    A    Yes.

3    Q    Union pension.  So you're familiar with the term

4    "prevailing wage rate" are you not?

5    A    Yes, I am.

6    Q    And would you agree with me that the prevailing wage rate

7    in New York is the union wages and benefits as set forth in the

8    collective-bargaining agreement?

9    A    Yes.

10   Q    And would you agree with me that the prevailing wage rate

11   has to be paid by all contractors working on any public work's

12   job, whether they're union or nonunion?

13   A    Yes.

14   Q    Do you agree with that?

15   A    Yes.

16   Q    And that in the nonunion sector in order to comply with

17   the prevailing wage rate statute the employer either has to

18   actually provide the fringe benefits of an equal cost, or put

19   the money in the pay envelop, would you agree with that?

20   A    Yes.

21   Q    All right.  So basically on a public work's job, whether

22   it be Ithaca Town Hall or on the SUNY job, or any sort of

23   public work's job you're going to be paying the union rate on

24   way or the other?

25   A    Correct.

1  Q    But the rules are very different on a private job, would

2  you agree with me on that?

3  A    Yes.

4  Q    And with respect to a nonunion, non-signatory contractor

5  they can pay anything they want as long as the meet the federal

6  minimum wage, would you agree with that?

7  A    Yes.

8  Q    All right.  Now, for a union contractor on private work,

9  even though there's not prevailing wage rate statute, they

10  still have to pay the collectively bargaining wages and fringes

11  as if it were a public work's job, would you agree with me on

12  that?

13  A    Yes.

14  Q    And for 50 years this has been your understanding on how

15  it works?

16  A    Yes.

17  Q    All right.  Now, Bella, being non-signatory, was free on

18  public -- was not free on public work's jobs not to pay the

19  prevailing rate, they had to pay the prevailing rate, would you

20  agree with me on that?

21  A    Yes.

22  Q    Okay.  So as we look at GC-35, and I look at the different

23  wage rates and so forth, by not being signatory you're saving -

24  - for instance, for Randy Bell on a non-prevailing wage rate

25  project, let's say the Vestal project, was that prevailing wage

1  or non-prevailing wage?

2  A    The Vestal?

3  Q    Yes.

4  A    Non.

5  Q    Non-prevailing wage.  You're saving -- he gets paid 31.78

6  if he works that job versus what he would have gotten paid if

7  the union contract applied, which was 43.73.  So you're saving

8  whatever the math is there, roughly $12 an hour for Randy Bell,

9  am I correct on that?

10 A    It's possible, but I'd have to look back on GC-26 and see

11 what he was actually paid for that job.

12 Q    Well, if we work off of -- we're working right now off of

13 GC-35.

14 A    Yes.

15 Q    He agreed to a non-prevailing wage rate of 31.78 without

16 fringe benefits, am I correct on that?

17 A    Yes, you are.

18 Q    All right.  And if we look at Phil Bond, he was an

19 apprentice, am I correct?

20 A    He's an apprentice, yeah.

21 Q    All right.  He was getting paid 21.42 on a non-prevailing

22 wage job, and 21.42 on a prevailing wage, but on a prevailing

23 wage he was also getting fringes of 16.95.  Take a look at the

24 document, is your document incorrect or is it correct?

25 A    It's correct.

1   Q    Okay.  So on a job such as the Vestal project there's a

2   $17 difference as to what you're going to pay an individual in

3   Phil Bond versus is you applied a collective-bargaining

4   agreement like Ace Masonry had, am I correct on that?

5   A    It appears that way, yes.

6   Q    All right.  And of course you would agree with me that

7   Bella Masonry is always looking to get labor at the cheapest

8   cost to the town, am I correct on that?

9   A    I am looking to get skilled labor.

10  Q    And pay whatever -- as little as you can to have a

11  suitable worker work for you, right?  You like to make money?

12  A    Yes, I like to make money.

13  Q    Would you rather have the money go in your pocket to Phil

14  Bond's pocket?

15  A    I don't like to put it that way, I like to share the

16  wealth.

17  Q    Well, I'm not --

18  A    If you're putting it that way --

19  Q    It appears the document that --

20  A    Yes.

21  Q    -- had the employees signed is putting it that way.

22  A    Yeah.

23  Q    All right?

24  A    Yeah.

25  Q    So you'd be paying Phil Bond less without the application

1    of a collective-bargaining agreement than if you had one on a

2    job such as Vestal?

3    A    Correct.

4    Q    But of course on a job where the prevailing wage rate

5    applies it's going to be a wash.

6    A    Yeah.

7    Q    Right.  And if we go through to Derek Hager, one of your

8    key superintendents, correct?

9    A    Correct.

10   Q    All right.  His total on a prevailing wage job, in essence

11   the union wage, is $43, but on a non-prevailing wage we're back

12   to 31.78, again a $12 per hour split, right?

13   A    Right.

14   Q    And that doesn't take into consideration overtime rates

15   does it?  My question is it doesn't take into consideration

16   overtime rates does it?

17   A    Correct.

18   Q    All right.

19   A    Correct.

20   Q    The union contract requires overtime rates after eight

21   hours in a day, generally speaking, am I correct?

22   A    You're correct.

23   Q    All right.  And you made no provision for overtime rates

24   in this document.

25   A    No, I did not.

1    Q    All right.  And if I go through the document again, I'm

2    not going to go through each and every name --

3    A    Yeah.

4    Q    -- but by avoiding or not applying the union contract at

5    Bella Masonry certainly on public work's project you were

6    saving anywhere from 10 or $12 to $17 an hour per employee?

7    A    It appears that way, yes.

8    Q    All right.  Now, you indicated and you testified that

9    there was an October 14th meeting held at Ace Masonry offices in

10   which certain employees attended, you were in attendance, Bob

11   Bellavigna was in attendance, do you recall your testimony on

12   that?

13   A    Yes.

14   Q    All right.  And that meeting was held in Bob Bellavigna's

15   officer?

16   A    It was outside of his office in the warehouse area I think

17   we met if I remember right.

18   Q    All right.  And just recount for me again who was present?

19   Was Derek Hager present at that meeting?

20   A    I can't remember exactly everybody that was there.

21   Q    Okay.  To the best of your recollection.

22   A    That's my recollection.  I would say yes.

23   Q    All right.  Was Randy Bell there?

24   A    Yes.

25   Q    All right.  Was Dick Tracy there?

```
 1  A    Yes.

 2  Q    Was Melissa Blanchard there?

 3  A    No.

 4  Q    Were there any other craft employees there other than

 5  Tracy, Bell and Hager?

 6  A    I think possible Chuck Morrow might have been there.

 7  Q    How about Scott Smith?

 8  A    And I don't -- I'd be lying if I said absolutely, I just

 9  don't remember.  I know there was employees.

10  Q    Okay.  And Hager is a superintendent, am I correct?

11  A    Yeah.

12  Q    Okay.  Randy Bell is a superintendent?

13  A    Yeah.

14  Q    Correct?  Dick Tracy is a superintendent.  So these are

15  some of your real key guys, right?

16  A    Uh-huh.

17  Q    These aren't just -- these are guys that's been with you

18  since almost the inception of Ace.

19  A    (No verbal response.)

20       JUDGE CARTER:  Is that a yes?

21       THE WITNESS:  That's a yes.

22       MR. FURLONG:  All right.

23  BY MR. FURLONG:

24  Q    And so you pull in your key guys into this October 14th

25  meeting and Bob is there, and you tell me what Bob said with
```

```
 1   respect to these guys possibly working at Bella?
 2   A    I don't remember word for word.
 3   Q    Give me a summary?  Give me what you remember.
 4   A    A summary was that Ace is financially in trouble, and
 5   Henry is going to start up a company.
 6   Q    And what else does he say with respect to -- okay, he's
 7   going to start a company, what, making toilet paper or becoming
 8   a masonry contractor?
 9   A    Masonry contractor.
10   Q    Okay.  And did he make an offer of jobs?  Did he say to
11   these guys, "You might want to consider working for Henry"?
12   A    At that point it was brought up that -- consider it.
13   Q    Brought up by who?
14   A    By Robert at that point.  That Henry is going to start up
15   a company, it were his employees at the time, and --
16   Q    And he attach a name to the company?
17   A    No.
18   Q    So it was just Henry is going to start up a masonry
19   contractor, right?
20   A    Yes.
21   Q    And Ace is not doing well.
22   A    Right.
23   Q    And I don't want to put words in your mouth, you tell me.
24   Did he say basically you guys might want to consider working
25   for Henry's new company?
```

1  A    Think about it.

2  Q    What --

3  A    I don't remember the exact words.

4  Q    Was there an offer of employment made?  Basically, "Hey,

5  you guys might want to talk to Henry about working for him" or

6  something?  Tell me what he said?

7  A    Exactly I don't remember.  I know he mentioned about that

8  I was starting up a company, maybe you want to think about

9  talking to Henry about what his future was, and what your

10  future would be with him, and that's all I can remember.

11  Q    Okay.  Were there any wages or anything like that --

12  A    No.

13  Q    -- spoken about?  Okay.  So basically Ace is winding down

14  and --

15  A    Yeah.

16  Q    -- and not in good shape?

17  A    Yeah.

18  Q    Henry is starting a new company --

19  A    Yeah.

20  Q    -- speak to Henry about working for him at his new

21  company.  Is that the sum and substance of it?

22  A    That's the summary of it.

23  Q    All right.  Now, this is October the 14th that you're

24  talking about?

25  A    I think so.

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 316
Wayne, New Jersey 07470
(973) 692-0660

1    Q    Roughly the middle of October?

2    A    I think so.

3    Q    Okay.  And it's your testimony that Bob Bellavigna did not

4    go on the payroll record of Bella until December, am I correct?

5    A    December 12th, yeah.

6    Q    December 12th.

7    A    Yeah.

8    Q    So it's fair to say that while he was on the payroll

9    record of Ace Masonry he met with Ace employees in an Ace

10   office, his office, to make them an offer of employment for

11   Bella Masonry, isn't that true?

12   A    No, he didn't make them an offer.

13   Q    Okay.  He suggested to them, with you in the room, that

14   they could utilize their skills and gain employment with

15   Henry's new company, is that not your testimony?

16   A    That is my testimony, yes.

17   Q    Okay.  Thank you.  Now, talking about the Cornell job that

18   you successfully bid as Bella Masonry, do you recall that

19   testimony?

20   A    Yes.

21   Q    Okay.  When was that job?

22   A    The Cornell job?

23   Q    Yeah, that you subcontracted back to Ace, when was that

24   job?

25   A    I don't know the exact date.

1    Q    Was it in the fall of 2011?

2    A    I don't know the exact date.

3    Q    Was Bella in existence when you bid the job?

4    A    Was Bella in existence --

5    Q    Yes.

6    A    -- when I bid the job?

7    Q    For Bella.

8    A    Yes.

9    Q    And you would agree with me that Bella started its

10   operations in September of 2011?

11   A    Correct, about the third week I think it was, yeah, the

12   21st, 22nd, yeah.

13   Q    Okay.  So it's safe to say then that this was sometime in

14   the fall of 2011 that you built -- that you bid that Cornell

15   project?

16   A    Correct.

17   Q    And ended up subcontracting it to Ace, right?

18   A    Right.

19   Q    Now, you testified, in response to General Counsel's

20   questions, that you left Ace because it was very distressed, it

21   was going under, you saw the writing on the wall, you wanted

22   out, do you recall that testimony?

23   A    Yes, I do.

24   Q    All right.  And you understood that your daughter-in-law

25   essentially had an emotional breakdown during that time period,

1  where she really couldn't operate or go to work, you understood

2  that, right?

3  A   Yes.

4  Q   And you understood her to be the mover and shaker in

5  essence of Ace Masonry, Lisa Bellavigna?

6  A   Yes.

7  Q   All right.  And you knew that they were not paying their

8  trust fund obligations to the various unions, you understood

9  that too, did you not?

10  A   No, I did not know all their debt.

11  Q   I didn't ask you if you knew all their debt.  Did you know

12  that they were behind on their trust fund obligations?

13  A   No, I did not.

14  Q   So you had no knowledge of any of that?

15  A   No.

16  Q   All right.  Did you -- but you did testify that you

17  understood that financially they were a distressed company?

18  A   Yes.

19  Q   All right.  So you also understood, and you were in the

20  room when Lisa Bellavigna testified about there being a lack of

21  manpower, she couldn't get manpower to handle her jobs, which

22  is why she had to engage in some subcontracting arrangements

23  with Bella, do you recall that?

24  A   I recall the conversation.

25  Q   Right.  And would you agree with your daughter-in-law that

1  in fact her testimony was truthful, but in fact you understood

2  that Ace Masonry was lacking manpower?

3      JUDGE CARTER:  That's not a proper question for the

4  Witness.

5  BY MR. FURLONG:

6  Q    Do you disagree with the proposition that Ace Masonry, in

7  the late summer, early fall of 2011 was lacking manpower, do

8  you disagree with that or agree with that proposition?

9  A    There's a reason for that.

10  Q    Can you agree or disagree with that proposition, Mr.

11  Bellavigna?

12  A    I agree.

13  Q    That they were lacking manpower.

14  A    That they were lacking manpower.

15  Q    Now, I think you would agree with me that there are

16  perhaps 10 to 12, maybe 15 masonry contractors, just in

17  Tompkins County alone that could have performed that Cornell

18  project?

19  A    Correct.

20  Q    All right.  And in fact if we go outside Tompkins County

21  into Skyler County and Courtland County and everything we can

22  expediently increase that number of capable masonry contractor

23  who could have accepted a subcontract from Bella, do you agree

24  with that?

25  A    Yes.

1   Q   All right. So we are left with the conclusion, you tell me

2   different, that you subcontracted work to a firm where you knew

3   the leader of the firm was having some emotional difficulties,

4   they lacked manpower and they had financial problems, and that

5   was the firm you picked to subcontract the work to at Cornell,

6   is that correct?

7   A   Correct for a reason.

8   Q   Thank you. And you didn't put any of the -- you didn't

9   contact any other masonry firm about accepting your subcontract

10   up at the Cornell project, you simply contact Ace Masonry, even

11   knowing what you knew, isn't that correct?

12   A   It was as small contract --

13   Q   My answer is yes or -- it calls for a yes or no. Did you

14   contact any other firms --

15   A   No, I did not.

16   Q   Okay. One of the jobs that we haven't spoken about but

17   that's listed on the list of Bella Masonry jobs is a church or

18   some sort of facility it Trumansburg, do you recall that

19   project?

20   A   Yes, I do.

21   Q   Tell us about the nature of that project? What did it

22   involve?

23   A   It involved masonry restoration at the church in different

24   phases.

25   Q   Okay. And who worked on that project for Bella? What

1    employees?

2    A    I couldn't tell you.

3    Q    You don't recall?

4    A    I don't remember the names of people.

5    Q    Was it a big project, was it a small --

6    A    A small project.

7    Q    A few thousand dollars?

8    A    A small project.

9    Q    Okay.  And did those employees, when they worked on that

10   project, were they told that they were working for Bella?

11   A    Were they told they were working for Bella?

12   Q    Yeah.  Did they --

13   A    They received --

14   Q    Is it your understanding they received --

15   A    They received a paycheck for Bella, they had to be working

16   for Bella.

17   Q    I understand, we'll get into that.

18   A    They had to have a sign up.

19   Q    We'll get into that.  Before they received their paycheck

20   were they told they were working for Bella?  Did you tell them

21   "You now work for Bella"?

22   A    They signed -- before they worked for Bella they signed an

23   application of employment that they filled out, so they had to

24   know that they were working for Bella.

25   Q    All right.  So your testimony here is that any employee

1    who may later testify saying "I didn't know I was working for

2    Bella" he certainly did know he was working for Bella?

3    A    Absolutely.

4    Q    Okay.  Now, I want to make sure that I understand your

5    office operations.  You've got an office in Burdett in your

6    home?

7    A    Correct.

8    Q    Okay.  Do you have a storage yard there for storage of

9    equipment or anything like that?

10   A    Yes, I do.

11   Q    What's that, a shed, a driveway, what is it?

12   A    A couple of barns.

13   Q    A couple of barns?

14   A    Yeah.

15   Q    Okay.  And in the office itself you've to Melissa

16   Blanchard, correct?

17   A    Correct.

18   Q    And you, correct?

19   A    Correct.

20   Q    Any other office employees that we haven't heard about in

21   this proceeding?

22   A    No.

23   Q    None, all right.  And so between the two of you -- excuse

24   me, excluding the two of you everyone else working for Bella

25   Masonry works in the field with the tools, as we say, is that

1    correct?

2    A    Everybody except Robert.

3    Q    Robert Bellavigna?

4    A    Robert Bellavigna works for me now, yes.

5    Q    Okay.  But putting -- when Robert first began with Bella,

6    I think your testimony was he actually worked with the tools

7    laying block, is that correct?

8    A    Along with some other duties.

9    Q    Along with some other duties, all right.  But in terms of

10   the office staff, the people that are dealing with drawings,

11   dealing with estimating, dealing with customer and all that,

12   it's you and Melissa Blanchard, right?

13   A    That's correct.

14   Q    All right.  And it's your testimony that the website that

15   has existed, at least since October of 2011 up until yesterday

16   you never saw a copy of the website, never looked at it?

17   A    Never looked at it, I'm not a computer person.

18   Q    Okay.  And it's your testimony that the insurance form

19   that was marked for identification but not actually received

20   because you wouldn't identify, or couldn't identify it, GC-28,

21   a certificate of liability insurance, you also have never seen

22   that?

23   A    I did not say that.

24   Q    You had seen it.

25        MR. FURLONG:  Can we show the Witness a copy of GC-28 that

1  has not been received?

2  **(Pause)**

3  BY MR. FURLONG:

4  Q    I think it was your testimony in response to questions by

5  Mr. Lehmann that you couldn't identify that document having

6  never seen it before?

7  A    What I said was I wasn't sure at first, and then I read

8  the name down at the bottom, it says "Robert and Lisa

9  Bellavigna", and I said it could be to the repairs that Bella

10  Masonry did at their home recently.

11  Q    Right.  Well, let me ask you then.  Do you recognize this

12  document and can you authenticate this document as being

13  legitimate, as being authentic?

14  A    Is it legitimate?  Yes, it is.

15  Q    You recognize the document?

16  A    Yes.

17  Q    Okay.

18      MR. FURLONG:  I would move then for it for its receipt

19  because it hasn't been received.

20      MR. LEHMANN:  I would reoffer GC-28.

21      MR. JAMESON:  No objection, Your Honor.

22      MR. BAILEY:  No objection.

23      JUDGE CARTER:  All right.  Exhibit 28 be admitted without

24  objection.

25      **(General Counsel Exhibit 28 received in evidence.)**

1      MR. FURLONG:  Can we show the Witness the -- I think we

2  have two websites, October and November, I really don't care

3  which one it is.

4      MR. BAILEY:  I think it was like 27 and 29 isn't it?

5      MR. FURLONG:  Yeah.

6      JUDGE CARTER:  This is Exhibit 27 for the record.

7  BY MR. FURLONG:

8  Q    Looking at the bottom of that document, are you looking at

9  the November or October?

10  A    10/26.

11  Q    10/26.  All right.  Do you see your picture there on the

12  front page, on the second page?

13  A    Yes, I do.

14  Q    Okay.  And do you recall when that picture was taken?

15  A    No, I don't.

16  Q    Was it taken when you were a principal of the Bella

17  Masonry Company?

18  A    I don't remember.

19  Q    Have you ever had your picture taken -- have you ever

20  posed for a picture --

21  A    Yes, I have.

22  Q    -- since October of 2011?

23  A    I don't remember.

24  Q    All right.  Did you have a picture taken of you for Ace

25  Masonry?

```
 1   A    Yes, I have.

 2   Q    And is that the picture that we're looking at on the Bella

 3   website?

 4   A    Very possible it could be.

 5   Q    Okay.  And did Ms. Blanchard come to you and ask for any

 6   permission as to whether or not she could use a picture from

 7   Ace on the Bella website?

 8   A    Well, I would --

 9   Q    Did she come to you and ask you --

10   A    Why would Ms. Blanchard come and ask me --

11   Q    All right.  Mr. Bellavigna, with all due respect, you're

12   the witness, I ask the questions.

13   A    Yes.

14        All right?  So my question to you is did Ms. Blanchard

15   come to you and ask permission to use a picture from another

16   contractor where you worked on Bella's site?

17   A    Not that I remember.

18   Q    All right.  And did she go over -- before she put this

19   website together did she go over the contents of the website

20   with you?

21   A    Who said she put it together?

22   Q    I think you did in your answers in response to Mr. Lehmann

23   that --

24   A    I said --

25   Q    -- your son in Florida and Ms. Blanchard put this together
```

1    jointly, that was your response.

2    A    I do not know that for a fact.  What I said -- I thought I

3    said was that my son in Florida put this together, and that

4    Melissa Blanchard and him might have thought together, I don't

5    know that for a fact.

6    Q    All right.  I recall your testimony being somewhat

7    different.  That Melissa --

8    A    Okay.

9    Q    -- Blanchard and your son put -- you want to correct that

10   that's fine.

11   A    That's what I want to correct.

12   Q    What's your son in Florida's name?

13   A    Dominick.

14   Q    All right.  Did Dominick have access, to your knowledge,

15   to the Ace Masonry website?

16   A    To the Ace Masonry website.  I don't know, I don't know

17   computers, I --

18   Q    Okay.  In October or November of 2011 would you agree with

19   me that the Ace Masonry website was not up?

20   A    In when?

21   Q    October and November of 2011 would you agree with me that

22   the Ace Masonry website was not up.

23   A    I don't know.

24   Q    All right.  Would you agree with me that you son Dominick

25   never worked for ace Masonry?

1    A    Yeah, I don't think he ever did.

2    Q    Okay.  Do you have any reason to believe that your son

3    Dominick -- do you have any reason to believe that your son

4    Dominick received permission to take the Ace Masonry website,

5    in an essence cross out Ace Masonry and put Bella Masonry on

6    the top, do you have any reason to believe that he had

7    permission to do that?

8    A    Yes, I believe.  We had talked, I don't remember the

9    conversation exactly.

10    Q    Did you talk with Dominick about the Ace Masonry website

11    or the Bella Masonry?

12    A    I talked to Dominick, he talked to me about setting

13    something up on the website.

14    Q    For Bella?

15    A    For Bella.

16    Q    And what did that conversation -- what took place during

17    that conversation?

18    A    I had put together a company brochure, okay?

19    Q    For what company?

20    A    For Bella Masonry.

21    Q    Okay.

22    A    That probably that's where he might have taken most of

23    this information --

24    Q    All right.

25    A    -- that he would have had a copy of.

1    Q    I'm curious about the discussion between you and Dominick

2    on setting up the Ace Masonry shop or the website.  Did he say

3    to you, "Dad, I'd like to put up a website for Bella Masonry"?

4    A    Probably.

5    Q    All right.  And what -- and where you situated in central

6    New York and he was situated in Florida?

7    A    Correct.

8    Q    All right.  And was Melissa Blanchard involved in those

9    discussions?

10   A    At that point I don't know.

11   Q    All right.

12   A    Somewhere down the road she was.

13   Q    All right.

14   A    I think.

15   Q    And you had a brochure that you had put together for Bella

16   Masonry?

17   A    For Bella Masonry.

18   Q    All right.  And did that brochure include the contents of

19   what's now on the Bella Masonry website?

20   A    Some of it in some form.

21   Q    Well, let's talk about what was and was not.  Let's --

22   A    I am not --

23   Q    -- take a letter from the president that you -- that sits

24   over your name and your picture where you talk about when

25   people ask you what sets Bella Masonry against from its

```
 1   competitors, "My answer is" and then you go on.  Did you put
 2   that together?
 3   A    Is it word for word I don't know unless I got both of them
 4   in front of me.
 5   Q    Okay.  Are those your words that you wrote, "When someone
 6   asks me what sets Bella Masonry apart" did you tell Dominick,
 7   "This is what I want on my website"?
 8   A    I told Dominick probably -- no, no, not this is what I
 9   want on my website.
10   Q    What did you tell him?
11   A    I didn't know anything about what was on the website.  He
12   mentioned about putting it together, I've never reviewed it,
13   never seen it until right now.
14   Q    Okay.  And so you've talked about putting it together.
15   Now he obviously didn't write the letter from the president --
16   A    No.
17   Q    -- would you agree with me?
18   A    Yes.
19   Q    He got that from someplace.
20   A    Yeah, and like I said he probably got it from the brochure
21   that I had sent him.
22   Q    All right.  You had sent him a brochure, now was that
23   brochure a Bella brochure?
24   A    A Bella brochure.
25   Q    Okay.  So it gets back to you --
```

1    A    Yes.

2    Q    -- you wrote the brochure, am I correct on that?

3    A    Yes, yes, yes.

4    Q    All right.  And if he took it from the brochure, that's

5    your understanding --

6    A    Yeah.

7    Q    -- then these actually are your words but they started out

8    in the brochure and ended up on the website thanks to Dominick,

9    correct?

10   A    Correct.

11   Q    All right.  So these are your words.  Now, where did you

12   get these words?

13   A    Where did I get the words.

14   Q    Yeah, where did you draft this letter from the president,

15   where did you get it?

16   A    I also did the company brochure for Ace.

17   Q    So it's essentially the same?

18   A    It could be.  There might be parts and pieces --

19   Q    Okay.

20   A    -- that are the same, and it was adjusted for -- not a

21   general contractor but a masonry contractor.

22   Q    All right.  And in addition -- well, let me go to the

23   third page, okay?

24   A    Yeah.

25   Q    Where is says "Mission statement" --

1  A    Yes.

2  Q    -- do you see that?

3  A    Yeah.

4  Q    All right.  And before we get into the contents of that

5  Missy Blanchard I'm assuming looked this over and proofed it,

6  am I correct on that?

7  A    I'm sure.

8  Q    All right.  Now, you've indicated that Bella Masonry is

9  not a general contractor but actually a masonry contractor and

10  that's what sets it apart from Ace, do you recall that

11  testimony?

12  A    Yes.

13  Q    All right.  Let's take a look at the second line, "Mission

14  statement.  Established Bella Masonry as the most widely

15  recognized provider of general construction", not masonry

16  construction, general construction, "in our chosen region."

17  Would you agree with me that that's an actual -- that that is

18  an accurate depiction and Missy Blanchard was correct in

19  allowing that up on your website, or did it get past both you

20  and Missy?

21  A    It got past me.

22  Q    But you never saw the sites so it probably just got past

23  Missy, right?

24  A    If she was -- I don't know the conversation between her

25  and my son, what they had.

1    Q    Okay.

2    A    So I --

3    Q    But later in this we have a description of Missy

4    Blanchard, and it says specifically she's got an eye for

5    detail, that's how you represented her to the public.

6    A    Okay.

7    Q    And you testified that she does.

8    A    Yeah.

9    Q    Okay.  And you would agree with me that you are holding

10   yourself out to the public on this website, available to

11   anybody, from and Ithaca resident to somebody living in a cave

12   in Afghanistan, if they pull up your website you are holding

13   yourself out as a provider of general construction work?

14   A    I'm not a general contractor.

15   Q    I'm asking are you holding yourself out to the public in

16   that way?

17   A    By reading this, yes.

18   Q    Yeah.  And in fact that's the way that Ace Masonry held

19   itself out, as a general contractor.

20   A    Ace Masonry was a general contractor.

21   Q    Okay.  Now, going down toward the bottom of that page I

22   noticed something that the paragraph that begins, "We expect

23   full assistance and cooperation from our entire work force", do

24   you see that?

25   A    Uh-huh.

1    Q    All right.  And then it continues, "And we assign

2    responsibility of enforcing a safety program as field

3    supervision, management and owners" who are the owners?

4    A    I'm the owner of Bella Masonry.

5    Q    And who else?

6    A    There is no other.

7    Q    So the representation then is incorrect?

8    A    It's incorrect.

9    Q    Okay.  Now, as we get further into this website I look at

10   the clientele that's listed on there, and I think we've been

11   through this fairly exhaustively --

12   A    Yes.

13   Q    -- with the General Counsel, but these were, with the

14   exception perhaps of one job, these were all Ace Masonry

15   clientele, would you agree with me?

16   **(Pause)**

17        THE WITNESS:  Yes.

18        MR. FURLONG:  All right.

19   BY MR. FURLONG:

20   Q    And in the brochure that you provided to your son Dominick

21   did you list the Ace Masonry clientele as he set forth on this

22   website?

23   A    It could very possibly be.  Like I said before, I got a

24   side both out in front of me to see, but probably.

25   Q    So as you're writing the brochure, that I'm assuming,

```
 1   again to use your words, is advertising to potential markets,

 2   as --

 3   A    Yeah.

 4   Q    -- you're writing this Bella brochure --

 5   A    Yeah.

 6   Q    -- that was sent to Dominick and posted on your website

 7   you are consciously taking the Ace clientele and having

 8   Dominick put them up there as Bella Masonry clientele, true or

 9   not?

10   A    Not.

11   Q    Not, okay.  So if somebody just looks at the Ace --

12   www.BellaMasonry and looks at the clientele they should assume

13   those actually are clients of Bella Masonry, is that your

14   testimony?

15   A    My testimony is that I worked with these people.  Not

16   Bella Masonry, Henry Bellavigna.

17   Q    Okay.  Is this a Henry Bellavigna website or is this a

18   Bella Masonry website?

19   A    This is a Henry Bellavigna, Bella Masonry website.

20   Q    I see.

21   A    Okay?  I'm the owner.

22   Q    Okay.  I'll get off this in a moment, but show me on the

23   website where this says this is a Henry Bellavigna website,

24   show me.  Here, you got it in your hands.

25   A    I got it in my hands?
```

1  Q    Yeah

2  A    Some of these are cut out, I can't see if I had my

3  signature on any of this.

4  Q    Tell me where it says it's a Henry -- that these are Henry

5  Bellavigna clients.

6  **(Pause)**

7      THE WITNESS:  To me Bella Masonry and Henry Bellavigna are

8  one in the same.

9  BY MR. FURLONG:

10  Q    I'm not asking your opinion; I'm asking would you show me

11  on your website --

12  A    I can't show it to you on my website.

13  Q    All right.  Now, let's get down to the references and

14  contacts portion.  Lock and Central School District, by the way

15  I've subpoenaed them, they're going to testify later, would you

16  agree with me that Bella did no work for Watkin Central School

17  District?

18  A    Bella, no.

19  Q    And Ace did?

20  A    Yes.

21  Q    All right.  And you are using an Ace customer as a

22  reference for Bella, true or not?

23  A    Here we go again.  You're separating Bella from Masonry --

24  Q    Right.

25  A    -- from Henry.

1    Q    Was Watkin Central School District -- did you perform for

2    Ace Masonry several contracts for Watkins Central School?

3    A    Correct.

4    Q    All right.  And the people listed there, Mike DeNardo and

5    Tom Phillips were familiar with Ace's work on those projects,

6    correct?

7    A    Correct.

8    Q    All right.  And neither Mr. DeNardo nor Mr. Phillips nor

9    Watkin Central School ever contracted or did a Bella project?

10   A    Correct.

11   Q    And they're being listed not on Ace project, but in the

12   Bella brochure put together by you, given to your son and

13   posted for the world to see on your website, correct?

14   A    Correct.

15   Q    All right.  And if we go down each and every -- and

16   there's a whole list of references here for Bella Masonry on

17   Bella's site, you would agree with me, Ithaca Central School,

18   LP Seminelli, Schuyler County, they've been subpoenaed, Ithaca

19   College, Edger Enterprises, every reference for Bella is based

20   on work performed by Ace not Bella, correct?

21   A    Correct.

22   Q    All right.  And as we get down to "vendors" you list a

23   whole bunch of vendors from Bock Brick to Thermal Foam, Paragon

24   Supply, all vendors for Ace, correct?

25   A    Correct.

1   Q    And if we look at the contact names those were all people

2   that had duties and jobs dealing with the Ace contracts,

3   correct?

4   A    Correct.

5   Q    Okay.  And not Bella?

6   A    No, that's not -- that's incorrect.

7   Q    All right.  Do you see the list of architects?

8   A    Yes.

9   Q    And you got a list probably of -- taking an eyeball sketch

10  of this, 70 different architects, do you see that?

11  A    Yeah.

12  Q    All right.  I want you to go through and tell me how many

13  did not perform work for Ace.  Look at the list and tell me.

14  I'm going to propose to you that every one of those was an Ace

15  architect, you tell me where I'm wrong.

16                  **(Witness reviews document.)**

17       THE WITNESS:  The second name, the third name.

18  BY MR. FURLONG:

19  Q    Didn't do any work for Ace?

20  A    Not that I'm aware of.

21  Q    They're listed here completed projects for the following

22  projects.  Did Bella complete projects for them?

23  A    No.

24  Q    Okay.  Why don't we -- let's move off the Ace then for a

25  bit.  Completed projects on a Bella website, what architects --

1   did Beardsley & Beardsley do a project for Bella?

2   A    No.

3   Q    All right.  Would you agree with me though that you're

4   holding this out to the public that they did do a project for

5   Bella?  Would you agree with me?

6   A    Yes.

7   Q    All right.  And as we go down the list, Bearsch Compeau

8   Associates.

9   A    Right.

10  Q    What project did they do for Bella?

11  A    They did none for Bella.

12  Q    Agree with me again that they have not done any project,

13  that you are holding it out as Bella Masonry that this

14  architect did work for Bella, right?

15  A    Right.

16  Q    All right.  Tell me the architects actually that have --

17  as you represent to the public, completed project for Bella?

18  Go down the list.

19  A    Well, there again you're separating Henry from Bella.

20  Q    My question to you, Mr. Bellavigna --

21  A    None.

22  Q    Okay, none.

23  A    None.

24  Q    All right.  Not a single one of the 70 has done it, even

25  though you say that --

1    A    Correct.

2    Q    -- they've completed projects.

3    A    Right.

4    Q    As we look at the employees, by the way, your number, your

5    telephone number under your name as president of Bella, (607)

6    327-1511 --

7    A    Correct.

8    Q    -- that was your number at Ace Masonry, right?

9    A    Same phone number.

10   Q    Okay.  And if we were subpoena any notices that you sent

11   out to potential customers when you left Ace saying that I'm

12   going to be retaining the same number but it's not -- I no

13   longer work for Ace, I work for Bella, would I get any notices

14   that you sent to customers?

15   A    I didn't use my cell phone in that manner that often.

16   Q    Okay.  My question -- going back to my question, did you

17   send notices out to customers saying "I am working for a

18   different company.  If you're trying to use Ace don't use this

19   number"?

20   A    No.

21   Q    All right.  So anyone out there who didn't know about your

22   transition from Ace to Bella whose trying to reach you at Ace

23   would in all likelihood use the 327-1511 number, correct?

24   A    Possible.

25   Q    Okay.  I want to go through your grandson's telephone

1  number, 342-5747, would you agree with me that that was the

2  number that he used at Ace Masonry?

3  A    I don't know that.

4  Q    All right.  While we're on your grandson I see that you

5  represent on the Bella Masonry site he was a Bricklayer union

6  member since 2009, do you see that?  The affiliation?

7  A    Yes.

8  Q    Okay.  And while that is certainly true would you agree

9  with me that when this website was posted in October that Bella

10  as not signed or using any labor with the Bricklayers?

11  A    Correct.

12  Q    Okay.  And in fact, without going through each and every

13  name, on every single employee, with the exception of Missy

14  Blanchard, you list the union affiliation, that includes Derek

15  Hager, Randy Bell, Dick Tracy, you used the union affiliation

16  that you list on the website at that time, while they may have

17  been union members Bella was not signed with the union, or

18  apply to any contract, would you agree with you?

19  A    I would agree with you.

20  Q    Okay.  Now, certainly your son, Robert P. Bellavigna, you

21  know his telephone number, you must contact him fairly

22  frequently, right?

23  A    Yeah.

24  Q    All right.  And that number is (607) 327-2949 was the

25  number that he utilized while he was Ace, am I correct?

1    A    You're correct.

2    Q    All right.  So as with you if somebody didn't know that

3    Bob P. Left Ace and was now working for Bella and tried to

4    reach him they would call that number thinking they're calling

5    him at Ace but it was actually Bella, would you agree with me?

6    A    I would agree with you.

7    Q    All right.  Let me look at Randy Bell.  His -- and Randy

8    Bell by the way is still working for you, correct?

9    A    Yes, he is.

10    Q    All right.  And that number 327, listed telephone number,

11    0875 was a number that Mr. Bell as a superintendent for Ace

12    Masonry held, am I correct?

13    A    I don't know that.

14    Q    All right.  Let's take a look at the jobs that is says

15    Randy has been involved in some of the following jobs, take a

16    moment to review those jobs and I want you to tell me which

17    ones were Bella jobs.

18                   **(Witness reviews document.)**

19         THE WITNESS:  That's his work experience.

20    BY MR. FURLONG:

21    Q    And in fact, if we go down, and I'm not going to do this,

22    but you can short circuit this for me, if we go down that job

23    every single one was an Ace job, am I correct?

24    A    I don't know that for a fact, and I know --

25    Q    What jobs are you --

```
 1   A    -- the bottom on --

 2   Q    Go ahead.

 3   A    -- I don't know every job Randy Bell was on to swear to

 4   that.

 5   Q    Do you recognize any of them as being an Ace job?

 6   A    I recognize the Ace jobs.

 7   Q    Such as.

 8   A    Was Randy Bell at the St. Lawrence up in the Adirondack, I

 9   don't know.

10   Q    All right.  Let's take St. Lawrence out of the equation.

11   How about the other jobs, do you recognize them as Ace jobs?

12   A    EFA, Cornell University, Planet Science Roof, NEADS Sports

13   Facility I don't know, the Aranet (ph) I don't know..  The rest

14   of them I would say he was on those jobs as Ace jobs.

15   Q    Okay.  And the jobs that you just mentioned but you're not

16   sure if they were Ace jobs, are these jobs you have listed in

17   your brochure that you gave to Dominick to post?

18   A    I probably just looked up --

19   Q    I'm not asking for conjecture,  Do you know --

20   A    I don't know.

21   Q    -- those jobs listed?

22   A    I don't know.

23   Q    Does Dominick know Randy Bell?

24   A    Does Dominick know Randy Bell?

25   Q    Yeah.
```

1    A    No.

2    Q    All right.  What would give Dominick cause to put these

3    jobs on the website?

4    A    I would say somewhere he must have talked probably to

5    Melissa.

6    Q    I'm not asking for conjecture.  Are you aware of a

7    conversation between Dominick and Melissa?

8    A    I'm aware that they talked.

9    Q    All right.  Would you agree with me Dominick is not going

10   to put something on the website unless he's certain that it's

11   the case?

12   A    Correct.

13   Q    Because you want your website to be as accurate as

14   possible for the public, correct?

15   A    I want the information that we agree -- that they agreed

16   on to be on the website.

17   Q    Right.  And you would also agree with me that as an owner

18   of a business, and you've been in this business for 50 years,

19   it's important that contractors not mislead the potential

20   clients, isn't that correct?

21   A    Correct.

22   Q    Okay.  And in fact if I look at the top of the website it

23   talks about Bella Masonry, "Quality, integrity and reliability"

24   and part of having integrity at Bella Masonry is not in any

25   way, shape or form to mislead your customers with respect to

1   any of the contents in your website, would you agree with me,

2   Mr. Bellavigna??

3   A    To a point.

4   Q    To a point?

5   A    Yeah.

6   Q    Explain.

7   A    Maybe stretching some of the things.

8   Q    Integrity.

9   A    Integrity.  The integrity, I worked on these jobs and

10  you're separating me from Bella, so where does the integrity --

11  I did do the job, I'm the owner of Bella --

12  Q    My question is --

13  A    Yeah.

14  Q    -- you have no interest whatsoever in misleading in any

15  way, shape or form potential customers?

16  A    I didn't believe I was misleading the customer.

17  Q    Okay.  Now, getting to the letter from the president, I'm

18  going to come back to some of the employees in a little while.

19  A    Okay.

20  Q    You state that "our team" and I'm on the second paragraph,

21  and I think you testified that this is what you wrote in the

22  brochure and gave to Dominick, "Our team has over 430 years of

23  combined years of extensive construction experience", 430

24  years, who was included in that calculation, what team?

25  A    What team?

1  Q    Yeah.

2  A    I think that is an error on our part as far as the years

3  because the team at that point would have been the employees in

4  the field and myself.

5  Q    Okay.  And if I were to tell you that your daughter-in-law

6  wrote that exact same sentence in a sentence that she wrote to

7  Cornell University about the Ace team having exactly 430 years

8  of combined construction experience --

9  A    That's where probably it came from.

10  Q    From the Ace --

11  A    And it got -- it should have been changed and it didn't

12  get changes.

13  Q    Okay.  And if you were to compare, and I'm not going to

14  get the document out now, unless you can't recall, but if you

15  could compare your letter from the president to Lisa

16  Bellavigna's letter to Cornell University, with respect to the

17  experience of Ace Masonry do you think that they read the same?

18  A    I don't know that.

19  Q    You don't know?

20  A    Right.

21  Q    All right.  Well, let's get the documents out.

22  **(Pause)**

23       MR. FURLONG:  I'm looking at Charging Party 2, and the

24  Bella Masonry November website.

25  **(Pause)**

1    BY MR. FURLONG:

2    Q    Do you have the documents, Mr. Bellavigna?

3    A    Yeah.

4    Q    All right.  Go to the second page of Charging Party 2 --

5    A    Yeah.

6    Q    -- and last paragraph, "When someone asks me what sets Ace

7    Masonry, d/b/a Ace Unlimited apart from its competitors my

8    answer is simple and to the point, integrity, quality and the

9    highest standards in the construction industry."  Now, let's

10    take your website.  Letter from the president, Henry

11    Bellavigna, "When someone asks me" -- first paragraph, "what

12    sets Bella Masonry apart from its competitors my answer is

13    simple and to the point, integrity, quality and the highest

14    standards in the construction industry", would you agree with

15    me that that's fairly similar language?

16    A    That's fairly similar.

17    Q    In fact it's identical, right?

18    A    It's similar.

19    Q    Is there any difference, even a word of difference between

20    what Lisa wrote as an Ace president what you're writing as

21    Bella?

22    A    Yeah, you're talking about WBE and all that, I'm not a

23    WBE.

24    Q    Okay.  Substituted Bella for Ace otherwise the content of

25    the language was the same.

1  a    Yes, like I said, I'm the one that wrote it originally, I

2  know I changed some of it.

3  Q    Your testimony was that you wrote the Bella Masonry

4  brochure.

5  A    Brochure.

6  Q    Where did you get your information for the Bella Masonry

7  brochure?

8  A    And I also wrote the Ace brochure.

9  Q    Okay.  So you wrote both?

10  A    I wrote both.

11  Q    Okay.  And would you agree with me that --

12  A    And I wrote one for McGuire and Bennett.

13  Q    Okay.

14  A    And changed things around over the years that fit the

15  situation.

16  Q    Okay.  You were here in the room when Lisa Bellavigna

17  testified about the Cornell letter that's now Charging Party 2?

18  A    I was here in the courtroom.

19  Q    Okay.  And I asked her "Is that your signature there on

20  the bottom of page 3", do you recall that?

21  A    Yeah.

22  Q    Okay.  And I asked her "Did you write this letter on Ace's

23  letterhead to go to Corning Incorporated", do you recall that

24  testimony?

25  A    I remember you talking about it.

1  Q    Okay.  And do you recall her saying "Yes, I wrote this

2  letter and I measured my words", do you recall that line of

3  testimony, I asked her, not General Counsel --

4  A    Yeah.

5  Q    -- do you recall that?

6  A    Yeah.

7  Q    Okay.  So is your testifying here that Lisa Bellavigna

8  actually didn't write these words, that she uses words that you

9  had written in an Ace manual?

10  A    Could have been.  I don't know her.

11  Q    Okay.  With respect to the letter from the president, Mr.

12  Bellavigna --

13  A    Yes.

14  Q    -- it's now your testimony that the brochure you wrote for

15  Bella sent to Dominick was actually lifted from a brochure you

16  wrote for Ace and somehow found its way into Lisa Bellavigna's

17  letter to Corning, is that your testimony?  Is it?

18  A    Say that over again, please?

19  Q    Yes.  That the letter from the president --

20  A    Yes.

21  Q    -- that you posted on the Bella website came from a

22  brochure that you wrote for Bella that in turn mimicked the

23  brochure you wrote for Ace that somehow found its way into a

24  letter over Lisa's signature to a large potential customer,

25  Corning, Incorporated, is that accurate?

1   A    I don't know about Lisa's letter and how she -- what she

2   come up with, but the words are --

3   Q    Okay.  Taking a look at the website for Bella Masonry,

4   you've listed Derek Hager, Randy Bell, some other people on

5   that, right?

6   A    Yeah.

7   Q    Right.  And that website, we have an exhibit in there,

8   actually the first exhibit is October of 2011, correct?

9   A    Yeah.

10  Q    Was Dick Tracy working for Bella Masonry in October of

11  2011?

12  A    I'd have to look at the payroll records.

13  Q    You have them in front of you, why don't you take a look

14  and see.  You have the Ace payroll records and the Bella

15  payroll records.  Actually, where's the document with when

16  Bella employees began?

17  A    Again, on October 17th, as far as I remember.

18       MR. FURLONG:  Can we go off the record for a minute?

19       JUDGE CARTER:  Off the record.

20            **(Whereupon, a brief recess was taken.)**

21       **JUDGE CARTER:  Back on the record.**

22       Further questions?

23       MR. FURLONG:  Thank you, Your Honor.

24  BY MR. FURLONG:

25  Q    Mr. Bellavigna, I was asking about your October 26, 2011

1   website that has been received into evidence, do you recall

2   those questions?

3   A    Yeah.

4   Q    All right.  And I see on that website Robert P. Bellavigna

5   with a picture of your son, want to take a look?

6   A    Uh-huh, okay.

7   Q    Are you familiar with it?

8   A    Yes.

9   Q    Okay.  In fact that's your son, correct?

10  A    Yes, it is.

11  Q    Okay.  And if you take a look at the description of his

12  work and his experience, "Bob started construction industry",

13  do you see that?

14  A    Uh-huh.

15  Q    Take a look at that paragraph and tell me if there's

16  anything that you would change in there.

17                    **(Witness reviews document.)**

18       THE WITNESS:  No.

19  BY MR. FURLONG:

20  Q    It's accurate, right?

21  A    Huh?

22  Q    It's accurate, right.

23  A    It's accurate.

24  Q    Okay.  And as of October of 2011 you would agree with me

25  that your son, Robert P. Bellavigna, was not employed by Bella

1    Masonry, correct?

2    A    That's correct.

3    Q    As this picture of Robert P., and all of his experience

4    and so forth was represented to the public as a Bella employee,

5    in fact he was pulling a check from Ace Masonry, correct?

6    A    Yes, he was.

7    Q    And he was working full-time for Ace Masonry in October of

8    2011?

9    A    Yes, he was.

10   Q    And wasn't doing anything for Bella Masonry, correct?

11   A    That's correct.

12   Q    Okay.  Now, it's your belief that Missy Blanchard, working

13   in conjunction with Dominick, reviewed this website as it was

14   being posted, that's your testimony?

15   A    That's my testimony.

16   Q    Would Missy Blanchard, to your knowledge, have understood

17   -- well, let me backtrack.  How long had she known your son?

18   A    Very little.

19   Q    Did Missy Blanchard work at Ace Masonry?

20   A    Yes, she did.

21   Q    Did your son work at Ace Masonry?

22   A    Excuse me, which son are you talking about?

23   Q    I'm talking about Robert P.

24   A    Okay.

25   Q    Both Robert P and Missy Blanchard worked in the office at

1    Ace Masonry?

2    A    Yes, they did, yes.

3    Q    All right.

4    A    Yes.

5    Q    So it's fair to say they knew each other well, right?

6    A    Yes, they did.

7    Q    All right.  And it's fair to say you -- you can't speak

8    for Missy, she's going to testify, but you would assume she

9    knew in October that your son did not work for Bella Masonry?

10   A    Correct.

11   Q    Okay.  And is it your testimony she worked with Dominick

12   in this posting?

13   A    Correct.

14   Q    Now, with respect to Ms. Blanchard, who again will testify

15   here, I think you indicated that this content of this came from

16   a brochure that you wrote actually for Ace Masonry and then

17   made it into a Bella Masonry brochure, is that -- that was your

18   testimony?

19   A    Probably, yes.

20   Q    And you described Missy Blanchard as having -- she's

21   pleasant yet aggressive with an eye for detail, as to that

22   later phrase, an eye for detail, I want you to -- those are

23   your words, right, in the brochure?

24   A    At some point it might have -- it probably was, yeah.

25   Q    Okay.  So tell us what you meant by Missy Blanchard having

1    an eye for detail?

2    A    Well, you know, I shouldn't say that.  I shouldn't always

3    say that because when I did --

4    Q    My question was the eye for detail phrase in your brochure

5    what did you mean by that?

6    A    Can I --

7    Q    What did you mean -- please answer the question.

8    A    I'm not saying that was my statement.

9    Q    Were there other people that contributed to the brochure

10    at Ace Masonry?

11    A    There was -- yes.

12    Q    Well, who were the other people?

13    A    We sat around, and when we started putting it in the

14    brochure we sat around and we had input from different people.

15    Q    Who were the other people that put into the --

16    A    Didn't review, well, I didn't write this, and I didn't

17    write that.

18    Q    Okay.  So you're now distancing yourself from that phrase,

19    you're not sure those were your words?

20    A    I'm not saying that's my exact words, that could have been

21    somebody else's exact words.

22    Q    Do you agree --

23    A    We all --

24    Q    Putting aside the words do you agree that Missy Blanchard

25    has an eye for detail, or would you disagree with what's on the

1    Bella website?

2    A    No, I agree.

3    Q    All right.  So tell me why you agree that Missy Blanchard

4    has an eye for detail.  What do you know about her that would

5    lead you that conclusion?

6    A    Because she's usually pretty thorough about what she does.

7    Q    All right.  So she doesn't make a lot of mistakes are you

8    correct?  Am I correct in saying that?

9    A    No, she corrects me a lot of the time.

10    Q    Okay.

11    A    So, yes.

12    Q    And so when she makes an action or posts something or

13    whatever there's a reason behind it other than simple a

14    mistake, would you agree with me on that?

15    A    No.

16    Q    Okay.  She makes mistakes like the rest of us?

17    A    Everybody makes mistakes.

18    Q    All right.  And so if she posted this or Dominick posted

19    it you had no involvement of course with this --

20    A    No.

21    Q    -- in October?

22    A    No.

23    Q    It was simply a mistake putting your son up there

24    representing that he worked for Ace and had all this

25    experience, that was a mistake?

1   A    No, it wasn't a mistake, I'm not saying that was mistake.

2   Q    Was it a mistake posting it in October?

3   A    Right, probably we as a family had conversation that he

4   intended to come to work when he was done.  I'm sure he must

5   have.

6   Q    Okay.  Well, let's talk about that.

7   A    Yes.

8   Q    Did you have conversations with your son about coming to

9   work for Bella?

10  A    Do I remember it specifically?  No, but I'm sure we did.

11  Q    Okay.  So you don't have any recollection of talking to

12  your son about coming to work for Bella?

13  A    A specific time or date --

14  Q    I'm not asking a specific time or date.  Let's talk about

15  the month of October.  Did you  have discussions with your son

16  about coming to work for Bella?

17  A    I probably did, I probably told him something about -- you

18  know, probably if he failed that --

19  Q    Where did this discussion take place?

20  A    I don't remember.

21  Q    Was it over the phone or in person?

22  A    I don't -- it was probably in person, not over the phone.

23  Q    Okay.  Where in person did the discussion take place?

24  A    I don't remember.

25  Q    Who initiated the discussion that may have taken place, do

1    you recall?

2    A    Probably me.

3    Q    All right.  And what did you say to your son?

4    A    That if things probably didn't work out and you went down

5    the road and the company is going down there's a place at Bella

6    for you.

7    Q    Okay.  And would that have taken place prior to the

8    posting of the website with your son's picture?

9    A    Absolutely.

10    Q    All right.  So did your son commit to coming over to Bella

11    prior to the posting of the website picture?

12    A    He said if it failed he would come over to Bella, yeah.

13    Q    Okay.  And in terms of it failing you heard the testimony

14    from your daughter-in-law that they are still in business

15    acting as GC, did you hear that testimony?

16    A    Yes, yes.

17    Q    Were you in the room?

18    A    Yeah.

19    Q    And in fact is that true?  Are they still in business as a

20    GC finishing up their projects?

21    A    I don't know, ask her.

22    Q    I did ask her.  Were you in the room when I got the

23    answer, "Yes, we're still in business"?

24    A    I didn't listen to every question.

25    Q    When you were in the room you didn't hear that?

1    A    I didn't hear -- I didn't listen to every questions.

2    Q    Okay.  In any event, we can agree that the posting of your

3    son's picture with his experience, as having all this

4    experience for Ace was at the very least premature by several

5    months because he didn't get hired --

6    A    Yes, it was.

7    Q    -- at the very least?

8    A    Yes.

9    Q    And it was posted by your son, who you trust, obviously,

10   right?

11   A    Yes.

12   Q    And have the utmost respect for his integrity, correct?

13   A    Correct.

14   Q    And by Missy Blanchard who you've described as having an

15   eye for detail?

16   A    Yes.

17   Q    And those two were responsible for this mistake, the

18   premature posting.

19   A    The premature posting.

20   Q    And you are accepting no responsibility for that?

21   A    I'm not saying that.

22   Q    Well, what responsibility would you accept?

23   A    Well, I'm owner of the company so I guess I got to be

24   responsible for it.

25   Q    Okay.  And basically, as Harry Truman said, the buck stops

1  with you, right?

2  A    Yeah.

3  Q    Okay.  And if there's a mistake made by an office manager

4  or your son, who's not employed by the company, at the end of

5  the day it's Henry Bellavigna's mistake, am I correct?

6  A    You're correct.

7  Q    All right.  What are you current jobs ongoing now?  I want

8  the names of the jobs if you know them.

9  A    I don't know them.

10  Q    You don't know what jobs Bella's doing right now?

11  A    No, not exactly, not off the top of my head, no.

12  Q    Let me get this straight, you're the owner of the company,

13  right?

14  A    Yup.

15  Q    You're the chief and only estimator for the company,

16  correct?

17  A    Yup.

18  Q    Okay.  And you are the sole -- you and Ms. Blanchard, you

19  testified you're the only two in the office?

20  A    Yup.

21  Q    And as we sit here an August 1st you can't tell me what

22  jobs Bella Masonry has?

23  A    No.

24  Q    Okay.  Can you name any of them?

25  A    The jobs that are ongoing now?

```
 1   Q     Yes.

 2   A     There is the Trinity Church.

 3   Q     Hang on one second I'll be writing so please be fair with

 4   me.  Okay?

 5   A     Thank you.

 6   Q     Trinity Church.  What else?

 7   A     There is jobs that -- I'm doing a retaining wall down on

 8   Seneca Lake.

 9   Q     And who's the customer?

10   A     It's an individual.

11   Q     And what's the name?

12   A     I don't remember the name.

13   Q     You don't remember the name of your customers?

14   A     No, I have to look at the contract, it's a home owner.

15   Q     Okay.

16         MR. FURLONG:  I would ask, Judge, that -- we're going to

17   obviously break and maybe Mr. Bellavigna can call the office

18   and find out the name of his customer down on Seneca Lake.

19         JUDGE CARTER:  Is that an important --

20         MR. FURLONG:  We're trying to establish what work is going

21   on now for Bella Masonry, because I want to establish through

22   other ways that they're actually doing the exact same type of

23   work that Ace Masonry did.  And obviously he should know the

24   answer to this.

25         JUDGE CARTER:  Okay.
```

1  BY MR. FURLONG:

2  Q    So, Mr. Bellavigna, during the break can you --

3      MR. BAILEY:  Judge, we provided copies of all the

4  contracts.  I believe they're in chronological order.  If they

5  want to parade them in front of Mr. Bellavigna, fine.  But when

6  he steps down from the witness stand I'm not asking him to call

7  his office to perform further investigation for their benefit,

8  I'm not going to do it.

9      MR. FURLONG:  Judge, we're not talking about a fortune 500

10  company here, we're talking about a shop he runs out of his

11  house with an office manager and himself, and the testimony is

12  he can't recall or doesn't know who his customers are.  That

13  clearly can't be the case.  So I'm now asking him to do a

14  little bit of due diligence to answer the question that

15  obviously should come naturally right out of his mouth as we

16  sit here.

17      JUDGE CARTER:  Well, do you have contracts that they

18  provided in response to the subpoena?

19      MR. FURLONG:  I don't have anything.  It wasn't my

20  subpoena, I don't have those documents.

21      MR. BAILEY:  That's perfect.  You didn't bother to request

22  the information so now he's going to, at his lunch break, ask

23  Henry to go dig for stuff that he wants?  I'm not going to ask

24  him to do it.

25      MR. FURLONG:  Well, it's not a question of counsel asking

1    him to do it, it's a --

2        MR. BAILEY:  Well, you know what?

3        MR. FURLONG:  --question but directed from the Judge --

4        MR. BAILEY:  That's fine, it' not going to happen.

5        MR. FURLONG:  And I'm asking this Witness --

6        MR. BAILEY:  Hold him in contempt then.

7        JUDGE CARTER:  Mr. Bailey --

8        MR. FURLONG:  Wait a second.  Are you suggesting that if

9    the Judge orders him to do it that you're going to --

10       MR. BAILEY:  I'm suggesting you should have subpoenaed the

11   records.

12       MR. FURLONG:   -- it that you're going to tell him not to

13   do it?

14       MR. BAILEY:  I'm suggesting you should have subpoenaed the

15   records.

16       MR. FURLONG:  I'm asking him now --

17       JUDGE CARTER:  Counsel, it's -- let's not argue across the

18   table.  If you want -- obviously the GC has subpoenaed

19   documents.  If you want to confer with acting GC and see if

20   they have information about these contracts already in their

21   files, materials they received, then you can question the

22   Witness.  And we'll table your request about having Mr.

23   Bellavigna --

24       MR. FURLONG:  Okay.

25       JUDGE CARTER:  -- do further research.  But if they have

1  materials already in the possession of the Agency on that issue

2  then let's just use those.

3      MR. FURLONG:  All right, that's fine, and I'll take a

4  look.  Thank you, Your Honor.

5  BY MR. FURLONG:

6  Q    Other than the Seneca Lake and the Trinity Church what

7  other customers can you recall that Bella Masonry is now

8  engaged in working for?

9  A    I'd have to see the list in front of me.

10  Q    Okay.  So no other come to mind?

11  A    No other, I just --

12  Q    Okay.  Now, Missy Blanchard, with an eye for detail, may

13  be able to tell us those customers but --

14  A    Absolutely.

15  Q    -- you can't?

16  A    Sure.

17  Q    Okay.  Putting aside customers you've estimated -- you

18  estimate the jobs for Bella Masonry?

19  A    Yes.

20  Q    What jobs have you estimated and put in bids for in the

21  last three months?

22  A    I'd have to have the list put in front of me.

23  Q    Okay.  You don't know?

24  A    I don't remember.

25  Q    I'm not asking for everyone.

```
 1   A    You just showed me some documents with four of them that I

 2   just did.

 3   Q    Give me some ones that you do --

 4   A    Onondaga War Memorial.

 5   Q    Onondage --

 6   A    War Memorial.

 7   Q    Was Memorial.  The City of Syracuse?

 8   A    City of Syracuse.

 9   Q    And what else?

10   A    There is a -- I got to see them in front of me.  There's a

11   couple of motels that we just bid on.

12   Q    Do you recall where they're located?

13   A    In Elmira.

14   Q    And what are the names of the motels?

15   A    What was that?

16   Q    What are the names of the motels?

17   A    One was a Hampton, I can't remember the name of the other

18   one.

19   Q    All right.  It's clear to me that you're having a lack of

20   memory on some of the stuff so I'll move on, we'll look at the

21   records, but you can't recall who your customers are and who

22   you're putting bids in other than the ones you just mentioned?

23   A     I mean, when you bid three or four a week and it goes on

24   and on and on you try to put certain things out of your mind

25   for the next one.
```

1  Q    Okay.

2  A    Ask me what I'm going to bid next week, yeah, I got a list

3  on the board, those I'm going to bid next week.  I got a

4  Cortland job lined up, I got a Syracuse job lined up.

5  Q    Now, with respect to Missy Blanchard otherwise known as

6  Melissa Blanchard, you've known her for a number of years,

7  correct?

8  A    Yeah.

9  Q    You knew her from your work at Ace Masonry, correct?

10 A    From Ace Masonry.

11 Q    Okay.  And there came a time in October of 2011 when Missy

12 Blanchard left Ace and began working for you, is that correct?

13 A    That's correct.

14 Q    And would you agree with me that her rate of pay for Bella

15 Masonry is $15 an hour?

16 A    Yes.

17 Q    And would you agree with me that her rate of pay at Ace

18 Masonry was $15 an hour?

19 A    I don't know what it was at Ace Masonry.

20 Q    Okay, all right.  So if in fact those two rates of pay

21 match up, according to the documents that's been received,

22 that's simply by chance then, is that your testimony?

23 A    No, she probably asked me for the same rate of pay.  I --

24 Q    Let's talk about that, Mr. Bellavigna.  Did you have a

25 discussion with Missy Blanchard at one time about transitioning

1    over from Ace to Bella?

2    A    Did I talk with her?

3    Q    Yeah.

4    A    No, she was out looking for work.

5    Q    She was out -- so had she been laid off from Ace?

6    A    No, she wasn't laid off, but she was looking, she was

7    having problems.

8    Q    Okay.  So she -- did she sent in a résumé to Bella, or did

9    she call you, or what happened?

10   A    I think she talked to my son Bob about it, and Bob her to

11   talk to me, that I was starting a company --

12   Q    And she --

13   A    -- and then she came and talked to me.

14   Q    And she talked to you.  And did she talk to you in person

15   or did she talk --

16   A    In person.

17   Q    In person.  And where did that take place?

18   A    Probably at my home.

19   Q    At your home.  And was there anyone else present when Ms.

20   Blanchard came and spoke to you at your home?

21   A    No.

22   Q    All right.  And what was -- I want you to tell me about

23   the discussion whereby the office manager from Ace came over

24   the -- became the office manager of Bella?  Did you discuss

25   your duties?

1   A     Her duties?

2   Q     Her duties at Bella, what was to be expected of her?

3   A     Did we talk about it, yeah.

4   Q     Okay.  And what were the duties that you expected of Ms.

5   Blanchard?

6   A     I expected her to do all the payroll, all the accounts

7   payable and receivable, answer the phone, she was on an account

8   so she could write checks.

9   Q     Okay.

10  A     Whatever was needed she --

11  Q     She's an office manager, right?

12  A     She's an office manager.

13  Q     And I want to read you some detail that she apparently --

14  I don't know the source, whether it was your brochure or

15  whatever, but working with Dominick, you son, put on the

16  website as to what her duties were for Bella and you tell me if

17  she was accurate or not.  "Answering telephones and greeting

18  visitors", is that what she does?

19  A     Uh-huh.

20  Q     Okay.

21        JUDGE CARTER:  That was a yes/

22        THE WITNESS:  Yes.

23  BY MR. FURLONG:

24  Q     She does -- she put down "job responsibility, mail

25  distribution" does she do that?

1    A    Yes.

2    Q    "Administrative assistant" does she do that?  She's your

3    assistant?

4    A    She's my assistant, yes.

5    Q    Okay.  Does she order supplies and drawings for you?

6    A    Yes.

7    Q    Does she engage in website design and maintenance?  I

8    think you've already testified to that, right?

9    A    Yeah, yeah.

10   Q    Okay.  Does she send out bid requests?

11   A    Yes.

12   Q    Does she update and maintain vendor subcontracted data

13   base?

14   A    Yes.

15   Q    Okay.  And you were in the room when your daughter-in-law,

16   Lisa, testified that indeed everyone on of those activities she

17   performed for Ace Masonry as well, do you recall that

18   testimony?

19   A    I remember part of it, yes.

20   Q    Okay.  So would you agree with me that essentially Missy

21   Blanchard's job as an office manager for Ace and her job as an

22   office manager for Bella involved the same tasks?

23   A    Same tasks.

24   Q    Okay.  And she's getting paid the same amount of money?

25   A    It appears that way, yeah.

1  Q    Okay.

2  **(Pause)**

3  BY MR. FURLONG:

4  Q    Now, you indicated that you're not familiar with

5  computers, is that correct?

6  A    Absolutely not, yes.

7  Q    Okay.  Have you ever heard of Craig's List?

8  A    I've heard of it.

9  Q    Okay.  Are you aware whether or not Bella Masonry has

10  advertised for workers on Craig's List?

11  A    I think I've heard Melissa talk about it, yes.

12  Q    Okay.  And did you direct her to advertise for workers on

13  Craig's List?

14  A    I directed her to advertise for workers, yes.

15  Q    Okay.  And did you ever have an opportunity to see the ad

16  that was written?

17  A    No.

18  Q    Okay.  Now, who would have composed the ad, you or Ms.

19  Blanchard?

20  A    Ms. Blanchard.

21  Q    Okay.  And would she have gotten information from you

22  necessary to post the ad?

23  A    No.

24  Q    Okay.  So she would know what workers you were looking

25  for?

1    A    Sure.

2    Q    What crafts you're looking for?

3    A    Sure.

4    Q    And she would know what areas you're doing projects in, or

5    plan to do projects in?

6    A    Correct.

7    Q    And would you agree with me, and we'll get to the ad

8    itself in a moment, that you were proposing to engage in

9    projects in the following areas for Bella: Ithaca, Binghamton,

10   Elmira, Corning, Syracuse, Watertown, Canton, Potsdam, Messina,

11   Rochester, Canadaque, Penya and Geneva, do those all sound like

12   areas that Bella --

13   A    Yes.

14   Q    -- plans on operating in?

15   A    Sure.

16   Q    All right.  And would you agree with me that with respect

17   to the geographic areas I just mentioned that Ace Masonry also

18   operated in Ithaca, Binghamton, Elmira, Corning, Syracuse and

19   so on?  The same areas.

20   A    Could be.

21   Q    Could be?  You were there since 2044 at Ace Masonry as

22   lead estimator?

23   A    Yeah.

24   Q    Did you figure out bids for jobs in those areas?

25   A    Yes, I have.

1   Q   Okay.  So it's fair to say then that Ace Masonry was in

2  the same geographic market as Bella either is or plans to be?

3   A   And so are another 50 other contractors.

4   Q   Back to my question.

5   A   Yeah.

6   Q   The same as Bella --

7   A   Yes.

8   Q   -- plans or is?

9   A   Yes.

10   Q   Okay.

11  **(Pause)**

12     MR. FURLONG:  Thank you, Mr. Bellavigna.

13     MR. LEHMANN:  Your Honor, , I don't believe there are any

14  questions left for me to ask.

15     JUDGE CARTER:  All right.

16     MR. BAILEY:  Just a couple of minutes, Your Honor.  Can I

17  just break for a couple of minutes to go over my notes?  I'll

18  be brief with Henry.

19     JUDGE CARTER:  Let me take care of one housekeeping detail

20  before we do that.

21     MR. BAILEY:  Sure.

22     JUDGE CARTER:  But since my rulings have been piecemeal on

23  this one exhibit, Exhibit 21 for GC, everything in that package

24  is in except for one document, that being the January 13th

25  letter to Mr. Bellavigna, that is actually not in evidence.

1    MR. LEHMANN:  At this time, Your Honor, I'd offer that

2  January 13, 2012 letter into evidence.

3    JUDGE CARTER:  Okay.  Any objection to that?

4    MR. BAILEY:  On objection, Your Honor.

5    MR. JAMESON:  No objection.

6    MR. LEHMANN:  That was my letter to Mr. Bellavigna am I

7  correct?

8    JUDGE CARTER:  The original --

9    MR. LEHMANN:  Yeah.

10    JUDGE CARTER:  -- information request.

11    MR. BAILEY:  No objection.

12    JUDGE CARTER:  So with that clarification the letter of --

13  the entire packet is now admitted for GC-21.

14        **(General Counsel Exhibit 21 received in evidence.)**

15    MR. LEHMANN:  Thank you, Your Honor.

16    JUDGE CARTER:  And now we'll go ahead and take a five

17  minute break.  Let's go off the record.

18        **(Whereupon, a brief recess was taken.)**

19    **JUDGE CARTER:  Back on the record.**

20    MR. BAILEY:  I'm going to be very brief, I'm going to

21  reserve most of Henry's testimony as part of our case.

22    JUDGE CARTER:  Okay.

23                    **CROSS-EXAMINATION**

24  BY MR. BAILEY:

25  Q    Henry, yesterday do you remember being asked about the

1  Trinity jobs and the SUNY, Binghamton job and then the Ithaca

2  job?

3  A    Which Ithaca job, the town --

4  Q    The Ithaca Town Hall job.

5  A    Yes.

6  Q    And opposing counsel had asked the same question with

7  respect to each of those projects asked if Bella used Ace

8  employees, do you remember that?

9  A    Yes.

10  Q    Was it Ace employees or former Ace employees?

11  A    Former Ace employees.

12  Q    And -- okay.  Earlier this morning opposing counsel was

13  talking to you about the Cornell project in that you subbed

14  that work to Ace, and you had indicated that there was reason

15  for that but opposing counsel cut you off and wouldn't let you

16  explain.  What was the reason you subbed that work to Ace for

17  Cornell?

18  A    Subbed the work to Ace is Ace was already working there on

19  the project, I knew that, simply it was a small job, it was not

20  very much money, and I thought that would be the easiest out

21  for me and I'd make a few bucks, and that's what I did.  Why

22  advertise for something for a small amount of dollars like

23  that.

24  Q    Opposing counsel also went through in great detail the

25  website of the projects that are lists and some of the

1  clientele listed on the website, and you indicated you draw no

2  distinction between Henry and Bella.

3  A    No.  Bella is Bellavigna, Henry, it's all one, there's no

4  other owner, so I consider when you put that information in

5  it's me.  So --

6  Q    And had you worked for any of those clients prior to Ace?

7  A    Absolutely.

8  Q    Where?

9  A    On the different jobs that were listed on there I had

10  worked for them.

11  Q    Okay.

12  A    That's where the names came from originally.  They

13  probably came from McGuire and Bennett when I worked for them.

14  Henry, I was vice president of the company, I was in charge of

15  field operations at the plant, I was in charge of their masonry

16  division for a time.  I labored for them for a time, so I

17  worked my up and I knew lots of people.

18  Q    Okay.

19       MR. BAILEY:  That's all I have for now, Your Honor.  Of

20  course I reserve to recall Henry as part of our case.

21       JUDGE CARTER:  Okay.  Any redirect?

22       MR. LEHMANN:  Yes, Your Honor.  Very briefly.

23                       **REDIRECT EXAMINATION**

24  BY MR. LEHMANN:

25  Q    The employees that were working for Bella were not just

1    Bella employees, correct?  They weren't just former Ace

2    employees, they were actually Ace employees when they were

3    working for Bella, correct?

4    A    Absolutely not.

5    Q    Absolutely not, okay.  So let's pull General Counsel

6    Exhibit 26, and I'm going to bring your attention to General

7    Counsel's 26, which is Bella's payroll.

8    A    Yeah.  I got to see what I did with that.

9    Q    And I also want you to grab General Counsel Exhibit 3 at

10   the same time.

11   **(Pause)**

12        THE WITNESS:  What do you want me to grab?

13        MR. LEHMANN:  GC-3 and 26.  Starting with Randy Bell.

14   BY MR. LEHMANN:

15   Q    On General Counsel Exhibit 26 what is --

16   A    Okay.

17   Q    -- the first date that you have him working for Bella?

18   Look at General Counsel Exhibit 26.

19   A    Randy, yeah, okay.

20   Q    Okay.  What's the first date that you have him working for

21   Bella?

22   **(Pause)**

23        THE WITNESS:  As far as I see on here 10/17.

24        MR. LEHMANN:  October 17, 2011.

25        THE WITNESS:  Yeah.

```
 1   BY MR. LEHMANN:

 2   Q    Now I'd like you to refer to General Counsel Exhibit 3,

 3   please?

 4   A    Yeah.

 5   Q    "Date last worked", find Randy Bell?  November 1, 2011,

 6   correct?  Randy Bell, the 6th from the top.

 7   A    Yeah.

 8   Q    November 1, 2011, correct?

 9   A    On this thing, yeah.

10   Q    Okay.  So you've got a half a month in October that he's

11   working at both Ace and Bella, correct?

12   A    According to this.

13   Q    Okay.  And let's go on to the next person.  Refer to

14   General Counsel Exhibit 26, which is the Bella payroll.

15   A    Yeah.

16   Q    And I want you to find Phillip Bond, page 13.

17   (Pause)

18   BY MR. LEHMANN:

19   Q    What's the earliest date that you have him starting with

20   Bella?

21   A    I would say 10/20.

22   Q    October 20, 2011, right?

23   A    Uh-huh, yeah.

24   Q    General Counsel Exhibit 3, Phillip Bond, you'd agree with

25   me that it states November 18, 2011, correct?
```

1    A    Yeah.

2    Q    Okay.  So that's a whole month working at both Ace and

3    Bella, correct?

4    A    This is '11, yeah.

5    Q    Okay.  Correct?

6    A    Yeah.

7    Q    So he worked at both Ace and Bella for one month.

8    A    According to this, yes.

9    Q    Okay.

10    JUDGE CARTER:  And just to the record is clear, with the

11    "this" that Mr. Bellavigna is referring to GC Exhibit 3.

12    THE WITNESS:  Yes.

13    MR. LEHMANN:  Okay.

14    BY MR. LEHMANN:

15    Q    Next one is Robert A. Bellavigna, on General Counsel

16    Exhibit 26, page 3.

17    **(Pause)**

18    BY MR. LEHMANN:

19    Q    What's the earliest date that you have your grandson

20    working for Bella?

21    **(Pause)**

22    THE WITNESS:  10/17.

23    MR. LEHMANN:  October 17, 2011.

24    BY MR. LEHMANN:

25    Q    Now, refer to General Counsel Exhibit 3, what does it say

```
 1   for date last worked for Ace Masonry?

 2   A    11/07.

 3   Q    11/07, 2011.

 4   A    Uh-huh.

 5   Q    Three weeks working at both getting paid by both Ace and

 6   Bella for three weeks, correct?

 7   A    Yeah, this is an Ace document though.

 8   Q    All right.  And you said it absolutely doesn't happen,

 9   correct?

10   A    I said what absolutely doesn't happen?

11   Q    That they didn't work for both Ace and Bella.

12   A    No, no.

13   Q    Let's go to the next day.

14   A    This isn't proving anything, this is paperwork.

15   Q    That's up to the Judge.

16   A    Okay.

17        JUDGE CARTER:  Just for the record, again references to GC

18   Exhibit 3.

19        THE WITNESS:  Yeah.  What's the next one?

20        MR. LEHMANN:  Derek Hager, page 18.

21   (Pause)

22        THE WITNESS:  Whoops, I seen it once.  Where is it?

23   10/19.

24        MR. LEHMANN:  October 19, 2011.

25        THE WITNESS:  Uh-huh.
```

1     MR. LEHMANN:  Now refer to General Counsel Exhibit 3.

2  **(Pause)**

3     THE WITNESS:  11/16.

4     MR. LEHMANN:  Okay.

5  BY MR. LEHMANN:

6  Q    A whole month getting paid by both Ace and Bella?

7  A    I don't know that.

8  **(Pause)**

9     THE WITNESS:  Can I ask you a question?  Do we know --

10    MR. LEHMANN:  No.

11    THE WITNESS:  -- who prepared this?

12    MR. LEHMANN:  I ask the questions.

13    THE WITNESS:  Okay.

14    MR. LEHMANN:  Nothing further.

15    JUDGE CARTER:  Any follow-up?  Mr. Bellavigna, you've

16 finished your testimony, you may be recalled as some point,

17 perhaps by even the counsel for the Respondent.

18    THE WITNESS:  Okay.

19    JUDGE CARTER:  So the same rules apply as a general matter

20 you're free to discuss other matters but don't discuss your

21 testimony with any other possible witness.

22        **(Whereupon, the witness was excused.)**

23    JUDGE CARTER:  Do you have another witness present?  Next

24 witness.  We'll go off for a second.

25 **Off the record.**

```
 1              (Whereupon, a brief recess was taken.)

 2         JUDGE CARTER:  Back on the record.

 3         And what's the name of the this witness?

 4         MS. KLUYTENAAR:  Richard Tracy.

 5         JUDGE CARTER:  Sir, could you stand please?  Raise your

 6    right hand, please?

 7    Whereupon,

 8                          RICHARD TRACY,

 9    having first been duly sworn, was called as a witness and

10    testified as follows:

11         JUDGE CARTER:  Please be seated.  And if you can state

12    your full name, please?

13         THE WITNESS:  Richard Paul Tracy.

14         JUDGE CARTER:  You may inquire.

15         MS. KLUYTENAAR:  Thank you, Your Honor.

16         Good morning, Mr. Tracy.

17         THE WITNESS:  Good morning.

18                     DIRECT EXAMINATION

19    BY MS. KLUYTENAAR:

20    Q    What is your profession?

21    A    A bricklayer.

22    Q    And are you a union member?

23    A    Yes.

24    Q    Which union do you belong to?

25    A    BAC, Local 3.
```

```
 1   Q    And how long have you been a union member?

 2   A    About 25 years.

 3   Q    Are you familiar with Ace Masonry?

 4   A    Yes.

 5   Q    How so?

 6   A    I worked for them for about four years.

 7   Q    And was Ace a union contractor?

 8   A    Yes.

 9   Q    Are you familiar with Robert P. Bellavigna?

10   A    Yes.

11        MS. KLUYTENAAR:  I'm going to refer to him, just so the

12   record is clear as Bob Bellavigna.

13   BY MS. KLUYTENAAR:

14   Q    How are you familiar with Bob Bellavigna?

15   A    Working for him.

16   Q    And do you know what his position was?

17   A    He'd be the person we'd talk to about our jobs.

18   Q    Okay.  Just to be clear, where did you work for him?

19   Where did you work for Bob Bellavigna?

20   A    You mean jobs or --

21   Q    No, I'm sorry.  You just testified -- I asked you are you

22   familiar with Robert P. Bellavigna.

23   A    Yeah.

24   Q    And your testimony that you worked for him?

25   A    Yes.
```

```
1    Q    Where did you work for him, at what company?

2    A    Ace Masonry.

3    Q    Okay.  And what was his title or his position there at

4    Ace?

5    A    Project coordinator, I believe.

6    Q    Okay.  And just briefly --

7    A    I'm not sure exactly, but I believe project coordinator.

8    Q    What was your understanding of what he did at Ace?

9    A    He's the person that we go to to find out where we're

10   going to work and just to talk to him about anything with the

11   job.

12   Q    Okay.  And what was your position at Ace?

13   A    Superintendent.

14   Q    Are you familiar with Lisa Bellavigna?

15   A    Yes.

16   Q    How so?

17   A    She had an office in the Ace.

18   Q    Okay.  Did you ever work with her at Ace?

19   A    We would talk.

20   Q    Did you work with her at Ace?

21   A    Worked with her -- in respect to?

22   Q    Well, when you say you would talk do you mean you would

23   have casual conversation with her, or --

24   A    Yeah, say "good morning" and she would ask me how my job

25   is going.
```

1   Q     I'm sorry?

2   A     We'd say good morning or good afternoon, she'd ask me how

3   my job was going.

4   Q     Okay.  So did you ever have any conversations with Lisa

5   Bellavigna about work related issues?

6   A     Casual things, but we would go to Bob for instructions on

7   what we were doing on our job.

8   Q     Are you familiar with Bella Masonry?

9   A     Yes.

10   Q     How are you familiar with Bella?

11   A     I worked for them briefly.

12   Q     I'd like to direct your attention to October of 2011.

13   A     Okay.

14   Q     Are you familiar with a job at the Ithaca Town Hall?

15   A     Yes.

16   Q     Okay.  What was the job?  That you know of.  What was the

17   nature of the job?

18   A     It was repointing and caulking of stone and brick.

19   Q     Did you work that job?

20   A     Yes.

21   Q     Was it an Ace job?

22   A     It was, yes.

23   Q     Okay.  What was -- why do you think it was an Ace job?

24   A     When we first started working there it was one of our jobs

25   that we talked about in a superintendent's meeting as an up and

1    coming job.

2    Q    Okay.  You just mentioned a superintendent's meeting, what

3    is that?

4    A    It's a monthly meeting where all the superintendents would

5    get together with Bob.

6    Q    Okay.  When you say "Bob" are you referring to Bob

7    Bellavigna?

8    A    Yes.

9    Q    And are those -- where did you attend those meetings?

10   A    At Ace Masonry.

11   Q    Did you attend them as an employee of Ace?

12   A    Yeah.

13   Q    Okay.  And did there come a time when you had a

14   conversation with Bob Bellavigna about the Ithaca Town Hall job

15   changing to a Bella job?

16   A    Yes.

17   Q    Where did that conversation take place?

18   A    In his office.

19   Q    And where is his office?

20   A    In the back of the Ace building.

21   Q    Okay.  Was anyone else present?

22   A    No.

23   Q    And can you describe that conversation?  What happened?

24   A    I was going in asking him about upcoming work, telling him

25   that I was running out of work on the jobs that I was on, and

1   where I was going to go next.

2   Q    Okay.  And what did Bob say?

3   A    That if I wanted to I could work on the Town Hall job, but

4   it was going to change from Ace to Bella.

5   Q    Did he say anything else?

6   A    Not really.

7   Q    Okay.  And what was your response?

8   A    All I asked is about our pay.

9   Q    Specifically what did you ask?

10  A    What I'd be paid.

11  Q    And what did Bob Bellavigna say?

12  A    That I'd be paid the same.

13  Q    Okay.  Have you ever heard of Bella before?

14  A    Only rumors that they wanted to start a new company.

15  Q    Okay.  Did you work at Ithaca Town Hall after that

16  conversation?

17  A    Yes.

18  Q    How did you know to go there?  To go to that job.

19  A    Bob told me when I got done, or if I ran out of work on

20  one of the jobs that I was doing to go to the Town Hall.

21  Q    And that's what you did?

22  A    Yeah.

23  Q    Okay.  Did anyone else instruct you to go to work at Town

24  Hall?

25  A    No.

1    Q    Did you ever have any conversation with Henry Bellavigna

2    about going to the Town Hall job?

3    A    I don't believe so.

4    Q    Is this about the time that you began receiving paychecks

5    from Bella?

6    A    Yes.

7    Q    Were you also receiving paychecks from Ace at the time?

8    A    Yes.

9    Q    Okay.

10        **(General Counsel Exhibit 36 marked for identification.)**

11        MS. KLUYTENAAR:  I'm showing you what's been marked for

12   identification as GC Exhibit 36.

13   BY MS. KLUYTENAAR:

14   Q    Mr. Tracy, do you recognize these?

15   A    Yeah, my paystubs.

16   Q    Okay.  Paystubs -- whose paystubs?

17   A    Mine.

18   Q    Okay.  And from where?

19   A    Bella and Ace.

20   Q    And what time period are these paystubs for?

21   A    Early September and October through December.

22   Q    Of what year?

23        MR. BAILEY:  Are we going to move these in before we're --

24   enter evidence before we start testifying --

25        JUDGE CARTER:  Well, just giving the date on the record is

1  not a problem at this point.

2      THE WITNESS:  2011.

3      MS. KLUYTENAAR:  I'd like to offer GC-36.

4      MR. BAILEY:  No objection.

5      MR. JAMESON:  No objection, Your Honor.

6      MR. FURLONG:  No objection, Your Honor.

7      JUDGE CARTER:  Exhibit 36 for General Counsel admitted

8  without objection.

9      **(General Counsel Exhibit 36 received in evidence.)**

10     MS. KLUYTENAAR:  Okay.

11  BY MS. KLUYTENAAR:

12  Q    Are you familiar with a job at Wegman's (ph) around the

13  same time period, say October of 2011?

14  A    Yeah, I worked there one afternoon to help Gangly (ph)

15  finish the concrete.

16  Q    I'm sorry, to help who?

17  A    Gangley Contractor.

18  Q    Okay.  Who is that?

19  A    It's a local contractor.

20  Q    Okay.  Who directed you to go to that job?

21  A    Bob.

22  Q    Did you -- when you say Bob are you referring to Bob

23  Bellavigna?

24  A    Yes.

25  Q    Did you work on that job for Ace?

1    A    I'm not even sure.

2    Q    When you went to the job who did you think you were

3    working for?

4    A    I assumed Ace.

5    Q    Okay.  Why did you assume that?

6    A    I wasn't told anything different.

7    Q    And who else worked on that job?

8    A    It was Bob, Jr. and Bob and I finishing concrete.

9    Q    Okay.  And when you say Bob you're referring to Bob

10   Bellavigna?

11   A    Yes.

12   Q    And Bob, Jr. is that Bob Bellavigna's son?

13   A    Yes.

14   Q    Okay.  Were you familiar with both of them?

15   A    Yeah.

16   Q    How were you familiar with them?

17   A    Working at Ace.

18   Q    Okay.  They both were employees of Ace?

19   A    Yeah.

20   Q    Do you recall how you got to that job site?

21   A    I met Bob at the office and went over with him.

22   Q    Which office did you meet him at?

23   A    Ace office.

24   Q    Okay.  Still focusing on the same time period, around

25   October, 2011, are you familiar with a job in Vestal, New York?

1    A    Yes.

2    Q    And did you work at that job?

3    A    Yes.

4    Q    When did you start working on that job?

5    A    Early in November, as much as I can recall.

6    Q    Okay.  And who told you to go to that job?

7    A    I spoke with Henry.

8    Q    Okay.  Was this over the phone, in person?

9    A    When I actually went to the job it was over the phone.

10    Q    Okay.  So did you call Henry or did Henry call you?

11    A    I'm not sure.

12    Q    Okay.  So you had a phone conversation with Henry --

13    A    Yeah.

14    Q    -- and can you describe that conversation?

15    A    Just asking me if I'd go to Bethel and work on the Vestal

16    job.

17    Q    Okay.  And what was your response?

18    A    I said yes.

19    Q    Was there any further conversation?

20    A    Henry asked that he wanted to have a meeting and get

21    together and discuss wages and what he expected from us.

22    Q    Did you discuss wages at the time on the phone with him?

23    A    No.

24    Q    Did you schedule a meeting with -- during that phone

25    conversation did you make arrangements to have a meeting?

```
 1   A    I don't know if -- I don't believe we made them right
 2   then.  Got another phone call and when we were going to meet.
 3   Q    Okay.  After the initial phone call?
 4   A    Yes.
 5   Q    Okay.  At this point had you submitted an employee
 6   application or an employment application for Bella?
 7   A    No.  I think the only thing that I did was fill out a W-4.
 8   Q    Okay.  And had you submitted it?
 9   A    Yes.
10   Q    How did you submit it?
11   A    I left it at the Ace office for someone to pick up and
12   take to the Bella office.
13   Q    Let's talk for a moment about the equipment at the Vestal
14   job, do you recall what kind of equipment you used on that job?
15   A    Yeah, forklifts, two mixers and a grout pump.
16   Q    Okay.  And do you know whose equipment that was?
17   A    Some of the grout pump and the mixers said "Ace" on them.
18   The forklift doesn't have anything on it.
19   Q    Okay.  Do you have any idea who owned the forklift?
20   A    Yeah, it was one that I recognized using for Ace.
21   Q    Okay.  So the grout pump and the mixer, was there any
22   other equipment besides the forklift?
23   A    Just small stuff.
24   Q    Okay.
25   A    Mud pans and stands.
```

```
 1   Q    Okay.  Did you recognize any of it?

 2   A    Yeah.

 3   Q    From where?

 4   A    Using them on different jobs with Ace.

 5   Q    Okay.  Shifting now to a little later in November of 2011

 6   did there come a time when you met with Henry at his house?

 7   A    Yes.

 8   Q    Who was present?

 9   A    Melissa, me, Henry, Randy, Derek and Bob, Jr.

10   Q    Okay.  I just want to go through those people individually

11   and see if you know any of their last names.  When you say

12   Melissa who are you referring to?

13   A    Melissa Blanchard.

14   Q    Okay.  Just so that the record is clear.

15   A    Yeah.

16   Q    Bob, Jr. is that Bob Bellavigna's son?

17   A    Yeah.

18   Q    Derek?

19   A    Derek Hager.

20   Q    And I'm sorry, who else did you say was there?

21   A    Randy Bell.

22   Q    Randy Bell.  Anyone else?

23   A    I don't believe so.

24   Q    Was Henry Bellavigna thee?

25   A    Yeah.
```

```
 1   Q    How did you get to this meeting?

 2   A    Derek and I rode together.

 3   Q    And what happened at the meeting?

 4   A    We talked to Henry about what he expected from us, and

 5   discussed wages.

 6   Q    You did discuss wages?

 7   A    Yeah.

 8   Q    What was the discussion?

 9   A    He asked us what we wanted and we told him we wanted what

10   we always got.

11   Q    Was there any discussion about fringes, fringe benefits?

12   A    Yeah.

13   Q    And what was that discussion?

14   A    That we'd get paid fringes later in a different check that

15   would be paid to us.

16   Q    And who is "they"?

17   A    Henry.

18   Q    Did you sign a sheet of paper at that meeting regarding

19   your wages?

20   A    Yes.

21   Q    Okay.  I think you have a full set of exhibits there, if

22   you'd refer to General Counsel's Exhibit 35.

23   (Pause)

24   BY MS. KLUYTENAAR:

25   Q    If you would flip to the last page on that exhibit?
```

1    A    Yeah.

2    Q    Do you recognize that document?

3    A    Yes.

4    Q    Is that your signature?

5    A    Yes.

6    Q    And do you see the date there on the document?

7    A    Yes.

8    Q    The handwritten date?

9    A    Yeah.

10   Q    Is that the date that you signed the document?

11   A    Yes.

12   Q    And where did you sign the document?

13   A    At Henry's.

14   Q    Okay.  Did you sign this document while you were at the

15   meeting at Henry's house?

16   A    Yes.

17   Q    Was there any discussion at this meeting about Bella's

18   union status?

19   A    We asked him if he would be able to go union and he said

20   maybe at some point, but not right then.

21   Q    When you say "he", who?

22   A    Henry.

23   Q    Staying again in the fall of 2011, are you familiar with a

24   job called the Chesapeake job?  Chesapeake, Athens job?

25   A    Yes.

```
 1   Q    Did you work that job?

 2   A    Yes.

 3   Q    Okay.  And where was that job?

 4   A    In Athens, PA.

 5   Q    Pennsylvania?

 6   A    Yeah.

 7   Q    Was that an Ace job?

 8   A    I'm not sure.

 9   Q    Well, when you first started working on the job whose job

10   did you think it was?

11   A    Ace.

12   Q    Why did you think that?

13   A    We rode in the Ace vehicles down to the job.

14   Q    Okay.

15   A    And used all the equipment that we've always used.

16   Q    Was the equipment you used -- did it say "Ace" on it?

17   A    Just the mixer.

18   Q    Okay.  And the other -- what was the other equipment that

19   you used?

20   A    We used the GC's forklift, we didn't take one of our own.

21   Q    Okay.

22   A    And just mud stands and things.

23   Q    Was that equipment that you recognized?

24   A    Yeah.

25   Q    Where did you recognize it from?
```

```
 1   A     Ace.

 2   Q     Did you take this equipment down to the job site with you?

 3   A     Yeah.

 4   Q     Okay.  And where did you leave from?

 5   A     The Ace office.

 6   Q     Do you remember who went with you, or did you go by

 7   yourself?

 8   A     Derek and I rode together in the truck.

 9   Q     Okay.  Anyone else?

10   A     Not with us, no.

11   Q     Did other people go down at the same time as you?

12   A     Yeah.

13   Q     Who was that?

14   A     Bob Bellavigna, Randy Bell and Bob, Jr.

15   Q     Okay.  Now, you were an employee of Ace for about four

16   years you said?

17   A     Yes.

18   Q     Do you know if Ace had a website?

19   A     Yes.

20   Q     And did you appear on that website?

21   A     Yes.

22   Q     You did.  Do you recall a discussion about putting you on

23   the Ace website?

24   A     Yes.

25   Q     Okay.  And who did you have that discussion with?
```

1    A    Melissa.

2    Q    Melissa Blanchard?

3    A    Yes.

4    Q    When was that, if you recall?

5    A    I'm not really sure.

6    Q    Okay.  Do you recall if you posed for a photo for that

7    website?

8    A    Yes.

9    Q    Did you ever see your photo and/or your biography on the

10   Ace website?

11   A    Yeah, once.

12   Q    Okay.  How did you see it?

13   A    Melissa brought it up on the computer and showed it to me.

14   Q    Okay.  Were you ever asked to appear on the Bella website?

15   A    I don't believe so.

16   Q    Did you ever have any discussion with anyone about being

17   on the Bella website?

18   A    No.

19   Q    Okay.  I'd like you to turn to General Counsel Exhibit 27,

20   if you can find it in that pile.

21   **(Pause)**

22   BY MS. KLUYTENAAR:

23   Q    If you would turn to page 6 of 7, and 7 of 7, spans two

24   pages.  Sir, it was 6 of 7.

25   A    Yeah.

1    Q    Is that your photo?

2    A    Yes.

3    Q    Is that the photo that you posed for the Ace website?

4    A    Yeah.

5    Q    Did you ever pose for a photo for the Bella website?

6    A    No.

7    Q    Do you -- if you would actually just take a look at that

8    phone number that's listed there, (607) 327-0019 --

9    A    Yeah.

10   Q    Do you recognize that number?

11   A    Yes.

12   Q    What is it?

13   A    It was my cell number to my company phone.

14   Q    Where?

15   A    For Ace.

16   Q    Okay.  And when you worked for Bella did you have a

17   company phone?

18   A    No.

19   Q    No?  So this -- was this ever your number while you worked

20   for Bella?

21   A    I still have the phone, yes.

22   Q    You still have the phone with that same number?

23   A    Yeah.

24   Q    Did you have the phone from the time you left Ace through

25   -- continuously to the present?  Have you had the phone?

```
 1   A    No, I don't have it now, I've gotten a new phone.

 2   Q    Okay.  When did you last have the phone?

 3   A    Probably November 25th or 23rd, somewhere in there.

 4   Q    What happened to the phone?

 5   A    I left it -- I gave it to Bob Bellavigna.

 6   Q    Okay.  Were you using it up through that period until you

 7   gave it back to Bob Bellavigna?

 8   A    Yeah.

 9   Q    Who initially gave you the phone?

10   A    Missy.

11   Q    I'm sorry?

12   A    Missy, when I started working for Ace.

13   Q    Okay.  And Missy is who?  Just so that the record is

14   clear.

15   A    Melissa Blanchard.

16   Q    Okay.  She's been referred to by a couple of different

17   names, Melissa, Missy, Ms. Blanchard.

18        Okay, if you would just turn to 7 of 7.  Do you recognize

19   the text on this page?

20   A    Yes.

21   Q    "Rich started his construction career in 1988"?

22   A    Yes.

23   Q    Where do you recognize that from?

24   A    It looks similar to the Ace bio.

25   Q    Okay.  Did you ever provide any information to Bella for a
```

1    biography?

2    A    No.

3    Q    Looking at the list of jobs there, there are five jobs

4    listed, "The following is a list of some of the projects Rich

5    has been involved with", do you see that?

6    A    Yeah.

7    Q    Do you recognize those jobs?

8    A    Yeah, they're all jobs that I did working for Ace.

9    Q    Okay.  Are any of those jobs that you did for Bella?

10   A    No.

11   **(Pause)**

12        MS. KLUYTENAAR:  That's all I have.

13        JUDGE CARTER:  Okay.  Mr. Furlong?

14        MR. FURLONG:  Thank you, Your Honor.

15                    **DIRECT EXAMINATION**

16   BY MR. FURLONG:

17   Q    Mr. Tracy, we've met before over at the union hall haven't

18   we?

19   A    Yes.

20   Q    And we had an opportunity not only to introduce ourselves

21   with one another but to go over your -- what you knew about the

22   relationship if any between these companies, right?

23   A    Yes.

24   Q    Okay.  I want to ask you a couple of questions with

25   respect to some of the things that General Counsel asked and

1    perhaps some others.  Getting to this discussion that you had

2    with Bob Bellavigna in the Ace offices regarding the Ithaca

3    Town Hall, do you recall your testimony?

4    A    Yes.

5    Q    And was it just you and Bob Bellavigna in that meeting?

6    A    Yes.

7    Q    And Henry was not present?

8    A    No.

9    Q    Okay.  And did the issue of "Getting your 40 hours in"

10    ever come up during that meeting?

11    A    Yes.

12    Q    Tell me about it?

13    A    I'd gone in the office to tell him that I was running out

14    of work on the projects that I was working on and what else

15    there was for me to do.

16    Q    And generally speaking did you understand that Bob

17    Bellavigna assigned work with respect to guys like you,

18    superintendents?

19    A    Yes.

20    Q    Now -- and did you go in and you say "Hey, I'm running out

21    of work" and what does he say?

22    A    That I could go to the Town Hall and work on that job.

23    Q    At that time did he tell you that that was either an Ace

24    of a Bella job?

25    A    He said it would be changing from Ace to Bella.

1    Q    Okay.  And what else did he say about that, anything?

2    A    I only asked about my pay and he said it would be the

3    same.

4    Q    Okay.  And when you got there did you understand that at

5    that point in time it was an Ace job, or that it was a Bells

6    job, or did you not know?

7    A    I wasn't sure.

8    Q    All right.  When you went on that job site was there

9    equipment on the job site for the masons?

10    A    Just small things.

11    Q    Did you recognize that equipment as being Ace or Bella

12    equipment?

13    A    No.

14    Q    You had no knowledge whose it was?

15    A    Right.

16    Q    All right.  Directing your attention to General Counsel

17    Exhibit 36, which are the paychecks that General Counsel showed

18    you, do you see that?

19    A    Yeah.

20    Q    All right.  If you go to the third page in, I see check

21    108 at the bottom, Bella Masonry made out to you, do you see

22    that?

23    A    Yes.

24    Q    And then there's some writing on there, "Town Hall", do

25    you know the source of that writing is?

1    A    I wrote that on there.

2    Q    All right.  And if I -- and that's for the week ending

3    10/23/11, am I correct?

4    A    Yes.

5    Q    All right.  And you have on there 21 hours paid by Bella,

6    right?

7    A    Yes.

8    Q    Now, if I go to the next check, top of the next page, I've

9    got 19 hours from Ace, do you see that?

10   A    Yes.

11   Q    All right.  For the same -- the week ending the same week,

12   10/28/11?

13   A    Yes.

14   Q    So if I add the 19 and the 21 do I come up with your 40

15   hours as a follow-up to your discussion with Mr. Bellavigna?

16   A    Yeah.

17   Q    Now, if I go to the next check, which is a Bella check,

18   and it's for the week of 11/04, 2011, it appears you got paid -

19   - and again, Town Hall, is that also your writing?

20   A    Yes.

21   Q    You got paid 22 hours for Bella Masonry during that week,

22   right?

23   A    Yes.

24   Q    And then the check below it, which the Ace Masonry check,

25   for the same week you got paid 18 hours, right?

1  A    Yes.

2  Q    And so for that week of 11/04/11, if we add the two

3  companies paying you you're getting your 40 hours in, right?

4  A    Yes.

5  Q    All right.  And if we go to the following check, which if

6  a Bella check for the week of 11/11 you got your entire 40

7  hours in for them, am I correct on that?

8  A    Yes.

9  Q    Okay.  So there was no Ace Masonry work that week, right?

10  A    Right.

11  Q    Okay.  Then I go to the next week, which is 11/18, and I

12  see you didn't quite get 40 in but you got 37 for Bella, right?

13  A    Yes.

14  Q    Al right.  And then the next week, which is 11/25, I'm

15  looking at the bottom check on that page, you ended up with 32

16  hours for Ace, if I go to the top of the next page you got 5

17  hours for Bella, again, taking you almost to 40, to 37, right?

18  A    Yes.

19  Q    Okay.  So basically, as we look at your actual pay history

20  as you transitioned into Bella, that discussion you had with

21  Mr. Bob Bellavigna at Ace offices proved to be the case between

22  the two that gets you your 40 hours, right?

23  A    Yes.

24  Q    All right.  Now, with respect to the job done down in

25  Vestal, do you recall traveling to that job site?

1    A    Yes.

2    Q    And did you travel in a Bella truck, and Ace truck or your

3    own vehicle?

4    A    It depended on the day.

5    Q    Okay.

6    A    Some days it would be my truck --

7    Q    Your truck being your personal vehicle?

8    A    Yeah.

9    Q    Okay.  Go ahead, I didn't mean to -- go ahead.

10    A    Some days it would be the 450.

11    Q    What's the 450?  Who owned that?

12    A    I believe Ace but it didn't have Ace signs on it.

13    Q    Is that a truck that you recognized say from the spring of

14    2011, or the fall of 2010, is that a truck that had been --

15    A    Yes.

16    Q    All right.  It's a pickup truck?

17    A    Yeah, it's a large truck.

18    Q    Okay.  And what was your point of departure from wherever

19    you were coming from down to Vestal, New York?

20    A    From the Ace office.

21    Q    On Cecil Malone Drive?

22    A    Yeah.

23    Q    Okay.  And did other employees ride with you in this

24    vehicle?

25    A    Yeah.

```
 1   Q    Who would they have been?

 2   A    Usually Derek and I.

 3   Q    Derek who?

 4   A    Hager.

 5   Q    Okay.  Was he also an Ace superintendent?

 6   A    Yeah.

 7   Q    And did you carry equipment in that vehicle when you were

 8   traveling to the Vestal job?

 9   A    Mostly our personal tools.

10   Q    Okay.

11   A    The equipment was already on the job.

12   Q    And you testified about certain markings on the equipment

13   being Ace markings on that Vestal job?

14   A    Yeah.

15   Q    All right.  At the time that you were traveling in that --

16   you said it was a 450?

17   A    Yeah.

18   Q    Okay.  With Mr. Hager you understood it to be an Ace truck

19   and leaving from Cecil Malone Drive, right?

20   A    Yeah.

21   Q    Did you ever leave from Henry Bellavigna's address in

22   Burdett, New York to go to that Vestal job?

23   A    No.

24   Q    Okay.  And how did you know to go to the Cecil Malone Ace

25   offices prior to your departure down to the Bella job?
```

1    A    It was a convenient place for us to meet, we were all

2    familiar with it, we could leave our personal vehicles and not

3    have to worry about them.

4    Q    Leave them in the Ace parking lot?

5    A    Yeah.

6    Q    Okay.  And who drove the vehicle?

7    A    It would depend of the day, some days I might drive, some

8    days Derek might drive.

9    Q    Okay.  Did Bob Bellavigna ever drive down with you?

10   A    No.

11   Q    Did you ever see Bob Bellavigna on that job?

12   A    Once.

13   Q    Okay.

14   A    Well, twice actually, in December.

15   Q    Okay.  And I want to just backtrack for a minute back to

16   the Town Hall project.

17   A    Yeah.

18   Q    Okay.  Did you ever see Henry Bellavigna on that project?

19   A    No.

20   Q    Was Randy Bell on the project in Vestal?

21   A    No.

22   Q    You testified, Mr. Tracy, about leaving a tax form, a W-4

23   tax form for Bella Masonry at the Ace office on Cecil Malone

24   Drive?

25   A    Yeah.

1  Q    Okay.  Do you know who you left it with?

2  A    I just left it there.

3  Q    At the front desk?

4  A    We would leave stuff on the conference table in the

5  office.

6  Q    Okay.

7  A    It's the same place we would pick up our paychecks.

8  Q    Okay.  And after you left it there did Henry Bellavigna or

9  Melissa Blanchard ever contact you and say, "Hey, we never got

10  your W-4 form"?

11  A    No.

12  Q    Okay.  Do you have any reason to believe that Ace Masonry

13  didn't arrange for the pickup of your W-4 form from its

14  offices?

15       MR. BAILEY:  Do you mean Bella or Ace?

16       MR. FURLONG:  Ace didn't arrange for the pickup.

17       THE WITNESS:  I have no idea who picked it up.

18       MR. FURLONG:  We're at CARPENTERS?

19       MS. KLUYTENAAR:  Six.

20       MR. FURLONG:  CARPENTERS-6?

21       JUDGE CARTER:  I have 1 through 4 for Charging Party.

22       MS. KLUYTENAAR:  Okay.

23       MR. FURLONG:  So we're at 5?

24       MS. KLUYTENAAR:  Five.

25            **(Charging Party 5 marked for identification.)**

1          MR. FURLONG:  Does this water belong to anyone?

2          MR. JAMESON:  Is it cold?

3          MR. FURLONG:  No.

4     **(Pause)**

5          MR. FURLONG:  Let me just interject a quick question

6     before we even get into this document.

7     BY MR. FURLONG:

8     Q    Mr. Tracy, are you testifying here voluntarily or were you

9     subpoenaed to testify?

10    A    I was subpoenaed.

11    Q    Okay.  By who?

12    A    The labor board.

13    Q    Okay.  Now, I've put in front of you a document marked for

14    identification as Charging Party 5, that's a CP, which means

15    the people that I represent.  Do you recognize this document?

16    A    Yes.

17    Q    And would you tell us from where you recognize the

18    document?

19    A    It's my bio from the Ace website.

20    Q    Okay.  And did you have an opportunity to retain a copy or

21    download and print a copy of this bio and then provide it to

22    me?

23    A    It was given to me.

24    Q    Okay.  But do you know it to be your bio and picture that

25    appeared on the Ace website?

1  A    Yes.

2  Q    And do you know when that website was up and on a server?

3  A    I'm not sure when it was -- when I gave the information

4  and took the picture, but while I worked at Ace it was up and

5  going.

6  Q    And you managed to retain it after it was provided to you?

7  A    Yes.

8  Q    All right.

9       MR. FURLONG:  I move that it be received into evidence.

10      MS. KLUYTENAAR:  No objection.

11      MR. JAMESON:  No objection.

12      MR. BAILEY:  No objection.

13      JUDGE CARTER:  Exhibit 5 for Charging Party is being

14  admitted without objection.

15           **(Charging Party 5 received in evidence.)**

16  BY MR. FURLONG:

17  Q    Now, Mr. Tracy, taking first note of the picture that

18  appears and comparing that to the picture that's in GC-27, is

19  it the same picture that was utilized on both websites?

20  A    Yes.

21  Q    All right.  And do you recognize the garment that you're

22  wearing, the sweat shirt?

23  A    I'm not sure.

24  Q    Okay.  Do you recognize whether or not that sweat shirt

25  was an Ace sweat shirt?

1    A    I'm not sure.

2    Q    Okay.

3    **(Pause)**

4    BY MR. FURLONG:

5    Q    Just a couple of follow-up questions.  Back to the meeting

6    with Bob Bellavigna at the Ace offices when you discussed your

7    work at the Ithaca Town Hall project, I think you testified

8    that your -- you inquired about your pay?

9    A    Yes.

10   Q    And did Mr. Bellavigna have any response to your

11   inquiries?

12   A    He said my pay would be the same.

13   Q    Okay.  And I take it you were satisfied with that?

14   A    Yes.

15   Q    And went to work at Bella?

16   A    Yes.

17   Q    Okay.

18        MR. FURLONG:  Nothing further.

19        JUDGE CARTER:  Okay.  Mr. Jameson?

20        MR. JAMESON:  No questions for me, Your Honor.

21        JUDGE CARTER:  All right.  Cross?

22        MR. BAILEY:  Can I have two minutes just to discuss

23   something with my client and then I would imagine it would be

24   less than five minutes with Mr. Tracy.

25        JUDGE CARTER:  Okay.  We'll go off the record.

1          **(Whereupon, a brief recess was taken.)**

2          **JUDGE CARTER:  Back on the record.**

3          We're back on and ready to cross.

4          MR. BAILEY:  Thank you, Judge.

5          My name is Jason Bailey, I don't think we've ever met

6     before.

7          THE WITNESS:  No.

8                         **CROSS-EXAMINATION**

9     BY MR. BAILEY:

10    Q    Maybe in the Ace office years in the past, but nothing

11    with respect to this case, correct?

12    A    Correct.

13    Q    As you probably figured out I represent both Ace and

14    Bella.

15    A    Yes.

16    Q    I just want to ask you a few questions and we'll let you

17    get back to work.  Did you ever receive ever, or hear about any

18    letter from fall/winter of 2011 from the unions with respect to

19    working at Ace?

20    A    Yes.

21    Q    And can you tell me what that letter was and what it said?

22    A    I can show it to you.

23    Q    Oh, excellent.  Thank you, sir.

24         MR. BAILEY:  I presume you have a copy since it's your

25    client?

1      MR. FURLONG:  Actually, it's not his client, it's my

2  client, but I don't have a copy.

3      MS. KLUYTENAAR:  Can we have the record reflect that Mr.

4  Tracy handed a letter to Mr. Bailey?

5      JUDGE CARTER:  The record will so reflect.  And if it

6  comes into play obviously you have a right to see that

7  document.

8      MS. KLUYTENAAR:  Thank you.

9      MR. BAILEY:  Judge, may I have this marked?

10         **(Respondent Exhibit 1 marked for identification.)**

11     JUDGE CARTER:  And while we're waiting do you have any

12  problem with having a sticker like this one put on the

13  document?

14     THE WITNESS:  No.

15  **(Pause)**

16     JUDGE CARTER:  Mr. Jameson has to see it also.

17  **(Pause)**

18  BY MR. BAILEY:

19  Q    Mr. Tracy, can you tell me what R-1 is?

20  A    It's a letter I received from the union hall about working

21  for Ace, if I continued to work for Ace.

22  Q    Can you be a little bit more specific?  What union hall

23  did you receive this from?

24  A    It's actually from our funds office in Ithaca, Local 17

25  funds office.

1  Q    Okay.  And when did you receive this letter, sir?

2  A    October 12th.

3  Q    And how do you know that?

4  A    Because it's on the envelop.

5  Q    Okay.  Do you remember receiving it?

6  A    Yes.

7  Q    Did you read it when you received it?

8  A    Yes.

9  Q    What did you do when you -- after you read it?

10 A    I talked to our people at the funds office.

11 Q    And without essentially just reading the entire letter can

12 you tell me what it says, essentially?

13 A    I was telling us --

14      MS. KLUYTENAAR:  Objection, Your Honor, I don't see the

15 relevance of this line of questioning.

16      MR. FURLONG:  It also calls for hearsay.

17      JUDGE CARTER:  Well, it's --

18      MS. KLUYTENAAR:  The document speaks for itself, it's not

19 in evidence and I don't see the relevance at all.

20      JUDGE CARTER:  All right, well --

21      MR. FURLONG:  The first objection is it's hearsay by a

22 non-party.

23      JUDGE CARTER:  One step at a time.  Who is the letter

24 from?

25      MR. FURLONG:  It's from a trust fund, a Taft Hartley trust

1  fund, who is not a party to these proceedings, who I don't

2  represent, the General Counsel doesn't represent.  Obviously if

3  they want to bring in somebody to identify it they'd bring in

4  the person who drafts the letter.  If they want to ask this

5  individual what that person said that's hearsay.

6      JUDGE CARTER:  Well, so they can still use it to show what

7  may have led Mr. Tracy to take certain actions, not for the

8  truth of the content of the letter.  They can use if for that

9  purpose.

10      MR. FURLONG:  But if they ask him what does the letter say

11  that's --

12      JUDGE CARTER:  Right.

13      MR. FURLONG:  -- hearsay.  It's clearly not against a

14  statement made against interest because they're not a part of

15  the proceeding.

16      JUDGE CARTER:  They can use it for a non-hearsay purpose

17  of showing that this letter, whether it's true or not, the

18  content caused Mr. Tracy to take certain actions.

19      MR. FURLONG:  Okay.

20      JUDGE CARTER:  So it's fine for that purpose.  Now, as far

21  as the fact that it's not in evidence, you know, that's a fair

22  point.  So we need to address that.

23      MR. BAILEY:  Sure.  Let me continue to go through.

24  BY MR. BAILEY:

25  Q   So you received the letter and what did you do?  I'm

1    sorry?

2    A    I talked to the benefits fund, that's who the letter is

3    from, and told them that we still wanted -- that I still wanted

4    to work for Ace and try and help them finish up jobs that they

5    had.

6    Q    And did you recognize who the letter was from?

7    A    Yes.

8    Q    And have you received letters from them in the past?

9    A    Yeah.

10    Q    And did it strike you as odd that you were receiving this

11    letter, sir?

12        MS. KLUYTENAAR:  Objection.  I would object to the line of

13    questioning, I just don't see the relevance at all.

14        MR. BAILEY:  Actually --

15        JUDGE CARTER:  I think I understand the relevance, but go

16    ahead and respond to relevance.

17        MR. BAILEY:  Well, Your Honor, I think there has been some

18    testimony earlier from Lisa with respect to manpower issues,

19    and that Ace was unable to get manpower at certain instances,

20    and there was a whole line of questioning whether or not she

21    called the union hall.  And this is going with, I think, that

22    very issue on whether or not Ace employees are being told by

23    the union halls to continue to work for Ace.  It goes to the

24    very heart whether or not they can supply labor.

25        MR. FURLONG:  Well, Judge, first of all, as an immediate

1    practical response to that, when counsel says the union halls
2    were pulling the labor, they don't pull the labor.  This was a
3    fund -- this is a Taft Hartley fund with management trustees
4    governing the -- this actual issuance of this letter, as with
5    every single trust document if you're not paying, you know,
6    certain contributions to trust funds at a certain point put
7    their foot down.  You have to get into that, but it was not the
8    union hall in any way pulling labor.  And unless counsel can
9    make a proffer of proof that it was a union hall that pulled
10   the labor this has no relevance.
11       JUDGE CARTER:  Well, that's a leap that you can't make.
12   It's relevant to the question whether this letter may have
13   effected, at least Mr. Tracy and perhaps other workers who
14   received it and their willingness to work for Ace, and that has
15   been put into issue in the case as to the issue of manpower.
16   So the relevance objection is overruled.  Let's move on.
17       MR. BAILEY:  Thank you, Judge.  Actually, Judge, I would
18   actually move that R-1 be admitted into evidence.
19       MR. FURLONG:  Objection.  I've stated my objection.
20       JUDGE CARTER:  Okay.  Your objection is relevance or --
21       MR. FURLONG:  My objection is that there's -- that this
22   individual first of all can't authenticate that letter.
23       JUDGE CARTER:  He received it.
24       MR. FURLONG:  But you have to bring in the person who
25   drafted it, as we know from the objections raised by counsel

1  when he was objecting with respect to authenticity.  He

2  authored those letters.  He can -- this Witness can testify

3  that he received it, but that's all he can testify to, and we

4  don't know, he could have received it from Mr. Bellavigna or

5  me.

6      JUDGE CARTER:  That's entirely true, and that goes to

7  weight, but not admissibility.  Objection is overruled.  He can

8  state that he received that letter and it caused him to take

9  certain actions.  Now, you can argue the point about whether it

10 in fact came from the benefit fund or whatever the contents of

11 the letter are true or not, but he still can testify and say

12 that I received this document in the mail and it caused me to

13 do certain things.

14     MR. FURLONG:  All right.

15     JUDGE CARTER:  Other positions on the document?

16     MS. KLUYTENAAR:  My objection as to relevance still

17 stands.

18     JUDGE CARTER:  Overruled.

19     MR. JAMESON:  I join in the other objections, Your Honor.

20     JUDGE CARTER:  Overruled.  So R-1 for Respondent will be

21 admitted over objection.

22 BY MR. BAILEY:

23 Q   So, Mr. Tracy, let me get back to the letter.  Essentially

24 what does it say?

25 A   It said if we continued to work for Ace we'd be brought up

1   on charges.

2   Q     And when you say "we" who do you mean?

3   A     Anyone -- any mason -- anyone working for Ace.

4   Q     Any union mason --

5   A     Yes.

6   Q     -- is that what you mean?

7   A     Yes.

8   Q     Okay.  And when you say "brought up on charges" what do

9   you mean by that?

10  A     You can be charged for working for a nonunion company.

11  Q     "Charged" do you mean some sort of financial penalty?

12  A     Yeah.

13  Q     Have you ever been charged in the past or penalized in the

14  past?

15  A     No.

16  Q     Do you know of anyone that's ever been penalized in the

17  past?

18  A     No.

19  Q     Okay.  But you're aware that they have this capability?

20  A     Yeah, it's in our book that we get from the union hall.

21  Q     Okay.  Did this influence whether or not you continued to

22  work for Ace?

23  A     No, I still worked for Ace.

24  Q     Okay.  Do you know if it influenced anyone else?

25  A     MR. FURLONG:  Objection, foundation --

1  MS. KLUYTENAAR:  Objection.

2  MR. FURLONG:  -- on that.

3  MS. KLUYTENAAR:  Speculation.

4  MR. FURLONG:  It calls for speculation.

5  JUDGE CARTER:  Overruled.  He can answer if he knows and

6 then we'll establish what the basis is.

7  THE WITNESS:  I don't know.

8  MR. BAILEY:  Okay, fair enough.

9 BY MR. BAILEY:

10 Q Do you know who else received these letters?

11 A I'm not sure.

12 Q Okay.  You mentioned earlier some equipment and tools on

13 Bella projects that had -- that you recognized it from Ace?

14 A Yeah.

15 Q Did you know that Bella and Ace entered into a rental

16 agreement for some tools?

17 A No.

18 Q Okay.  So if there was a rental agreement between Lisa --

19 I'm sorry, between Ace and Bella for those tools then it would

20 be --

21  MS. KLUYTENAAR:  Objection, Your Honor

22  MR. FURLONG:  Objection, calls for --

23  MS. KLUYTENAAR:  Counsel is testifying, there's no rental

24 agreement in evidence.  I don't know what document you're

25 referring to, and you're calling for speculation by the

1  Witness.

2      MR. FURLONG:  He's also testified he's unaware of any

3  rental agreement.

4      JUDGE CARTER:  All right.  Sustain as to form.

5      MR. BAILEY:  I'll move on, actually, Your Honor.

6  BY MR. BAILEY:

7  Q   While working for Ace or Bella did you ever -- strike

8  that.

9      Did Ace rent equipment from other companies like NES

10 Rentals or anything like that?

11 A   Yes.

12 Q   Is it common for contractors to rent equipment from other

13 places?

14 A   Yes.

15 Q   Do you know if Bella rented any equipment from any other

16 places line NES Rentals?

17 A   I'm not sure.

18 Q   No.  But it certainly wouldn't be uncommon?

19 A   No.

20 Q   Okay.  You had talked about your interactions with Lisa at

21 Ace, did you ever talk about job costs with Lisa?

22 A   Yeah.

23 Q   What are job costs?

24 A   It's basically how you're doing on your job when she would

25 ask how the job was going.

1   Q    From a financial standpoint?

2   A    Yeah.

3   Q    Okay.  And so you would interact with Lisa about whether a

4   job is profitable or not profitable?

5   A    Right.

6   Q    Okay

7   **(Pause)**

8        MR. BAILEY:  That's all I have, Sir.  Thank you.

9        JUDGE CARTER:  Okay.  Any redirect?

10       MS. KLUYTENAAR:  Yes, please.  Just a couple of quick

11  questions.

12                        **REDIRECT EXAMINATION**

13  BY MS. KLUYTENAAR:

14  Q    Mr. Tracy, were you at any time unwilling to work for Ace?

15  A    No.

16  Q    You continued to work for Ace in fact, did you not?

17  A    Yeah.

18  Q    After you received the letter that was just entered as --

19  A    Yes.

20  Q    -- Respondent 1?

21  A    Yeah.

22  Q    Were you ever brought up on charges by the union?

23  A    I was told that I was but I never went to the post office

24  and picked up the certified letter.

25  Q    Well, to your knowledge at this point were you ever

1    brought up on charges?

2    A    No.

3    Q    And who was your primary contact at Ace?

4    A    Bob.

5    Q    When you had questions regarding wages or manpower who

6    would you go to?

7    A    Bob.

8    Q    When you had questions about issues in the field on a job

9    who would you go to?

10   A    Bob.

11   Q    Okay.

12        MS. KLUYTENAAR:  Nothing further.

13        JUDGE CARTER:  Anything else from other parties?

14                          **RECROSS- EXAMINATION**

15   BY MR. BAILEY:

16   Q    Mr. Tracy, are you still a union member?

17   A    Yes.

18   Q    Regarding these alleged charges you say you never saw

19   them?

20   A    No.

21   Q    And do you know whether or not you were ever told -- were

22   you ever told that you were being brought up on charges for

23   working for Ace, or you were going to be brought up on charges

24   for working for Bella?

25   A    I wasn't told.

1   Q    Which it was?

2   A    Right.

3   Q    Okay.  What's the date on that letter that's in front of

4   you?

5   A    October 12th.

6   Q    Okay.  What year?

7   A    2011.

8   Q    And if we look at General Counsel's Exhibit 36, in fact

9   you did continue to receive paychecks from Ace Masonry post

10  October 12, 2011, am I correct?

11  A    Yes.

12  Q    And do you know of even a single employee who withheld

13  manpower from Ace Masonry as a result of receiving any letter

14  from a trust fund, the union or any comments, do you know

15  anybody that refused to work for Ace as a result of actions by

16  the union or its trust funds, anybody?

17  A    No.

18       MR. FURLONG:  Nothing further.

19       MR. JAMESON:  No questions, Your Honor.

20       JUDGE CARTER:  Okay, all right.  Mr. Tracy, you've

21  completed your testimony.  So the instruction at this point is

22  you're free to go but just don't discuss what you testified

23  about with any other possible witness.

24       THE WITNESS:  Okay.

25       JUDGE CARTER:  Thank you.

1                    **(Whereupon, the witness was excused.)**

2        JUDGE CARTER:  And let's go ahead and take a break.  So

3    we'll resume at 1:25.  Off the record.

4                    **(Whereupon, a brief recess was taken.)**

5

1              **A F T E R N O O N   S E S S I O N**

2                                        **(Time Noted: 1:25 p.m.)**

3         **JUDGE CARTER:  Back on the record.**

4         And do you have another witness?

5         MS. KLUYTENAAR:  Scott Smith.

6         JUDGE CARTER:  You can stand and raise your right hand,

7    please?

8    Whereupon,

9                          **SCOTT SMITH,**

10   having first been duly sworn, was called as a witness and

11   testified as follows:

12        JUDGE CARTER:  Please be seated.  Can you state your full

13   name, please?

14        THE WITNESS:  Scott Arthur Smith.

15        MS. KLUYTENAAR:  Thank you.  Mr. Smith, good afternoon.

16                      **DIRECT EXAMINATION**

17   BY MS. KLUYTENAAR:

18   Q    Are you currently employed?

19   A    No.

20   Q    What is your profession?

21   A    I'm a union laborer.

22   Q    And you're a union member currently?

23   A    Yes.

24   Q    What union do you belong to?

25   A    Local 785.

```
 1   Q    How long have you been a union member?

 2   A    Sixteen years.

 3   Q    Are you familiar with Ace Masonry?

 4   A    Yes, I am.

 5   Q    How are you familiar with them?

 6   A    I worked for them for six or seven years.

 7   Q    In what position?

 8   A    I was a mason tender.

 9   Q    Is that the same thing as a laborer?

10   A    Yes.

11   Q    Okay.  Was Ace a union contractor?

12   A    Yes.

13   Q    The entire time you worked for them?

14   A    Yes.

15   Q    Are you familiar with Robert P. Bellavigna?

16   A    Yes.

17   Q    Is he referred to as Bob Bellavigna?

18   A    Yes.

19   Q    Okay.  How are you familiar with him?

20   A    He was the -- an estimator I do believe.

21   Q    Where is that?

22   A    At Ace Masonry.

23   Q    And are you familiar with Lisa Bellavigna?

24   A    Yes.

25   Q    And how are you familiar with her?
```

```
 1   A    She was a president.

 2   Q    And where was that?

 3   A    At Ace Masonry.

 4   Q    Okay.  Did you have interaction with Lisa at Ace?

 5   A    No.

 6   Q    Are you familiar with Bella Masonry?

 7   A    Yes.

 8   Q    How are you familiar with them?

 9   A    I worked for them for a short period.

10   Q    Approximately when was that period?

11   A    October to December.

12   Q    Of what year?

13   A    2011.

14   Q    Turning your attention to around that period, October,

15   2011, are you familiar with the job at Trumansburg Church?

16   A    Yes.

17   Q    What was that job?  What did it involve?

18   A    Caulking.

19   Q    Did you work on that job?

20   A    Yes, I did.

21   Q    Was that an Ace job?

22   A    No, that was a Bella job.

23   Q    Okay.  When you first went to work at that job who did you

24   think you were working for?

25   A    Ace.
```

```
 1   Q    And how long of a job was it?

 2   A    Two days.

 3   Q    When you went to work at the job had anyone asked you if

 4   you wanted to work for Bella?

 5   A    No.

 6   Q    Who else was at the job with you?

 7   A    Stevie Rollins.

 8   Q    And who is he?

 9   A    He's a superintendent for Ace Masonry.

10   Q    Okay.  At the time you were working on the Trumansburg job

11   has you submitted any sort of employment application for Bella

12   Masonry?

13   A    Not at that time.

14   Q    Did there come a time when you started to receive

15   paychecks from Bella?

16   A    Yes.

17   Q    And when was that?

18   A    After the Trumansburg job.

19   Q    Were you also receiving paychecks from Ace during that

20   time?

21   A    Yes.

22   Q    And at the time you received your first paycheck from

23   Bella had anyone asked you whether you would work for Bella?

24   A    No, not at that time.

25   Q    Are you familiar with a job called the Chesapeake job?
```

```
 1   A    Yes.

 2   Q    And did you work on that job?

 3   A    One day.

 4   Q    For who?

 5   A    I'm not sure, I couldn't tell you.

 6   Q    Who did you -- did you have any understanding as to who

 7   you were working for on that job?

 8   A    I don't recall.

 9   Q    Would it have been either Ace or Bella or --

10   A    Yes, it would --

11   Q    -- a different contractor?

12   A    -- been one or the other.

13   Q    How did you get to the job site in Chesapeake?

14   A    I rode in the company truck.

15   Q    When you say "the company truck"?

16   A    That would have been an Ace truck.

17   Q    Okay.  This job site was where?

18   A    Pennsylvania.

19   Q    Okay.  And where did you leave from to go to the job site?

20   A    The Ace shop.

21   Q    Okay.  And where is that shop?

22   A    Cecil Malone Drive.

23   Q    Is that in Ithaca?

24   A    Yes.

25   Q    When you got to the job site was there any equipment on
```

1   the job site?

2   A    Yes.

3   Q    What was the equipment that you used if you recall?

4   A    Scaffolding, mortar mixers, forklift.  No, it wasn't their

5   forklift, I'm sorry.

6   Q    So did you -- when you say "their forklift" did you

7   recognize this equipment?

8   A    Yes.

9   Q    Okay.  Do you know who owned the equipment?  Whose

10  equipment you were using?

11  A    Ace Masonry.

12  Q    And why do you say that?

13  A    It's the same equipment that we have used for five, six

14  years.

15  Q    Did there eventually come a time when you did fill out

16  some paperwork for Bella Masonry, employment related paperwork?

17  A    Yes.

18  Q    When was that?

19  A    I do not recall the date.

20  Q    Okay.  And how did that happen?  How did it come about?

21  A    They mailed it to me and I mailed it back.

22  Q    Who mailed it to you?

23  A    Missy.

24  Q    Okay.  And you mailed it back?

25  A    Yes.

```
 1  Q    Do you remember where -- what address you mailed it back
 2  to?
 3  A    I'm not sure.
 4  Q    Okay.  Sticking with October of 2011, are you familiar
 5  with a job called Vestal Hills in Vestal, New York?
 6  A    Yes.
 7  Q    Did you work that job?
 8  A    Yes.
 9  Q    Let's just talk for a second about the equipment at that
10  job.  Do you remember what equipment you used?
11  A    Yes.
12  Q    What did you use?
13  A    A mortar mixer, a forklift, scaffolding, (indiscernible)
14  riggers, plank and safety rail and other stuff that you need
15  there for a masonry job.
16  Q    Did any of that equipment have Ace signs on it?
17  A    The mixer had Ace on it.
18  Q    Okay.  Did you recognize any of the other equipment?
19  A    Yes.
20  Q    Which equipment?
21  A    The scaffolding, it's painted red, the forklift, the same
22  one that's been -- they had for quite awhile.
23  Q    So where did you recognize the equipment from?
24  A    Ace.
25  Q    Okay.  When you went to -- how far is Vestal from Ithaca?
```

```
 1   A     Forty minutes.

 2   Q     Approximately.  Forty minutes?

 3   A     Yeah.

 4   Q     Okay.  So how did you get to the job site?

 5   A     I would go to the Ace yard and get in an Ace vehicle.

 6   Q     Who else worked on the job with you if you recall?

 7   A     Richard Tracy, Derek Hager, Stevie Rollins, Robbie

 8   Bellavigna and Bob was there a couple of days.

 9   Q     When you say "Bob" do you mean Bob Bellavigna?

10   A     Yeah, senior.

11   Q     When you say "Robbie Bellavigna" is that --

12   A     Junior.

13   Q     Okay.  That's Bob's son?

14   A     Yes.

15   Q     Okay.  Just want to be sure the record is clear.

16         And the other people you mentioned, Richard Tracy?

17   A     Yes.

18   Q     Do you know him?

19   A     Yes, I do.

20   Q     How do you know him?

21   A     He was one of my superintendents.

22   Q     Okay.  Where?

23   A     For Ace Masonry.

24   Q     And Derek Hager --

25   A     Yes.
```

1   Q    -- do you know him?

2   A    Yes.

3   Q    Who is he?

4   A    He's a superintendent for Ace Masonry.

5   Q    Stevie Rollins?

6   A    Yes.

7   Q    Who is he?

8   A    He's a superintendent for Ace Masonry.

9   Q    Okay.  Anyone else on the job that you recall?

10  A    Phillip Bond.

11  Q    Do you know him?

12  A    Yes.

13  Q    Who is he?

14  A    He's an apprentice through the mason's union.

15  Q    Okay.  Was he an employee at Ace?

16  A    Yes.

17  Q    Around that same time in October of 2011 were you also

18  working at an Ace job in Binghamton?

19  A    Yes.

20  Q    What job was that?

21  A    That would be the Science Center.

22  Q    Okay.  The SUNY Science Center?

23  A    Yes.

24  Q    And that was an Ace job?

25  A    Yes.

1    Q    And how did you get to that job site?

2    A    Stevie Rollins.

3    Q    Steve Rollins was working on that job also?

4    A    Yes.

5    Q    Was it just the two of you?

6    A    At the last point of the job, yes.

7    Q    Okay.  And when you say you rode with Mr. Rollins do you

8    recall what vehicle you rode in?

9    A    His personal truck.

10   Q    Okay.

11        MS. KLUYTENAAR:  Nothing further.

12        JUDGE CARTER:  Mr. Furlong?

13        MR. FURLONG:  Mr. Smith, good afternoon.

14                        **DIRECT EXAMINATION**

15   BY MR. FURLONG:

16   Q    We know one another from a couple of prior meetings,

17   correct?

18   A    Yes.

19   Q    And would include meeting at the union halls as well as

20   earlier today here?

21   A    Yeah.

22   Q    Okay.  I'm going to ask you some questions and if you need

23   some clarification certainly ask and I'll be happy to do so.

24        You indicted that you were hired by Ace several years ago?

25   A    Yes.

1   Q    Do you recall when that was?

2   A    I don't recall.

3   Q    Could it have been 2004?

4   A    Yes, it could have been.

5   Q    All right.  And have you worked, or did you work steady

6   for Ace Masonry from 2004 up until the latter part of 2011?

7   A    Yes.

8   Q    All right.  And during that time did you have

9   opportunities to go into the office at Ace Masonry?

10  A    No.

11  Q    Okay.  And did you have opportunities to interact with

12  Lisa Bellavigna?

13  A    No.

14  Q    All right.  Did you ever know Lisa Bellavigna to direct

15  you to go to any particular job site --

16  A    No.

17  Q    -- or do anything like that?

18  A    No.

19  Q    Did you ever witness any of your coworkers directed by

20  Lisa Bellavigna to go to job sites or do anything like that?

21  A    No.

22  Q    All right.  Who did that type of activity?  Who did the

23  direction of the work force?

24  A    I'm not really sure.

25  Q    Could it have been the superintendents?

1    A    The superintendents told me where to do -- what to do.

2    Q    How about Bob Bellavigna?

3    A    Yes, he could, h has that authority too.

4    Q    All right.  I'm going to ask you some questions about the

5    Trumansburg project, most of it was covered by General Counsel

6    but I just want to ask some other things.

7         You indicated you went up there and worked for a couple of

8    days?

9    A    Yes.

10   Q    All right.  Just for the record, Trumansburg, how far is

11   it from Ithaca?

12   A    Ten minutes.

13   Q    All right.  And this was a church project?

14   A    Yes.

15   Q    And what was the nature of the work?

16   A    Caulking.

17   Q    Okay.  And is caulking the type of work that when you were

18   working for Ace Masonry you did?

19   A    No.

20   Q    Okay.  You never did any caulking for Ace Masonry?

21   A    No, not really.

22   Q    Okay.  Did you do anything else on the Trumansburg Church?

23   A    No.

24   Q    What was the nature of the project other than the

25   caulking, was there anything else?

1    A    No.

2    Q    All right.  Now, you indicated that at the time you went

3    out there you didn't know that this was a Bella job, is that

4    correct?

5    A    That's correct.

6    Q    All right.  And you were told by Mr. Rollins to go out to

7    this project?

8    A    Yes.

9    Q    Okay.  Did you have any harnesses on that job?

10   A    Yes, we had a man lift and we had harnesses.

11   Q    Okay.  Were the harnesses marked with any markings?

12   A    There was Ace written on one of them.

13   Q    Okay.  Was it a harness that you recognized from the Ace

14   shop?

15   A    Yes.

16   Q    All right.  Did there come a time after you got done with

17   that two-day job at the Trumansburg Church were you learned in

18   fact you had been working for a company called Bella?

19   A    Yes.

20   Q    All right.  And how did you learn that?

21   A    Paycheck.

22   Q    Okay.  Up to that time had you heard any talk about you

23   working for Bella Masonry?

24   A    No.

25   Q    Up to that time -- by the way, I withdraw that.

1        Do you know Henry Bellavigna?

2    A    Yes.

3    Q    Where do you know Henry Bellavigna from?

4    A    From Ace Masonry.

5    Q    Okay.  Up to that time had Henry Bellavigna ever asked you

6    if you were interested in working at Ace Masonry?

7    A    At Ace Masonry?

8    Q    Excuse me, Bella Masonry.

9    A    No.

10    Q    Okay.  In fact after you learned you were working at Bella

11    Masonry did Henry Bellavigna ever ask you,  "Do you want to go

12    work for Bella Masonry"?

13    A    No.

14    Q    Okay.  How long have you been a construction worker?

15    A    Twenty years.

16    Q    All right.  Other than the situation involving this Bella

17    job up at Trumansburg have you ever worked for a company and

18    not knowing that you worked for that company?

19    A    No.

20    Q    Okay.  You always have known which company you were

21    working for?

22    A    Yes.

23    Q    On the Chesapeake Energy project that you testified to do

24    you know whether that was an Ace or a Bella job?

25    A    No, I do not.

1   Q    Do you know what check you got paid on for that check?

2   A    I do not recall.

3   Q    Okay.  Just a couple of more questions involving Vestal

4   and the Science Center at SUNY, Binghamton.

5        Where there ever days in which you worked in part on the

6   Vestal Hills job and in part on the SUNY, Binghamton Science

7   Center project?

8   A    No.

9   Q    Okay.  So it was either one or the other?

10  A    Yes.

11  Q    In temporal, or in time proximity were they close or were

12  they apart?

13  A    They were close.

14  Q    All right.  Did you ever work in the same week on SUNY,

15  Binghamton project Science Center and the Vestal Hills job?

16  A    I don't recall.

17  Q    Okay.

18       MR. FURLONG:  Thank you, Mr. Smith.

19       MR. JAMESON:  No questions, Your Honor.

20       JUDGE CARTER:  Okay.  Cross-examination?

21       MR. BAILEY:  Mr. Smith, you're lucky to have no questions

22  for you.

23       THE WITNESS:  Okay.

24       JUDGE CARTER:  All right.  Any redirect?

25       MS. KLUYTENAAR:  No, I'm all set, thanks.

```
1          JUDGE CARTER:  All right, Ms. Smith --
2          THE WITNESS:  You're all done with me?
3          JUDGE CARTER:  Just a second.  So you've completed your
4   testimony and you're free to go, just don't discuss your
5   testimony with any other possible witness in the case.
6          THE WITNESS:  Okay.
7          JUDGE CARTER:  Thank you.
8                  (Whereupon, the witness was excused.)
9          JUDGE CARTER:  Do you have another witness?
10         MR. LEHMANN:  Yes.  Can I take two minutes?
11         JUDGE CARTER:  Okay.  We'll go off a minute.
12   Off the record.
13                  (Whereupon, a brief recess was taken.)
14         JUDGE CARTER:  Back on the record.
15   And another witness acting General Counsel?
16         MR. LEHMANN:  Yes.  General Counsel calls Melissa
17   Blanchard.
18         JUDGE CARTER:  Okay.  Can you stand and raise your right
19   hand, please?
20   Whereupon,
21                  MELISSA BLANCHARD 611(C),
22   having first been duly sworn, was called as a witness and
23   testified as follows:
24         JUDGE CARTER:  Be seated.
25         THE WITNESS:  Thank you.
```

1        JUDGE CARTER:  Can you tell us your full name, please?

2        THE WITNESS:  Melissa Sue Blanchard.

3        JUDGE CARTER:  You may inquire.

4        MR. LEHMANN:  Thank you.  Good afternoon, Ms. Blanchard.

5        THE WITNESS:  Good afternoon.

6        MR. LEHMANN:  My name is Greg Lehmann, I am an attorney

7    for the United States Government, National Labor Relations

8    Board.  I'm going to just ask you a couple of questions.  More

9    than a couple, a few questions.

10                    **DIRECT EXAMINATION 611(c)**

11    BY MR. LEHMANN:

12    Q    Are you currently employed?

13    A    Yes.

14    Q    And where are you employed?

15    A    Bella Masonry, LLC.

16    Q    And do you remember when you started there?

17    A    I don't know the exact date, but around the third week of

18    October, 2011.

19    Q    Okay.  And how were you hired?  Who hired you?

20    A    Henry Bellavigna.

21    Q    Okay.  How did it come about that you got hired at Bella

22    Masonry?

23    A    I was looking for work and Henry approached me and asked

24    me if I wanted to work for him.

25    Q    Where did he approach you at?

```
 1   A    I don't remember.

 2   Q    Okay.  Did he call you?

 3   A    It was in person.

 4   Q    It was in person?

 5   A    But I don't know where.

 6   Q    Okay.  You know Henry Bellavigna?

 7   A    Yes.

 8   Q    All right.  And where do you know him from?

 9   A    He's my employer.

10   Q    Okay.  And did you know him before --

11   A    Yes.

12   Q    -- you started working at Bella Masonry?

13   A    Yes.

14   Q    And where did you know him?

15   A    Ace Masonry.

16   Q    At Ace Masonry?  Okay.  And, now, before you started

17   working at Bella Masonry you said you met with him in person,

18   correct?

19   A    Yes.

20   Q    Did you ever meet with Henry outside of Ace Masonry?

21   A    I don't remember that it it at Ace Masonry, it was just in

22   person that he asked me.  I don't know where.

23   Q    Okay.  But do -- the question was do you remember meeting

24   -- do you typically meet Henry outside of Ace Masonry, the

25   facility?
```

1    A    Yes.

2    Q    You did?

3    A    Yeah, I've seen him in restaurants, local restaurants

4    around town.

5    Q    Okay.

6    A    We live in the same vicinity, so, yes, I've seen him

7    outside of Ace Masonry.

8    Q    Okay.  But did you actually have a meeting outside of the

9    facility?  Typically when you were working, or before you

10    started working at Bella Masonry?

11    A    If I had to go to -- I guess I don't understand the

12    questions.

13    Q    Okay.  Well, I'm just trying to pinpoint where this

14    meeting would have taken place when --

15    A    I don't remember, I don't know.

16    Q    Okay.  And what is your job title at Bella?

17    A    Office coordinator.

18    Q    Okay.  Were you ever an office manager?

19    A    At Bella Masonry?

20    Q    Yeah.

21    A    No.

22    Q    Okay.  Were you ever listed as an office manager on Bella

23    Masonry?

24    A    I could have been, but I don't remember that, no.  I was

25    office coordinator.

```
 1   Q    And whose is your immediate supervisor?

 2   A    Henry Bellavigna.

 3   Q    Okay.  And what are you job duties?

 4   A    Payroll, accounts receivable, accounts payable, I help

 5   with the estimating, pretty much, order office supplies,

 6   equipment if it's needed.  Material for job sites, I call --

 7   kind of directs me to call and I call and order that.

 8   Q    Okay.  Anything else?

 9   A    I do the weekly, quarterly taxes, federal and state taxes.

10   Q    Okay.

11   A    Print drawings.

12   Q    You said print drawings or proof?

13   A    Print.

14   Q    Print, okay.

15   A    Print drawings.

16   Q    Okay.  Anything else?

17   A    Pretty much whatever he tells me to do.

18   Q    Okay.  Do you fill out paperwork for like liability

19   insurance?

20   A    I order the insurance certificates, yes.

21   Q    Okay.  Including like workers' comp?

22   A    I would if we had a workers' comp case fill out the

23   paperwork, but we have not had one.

24   Q    Okay.  Do you fill out the paperwork for like lines of

25   credit or --
```

1    A    Yes.

2    Q    Okay.  And do you have any involvement or knowledge of

3    vehicle insurance, whether the carrier, like the carrier for

4    vehicle insurance for Bella Masonry?

5    A    I know who our -- no, I don't know who it is.

6    Q    You don't know who the vehicle insurance carrier is?

7    A    Not off --no, not off the top of my head.

8    Q    Okay.  Do you get the phone bills?

9    A    Yes.

10   Q    Do you open the phone bills?  You know who sends you phone

11   bills?

12   A    Yeah.

13   Q    Okay.  Now, are you aware that a subpoena was issued by my

14   office to Bella Masonry about the matters pertaining to this

15   hearing?

16   A    Yes.

17   Q    Okay.  And did you participate in gathering the documents

18   responsive to that subpoena?

19   A    Yes.

20   Q    Okay.

21       MR. LEHMANN:  At this time, Your Honor, I request

22   permission to examine Ms. Blanchard under 611(c).

23       MR. BAILEY:  No objections, Your Honor.

24       JUDGE CARTER:  You may so inquire.

25   BY MR. LEHMANN:

1  Q    Now, were you also employed -- you were also employed at

2  Ace Masonry?

3  A    At one time, yes.

4  Q    Okay.  And when were you employed there?

5  A    May of 2008 until the second week of October, 2011.

6  Q    Okay.  You remember when you stopped working at Ace

7  Masonry?

8  A    I don't know the exact date, no.

9  Q    What are the -- what was the approximate date when you

10 stopped working at Ace and when you started working at Bella,

11 do you remember?

12 A    I don't, I don't, I mean, it was right around say the 20th

13 or 21st I stopped working at Ace and started there the next --

14 at Bella the next day.

15 Q    Okay.  Oh, so it was like --

16 A    It was just --

17 Q    You didn't take any day off or --

18 A    No.

19 Q    Okay.  Was that at the end of the week?  Was it like a

20 Friday you stopped working for Ace and you started working for

21 Bella on a Monday?

22 A    I don't remember, I don't --

23 Q    Okay.  Do you remember Ace's payroll dates or the time

24 period of when pay was?  The pay week?

25 A    Oh, pay week?

1   Q    Yeah.

2   A    Monday the -- for Ace?

3   Q    For Ace.

4   A    Monday through Sunday.

5   Q    Monday through Sunday?

6   A    Yes.

7   Q    And how about for Bella?

8   A    It's the same.

9   Q    Okay.  Okay, so do you remember if it was like midweek

10  that you started working for Bella, or like you stopped working

11  for Ace on Friday, started on Monday?

12  A    I don't remember.

13  Q    After you -- how long after you spoke to Henry did you

14  start working for Bella?  Was it a week?

15  A    It was probably about two weeks.

16  Q    Okay.  So you spoke to him around early October, 2011?

17  A    Yes.

18  Q    And who was your immediate supervisor at Ace Masonry?

19  A    At where?

20  Q    At Ace.

21  A    Lisa Bellavigna.

22  Q    Okay.  And what were your job duties at Ace?

23  A    I was the receptionist, I answered the telephones, I

24  filled in when needed, I cleaned, I inputted information.

25  Q    What are -- what do you mean by input information?

1    A    Like pay -- I input the payroll.

2    Q    You did the --

3    A    I just did the inputting of it.  I collected the time

4    cards, I inputted the payroll.

5    Q    Okay.  Some of those same duties that you did at Ace do

6    you do at Bella?

7    A    Yes.

8    Q    Okay.  Did you have any responsibility for accounts

9    payable at Ace?

10    A    Just inputting the receipts, the -- excuse me, the

11    invoices.

12    Q    Okay.

13    **(Pause)**

14    BY MR. LEHMANN:

15    Q    At Ace were you the administrative assistant?

16    A    Yes.

17    Q    And what specifically were your duties as the

18    administrative assistant?

19    A    Typing letters, filing, running to the bank.

20    Q    What would you do when you went to the bank?

21    A    Just deposited.

22    Q    Deposits?

23    A    Yeah.

24    Q    Okay.  When you were at Ace did you become aware of why --

25    did you have any responsibility with knowing who the liability

1    insurance carrier was, or seeing any documents pertaining to

2    liability insurance?

3    A    I would see the insurance certificates, I --

4    Q    Okay.  So you could identify who --

5    A    I knew how to read them, yes.

6    Q    Okay.  And would that include workers' comp or lines of

7    credit, did you have any responsibility with lines of credit at

8    Ace?

9    A    Maybe filling out the paperwork.

10    Q    Filling out the paperwork.  So similar duties at Bella

11    that you did at Ace?

12    A    Similar.

13    Q    Okay.

14    **(Pause)**

15    BY MR. LEHMANN:

16    Q    Did Ace have any cell phones?

17    A    Did Ace have any cell phones, yes.

18    Q    Cell phone plans.

19    A    Yes.

20    Q    Okay.  Did -- does Bella have any cell phone plans?

21    A    Yes.

22    Q    All right.  Who was the cell phone carrier for Ace?

23    A    Verizon.

24    Q    And who is it for Bella?

25    A    Verizon.

```
 1   Q     Did Ace have a checking account?

 2   A     Yes.

 3   Q     And do know how many checking accounts it had?

 4   A     No.

 5   Q     Okay.  Who was Ace's bank?

 6   A     Tompkins Trust.

 7   Q     Okay.  Do you know if Bella has a checking account?

 8   A     Yes.

 9   Q     And do they have more than one to your knowledge?

10   A     No.

11   Q     Where is Bella's checking account located?

12   A     Chemung Canal.

13   Q     Do you have the authority to write checks for Bella?

14   A     No.

15   Q     The liability insurance carrier for Ace, do you know who

16   that was?

17   A     No.

18   Q     How about for Bella?

19   A     No.

20   Q     You've seen -- you testified earlier that you saw

21   paperwork involving liability insurance, like the carrier, you

22   can't remember, or you just don't know who the carrier is for

23   liability insurance?

24   A     I don't remember -- I don't -- I'd have to read it off the

25   document, I couldn't tell you off the top of my head, no.
```

```
 1   Q    Okay.  How about vehicle insurance?

 2   A    No.

 3   Q    No, you don't know --

 4   A    I don't know who would -- who the carrier is, no.

 5   Q    For Ace you don't know who the carrier was?

 6   A    No.

 7   Q    How about for Bella?

 8   A    No.

 9   Q    Did Ace have a payroll servers -- service provider?

10   A    No, it was done in-house.

11   Q    Okay.  And who did it in-house?

12   A    I inputted the payroll and --

13   Q    Okay.  And anything else?

14   A    I printed the checks when I was told.

15   Q    How about at Bella, does Bella have a payroll service

16   provider?

17   A    No.

18   Q    Okay.  Is it down in-house?

19   A    Yes.

20   Q    Okay.  And who does it in-house?

21   A    I do.

22   Q    Okay.  And what do you do?  What's your responsibility for

23   the payroll for Bella?

24   A    Collecting the time cards, inputting them, printing them,

25   printing the checks.
```

1  Q    Okay.  The same work that you did at Ace?

2  A    Yes.

3  Q    okay.  And time and attendance for Ace, is there some

4  special program for time and attendance?

5  A    No.

6  Q    You put in hours into the computer system?

7  A    Yeah, I just put in the hours.

8  Q    Is it like a program, a special program for --

9  A    Yeah, it was an accounting program.

10  Q    Do you know the name of it?

11  A    Foundation.

12  Q    And for Bella is there a special program for time and

13  attendance?

14  A    Yes.

15  Q    And what is that?

16  A    Foundation.

17  Q    Okay.

18  **(Pause)**

19  BY MR. LEHMANN:

20  Q    Now, I'm going to read some names of companies.  You -- I

21  know you testified earlier you helped fill out lines of credit,

22  applications for Bella Masonry, and you did so the same also

23  for Ace, filled out lines of credit applications for Ace as

24  well?

25  A    Yes.

1  Q    Are you familiar with Allied Building Products?

2  A    Yes.

3  Q    Does -- did Bella have one credit with them?

4  A    They do, yes.

5  Q    Okay.  And how about Ace?

6  A    I don't know.

7  Q    Do you remember filling out paperwork for Ace?

8  A    No.

9  Q    Okay.  How about Bonds & Comb, is that --

10 A    Yes.

11 Q    Does Bella have a line of credit for them?

12 A    Yes.

13 Q    How about Ace?

14 A    I don't know.

15 Q    You don't know if Ace had line of credit with Bonds and

16 Comb?

17 A    No.

18 Q    All right.  How about Barney & Dickenson?  Barney &

19 Dickenson.

20 A    For which company?

21 Q    For Bella.

22 A    Yes, they do.

23 Q    Okay.  And how about for Ace?

24 A    I don't know.

25 Q    Okay.  Cayuga Lumber?  Are you familiar with Cayuga

```
 1    Lumber?

 2    A    Uh-huh.

 3    Q    Does Bella have a line of credit with them?

 4    A    Yes.

 5    Q    How about Ace?

 6    A    Yes.

 7    Q    All right.  Dataflow?  A company Dataflow?

 8    A    Uh-huh.

 9    Q    How about with Bella?  A line of credit?

10    A    Yes.

11    Q    With Ace?

12    A    Yes.

13    Q    Okay.  Eastern Industries?

14    A    For Bella?

15    Q    Are you familiar with that company?

16    A    Yes.

17    Q    All right.  For Bella?

18    A    Yes.

19    Q    All right.  For Ace?

20    A    I don't know.

21    Q    How about Fastenal?

22    A    Yes.

23    Q    For Bella, line of credit?

24    A    Yes.

25    Q    For Ace?
```

```
 1  A    Yes.

 2  Q    How about Hobart, Stone Dealers, a line of credit for

 3  Bella?

 4  A    Yes.

 5  Q    And for Ace?

 6  A    Yes.

 7  Q    Kelmar Construction?

 8  A    Yes.

 9  Q    For Bella?

10  A    Yes.

11  Q    And for Ace?

12  A    Yes.

13  Q    Precast Concrete Products, a line of credit for Bella?

14  A    I don't know about that one.

15  Q    Precast Concrete Products, are you familiar with that

16  company?

17  A    I don't -- I'm not familiar with it, no.

18  Q    Okay.  Lehigh Hanson?

19  A    Yes.

20  Q    Line of credit for Bella?

21  A    Yes.

22  Q    And how about for Ace?

23  A    Yes.

24  Q    Okay.  McQuade, Bannigan?

25  A    Yes.
```

```
 1   Q    A line of credit for Bella?

 2   A    Yes.

 3   Q    And Ace?

 4   A    Yes.

 5   Q    NES Rentals?

 6   A    Yes.

 7   Q    Line of credit for Bella?

 8   A    Yes.

 9   Q    And for Ace?

10   A    Yes.

11   Q    All right.  Oneonta Block?

12   A    Yes.

13   Q    Same question, Bella?

14   A    Yes.

15   Q    And Ace?

16   A    Yes.

17   Q    All right.  And P-A-O-L-A-N-G-E-L-I, do you know how to

18   pronounce that?

19   A    Paolangeli.

20   Q    Paolangeli Contractor.

21   A    Yes.

22   Q    Line of credit for Bella?

23   A    Yes.

24   Q    And for Ace?

25   A    I don't know.
```

```
 1   Q     Do you know where Paolangeli is located?

 2   A     It's on Cecil Road.

 3   Q     Okay.  Just up the block from Ace Masonry's former site?

 4   A     Yes.

 5   Q     And how about -- how far?  Fifty yards, fifty feet?

 6   A     Sure, 50 feet, I don't know.

 7   Q     Okay.  Paragon Supply?

 8   A     Yes.

 9   Q     Line of credit for Bella?

10   A     Yes.

11   Q     And for Ace?

12   A     Yes.

13   Q     And Phelps Cement?

14   A     Yes.

15   Q     For Bella?

16   A     Yes.

17   Q     And for Ace?

18   A     I don't know.

19   Q     You -- are you familiar with Pooler Enterprises?

20   A     Yes.

21   Q     And how are you familiar with them?

22   A     I received checks from them when I was at Bella.

23   Q     Had you heard of Pooler Enterprises prior to working for

24   Bella?

25   A     No.
```

1   Q    Ace never did any work for Pooler Enterprises?

2   A    Not to my knowledge, no.

3   Q    Are you aware of a contract that Pooler has with Bella?

4   A    Yes.

5   Q    Okay.  And how are you aware of that?

6   A    I had to file it.

7   Q    You filed it?  And how did you file it?  Did you fax it

8   off to Pooler Enterprises?

9   A    That was done before I started at Bella.

10  Q    Okay.  So when you said you had to file it what did that

11  mean?  What were you referring to?

12  A    When I started at Bella I filed everything that was there

13  prior to me being there.

14  Q    You mean to put it in a draw?

15  A    Yeah.

16  Q    Okay.  Do you know Robert P. Bellavigna?

17  A    Yes.

18  Q    And he is Lisa's husband?

19  A    Yes.

20  Q    Do you know if he worked at Ace Masonry?

21  A    Yes.

22  Q    Okay.  Do you know if he worked at Bella Masonry?

23  A    Yes.

24  Q    Do you know where he works now?

25  A    Bella Masonry.

1  Q    Okay.  And do you know when he started at Bella?

2  A    I believe it was the second week of December, 2011.

3  Q    Okay.  And how do you know -- you believe -- what brings

4  that to a -- how do you know that it was the second week of

5  December?

6  A    I just know that.

7  Q    Okay.  Did you help fill out like an employment

8  application for --

9  A    I did, and I had to file that with the State of New York.

10  Q    Okay.  And what did you file with the state?  What

11  paperwork.

12  A    When you have a hire -- new hire you have to file a new

13  hire with the State of New York.

14  Q    And you recollect that that was December?

15  A    Yes.

16  Q    The second week of December?

17  A    Yes.

18  Q    All right.  Do you know Robert A Bellavigna?

19  A    Yes.

20  Q    Okay.  Lisa's son?

21  A    Yes.

22  Q    All right.  Do you know if he worked at Ace Masonry?

23  A    Yes.

24  Q    Do you know if he worked at Bella Masonry?

25  A    Yes.

1  Q    And do you know when he stared working at Bella?

2  A    I believe it was the second or third week of October of

3  2011.

4  Q    And how do you know that?

5  A    Again, filing the paperwork with the State of New York.

6  Q    Okay.  Are you talking about a W-4 form?

7  A    Yes.

8  Q    And I-9 forms?

9  A    Yes.

10  Q    Okay.  And how about an employment application?  Is there

11  an employment application for Robert A.?

12  A    Yes.

13  Q    That's on file?

14  A    Yes.

15  Q    Do all the employees who are hired by Bella do they fill

16  out employment applications?

17  A    Yes.

18  Q    And so you have that on file?

19  A    Yes.

20  Q    What does the employment application look like?  Is it a

21  one-page document, two-page document, front and back?

22  A    It's probably 10 pages, including the W-4 and the I-9, and

23  it's all one-sided.

24  Q    Well, what's the first page?

25  A    The name, your social security number, your birth date,

1   emergency contact.

2   Q    Okay.  How about the second page?

3   A    Is the W-4.

4   Q    Okay.  Third page?

5   A    I believe it's the instructions of the W-4.

6   Q    Okay.  How about the next page?

7   A    It could be the I-9 and then the instructions for that.

8   Q    Okay.

9   **(Pause)**

10      MR. LEHMANN:  I'm going to show you what's been marked as

11  General Counsel Exhibit 33.

12  **(Pause)**

13  BY MR. LEHMANN:

14  Q    Do you recognize this document?

15  A    Yes.

16  Q    And this is the document that you -- and -- well, how do

17  you recognize this document?

18  A    I had to file it.

19  Q    Okay.  Did you do anything else with the document?

20  A    No.

21  Q    Is that -- on the first page is that Henry Bellavigna's

22  signature?

23  A    Yes.

24  Q    Okay.  And turning to the second page, do you know whose

25  handwriting is on the second page?

```
 1   A    No.

 2   Q    When you filed the paperwork, when you started -- and you

 3   started working for Bella when?  When was it?

 4   A    Right around the third week of October of 2011.

 5   Q    Okay.  And when you filed the paperwork was the

 6   handwriting on the document?

 7   A    I'm assuming yes.

 8   Q    Okay.  How about the third page?  Do you recognize any of

 9   the handwriting there?

10   A    No.

11   Q    Okay.  How about the fourth page?

12   A    No.

13   Q    You don't recognize the handwriting there?

14   A    No.

15   (Pause)

16   BY MR. LEHMANN:

17   Q    Now, turning your attention to the second page, the --

18   what's it dated?

19   A    September 28, 2011.

20   Q    Okay.  And does it look like the 8 of 28 is handwritten in

21   there?

22   A    It does.

23   Q    Okay.  And do you know anything about that?

24   A    No.

25   Q    Okay.  I'm going to bring your attention to the fourth
```

1  page.  Now, actually before that, did you -- have you ever seen

2  job bids before at Ace Masonry?

3  A    Yes.

4  Q    Okay.  And would you send them off or would you file them

5  or --

6  A    I would file them.

7  Q    Okay.  And approximately how many job bids at Ace Masonry

8  were there a week?

9  A    It would depend, I don't know how many, no, I don't.

10  Q    Okay.  A lot?

11  A    Yeah.

12  Q    More than --

13  A    Yes.

14  Q    -- 50 a week?

15  A    No.

16  Q    Okay.  More than 25?  About 25 a week?

17  A    No.

18  Q    How about 10?

19  A    Depending on the time of the year, yeah, yes.

20  Q    Okay.  So you've seen, or you're familiar, pretty familiar

21  with the format of the job bid for Ace Masonry?

22  A    Yes.

23  Q    Okay.  Now, looking at the format of the masonry quotation

24  on page 4, if you can just put your hand over the Bella Masonry

25  cover of -- on the top, is it the same format as it was with

1    Ace?

2    A    Yes.

3    Q    Now, at the bottom of page 4, actually before I ask you

4    about that, do you know if Henry Bellavigna was the chief

5    estimator at Ace Masonry?

6    A    Yes.  I don't know his exact title but I know he's an

7    estimator.

8    Q    Okay.  And looking at the bottom of page 4, now -- for Ace

9    Masonry, this one is signed Bella Masonry.  Okay?  Would Ace

10   Masonry be printed in there similar to the way Bella is?

11   A    Yes.

12   Q    Okay.  Or would there be a signature?

13   A    I'm sorry.

14   Q    Or would there be a signature?

15   A    It would be similar to this.

16   Q    It would be printed like that?

17   A    Similar to it, yes.

18   Q    Okay.  Except it would say Ace Masonry?

19   A    Correct.

20   Q    All right.  And does it say Ace Masonry underneath Bella

21   Masonry?

22   A    On this form?

23   Q    Yeah.

24   A    No.

25   Q    Okay.  You see something, or -- I mean, you see something

1   right above Bella Masonry?

2   A    I see lines, yes.

3   Q    Okay.  You can't make that out?

4   A    No.

5   Q    You're familiar with Craig's List?

6   A    Yes.

7   Q    What is Craig's List?

8   A    It's an online shopping, advertisement.

9   Q    And is it also a place where you can place job

10  advertisements?

11  A    Yes.

12  Q    Okay.  And do you know whether Bella places job

13  advertisements on Craig's List?

14  A    They have in the past, yes.

15  Q    Okay.  And do you play any role in that?

16  A    Yes.

17  Q    What role do you play?

18  A    I get on there and put them on there.

19  Q    And you'd put the ad on Craig's List?

20  A    Yes.

21  Q    Okay.  And do you draft the ad up yourself?

22  A    Yes.

23  Q    Okay.  And how do you get the information for the

24  advertisement?  How do you get that information?  Do you just

25  come up with it yourself, or --

1   A    No.  Henry would tell me that we need a mason.

2   Q    Okay.

3   A    So I would put in on there.

4   Q    So you'd draft up the language?

5   A    Yes.

6   Q    Now, before placing it on Craig's List do you run it by

7   Henry before you do that?

8   A    For Bella, yes.

9   Q    Okay.  And before anything you put on Craig's List you

10  would run that by Henry?

11  A    Yes.

12  Q    Okay.  And that's -- have you drafted letters for Henry?

13  A    Yes.

14  Q    Okay.  And when you draft a letter for Henry you -- before

15  you sent it out you would give it to him --

16  A    Yes.

17  Q    -- for his review?  And that happens with all of the

18  letters, right?

19  A    Yes.

20  Q    Okay.  Anything you put on the internet site you would run

21  it by Henry and get his approval --

22  A    Yes.

23  Q    -- and make sure everything is accurate and --

24  A    Correct.

25  Q    Okay.  You place any other ads besides on Craig's List?

1    Any other advertisement engine?  Like similar to Craig's List?

2    A    For?

3    Q    For ads.

4    A    For ads for what?

5    Q    For employment application -- or employment

6    advertisements.

7    A    Yes.

8    Q    Okay.  What other websites do you use, where you place ads

9    on?

10   A    The only other one is New York State, the website through

11   New York State.

12   Q    Okay.  And same process, you run that ad before you put in

13   online you run it by Henry --

14   A    Yes.

15   Q    -- and he approves it?  Okay.

16   **(Pause)**

17   BY MR. LEHMANN:

18   Q    Do you know what areas Bella Masonry is hiring -- or the

19   work -- do you know the work areas that Bella Masonry has?  Do

20   they have work in Syracuse for instance?

21   A    Right now?

22   Q    Yeah.

23   A    No.

24   Q    Okay.  Do they work in Syracuse?  Do they have jobs in

25   Syracuse?

1   A     If they would have a job in Syracuse then they'd work in

2   Syracuse.

3   Q     Okay.  And if they have a job in Ithaca they'd work in

4   Ithaca?

5   A     Correct.

6   Q     All right.  And Canadaigua?

7   A     Yes.

8   Q     Binghamton?

9   A     Yes.

10  Q     Elmira?

11  A     Yes.

12  Q     Corning?

13  A     Yes.

14  Q     Syracuse?

15  A     Yes.

16  Q     Watertown?

17  A     Yes.

18  Q     All right.  And you had an advertisement for those areas

19  for jobs that work in those areas?

20  A     Yes.

21  Q     Okay.  And those are the same areas that Ace performed the

22  work in?

23  A     Yes.

24  Q     Okay.

25  **(Pause)**

1    BY MR. LEHMANN:

2    Q    You're aware that Bella has a website?

3    A    Yes.

4    Q    Okay.  And you helped design this website?

5    A    Yes.

6    Q    All right.  And how did it come about that the website was

7    -- do you remember when it was created?

8    A    I was already created when I started.  I just tweaked it.

9    Q    Okay.  And when you say "just tweaked it" when did you

10    just tweak it?

11    A    After I was hired at Bella.

12    Q    And how did you tweak it?

13    A    I told the person that was doing it things that were wrong

14    on it, or if I didn't like the color of it, or --

15    Q    Do you remember when you tweaked it?  Was it shortly after

16    you began?

17    A    I would say yes, shortly after I began at Bella.

18    Q    Okay.  And you looked at it and you made corrections?

19    A    Correct.

20    Q    Okay.  And did you change the color you said, or --

21    A    I was just giving you an example.

22    Q    Okay.  All right, but anything that needed to be corrected

23    -- and when you say "corrected" things that aren't -- weren't

24    accurate on the website you would --

25    A    Spelling, things that just didn't make sense.

```
 1   Q    Okay.

 2   A    If it was written out and it didn't make sense.

 3   Q    All right.  And you corrected that?

 4   A    I -- yes.

 5   Q    Okay.  Now, would you actually go in there and --

 6   A    (Nods negative)

 7   Q    You got to verbalize.

 8   A    No.

 9   Q    Well, actually let me finish my question --

10   A    Okay.

11   Q    -- and then you can go ahead and answer it.

12        Did you actually go in there and make the corrections

13   yourself?

14   A    No.

15   Q    Okay.  And how would those corrections --

16   A    I would call the person that was doing it and say -- or

17   I'd e-mail them and say, "Perplexed is spelled wrong" or --

18   Q    Right.

19   A    -- whatever.

20   Q    Right, okay.  And how was this person that you would call?

21   A    Dominick Bellavigna.

22   Q    And who is Dominick Bellavigna?

23   A    Henry's son.

24   Q    And where does Dominick live?

25   A    Florida.
```

1  Q    Okay.  And you would call him and say "X" thing is wrong,
2  and he would then go in and change it himself?
3  A    Yes.
4  Q    All right.  Did -- was there ever a time when you said
5  something is wrong and he didn't change it, or he thought that
6  it was right?
7  A    I don't remember anything, no.
8  Q    Okay.  So whenever you said there's something wrong he --
9  and you brought it to his attention he changed it, right?
10 A    Not immediately, but, yes.
11 Q    N.
12 A    Yeah.
13 Q    Within --
14 A    Reason, yes.
15 Q    -- a day?
16 A    Sure.
17 Q    Two days?  Okay.
18 A    Yes.
19 Q    And when you -- who told you that there was a website when
20 you started?
21 A    Henry.
22 Q    Henry told you?
23 A    Uh-huh.
24 Q    Okay.  And did you have any discussions with him about the
25 website?

1   A    He asked me to look it over to see what I thought about

2   it.

3   Q    Okay.  And that was right when you started?

4   A    Within a couple of days, yes.

5   Q    Okay.  What did he think about the website?

6   A    I don't know.

7   Q    Did he like it?

8   A    I don't know, I don't --

9   Q    Was he -- how did he -- does he hand over a document of

10  the website, or does he take you to the computer and he pulls

11  it up, www.BellaMasonary.com, or -- I mean, how does he show

12  you the website?  Does he print something out?

13  A    He said it's Bellamasonry.com, look it up and see what you

14  think.

15  Q    Okay.  And he didn't tell you what he thought about it?

16  A    No.

17  Q    Okay.  So you did?

18  A    Uh-huh.

19  Q    Looked it up and you made -- do you remember the

20  corrections that you made?

21  A    Not off the top of my head, no.

22  Q    Okay.  Any big corrections?

23  A    Not --

24  Q    Any glaring mistakes?

25  A    I think there was spelling errors, but I don't know what

1    they were.

2    Q    Okay.  And on the website you've got a letter from the

3    president, do you remember --

4    A    Yes.

5    Q    Okay.  and you proof -- you read over the letter?

6    A    Yes.

7    Q    Do you remember making any changes to the letter?

8    A    I don't remember, no.

9    Q    Okay.  And then on the website there's also like a visions

10   statement?

11   A    Yes.

12   Q    And a mission statement?  Do you remember making any

13   changes to those?

14   A    I don't.

15   Q    Okay.  Company goals?

16   A    Yes, it's on there.

17   Q    All right.  And do you remember making any changes --

18   A    I don't.

19   Q    Okay.  There are pictures on there?

20   A    Yes.

21   Q    Okay.  Were there employees listed on there also?

22   A    Yes.

23   Q    Any major changes with that?  Anything that needed to be

24   changed?

25   A    No, I don't know.  I don't remember making any changes.

1   Q    Okay.  But all of the employees that were on there at that

2   particular time were employed there, obviously?

3   A    When I started, yes.

4   Q    Okay.  And -- okay.  Any changes to the phone numbers?

5   A    No.

6   Q    Did you make any tweaks in job titles?

7   A    No, not that I remember.

8   Q    Adding like a vice president to somebody, or VP, does that

9   ring a bell?

10  A    I didn't add it, no.

11  Q    Okay.  Well, what -- do you remember any tweaks or changes

12  that you made?

13  A    I don't.  I mean I know that I did, but I don't know what

14  -- I couldn't tell you sitting right here what it -- what they

15  were.

16  Q    Okay.

17  **(Pause)**

18  BY MR. LEHMANN:

19  Q    After you looked at it did you have conversations with

20  Henry?

21  A    Yes.

22  Q    And what did -- what was the conversation about?

23  A    I remember telling him I liked the overall format of it,

24  and it was easy to navigate.

25  Q    Okay.  Anything else?

1  A    No.

2  Q    Do you remember asking any questions about it?

3  A    No.

4  Q    Did you tell him it was accurate?

5  A    I'm sure if there were mistakes I told him what they were.

6  Q    Okay.  But you don't remember any major mistakes?

7  A    No.

8  Q    Okay.  And have you spoke to Mr. -- have you spoken to

9  Henry about the website since?

10  A    Yes.

11  Q    Okay.  And what were those discussions?

12  A    Just, you know, I don't know, if we needed -- I don't

13  know.  I know that we have spoken about it, I mean, it's part

14  of the day-to-day, I'm sure we spoke about it.

15  Q    When was the last time you spoke to him about the website?

16  A    I don't know.

17  Q    Okay.  Was it yesterday?  Was it a week ago?  Was it a

18  month ago?

19  A    I don't know.

20  Q    I'm going to show you what's been marked as General

21  Counsel's Exhibit 27.

22  **(Pause)**

23  BY MR. LEHMANN:

24  Q    You have that in front of you?

25  A    Yes.

```
 1   Q    Okay.  Do you recognize that as being Bella Masonry's
 2   website?
 3   A    Yes.
 4   Q    And on the first page there at the bottom right hand
 5   corner it says a date of October 26, 2011?
 6   A    Uh-huh.
 7   Q    You were employed by Bella Masonry at that time?
 8   A    Yes.
 9   Q    Okay.  And the first two pages are the letter from the
10   president and Henry's picture is on the second?
11   A    Uh-huh.
12   Q    Do you recognize that?
13   A    Yes.
14   Q    Had you seen that picture before?
15   A    Yes.
16   Q    Okay.  And where did you see that picture before?
17   A    I took it.
18   Q    When did you take it?
19   A    I don't know.
20   Q    Do you remember taking it before or after you started at
21   Bella?
22   A    I think I took it before.
23   Q    Before you started working at Bella?
24   A    Yes.
25   Q    So you were working at Ace?
```

```
 1   A     Yes.

 2   Q     Okay.  And this picture was taken at the Cecil Malone

 3   facility?

 4   A     Yes.

 5   Q     Okay.  And is that in his office or conference room?

 6   A     I believe it was in the lobby.

 7   Q     Okay.  Now, turning your attention to page 4.  On the

 8   pictures --

 9   A     Uh-huh.

10   Q     -- had you seen -- and I'm going to work from top to the

11   bottom.  Have you see that first picture before?

12   A     Yes.

13   Q     And where have you seen that picture?

14   A     That's on the website.

15   Q     On Bella's website?

16   A     Yes.

17   Q     Okay.  Had you seen it before seeing it on Bella's

18   website?

19   A     The first one I don't know.

20   Q     Okay.  By the way did Ace Masonry have a website?

21   A     Yes.

22   Q     And did you play any role with the website for Ace?

23   A     Yes.

24   Q     Okay.  And what role was that?

25   A     I designed it.
```

```
 1   Q    You designed it?  Put the information on the website?

 2   A    Yes.

 3   Q    And did you also put pictures on the website?

 4   A    Yes.

 5   Q    That first picture there wasn't on Ace's website?

 6   A    It could have been, I don't know.

 7   Q    For Ace Masonry was there anyone else who would put things

 8   on the website?

 9   A    No.

10   Q    Okay.  So only you would --

11   A    Correct.

12   Q    -- put things on the website.

13        And so you don't recognize the first picture?

14   A    Not the first one, no.

15   Q    Okay.  How about the second picture?  Have you seen that

16   before?

17   A    Yes.

18   Q    And where have you seen that before?

19   A    On the website.

20   Q    On Bella's website?

21   A    Yes.

22   Q    Okay.  Have you seen it on Ace's website?

23   A    I've seen the picture at Ace before, yes.

24   Q    Okay.  And when you say "at Ace" you mean Ace's website?

25   A    I don't know if that one was included in the website.
```

1  Q    Okay.  You can't remember if you put that picture on the

2  website?

3  A    No.

4  Q    Okay.  How about the third picture

5  A    Yes.

6  Q    You've seen it on Bella's website?

7  A    Yes.

8  Q    How about on Ace's website?

9  A    Yes.

10 Q    Okay.  How about the fourth picture?

11 A    Yes.

12 Q    On Bella's Website, obviously.  Ace's website?

13 A    Bella's, yes, Ace's, yes.

14 Q    Okay.  And the last one, on Ace's website?

15 A    On Ace's, yes.

16 Q    Okay.  Now, I'm going to direct your attention to the

17 second -- two of seven and three of seven.

18 **(Pause)**

19 BY MR. LEHMANN:

20 Q    Lisa's son, Robert A. Bellavigna?

21 A    Uh-huh.

22 Q    He was employed with Bella when you began working for

23 Bella?

24 A    Yes.

25 Q    Okay.  Did you make any changes to this -- any of his bio?

1   Do you remember making any changes to the bio?

2   A    No.

3   Q    Okay.  The next picture is Robert P. Bellavigna?

4   A    Yes.

5   Q    And that is Lisa's husband?

6   A    Yes.

7   Q    And he was employed at Bella on October 26, 2011?

8   A    No.

9   Q    He wasn't?

10  A    No.

11  Q    Okay.  Did you bring that to anyone's attention that he

12  wasn't employed there?

13  A    No.

14  Q    Okay.  You didn't tell Henry, "Listen,, we have Robert P.

15  Bellavigna, he's on the website, he's not employed here"?

16  A    No.

17  Q    You noticed that he was on the website?

18  A    Yes.

19  Q    But you didn't bring that to anyone's attention?

20  A    No.

21  Q    Did you make any changed?  Did you recommend that any

22  changes be made to Robert P. Bellavigna's bio?

23  A    No.

24  Q    Job title?

25  A    No.

1  Q     Okay.  The -- skipping over you, Randy Bell, is -- did you

2  make any recommendations or changes to his bio that you can

3  recall?

4  A     No.

5  Q     Derek Hager?

6  A     No.

7  Q     Or Richard Tracy?

8  A     No.

9  Q     Have you seen Henry Bellavigna on his website?

10  A     Have I seen him on -- no.

11  Q     You haven't seen him?  Does he have a computer?

12  A     No.

13  Q     Have you ever seen him on a computer?

14  A     No.

15  Q     Okay.  So besides you who else would tell Dominick to make

16  changes, or is that really your job to bring that stuff to --

17  A     That would be my job to bring it to his attention.

18  Q     Okay.  Now, I'm showing you what's been marked as General

19  Counsel Exhibit 29.

20  **(Pause)**

21  BY MR. LEHMANN:

22  Q     And turn to three of six, actually and also after you turn

23  to three of six of GC-29 open GC-27 back up to three or seven.

24  **(Pause)**

25  BY MR. LEHMANN:

1    Q    Robert P. Bellavigna?

2    A    Uh-huh.

3    Q    The -- comparing the job titles, project coordinator on

4    October 26, but on the November 14th is says, "VP, project

5    coordinator"?

6    A    Uh-huh.

7    Q    Do you know how that got changed?

8    A    No.

9    Q    You don't remember recommending that that change?

10   A    No.

11   **(Pause)**

12         MR. LEHMANN:  Nothing further.

13         JUDGE CARTER:  Mr. Furlong?

14         MR. FURLONG:  Good afternoon, Ms. Blanchard.  My name is

15   Richard Furlong and I represent the Laborers Union, 785 and the

16   Bricklayers Union, Local 3.

17                         **DIRECT EXAMIANTION**

18   BY MR. FURLONG:

19   Q    Both of which I think you've heard of in the past, right?

20   A    Yes.

21   Q    Let me ask you some questions, and I'm happy to rephrase

22   the questions if any of them are confusing for you.

23         Are you on any medication or is there any cause to believe

24   that your memory would be compromised in any way?

25   A    No.

1   Q    Okay.  You got a pretty good memory you think?

2   A    I'm getting old.

3   Q    As we all are, as we all are.  But taking a cue from the

4   web page that the counsel was just talking about --

5   A    Okay.

6   Q    -- where it describes you and your pleasant personality,

7   which certainly I would agree from what I've seen so far, but

8   it also goes on to say that you have a mind for detail, right?

9   A    Yes.

10  Q    More specifically -- okay, you have an eye for detail.

11  And would you consider that to be true?

12  A    Yes.

13  Q    All right.  And part of your job of course is making sure

14  that things that cross your desk are accurate, correct?

15  A    Correct.

16  Q    All right.  Now, you mentioned, or when counsel was

17  questioning you about the Bella Masonry website, and now

18  looking at GC-27, which was the October website, you've seen

19  that before?

20  A    Yes.

21  Q    All right.  Because in fact as part of your job duties,

22  okay, on the Bella website it talks about wed design and

23  maintenance, right?

24  A    Right.

25  Q    All right.  Now, the web design portion of that, I want

1    you to tell us what role you had in designing this website?

2    A    None.

3    Q    Okay.  So that's not accurate?

4    A    No.

5    Q    Okay.

6    A    It's not accurate.

7    Q    All right --

8    A    Yes, it's not accurate.

9    Q    It's not accurate.  Okay.  And when you went over this and

10   tweaked it for accuracy did you bring it to Henry's attention

11   that that wasn't accurate?

12   A    No.

13   Q    Why not?

14   A    I don't know.

15   Q    Okay.  But you do take your job duties seriously?

16   A    Yes.

17   Q    All right.  And you understand that an eye for detail is

18   important to Henry Bellavigna?

19   A    Yes.

20   Q    All right.  How about the web maintenance portion of that?

21   A    It was just --

22   Q    Tel me about your web maintenance duties for Bella

23   Masonry?

24   A    By calling the web designer and telling him what's wrong.

25   Q    Who's Dominick Bellavigna?

1  A    Correct.

2  Q    All right.  And that would include not only typos but

3  content or anything else --

4  A    Correct.

5  Q    -- that you think Henry would be concerned about, am I

6  correct on that?

7  A    Correct.

8  Q    All right.  So a few days after you're hired, which is

9  October 20th, the day after you were let go by Ace or you left

10  on your own volition, the 19th, a couple of days later you look

11  at this website at the directive of Henry to review it for the

12  accuracy, right?

13  A    Correct.

14  Q    And to work with Dominick and making sure that Bella had

15  an accurate website, correct?

16  A    Yes.

17  Q    All right.  And with that you looked up and you see Robert

18  P. Bellavigna, a picture of Mr. Bellavigna with an extensive

19  description of his history as a mason, as a superintendent, his

20  running work, right?

21  A    Yes.

22  Q    You see that, right?  And of course you knew Robert

23  Bellavigna because you had worked with him over at Ace, right?

24  A    Correct.

25  Q    All right.  And you knew that this wasn't a typo or a

1  comma or anything, missing a picture of somebody, with a

2  content and jobs that he's worked on, plus his training and

3  certificates, right?

4  A    Uh-huh.

5  Q    And he doesn't work there?

6  A    No.

7  Q    And you knew he didn't work there?

8  A    Yes.

9  Q    And you were okay with allowing that to remain on the

10  website?

11  A    Yes.

12  Q    Okay.  Are there any other people on this website who are

13  being represented as employees of Bella Masonry when in fact

14  they're not employees of Bella Masonry?

15  A    No.

16  Q    Getting back to Robert P. Bellavigna, you understood that

17  he had absolutely -- your understanding was he had no

18  relationship at this point with Bella Masonry?

19  A    Yes.

20  Q    "Yes" meaning he had no relationship?

21  A    Yes.

22  Q    All right.  And you understand, of course, being a web

23  designer and somebody who maintains websites that you're

24  putting that out there into cyber space for anybody, including

25  potential customers to view?

```
 1   A    Yes.
 2   Q    Why would Robert P. Bellavigna remain on that website?
 3   Give me the answer.
 4   A    It was a mistake.
 5   Q    It was a mistake.  And I'm assuming that it was a mistake
 6   that just got past you?  You didn't notice that?
 7   A    It was a mistake to leave him on there.  To not say
 8   anything.
 9   Q    Oh, in other words you understood it wasn't truthful but
10   it was a mistake leaving in on there and to being truthful?
11   A    It was a mistake.
12   Q    What was the mistake?  The content was a mistake or you
13   knew it was not truthful to leave it on the website and it was
14   a mistake that it was left on there as a result of your not
15   bringing it to Henry's attention?
16   A    It was a mistake.  I don't know, I don't know.
17   Q    In essence you don't have an explanation as to why Robert
18   P.?
19   A    No.
20   Q    Okay.  Did you ever bring it to Robert P. Bellavigna's
21   attention that a company that he had no connection with was
22   utilizing his picture?
23   A    No.
24   Q    And you didn't bring it to his attention?
25   A    No.
```

1  Q    And do you consider yourself a friend of Bob's?

2  A    No, no.

3  Q    Okay.  You consider him a work acquaintance?

4  A    Yes.

5  Q    Somebody that you've worked with for many years at Ace?

6  A    Yes.

7  Q    Okay.  Now, as we get into the contents of the website,

8  because again you're viewing this for accuracy, given your eye

9  for detail, right?

10 A    Yes.

11 Q    All right.  As we look at this, the letter from the

12 president, do you see that on the front page?

13 A    Uh-huh.

14 Q    All right.

15 A    And which one?

16 Q    GC-27, it's the same letter as GC-29 as well.

17 A    Okay.

18 Q    Ever see that before?

19 A    Yes.

20 Q    Where have you seen it before?

21 A    On the website.

22 Q    Prior to the Bella website where did you see it before?

23 A    I don't know.

24 Q    You never saw that on the -- well, let me backtrack.  You

25 maintain, according to Lisa Bellavigna, you maintain Ace

1    Masonry website, that was one of your duties?

2    A    Yes.

3    Q    Is that accurate?

4    A    Yes.

5    Q    All right.  And part of maintenance of that website was to

6    review it for accuracy and contents, correct?

7    A    Correct.

8    Q    Now, this is a lengthy letter.  Are you testifying here

9    under oath today that you never saw a similar letter of the Ace

10   Masonry website, is that your testimony?

11   A    No, I've seen a similar letter, yes.

12   Q    All right.  And how did this letter change, other than the

13   name Bella Masonry for Ace Masonry, and other than Lisa for

14   Henry, how did the contents of the letter change?

15   A    I would have to look at both of them together to see that.

16   I don't know.

17   Q    Okay.  Without looking at them, just from your job, can

18   you recall -- does this look like the letter that was posted,

19   word for word, with those exceptions that I mentioned, on the

20   Ace Masonry website?

21   A    Yes.

22   Q    All right.  Now, do you have an explanation as to how a

23   company that's completely unrelated to Bella Masonry, how their

24   content of their website ended up on Bella Masonry's website?

25   Can you give us that explanation?

1    A    No.

2    Q    Okay.  Did it -- was your curiosity raised where you

3    wanted to go Henry and say, "Henry, this company that has

4    nothing to do with us we've taken the content of their website

5    and put it on our web page"?  Did that raise some red flags for

6    you?

7    A    No.

8    Q    Okay.  Nothing unusual about that, right?

9    A    No.

10   Q    Even the part with Ace Masonry where it says, "Quality,

11   integrity and reliability" you lifted that, or Dominick did,

12   and put in on Bella Masonry's caption at the top, correct?

13   A    Did I do it?

14   Q    No.  I'm saying did Bella Masonry do it?

15   A    Yes.

16   Q    All right.  And you didn't have any problems unrelated to

17   Bella Masonry, right?

18   A    I didn't take it.

19   Q    Okay.  But you reviewed it for content and accuracy,

20   right?

21   A    Yes.

22   Q    Okay.  You know Lisa Bellavigna?

23   A    Yes.

24   Q    You think highly of Lisa Bellavigna?

25   A    Yes.

1  Q    You understand that she runs Ace Masonry?

2  A    Yes.

3  Q    Okay.  Did you understand that you were taking something

4  from the content of an unrelated company, owned and operated by

5  Lisa and using it for a company called Bella Masonry, do you

6  understand that?

7  A    I didn't take it.

8  Q    Did you understand that Dominick or Henry was doing that?

9  A    Yes.

10  Q    All right.  And were you concerned about that?

11  A    No.

12  Q    Okay.  And why is that?

13  A    I don't know.

14  Q    Okay.

15  A    I just wasn't.

16  Q    All right.  Now, as we get down into the accuracy portion

17  of this letter of the president, I notice in the second

18  paragraph, about five lines down, "Our team has over 430 years

19  of combined experience in the construction industry", do you

20  see that?

21  A    Uh-huh.

22  Q    Okay.  Tell me how accurate that is at Bella Masonry?

23  A    According to the website?

24  Q    Yeah, tell me where did they come up with -- you're

25  checking this for accuracy and your eye for detail, where did

 1   they come up with the 430 years of construction experience?

 2   A    I don't know.

 3   Q    Is it -- could it have been that the 430 years was

 4   actually listed on the Ace Masonry, word for word like that?

 5   A    Sure.

 6   Q    Okay.  And so let's just cut through the chase of it, cut

 7   through the chase on this.  This letter, with the exception of

 8   the Bella Masonry substitution for Ace Masonry, you know was

 9   taken from the Ace Masonry website, correct?

10   A    Yes.

11   Q    All right.  Now by the way, you review the bills that come

12   into Bella Masonry?

13   A    Yes.

14   Q    Okay.  Do you ever see a bill from Ace Masonry to Bella

15   Masonry for some sort of royalty payments or anything like that

16   for --

17   A    No.

18   Q    -- taking the content?  Okay.  So to your knowledge, Ms.

19   Blanchard, this content, at least for the letter of the

20   president was taken without any money going back to Ace Masonry

21   to take the content from Ace's website?

22   A    Yes.

23   Q    Okay.  Looking at the mission statement, underneath the

24   vision statement, you reviewed that mission statement for

25   accuracy didn't you?

1    A    Yes.

2    Q    All right.  And it says in the second paragraph that Bella

3    Masonry -- you want to establish Bella Masonry as the most

4    widely recognized provider of general construction in our

5    chosen region, do you see that?

6    A    Uh-huh.

7    Q    And you  understand that as an employee to be accurate,

8    correct?

9    A    Yes.

10    Q    Okay.  And we move on to the clientele on the next page.

11    As part of your duties as an office manager at Ace you surely

12    knew, because you were sending correspondence and letters and

13    everything else to the customer of Ace, right?

14    A    Yes.

15    Q    I'm not going to go customer by customer, but take a look,

16    I want you to carouse that list and you tell us what customers

17    there were not Ace customers?

18    **(Pause)**

19        THE WITNESS:  None.

20        MR. FURLONG:  None.

21    BY MR. FURLONG:

22    Q    They were all Ace customers, right?

23    A    Correct.

24    Q    All right.  Now, if we look at the next exhibit, or

25    actually in November's but you don't have to right now because

1   it reads the same, but if you look at the November list of

2   clientele by that time Bella had been doing work for certain

3   customers, had they not?

4   A     Yes.

5   Q     Ithaca Town Hall, right?  They had done work down in

6   Vestal, right?

7   A     Yes.

8   Q     They had done work up in Trumansburg Church, right?

9   A     Yes.

10  Q     Okay.  They had a bunch of customers, Bella did, right?

11  A     Uh-huh.

12  Q     Okay.  But if we take a look at the November they didn't

13  even list their own customers, they only listed Ace's

14  customers, isn't that accurate?

15  A     Yes.

16  Q     Okay.  So not only did they not list Bella but they were

17  listing Ace, promoting it out there as this is the company that

18  we are?

19  A     I didn't --

20  Q     I'll withdraw it.

21        Do you know if Bob -- do you deal with architects?  Do you

22  ever have correspondence or dealings with architects?

23  A     Yes.

24  Q     Okay  And what architects have you dealt with at -- since

25  you've been to Bella?

1    A    Can I rephrase that?  I dealt with their secretaries or

2    whatever.

3    Q    Are you familiar with the firms that Bella deals with

4    architectural wise?

5    A    Yes.

6    Q    All right.  Name some.

7    A    Hunt, M&E I believe the name of it is, they would be the

8    two that I remember calling for Bella.

9    Q    Okay.  And were they also architects that you dealt with

10    with Ace Masonry?

11    A    Hunts, yes.

12    Q    How about the other one?

13    A    I don't remember.

14    Q    What was the second one?

15    A    M&E or something like that.

16    Q    You see that M&E on this list here of completed projects

17    for the following architects?

18    A    They weren't a project that we completed or did work for,

19    they were a project that bid for.

20    Q    Okay, all right.  But they're not listed on there either?

21    A    No.

22    Q    All right.  These architects are all architects that you

23    dealt with with Ace Masonry?

24    A    Yes.

25    Q    Okay.

1   **(Pause)**

2   BY MR. FURLONG:

3   Q    You testified a moment ago that you get along with Lisa

4   Bellavigna, right?

5   A    Yes.

6   Q    And have considered her a friend, right?

7   A    Yes.

8   Q    Want to see her succeed?

9   A    Yes.

10  Q    Want to see Ace Masonry succeed, right?  You did when you

11  were with them?

12  A    Well, yeah.

13  Q    Now of course they're a competitor to Bella so you're not

14  so sure, but when you were with them you wanted to see them

15  succeed, right?

16  a    Yes.

17  Q    And you're a friend of Henry Bellavigna, you think highly

18  of Henry?

19  A    I don't know that "friend" is a word, he's my employer.

20  Q    Are you in acquaintance with him?

21  A    Yes.

22  Q    And respect him?

23  A    Yes.

24  Q    All right.  And the same thing would be for Bob P.

25  Bellavigna, right?

1    A    He's a coworker, yes.

2    Q    Yes.  But you respect Bob, right?

3    A    Sure.

4    Q    Right.  Now, there came a time when you indicated that

5    your employment was coming to a close with Ace Masonry,

6    remember that?

7    A    Uh-huh.

8    Q    When was that?

9    A    When?

10   Q    Yeah, when was it starting to come to a close?

11   A    I don't understand.  When was it --

12   Q    Did you start to look for a job at a certain point?

13   A    Yes.

14   Q    Why did you start to look for a job?

15   A    Because I knew Ace wasn't doing very well and I had to

16   provide for my family.

17   Q    Okay.  So you started -- what, you saw the writing on the

18   wall that Ace was closing or something like that?

19   A    I knew that it wasn't doing great.

20   Q    Were they meeting your paychecks?

21   A    Yes.

22   Q    Ever miss a paycheck?

23   A    No.

24   Q    Okay.  Now, as we go through the summer, and we go into

25   the fall of 2011 --

1    A    Okay.

2    Q    -- tell me if you have any familiarity with these jobs.

3    Kaminski Field Renovations at Ithaca College, $731, 855, not

4    due to be completed until the end of the year, do you remember

5    that job?

6    A    For Ace?

7    Q    For Ace.

8    A    Yes.

9    Q    Okay.  $731,000 job, right?

10   A    Correct.

11   Q    Okay.  You've got a $459,000 job in Corning for Erwin, LFA

12   Saline (ph), do you remember that job?

13   A    I know they did work at Corning, yes.

14   Q    Are you familiar with how big the job was?

15   A    I didn't know what the numbers were, no.

16   Q    Okay.  You got a whole bunch of jobs through the summer,

17   which I won't go through.  And by the way, if you want to give

18   the -- this is GC-2, all right?  Cornell University, Gannett

19   Health Services, do you remember that job?

20   A    Yes.

21   Q    Okay.  It was still ongoing when you left there, correct?

22   A    I believe so, yes.

23   Q    $202,000, all right?  The East Tower in Ithaca College,

24   $290,000, do you remember that job, Ithaca College, East Tower?

25   A    Yes.

1  Q    Okay.  You're smack in the middle of it when you decide to

2  leave.  Was it ongoing when you were there?

3  A    Yes.

4  Q    And when you decided to leave?

5  A    Yes.

6  Q    Okay.  $200 -- Steam Bolt Repairs, $259,000, ongoing when

7  you decided to leave, right?

8  A    Yes.

9  Q    Okay.  Summer Surge Source and Gross, okay?  $85,000 job,

10  do you remember that job?

11  A    Yes.

12  Q    Ongoing when you decided to leave, correct?

13  A    Yes.

14  Q    All right. IC Garden Heated Sidewalks, $40,000 job ongoing

15  when you decided to leave, right?

16  A    Yes.

17  Q    Okay.  The Erwin Time and Material job, small job, $3400

18  dollars, but that was ongoing when you decided to leave,

19  correct?

20  A    Yes.

21  Q    Okay.  Trinity Episcopal Church, almost -- it's $198,000,

22  still isn't done, and they had already gotten that job, were

23  doing that job, correct, when you decided to leave?

24  A    We're talking about Ace?

25  Q    I'm talking about Ace.

1   A    Yes.

2   Q    Okay.  And then a series of smaller jobs that are listed

3   there going into December, do you see those jobs?

4   A    Yes.

5   Q    So they had well over a million dollars' worth of work on

6   the books at the time that there were "winding down" and you

7   looked for another job, am I correct on that?

8   A    Yes.

9   Q    All right.  And you were getting paid $15 an hour, right?

10  A    Yes.

11  Q    And you were nervous about your job?

12  A    Yes.

13  Q    Okay.  And in essence you walked out on Lisa Bellavigna at

14  a time when she had work on the books and the company was --

15  had over a million dollars of work on the books that it was

16  performing in order to go to another company?

17  A    That's my choice, yes.

18  Q    Okay.  It certainly is your choice, I'm just trying to get

19  to the reasoning under -- behind that choice.  And you took a

20  job where you got paid $15 an hour, the same as you were

21  getting paid at Ace Masonry?

22  A    Yes.

23  Q    Okay.  And your working conditions were essentially the

24  same.  You got the same -- you got the same benefits, whatever

25  they were.  Well, let me backtrack, what were your benefits at

1  Ace Masonry?  Not wages, what were your benefits?

2  A    401(k) and health insurance.

3  Q    Okay.  And what were you getting at Bella Masonry?

4  A    What am I getting at Bella?

5  Q    Yeah.

6  A    Neither.

7  Q    So you actually -- you actually took a decrease in

8  compensation --

9  A    Yes.

10  Q    -- to go to Bella Masonry?

11  A    Yes.

12  Q    Okay.  And essentially the same duties -- you were taking

13  the same -- performing the same duties at Bella as you were at

14  Ace.  You were the right hand person to the boss?

15  A    Yes.

16  Q    All right. So tell me, someone at a certain point must

17  have spoken to you about going to work at Bella Masonry where

18  you were going to take a pay cut, do the same job and leave a

19  company that's got over a million dollars' worth of work on the

20  books.

21  A    And be closer to home.

22  Q    Was that the reason?  Was that one of the motivations?

23  A    There was one other -- yes, I have an 80 year-old mother

24  that sick.

25  Q    Okay.

1   A    Yes.

2   Q    But Burdett is roughly what, about 15 miles from Ithaca?

3   A    I don't live in Ithaca.

4   Q    Okay.  Where do you live?

5   A    Watkins Glenn.

6   Q    All right.  So Burdett would cut what, about 20 minutes

7   off your drive?

8   A    Yeah.

9   Q    That's the reason you left this job you had been with for

10  about --

11  A    No, I left because I didn't like the controller that they

12  had.

13  Q    Okay, all right.  And you ended up with Bella Masonry?

14  A    Correct.

15  Q    All right.  Now, I just want to revisit a couple of topics

16  and then I'll conclude.  I'm assuming that -- and you tell me

17  if I'm wrong, that one of the directives given to you by Henry

18  Bellavigna was to maintain that website as best as possible?

19  A    Yes.

20  Q    All right.  Why haven't the Bella jobs been placed on that

21  website?

22  A    I guess I've lacked in my job.

23  Q    I can accept that.  One of your job duties, as I look at

24  different documents that have been received into evidence,

25  which you haven't seen, is to complete remittance forms and to

1   be sent in for mason, carpenters and bricklayers, are you

2   familiar with what I'm talking about?  When you were at Ace.

3   A    Yes.

4   Q    Okay.  Tell us what a remittance form is?

5   A    They're union dues, what's owed to them, owed to the guys.

6   Q    Okay.  Meaning their Health and Welfare, their pension,

7   their annuity?

8   A    Yes.

9   Q    And their dues?

10  A    Yes.

11  Q    Together with any sort of contributions being made to a

12  multi-employer group, such as the construction industry

13  employers or whatever?

14  A    Yes.

15  Q    All right.  It's all on the forms, right?

16  A    Right.

17  Q    And part of your job was to calculate according to the

18  collective-bargaining agreement what rates would be applicable

19  to each individual, based on their job and their status,

20  journeyman, apprentice, whatever?

21  A    Printed out of the machine.

22  Q    I'm not sure what you mean by printed out of the machine.

23  A    It printed out of the accounting software, all I did was

24  write it from there to the form.  So I just copied it over.

25  Q    Okay.  But machined don't make up numbers, somebody

 1  entered into the machine or the program what those figures

 2  were.

 3  A    Yes.

 4  Q    And would that have been you?

 5  A    Yes.

 6  Q    Okay.  Ms. Blanchard, in the fall of 2011 did you attend a

 7  meeting at Henry Bellavigna's house with a number of the Ace

 8  employees who were thinking about joining Bella Masonry?

 9  A    No.

10  Q    You never attended a meeting where there was beer and

11  pizza and Henry chaired the meeting?

12  A    At the time they were Bella employees.

13  Q    They had already been Bella employees?

14  A    Yes.

15  Q    Okay.  Who was there?

16  A    Derek Hager.

17  Q    Where did he work prior to Bella?

18  A    Ace Masonry.

19  Q    And who else was there?

20  A    Scott Smith.

21  Q    And where did he work prior to --

22  A    No, excuse me, I miss said.  He was not there.

23  Q    Okay.  Who else?  Derek Hager.

24  A    Derek Hager, Richard Tracy, Chuck Morrow, Phil Bond.

25  Q    Are these all Ace guys that went over -- transitioned over

1    to Bella?

2    A    Yes.

3    Q    Okay.  Who else?

4    A    Rob Bellavigna.

5    Q    Okay.  Was there a single person at that meeting who a

6    month earlier had not worked at -- was not working at Ace

7    Masonry?  So that we don't get caught up in the month -- two

8    months earlier.

9    A    No.

10   Q    They were all Ace people?

11   A    Former, yes.

12   Q    And what happened --

13        JUDGE CARTER:  You said Rob Bellavigna?

14        THE WITNESS:  Robert A. Bellavigna.

15        JUDGE CARTER:  So the son?

16   BY MR. FURLONG:

17   Q    The grandson of Henry?

18   A    Yes, Henry's grandson.

19        JUDGE CARTER:  Grandson.

20   BY MR. FURLONG:

21   Q    And how did you know to the meeting?

22   A    How did I?

23   Q    You don't normally hang around and drink beer with Henry.

24   How did you know to go there?

25   A    I was asked to stay after by Henry.

1   Q    Okay.  And these other guys arrived thereafter?

2   A    Correct.

3   Q    All right.  Did you know the purpose of the meetings

4   before it began?

5   A    I guess to clarify what their wages were going to be and

6   ask if they had any questions about things.

7   Q    So you understood that their wages --

8   A    Just a normal monthly meeting, superintendent's meeting

9   and an employee meeting.

10   Q    Okay.  And had they had similar superintendent's meetings

11   when they were at Ace?

12   A    Yes.

13   Q    This was really just a continuation of what went on at

14   Ace?  Maybe with the addition of some beer, but otherwise it

15   was the continuation of what went on at Ace?

16   A    It was similar, yes.

17   Q    All right.  And how did the meeting open up?

18   A    Henry asked about jobs, I believe, and how things are

19   rolling and he discussed that, and then he talked -- we talked

20   about their wages.

21   Q    And what did he say about their wages?

22   A    He said -- there was a paper that he had them all look at

23   and he went through the -- what they would get if a job was

24   prevailing wage and if a job wasn't a prevailing wage and stuff

25   like that.

1    Q    Okay.  And did the issue of whether or not Henry would

2    sign a union contract or honor the union contract come up?

3    A    If he would sign a union contract?

4    Q    Or honor the union contract.  Do you recall Derek Hager

5    saying something about, "Are you going to be union, Henry?" at

6    that meeting?

7    A    No, I don't recall that.

8    Q    Do you recall any of the employees there asking, "Are you

9    going to honor the union contract, or go union, Henry"?

10   A    I don't remember that, no.

11   Q    All right.  So your testimony is that you can't recall, as

12   you sit here, any discussion regarding the union?

13   A    No, I don't recall.

14   Q    You don't recall, okay, fair enough.

15   **(Pause)**

16        MR. FURLONG:  Thank you very much, Ms. Blanchard.

17        THE WITNESS:  Thank you.

18        JUDGE CARTER:  Mr. Jameson, you have any questions?

19                    **DIRECT EXAMINATION**

20   BY MR. JAMESON:

21   Q    Ms. Blanchard, you said that one of the programs you used

22   in your employment with Bella was a Foundation Time and

23   Attendance system?

24   A    It's accounting software, yes.

25   Q    Okay.  Called Foundation or some word of that name?

```
 1   A     In a -- yes.

 2   Q     Okay.

 3   A     Foundation.

 4   Q     Okay.  And when you started was Foundation already there

 5   for you?

 6   A     Yes.

 7   Q     Okay.  Would you agree that Henry wouldn't know a computer

 8   from a toaster oven?

 9         MR. BAILEY:  I'll objection.

10         MR. JAMESON:  Okay.

11   BY MR. JAMESON:

12   Q     Would you agree that Henry is not familiar ---

13         MR. FURLONG:  You should be stipulating given the

14   testimony of your client.

15   BY MR. JAMESON:

16   Q     Would you agree that Henry is not very familiar with

17   computers?

18   A     He's not very computer literate, yes.

19   Q     Yeah.  And beyond that familiarity he's just computer

20   ignorant perhaps?

21   A     Yes.

22   Q     Okay.

23   A     You may talk great about my boss, great.

24   Q     Some people are, from a different generation.

25         Dominick, his son, one of his sons, lives in Florida to
```

1  your knowledge?

2  A    Yes.

3  Q    Okay.  And when you switched over to Bella did you witness

4  Dominick in Henry's New York offices?

5  A    No.

6  Q    Okay.  I'm sorry, Henry, but I have to ask.  Henry's wife

7  had passed at that time -- by that time?

8  A    Yes.

9  Q    Okay.  You were Henry's first office hire at Bella,

10  correct?

11  A    Yes.

12  Q    Okay.  And at that time maybe Henry had employed two or

13  three tradesmen, I think Rollins and maybe Tracy maybe another,

14  do you believe that's correct?

15  A    Yes.

16  Q    Okay.  Did you ever -- I assume when you got there you

17  were paying Bella's debts, corporate debts, correct?  An

18  invoice would come in for lumber for example, and you'd pay it?

19  A    Yes.

20  Q    Okay.  And when you got there is it accurate that there

21  may have already been a couple of invoices?

22  A    Yes.

23  Q    Bella would have been running for at least three days

24  before you got there?

25  A    Sure.

1  Q    Okay.  Do you remember paying an invoice for a computer?

2  A    Within the first three days?

3  Q    No, say within the first 30 days.

4  A    No.

5  Q    Okay.  Do you remember paying an invoice for a Foundation

6  software license?

7  A    No.

8  Q    Okay.  Do you know how much the Foundation software

9  license goes for?

10  A    I do not.

11  Q    Okay.  Do you know what Prima Vera Contractor software

12  program is?

13  A    Yes.

14  Q    And what is that to your knowledge?

15  A    It's a project manager software.

16  Q    It is used at Bella?

17  A    No.

18  Q    Was it used at Ace?

19  A    Yes.

20  Q    Okay.  If Henry is computer ignorant, and you never

21  witnessed Dominick at Bella's office, and Henry's wife has

22  passed, how did you get a computer already set up and running

23  Foundation at Bella's offices?

24  A    I don't know.

25  Q    Do you know where the computer came from?

1   A    No, I don't.

2   Q    Did you recognize it?

3   A    No.

4   Q    No?  So Henry, which wouldn't know much about computers,

5   has a computer system running with the Foundation program

6   installed?

7   A    Yes.

8   Q    Henry might know what a computer looks like, but would you

9   agree he would not know how to install software on a computer?

10  A    Yes.

11  Q    Okay.  Any idea how it got there?

12  A    No.

13  Q    Any idea why Henry chose Foundation?

14  A    No.

15  Q    I was looking on the internet, I can't find Foundation.

16  Do you know who makes the Foundation program?

17  A    No.

18  Q    Okay.  Do you have any idea why Henry chose Foundation

19  over one of the other 100 time and attendance programs he could

20  have chosen?

21  A    No.

22  Q    But it's up and running for you?

23  A    Correct.

24  Q    Is there a printer installed?

25  A    No.

1  Q    And you don't remember any invoice -- well, did Bella have

2  a corporate credit card?

3  A    Yes.

4  Q    Do you remember a charge at an electronic store, perhaps

5  an office store such as Staples, perhaps Best Buy, perhaps Dell

6  Direct --

7  A    No.

8  Q    -- for the purchase of a computer?

9  A    No.

10  Q    Okay.  Bella's bank is Chemung Canal Trust Company,

11  correct?

12  A    Yes.

13  Q    Ace had two checking accounts didn't it?

14  A    I know of Tompkins Trust Company.

15  Q    Okay.  And when you worked at Ace were you aware that they

16  also had an account at Chemung Canal?

17  A    No.

18  Q    Okay.

19      MR. JAMESON:  Nothing further.

20      JUDGE CARTER:  Do you need time for your cross, or do

21  you --

22      MR. BAILEY:  Just a couple of minutes, Your Honor, that's

23  it.  Just to run through my notes.

24      JUDGE CARTER:  Okay.  We'll take a couple of minutes and

25  try to finish the Witness.

1    **Off the record.**

2              **(Whereupon, a brief recess was taken.)**

3         **JUDGE CARTER:  Back on the record.**

4    And we're ready for cross.

5    MR. BAILEY:  Okay.  Hi, Missy.

6    THE WITNESS:  Hi, Jason.

7                    **CROSS-EXAMINATION**

8    BY MR. BAILEY:

9    Q    Just two general areas that I want to hit on with you

10   quick.  You were talking about some of your duties with Ace and

11   then some of your duties with Bella, and there are some

12   similarities between the two.

13   A    Yes.

14   Q    Can you tell me some of the differences between the two?

15   A    I have more responsibility at Bella, as far as -- at Ace I

16   never did anything with accounts receivable, and with Bella

17   that's part of my job, that's a big part of my job is accounts

18   receivable with Bella.

19   Q    And when you say "accounts receivable", and that it's a

20   big part of your job what do you mean?

21   A    Filling out AIA documents, doing the checking account, I

22   have access to Bella's checking account, full access to their

23   checking account.

24   Q    Can you sign checks?

25   A    No.

1   Q    You can't, okay.  What other -- withdraw.

2        What are some of the other differences between Bella and

3   Ace?

4   A    Ordering material, I have a lot more to do with

5   estimating.

6   Q    And you're talking about Bella now?

7   A    Correct.

8   Q    Okay.

9   A    I have more responsibility with the estimating portion of

10  it, sales tax, I file that, I never did that at Ace.

11  Q    Anything else that you can think of off the top of your

12  head?

13  A    Not off the top of my head, no.

14  Q    Okay.  The other -- the only other area that I want to

15  talk to you about, today with anyway, you said that you started

16  looking for other work at some point in time.

17  A    Yes.

18  Q    And when you were working at Ace at some point in time you

19  decided, "I'm going to look elsewhere"?

20  A    Yes.

21  Q    And, again, about when was that?

22  A    I believe it was the end of August, early September that I

23  started looking.

24  Q    Okay.  And did you send out résumés and make phone calls?

25  A    Yes.

1    Q    Explain who you reached out to and what you did?

2    A    I sent -- I went on Cornell University's website, I

3    applied for jobs there, Ithaca College's website.  I believe

4    Gannett Health, but that could have been, Your Honor later in

5    October -- later in September, but I know that I did Cornell

6    University and Ithaca College.

7    Q    Did you actually submit résumés?

8    A    Well, it's online, yes.

9    Q    Okay.  To all three of those?

10   A    Yes.

11   Q    Okay.  Any interviews?

12   A    I -- oh, the other one was, and I don't know how to say

13   the name of the company, it's like I'm Going To Layaway or

14   something like that, it's up on Warren Road, I did have an

15   interview there.

16   Q    Okay.  But then you ultimately picked Bella?

17   A    Correct.

18   Q    And you -- what were the reasons why?

19   A    Closer to home, it was closer to my house.  Well, they

20   didn't offer me a job at the other places.

21   Q    Okay.

22   A    That was the biggest reason.  It was closer to home, I

23   knew Henry, I liked Henry.

24        MR. BAILEY:  Thank you.  That's it, Your Honor.  I reserve

25   the right to potentially recall -- call her as part of my case.

```
1        JUDGE CARTER:  Okay.  Any redirect?
2                  REDIRECT EXAMINATION
3   BY MR. LEHMANN:
4   Q    What do you mean access to the checking account?
5   A    I can --
6   Q    What do you mean?
7   A    Bella's checking account I can get online and physically
8   look at the checking account.
9   Q    Okay.  Do you have any signing power?
10  A    No.
11  Q    Can't sign checks?
12  A    No.
13  Q    Can you go down to the bank and make a withdrawal?
14  A    No.
15  Q    Can you transfer money online from "X" account to another
16  account?
17  A    If there was another account, yes, I can go online and do
18  that.
19  Q    So you can make transfers from one account to another
20  account?
21  A    Yes.
22  Q    Okay.  And have you done that in the past?
23  A    No, there's no other account to transfer it to.
24  Q    Well, there's billions of accounts out there.
25  A    You mean -- oh, I thought you meant -- excuse me, I
```

1    thought you meant another of Bella's account.  No, I've never

2    done that.

3    Q    Okay.  But you have the authority to move money from say a

4    Bella account to an Ace account, say for example?

5    A    No.

6    Q    Okay.  Never done that?

7    A    No.

8    Q    I have nothing further.

9         JUDGE CARTER:  Any follow-up to the --

10        MR. FURLONG:  Yeah, briefly.

11                         **REDIRECT EXAMINATION**

12   BY MR. FURLONG:

13   Q    Ms. Blanchard, when you were with Ace you dealt with the

14   union?  When you were with Ace you dealt with the unions?

15   A    Yes.

16   Q    And would that include securing like OSHA 10 cards from

17   the unions?

18   A    Yes.

19   Q    And when you with Bella did you deal with the unions?

20   A    No.

21   Q    Did you ever secure OSHA 10 cards or seek them from the

22   unions?

23   A    No.

24   Q    Okay.

25        MR. FURLONG:  Could I have a minute, Judge?  I have some

1  document --

2      JUDGE CARTER:  Okay.  We'll go off for a second.

3  **Off the record.**

4          **(Whereupon, a brief recess was taken.)**

5      **JUDGE CARTER:  Back on the record.**

6      Further questions?

7      MR. FURLONG:  Yes, Your Honor.

8     **(Charging Party Exhibit 6 marked for identification.)**

9      MR. FURLONG:  Ms. Blanchard, I've shown -- I've passed

10 around and given you a document marked for identification as

11 Charging Party Number 6.

12 BY MR. FURLONG:

13 Q    You see at the top where it says from Melissa Blanchard at

14 AceUnlimited.net, dated November 29th, do you see that?

15 A    Yes.

16 Q    Okay.  And is this a note that you recognized having sent

17 back to Charity Kittle (ph) at the Skilled Trades Adversity

18 Council?

19 A    Yes.

20 Q    Okay.  And I asked you before I broke to get the document

21 that -- I asked you whether you ever asked the unions for OSHA

22 10 cards, do you recall that?  And you stated "no".

23 A    I assumed you meant for Bella.

24 Q    Okay.  So were you asking for these cards for Ace

25 Unlimited?

1    A    Yes.

2    Q    As of November 29, 2011?

3    A    Yes.

4    Q    Okay.  And at that time you were employed by Bella

5    Masonry?

6    A    Yes.

7    Q    Okay.

8        MR. FURLONG:  I move that it be received into evidence.

9        MR. LEHMANN:  No objection.

10       MR. BAILEY:  No objection.

11       MR. JAMESON:  No objection.

12       JUDGE CARTER:  Exhibit 6 for General Counsel -- Charging

13   Party will be admitted without objection.

14       **(Charging Party Exhibit 6 received in evidence.)**

15       JUDGE CARTER:  Further questions?

16       MR. FURLONG:  None for me.

17       JUDGE CARTER:  Any additional?

18       MR. BAILEY:  No, Your Honor.

19       JUDGE CARTER:  Any redirect based on that limited amount?

20   **(No response.)**

21       JUDGE CARTER:  All right.  So we've completed this round

22   of questioning, there's a chance you might be recalled as a

23   witness, but regardless the instruction are that you're free to

24   go, just don't discuss the case or your testimony with any

25   other possible witness in the matter.

1      THE WITNESS:  Okay.

2      JUDGE CARTER:  Thank you.

3              **(Whereupon, the witness was excused.)**

4      JUDGE CARTER:  Off the record.

5              **(Whereupon, a brief recess was taken.)**

6      **JUDGE CARTER:  Back on the record.**

7      And do you have another witness?

8      MS. KLUYTENAAR:  General Counsel calls Robert P.

9  Bellavigna.

10     JUDGE CARTER:  Would you stand and raise your right hand,

11 please?

12 Whereupon,

13              **ROBERT P. BELLAVIGNA 611(C),**

14 having first been duly sworn, was called as a witness and

15 testified as follows:

16     JUDGE CARTER:  Please be seated, and if you can state your

17 full name, please?

18     THE WITNESS:  Robert Paul Bellavigna.

19     JUDGE CARTER:  You may inquire.

20     MS. KLUYTENAAR:  Thank you.

21              **DIRECT EXAMINATION**

22 BY MS. KLUYTENAAR:

23 Q   Mr. Bellavigna --

24     THE WITNESS:  Can I just say something?

25     JUDGE CARTER:  Go ahead.

1       THE WITNESS:  I have a hearing disability, and you really

2   got to talk clearly and in a room like this it's very hard for

3   me to hear, so if I --

4       JUDGE CARTER:  Okay.

5       THE WITNESS:  -- don't understand and keep making you

6   repeat it I'm sorry.

7       JUDGE CARTER:  If there's something you don't understand

8   let us know so we can make sure the record is clear about that.

9       THE WITNESS:  Okay.

10      MS. KLUYTENAAR:  Mr. Bellavigna, good afternoon.  My name

11  is Brie Kluytenaar, I'm an attorney for the National Labor

12  Relations Board, and agency of the United States Government,

13  I'm going to be asking you some questions.

14      THE WITNESS:  All right.

15      MS. KLUYTENAAR:  And I noted that you said you have a

16  hearing disability, so please, if you can't hear me ask me to

17  speak up, I'll try and go slowing and if there's any question I

18  ask that you don't understand please let me know and I'll do my

19  best to rephrase it.

20      THE WITNESS:  Uh-huh.

21  BY MS. KLUYTENAAR:

22  Q    Are you currently employed?

23  A    Yes.

24  Q    And where are you employed?

25  A    Bella Masonry.

1   Q    When did you start working there?

2   A    December 12th.

3   Q    Of what year?

4   A    2011.

5   Q    Did you have any involvement with Bella Masonry before

6   that time?

7   A    Describe involvement.

8   Q    Well, did you have any involvement with Bella Masonry

9   before December 12, 2011?

10  A    Yeah.

11  Q    Okay.  What was that involvement?

12  A    Just discussing with my father, he was starting up a new

13  business and just in general, starting up a new business and

14  told him that my counsel didn't think it was a good idea.

15  Q    Okay.  You mentioned your father, just to identify for the

16  record your father is Henry Bellavigna?

17  A    Yes, he is.

18  Q    Okay.  And the new business that you were discussing

19  creating was Bella Masonry?

20  A    Yes.

21       MR. BAILEY:  And, Bob, just so you know, any conversations

22  with counsel are -- they're protected and privileged, don't

23  talk about the.

24       THE WITNESS:  Okay.

25       MR. BAILEY:  Okay?

```
 1        MS. KLUYTENAAR:  Yeah, I wasn't going to --
 2        MR. BAILEY:  I knew you wouldn't, but I didn't want him to
 3   keep going.
 4        MS. KLUYTENAAR:  Yeah.
 5   BY MS. KLUYTENAAR:
 6   Q    What position do you hold at Bella?
 7   A    Project coordinator.
 8   Q    Do you hold any other position at Bella?
 9   A    No.
10   Q    Are you a VP at Bella?
11   A    I guess that's the title they -- go along with the project
12   coordinator.
13   Q    Are you aware that you have that title at Bella?
14   A    I'm not sure what it means, but yeah, I do.
15   Q    Okay.
16   A    Yeah.
17   Q    What are your job duties as the project coordinator?
18   A    I'm basically -- I schedule manpower, make sure the guys
19   have the materials ordered, basically your day-to-day
20   construction stuff to help assist the people in the field.
21   Q    Do you yourself work in the field?
22   A    Yeah, not full-time but occasionally, yeah.
23   Q    Okay.  What percentage of your work is done in the field?
24   A    I'd say probably maybe five percent.
25   Q    Five percent?
```

1    A    Yeah.

2    Q    And when you -- when we're talking about in the field does

3    that -- is that laying block, actually doing masonry work?

4    A    Uh-huh.

5         JUDGE CARTER:  That was yes?

6         THE WITNESS:  Yes, I'm sorry.

7    BY MS. KLUYTENAAR:

8    Q    Are you yourself a mason by trade?

9    A    Yes.

10    Q    Okay.  And how many years of experience do you have as a

11    mason?

12    A    Somewhere around 28½.

13    Q    Are you a member of the Bricklayers Union?

14    A    Yes.

15    Q    And how long have you been a member of the Bricklayers

16    Union?

17    A    28½ years.

18    Q    Okay.  Back to your job duties as a project coordinator,

19    what else do you do?

20    A    It's a lot smaller of a company, so when they ask me I do

21    help in other things, like estimating or calling subs to get

22    bids in, and I'll assist in that.  But not too much, most of

23    it's --

24    Q    Okay.  Do you oversee the field employees?

25    A    Yes.

```
1   Q    Okay.  Do you have oversight of the projects?

2   A    It's a shared responsibility between myself and Henry.

3   Q    Okay.

4   A    Yeah.

5   Q    And I think you testified you coordinate the manpower?

6   A    Yes.

7   Q    You also schedule the manpower?

8   A    It depends on what -- once they're in the field and the

9   superintendent is there, he coordinates manpower.

10  Q    Okay.  What are you duties as VP?

11  A    I have no idea what it even -- what it is.

12  Q    Well, are you aware what VP stands for?

13  A    No, not really.

14  Q    No.

15  A    No.

16  Q    You have no basis for knowledge?

17  A    No.

18  Q    Okay.  Do you have a company cell phone?

19  A    Yes, I do.

20  Q    What's your cell phone number?

21  A    It's 327-2949.

22  Q    Do you have an e-mail address?

23  A    Yes, I do.

24  Q    What is it?

25  A    It's -- I believe it's BOB@BELLAMASONY.COM.
```

```
 1   Q    Okay.  Do you have a personal e-mail address?

 2   A    Do I have a what?

 3   Q    A personal e-mail address.

 4   A    I think they do and I'd have to set up the phone, but I

 5   don't know what it is.

 6   Q    Do you yourself have a personal e-mail address?

 7   A    I don't know how to answer that question other than the

 8   way I just did.

 9   Q    Well, I think if you had a personal --

10   A    They set up --

11   Q    -- e-mail address you would know, you would check it on a

12   regular basis, or maybe an irregular basis.

13   A    No, I don't.

14   Q    Okay.  What's your understanding of where you fall in the

15   Bella Masonry hierarchy?  In the managerial hierarchy of the

16   company?  At the top, at the bottom?

17   A    I'm a project coordinator.

18   Q    Okay.  But what is your understanding of -- in terms of

19   the Bella managerial hierarchy, I'm assuming, and please

20   correct me if I'm wrong, that the owner, Henry Bellavigna, the

21   president, is at the top of the hierarchy, correct?

22   A    Yes, he is.

23   Q    Okay.  And are you second to him?

24   A    No, I'm not.

25   Q    Okay.  Who is second to him?
```

1    A    He is the man.

2    Q    But who is second in -- who is second in command?

3    A    There is no second in command.

4    Q    Okay.  Well, who would be beneath him then in terms of the

5    hierarchy?

6    A    I couldn't tell you, you'd have to ask him.

7    Q    Okay.  Well, I'm asking about what your understanding is.

8    A    I was hired as a project coordinator.

9    Q    Okay.  Well, what's your understanding, generally, you've

10   worked in the business for 28 years, what is your

11   understanding, generally, of where a project coordinator falls

12   in the hierarchy of a masonry company?  Above or below the

13   field employees?

14   A    They're above the field employees, yeah.

15   Q    All right.  They would have to be, right?

16   A    Uh-huh.

17   Q    They supervise the field employees?

18   A    Yeah.

19   Q    Above or below the superintendents?

20   A    I'd rank them about the same.

21   Q    Okay.

22        MS. KLUYTENAAR:  At this time, Your Honor, I'd propose a

23   stipulation to counsel that Mr. Bellavigna is a supervisor of

24   Bella within the meaning of the Act.

25        MR. BAILEY:  No stipulation.

1     MS. KLUYTENAAR:  Okay.  I'd like to request permission to

2     inquire under Rule 611(c) of the Witness.

3     MR. BAILEY:  No objection.

4     JUDGE CARTER:  You may so inquire.

5     MS. KLUYTENAAR:  Thank you.

6     BY MS. KLUYTENAAR:

7     Q     Mr. Bellavigna, as Bella's project coordinator can you

8     hire employees?

9     A     Yes.

10    Q     You can?

11    A     Yes.

12    Q     And have you hired employees during your employment with

13    Bella?

14    A     No, I don't believe I have directly hired.

15    Q     Okay.  Have you indirectly hired employees?

16    A     I don't recall.

17    Q     Okay.

18    A     I don't mean that sarcastically, I just -- people come and

19    go, so, you know, I might make a suggestion to some of the

20    foremen, you know, this guy is looking for work, you might want

21    to call them, that type of thing, but usually the field people

22    will hire -- the superintendents hire in the field.

23    Q     Okay.  Just to clarify, when you say "foreman" is the

24    foreman the same as the superintendent?

25    A     Yeah.

1  Q    Yes.  Okay, and your testimony is that the superintendents

2  or the foremen hire the field employees?

3  A    Yes.

4  Q    Okay.  Who hires the superintendents?

5  A    It can be the project coordinator or somebody above them.

6  Q    Okay.  And who would be above the project coordinator?

7  A    In the company I work right now that would be Henry.

8  Q    Okay.  Anybody else?

9  A    Nope.

10 Q    Okay.  So it could be you hiring the superintendents?

11 A    It could be.

12 Q    Okay.  Or it could be Henry?

13 A    With his authority, yeah.

14 Q    So it could be you hiring the superintendents with Henry's

15 authority?

16 A    Yes, with his permission.

17 Q    Okay.  Could you hire them without Henry's permission?

18 A    We usually don't, no.

19 Q    Do you know if you could?

20 A    I've never asked the question.

21 Q    Okay.  Anyone else besides you or Henry that could hire a

22 superintendent at Bella?

23 A    Not that I'm aware of.

24 Q    Okay.  So how many employees does Bella have at the

25 moment?  Approximately.

```
 1   A    I think there's four in the field and three or two in the

 2   office.

 3   Q    Okay.  And who hired those employees?

 4   A    Henry.

 5   Q    Henry hired all of them?

 6   A    I believe so.

 7   Q    Okay.  And could you name them?

 8   A    Could I name who?

 9   Q    Name the employees.

10   A    There would be my son Rob.

11   Q    Okay.  Is he a field employee or an office employee?

12   A    Yes.

13   Q    Field employee?

14   A    Yeah, he's a field employee, but he also works in the

15   office sometimes.

16   Q    Okay.  Well, you had said there were four field employees

17   and three office employees, correct?  So are you counting him

18   as a field employee or as an office employee?

19   A    He's in the field right now.

20   Q    Okay.  And this is Robert A. Bellavigna, correct?

21   A    Yes.

22   Q    Okay.  So counting him as a field employees, that's one,

23   right?

24   A    Yeah.

25   Q    So your testimony is that Henry hired him?
```

1  A    Yup.

2  Q    Did you have any involvement whatsoever in his hire?

3  A    No.

4  Q    Okay.  Who else?  Who are the other three field employees?

5  A    There's Bob Freelove, Josh Freelove and Randy Bell.

6  Q    Okay.  And you hired none of those individuals?  Henry

7  hired them all?

8  A    It was either Henry or my son.

9  Q    Okay.  What about the three office employees?

10 A    Well, one of them is me.

11 Q    Okay.

12 A    So --

13 Q    So you didn't hire yourself?

14 A    Henry hired me.

15 Q    Okay.  Who are the other three?

16 A    Then there's Missy Blanchard.

17 Q    Okay.  Do you know who hired her?

18 A    Henry.

19 Q    Okay.  And who is the other one?

20 A    That would be Henry.

21 Q    Henry is the other office employee?

22 A    Uh-huh.

23 Q    Okay.  And we won't ask who hired Henry.

24      So you said people come and go, correct?

25 A    Uh-huh.

```
 1        JUDGE CARTER:  That was a yes?
 2        THE WITNESS:  Yes.
 3   BY MS. KLUYTENAAR:
 4   Q    There have been other employees at Bella Masonry in its
 5   relatively short existence, correct?
 6   A    Yes.
 7   Q    Could you name some of those other employees for me?
 8   A    I don't know if I get them all right, but there was Doug
 9   Miles, let's see there's Dick Tracy, Derek Hager, Steve
10   Rollins, Scott Smith, there was two other apprentices that I
11   can't remember their names, I can't remember their names.
12   Q    Okay.
13   A    I didn't deal with them a lot.
14   Q    Okay.  Did you have any role in hiring any of those
15   people?
16   A    For Bella I did not hire them, no.
17   Q    Okay.  What about for Ace?
18   A    Pardon?
19   Q    What about for Ace?
20   A    Yes.
21   Q    What was your role in hiring them?  You hired them?
22   A    As a superintendent, yeah.
23   Q    At Ace?
24   A    Yeah.
25   Q    Okay.  So you just testified a minute ago that you had --
```

1  you can hire employees as a project coordinator at Bella,

2  right?  But you haven't done so.

3  A    With Henry's authority I can, yes.

4  Q    Okay.  So what would be the process for you to obtain

5  Henry's permission or approval of someone that you wanted to

6  hire?

7  A    He would review his résumé and, you know, see what kind of

8  experience he had and he'd let me know if I could do it or not.

9  Q    Okay.  Well, let's back up a second.  So say -- are we

10 talking about a superintendent here?  Is that who you would be

11 considering for hire?  You indicated that the superintendents

12 take care of the hiring of the field employees.

13 A    That's all I hire.

14 Q    Superintendents?

15 A    Yes.

16 Q    Okay.  So how does it work?  I mean, how do you decide on

17 which superintendent you'd like to hire?

18 A    Usually they'll send a résumé in and I'll review it and

19 pass it on to Henry and if Henry agrees we'll give him an

20 interview and if he's qualified we'll hire him.

21 Q    Okay.  So you obviously have 28 years of experience in the

22 field, has all those 28 years been in the same geographic area?

23 A    Yes.

24 Q    Okay.  So you probably know a lot of people in the

25 business, correct?

1    A    Yes.

2    Q    Okay.  So did it ever happen that some résumé comes across

3    your deck who -- of somebody you know?

4    A    Yeah.

5    Q    Okay.  And in that instance you might say, oh, I know this

6    person, I know them to be a good worker or a bad worker, I

7    think we should hire them or not, is that right?

8    A    I can do that, but usually --

9    Q    Has that ever happened?

10    A    No, not for Bella.

11    Q    Okay.  If that were to happen what would be your course of

12    action?  You would take it to Henry and say, "Henry, I think we

13    should hire this person", and Henry would look at their résumé?

14    A    Yeah.

15    Q    And the two of you would discuss it?

16    A    Uh-huh.

17    Q    And would you --

18         JUDGE CARTER:  That was a yes?

19         THE WITNESS:  Yes.

20    BY MS. KLUYTENAAR:

21    Q    Would you explain to Henry or convey to Henry why you

22    thought this person should be hired?

23    A    Yup.

24    Q    Okay.  All right, let's talk about your oversight of the

25    field employees and the superintendents.  So my understanding

1   is the project coordinator oversees the superintendents,

2   correct?

3   A    (No response.)

4   Q    And the superintendents oversee the field employees?

5   A    Yes.

6   Q    Is that correct?

7   A    Yeah.

8   Q    Okay.  So if there's a problem with one of the field

9   employees, the superintendent maybe attempts to resolve it and

10  they can't do they come to you?

11  A    Yes, they could.

12  Q    Okay.  And would you then have the ability or the

13  authority to resolve it?

14  A    Depending on what it was, yes.

15  Q    Okay.  Well, what would you have the ability to resolve?

16  What type of an issue?  Let's take wages for example.

17  A    For what?

18  Q    Let's take a wage issue.  Say there was a field employee

19  who felt that they weren't being paid the correct rate and they

20  came to the superintendent, the superintendent couldn't resolve

21  their issue, and the superintendent brought it to you, would

22  you have the ability to resolve their issue?

23  A    No.

24  Q    No?  Why not?

25  A    I don't own the company.

1  Q    Okay.

2  A    I don't --

3  Q    So you don't have the authority to resolve a wage issue?

4  A    No, I don't -- I guess I shouldn't say that because I

5  don't know, we've never ran into that.

6  Q    Okay.  Do you --

7  **(Pause)**

8  BY MS. KLUYTENAAR?

9  Q    Do you have the authority to discipline the

10  superintendents, or you don't know?

11  A    Describe discipline?  I guess I --

12  Q    Well, you testified a minute ago that you oversee the

13  superintendents --

14  A    Yes.

15  Q    -- so if there was a problem and a superintendent, you

16  know, acted out, or engaged in some type of conduct that you

17  thought was inappropriate or warranted some type of discipline

18  would you be able to take that discipline?

19  A    Yeah, I'd pull him off the job.

20  Q    As a project coordinator?

21  A    Yeah.

22  Q    Right.  Okay.  Have you encountered that type of instance

23  in your employment with Bella so far?

24  A    No.

25  Q    No problems with superintendents?

1  A    No.

2  Q    Okay.  So you just referred to pulling him off the job, my

3  understanding are there are multiple jobs ongoing at one -- at

4  any given time at Bella, correct?

5  A    Yes.

6  Q    Or there could be?

7  A    Yes.

8  Q    Okay.  So and a superintendent can be overseeing more than

9  one -- field employees got more than one job at a time, or

10  would they only be assigned to one?

11  A    Multiple jobs, yes.

12  Q    Okay.  So as the project coordinator you're in the role --

13  correct me if I'm wrong, you're in the role of making sure that

14  the projects are staffed appropriately, and if you need to pull

15  men off of one job and move them to another job you can do

16  that, correct?

17  A    Yup.

18  Q    Okay.

19  A    Yes, sorry.

20  Q    And you can direct a superintendent to move an entire team

21  of field employees from one project to another if it was

22  necessary?

23  A    Yes.

24  Q    If it was necessary.  Okay.

25       And are you the one that's assessing which project needs

1    manpower at any given time, and so you would be evaluating

2    then, right, I need five guys on this project and two guys on

3    this project so I'm going to switch so and so from here over to

4    here, right?  Is that basically your role, or part of your

5    role?

6    A    Yes, that's part of my role.

7    Q    Okay.  And prior to Bella you worked at Ace Masonry,

8    correct?

9    A    Yes.

10   Q    And you were a project coordinator at Ace also, correct?

11   A    Yes.

12   Q    Okay.  How long were you a project coordinator at Ace?

13   A    I believe the nine plus years that I was there.

14   Q    Okay.  The entire time you worked there, right?

15   A    Yeah.

16   Q    Okay.  And when did you start working there?

17   A    I don't recall the date.

18   Q    Did you start working there right at the time that Ace was

19   formed?

20   A    Yes.

21   Q    Okay.  2002, would that be about right?

22   A    Yeah.

23   Q    Okay.  And when did you leave your employment with Ace?

24   A    I believe it was December 9th.

25   Q    Okay.  That was your last day?

1  A    Yes.

2  Q    And your first day on the job at Bella was December 12th?

3  A    I believe so, yes.

4  Q    Okay.  So there was not -- I mean, I'd have to look at a

5  calendar, I don't know if that was a weekend or not, but there

6  was virtually no hiatus or break in your employment, correct?

7  A    No.

8  Q    You went from one to the other?

9  A    Yes.

10 Q    Okay.  Was there ever a time when you were employed by

11 both Bella and Ace at the same time?

12 A    Not that I believe.

13 Q    Okay.  You would probably know, right?

14 A    (No response).

15 Q    Were you ever getting paid by both Bella and Ace at the

16 same time?

17 A    Well, there was an error in paychecks so it looked like it

18 at one time, but I believe they straightened that out.

19 Q    Okay.  Were you ever performing work for Bella while you

20 were employed by Ace?

21 A    Say that one more time?

22 Q    Were you ever performing work for Bella while you were

23 employed by Ace?

24 A    I was not employed by Bella --

25 Q    That's not the question.  Were you ever performing work

1    for Bella while you were employed at Ace?

2    A    I've consulted for them, yes.

3    Q    You did?

4    A    Yes.

5    Q    Were you paid for that?

6    A    It was part of my hire.

7    Q    Were you paid for the consulting?

8    A    Huh?

9    Q    Were you paid for your consulting services to Bella?

10   A    No.

11   Q    No, you weren't.  So you provided them for free?

12   A    Uh-huh.

13   Q    While you were working at Ace?

14   A    I still do that today for people.

15        JUDGE CARTER:  Just to be clear.  So you're answers to the

16   question about whether you provided consultant services for

17   free is "yes"?

18        THE WITNESS:  Yes.

19        JUDGE CARTER:  Okay.

20   BY MS. KLUYTENAAR:

21   Q    Okay.  Just so that I'm clear, when was this?  Shortly

22   before you began working for Bella?

23   A    I guess -- repeat that question again?

24   Q    Okay.  You just testified that you provided some

25   consulting services to Bella while you were still employed at

1  Ace, correct?

2  A    Yeah.

3  Q    When was that?

4  A    I couldn't give exact dates.

5  Q    Okay.

6  A    If they needed --

7  Q    Approximately when was that?

8  A    -- needed my opinion on something I would give it.

9  Q    Okay.  Do you remember specifically anything -- any types

10  of matters that you consulted on for Bella while you were

11  employed at Ace?

12  A    Yeah, my son Robert is very young and new in the business,

13  and I looked at a few jobs with him to give an idea of how he

14  should set them up.

15  Q    Okay.  Was Robert A. Bellavigna, your son, the one you're

16  referring to, was he employed at Bella at the time?

17  A    Yes.

18  Q    And you were employed at Ace?

19  A    Yes.

20  Q    Okay.  And describe for me in more detail what jobs did

21  you look at with him?

22  A    I believe there was only two, and that would have been

23  Vestal Hills and -- I'm trying to remember the name.  I can't

24  remember the name of it.

25  Q    Where was it?

```
 1   A     What's that?

 2   Q     Where was it?

 3   A     Athens, New York, or Athens, Pennsylvania.

 4   Q     Okay  Chesapeake, would that be the job?

 5   A     Pardon?

 6   Q     Chesapeake, Athens?

 7   A     Yes, that's it, yes.

 8   Q     Okay.  So what was your son Robert's role in these

 9   projects?

10   A     I'm not sure what his title was then.

11   Q     Well, what was his role in the project?  Why were -- what

12   were you helping him with?

13   A     Setting the job up, and he was asking my opinion how he

14   should set it up, and that's what we discussed.

15   Q     Okay.  And this would have been approximately when?

16   A     I don't recall dates.

17   Q     Okay.  Well, Bella was not formed until September of 2011,

18   correct?

19   A     I'm not sure what the dates were.

20   Q     Okay.  Well, do you have any knowledge of when Bella was

21   formed?  What year?

22   A     I don't know the dates, I'm sorry.

23   Q     Okay.

24   A     Yeah.

25   Q     Do you have -- that's not the question.  Do you have any
```

1    knowledge of the year that Bella was formed?

2    A    I couldn't honestly answer it, no.

3    Q    Okay.

4    **(Pause)**

5    BY MS. KLUYTENAAR:

6    Q    Okay, so the Vestal Hills job, that's the job -- I'd like

7    to take these two separately, but the first job, you testified

8    that you assisted or consulted to your son Robert on the Vestal

9    Hills job?

10    A    Uh-huh.

11    Q    Okay.

12    A    Yes.

13    Q    So describe to me what exactly you did?  Did you visit the

14    job site --

15    Q    Yeah, we just walked the site and looked at it and told

16    him where he should set the mixers up and where he should

17    start, and how to move the men around the project.

18    Q    And what was your understanding of his role at this point?

19    That he was going to be managing the project?

20    A    Yeah.

21    Q    Is that correct?

22    A    Yeah.

23    Q    Okay.  Aside from your involvement as an Ace employee at

24    the time, did Ace have any other involvement in that project?

25    A    No.

1    Q    Just your involvement, correct?

2    A    That I know of, yes.

3    Q    Okay.  How many times did you visit the job site?

4    A    I don't remember, it was awhile ago, and when I went to

5    work with -- for Bella I went to work on that job, so it's kind

6    of -- I don't quite remember exactly.

7    Q    Okay.  More than once?

8    A    Yes, I do believe it was more than once that I was there,

9    yeah.

10    Q    Before you worked for Bella?

11    A    Before, yes.

12    Q    Okay.

13    **(Pause)**

14    BY MS. KLUYTENAAR:

15    Q    Would you say you perform a similar function at Bella as a

16    project coordinator as you did as a project coordinator at Ace?

17    A    No.

18    Q    No?  You don't perform a similar function?

19    A    Rephrase the question.

20    Q    Well, you're project coordinator at Bella, correct?

21    You're a project coordinator at Bella, correct?

22    A    Yes.

23    Q    And you were a project coordinator at Ace, correct?

24    A    Yup.

25    Q    Okay.  So would you -- the question is, would you say you

1  perform a similar function now as a project coordinator at

2  Bella as you did when you worked for Ace as a project

3  coordinator?

4  A    No.

5  Q    No, okay.  What's the difference?  What do you do

6  differently now at Bella that you didn't do at Ace, or that

7  you --

8  A    As a project coordinator for --

9      MS. KLUYTENAAR:  Actually, I'll withdraw the question.

10  **(Pause)**

11      MS. KLUYTENAAR:  Can we go off the record for on second,

12  please, Your Honor?

13      JUDGE CARTER:  Okay.

14  **Off the record.**

15          **(Whereupon, a brief recess was taken.)**

16      **JUDGE CARTER:  Back on the record.**

17      Further questions?

18      MS. KLUYTENAAR:  Yeah.

19      THE WITNESS:  Pardon?

20      MS. KLUYTENAAR:  I'm just going to show you this.

21      JUDGE CARTER:  And for the record what are you showing the

22  Witness?

23      MS. KLUYTENAAR:  I'm showing the Witness the affidavit

24  that he gave to the National Labor Relations Board.

25  **(Pause)**

1    BY MS. KLUYTENAAR:

2    Q    Mr. Bellavigna, you recall giving an affidavit to the

3    National Labor Relations Board in connection with the

4    investigation in this matter?

5    A    Yeah.

6    Q    Okay.  And you were under oath when you gave that

7    statement, correct?

8    A    Yes, I believe so.

9    Q    Okay.  And I'd like to call your attention to paragraph 1,

10    I'm sorry, actually paragraph 2, where you stated "I'm familiar

11    with the job I call Vestal Hill on Plaza Drive in Vestal, New

12    York.  I've only been involved on the project as a Bella

13    Masonry employee.  To my knowledge Ace had no involvement in

14    that project."

15    A    Uh-huh.

16    Q    But you just testified that you were employed for Ace and

17    you did have involvement in that project, did you not?

18    A    Yeah, to my son.

19    Q    Okay.  Wasn't it just your testimony that you consulted

20    with your son for Bella Masonry on the Vestal Hills project as

21    an Ace employee?

22    A    No, I was employed for Bella when I -- for Ace when I did

23    it.

24    Q    Right.

25    A    Yeah.

1    Q    Right.  So that would be Ace's involvement in the Vestal

2    Hill project, would it not?

3    A    I mean, I guess you can twist it into that, yeah.

4    Q    Well, you stated "I've only been involved on the project

5    as a Bella Masonry employee" so that's not correct is it?

6    A    I was doing it for my son.

7    Q    That's not correct, is it?  That statement is not correct?

8         MR. BAILEY:  He's answered the question.

9         MS. KLUYTENAAR:  No, he didn't answer the question.

10        MR. BAILEY:  No, he provided --

11        MS. KLUYTENAAR:  He gave an explanation.

12        MR. BAILEY:  He provided an answer to the question.

13        JUDGE CARTER:  He actually didn't answer the question, he

14   made a statement about why he was doing it.  So overruled.

15   BY MS. KLUYTENAAR:

16   Q    So that statement is not correct, is it?  It's an

17   incorrect statement?

18   A    Yeah.

19   Q    That you gave under oath, correct?

20   A    I think it was misinterpreted, but, yeah.

21   Q    Okay.  Further down in paragraph 2, "I am project

22   coordinator for Bella and I perform a similar function to that

23   I did for Ace", isn't that just what you testified that you

24   don't perform a similar function?  So where you --

25   A    They are similar.

1    Q    They are similar?

2    A    But they're not exact.

3    Q    Okay.  But I just asked you about three minutes ago if you

4    performed a similar function as project coordinator for Ace as

5    you did for Bella, and you said "no", correct?

6    A    I guess, if you want to use those words.

7    Q    Well, do you recall saying, "no", about two minutes ago on

8    the witness stand?

9    A    My job duties are not the same.

10   Q    Okay.  You're not answering the question.  The question

11   is; I just asked you two minutes ago, when you were testifying

12   under oath on the witness stand, if you perform a similar

13   function as project coordinator for Bella as you did for Ace.

14   And your answer was, "no", correct?

15   A    Yes.

16   Q    Okay.  So were you lying them?

17   A    No.

18   Q    Are you lying in your affidavit?

19   A    No.

20   Q    These two statements are completely inconsistent, correct?

21   A    No.

22   Q    No, they're not inconsistent?

23   A    No.

24   Q    Okay.  So let's talk further about your job duties at Ace

25   as project coordinator.  I'd like you to look in that pile

 1   there, there's a Charging Party Exhibit 1.  I can --

 2   **(Pause)**

 3   BY MS. KLUYTENAAR:

 4   Q    Do you have it?  Do you have the Exhibit?

 5   A    Pardon?

 6   Q    Do you have the Exhibit?  Charging Party 1.

 7        JUDGE CARTER:  He has a copy of the Exhibit.

 8        THE WITNESS:  Yes, I have a copy of it.

 9        MS. KLUYTENAAR:  Okay.  I'd like to ask you to look over

10   this, take a moment to review it, and then you can tell me if

11   this accurately reflects your job duties at Ace in 2011.

12                    **(Witness reviews document.)**

13   BY MS. KLUYTENAAR:

14   Q    Is this an accurate reflection of your job duties?

15   A    No.

16   Q    No?

17   A    No.

18   Q    Well, I'd like you to keep the Exhibit in your hands,

19   we're going to --

20   A    Sure.

21   Q    -- discussing it.  So what is inaccurate on that?

22   A    It looks like an old résumé.

23   Q    Okay.  Well, this is a résumé that you prepared and

24   submitted to Cornell in connection with a JOC's program

25   application, correct, in 2010?

```
 1   A    They could have, yeah, they could have submitted --
 2   Q    Do you recognize it?
 3   A    Yes, it's an old résumé of mine, it's not updated.
 4   Q    Okay.
 5   A    It's a résumé, it's not a job description.
 6   Q    Okay, that's fine.
 7        MR. BAILEY:  Judge.  I don't mean to cut you off, sorry,
 8   but we're getting close to the time that Henry has to leave for
 9   his business engagement, so I just want to remind the Court
10   gently.
11        JUDGE CARTER:  Right.  Understand.  What -- and just
12   briefly -- I was planning on going until 5:00 and then that
13   will give an hour -- leave an hour for him to make the
14   transition, is that sufficient?
15        MR. BAILEY:  Is that okay, Henry?  Okay.  Thank you,
16   Judge.
17        JUDGE CARTER:  All right, so we'll go to 5:00, but I'm not
18   sure -- go ahead and ask your question.
19        MS. KLUYTENAAR:  Thank you.
20   BY MS. KLUYTENAAR:
21   Q    Let's look at the bullet point under "work history", sixth
22   bullet down, "Placement of all supervision and manpower", do
23   you use that one?
24   A    Uh-huh.
25   Q    Is that incorrect?
```

```
 1  A    Well, I'd like to just say that this is not my --
 2  Q    Okay.
 3  A    This is a résumé, it's not my job description.
 4  Q    Okay.  But is that an incorrect representation of what you
 5  did at Ace?
 6  A    That's one of the duties I did at Ace, yeah.
 7  Q    Okay.  Did you do that in 2010?
 8  A    Yes.
 9  Q    Did you do that in 2011?
10  A    Can I clarify that?
11  Q    No, just answer the question, yes or no.
12  A    2011, no.
13  Q    While you worked for Ace as project coordinator in 2011
14  you did not -- you weren't responsible for placement of all
15  supervision and manpower?
16  A    No.
17  Q    Okay.  "Scheduling of all work with jobsite
18  superintendents" --
19  A    Pardon?
20  Q    -- the bullet below that.
21  A    And could you read that again?
22  Q    Do you see that?  "Scheduling with all work with jobsite
23  superintendents."  Do you see that one?
24  A    Yeah.  And your question?
25  Q    The question is; is that -- was that your duties at Ace,
```

1    part of your duties as project coordinator in 2011?

2    A    No.

3    Q    Were those your duties in 2010?

4    A    I guess I'd have to go back and look at the records.  I

5    don't know.

6    Q    Okay.  You don't recall what your job duties are?

7    A    The time they changed.

8    Q    Ace was a union contractor, correct?

9    A    Yes.

10   Q    And bid on union jobs?

11   A    (Nods affirmative)

12   Q    Did Ace bid on union jobs?

13   A    Yes.

14   Q    Okay.  You have to answer the question verbally.

15        Are you familiar with the collective-bargaining agreement

16   that Ace had with the different craft unions?

17   A    No.

18   Q    Not at all?

19   A    I mean, I knew they have them, but I don't know --

20   Q    Okay.  You knew they exists, correct?  You're a member of

21   the Bricklayers Union, correct?

22   A    Yes.

23   Q    Okay.  You know that a collective-bargaining agreement

24   exists between the Bricklayers Union and Ace, among other

25   employers?

1   A   In 2002, yes.

2   Q   No, I'm not asking about 2002.

3   A   That's the only one I know about.

4   Q   Okay.  I never asked about 2002.

5      MR. BAILEY:  The attitude is amazing.

6      JUDGE CARTER:  Counsel, let's keep it about the case.

7 BY MS. KLUYTENAAR:

8   Q   As a union contractor, and I'm not specifying a time

9 period here, but in your understanding as a union contractor

10 Ace paid union contractual wage rates and benefits, correct?

11   A   That's not my job description.

12   Q   Okay.  You can just answer the question either yes, no, or

13 you don't know.

14   A   I don't know.

15   Q   Okay.

16      MS. KLUYTENAAR:  Can I just have a minute, please, Your

17 Honor?

18      JUDGE CARTER:  Okay.  Go until 5:00.  Off the record.

19         **(Whereupon, a brief recess was taken.)**

20      **JUDGE CARTER:  Back on the record.**

21      Further questions.

22 BY MS. KLUYTENAAR?

23   Q   Mr. Bellavigna, you just testified a moment ago that

24 you're a union member, correct?

25   A   Yeah.

1  Q    Okay.

2  A    Yes.

3  Q    And you were a union member when you were employed at Ace,

4  correct?

5  A    Yes.

6  Q    Okay.  So you're at least somewhat familiar with the union

7  contractual wage rates, correct?  You yourself were paid the

8  contractual wage rates, were you not?

9  A    Yes.

10  Q    Okay.  And you're aware that there are collective-

11  bargaining agreement in existence in in 2011, correct?

12  A    Say that again?

13  Q    You were aware that there were collective-bargaining

14  agreement in existence in 2011, correct?

15  A    With?

16  Q    With the Bricklayers Union, with the Carpenters Union and

17  with the Laborers Union, the craft unions.

18  A    I'm not sure what you're asking.

19  Q    Okay.  Well --

20        JUDGE CARTER:  The question is whether -- did you know

21  that there were collective-bargaining agreement between Ace and

22  those three craft unions in 2011.

23        THE WITNESS:  No, I did not know.

24        MS. KLUYTENAAR:  Okay.

25  BY MS. KLUYTENAAR:

1   Q    As a union member you have dues deducted from your

2   paycheck, correct?

3   A    Yes.

4   Q    Okay.  And you have -- you receive fringe benefit

5   payments, right?  Health and Welfare --

6   A    Yes.

7   Q    -- payments, pension?

8   A    Yes.

9   Q    Annuity, and those things are listed on your paycheck,

10  correct?

11  A    Yes.

12  Q    Okay.  And you wouldn't be receiving those things if a

13  collective-bargaining agreement didn't exist, correct?

14  A    I don't know that.

15  Q    Okay.

16  **(Pause)**

17  BY MS. KLUYTENAAR:

18  Q    You were appointed as an employee trustee of the Laborers

19  Local 589 Welfare Fund in 2007, correct?

20  A    I'm not sure of the date, but, yes, I was on the board,

21  yeah.

22  Q    Okay.

23      **(General Counsel Exhibit 37 marked for identification.)**

24  BY MS. KLUYTENAAR:

25  Q    Mr. Bellavigna, I'm showing you what's been marked as GC-

1    37, do you recognize that document?

2    A    Yup, yes.

3    Q    Okay.  What is it?

4    A    It's appointing me to be a trustee on the Laborers 589.

5    Q    On the Laborers 589 what?

6    A    As a trustee for the Laborers.

7    Q    Okay.  Do you see the second sentence where it says the

8    Local 589 Welfare Fund?

9    A    Yup, yes.

10   Q    Okay.  You were being appointed a trustee of the Welfare

11   Fund were you not?

12   A    Yes.

13   Q    Okay.  Is that your signature down there?

14   A    Yes, it is.

15   Q    Right above Robert Bellavigna?

16   A    Yes, it is.

17   Q    Is that the date you signed the document, 2/6/07?  Is that

18   your handwriting?

19   A    Yes.

20   Q    Okay.

21        MS. KLUYTENAAR:  I'd offer GC-37.

22        MS. KLUYTENAAR:  No objection.

23        MR. JAMESON:  No objection.

24        MR. BAILEY:  No objection, Your Honor.

25        JUDGE CARTER:  Exhibit 37 for General Counsel admitted

1  without objection.

2       **(General Counsel Exhibit 37 received in evidence.)**

3       JUDGE CARTER:  And I think with that we'll put a pause and

4  resume tomorrow at 8:30.

5       You're free to go for the evening, but don't discuss the

6  case of your testimony with any other possible witness and

7  we're resume tomorrow at 8:30.

8       THE WITNESS:  Okay.

9       JUDGE CARTER:  Off the record.

10  (**Whereupon, at 5:03 p.m. the hearing in the above-entitled**

11  **matter adjourned, to reconvene on Thursdsay, August 2, 2012, at**

12  **8:30 a.m.)**

C E R T I F I C A T E

This is to certify that the attached proceedings done before
the NATIONAL LABOR RELATIONS BOARD REGION THREE

In the Matter of:
**ACE MASONRY, INC., d/b/a ACE UNLIMITED and BELLA MASONRY,
LLC, alter egos**

and

**INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS,
LOCAL 3,**

and

**LABORERS INTERNATIONAL UNION, LOCAL 785,**

and

**NORTHEAST REGIONAL COUNCIL OF CARPENTERS**

Case No.   3-CA-073540
           3-CA-074523
           3-CA-073549
           3-CA-073531
           3-CA-079606

Date:      August 1, 2012

Place:     Ithaca, New York

Were held as therein appears, and that this is the original
transcript thereof for the files of the Board

                    _____
                    Official Reporter

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 316
Wayne, New Jersey  07470
(973) 692-0660

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| In the Matter of: | |
| **ACE MASONRY,INC., d/b/a ACE UNLIMITED, AND BELLA MASONRY,LLC, alter egos,** | **Case Nos.** 3-CA-073540<br>3-CA-074523 |
| Respondent,<br>And | |
| **INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS, LOCAL NO. 3,** | 3-CA-073549 |
| Charging Party,<br>And | |
| **LABORERS INTERNATIONAL UNION, LOCAL NO.785,** | 3-CA-074531 |
| Union Involved, | |
| And | 3-CA-079606 |
| **NORTHEAST REGIONAL COUNCIL OF CARPENTERS,** | |
| Union Involved. | |

The above-entitled matter came on for hearing pursuant to

Notice, before **GEOFFREY L.J. CARTER**, Administrative Law Judge,

at Ithaca City Hall, 108 East Green Street, 2nd Floor Conference

Room, Ithaca, New York, on Thursday, August 2, 2012, at

8:30 a.m.

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 316
Wayne, New Jersey 07470
(973) 692-0660

<u>**A P P E A R A N C E S**</u>

```
 1   On Behalf of the General Counsel:
 2
 3        GREG LEHMANN, ESQ
 4        BRIE KLUYTENAAR, ESQ
 5        National Labor Relations Board
 6        Leo W. O'Brien Federal Building
 7        11A Clinton Avenue, Room 342
 8        Albany, NY  12207
 9
10
11   On Behalf of the Charging Party:
12
13        RICHARD D. FURLONG, ESQ
14        Lipsitz, Green, Scime, Cambria, LLP
15        42 Delaware Avenue,
16        Buffalo, NY  14202
17
18        CURTISS T. JAMESON, ESQ
19        Kroll Heineman
20        Metro Corporate Campus I
21        99 Wood Avenue South, Suite 307
22        Iselin, NJ 08830
23
24   On Behalf of the Respondents:
25
26        JASON B. BAILEY, ESQ
27        Sheats & Bailey, PLLC
28        P.O. Box 820,
29        9650 Brewerton, NY 13029
30
```

1
2

# I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---------|--------|-------|----------|---------|-----------|
| DEREK HAGER | 752<br>765 | 778 | 788<br>791 | 797 | -- |
| DAN THAETE | 799<br>804 | 806 | -- | -- | -- |
| ROBERT BELLAVIGNA | 808<br>864<br>958 | 961 | 969 | -- | -- |
| SCOTT STRINGER | 978 | -- | -- | -- | -- |

3
4

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 316
Wayne, New Jersey  07470
(973) 692-0660

1                           **E X H I B I T S**

| **EXHIBIT NUMBER** | **IDENTIFIED** | **RECEIVED** |
|---|---|---|
| GENERAL COUNSEL'S | | |
| GC-38 | 803 | 803 |
| GC-39 | 810 | 811 |
| GC-40 | 824 | 825 |

2

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 316
Wayne, New Jersey  07470
(973) 692-0660

1                    P R O C E E D I N G S

2                              **(Time Noted:  8:55 a.m.)**

3        **ADMINISTRATIVE LAW JUDGE CARTER:  On the record.**

4        We are on the record and recalling the case of Ace

5    Masonry, Incorporated, doing business as Ace Unlimited and Bella

6    Masonry, LLC, alter egos, Case Numbers 3-CA-73540, 74523, 73549,

7    74531, and 79606.  This is a matter before the National Labor

8    Relations Board, Administrative Law Judge Geoff Carter

9    presiding.

10        I'd ask for the appearances.

11        MS. KLUYTENAAR:  Brie Kluytenaar for the Acting General

12    Counsel.

13        MR. LEHMANN:  Greg Lehmann for the Acting General Counsel.

14        MR. FURLONG:  Richard Furlong for Laborers Local 785 and

15    Bricklayers Local 3.

16        MR. JAMESON:  Curtiss Jameson for the Carpenter Union.

17        MR. BAILEY:  Jason Bailey for the employers.

18        JUDGE CARTER:  Welcome back, everyone.  And does the

19    Agency have another witness?  We're taking a break with -- in

20    his testimony and I gather we have another witness coming in.

21    Who is that person?

22        MS. KLUYTENAAR:  General Counsel calls Derek Hager.

23        JUDGE CARTER:  So if you would stand and raise your right

24    hand?

25    (Whereupon,

1                          **DEREK HAGER,**

2    was called as a witness by and on behalf of the General Counsel

3    and, after having been duly sworn, was examined and testified as

4    follows:)

5           JUDGE CARTER:  You can be seated.  And if you could state

6    your full name, please?

7           THE WITNESS:  Derek Arthur Hager.

8           JUDGE CARTER:  Your middle name was Arthur?

9           THE WITNESS:  Yes.

10          JUDGE CARTER:  You may inquire.

11          MS. KLUYTENAAR:  Thank you, Your Honor.

12                      **DIRECT EXAMINATION**

13   BY MS. KLUYTENAAR:

14   Q     Good morning, Mr. Hager.

15   A     Good morning.

16   Q     Are you currently employed?

17   A     Yes.

18   Q     Where are you employed?

19   A     C.J. Hollister.

20   Q     And what's your profession?

21   A     I'm a mason.

22   Q     Are you a union member?

23   A     Yes.

24   Q     What union do you belong to?

25   A     Bricklayers Local 3.

```
 1   Q    And how long have you been a member of that union?

 2   A    Thirteen years.

 3   Q    Are you familiar with Ace Masonry?

 4   A    Yes.

 5   Q    How are you familiar with them?

 6   A    I worked for them for 10 years.

 7   Q    And was Ace a union contractor?

 8   A    Yes.

 9   Q    Are you familiar with Robert P. Bellavigna?

10   A    Yes.

11   Q    Otherwise known as Bob Bellavigna?

12   A    Yes.

13   Q    How are you familiar with him?

14   A    He was the boss.

15   Q    Where is that?

16   A    At Ace.

17   Q    And do you know what his job was at Ace?

18   A    I believe he was a project manager/estimator.

19   Q    Are you familiar with Lisa Bellavigna?

20   A    Yes.

21   Q    How so?

22   A    She was the president of the company.

23   Q    At Ace?

24   A    Yes.

25   Q    And did you ever interact with Lisa at Ace?
```

1  A    Yes.

2  Q    What was your interaction with Lisa?

3  A    It was usually about how one of the jobs I was running was

4  going.

5  Q    Okay.  Are you familiar with Bella Masonry?

6  A    Yes.

7  Q    How so?

8  A    I worked for Bella after Ace.

9  Q    When did you leave your employment with Ace?

10  A    I don't know the exact date.

11  Q    Do you have an approximate time frame?

12  A    It was the fall of 2011.

13  Q    Okay.  I'd like to direct your attention to that time

14  period, fall of 2011, and ask if you're familiar with a job at

15  the Ithaca Town Hall.

16  A    That was a job that was going on, but I didn't work there.

17  Q    Okay.  Do you know what the nature of the job was?

18  A    It was something to do with the parapets on the roof, I

19  believe, or coping.

20  Q    Okay.  And you didn't work that job?

21  A    I did not.

22  Q    Do you recall where you were working at the time?

23  A    I believe I was working at the steam vault, at Cornell.

24  Q    I'd like you to, if you can find General Counsel's

25  Exhibit 26 in that pile in front of you, and if you could turn

1   in that exhibit to Page 26 -- or, I'm sorry, 19, Page 19.  Do

2   you see where it lists your name there?

3   A     Yes.

4   Q     Okay.  And do you see under your name where it lists you

5   as having worked at the Ithaca Town Hall?

6   A     Yes.

7   Q     Your testimony is that you never worked at the Ithaca Town

8   Hall, right?

9   A     No.  I might have been there to pick up tools from another

10  superintendent, but I never worked there.

11  Q     Okay.  Do you have any idea why Bella Masonry would list

12  you on their timecards as having worked at that job?

13  A     I don't know.

14  Q     Keeping your attention on October 2011, are you familiar

15  with a job in Vestal, New York?

16  A     Yes.

17  Q     The Vestal Hills job.  Did you work that job?

18  A     Yes.

19  Q     Was that an Ace job?

20  A     It started out as an Ace job and then turned into a Bella

21  job.

22  Q     When did you first learn about that job?

23  A     Earlier that summer, Bobby had shown me the prints in his

24  office.  It was before any of the material had been over.  We

25  were just talking about jobs that we were, had that were coming

1    up.

2    Q    Okay.  When you say Bobby, are you referring to Bob

3    Bellavigna?

4    A    Yes.

5    Q    And where was Bobby's office?

6    A    At the shop, at Ace.

7    Q    Okay.  So you had this conversation with Mr. Bellavigna in

8    his office at Ace?

9    A    The first time we talked about Vestal Hills, yes.

10   Q    Okay.  And when did you actually start working on the job,

11   if you recall?

12   A    I had been there -- I was working at Binghamton

13   University, finishing up a job down there.  And we were supposed

14   to start the Vestal Hills job, but it was too wet.  We couldn't

15   start it.  And I was taking scaffold and stuff out of that job.

16   So, periodically, I would go down to the Vestal Hills job, it

17   was a half mile away, to see if I could take the scaffold there

18   instead of taking it, you know, back to the shop.  But it got

19   pushed off because it was so wet.  So I don't know the exact

20   date.  I as there a few times, you know, no work was done.

21   Q    Okay.  And eventually did there come a time when you did

22   work on that job?

23   A    Yes.

24   Q    When you worked on that job, how did you get to the job

25   site?

1   A     We rode in the truck from the shop.  We rode together

2   because it was --

3   Q     Okay.  When you say the shop, what are you referring to?

4   A     The Ace shop, on Cecil A. Malone.

5   Q     Cecil Malone Drive?

6   A     Yeah.

7   Q     Okay.  And when you say we, do you remember who you rode

8   with?

9   A     It was Dick Tracy, Steve Rollins, Scott Smith, Phil Bond,

10  I think, Robby Bellavigna came a couple of times.

11  Q     Okay.  Is that Robby Bellavigna, Jr.?

12  A     Yes.

13  Q     And are you familiar with all of those people?

14  A     Yes.

15  Q     How?

16  A     I worked for them for 10 years.

17  Q     At Ace?

18  A     At Ace and then Bella.

19  Q     Do you remember what type of equipment you used at the

20  Vestal job?

21  A     Any masonry job is the same, scaffold, mixers, forklift.

22  Q     Okay.

23  A     Saws.

24  Q     Do you know who owned the equipment that you used at the

25  Vestal job?  Do you know whose equipment you were using?

1    A    It was the same stuff that we'd used for 10 years.

2    Q    Okay.  Do you know who -- did you recognize the equipment

3    or was it labeled at all?

4    A    It was the same equipment we used the whole time we'd been

5    there.

6    Q    Okay.  So you recognized it?

7    A    Yeah.  It was our tools.

8    Q    Okay.  During the time you were working at Vestal, were

9    you also working for Ace in Binghamton?

10    A    I believe the BU job was pretty much done by the time we

11    actually started Vestal Hills.  But there was a few times when I

12    was at Binghamton University and drove up there to look at the

13    next job site.

14    Q    What was that job?

15    A    East Gym.

16    Q    The East Gym at SUNY Binghamton?

17    A    Yes.

18    Q    Did there come a time when you began receiving paychecks

19    from Bella?

20    A    Yes.

21    Q    When was that?

22    A    I believe it was when we were at Vestal Hills.  I don't

23    remember the exact day.  It was a long time ago.

24    Q    Okay.  And, at that time, had you had any discussions with

25    anyone about working for Bella?

1   A      I believe I talked with Henry.

2   Q      Okay.  Had you filled out any employment related paperwork

3   for Bella?

4   A      I don't remember the exact time or date that I filled out

5   paperwork for Henry.

6   Q      Were you also receiving paychecks from Ace, at the time?

7   A      I don't -- there was probably a time when someone

8   overlapped from one to the other, because I mean I worked and,

9   you know, it's not like I was laid off and then came back as a

10  Bella employee.  I just worked right, worked for 10 years, and I

11  spoke with Henry, and then, well, I went to work for Bella, I

12  guess.  I don't -- I'm trying to remember.  It was a long time

13  ago.

14  Q      Did you speak with Henry before you worked at Vestal?

15  A      I believe so, yes.

16  Q      Did there come a time when you met with Henry in his

17  house?

18  A      Yes.  We had a Bella meeting at Henry's house and we had

19  dinner.

20  Q      Do you remember who was present at the meeting?

21  A      Henry and myself, and Scott Smith, Steve Rollins, Dick

22  Tracy.  I think Phil was there.  Rob was there.  Randy Bell was

23  there.  And that was it.

24  Q      When you say Rob, are you referring to Robert Bellavigna?

25  A      Yes.

1   Q      Junior?

2   A      Yes.

3   Q      Okay.  What happened at that meeting?

4   A      We had talked about what we were going to make.  We signed

5   an agreement.  The agreement was that Henry didn't know if he

6   was going to go union at that time or a non-union company,

7   because he was just starting his business.  And he said that

8   when he got his first draw from Pooler (ph.), that if he didn't

9   go union, that he would pay us our benefits.  And if he did go

10  union then the benefits would be sent to the hall.

11  Q      Do you recall signing a sheet of paper at that meeting

12  regarding your wages?

13  A      Yes.

14  Q      There should be a General Counsel's Exhibit 35 in that

15  pile, if you could turn to General Counsel 35.  Do you have that

16  document in front of you, Mr. Hager?

17  A      I don't see it, no.

18  Q      Okay.

19  A      Okay.  I do.

20  Q      Thank you.  Okay, if you would turn to the third page

21  there, do you see your name on that document?

22  A      Yes, I do.

23  Q      Do you recognize this form?

24  A      Yes.

25  Q      Is this the form that you signed at Henry's house?

1    A    That's correct.

2    Q    At the meeting.  And is that your signature there?

3    A    That is mine.

4    Q    Okay.  And I see the date.  It looks like it says

5    November 9th.  Is that the date that you signed this?

6    A    Yes.

7    Q    Do you recall was Melissa Blanchard at that meeting?

8    A    Yes.

9    Q    And did you fill out any other employment related

10    paperwork for Bella at that meeting aside from this wage form?

11    A    Probably was a tax, a W-2 or whatever, W-4.  I forget

12    which is which, like an employee packet.

13    Q    You remember filling that out at the meeting?

14    A    I believe I did.

15    Q    Okay.  Do you recall if you had already received that

16    paperwork or if it was given to you at the meeting?

17    A    It was probably given to me before that.  I didn't fill it

18    out and I just probably filled it out at that time right there.

19    Q    Okay.  Do you recall, if it was given to you before the

20    meeting, do you recall how it was given to you, in person, in

21    the mail?

22    A    I don't remember.

23    Q    Okay.  Are you familiar with a job called the Chesapeake

24    job, Chesapeake Athens (ph.)?

25    A    Yes.

1   Q    Okay.  Did you work that job?

2   A    I worked there for two days.

3   Q    Where was it?

4   A    Athens.

5   Q    Where is that?

6   A    Pennsylvania.

7   Q    And do you remember what the nature of the job was?

8   A    I believe it was going to be a truck wash, that would be a

9   car wash for trucks.

10  Q    And do you recall when you worked that job how you got to

11  the job site?

12  A    It was in the 450, the Ace truck, we went down there first

13  time.  And then I believe the second time we went down there, I

14  had to leave early and Bobby gave me his truck to drive back, I

15  think.

16  Q    Okay.  Do you recall if Bob's truck was his personal

17  vehicle or an Ace truck?

18  A    I think it was his personal vehicle.

19  Q    Okay.  And when you took the trucks to the job, where were

20  you leaving from?

21  A    I don't remember exactly leaving, but I would assume it

22  was from the shop.  That's usually where we met.

23  Q    Okay.  Where is the shop again?

24  A    Malone.

25  Q    So you're referring to the Ace shop?

```
 1   A      The Ace shop.

 2   Q      And do you recall who else was on that job?

 3   A      It was Dick Tracy, Steve Rollins, Randy Bell, Scott Smith,

 4   I think Phil and Rob were there.

 5   Q      When you say Phil, are you talking about Phil Bond?

 6   A      Phil Bond.

 7   Q      Okay.

 8   A      And Rob --

 9   Q      Rob Bellavigna?

10   A      -- Bellavigna.

11   Q      And was Bob Bellavigna at that job?

12   A      He was there in the morning of the first time.  The second

13   time we were there, we were there all day.  I believe he was

14   there all day working with us.

15   Q      Okay.  Do you know did Ace Masonry have a website?

16   A      Yes, they did.

17   Q      Have you seen the website?

18   A      When I worked there.

19   Q      Okay.  And do you know did you appear on the website?

20   A      Yes.

21   Q      Do you recall a discussion about putting you on the Ace

22   website, when you worked there?

23   A      Yes.

24   Q      Who did you have a discussion with?

25   A      Probably Lisa and Missy.
```

1  Q    Okay.  Do you recall posing for a photograph for the

2  website?

3  A    Yep.

4  Q    Were you ever asked to appear on the Bella Masonry

5  website?

6  A    No.

7  Q    Were you aware that you appear on the Bella Masonry

8  website?

9  A    No.

10 Q    Did you ever have any discussion with anyone about being

11 on the Bella website?

12 A    No.

13 Q    Okay.  I'd like you to, the last one, turn to General

14 Counsel 27, please.  And if you would turn to Page 5 of 7 at the

15 back.

16 **(Pause.)**

17 BY MS. KLUYTENAAR:

18 Q    Okay.  Do you recognize that photo of yourself?

19 A    Yep.

20 Q    Is that the photo that you posed for, for the Ace website?

21 A    It appears to be the same one, but I don't know exactly,

22 but --

23 Q    Okay.  Well, where do you recognize the photo from?

24 A    It looks like it's that picture.  I don't remember

25 standing against a red door.

1    Q    Okay.

2         JUDGE CARTER:  Just to be clear, the witness has

3    Exhibit 29 and actually this is another version of that exhibit.

4    I don't know if it matters.

5         MS. KLUYTENAAR:  It doesn't matter, that's fine, 29 is

6    fine.

7    BY MS. KLUYTENAAR:

8    Q    Do you recognize that biography of yourself there

9    underneath your photo?

10   A    Yes.

11   Q    Okay.  Do you recognize the jobs that are listed there,

12   the TCAT (ph.) facility, Cayuga Medical Center, Trudeau

13   Institute?

14   A    Those are jobs I've either worked on or ran.

15   Q    Okay.  When did you either work on or run those jobs?

16   A    For Ace.

17   Q    Okay.  Did you work on any of those jobs for Bella?

18   A    No.

19        MS. KLUYTENAAR:  Those are all my questions.  Thank you,

20   Mr. Hager.

21        JUDGE CARTER:  Mr. Furlong?

22        MR. FURLONG:  Thank you, Judge.

23                      **FURTHER DIRECT EXAMINATION**

24   BY MR. FURLONG:

25   Q    Mr. Hager, good morning.  You and I have met before, is

1    that true?

2    A      Yes.

3    Q      And we met one time over at the union hall to discuss your

4    testimony?

5    A      Yes.

6    Q      And we haven't met since then, but met again this morning.

7    Correct?

8    A      Correct.

9    Q      Okay.  Now, Mr. Hager, I do want to follow-up on some

10   questions the General Counsel asked you.  And of course I'd be

11   happy to rephrase the questions if any of them are confusing to

12   you.  Simply ask.  I want to talk for a moment about the meeting

13   that took place with Bob Bellavigna to discuss the Vestal Hills

14   project.  Do you recall your testimony on that?  And where did

15   that meeting take place again?

16   A      In Bobby's office.

17   Q      Bobby's office where?

18   A      At Ace.

19   Q      At Ace Masonry?

20   A      Yes.

21   Q      On Cecil Malone Drive?

22   A      Correct.

23   Q      In addition to Bob Bellavigna and yourself, was there

24   anyone else present?

25   A      Dick Tracy.

1  Q     And who is Mr. Tracy?

2  A     Another superintendent.

3  Q     Superintendent for Ace or Bella, at that time?

4  A     At the time, it was Ace.

5  Q     All right.  And you were employed at that time by Ace?

6  A     Correct.

7  Q     As a superintendent?

8  A     Yes.

9  Q     Okay.  And was there anyone else or it was just the three

10 of you?

11 A     I believe it was the three of us.

12 Q     Did you have any discussion with respect to job site

13 prints?

14 A     We looked at the prints that he had right there that were

15 of that job.

16 Q     Okay.  They were all for the Vestal job?

17 A     Correct.

18 Q     All right.  And blueprints is the same thing as prints,

19 just for the record, am I correct?

20 A     Yes.

21 Q     Okay.  And what was the nature of the discussion you had

22 with Mr. Bellavigna and Mr. Tracy regarding the prints?

23 A     We were looking over the job to see what it entailed, what

24 materials were going to be needed, and just looking over the job

25 before we went there.

1    Q    Before you went to the job?

2    A    Before, yeah, this was months before it was even ready to

3    go there and perform the work.

4    Q    So that we're clear at this point, you're an Ace employee,

5    correct?

6    A    Correct.

7    Q    Mr. Tracy is an Ace employee?

8    A    Yes.

9    Q    And Mr. Bob Bellavigna is an Ace employee.

10   A    Yes.

11   Q    Was Henry Bellavigna in the meeting?

12   A    I don't believe so, no.

13   Q    And to the best of your knowledge, at the point where you

14   are looking at prints, typically how long is that before the

15   commencement of the project?

16   A    It could be six months or it could be a month, it depends

17   on the schedule and the job.

18   Q    And, Mr. Hager, to the best of your recollection, with

19   respect to this Vestal Hills project, when were you in this

20   meeting with Mr. Bellavigna and Mr. Tracy?

21   A    It was -- I would say it was not the springtime, but it

22   wasn't, you know, it was summer.  It was hot, summertime, you

23   know.  I would say mid-summer.

24   Q    And at that time was it your understanding that Ace

25   Masonry had secured the job, or was looking at the job, or what?

1   A      Yeah, we were going to do it.

2   Q      You were going to do the job?

3   A      Yeah.

4   Q      And how do you know that?

5   A      We were looking at the prints to -- I mean I would assume

6   we had a signed contract for the job and we were going to do it,

7   you know what I mean?  Otherwise, we wouldn't have been looking

8   at it.  Bobby was showing us prints.  And Dick was pretty much

9   going to run, do the paperwork, and ask the questions.  And then

10  I was going to run the stuff in the field.

11  Q      And is that the way it typically worked at Ace with

12  respect to the superintendent and Bob?

13  A      Um-hum.

14         JUDGE CARTER:  That was a yes?

15         THE WITNESS:  Yes.

16  BY MR. FURLONG:

17  Q      So is it fair to say this was not the first type meeting

18  where a couple of superintendents and Bob Bellavigna got

19  together to look at upcoming jobs?

20  A      No.  I have been there for 10 years.

21  Q      Later, you worked on the Vestal project?

22  A      Yes.

23  Q      And did you have an opportunity to see the same prints

24  when you were working on the project?

25  A      Yes.

```
 1   Q    They were the same prints that you saw when you sat down
 2   with Bobby in the Ace offices?
 3   A    I don't know if they did that.  Usually, there was a set
 4   that was kept in the office and there was a set that we were
 5   given to take out to the field.
 6   Q    But the contents of the prints, themselves --
 7   A    It was the same, yes.
 8   Q    The trucks that you took down there, did there come a time
 9   -- let me backtrack and withdraw that.  Were those trucks ever
10   marked Ace Masonry?
11   A    Yes.
12   Q    And I'm speaking now of the Vestal project, right?
13   A    Right.
14   Q    And was there a time, Mr. Hager, when the Ace Masonry
15   emblem was removed from the truck?
16   A    Yes.
17   Q    Do you know who removed it?
18   A    No.
19        MR. FURLONG:  I'd like to show the witness GC-3, if we
20   could, together with GC-35.
21   BY MR. FURLONG:
22   Q    Mr. Hager, before you are two documents that have been
23   received into evidence.  I'll direct your attention first to
24   that which is marked GC, which for your information stands for
25   General Counsel, Exhibit 3, right?  Which at the top is
```

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 316
Wayne, New Jersey  07470
(973) 692-0660

1  captioned Ace payroll records.  Do you see that document?

2  A    Yes.

3  Q    Would you go down to your name?  It is alphabetical by

4  surname.  Do you see your name?

5  A    Yes, I do.

6  Q    And then your description, you're a mason superintendent,

7  you see that?

8  A    Yes.

9  Q    And to refresh your recollection or if you know, actually,

10  let me ask you without looking at the document.  Do you know

11  what your last day of work was at Ace Masonry?

12  A    No.

13  Q    Would this document help refresh you recollection?

14  A    Right here, yes.

15  Q    Okay.  And what does it say?

16  A    11/16/11.

17  Q    Does that sound right to you now?

18  A    It could be yes.

19  Q    All right.

20  A    It was the fall time.

21  Q    Okay.  Now if we look at the other document that has been

22  placed before you by the Judge, General Counsel's Exhibit 35,

23  where you signed the document on the 9th of November, a week

24  earlier, confirming your arrangement working at Bella Masonry,

25  do you see that?

1    A    Yes.

2    Q    Is it fair to say that you were therefore working at Bella

3    Masonry and Ace Masonry at least for a week of overlap?

4    A    Yes.

5    Q    Okay.  You did indicate and I'm going to use your phrase

6    that your transition from Ace Masonry into Bella that there was

7    no gap.  There was no layoff.  It was basically seamless.  One

8    day you were working for Ace.  The next day you were working for

9    Bella.  Is that correct?

10    A    Correct.

11    Q    The General Counsel asked you some questions about the

12    website.  And I think we were looking both at an October and a

13    November website for Bella Masonry.  Do you have those documents

14    in front of you?

15    A    27th or 29th?

16    Q    The 27th, which is the October.  Now it is fair to say

17    given what we just reviewed in terms of your last day at Ace, as

18    of October 2011, you were not employed by Ace -- or, rather, not

19    employed by Bella, but rather by Ace.  Is that accurate?

20    A    Yes.

21    Q    All right.  Were you aware that your picture and

22    description of your work was posted on the Bella website?

23    A    No.

24    Q    Anybody ever ask your permission?

25    A    No.

```
 1   Q    Let's switch gears to the meeting at Henry's house.  Do
 2   you recall your testimony on that?
 3   A    Yes.
 4   Q    Okay.  And just refresh my recollection, who was present
 5   at the meeting in addition to you and Henry Bellavigna?
 6   A    Scott Smith, Dick Tracy --
 7   Q    Let me stop you there.  Dick Tracy, is he a superintendent
 8   for Ace?
 9   A    Yes.
10   Q    You were a superintendent?
11   A    Yes.
12   Q    Continue.
13   A    Randy Bell.
14   Q    Was Randy Bell a superintendent?
15   A    Yes.
16   Q    Who else?
17   A    Scott Smith.
18   Q    Scott Smith, who was a laborer?
19   A    Yep.
20   Q    Okay.
21   A    Phil Bond.
22   Q    Is an apprentice?
23   A    Yep.
24   Q    Bricklayer apprentice?
25   A    Yes.
```

```
 1   Q     Okay.

 2   A     Rob.

 3   Q     Bellavigna?

 4   A     Yeah.

 5   Q     Okay.

 6   A     And Missy.

 7   Q     Who is the office manager?

 8   A     Yeah.  And Henry.

 9   Q     And Henry, okay.

10   A     Who I believe was there.

11   Q     So you had some key guys there in --

12   A     And Chuck Morrow (ph.) might have been there, too.

13   Q     And what trade is Chuck Morrow?

14   A     He's a millwright carpenter.

15   Q     Okay.  Does he run work or do anything like that?

16   A     No.  He's a fabricator like trade.

17   Q     So you had a couple of superintendents there, the owner,

18   office manager, laborer, and millwright.

19   A     Correct.

20   Q     How about Rollins, was he at the meeting?

21   A     Yes, he was.

22   Q     Okay.  And what's Steve Rollins' position.

23   A     He's a mason.

24   Q     Okay.  Is he a superintendent?

25   A     I think he has run some work.
```

1  Q    Okay.

2  A    Not a lot, but I think he has run some jobs there and

3  filled in when other superintendents had to leave a job.

4  Q    So we are talking about a couple of real key guys with

5  respect to Ace Masonry in terms of running work and so on, guys

6  who knew what they were doing?

7  A    Yes.

8  Q    All right.  A moment ago you testified about it basically

9  being a seamless transition from Ace to Bella.  Let me talk for

10 a minute about the nature of the work.  Ace Masonry was a

11 masonry contractor, correct?

12 A    Yes.

13 Q    And Bella was a masonry contractor, right?

14 A    Yes.

15 Q    Right.  Would you agree with me that they essentially did

16 the exact same type of work, same type of product for customers?

17 A    Yes.

18 Q    Same tools?

19 A    Yes.

20 Q    And in this case same employees?

21 A    Yes.

22 Q    Getting back to Lisa Bellavigna for a moment, you spoke

23 about having some interaction with Lisa Bellavigna.  Did she

24 ever run jobs, I'm talking about in the field, when you were

25 with Ace?

1  A    I believe she was more the money part of it.  She wasn't,
2  you know, Bobby was in the field with me.
3  Q    Okay.  Well, let me just go through some, some different
4  types of tasks that an individual may perform.  Did she direct
5  manpower in the field?
6  A    No, that was Bobby.
7  Q    All right.  Did she ever tell you where to go in terms of
8  you're to work at Vestal, or work at SUNY Binghamton, or any
9  other project, or was that Bob?
10  A    Bob.
11  Q    In terms of scheduling the work with the job site
12  superintendents, was that Bob or Lisa?
13  A    Bob.
14  Q    In terms of troubleshooting the jobs, Bob or Lisa?
15  A    Bob.
16  Q    In terms of buying out materials for the job, Bob or Lisa?
17  A    Bob.
18  Q    Okay.  In terms of pricing the masonry restoration work,
19  Bob Bellavigna or Lisa?
20  A    I don't know.
21  Q    Okay.  In terms of inspecting the work to ensure
22  compliance with construction and safety standards, Bob or Lisa?
23  A    Bob.
24  Q    Okay.  In terms of scheduling the concrete pours with the
25  superintendents, Bob or Lisa?

1  A    Bob.

2  Q    Okay.  At the beginning of your testimony with the General

3  Counsel, you used the words Bob Bellavigna, he was the boss.  In

4  addition to the tasks that I just described to you and you

5  indicated that Bob directed the work best of your knowledge, any

6  other tasks that Bob did for Ace Masonry?

7  A    I mean if I, I guess I don't understand the question.

8  Q    Sure.  Is there anything else?  I just went through

9  somewhat of a laundry list of tasks that a masonry

10 superintendent or a masonry coordinator/project coordinator

11 would perform, were there any other tasks that I left off the

12 list that would cause you to say Bob was the boss?

13 A    No.

14 Q    Okay.  Did Bob have authority to discipline when he was at

15 Ace Masonry?  Send a guy home?

16 A    I don't remember anybody ever getting sent home in 10

17 years.  But I guess --

18 Q    Okay.  So you don't know?

19 A    No, I don't know.

20 Q    Okay.  Did you ever work at the SUNY Binghamton project

21 other than what you described here was bring bringing some

22 equipment up, the SUNY Binghamton project and the Vestal project

23 on the same day?

24 A    I went there and taken some small scaffold parts from the

25 East Gym to the Vestal Hills job.  But I didn't -- I mean I

1   dropped off scaffolding.

2   Q     Transported equipment?

3   A     Right.  But I didn't what I consider work.  I didn't

4   physically build the building.

5   Q     You didn't work with the tools?

6   A     Correct.

7   Q     You dropped off equipment?

8   A     Yes.

9   Q     Okay.  All right.  And incidentally, last question, Mr.

10  Hager, are you testifying here today pursuant to a subpoena or

11  voluntarily?

12  A     I was subpoenaed.

13  Q     Thank you for your testimony.

14        MR. JAMESON:  No questions, Your Honor.

15        JUDGE CARTER:  Any cross?

16        MR. BAILEY:  Just a few minutes, just to confer with my

17  client?  We won't be very long.

18        JUDGE CARTER:  Off the record for a second.

19  **(Discussion off the record.)**

20        JUDGE CARTER:  We're back on the record and ready for

21  cross-examination.

22        MR. BAILEY:  Thank you, Judge.

23                          **CROSS-EXAMINATION**

24  BY MR. BAILEY:

25  Q     Mr. Hager, my name is Jason Bailey.  I represent both Ace

```
 1   and Bella.  I'd ask you a few questions.  You and I have never

 2   met before, correct?  Maybe crossed in the halls of Ace a few

 3   years ago, but --

 4   A     I think we were at a picnic.

 5   Q     We shot skeet together.

 6   A     We did.

 7   Q     Yeah.  You probably remember that because I shot very

 8   poorly.  For the record, I didn't have my own gun, so it was a

 9   borrowed weapon.  But we haven't talked about this case.

10   A     No.

11   Q     Okay.  Opposing counsel was asking you about a couple of

12   different documents and I want to just ask you a couple of

13   questions about those.  GC-3, if you could turn to that for me,

14   please.  And if we look at your name, there is a date last

15   worked on there.  It says 11/16/2011, correct?

16   A     Yes.

17   Q     Did you have any involvement in creating this document?

18   A     No.

19   Q     Do you know how that date was entered there?

20   A     No.

21   Q     Do you know who put it in there?

22   A     No.

23   Q     So you can't say for sure whether that date is accurate?

24   A     No.

25   Q     Okay.  Turning to GC-26, which was that larger packet,
```

1    Page 19 on that exhibit, Page 19, sir.  We were looking at the

2    last entry under your name that shows, at least according to

3    this document, that you may have worked on I think a town hall

4    project.  Do you see that?

5    A    Yes.

6    Q    Did you create this document?

7    A    No.

8    Q    Did you have any role in creating this document?

9    A    No.

10   Q    Do you know how that entry came to be?

11   A    No.

12   Q    Did you create your own -- I shouldn't say create.  Did

13   you fill in your own weekly timecards?

14   A    I did.  And I believe at the end of that, Dick Tracy was

15   doing the paperwork part of that, so I believe Dick filled out

16   my timecard.

17   Q    So Dick -- go ahead.

18   A    Dick sent it to the office.

19   Q    Okay.  And on those timecards, would it indicate project

20   and hours worked?

21   A    I believe so, because he had a laptop and he was sending

22   it that way.  I did it all paperwork.  But at that time, there

23   wasn't many of us working, and Dick had the laptop, and he did

24   it through there.

25   Q    Okay.  Let's see, opposing counsel asked you about the

 1    nature of the work, Ace's work and Bella's work, and

 2    characterized it as masonry.  Did Ace do a fair amount of GC

 3    work, general contracting?

 4    A    Yes.

 5    Q    And fair amount is my words.  How would you characterize,

 6    I guess the percentage if you will, GC to masonry?

 7    A    I would say in the 10 years that I worked for Ace, the

 8    beginning of it, it was more masonry.  And then towards the end,

 9    it was more GC work.

10    Q    And then with Bella, it was what?

11    A    Masonry is all I did for Henry.

12    Q    Exclusively?

13    A    Yes.

14    Q    You talked a little bit about your interactions with Lisa.

15    Did Lisa participate in superintendent meetings at the office?

16    A    Yes.

17    Q    Okay.  On a regular basis?

18    A    Once a month.

19    Q    And is that when the meetings occurred?

20    A    Yes.

21    Q    And so she participated in would you say most of those

22    meetings?

23    A    Most of the meetings, yes.

24    Q    And tell me what was discussed at these meetings.

25    A    It was safety, paperwork, upcoming jobs.  If anybody had

1   been, you know, OSHA had been on your job sites.

2   Q    Did you ever discuss things like job cost with Lisa?

3   A    Yes.

4   Q    Would you say that Lisa was actively involved with Ace, in

5   the management of Ace?

6   A    Yes.

7   Q    We talked a lot about the Vestal project.  During that

8   time, did you have a car that broke down, do you remember?

9   A    My personal?

10   Q    Yeah.

11   A    I know my truck was broke for a while, but I don't

12   remember the exact time.  It was an electrical gremlin with it.

13   Q    With your truck?

14   A    With my truck, yes.

15   Q    Could you ballpark that time frame for me?

16   A    It was the last summer that I worked for Ace.

17   Q    Summer/fall or summer?

18   A    I would say it was -- I think it was summer.

19   Q    And whose vehicle did you use?

20   A    Ace's.

21   Q    They let you borrow?

22   A    Yes.

23   Q    Who did you contact about that?

24   A    Probably Bobby.

25   Q    And then you used an Ace vehicle?

```
 1   A    Yes.

 2   Q    Did you take that vehicle to job sites?

 3   A    Yes.

 4   Q    Do you remember what job sites?

 5   A    No.  I mean if my truck was broke, I'd probably borrow one

 6   of the Malibu's or something and then, you know, if we had -- I

 7   would go to the yard and then the big truck to go to the job.

 8   Q    Okay.  Towards the summer/fall of 2011, did you know that

 9   Ace was in trouble?

10   A    Yes.

11   Q    And how did you know that?

12   A    It had been common knowledge for a long time building up

13   to that point that things weren't well, the jobs that had gone

14   bad with Ace.

15   Q    And was it discussed at some of these superintendent

16   meetings?

17   A    Yes.

18   Q    The finances?

19   A    Not like dollar amounts, but there was concern for the

20   company's well-being, you know, that it was dumb to try to do

21   the best you could because times were tough.

22   Q    Let me have you turn to R-1.  It's right there actually.

23   Take a moment to read that for me, please.

24   A    I remember this letter.

25   Q    I'm sorry?
```

1   A     I remember this letter.

2   Q     You received a letter like that?

3   A     I believe so.  I believe I talked about this with Scott

4   Stringer.  I talked about this with Bobby, both of them.

5   Q     And it's --

6   A     I know exactly.  Do you want me to tell you?

7   A     Please.

8   Q     Okay.

9   A     My daughter's birthday is October 17th, which is the same

10  day as Bobby's.  And --

11  Q     Bob Bellavigna.

12  A     Bob Bellavigna.

13  Q     Okay.

14  A     We got this letter.  And basically in a nutshell, from

15  what I understood, that if we worked for Ace past this, we were

16  on our own as far as getting our benefits.  They weren't going

17  to chase any benefits after this date.

18  Q     When you say they, who do you mean?

19  A     The union --

20  Q     Okay.

21  A     -- was not going to -- we were on our own as far as Ace

22  didn't pay after this, they were letting us know we were on our

23  own.  My daughter's birthday dinner was when the employees met

24  with I believe Scott Stringer and some other union people to

25  discuss the circumstances of helping Bobby finish up union jobs

1    that he had open without being brought up on charges and that

2    kind of stuff.  We were going to be able to help Bobby finish up

3    the union work that he had.  And I was not part of this meeting

4    because it was my daughter's birthday and we went to the Chinese

5    Buffet, her choice, and that's why I said my daughter's birthday

6    is more important.  And then I had talked to -- I got all the

7    information the next day from one of the guys I worked with.

8    Q    Okay.  I think the letter references something about

9    charges or some sort of penalty?

10   A    Yes.  We discussed that afterwards.

11   Q    Who is we?

12   A    I was not at the --

13   Q    Okay.

14   A    All the guys that went to this meeting that met with these

15   guys.

16   Q    Okay.

17   A    The agreement was, and I was not there --

18        JUDGE CARTER:  Well, if you worked -- just testify about

19   what you were actually present for.  So if this information you

20   got from somebody else --

21        THE WITNESS:  Well, I was concerned about his.  And then I

22   had talked to --

23        JUDGE CARTER:  So you can tell us about something that

24   you, personally, heard but not something that you heard --

25        THE WITNESS:  Well, I wasn't at the meeting, so if those

1    guys all lied to me then I guess I don't know.

2        JUDGE CARTER:  Well, it's not about whether they were

3    truthful or not.  It's about what we can receive as evidence in

4    the case.

5        THE WITNESS:  Right.  I was under the assumption and I

6    believe, after talking to Scott Stringer, that we were going to

7    be able to help Bobby finish up the work we had without being

8    brought up on charges.  So I can say that I -- I believe I also

9    had a conversation with Scott about that, So which is different

10    than this meeting that I was not in.

11    BY MR. BAILEY:

12    Q    Sure.  Were you ever brought up on charges?

13    A    I was brought up on charges.

14    Q    And were you -- did you receive some sort of financial

15    penalty?

16    A    The charges were dropped.

17    Q    What was your reaction when you found out you were brought

18    up on charges?

19    A    I was pissed beyond pissed.  I was mad.

20    Q    At I'm sure a lot of people.

21    A    I was mad at a lot of people.

22    Q    Mad at Ace?

23    A    I was mad.  I would say I was --

24        MR. FURLONG:  Objection.  What's the relevance as to who

25    he was mad -- what's the relevance?

```
 1          THE WITNESS:  I was made at the whole situation.

 2          JUDGE CARTER:  Wait just a minute.  We have an objection.

 3          MR. BAILEY:  Judge, I think depending upon his answer, it

 4   may lead to what his actions were next.  I can short --

 5          MR. FURLONG:  But his motivation for what he does --

 6          MR. BAILEY:  I can short circuit this.

 7          MR. FURLONG:  I still have an objection.

 8          JUDGE CARTER:  He's going to pose another question.

 9          MR. BAILEY:  Exactly.

10   BY MR. BAILEY:

11   Q    What actions did you take after you found out that you

12   were brought up on charges?

13   A    I called the hall.

14   Q    And what did you do?

15   A    Asked them why it was -- why I got brought up on charges.

16   Q    And so how did it get resolved?

17   A    It just kind of went away.  I don't know.  I don't know

18   how it got resolved.

19   Q    You weren't penalized in any way?

20   A    No.

21   Q    Okay.

22          JUDGE CARTER:  Just for the record, you mentioned Scott

23   Stringer.  That person, I gather he's in the courtroom, but

24   what's his role, if any, with the union?

25          THE WITNESS:  He's my business representative, my field
```

 1  rep.

 2          JUDGE CARTER:  Okay.  Other questions, Mr. Bailey?

 3          MR. BAILEY:  Just one second, Your Honor.  I think that's

 4  it.  Thank you, sir.

 5          JUDGE CARTER:  Any redirect?

 6          MS. KLUYTENAAR:  Just a couple of questions.

 7                        **REDIRECT EXAMINATION**

 8  BY MS. KLUYTENAAR:

 9  Q     Mr. Hager, you mentioned attending superintendent

10  meetings, correct?

11  A     Yes.

12  Q     And were those regular meetings you attended as an Ace

13  employee?  Were they held regularly, on a regular basis?

14  A     Once a month.

15  Q     Once a month?

16  A     Once a month.

17  Q     Okay.  And who was present at those meetings?

18  A     It was usually all superintendents.  We had an apprentice.

19  We brought an apprentice in so they could see how things worked.

20  Q     Okay.

21  A     And the project managers.

22  Q     Who was that?

23  A     It changed a lot out of 10 years.

24  Q     Okay.

25  A     But it was --

1  Q    Anybody else?

2  A    It was, you know, owners of the company, Bob, Lisa, Henry.

3  We had safety coordinators that were there.  Mechanics.  I mean

4  there was pretty much anybody that was involved other than just

5  somebody that faced a wall was in there.

6  Q    Okay.  Who generally ran the meetings?

7  A    Bobby.

8  Q    Okay.  Was Lisa always present at the meetings?

9  A    Not always.

10  Q    Okay.  How often would you say?

11  A    I would say she was there the first 10 years or the first

12  9 years all the time and maybe less towards the very end.

13  Q    Okay.  Did Lisa generally speak at the meetings?

14  A    Yes.

15  Q    Okay.

16  A    Usually about paperwork.

17  Q    Okay.  Just returning for one moment to the Vestal job,

18  you said that you may have been borrowing an Ace truck at the

19  time?

20  A    It was the same truck that I'd used for years.  I don't

21  know when Ace stopped and Bella started.  I was I had a job to

22  do and I went and did it.  I didn't really --

23  Q    Okay.  I just want -- I think you testified that you would

24  go to the yard --

25  A    Yes.

1   Q     -- and get the truck.  And I just wanted to clarify when

2   you say go to the yard, what are you referring to?

3   A     The Ace yard.  The one on Cecil A. Malone.

4   Q     The Ace office at Cecil Malone Drive?

5   A     Yes.

6   Q     Okay.  And when you said get the truck, did you mean were

7   you switching over from the vehicle you had to a different truck

8   to go to the job site?

9   A     Yes.

10  Q     Okay.  And what vehicle did you actually take to the job

11  site?

12  A     The 450.  It was a flatbed F-450.

13  Q     Okay.  Was that an Ace vehicle?

14  A     Yes.

15  Q     Did it say Ace on it?

16  A     It did.  And then it was taken off at the end.

17  Q     Okay.  Were you taking equipment down to the job site with

18  you in that vehicle?

19  A     Yes.

20  Q     Okay.  And where would you load up that equipment into the

21  vehicle?

22  A     From the yard.

23  Q     From the Ace yard?

24  A     Yes.

25  Q     And was it Ace equipment that you were loading into the

1  vehicle?

2  A    I would assume so.  It's the stuff I had used for a long

3  time.

4  Q    Okay.  Fall of 2011, you were still employed at Ace,

5  correct?

6  A    Yes.

7  Q    Some point in the fall of 2011.

8  A    Yes.

9  Q    Do you have any -- do you have any idea if there was a

10  lack of manpower at Ace during that time?

11  A    There wasn't many people working there, so there could

12  have been a lack of manpower.

13  Q    Okay.

14        MS. KLUYTENAAR:  That's all.

15        JUDGE CARTER:  Follow-up?

16                **FURTHER REDIRECT EXAMINATION**

17  BY MR. JAMESON:

18  Q    Just as a follow-up to the last question, when you talk

19  about there could have been a lack of manpower, when you say

20  there is not a lot of people, do you know if they had a lot of

21  work going on?  I'm speaking of Ace.

22  A    No, there was not a lot of work going on.

23  Q    Okay.  So it may have been a lack of work, as opposed to a

24  lack of manpower?

25  A    It could have been lack of work.

1  Q    I mean were you short people on jobs where you were trying

2  to plug people in and simply couldn't get them?

3  A    We were short on the -- I mean there was times when we

4  could have used more people, but we didn't have more people to

5  hire.

6  Q    But you're in -- you've been in construction for many

7  years, Mr. Hager, is that correct?

8  A    Correct.

9  Q    And your experience as a superintendent working

10  construction, there's oftentimes on any job where you can use

11  people at a particular point, it may not happen, but then they

12  come onto a job, isn't that correct?

13  A    Yes.

14  Q    And was that the case with Ace toward the fall of 2011?

15  A    There was just a handful of us that worked there.

16  Q    Okay.  Did you ever call the union hall saying, hey, I

17  need people, and you were refused people?

18  A    No.

19  Q    Okay.  Did you write any memos to management, whether it

20  be Lisa Bellavigna or Bob Bellavigna saying, hey, we're short

21  people and we can't find them?

22  A    I didn't write any memos.  I might have talked to Bobby.

23  Q    Okay.  So when you say, again back to, you know, you may

24  have been short manpower, what specific jobs were you working on

25  that you couldn't man?

1    A    The Vestal job.

2    Q    Okay.  Was that a Bella job or was that an Ace job?

3    A    Well, it started as an Ace and then it went to Bella.  And

4    I don't know the exact date that it changed over.

5    Q    Okay.  All right.  Now going to GC-3, counsel for the

6    company or companies asked you if you put this document together

7    and could you be sure whether or not that 11/16/11 date was your

8    last date at Ace.  Do you recall that testimony?

9    A    I do.

10    MR. JAMESON:  Actually, I'm not going to direct this to

11    the witness but to counsel for the Respondents to stipulate that

12    GC-3 was produced by Ace Masonry for purposes of this hearing.

13    MR. BAILEY:  I think we've already established that and it

14    is admitted in evidence.

15    JUDGE CARTER:  I mean the document came in through --

16    MR. JAMESON:  That's fine.  Except the questioning to this

17    witness suggests maybe that the document produced by Mr.

18    Bailey's clients is inaccurate.

19    JUDGE CARTER:  No, I think the cross-examination was fine

20    on that.  I mean the point of the cross is that the witness did

21    not create this document.

22    MR. JAMESON:  Which we can stipulate to.

23    JUDGE CARTER:  But it still remains a document that Mr.

24    Bellavigna sponsored and which he testified.

25    MR. JAMESON:  Right, okay.

1  BY MR. JAMESON:

2  Q    I'll move on then to the issue of whether Ace was a

3  general contractor or not.  When you were working for Ace

4  Masonry, is it true that they hired carpenters?

5  A    Yes.

6  Q    Is it true that they hired masons?

7  A    Yes.

8  Q    Is it true that they hired laborers?

9  A    Yes.

10 Q    Did they direct hire any other craft such as electricians,

11 or sprinkler fitters, or operating engineers, or anything like

12 that, or did they continue just to direct hire the three groups

13 that I just mentioned.

14 A    As Ace Masonry?

15 Q    As Ace Masonry.

16 A    Did they direct anybody other than --

17 Q    Did they direct hire, meaning did they hire employees

18 other than the crafts that they had always directly hired, the

19 masons, the carpenters, and the laborers?

20 A    I don't know.  I mean I ran masonry work.

21 Q    Right.

22 A    I hired my guys.  I fired my guys on my job.  I don't know

23 what other, you know, I was just a spoke in the wheel.  I don't

24 know --

25 Q    You were a masonry superintendent.

1    A    Correct.

2    Q    On the jobs that you worked, did you see electricians you

3    knew were employed by Ace Masonry?

4    A    On my jobs, no.

5    Q    Yes.  Did you see sheet metal workers that were employed

6    directly by Ace Masonry?

7    A    No.

8    Q    Okay.  Did you see any other crafts directly employed by

9    Ace Masonry other than the ones that we've discussed, the

10   carpenter, the laborer, and the mason?

11   A    No.

12   Q    So in that respect, the direct hires were the same

13   throughout your tenure with Ace Masonry?

14   A    On my jobs, yes.

15   Q    Okay.  Did you ever see Bob Bellavigna down at the Vestal

16   job?

17   A    In the very beginning.  He was down there once.

18   Q    Okay.  And what did he do in the very beginning of the

19   job?

20   A    We looked at the job and decided it was too wet and they

21   weren't ready for us.

22   Q    Okay.  And so that would have been what, about September?

23   A    Early fall, yes.

24   Q    Early fall.  And did you ride down with him at that time

25   to check that job out or did he meet you at the job?

1   A      He met me down there.

2   Q      Anybody else join you or just Bob?

3   A      I think I had a couple of guys over at the East Gym that

4   came over with me.

5   Q      And was it your understanding when you met Bob over there,

6   Mr. Hager, that at that point it was an Ace job?

7   A      Yes.

8   Q      You indicated a short time ago in response to some

9   questions that you did some hiring and firing for Ace Masonry.

10  Do you recall that testimony?

11  A      Yes.

12  Q      With respect to masons, I'm assuming.

13  A      And laborers.

14  Q      And laborers as well, okay.  How about the carpenters?

15  A      I don't think I fired any carpenters.  I might have just

16  sent them to do another job.

17  Q      Okay.

18  A      Or laid off, or however you want to look at it.

19  Q      And when you did these hirings and firings, Mr. Hager, did

20  you generally run them past Bob Bellavigna for his approval or

21  disapproval?

22  A      Not usually, no.

23  Q      Okay.  He gave you that type of authority?

24  A      Yes.

25  Q      Okay.

1       MR. JAMESON:  Nothing further.  Thank you.

2       MR. FURLONG:  No questions.

3       MR. BAILEY:  Just very quickly.

4                    **RECROSS EXAMINATION**

5  BY MR. BAILEY:

6  Q    Continuing that point, the hiring and firing, would you

7  call the union hall for labor, to get more people on the

8  project?

9  A    If I had been on it long enough where I knew who to call,

10  then I'd call them first.  And then if I couldn't get a hold of

11  people that I was used to working with, then I would call the

12  hall.

13  Q    But that was something you would do?

14  A    Yes.

15  Q    You said earlier that there was a shortage of labor at

16  different points towards the end.

17  A    Yes.

18  Q    Why didn't you call the hall and ask for more workers?

19  A    Because at that point in time it was at the end and

20  benefits were not getting paid.  And then there was people that

21  probably weren't going to come there and work.

22  Q    So it would have been useless to call?

23  A    Probably, yes.  And then especially after this letter, you

24  know what I mean?

25       MR. FURLONG:  Objection in terms of the useless.  That

1    clearly goes to conjecture and supposition.

2         JUDGE CARTER:  It's speculation.  Sustained as to that.

3    BY MR. BAILEY:

4    Q    Do you think it would have been beneficial to call the

5    hall after this letter was issued?

6    A    No.

7    Q    I'm sorry?

8    A    No.

9         MR. FURLONG:  Objection for the same reason.  It clearly

10   goes to speculation and conjecture.

11        JUDGE CARTER:  He's giving his opinion, but it's limited

12   weight given.  The record we have about his knowledge about

13   other workers and what they may have heard or not heard about

14   this letter.  Overruled, but it has limited weight.

15   BY MR. BAILEY:

16   Q    You indicated when talking about Lisa's involvement that

17   she was at the meetings on a regular basis throughout the 10

18   years and then much less so at the end.

19   A    Yes.

20   Q    Do you know why she was there much less at the end?

21   A    No.

22   Q    That's all I have.  Thank you, sir.

23        JUDGE CARTER:  Okay.  Any final redirect?  Mr. Hager, you

24   have completed your testimony.  As to the rules, from this point

25   forward you are free to go, just don't discuss your testimony

1    with any other possible witness in the matter.  Thank you.

2    **(Witness excused.)**

3        JUDGE CARTER:  We'll go off.

4    **(Whereupon, a brief recess was taken.)**

5        JUDGE CARTER:  We're back on the record.  And does the

6    Agency have another witness?

7        MR. LEHMANN:  Yes.  We're calling -- General Counsel is

8    calling Dan Thaete.

9        JUDGE CARTER:  Stand, please, and raise your right hand.

10   (Whereupon,

11                           **DAN THAETE,**

12   was called as a witness by and on behalf of the General Counsel

13   and, after having been duly sworn, was examined and testified as

14   follows:)

15       JUDGE CARTER:  Please be seated.  Can you state your full

16   name, please?

17       THE WITNESS:  My name is Dan Thaete, T-H-A-E-T-E.

18       JUDGE CARTER:  You may inquire.

19                         **DIRECT EXAMINATION**

20   BY MR. LEHMANN:

21   Q    Good morning, Mr. Thaete.

22   A    Good morning.

23   Q    My name is Greg Lehmann.  I am counsel for the National

24   Labor Relations Board, counsel for the General Counsel.  I'm

25   just going to ask you a few questions.  Are you currently

1    employed?

2    A      Yes.

3    Q      And where are you employed?

4    A      The Town of Ithaca.  I'm a civil engineer.

5    Q      Okay.  And can you briefly describe your job duties?

6    A      Generally, prepare contract documents, oversee

7    construction on projects, day to day issues in the field with

8    sewer and water, design of infrastructure projects, that sort of

9    thing.

10   Q      Are you familiar with a project in or about September of

11   2011, at the Ithaca Town Hall?

12   A      Yes.

13   Q      And what was that project?

14   A      It was the town hall roof replacement project was what it

15   was titled.

16   Q      Okay.

17   A      That incorporated a new roof and masonry restorations on

18   the exterior of the building.

19   Q      And who was the -- was there a general contractor?

20   A      Yes.

21   Q      And who was that?

22   A      Hale Contracting (ph.).

23   Q      And are you familiar with Ace Masonry?

24   A      Yes.

25   Q      And do you know whether Ace Masonry performed any work on

1    this project?

2    A      Yes, they did.

3    Q      And how do you know that?

4    A      During the preconstruction meeting, we had asked Hale

5    Contracting who their sub was going to be, if they had subs.

6    His response was, yes, and that would be Ace.

7    Q      Okay.  And do you know if Ace worked on the job?

8    A      Yes.

9    Q      And how do you know that?

10   A      Every day I was on the site talking with the workers and

11   they had indicated they were with Ace.

12   Q      Do you remember any of the workers' names?

13   A      The one individual I always dealt with was Randy, was his

14   first name.

15   Q      Okay.  Do you know his last name?

16   A      I have it in the payrolls.  I don't know it off the top of

17   my head.

18   Q      Okay.  Any other?

19   A      There was a Bob, who was at the preconstruction meeting,

20   who indicated he was the manager in charge of that project for

21   Ace.  Randy was the actual laborer.

22   Q      Okay.  And have you seen Bob?  Do you know Bob's last

23   name?

24   A      Not off of the top of my head, no.

25   Q      Okay.  Have you seen him in this building, today?

1  A     Yes.  When I arrived, he was in the hallway.

2  Q     Okay.  Could we bring Bob into the hearing room just for

3  an identification?

4        JUDGE CARTER:  Stipulate?

5        MR. LEHMANN:  That it was Bob Bellavigna?

6        MR. BAILEY:  I'll stipulate.

7        JUDGE CARTER:  Okay.  That will be accepted.

8  BY MR. LEHMANN:

9  Q     All right.  And do you know if Ace Masonry finished the

10  job?

11  A     Yes.

12  Q     Okay.  Have you since learned otherwise?

13  A     Yes.

14  Q     Okay.  Explain please.

15  A     Throughout the duration of the project, Ace was the

16  contractor, like I had said before.  Talking with the employees,

17  they had indicated they were from Ace.  I didn't see any change

18  in manpower.  However, when I was subpoenaed, we went through

19  our records and sure enough certified payrolls indicated half,

20  approximately half the project was done by Ace; the other half

21  of the payroll aps or the certified payrolls were Bella.  That's

22  when I discovered that there may have been two parties involved.

23  Q     And do you maintain these payroll records, these certified

24  payroll records in the normal course of your business?

25  A     Yes.  When we receive pay aps, we also received the

1    certified payrolls as backup.

2    Q    Okay.  And you have collected the payroll, the certified

3    payroll records on this job?

4    A    Yes.

5    Q    Okay.

6    **(General Counsel Exhibit 38 marked for identification.)**

7    BY MR. LEHMANN:

8    Q    I'm showing you what's been marked as General Counsel's

9    Exhibit 38.  Do you recognize this document?

10   A    Yes.

11   Q    And what is it?

12   A    These are the certified payroll records we collected for

13   the town hall roof project.

14   Q    Okay.  And these are collected in the normal course of

15   your business?

16   A    Yes.

17        MR. LEHMANN:  I would offer General Counsel's Exhibit 38,

18   at this time.

19        MR. JAMESON:  No objection.

20        MR. FURLONG:  No objection.

21        MR. BAILEY:  No objection, Your Honor.

22        JUDGE CARTER:  Exhibit 38 for General Counsel will be

23   admitted without objection.

24   **(General Counsel Exhibit 38 received into evidence.)**

25        MR. LEHMANN:  No further questions.

1          JUDGE CARTER:  Mr. Furlong?

2                    **FURTHER DIRECT EXAMINATION**

3     BY MR. FURLONG:

4     Q     Thank you, Mr. Thaete.  Let me ask you a couple of

5     questions.  And if you would like me to rephrase any of the

6     questions, certainly feel free to ask me to do so, I will.

7     A     Okay.

8     Q     The Town of Ithaca had a contract with Hale Contracting,

9     is that correct?

10    A     That's correct.

11    Q     And then Hale Contracting, it was your understanding, had

12    a contract with Ace Masonry?

13    A     That's my understanding.

14    Q     And you were alerted prior to the beginning of the job

15    that Ace Masonry would be performing the job?

16    A     That's correct.

17    Q     Did Hale or Ace ever notify you thereafter that Ace was

18    being removed from the job and Bella would be performing the

19    job?

20    A     No.

21    Q     And in your contract with Hale, do you have a provision

22    where actually you should have received written notification --

23    A     Yes.

24    Q     -- of this change?  Okay.  And is it your testimony that

25    when you received the subpoena -- when did you receive the

1    subpoena, let me ask you that?

2    A     I would say approximately a week ago.

3    Q     Okay.  And in an effort to supply the documents sought in

4    the subpoena, that's when you discovered the Bella Masonry

5    payroll records?

6    A     That's correct.

7    Q     And Mr. Randy Bell, and I'm using the surname Bell, does

8    that ring a bell as to who Randy was?

9    A     Yes.

10    Q     All right.  He remained on the job and others remained on

11    the job, having gone from Ace to Bella, upon your review of the

12    certified payroll records?

13    A     Yes.

14    Q     We have a stipulation with respect to Bob Bellavigna being

15    the Bob who was at the pre-job.  Do you recall that discussion?

16    A     Yep.

17    Q     What's the nature of a pre-job meeting in the construction

18    industry at least with respect to your experience?

19    A     It varies job to job.  But for this job, laying out the

20    requirements of the city, considering our town building is in

21    the city.  You want to know who is, who is applying for permits,

22    talking with the contractors on when they anticipate starting,

23    letting them know about pay aps, when they need to be to our

24    office so we can review them.

25    Q     The pay aps is pay applications?

1  A    That's correct.

2  Q    For payment?

3  A    For payment, yes.

4  Q    Okay.

5  A    And just discussing the project in general, trying to hash

6  out any issues ahead of starting the project.  So that is

7  basically what we did on this project.

8  Q    And Mr. Bellavigna indicated that he was the manager or

9  the point person for Ace Masonry?

10  A    Yes.  He had indicated he was the manager of that project

11  for Ace.

12  Q    No further questions.  Thank you, Mr. Thaete.

13       MR. JAMESON:  Nothing, Your Honor.

14       JUDGE CARTER:  Okay.  Mr. Bailey?

15       MR. BAILEY:  Yeah, real brief.

16                        **CROSS-EXAMINATION**

17  BY MR. BAILEY:

18  Q    How are you doing, sir?  My name is Jason Bailey.  I

19  represent both Ace and Bella.  I'll ask you a couple of quick

20  questions here.

21  A    Right.

22  Q    Opposing counsel was asking you about the contact with

23  Hale.  So the town's contract was directly with Hale.

24  A    That's correct.

25  Q    And Hale is certainly the GC?

1    A    That's correct.

2    Q    Okay.  So it didn't have a contract with Ace or Bella?

3    A    That is correct.

4    Q    And so Ace and/or Bella didn't have a responsibility to

5    notify the town it was working on the project.  That would have

6    fallen directly on Hale, correct?

7    A    That's correct.

8         MR. BAILEY:  That's all I have, Judge.  Thank you, sir.

9         JUDGE CARTER:  Okay.  Any redirect?

10        MR. LEHMANN:  Nothing further.

11        UNIDENTIFIED SPEAKER:  Nothing further.

12        JUDGE CARTER:  Okay.  Mr. Thaete, you have completed your

13   testimony.  The only rule at this point is just don't discuss

14   what you testified about with any other possible witness.

15        THE WITNESS:  Okay.

16        JUDGE CARTER:  Otherwise, you're free to go.

17        THE WITNESS:  All right.  Thank you.  Did you want these?

18        MR. JAMESON:  Just the payroll records.

19        JUDGE CARTER:  Those can stay, but don't leave your

20   notebook, of course.

21        MR. FURLONG:  Thank you very much, Mr. Thaete.

22        THE WITNESS:  Thank you.

23   **(Witness excused.)**

24        JUDGE CARTER:  All right.  Just scheduling wise, I do have

25   a conference call to do this morning.  So we can go until 5 till

1    11:00 and then I'm going to take about a 15, 20 minute break for

2    that purpose.  So I don't know if we are resuming with Mr.

3    Bellavigna or you have another witness?

4        MS. KLUYTENAAR:  I think we're resuming with Mr.

5    Bellavigna.

6        JUDGE CARTER:  Okay.

7    **(Whereupon, a brief recess was taken.)**

8        JUDGE CARTER:  All right, we're back on the record.  And

9    Mr. Robert P. Bellavigna is back on the stand.  Remember you are

10   still under oath from your prior testimony.

11   (Whereupon,

12                        **ROBERT P. BELLAVIGNA,**

13   was recalled as a witness by and on behalf of the General

14   Counsel and, after having been previously duly sworn, was

15   examined and testified as follows:)

16       JUDGE CARTER:  And further questions from the acting

17   General Counsel?

18       MS. KLUYTENAAR:  Thank you, Your Honor.

19                        **DIRECT EXAMINATION**

20   BY MS. KLUYTENAAR:

21   Q    Good morning, Mr. Bellavigna.

22   A    Morning.

23   Q    I think when we left off, yesterday, you had just

24   completed your testimony that you were appointed a trustee of

25   the Laborers Local 589 Welfare Fund in 2007.  Do you remember

1   that testimony?

2   A    Yes.

3   Q    Okay.  Now there came a time where you resigned your

4   trustee position, did there not?

5   A    Dave asked me to, yes.

6   Q    Okay.  Who is Dave?

7   A    The business agent.

8        MS. KLUYTENAAR:  I'll let the record reflect that the

9   witness is pointing to someone in the courtroom.  If you could

10  name --

11       MR. MARSH:  Dave March.

12  BY MS. KLUYTENAAR:

13  Q    Okay.  And who is Dave Marsh.

14  A    Business agent.

15  Q    Business agent for which union?

16  A    589.

17  Q    Okay.  And did you then resign your trustee position?

18  A    Yes.

19  Q    And why did you do that?

20  A    He asked me to.

21  Q    Do you know why he asked you to?

22  A    Didn't ask.

23  Q    Okay.  Did you have a conversation with Mr. Marsh about

24  resigning your trustee position?

25  A    Yes.

1    Q    When was that conversation?

2    A    I don't recall the date.

3    Q    Okay.  Was it over the phone?

4    A    No.  He came to my office.

5    Q    Okay.  And tell me what you recall from that conversation.

6    A    Part of that conversation was he was kind of wondering how

7    Ace was doing.  And it was kind of a general conversation about

8    how I was doing and thought that it would be a good idea if I

9    resigned, as I recall the conversation.  It's been quite a

10   while, but --

11   Q    Okay.  But you don't have any recollection as to any

12   specific reason that he gave for you to resign?

13   A    Not that I recall.

14   Q    Okay.

15   **(General Counsel Exhibit 39 marked for identification.)**

16   BY MS. KLUYTENAAR:

17   Q    Mr. Bellavigna, I'm showing you what's been marked as

18   General Counsel Exhibit 39.  Do you recognize that document?

19   A    I didn't hear you.

20   Q    I'm sorry.  Do you recognize the document?

21   A    Yes.

22   Q    What is it?

23   A    It's my resignation.

24   Q    Your resignation from what?

25   A    Laborers Local 589, Pension Welfare, everything listed

1    right there.

2    Q    Okay.  And is that your signature there?

3    A    Yes.

4    Q    Above your name.  And is that the date that you signed the

5    document?

6    A    I would assume so.

7    Q    Do you remember where you were, when you signed the

8    document?

9    A    No.

10    MS. KLUYTENAAR:  Okay.  I would offer GC-39.

11    MR. FURLONG:  No objection.

12    MR. BAILEY:  No objection.

13    MR. JAMESON:  No objection.

14    JUDGE CARTER:  Exhibit 39 for Acting General Counsel

15    admitted without objection.

16    **(General Counsel Exhibit 39 received into evidence.)**

17    BY MS. KLUYTENAAR:

18    Q    I'd like to go back to talk a little bit about your

19    employment at Ace Masonry.  When you testified that you were

20    employed as a project coordinator at Ace Masonry from sometime

21    around its inception until 2011, correct?

22    A    Yes.

23    Q    In fact, you were employed there until December of 2011,

24    correct?

25    A    Yes.

1  Q     Okay.  Would it be fair to say that during your employment

2  with Ace as the project coordinator, you coordinated the

3  manpower and oversaw the superintendents in the field?

4  A     Till about 2010.

5  Q     Okay.  When in 2010?

6  A     I don't recall the date.

7  Q     And is it your testimony that after sometime in 2010, you

8  didn't do those things?

9  A     I did not do all of them.

10  Q     Okay.  What did you do?

11  A     Masonry.

12  Q     Let me rephrase the question.  Out of the duties that I

13  just described, coordinating the manpower and overseeing

14  superintendents, which of those things did you not do after

15  2010?

16  A     Say that one more time?

17  Q     Sure.  Out of these two duties that I just described,

18  overseeing the superintendent and coordinating the manpower,

19  which of those did you not do after 2010?

20  A     I don't know how to answer that because this was my --

21  they took away part of my duties.

22  Q     Okay.  Well, let's break it down a little bit.  You just

23  testified that up until 2010, you were responsible for both of

24  those things, correct, as a project coordinator?

25  A     Yep.

1    Q    Okay.

2    A    Yes.

3    Q    And sometime in 2010, as you remember it, you stopped

4    doing some of those things, correct?

5    A    Yes.

6    Q    And when you say they took away part of your job duties,

7    who is they?

8    A    They hired a project coordinator right at the end of it.

9    Q    No, I'm sorry, Mr. Bellavigna.  That's not the question.

10   The question is when you're referring to they, who are you

11   referring to?

12   A    Ace.

13   Q    I'm sorry?

14   A    Ace.

15   Q    But who, specifically?

16   A    Lisa.

17   Q    Okay.  So they is Lisa Bellavigna?  Is that who you are

18   referring to?

19   A    Yes.

20   Q    Okay.  So Lisa Bellavigna took away some of your job

21   duties.  Is that your testimony?

22   A    Yes.

23   Q    Sometime in 2010?

24   A    Yes.

25   Q    And what job duties did Lisa take away from you?

1    A    Part of the control, some of the people that I deal with.

2    Q    Okay.  Who?

3    A    It's done by job, so --

4    Q    Okay.  Who?

5    A    I didn't do -- I was directed to do certain jobs and she

6    directed the other person to do the other jobs.

7    Q    Who was the other person?

8    A    John Franzese.

9    Q    Okay.  And was he also a project coordinator?

10   A    I can't remember his title.

11   Q    Okay.  How long did Mr. Franzese work there?

12   A    I don't remember.

13   Q    Okay.  Do you have any idea?  Was it six months?  Was it

14   six years?

15   A    I think it was maybe a little over a year.

16   Q    Okay.  But you don't know what his title was?

17   A    No.  I don't remember.

18   Q    Okay.  Do you think he might have been a project

19   coordinator?

20   A    Project manager, project coordinator, they're pretty much

21   the same.  I don't know what he had on his card.

22   Q    Okay.  So your testimony is that sometime in 2010, Lisa

23   Bellavigna took away some of your job duties as project

24   coordinator and transferred them to Mr. Franzese, is that

25   correct?

1    A    Yes.

2    Q    Okay.  And what job duties did Lisa take away from you and

3    give to Mr. Franzese?

4    A    Like I said, it was done by job.

5    Q    Okay.

6    A    I still had the same duties, just you have these jobs and

7    you have those jobs.

8    Q    Okay.  So, in other words, maybe you can help me

9    understand, how many jobs would you have as a project

10   coordinator at any given time, approximately?

11   A    Anywhere from, just roughly, 15 to 30.

12   Q    Okay.  And you would be responsible for coordinating the

13   manpower and overseeing the superintendents on all those jobs,

14   right?

15   A    Yes.  Until 2010.

16   Q    Okay.  So your testimony is then that sometime in 2010,

17   Lisa Bellavigna directed John Franzese to take over the

18   oversight of some of the jobs that you had previous been

19   overseeing?

20   A    I don't recall it being like that.

21   Q    Okay.

22   A    I don't remember how it started per job.

23   Q    Okay.  Well, let's try and clarify your testimony, because

24   I think you testified that it went job by job.  And I asked you

25   what duties specifically did Lisa take away from you.  You

1  testified it went job by job, or something to that effect,

2  correct?  So what exactly -- correct, was that your testimony?

3  A    I guess I'm a little confused.  So I guess you're going to

4  have to straighten that out for me.

5  Q    Okay.

6       JUDGE CARTER:  If I can just step in for a second?  Up to

7  2010, were you the only project coordinator at Ace basically

8  working with superintendents about the various jobs?

9       THE WITNESS:  There were some junior project managers, but

10  I overseen those.

11       JUDGE CARTER:  Okay.  And then after 2010, when Mr.

12  Franzese came in, was he essentially working the same type of

13  job as you were doing?

14       THE WITNESS:  Yes.  Well, I can't speak for him.  I don't

15  know exactly what his job duties were.  But he ran, far as I

16  know, Lisa hired him to run the load that I couldn't take.  And

17  more of the GC end of it, the carpentry end of it, the millwork

18  end of it.  That's what he was responsible for.  And I went back

19  to doing masonry.

20       JUDGE CARTER:  I see.  So he was handling the GC

21  assignments, and carpentry, and what else?

22       THE WITNESS:  Well, there's a group of millwrights, which

23  are carpenters, that he overseen in Corning.

24       JUDGE CARTER:  And so if it was a masonry job, that

25  typically went to you.  And then he had all the other type of

1  assignments?

2       THE WITNESS:  Yes.  It gets kind of mixed up, because we

3  do our own masonry.  So John can be in charge of a job and still

4  I'm in charge of the masonry end of that job.  You understand?

5       JUDGE CARTER:  So there were some occasions where you had

6  some overlap?

7       THE WITNESS:  Yes.  Yes.

8       MS. KLUYTENAAR:  Thank you.

9       JUDGE CARTER:  I take it you weren't happy about that

10  change?

11       THE WITNESS:  I was happy.

12       JUDGE CARTER:  It made your job easier?

13       THE WITNESS:  Pardon?

14       JUDGE CARTER:  Why were you happy about the change?

15       THE WITNESS:  It was too much.  I couldn't do it.

16       JUDGE CARTER:  So Mr. Franzese coming in lightened your

17  workload a little.  Is that fair to say?

18       THE WITNESS:  A lot.

19       JUDGE CARTER:  Okay.

20  BY MS. KLUYTENAAR:

21  Q    Okay.  So just to wrap up on this topic and then I'll move

22  on, my understanding now is that you essentially kept the same

23  job duties, but you were working on fewer projects than you had

24  been prior to 2010, correct?

25  A    And the types of people that I would be directing.

```
 1   Q    Okay.  Right, as you did describe to the judge.
 2   A    Yep.
 3   Q    Okay.  Were you involved with superintendent meetings at
 4   Ace Masonry?
 5   A    Yes.
 6   Q    What was your role?  You pretty much ran the meetings,
 7   correct?
 8   A    Yeah.
 9   Q    Okay.  And was it only superintendents who attended the
10   meetings?
11   A    No.
12   Q    Who else attended?
13   A    There was -- it was open to anybody, yeah, we had an open
14   door.
15   Q    Okay.  But who generally attended asides from the
16   superintendents?
17   A    Apprentices.
18   Q    Anyone else?
19   A    Pardon?
20   Q    Anyone else?
21   A    Like I said, we had an open door policy there.  I mean if
22   somebody wanted to come to our superintendent meeting, they
23   could.  They were more than welcome.
24   Q    Okay.  Who is required to be there?
25   A    Superintendents and apprentices.
```

1   Q     Okay.  Henry Bellavigna, did he ever attend the meetings?

2   A     He might have attended something, if he had something to

3   say.  But, generally, no.

4   Q     Okay.  Lisa Bellavigna, did she ever attend the meetings?

5   A     Yeah, when we first got started, she would be there and go

6   through the meetings.  And like I say, if she had something to

7   bring up, she would go into the meeting and bring it up, along

8   with Missy, you know.

9   Q     When Lisa and/or Missy were at those superintendent

10  meetings, did they generally bring up issues related to the

11  office side of the business?

12  A     Generally, yes.

13  Q     Okay.  I mean they wouldn't be bringing up fields or job

14  related specific issues, correct?  It was more your purview?

15  A     Yeah.  I mean when you say job specific, yeah, they would

16  bring up different -- Lisa would, you know, if they have to do

17  with safety, if it had to do with materials or something on the

18  job, yeah.  I mean, yeah.

19  Q     Okay.  What was -- generally, what was the purpose of the

20  meetings?

21  A     Communication.

22  Q     Okay.

23  A     Getting everybody in the same room.  Letting everybody

24  know where everybody is, where our manpower is, who needs

25  manpower, that type of thing.

1  Q    Okay.  So you would generally tell the superintendents and
2  whoever else was at the meeting about upcoming jobs, where they
3  would be going, where you needed the manpower, is that right?
4  A    Yes.
5  Q    Okay.  And where were the meetings held?
6  A    In the office.
7  Q    In Ace's office?
8  A    Yes.
9  Q    And do you remember when the last superintendents meeting
10  you held was?
11  A    I'm going to say I don't recall the exact date, but we did
12  them once a month.  And as we seen the decline in the business,
13  we had them as we needed, which was probably sometimes once,
14  maybe twice a week.
15  Q    Okay.  Did you continue to hold these meetings through the
16  summer and fall of 2011?
17  A    Like I said, I don't remember specific dates, but it was
18  right to the bitter end when those guys left.  I can't remember
19  the date.
20  Q    You are also an authorized signer or, I'm sorry, you were
21  also an authorized signer on Ace's bank account, correct?
22  A    Yes.  The bank asked Lisa to do that because in case she
23  got sick or disabled where she couldn't do it, the bank wanted
24  somebody designated to do that.
25  Q    Did you actually sign checks on Bella's account?

1          JUDGE CARTER:  Bella's or Ace?

2     BY MS. KLUYTENAAR:

3     Q     Oh, I'm sorry.  I'm sorry.  Ace's account?

4     A     I don't recall.

5     Q     Okay.  Do you know if there were any other authorized

6     signers on Ace's account?

7     A     I don't believe so, no.

8          MS. KLUYTENAAR:  I'd propose to counsel a stipulation that

9     Mr. Bellavigna actually did sign checks for/on Ace's account.

10          MR. BAILEY:  I don't know that.  I mean if you have checks

11     then certainly --

12          MS. KLUYTENAAR:  You did supply checks to that effect in

13     the subpoenaed documents, so --

14          MR. BAILEY:  If you want to use them as an exhibit, that's

15     fine.

16          MS. KLUYTENAAR:  So you won't stipulate to it?

17          MR. BAILEY:  I haven't seen them.  I didn't --

18          MS. KLUYTENAAR:  You provided them pursuant to the

19     subpoena.

20          MR. BAILEY:  I understand what you're telling me.  But I'm

21     telling you I'm not going to stipulate because I haven't

22     actually seen the documents.

23          MS. KLUYTENAAR:  Okay.

24     BY MS. KLUYTENAAR:

25     Q     I think we discussed earlier that Ace is a union

1  contractor, right?

2  A    Yes.

3  Q    And did you deal with the union representatives regarding

4  -- let me withdraw that.  Did you deal with the union

5  representatives at all?

6  A    In what aspect?

7  Q    The business -- at all.

8  A    What aspects, I guess?

9  Q    Did you have any dealings whatsoever when you were

10 employed by Ace with any union representatives, business

11 agents --

12 A    Yes.

13 Q    -- business representatives.  Okay.  What were the nature

14 of those dealings?

15 A    If my superintendents couldn't get manpower, I would call

16 them up and try to figure out why they couldn't get it.

17 Q    Okay.  Would it be fair to say that the superintendents

18 would generally deal with labor relations with the employees,

19 the field employees at the job, and if they couldn't resolve an

20 issue, they would come to you?

21 A    Yes.

22 Q    Okay.  Was it your understanding that in the fall of 2011,

23 when you were still employed at Ace, that Ace was bound to

24 collective bargaining agreements with the Bricklayers' Union or

25 to a collective bargaining agreement with the Bricklayers'

1   Union?

2   A    I have no knowledge of that.

3   Q    Okay.

4   A    I assume, but I don't -- I can't say I seen a document or

5   anything.

6   Q    Well, I was asking what your understanding was.  I'm just

7   asking you what your understanding was, what was your

8   understanding?  That Ace was bound?

9   A    At the end, no, I didn't -- there were some issues there

10  and I didn't know.

11  Q    What was your understanding with regard to whether Ace was

12  bound to an agreement with the Carpenters' Union, in the fall of

13  2011?

14  A    I don't remember anything about the carpenters.  I mean I

15  assumed that, that they were signatory, yes.

16  Q    Okay.  And same question with respect to the Laborers'

17  Union.

18  A    I don't know a specific date, so I don't know when they

19  expire or when they sign them.  I don't know.

20  Q    Okay.  But in the fall of 2011, what was your

21  understanding as to whether or not Ace was bound to a collective

22  bargaining agreement with the Laborers?

23  A    Well, I knew there were some issues that Lisa didn't know

24  if she was still signatory.  I mean we had that conversation,

25  because she hadn't updated their bargaining agreement.  She

1  didn't re-sign.  So I don't know how to answer that, I guess.

2  Q    Okay.

3  A    That's all I know.

4  Q    Okay.

5       JUDGE CARTER:  Can I just put a pause here.  Let's take a

6  short recess.  We'll pick it up again about 11:25.

7  **(Whereupon, a brief recess was taken.)**

8       JUDGE CARTER:  On the record.  Any further questions from

9  the acting general counsel?

10      MS. KLUYTENAAR:  Thank you.

11 BY MS. KLUYTENAAR:

12 Q    Mr. Bellavigna, I think when we left off, excuse me, you

13 had testified that you were one of the authorized signers along

14 with Lisa Bellavigna on the Ace bank account, correct?

15 A    Yes.

16 Q    And I think I asked you if you actually had signed any

17 checks and you testified that you couldn't recall.

18 A    Yes.

19 Q    Okay.  I'm showing you what's been marked for

20 identification as General Counsel's Exhibit 40.

21 **(General Counsel Exhibit 40 marked for identification.)**

22      MS. KLUYTENAAR:  Let the record reflect it is a two-page

23 exhibit, but it's front and back, so it's four sides.

24 BY MS. KLUYTENAAR:

25 Q    And if you would just take a moment and review the

1  exhibit, Mr. Bellavigna, and let me know whether there are

2  checks on that exhibit that you actually did, in fact, sign on

3  behalf of Ace.

4  A    Yes, I see two of them on there.

5  Q    Okay.  I think there are more, but that's fine.

6  A    No, there's two.  No, you're right, there's three.

7  Q    Do you recognize your signature on those checks?

8  A    Yes.

9  Q    Is that in fact your signature?

10  A    Yes.

11  Q    Okay.

12       MS. KLUYTENAAR:  I would offer GC-40.

13       MR. FURLONG:  No objection.

14       MR. BAILEY:  No objection.

15       MR. JAMESON:  No objection, Your Honor.

16       JUDGE CARTER:  Exhibit 40 for general counsel admitted

17  without objection.

18  **(General Counsel Exhibit 40 received into evidence.)**

19  BY MS. KLUYTENAAR:

20  Q    There was some earlier testimony, Mr. Bellavigna, about a

21  period in the fall of 2011, when Lisa Bellavigna took a period

22  of leave from the company.  Do you recall that time?

23  A    Yes, I do.

24  Q    Okay.  And during that time, who was in charge?

25  A    You know, charge of what?

1    Q    Who was generally in charge, as you understood it?

2    A    I don't remember specific times, but they hired a, they

3    meaning Lisa -- not Lisa, but John Franzese and a group of

4    investors hired a controller.

5    Q    Who was that?

6    A    Hum?

7    Q    Who was that?

8    A    Who was what?

9    Q    Who was the controller that was hired?

10   A    Jalinda (ph.).

11   Q    Do you know her last name?

12   A    I believe its Ashmall (ph.) or something like that.

13   Q    Okay.  Continue.

14   Q    So she took over the roles for Lisa as far as the

15   accounting.  And I assisted her as much as I could with my

16   knowledge of accounting, meaning I don't have any knowledge of

17   it.  And so she took over kind of while Lisa was sick.

18   Q    Okay.  And you retained your regular duties?

19   A    Yes.

20   Q    Ace is still in business, correct?

21   A    Yes.

22   Q    Mainly performing masonry contracting work, correct?

23   A    I don't believe so.

24   Q    That's not correct?

25   A    What's that?

1  Q     My statement was not correct?  They are not mainly

2  performing masonry contracting work?

3  A     They are not self-performing masonry, no.

4  Q     Okay.  Bella is owned by your father, Henry Bellavigna,

5  correct?

6  A     Yes.

7  Q     Okay.  And your father, Henry, acted as an estimator at

8  both companies, is that right?

9  A     Yes.

10  Q     Okay.  Now Ace had a website, right?

11  A     I've never been on it, but I assume they did, yeah.

12  Q     Okay.  Have you ever seen it?

13  A     To be honest with you, no.

14  Q     Okay.  Were you aware that you were featured on the

15  website?

16  A     I would imagine so.

17  Q     You would imagine that you are on it?

18  A     Um-hum.

19  Q     Okay.  Why is that?

20  A     I'm part of the team.

21  Q     Okay.  When you say team, what do you mean exactly?

22  A     Part of the team with Ace.  A group of professional who

23  work as a team.

24  Q     Okay.  Having not seen the Ace website, you imagine you

25  are on there, correct?  Is that your testimony?

1   A    I've never been on there, so I don't know how.  I don't

2   know.  I just said I assume I was on there.

3   Q    Okay.  Bella has a website, correct?

4   A    I assume so.

5   Q    Do you know if Bella has a website?

6   A    I've never seen it.

7   Q    Okay.  All right, I would like to ask you to refer to

8   General Counsel Exhibit 27 in that packet there or the pile.  If

9   you would turn, Mr. Bellavigna, to Page 3 of 7.  Do you see

10  yourself there?

11  A    Yes.

12  Q    Do you recall posing for that photo?

13  A    Yes.

14  Q    When did you pose for that photo?

15  A    I don't recall.  I'm not good with dates.  I don't

16  remember.

17  Q    Do you recall whether it was during the time you were

18  employed with Bella or during the time you were employed with

19  Ace?

20  A    Ace.

21  Q    Did you ever have any conversations with anyone at Bella

22  about putting you on the website?

23  A    No.

24  Q    Did you ever have any conversations with anyone at Ace

25  about putting you on the website?

1  A     No.

2  Q     Okay.  If you would actually turn back to the page, we're

3  going to look at it further.  See the sort of biography that

4  appears underneath your photo, it says Robert P. Bellavigna,

5  project coordinator, 30 years construction experience?

6  A     Um-hum.

7  Q     And then there is a narrative beginning with Bob started

8  his construction career in 1981?

9  A     Yep.

10  Q     Did you give that information to someone for posting on

11  the website?

12  A     I don't recall how it got there.

13  Q     Okay.  So is it your testimony that you have no idea how

14  it got on the website?

15  A     No, I don't even know who put it together.

16  Q     Okay.  But you would agree that that is an accurate

17  representation of who you are and what your experience has been,

18  right?

19  A     Yes.

20  Q     Okay.  And if you would turn to the next page where the

21  narrative continues, the following is a list of some of the

22  projects Bob has been involved with.  Do you see that sentence?

23  A     Yes.

24  Q     Okay.  Would you just take a moment and review those

25  projects and let me know if you were involved with all those

1  projects?

2  A    Yes.

3  Q    Yes, you were involved with them?

4  A    To the best of my knowledge.

5  Q    Do you recall being involved with them?

6  A    To the best of my knowledge, I believe I did, yes.

7  Q    Okay.  Were you involved with these projects as an

8  employee of Ace or as an employee of Bella?

9  A    I believe they are all with Ace.

10  Q    If you would look at the bottom of that page, you see

11  there is a website, a URL there, and the date is on the bottom

12  right-hand corner of the page, do you see that?

13  A    Where is that now, on the same page?

14  Q    On the same page.  It's actually on every page.  If you

15  look down at the bottom right-hand corner, there is a date.  It

16  says 10/26/2011.

17  A    Yes.

18  Q    Okay.  You weren't employed with Bella on that date,

19  correct?

20  A    No.

21  Q    In fact, I think your testimony was that you didn't begin

22  your employment with Bella until December 12, 2011, correct?

23  A    Yes.

24  Q    Okay.  So this was almost two months before you began

25  working for Bella, is that right?

1    A    Yes.

2    Q    Do you have any idea why you would be featured on the

3    website with your photo and a description of your experience and

4    your projects when you weren't employed by Bella?

5    A    Yeah, I was in negotiations with Bella for a job.

6    Q    At this time?

7    A    Yes.

8    Q    On October 26th?

9    A    Thereabouts.  It was a couple of months before I left,

10   so --

11   Q    Okay.  But you weren't employed with Bella at the time,

12   correct?

13   A    I was in negotiations for a job.

14   Q    Okay.  So had you agreed on October 26, 2011, to work for

15   Bella?

16   A    I'm not sure what date it was, but it was right around

17   that time, yes.

18   Q    Okay.  And during your discussions or your negotiations

19   about working for Bella, did you agree to be featured on the

20   Bella website?

21   A    I don't recall saying anything, giving permission to do

22   anything like that, but I never did at Walloper's (ph.) or

23   anybody else's that I've worked for, so --

24   Q    Okay.  Were you aware on October 26, 2011, that you were

25   on the Bella website?

1   A     Say that one more time.

2   Q     On October 26, 2011, were you aware that you were featured

3   on the Bella website?

4   A     I believe I already told you I didn't even know they had

5   one.

6   Q     Okay.  When did you learn about the Bella website?

7   A     Just lately, I guess.

8   Q     Okay.  I think you actually testified that you didn't know

9   Ace had a website, right?

10  A     No.  I'm pretty sure I said I didn't know either -- that

11  Bella didn't have one.  If I misunderstood you, then sorry.

12  Q     Okay.  All right, Melissa Blanchard, do you see her

13  photograph there?

14  A     Yes.

15  Q     Do you recognize her?

16  A     Yes.

17  Q     Are you familiar with Ms. Blanchard?

18  A     Pardon?

19  Q     Are you familiar with Ms. Blanchard?

20  A     I'm sorry?

21  Q     Are you familiar with Ms. Blanchard?

22  A     Yes.

23  Q     Okay.  From where?

24  A     From working at Ace.

25  Q     She was the office manager at Ace, correct?

1    A    I believe that was her title, yes.

2    Q    Okay.  If you look there where it says job

3    responsibilities, answer telephone, greet visitor, mail

4    distribution, administrative assistant, are those generally the

5    same functions she performed at Ace?

6    A    I don't know.

7    Q    If you know.

8    A    I don't know.

9    Q    Okay.  If you turn the page, you see Randy Bell, masonry

10   superintendent, his photograph?

11   A    Um-hum.

12   Q    Are you familiar with Mr. Bell?

13   A    Yes.

14   Q    From where?

15   A    Randy and I have been friends for 30 years.

16   Q    Mr. Bell was also a superintendent at Ace, correct?

17   A    Yes.

18   Q    Okay.  Next page, Derek Hager, masonry superintendent.

19   A    Yes.

20   Q    Are you familiar with Mr. Hager?

21   A    Yes.

22   Q    He was a masonry superintendent at Ace, correct?

23   A    And he's a very close friend of mine.

24   Q    That's not the question.  He was a masonry superintendent

25   at Ace, correct?

```
 1   A     Yes.

 2   Q     Okay.  Richard Tracy, do you see his photograph, masonry

 3   superintendent?

 4   A     Yes.

 5   Q     You're familiar with Mr. Tracy?

 6   A     Pardon?

 7   Q     Are you familiar with Mr. Tracy?

 8   A     Yes.

 9   Q     He was also a masonry superintendent at Ace, correct?

10   A     Yes.

11   Q     Okay.  If I could have you turn to Page 2 of 4 on that

12   same exhibit, do you see where it says clientele at the top of

13   the page?

14         JUDGE CARTER:  Bob, I don't think you're on the same page.

15   2 of 4.

16         THE WITNESS:  2 of 4.  What is that, the numbers all

17   goofed up in this thing?

18         JUDGE CARTER:  Yes.

19         THE WITNESS:  Okay.

20   BY MS. KLUYTENAAR:

21   Q     Okay.  Do you see the list where it says clientele?

22   A     Yep.

23   Q     And you see all the different clients listed beneath it.

24   Do you recognize those clients?

25   A     Yes, I do.
```

1    Q    Where do you recognize them from?  Are they clients you

2    performed work for?

3    A    They've been clients.  Ever since I've been in my

4    apprenticeship, I've known these people and these clients.

5    Q    But as actual -- are these clients that you performed work

6    for?

7    A    I will start with McGuire Bennett, Welliver McGuire --

8    Q    I'm not sure I see where you're looking.

9    A    You're asking me who -- these clients.

10   Q    Right.  The clientele list that I'm looking at, the first

11   client listed is Cornell University, right?

12   A    Right.

13   Q    And Ithaca College, Cayuga Medical Center.  So let's take

14   them one by one in order.  Are you familiar with -- I'll

15   withdraw that.  Have you performed work for Cornell University?

16   A    I'll say it again, for McGuire Bennett, Welliver McGuire,

17   Ace --

18   Q    Mr. Bellavigna, please, that's not the question, okay?

19   The question is have you performed work for Cornell University,

20   yes or no?

21   A    Yes.

22   Q    Okay.  Did you perform work for Cornell as an Ace

23   employee?

24   A    Yes, I have.

25   Q    Performed work for Cornell as a Bella employee?

1    A    I'm not sure about the dates there, but -- you mean me,

2    physically?

3    A    You, physically, yes.

4    Q    I couldn't really say yes or no to that, because I don't

5    remember the dates.  I can't remember.

6    Q    Okay.  Ithaca College, performed work for them as an Ace

7    employee?

8    A    Yes.

9    Q    Perform any work for them as a Bella employee?

10    A    Say that one more time?

11    Q    Have you performed any work for Ithaca College as a Bella

12    employee?

13    A    I don't believe so.

14    Q    Okay.  Cayuga Medical Center, perform any work for them as

15    an Ace employee?

16    A    I don't recall.

17    Q    Okay.  Do you recall if Ace in general, the company Ace

18    performed work at Cayuga Medical Center?

19    A    I don't recall?

20    Q    Wells College, did you perform any work for Wells College

21    as an Ace employee?

22    A    I believe we did.

23    Q    For Ace, okay.  As a Bella employee, have you performed

24    any work for Wells College?

25    A    No.

```
 1   Q     Okay.  Just going back one to Cayuga Medical Center,

 2   perform any work for Cayuga Medical Center as a Bella employee?

 3   A     I don't recall.

 4   Q     Okay.  Morris Industrial Corporation.

 5   A     Um-hum.

 6   Q     The next one on the list, Morris Industrial Corporation,

 7   did you perform any work for them at Ace?

 8   A     I don't believe so.

 9   Q     Okay.  You, personally, or do you know if Ace performed

10   any work for Morris Industrial?

11   A     I don't recall.

12   Q     Okay.  Has Bella performed any work for Morris Industrial?

13   A     Not since I've been there.

14   Q     What about Ithaca City Schools, has Bella performed any

15   work for Ithaca City Schools?

16   A     Not that I'm aware of.

17   Q     All right.  Just to shorten this up a little bit, I want

18   you to look at the rest of the clients listed there and tell me

19   if Bella actually performed any work for any of those clients.

20   A     Not to my knowledge.

21   Q     Not to your knowledge.  Okay.  Would you turn the page to

22   3 of 4, please.  Do you see where it says completed projects for

23   the following architects?  And there is a list of many

24   architects.  Do you see that?

25   A     Yes, I do.
```

1    Q    Okay.  Would you review the list of architects and tell me
2    which one or which of those architects Bella Masonry has
3    performed jobs for?
4    A    I couldn't do that.
5    Q    You wouldn't be able to do that?  Is that a no or a yes?
6    A    I don't know.
7    Q    Okay.  You don't know.
8    A    No.
9    Q    But you're the project coordinator, correct?
10   A    Doesn't mean I remember architects.
11   Q    Yes or no, are you the project coordinator at Bella
12   Masonry?
13   A    Yes.
14   Q    Okay.  And you have oversight of all the projects,
15   correct?
16   A    Yes.
17   Q    You oversee the field employees?
18   A    Since I've been there, yes.
19   Q    Okay.  You attend the pre-contract meetings, pre-job
20   meetings with the contractor, correct?
21   A    Yes.
22   Q    You reviewed the contract that you have with the general
23   contractor, whomever the contract is with, to see what kind of
24   work you are going to need to be doing?
25   A    No.  I usually get a scope of work from Henry.

1  Q    Okay.  But then you review that scope of work, correct?

2  A    Um-hum.

3  Q    Okay.

4       JUDGE CARTER:  That's a yes?

5       THE WITNESS:  Yes.  Sorry.

6  BY MS. KLUYTENAAR:

7  Q    And so just to ask you one more time, you can't tell me

8  any of these architects if Bella performed work for any of them?

9  A    I couldn't honestly say yes or no.

10  Q    Okay.  Since you have been employed at Bella Masonry,

11  you're unable to tell me whether or not Bella has performed any

12  work for any of these architects, correct?  Is that your

13  testimony?

14  A    Well, if you want to go through every one of them, I --

15  Q    I do.

16  A    Okay, let's do it.

17  Q    Okay.  Well, now I'm asking -- I don't particularly want

18  to go architect by architect, but if you could just look at the

19  list and tell me, pick out which one or two or three or ten of

20  these architects Bella Masonry has performed work for.

21  A    And I'm telling you I honestly don't know.

22  Q    Okay.  The first page of this 1 of 2, the first page of

23  this exhibit, Bella Masonry, letter from the president, do you

24  see that?

25  A    Yes.

1    Q    Okay.  And the second page, there is a photo of Henry

2    Bellavigna, president?

3    A    Yes.

4    Q    Do you see that?  So you're familiar with Henry,

5    obviously, because he is your father, correct?  And he also

6    worked at Ace Masonry, correct?

7    A    Yes.

8    Q    Page 2 of 7 on this same exhibit, is that a photograph at

9    the bottom of your son, Robert A. Bellavigna?

10    A    Yes.

11    Q    Okay.  And he worked at Ace Masonry as well, correct?

12    A    Yes.

13    Q    Under Robert A.'s biography, four years construction

14    experience, Rob has helped run a face-paced general construction

15    job called Schuyler Human Service Building.  Is that a job he

16    ran for Ace?

17         UNIDENTIFIED SPEAKER:  Excuse me, about --

18         JUDGE CARTER:  I'm not sure if that was picked up on the

19    recording system, but we've just been notified that there may be

20    some intermittent, brief power outages as we proceed.  So we'll

21    do the best we can with that and we'll forge ahead.

22         MR. FURLONG:  I think the main issue there is the

23    transcript.  We want to make sure that there will be no issues

24    whatsoever with the transcript.  You're all set?  Okay.

25    BY MS. KLUYTENAAR:

```
 1   Q     Mr. Bellavigna, looking at Page 3 of 7, at Robert A.
 2   Bellavigna's biography, the biography indicates that he helped
 3   run a face-paced construction job called Schuyler Human Service
 4   Building.  Do you see that?
 5   A     Yes.
 6   Q     Is that a job he ran for Ace?
 7   A     Is it a job who ran for Ace?
 8   Q     Is it a job that Robert A. ran for Ace?
 9   A     As a helper.  He helped run it, but he didn't actually run
10   the project.
11   Q     Okay.  But that was while he was employed at Ace, correct?
12   A     Yes.
13   Q     Okay.  We went through the other employees featured on
14   this website who were also employees of Ace, and that included
15   Melissa Blanchard, Randy Bell, Derek Hager, Richard Tracy.  Do
16   you know when, well, taking them one by when, do you know when
17   Melissa Blanchard left Ace?
18   A     No.
19   Q     Do you know when Randy Bell left Ace?
20   A     Specific dates, no, I do not.
21   Q     Do you know a general time period?
22   A     I'd be lying if I said.  No, it's between October and
23   December.
24   Q     Of 2011?
25   A     Yes.
```

1   Q    Okay.  What about Derek Hager, do you know when he left

2   Ace?

3   A    I don't know exact dates, but in that time frame somewhere

4   I guess.

5   Q    In the same time frame?

6   A    Yes.

7   Q    October to December, 2011?

8   A    Yes.

9   Q    And what about Richard Tracy?

10  A    Same.  They all left at the same time.

11  Q    Okay.  And they all began working for Bella Masonry,

12  correct?

13  A    I'm not aware of specific dates, but, yes, I believe so.

14  Q    Okay.  Do you know why the all left Ace?

15  A    Didn't have any more work.

16  Q    Didn't have any more work?

17  A    No more work.

18  Q    Okay.  Now this website, as I indicated earlier, was

19  printed and this is how it appeared on October 26, 2011.  I'd

20  like you to take a look at General Counsel's Exhibit 29.  And if

21  you'll turn to Page 3 of 6.  Do you see where your name is

22  listed there, Robert P. Bellavigna?

23  A    Yes.

24  Q    Okay.  And right beneath that, do you see where it says

25  VP, project coordinator, correct?

1   A     Yes.

2   Q     Okay.  Now the last exhibit we looked at didn't say VP,

3   project coordinator, correct?

4   A     I don't know.  I'd have to go back and look.

5   Q     Okay.

6   A     No, it does not.

7   Q     Okay.  What does it say?

8   A     What does what say?

9   Q     The last exhibit we looked at simply says project

10  coordinator under your name, correct?

11  A     Yes.

12  Q     It doesn't say VP, correct?

13  A     Come again?

14  Q     It doesn't say VP, correct?

15  A     Yes, that's what I said, yeah.

16  Q     Okay.  So do you have idea who might have added VP to your

17  title on Exhibit 29?

18  A     I have no idea who put these together, no.

19  Q     Okay.  And you testified yesterday, I believe, that you

20  had no idea what VP means, correct?

21  A     I didn't get any extra money for it, I can tell you that.

22  Q     Okay.  That's not the question.  You testified, yesterday,

23  that you had no idea what VP means, correct?

24  A     In front of it or what it stands for?

25  Q     What it stands for.

```
 1   A      Vice president of what.

 2   Q      You think it stands for vice president?

 3   A      I would assume that, yes.

 4   Q      But you have no way of knowing?

 5   A      I've never really discussed it with anybody.

 6   Q      Okay.

 7   A      And what it meant.

 8   Q      Do you see the telephone number listed there next to your

 9   name, 607-327-2949?

10   A      Yes.

11   Q      That's still your number, correct?

12   A      Yes.

13   Q      Your Bella phone number?

14   A      Pardon?

15   Q      That's still your Bella phone number, correct?

16   A      Yes.

17   Q      Okay.  And that's the same number you had at Ace, correct?

18   A      I believe so for most of the time.  I can't remember some

19   of the early years if the number changed, but --

20   Q      Okay.  Well, when you left Ace, that was your phone

21   number, correct?

22   A      Yes.

23   Q      And for the year proceeding that, this was your phone

24   number?

25   A      The year proceeding what?
```

1  Q    For all of 2011, this was your phone number at Ace,

2  correct?

3  A    While I was there, yes.

4  Q    Okay.  Now I'll draw your attention to the date on the

5  bottom right-hand corner of this exhibit, 11-14-2011, do you see

6  that?

7  A    Yes, I do.

8  Q    And that is the date that this website was printed.  Now

9  you testified, I believe, that you didn't -- you weren't

10  employed at Bella, at this time, correct?

11  A    Yes.

12  Q    Yes, that's correct?

13  A    Yes.

14  Q    You also testified that you had done some consulting for

15  Bella during the time you were employed at Ace, is that right?

16  A    Yes.

17  Q    Okay.  Could you explain what exactly you meant by that?

18  A    Yeah, I do consulting for a lot of people, architect,

19  customers.

20  Q    Currently?

21  A    Yes.

22  Q    Paid consulting?

23  A    Yes.

24  Q    Okay.  Let's talk about specifically the consulting that

25  you did for Bella as an Ace employee, when did that start?

1  A    As an Ace employee?

2  Q    Correct.

3  A    I start consulting?

4  Q    You testified yesterday that while you were employed at

5  Ace, you did some consulting for Bella Masonry, correct?

6  A    Yes.

7  Q    Okay.  When did that start?

8  A    I don't recall specific dates.

9  Q    Okay.

10  A    I mean it's I don't recall the dates.

11  Q    Do you recall the time period?

12  A    No.  I believe I gave you the jobs that I went on, but I

13  don't remember dates.

14  Q    Okay.  Well, I don't think we talked exhaustively about

15  the jobs you went on.  I think we just talked about Vestal

16  Hills.  But do you recall whether you started consulting for

17  Bella in 2011?

18  A    Like I said, I don't remember the dates.

19  Q    Okay.  Well, I'm not asking you about a specific date.

20  I'm just asking you about a year.  Do you recall if it was in

21  2011 that you began consulting for Bella?

22  A    I believe so.

23  Q    Okay.  Do you recall if it was in the earlier part of 2011

24  or the latter part of 2011?

25  A    I don't remember.  Sorry, I don't mean to be rude about

1    it, but I just don't remember dates well.

2    Q    That's fine.  If you don't remember, you don't remember.

3    So how did it come about that you started consulting for Bella?

4    A    How did it happen?

5    Q    Um-hum.

6    A    Are we talking about helping my son?  That instance?  Is

7    that what we're talking about?

8    Q    Well, why don't you explain to me what you meant by

9    consulting for Bella Masonry?  What did that include?

10   A    Well, what I mean about consulting is if somebody has a

11   question about a project, or a means and methods of how to do

12   something, to me, when they ask me that, I am consulting them on

13   how to do it.

14   Q    Okay.  Okay.

15   A    And there's so many parts and pieces to construction.

16   Q    Okay.  But you wouldn't, I mean you wouldn't characterize

17   every single question you ask in the course of your day, or I'm

18   sorry, every single question you answer in the course of your

19   general day to day interactions as consulting, correct?

20   A    I guess if you want to -- I consider it consulting.  I

21   mean my guys ask me, you know, they ask me questions, I'm giving

22   them answers.

23   Q    Okay.  But if someone from a different company called you

24   and asked you one singular question about a particular project

25   or a work-related question, would you then consider that you

1    were consulting for that company?

2    A    Yes, I would.

3    Q    You would.

4    A    Yes.

5    Q    And you would represent that, that you were consulting?

6    A    Yes.

7    Q    Okay.

8    A    It happens all the time.

9         MS. KLUYTENAAR:  Can we just go off the record for one

10   minute, please?

11        JUDGE CARTER:  Okay, we can go off the record.

12   **(Discussion off the record.)**

13        JUDGE CARTER:  Further questions?

14        MS. KLUYTENAAR:  Okay.

15   BY MS. KLUYTENAAR:

16   Q    Mr. Bellavigna, Ace and Bella are essentially competitors,

17   are they not?  They are both competing for the same jobs, in the

18   same market, correct?

19   A    No.

20   Q    No?  They're not both bidding on the same types of jobs,

21   in the same area?

22   A    I don't believe Ace is bidding anything.

23   Q    Okay.  Let's talk about the fall of 2011, okay, after

24   Bella had been created and Ace is still in existence.  They both

25   do the same kind of work, correct?  Masonry?

1    A    Yes.

2    Q    Okay.  And they both operate in the Ithaca area, correct?

3    A    You say Ithaca area.  I'm saying it's a little bit bigger

4    than that.

5    Q    Okay, sure, bigger than that.

6    A    Yeah.

7    Q    Okay.  And to the best of your knowledge, they both would

8    potentially be bidding on the same types of jobs in that area,

9    correct?

10    A    No.

11    Q    Masonry jobs.  No?

12    A    Well, you changed it.

13    Q    Okay.

14         MR. BAILEY:  So wait till she finishes her question before

15    you answer, okay?

16         MR. FURLONG:  Your Honor, can we get a directive from Your

17    Honor to the witness to answer the questions.  We've had

18    basically about an hour and half of non-answers.  We would ask

19    that Your Honor direct him to answer the questions.

20         JUDGE CARTER:  I think there's been some confusion.  But

21    as a general matter, if you can just focus your answer on

22    whatever the specific question that's being asked.  You don't

23    have to elaborate or go off on some other chain of though.  Just

24    answer the one single question before you.  And your attorney's

25    point is just for the transcriber, it helps if we talk one at a

1  time.  So just wait until she finishes her question and then

2  answer.

3      THE WITNESS:  All right.  I thought she was.  Sorry.

4  BY MS. KLUYTENAAR:

5  Q    So as a general matter, Ace and Bella, both being masonry

6  subcontractors, would be potentially bidding on the same types

7  of jobs in the Ithaca area, correct, or a larger area?

8  A    I'm not an estimator for -- Ace, at the end, I guess

9  they'd be similar, yeah, projects.

10  Q    Okay.  So your testimony is that you were consulting,

11  assisting with Bella Masonry's projects at the time that you

12  were employed at Ace, correct?

13  A    Yes.

14  Q    And you were being paid by Ace, correct?  You were being

15  paid by Ace, correct?

16  A    Yes.

17  Q    Okay.  Were you being paid by Bella Masonry, at the time?

18  A    No.

19  Q    Did Ace know that you were doing consulting for Bella at

20  the time you were employed by Ace?

21  A    No.

22  Q    Your wife, Lisa, the owner of Ace Masonry, was not aware

23  that you were doing consulting for Bella Masonry at the time you

24  were employed with Ace?

25  A    My wife was sick, at the time.

1    Q    Okay.  But that's not an answer to the question.  Was she

2    aware or not aware?

3    A    And I answered that.  I said no.

4    Q    Let's talk about the Ithaca Town Hall.  Are you familiar

5    with that job?

6    A    Yes.

7    Q    Okay.  That was originally an Ace job, correct?

8    A    Yes.

9    Q    And Ace had a contract with Hale Roofing, correct?

10   A    Yes.

11   Q    And do you know how Bella wound up with that job?

12   A    Directly, I would assume that they called Henry.

13   Q    Okay.  So is it your testimony that you don't know?

14   A    The conversation between Hale Roofing and Henry?

15   Q    No.  Do you know how Bella got the contract or worked on

16   -- do you know how Bella came to work on the Ithaca Town Hall

17   job?

18   A    Only by assumption, no, I don't.

19   Q    Do you know how Ace came to stop working on that job?

20   A    Yeah, I do.

21   Q    How?

22   A    I couldn't supply manpower to the project anymore.

23   Q    Okay.  Elaborate on that.

24   A    I had no more manpower to give them.

25   Q    Why is that?

1    A    Because I was getting shut down and I didn't have enough

2    manpower that stayed with me to facilitate all the projects.

3    That was that.

4    Q    Okay.  When you say you were getting shut down, what do

5    you mean by that?

6    A    What do you mean?

7    Q    You just said you were getting shut down.  What do you

8    mean by that?

9    A    I wasn't getting the help from the union hall.

10   Q    Had you contacted the union hall?

11   A    No, I had not.  I left it up to my guys.

12   Q    And had they contacted the union hall?

13   A    I don't, I don't know that answer.

14   Q    Okay.  But it was just your testimony that you weren't

15   getting the help from the union hall that you needed to supply

16   manpower to the job, right?

17   A    That's what was told to me, yes.

18   Q    Who told you that?

19   A    What's that?

20   Q    Who told you that?

21   A    Well, I couldn't get anybody to work.  The foremen all

22   told me nobody is going to come here.

23   Q    Who told you that?

24   A    The foremen.

25   Q    Names?

1   A      Superintendents.

2   Q      Who?  Name.  Who told you that?

3   A      Randy Bell, Dick Tracy, Derek Hager, Steve Rollins,

4   everybody that worked for me, at that time.

5   Q      They told you they couldn't get anyone to come work there?

6   A      Yes.

7   Q      Did they tell you they had called the union hall and they

8   couldn't get manpower?

9   A      No.  They told me they couldn't get manpower.

10  Q      Okay.  And you, yourself, didn't call the union hall,

11  correct?

12  A      No, I did not.

13  Q      Okay.  But you had called the union hall in the past to

14  get manpower, correct?

15  A      Yes.  But the situation --

16  Q      Okay.  No, that's enough.

17  A      Okay.

18  Q      As the project coordinator at Ace, you were responsible

19  for coordinating the manpower for all the jobs, correct?

20  A      Yes.

21  Q      Okay.  So if your superintendents had a problem or they

22  came to you and they said they were having a problem getting

23  manpower, you would ultimately be responsible for that, correct?

24  A      Yes.

25  Q      Okay.  So why didn't you call the union hall to request

1   manpower?

2   A    Because Ace was shutting down and there was conflicts with

3   the unions and Lisa, and I didn't think it was worth my time.

4   Q    And when you say Ace was shutting down, what do you mean

5   by that?

6   A    They stopped bidding projects.

7   Q    Okay.  But they still had this project, correct?

8   A    Yes.

9   Q    And Ace also had the Trinity Episcopal Church project at

10  this time, correct?  Ace had a project at Trinity Church at the

11  same time, correct?

12  A    I don't know when the contracts were signed.  I don't

13  know.

14  Q    Okay.  You're the project coordinator at Ace in the fall,

15  2011, correct?

16  A    Yes, I am.

17  Q    You're responsible for overseeing all the projects,

18  correct?

19  A    When they are given to me, yes.

20  Q    Okay.  And you don't know whether Ace had a project at

21  Trinity Church in the fall of 2011?

22  A    I know we had a project there.  I don't know when the

23  contracts were signed.  So there is a fine line there.

24  Q    Okay.  I'm not asking when the contracts were signed.  I'm

25  asking if Ace had a project at Trinity Church in the fall of

1    2011.

2    A    I don't know that.

3    Q    You don't know, okay.

4    A    No.

5    Q    You testified earlier you are familiar with Richard Tracy,

6    Derek Hager, Randy Bell, Scott Smith (sic), correct?

7    A    Yes.

8    Q    They were all Ace employees, correct?

9    A    Yes.

10    Q    And they all worked on the Ithaca Town Hall job for Bella,

11    didn't they?

12    A    No.  I say that because I don't know specific people on

13    the job.  Randy Bell ran the job.  He's the one I dealt with.

14    Q    I'm sorry, could you repeat that?

15    A    Randy Bell is the superintendent on that project, so he

16    would schedule manpower.

17    Q    Okay.  For?

18    A    For the project.

19    Q    For what company?

20    A    We're talking about Ace.

21    Q    Those employees work on the job for Bella?

22    A    Can you repeat that question?

23    Q    Sure.  Richard Tracy, Derek Hager, Steve Rollins all

24    worked on the Ithaca Town Hall job for Bella, correct?

25    A    I don't know that.

1  Q     Okay.  Would it surprise you to know that they all worked

2  on the job for Bella?

3  A     I don't know anything about it.  I wasn't there.

4  Q     But, Mr. Bellavigna, please answer the question.  The

5  question was would it surprise you to know that those

6  individuals worked on the job for Bella?

7  A     Would it surprise me, no.

8  Q     Okay.  And I think you just testified that those are the

9  same individuals that came to you and told you they couldn't get

10  manpower to work on the job for Ace, is that correct?

11  A     Yes, I believe that's what I said.

12  Q     Okay.  The affidavit I showed you, yesterday, Paragraph 2,

13  do you want to see it again?  It say I have only been in -- I'm

14  familiar with a job I call Vestal Hills, on Plaza Drive, in

15  Vestal.  I have only been involved on the project as a Bella

16  Masonry employee.  You recall giving this statement, correct?

17  A     Yeah.

18  Q     Okay.  If you would look at General Counsel Exhibit 33?

19  Do you have the exhibit, Mr. Bellavigna?  You have the exhibit?

20  A     Yes.

21  Q     Okay.  Would you turn to the second page, please?  Do you

22  see up at the top where Bob.Bellavigna@gmail.com is written in

23  there?

24  A     Yes, I do see that.

25  Q     Okay.  Is that your email address?

1   A     I believe it is, yes.

2   Q     Do you have any idea why that's there?

3   A     I have no idea.

4   Q     Okay.  And you see the date on this document is

5   September 28, 2011, correct?

6   A     What's that now?

7   Q     The date on the document, right at the top there, where it

8   says masonry, quotation, for Ameritas at Vestal Hills, and then

9   is says September 28, 2011, do you see that?

10  A     Yep, if that's supposed to be an 8, yeah.

11  Q     Okay.  Any idea how that 8 got written in there?

12  A     I have no idea.

13  Q     Okay.  Is that your handwriting with the email address?

14  A     No.

15  Q     Okay.  Any idea who wrote that?

16  A     No.

17  Q     You don't recognize the handwriting?

18  A     No.

19  Q     Okay.  Do you have any idea why your email address would

20  be on this document?

21  A     Can I guess?

22  Q     No.

23  A     Okay.

24  Q     Do you know why your email address would be on this

25  document?

1    A     I can only make an assumption.

2    Q     Okay.  Why do you think your email address would be on

3    this document?

4    A     Why I think it would be on there?

5    Q     Yeah, what's your assumption?

6    A     That I was going to work for Bella Masonry and Henry was

7    just looking at it saying that maybe that this is the one that's

8    going to be running the job when he comes to work for me.

9    Q     Okay.

10   A     And it could have been very well that way.  That's what it

11   looks like to me.

12   Q     Okay.  So Bella Masonry was created on September 21 or 22,

13   2011.  So this is one week after the company was created,

14   correct?

15   A     I don't know what date it was created or whatever, so --

16   Q     Okay.  Well, the subcontract date on the front of this

17   document said 10/4/2011.  It looks like it may have been worked

18   up earlier than that, September 28th.

19   A     Where do you see that?

20   Q     On the first page of the document, where it says

21   subcontract date, Henry's signature there at the bottom is dated

22   10/4/11, the same date.  Do you see that?

23   A     I see the 10/4, yes.

24   Q     Okay.  Do you see where Henry dated 10/4 under his

25   signature?

1  A    It's kind of hard to read that, if that's supposed to be

2  a 10.

3  Q    Okay.  So that was about two weeks after Bella Masonry was

4  formed, correct?

5  A    I don't know when it was formed.

6  Q    Okay.  So is it still your testimony that you have only

7  been involved on the Vestal project as a Bella Masonry employee?

8  A    Repeat that one more time?

9  Q    Is it still your testimony that you have only been

10  involved in the Vestal project as a Bella Masonry employee?

11  A    Just so I understand that, can you just repeat that one

12  more time?

13  Q    Sure.  Is it still your testimony that you were only

14  involved in the Vestal project as a Bella Masonry employee?

15  A    No.

16  Q    Okay.  Are you familiar with a job in Chesapeake,

17  Pennsylvania, in 2011?

18  A    Yes.

19  Q    You went down there to the job site with some of the

20  employees, correct?

21  A    Not with the employees, but I met them there, yes.

22  Q    Richard Tracy, was he there?

23  A    I don't recall.

24  Q    Do you recall who was there?

25  **(Pause.)**

1  BY MS. KLUYTENAAR:

2  Q    You don't recall?

3  A    I mean I can -- no, I could not say specific names.  I

4  think I'd know them all, but I don't want to be wrong about it,

5  either.  I can tell you who I know was there, but --

6  Q    Sure, who do you know was there?

7  A    I remember that my son was there and Derek Hager.

8  Q    Okay.  Was that job done for the Cotton Concrete Company?

9  A    Yes.

10  Q    How did you get down to the job site?  How did you get

11  down to that job site?

12  A    I don't recall.

13  Q    Do you recall if there was any Ace equipment on that job

14  site they used?

15  A    I don't remember if I was even there when the equipment

16  was delivered.  I don't remember.

17  Q    Do you recall if there were any Ace vehicles down at that

18  job site?

19  A    I believe there was.

20  Q    Okay.  But that was a Bella job, correct?

21  A    I believe so.

22  Q    Okay.  Were the Bella, I'm sorry, the Ace vehicles

23  commonly used to get to the Bella jobs?

24  A    I know they rented some equipment from them.

25  Q    That's not the question.  The question is, were the Ace

1   vehicles commonly used to get to the Bella jobs?

2   A     To get to the job?

3   Q     Yes.

4   A     I know Derek borrowed one of the Ace vehicles.

5   Q     Okay.  Just yes or no, were the Ace vehicles commonly used

6   to get to the Bella jobs?

7   A     For the employees or me?

8   Q     Either one.

9   A     I wasn't there every day --

10  Q     Yes or no, or you don't know.

11  A     No, I don't know.

12  Q     Let's go back for a moment to the Vestal job.  Did you go

13  to the job site?

14  A     What's that?

15  Q     Did you go to the job site on the Vestal job?  I think you

16  testified earlier that you had, you have been to the job site a

17  couple of times with your son, Robert, correct?

18  A     As an Ace employee, yes.

19  Q     Right.  And did you go to the job site as a Bella

20  employee?

21  A     Yes, I did.

22  Q     Okay.  And there was Ace equipment being used on that job

23  as well, correct?

24  A     Yes.

25  Q     And there were Ace vehicles used to get to that job as

1  well, correct?

2  A    For employees are you talking about?  I know the equipment

3  was delivered with an Ace vehicle.

4  Q    Okay.  Are you familiar with a time and materials job at

5  Wegman's in the fall of 2011?

6  A    Yes, I do.

7  Q    Yes?  Was that an Ace job?

8  A    No, I don't believe so.

9  Q    Do you know whose job it was?

10  A    I believe it was Pelangelli's (ph.).

11  Q    Okay.  Pelangelli was the contractor?

12  A    Yes.

13  Q    But there was a subcontractor.  Do you know who the

14  subcontractor was?  Was it Bella?

15  A    I believe so, yes.

16  Q    Okay.  Did you work on that job?

17  A    Yes, I did.

18      JUDGE CARTER:  Are you fairly near the end of your direct

19  for Mr. Bellavigna?

20      MS. KLUYTENAAR:  Yes.  Can I just have one moment, Your

21  Honor?

22      JUDGE CARTER:  Okay.  Off the record.

23  **(Discussion off the record.)**

24      JUDGE CARTER:  We're ready for additional questions.

25      MS. KLUYTENAAR:  I have no further questions, thank you.

1          JUDGE CARTER:  Okay.  Let's go ahead and take a lunch

2    break.  We'll come back at 1:35.

3          Off the record.

4    **(Whereupon, at 12:31 p.m., a luncheon recess was taken.)**

5

1          **A F T E R N O O N   S E S S I O N**

2                                   **(Time Noted:  1:36 p.m.)**

3          **JUDGE CARTER:  We're back on the record.**

4     And I guess we're not at the point of, Mr. Furlong, any

5  questions for the witness?

6          MR. FURLONG:  Yes, I do.  Thank you, Your Honor.

7                    **FURTHER DIRECT EXAMINATION**

8  BY MR. FURLONG:

9  Q    Mr. Bellavigna, we haven't met before today, have we?

10 A    You mean physically or just talking?

11 Q    Yeah.  I'll make it as simple as possible.

12 A    No, I have not.

13 Q    The conversation that we just had two seconds ago, we

14 never met, was the first words we've ever exchanged, right?

15 A    Yes, I believe so.

16 Q    I'm going to be asking you questions some of which were

17 similar to what the general counsel asked you and others that

18 may vary a bit.  Are you on any medication that would compromise

19 your ability to recall details or facts?

20 A    No.

21 Q    Do you have any other reason that you may be able to point

22 to that may compromise your ability to answer details or facts?

23 A    No.

24 Q    Okay.  Did you get a good night's sleep last night?

25 A    No.

1    Q    All right.  So let's move beyond the sleep last night and

2    let's start talking about some items of interest to me.  If you

3    would, would you take a look at GC, which is General Counsel's

4    Exhibit 33?

5    A    You said GC-3?

6    Q    Yes, General Counsel's Exhibit 33, which is the cooler

7    contract with Bella Masonry.

8    A    Yep.

9    Q    Do you see that document?  Okay.  If you look at the

10   subcontractor on the title of the first page, the subcontract

11   date, it's 10/4/11.  Do you see that?

12   A    Yes.

13   Q    Underneath that we have Henry Bellavigna's signature on

14   behalf of Bella Masonry dated 10/4/2011, right?

15   A    It looks like a 10 there, yes.

16   Q    All right.  Now if you go to the second page, and the

17   general counsel did ask you some questions I just want to

18   follow-up.  On the Bella Masonry letterhead on the top of the

19   second page, to the right, there is a Bob.Bellavigna@gmail.com.

20   I think your testimony was that you have a Gmail account?

21   A    Yes, I believe so, yes.

22   Q    Okay.  And did you have a Gmail account in September of

23   2011?

24   A    I don't think I ever use that one.  I think it's on my

25   phone, so --

1  Q    Yes, my question once again is did you have a Gmail

2  account in September of 2011?

3  A    It comes with the phone.  I don't remember the phone

4  situation, so --

5  Q    Do you have a Gmail account now?

6  A    Yes.

7  Q    Is it Bob.Bellavigna@gmail.com?

8  A    I believe it is.

9  Q    Right.  And did you have a Gmail account in January of

10  2012?

11  A    With that email right there?

12  Q    With that email right there.

13  A    I believe it's the same.

14  Q    All right.  And did you have an email account going back

15  another three months from January, back to September of 2011?

16  A    With that one on there, I believe so, yes.

17  Q    Okay.  So it's fair to state that there is no question in

18  your mind right now that Bob.Bellavigna@gmail.com was your Gmail

19  account in September of 2011?

20  A    I'd have to turn on my phone to verify that.

21  Q    Do you have the phone with you?

22  A    Yes.

23  Q    Why don't you turn it on and see?  Is it powering up?

24  A    Yes.

25  Q    Now will that email account tell you the date of its

1    inception?

2    A    I don't know how -- I don't know how to operate that part

3    of the phone.

4    Q    Wait a minute.  My assumption is it will merely tell you

5    what the address is, but probably not the date that you actually

6    obtained the address.  But we'll wait for a moment.

7    A    I think it was set up on the phone.

8    Q    When did you get the phone?

9    A    I don't handle that, that portion of it.

10    Q    Yeah, I didn't ask you if you handled it.  Do you know

11    when you got it?

12    A    Verizon, I believe.

13    Q    Do you know when you got it?

14    A    No, I do not remember the date.

15    Q    Is that a Bella phone?

16    A    Yes.

17    Q    Okay.  So is it fair to say that this was set up, you had

18    this account set up on a Bella phone, when Bella gave you that

19    phone?

20    A    Yes.

21    Q    So if, in fact, you had this account,

22    Bob.Bellavigna@gmail.com, as of September 2011, you had a Bella

23    phone as of September 2011?

24    A    Let me just get this --

25    Q    Sure.

1    **(Pause.)**

2        THE WITNESS:  Yes.  That appears to be the same one that's

3    listed on the phone.

4    BY MR. FURLONG:

5    Q    On the telephone, for the record?  For the record, on the

6    telephone?

7    A    Yes.

8    Q    The phone that has been given to you by Bella Masonry?

9    A    I've had it since Ace.

10   Q    You've had it since Ace, okay.  Let's explore that for a

11   minute.  You've had the phone since Ace or the address

12   Bob.Bellavigna@gmail?

13   A    I've had the phone.

14   Q    Since Ace, all right.  And then when you went over to

15   Bella, you just carried the phone over?

16   A    Yeah, I don't -- yeah.

17   Q    I mean you had the same physical phone, right?

18   A    Yep.

19   Q    Right.  And when you were at Ace Masonry, was Ace Masonry

20   paying for your Verizon account?

21   A    Yes.

22   Q    Okay.  And then when you kept the phone and you kept the

23   same number, I think we've been through that with the general

24   counsel's questions to Bella, Bella assumed that account?

25   A    I would have to verify that with Missy, who set it up,

1  because I don't know -- I don't know.

2  Q    All right.  Well, let's talk about that from a different

3  direction.  If Bella were not -- if it was not a Bella account,

4  are you getting Verizon bills made out to Rob Bellavigna at your

5  home?

6  A    No, Bella took over the contract.

7  Q    Okay.  So Bella -- this was a contract with Verizon?

8  A    I say that.  I don't know how they switch it over, so --

9  Q    All right.

10  A    I'm just saying all I know is I went from Ace to Bella.

11  Q    That's all you know.

12  A    That's all I know.

13  Q    And you had a Gmail account with Ace and now you have a

14  Gmail account, the same Gmail account with Bella?

15  A    I think it's the same.  I would have to have her verify

16  that.

17  Q    Okay.  And where it says Bob.Bellavigna@gmail.com, your

18  testimony earlier was that's not your handwriting.

19  A    That is not my handwriting.

20  Q    And if I told you that Henry Bellavigna was questioned, he

21  said it's not his handwriting, he doesn't know how it got there,

22  would you have any reason to not believe that testimony?

23      JUDGE CARTER:  Again, that's not a proper question for the

24  witness.

25      MR. FURLONG:  All right.

1  BY MR. FURLONG:

2  Q    You don't know whose handwriting that is?

3  A    I do not.

4  Q    Okay.  Now at the time that you left Ace Masonry, did you

5  send out any notices to individuals that you do business with in

6  the construction community, indicating that you were going to be

7  joining a company called Bella Masonry?

8  A    Did I send out?

9  Q    Yes.

10  A    Me, personally?

11  Q    Yes.

12  A    No.

13  Q    Did you cause any notices to be sent out indicating that

14  you were going to be joining a new company called Bella Masonry?

15  Did you direct Missy or anyone else to send out such notices?

16  A    Not to my knowledge.

17  Q    Okay.  Now if I look at this Gmail account, it doesn't

18  indicate, as with all Gmail accounts, the name of the company.

19  It's a Google account, correct?

20  A    It's what drives the phone.  I honestly don't --

21  Q    So if somebody wants to get a hold of you, there is

22  nothing even in here that would tell you which company you're

23  with, is that correct?

24  A    Yes.

25  Q    And you current have that account still in operation?

1  A     This one?

2  Q     Yeah.

3  A     I don't use it, so I believe maybe.

4  Q     Let me switch gears here for a bit, okay?  You know Scott

5  Stringer?

6  A     Yes, I do.

7  Q     Who is Scott Stringer?

8  A     He's a business agent for the Bricklayers.

9  Q     And you have been a member of the Bricklayers for roughly

10 what, 30 years?  Bricklayers Union, so that the record is clear.

11 A     Yes.

12 Q     Okay.  And how long have you known Mr. Stringer?

13 A     I don't recall how long it has been.  It's been a while.

14 Q     Has it been 30 years, 10 years?

15 A     I'd say probably 10 years.

16 Q     Probably 10.  You ever work with Mr. Stringer in the

17 field?

18 A     I don't believe so.

19 Q     So your dealings with Mr. Stringer was in the context of

20 him being a business representative for the Bricklayers Union?

21 A     Yes.

22 Q     And the fact that you not only are a Bricklayers

23 contractor, but you hold a book, union book in the Bricklayers

24 Union?

25 A     Yes.

```
 1   Q     All right.  Now getting over to a gentleman named David
 2   Marsh.  Do you know David Marsh?
 3   A     Yes.
 4   Q     Okay.  And how do you know David Marsh?
 5   A     I've known Dave probably -- I'm going to give your age up,
 6   Dave.  It's got to be 23, 24 years.
 7   Q     I'm sorry.  What was the answer?
 8   A     23 or 24 years, somewhere in there.
 9   Q     Okay.  And did you work with Mr. Marsh in the field?
10   A     Yes, I did.
11   Q     And you worked with Mr. Marsh in the context of him being
12   a business agent or a business representative for the Laborers'
13   Union?
14   A     Yes.
15   Q     Is that correct?
16   A     Yes.
17   Q     You worked with Mr. Marsh in the context of Mr. Marsh
18   serving as a business representative for the Laborers' Union?
19   A     Yes.
20   Q     And I just want to situate where your actual offices are
21   with respect to the laborers and the bricklayers.  When Ace was
22   located on Cecil Malone Drive, would you agree with me that
23   physically the Ace building was within 75 yards of the
24   bricklayers offices where Mr. Stringer works out of?
25   A     I would have to say it's more than 75 yards, but --
```

1   Q   Do the two lots abut one another, the parking lot for the

2   Bricklayers and the parking lot for Ace Masonry?

3   A   I don't really know that.  I don't know that, no.

4   Q   Okay.  If it's not 75 yards, how far would you say it is?

5   A   Couple hundred yards.

6   Q   Okay.  A couple hundred yards, stone's throw, to be fair?

7   A   Yeah.

8   Q   All right.  And then if we move around the corner and go

9  over to the Laborers office, from the Cecil Malone offices, what

10  are we talking about, maybe 300 yards from the Cecil Malone

11  offices?

12  A   Sure.

13  Q   Okay.  Both within a football field of Ace Masonry, right?

14  A   300 yards is 3 football fields.

15  Q   You're right, okay.  And having been a former agent in the

16  NFL, I should know that, all right.  300 feet, 300 yards, who's

17  counting, all right.  In either case, it's close, correct?

18  A   Yep.

19  Q   Okay.  Now you indicated that you did not ask for any

20  manpower when you were winding up your career at Ace Masonry

21  from either the Laborers or the Masons.  Do you recall that

22  testimony?

23  A   Yes.

24  Q   And at that time, putting aside the physical proximity of

25  the offices, you also had Mr. Marsh's telephone number and Mr.

1    Stringer's, did you not?

2    A    Yes.

3    Q    Okay.  And you also had in the office, Missy would contact

4    by telephone, if you know, Missy would contact by telephone or

5    email the secretarial and office clerical staff with both the

6    Masons and the Laborers from time to time?

7    A    She doesn't work for me, so --

8    Q    You worked in the office with Missy, did you not?

9    A    Yeah, I worked in the same office, yes.

10    Q    Okay.  You ever caused her to send letters or emails, or

11    asked her to do anything for you?

12    A    As far as the unions go?

13    Q    Yeah.

14    A    I don't believe I have.

15    Q    Okay.  Let's get back then to the proximity of the

16    offices.  They are right around the corner, correct?

17    A    Yes.

18    Q    All right.  And as you have jobs that are ongoing, it's

19    your testimony that you were running short of manpower, recall

20    that testimony?

21    A    Yes.

22    Q    What jobs were those?

23    A    There was a handful of them.  I'd have to go back through

24    my worksheet of places.

25    Q    Well, you had Ithaca Town Hall, right?

1    A    Yeah.

2    Q    It was an Ace job, right?  Okay.  How many people were

3    working on that job?

4    A    I don't recall.

5    Q    Okay.  Less than half a dozen?

6    A    I don't recall.

7    Q    All right.  We had Randy Bell out there, correct?

8    A    Randy Bell ran the job, yes.

9    Q    Okay.  Dick Tracy was out there for a bit?

10   A    I can't say yes.  I don't know.

11   Q    You don't know?  All right.  Let's talk -- I'm going to

12   come back to the proximity of the offices, but let's talk about

13   the Ithaca Town Hall project.  You attended a pre-job meeting

14   there, did you not?

15   A    I believe I did, yes.

16   Q    Okay.  And it was you and Randy Bell, and among other

17   people, people from Hale Contracting, and in addition the civil

18   engineer from the town of Ithaca, a gentleman named Dan Thaete.

19   Do you recall that meeting?

20   A    Yeah.

21   Q    That would have been just prior to the beginning of the

22   job, right?

23   A    Yes, I believe so, yes.

24   Q    And at that job, you discussed manpower needs and anything

25   else that would need to be discussed with respect to the

 1  project?

 2  A    I don't recall that, but, yeah, okay.  I don't recall it,

 3  but I mean if we're all there talking, yeah.

 4  Q    And you don't recall from that meeting what you believed

 5  your manpower needs to be?

 6  A    I don't recall.

 7      MR. FURLONG:  What is the general counsel's exhibit on the

 8  certified payroll records?  It was only one copy made up.

 9      MS. KLUYTENAAR:  I think it's 38.

10      MR. FURLONG:  38.  Could we show General Counsel's

11  Exhibit 38?  Your Honor, mind if I overlook our shoulder and the

12  witness' shoulder as we only have one copy of that document?

13      JUDGE CARTER:  Sure.  Give it to the witness.  38.

14  BY MR. FURLONG:

15  Q    You've been in the business now about 30 years, right?

16  A    Yep.

17  Q    You know what certified payroll records are with respect

18  to public works projects?

19  A    I don't handle them, no.

20  Q    I didn't ask you if you handled them.  Are you familiar

21  with the obligation of the contract is to submit certified

22  payroll records?

23  A    Yes, I do.

24  Q    Do you have any reason to believe that Ace's certified

25  payroll records are not accurate, that they didn't report

1   anybody or anything like that?

2   A     I don't believe so.

3   Q     In fact, if Lisa Bellavigna, your wife, signed them, you

4   would assume that they would be accurate and truthful, correct?

5   A     Yes.

6   Q     Let's take a look and maybe this will refresh your

7   recollection.  Is that Ace Masonry listed at the top in terms of

8   its certification on the payroll records?

9   A     Yes, it is.

10  Q     And we see Randy Bell there working the first week?

11  A     Yep.

12  Q     Is that Lisa Bellavigna's signature?

13  A     Yes.

14  Q     Now as we go to the second week, we're looking at Randy

15  Bell and at Richard Tracy, correct?

16  A     Yes.

17  Q     Both are superintendents for Ace Masonry?

18  A     Yes.

19  Q     Okay.  And you were aware that they were working at the

20  project that you attended the pre-job for?

21  A     Yes.

22  Q     Okay.

23  A     Now I am aware.

24  Q     Okay.  Did you ever visit the job?

25  A     Yes, I did.

```
 1   Q      Okay.  Did you visit the job when it was an Ace job or a
 2   Bella job?
 3   A      Ace.
 4   Q      So you have no knowledge as to what happened with Bella,
 5   right?
 6   A      No.
 7   Q      With respect to this project?  Did you ever come to --
 8   what was your answer?
 9   A      What's that?
10   A      You have no knowledge as to how Bella got on this job or
11   what happened with Bella once they took over the job?
12   A      No, I have no -- I didn't work for Bella then, no.
13   Q      My question was what knowledge did you have about Bella
14   taking over the job or manning the job?  Do you have any
15   knowledge about it?
16   A      Other than my father and I talked about it.
17   Q      Well, what did he tell you?
18   A      That he talked with Steve Hale and is going to finish that
19   project.
20   Q      What did he tell you about the manpower?
21   A      What did who tell me about manpower?
22   Q      Your father-in-law, Henry -- or your father, excuse me.
23   A      We didn't -- about manpower.
24   Q      Just that simply Bella was going to be doing it?
25   A      Yeah.
```

1    Q     Had you expressed to your dad that Ace just simply

2    couldn't man this job or couldn't find people to do it?

3    A     Did I do what now?

4    Q     Did you express to your dad that Ace Masonry could not

5    find people to perform this job?

6    A     I don't believe so.  I can't remember.

7    Q     You were in charge of this job, at least with respect to

8    what you told the civil engineer during the pre-job, correct?

9    A     Um-hum.

10   Q     And you are intimately familiar, when you manage a job, as

11   to what the manpower needs are, right?

12   A     Yes.

13   Q     Okay.  And it's fair to say that you were familiar with

14   the fact that Robert A., your son, and your two superintendents

15   were working on that job, right?

16   A     Yes.

17   Q     Okay.  And you visited the job?

18   A     When I visited the job, the only one who was there was

19   Randy Bell.

20   Q     Okay.  But during this week, these individuals were

21   working at least according to your wife, so you would agree with

22   that right?

23   A     Yeah, I agree with that.

24   Q     Let's go through this as we start to look at it.  And then

25   you pulled somebody off the job, 10/3, Randy Bell was removed --

1    or not Randy Bell, but rather Rich Tracy was not working that

2    week.  It was your son and Mr. Bell, correct?

3    A    Yes.

4    Q    By the way, do you know, before we get to the Bella

5    payroll records, do you know whether or not Mr. Bell worked on

6    that job for Bella?

7    A    No, I do not.

8    Q    Okay.  Did he quit Ace Masonry while you were there?

9    A    They left, I believe.

10   Q    No, my question was did Mr. Bell, to your knowledge, one

11   of your key superintendents, leave Ace Masonry while you were

12   still employed there?

13   A    Yes, he left Ace Masonry when I was there.

14   Q    And what was the context, if any, of the discussion you

15   might have had with Mr. Bell as to why he left Ace Masonry?

16   A    I don't recall.

17   Q    You don't recall any discussion.  How long had Mr. Bell

18   been working for Ace Masonry?

19   A    I'm going to say probably eight years, maybe.

20   Q    One of your key superintendents, isn't that correct?

21   A    Yes.

22   Q    Okay.  And when you lost a key superintendent, leaving a

23   job that he was already running for Ace Masonry, you didn't have

24   any discussion as to why he left the employ of your company?

25   A    Like I said before, we had project manager/superintendent

1    meetings sometimes twice a week.  And we all sat there and

2    discussed what was happening, where we were going.

3    Q    Okay.  My question once again, I'm going to keep coming

4    back to this, was that Mr. Bell, one of your key

5    superintendents, running this Ithaca job, Ithaca Town Hall job,

6    left your employment at a certain point and went to work for

7    Bella?

8    A    Yep.

9    Q    I want you to tell me how you learned he was quitting Ace

10   and going to work for one of Ace's competitors.

11   A    I don't recall exact conversation with Randy Bell, with

12   the group, and as a group, they left as a group.

13   Q    With respect, once again, to Mr. Bell, is it your

14   testimony you had no discussions with him after he left?

15   A    About what?

16   Q    About remaining --

17   A    He's a friend of mine and we may have talked.

18   Q    About remaining an Ace Masonry employee as one of your key

19   superintendents running a job that you say has been undermanned,

20   and he quit on you mid-job, correct?

21   A    He left.

22   Q    He left.  And after he left -- how did you learn that Mr.

23   Bell was no longer working for Ace Masonry?

24   A    When they told me they were leaving.  They pretty much

25   told me --

1    Q    Where did Mr. Bell tell you this?

2    A    I don't recall.

3    Q    Did he tell you on the telephone or was it in person?

4    A    I don't recall.

5    Q    You must have been shocked when he decided to leave your

6    company right in the middle of a job.  It's not like him to do

7    something like that, is it?

8    A    Nope.

9    Q    Okay.  So did you call him on the phone and say, hey,

10   where are you, I need you on this job?  We're in the middle of a

11   contract.  We've got to get it done.  Did you do that with Mr.

12   Bell?

13   A    I don't recall.

14   Q    Okay.  Now as we go through the payroll records, okay,

15   Phillip Bond, what was his position with Ace Masonry?

16   A    He's an apprentice.

17   Q    Okay.  Randy Bell is on there.  Right?  Your son Bobby is

18   on there.  Right?

19   A    Robert, yeah.

20   Q    Okay.  Dick Tracy, we already spoke about.  He was an Ace

21   employee, previously worked on this job, as had your son, right?

22   As had Mr. Bell.  Am I correct on that?

23   A    Um-hum.

24   Q    Okay.  And Stevie Rollins.

25   A    Yes.

```
 1   Q     Superintendent for Ace, am I correct on that?

 2   A     He was a superintendent.

 3   Q     He was a superintendent for Ace.  So all of these people

 4   were working for Ace Masonry the week prior to them going to

 5   work for Bella Masonry.  Correct?

 6   A     Yeah, it's not uncommon.

 7   Q     Okay.  And they all quit to go work for Bella Masonry in

 8   order to man the job that the company they had just worked for

 9   was unable to man.  That's your testimony?

10   A     And pay them.

11   Q     Pardon me?

12   A     And pay them.

13   Q     We're talking about the manpower needs, okay.

14   A     Yeah, but people like to get paid.

15   Q     My question to you, Mr. Bellavigna, was that everyone who

16   worked for Bella during the week previous was working for Ace

17   and was at Ace's disposal to work on that Ithaca job, is that

18   correct or not?

19   A     Apparently so.

20   Q     Okay.  So you would agree with that?

21   A     Yes.

22   Q     Now I want to circle back to what we were discussing a few

23   minutes ago with respect to Mr. Stringer and Mr. Marsh.  It's

24   your testimony that you lacked manpower, but never bothered to

25   contact either Mr. Stringer or Mr. Marsh?
```

1    A    I leave that to the superintendents.

2    Q    Okay.  Have you ever had occasion to contact Mr. Marsh

3    because you needed laborers on your jobs?

4    A    I don't think I've ever had a problem with it that I can

5    recall.

6    Q    I'm not asking about a problem.  I'm asking about the

7    manpower needs.  All right, is it your testimony here, under

8    oath, that you have not called the Laborers hall looking for

9    workers, laborers to man your jobs?

10   A    No, that's not what I'm saying.

11   Q    Well, tell me what you're saying in response to my

12   question.

13   A    Okay.  Repeat the question.

14   Q    Sure.  Haven't you had opportunity, you, not your

15   superintendent, you, Robert Bellavigna, to on multiple occasions

16   in the last few years call over and speak to either Dave Marsh

17   or one of his representatives in order to secure laborers?

18   A    I've communicated with Dave, but I don't remember or

19   recall talking to Dave about manpower.

20   Q    So your testimony here is that while you worked for Ace

21   Masonry, you never called over to the union hall, the Laborers

22   hall looking for manpower?

23   A    I've talked with David, in general.  But specifically

24   talking about a specific job, that is the superintendent's job

25   and I don't believe I did.

1  Q    Okay.

2  A    But I have communicated with Dave, yes.

3  Q    Did you communicate with Dave about work issues?

4  A    In general, yes.

5  Q    And, in fact, given the proximity of the offices, isn't it

6  true that he would often stop by, and I'm going to get to Mr.

7  Stringer in a moment, he would stop by sometimes announced,

8  sometimes unannounced, sit down with you and talk about how

9  things were going on your jobs.  Isn't that the case?

10 A    Yeah.

11 Q    All right.  In fact, that would generally happen at least

12 once a month, maybe once every six weeks.  True or not?

13 A    No.

14 Q    It didn't.  How often did it happen, say, in a quarter of

15 a year, on average, if you know?

16 A    With Dave?  I would say probably once every quarter.

17 Q    All right.  He'd stop in.  So you had a good relationship,

18 right?

19 A    Very.

20 Q    And if you needed anything from the Laborers' Union, you

21 could go to Dave and try to work it out.  Sometimes, you'd get

22 it; sometimes, you wouldn't.  But you had an open communication

23 with Mr. Marsh, did you not?

24 A    Yes, I did.

25 Q    All right.  Let me switch gears and go to Mr. Stringer.  I

1  think we've established that Mr. Stringer's office also is in

2  very close proximity to your office, well within walking

3  distance, correct?

4  A    Yes.

5  Q    All right.  And Mr. Stringer would stop by, like Mr.

6  Marsh, periodically and take you out to lunch to talk about how

7  things were going on your projects and things like this,

8  correct?

9  A    Yes.

10  Q    And that's when you were running or at least had a

11  prominent role in the Ace Masonry company.  Am I correct on

12  that?

13  A    Yes.

14  Q    And you've been a bricklayer now for, what, 30 years?

15  A    Yes.

16  Q    And you understand they run a referral hiring hall out of

17  the Bricklayers for contractors to call, if there's people out

18  of work that can be sent out to work.  Are you aware of that?

19  A    No.

20  Q    Really?  Do you know what a hiring hall list is?

21  A    I've never seen one.

22  Q    I'm not asking if you've seen it.  Have you ever heard of

23  one?

24  A    Yes, I've heard of one.

25  Q    And what is a hiring hall list to your understanding?

```
 1   A     I've never been involved with it, so I don't know.

 2   Q     You don't know what a hiring hall list is?

 3   A     I don't know its function, no.

 4   Q     Okay.

 5   A     Or how it works.

 6   Q     All right.  Have you ever read the collective bargaining

 7   agreement between the Bricklayers and the Ace Masonry company?

 8   A     No.

 9   Q     Do you know whether or not there's any hiring hall

10   provisions in there or referral hall provisions in that

11   agreement?

12   A     I didn't read it.

13   Q     Okay.  How about with the Laborers, you ever read that

14   agreement?

15   A     I don't believe I have, no.

16   Q     Okay.  But you were a trustee at the Laborers Taft-Hartley

17   Funds?

18   A     Yep.

19   Q     Okay.  Now you indicated a few moments ago that it was the

20   responsibility of your superintendents to call for manpower, do

21   you recall that testimony?

22   A     Yes.

23   Q     And you're working for Ace Masonry and you've got a series

24   of jobs that your testimony is you were unable to man, right?

25   A     Yes.
```

1    Q      And you understand, having worked in the business this

2    long, that the ability to finish a job on time is critical to a

3    contractor, right?

4    A      Yes.

5    Q      Okay.  Did you direct your superintendents to call over to

6    the Laborers or the Bricklayers and say, hey, I'm short of

7    manpower, I need people?  Did you direct them?

8    A      We talked about it in a superintendents meeting.

9    Q      Who is we?

10   A      Huh?

11   Q      Who is we?

12   A      Me and the superintendents.

13   Q      Which would have included who?

14   A      Me and the superintendents.

15   Q      Mr. Hager?  Name the superintendents who were at that

16   meeting.

17   A      Yeah, I'm going to say everybody on that list.

18   Q      Mr. Bell, Mr. Hager, Mr. Tracy, a few others.

19   A      Yep.

20   Q      When was that superintendents meeting held?

21   A      At the Ace office.

22   Q      When, not where, when was it held?

23   A      Like I said, I don't remember dates, but they were

24   periodically throughout the closing of Ace.

25   Q      Okay.  But, Mr. Bellavigna, as a high-ranking official or

1    position within Ace, you're concerned that Ace isn't going to

2    get its contracts done and you are alarmed about this, correct?

3    A    Yep.

4    Q    And you're alarmed about the fact that your president is

5    on leave and so she's not available to help out with this,

6    correct?

7    A    Yes.

8    Q    And so you're telling your superintendents you make sure

9    that those jobs are manned and manned adequately so that we

10   don't get burned on our contracts, am I correct?

11   A    Yes.

12   Q    All right.  And so you make it very clear to them.  And

13   when more people don't show up on the job or at least people to

14   your satisfaction, do you have follow-up discussions with your

15   superintendents as to why people weren't showing up?

16   A    Yeah, they weren't getting paid.  Their benefits weren't

17   paid, so --

18   Q    Who did you have a discussion with?

19   A    With the group.

20   Q    All right.  And they told you that they reached out to the

21   union hall and that --

22   A    No, they didn't say that.

23   Q    What did they say?

24   A    That they were going to stay there and help me finish

25   this, these projects.

```
 1   Q     Okay.  So then where was the problem?  They were going to
 2   stay there and help you finish the projects.
 3   A     Well, there was a lot of problems because they ended up
 4   sending out a letter that said we're not going to be responsible
 5   for you guys if you end up working for Ace after this period.
 6   Q     Okay.  Did you call Scott --
 7   A     A lot of people would not come.
 8   Q     All right.  So you, at this point, between Trinity Church
 9   and some of the other projects there, you got close to
10   $1 million worth of work in the works.
11   A     I don't know about $1 million.
12   Q     Well, let's take a look at GC-2.  Go to the second page
13   where it shows the end dates on these projects.
14   A     Um-hum.
15   Q     Okay.  You had a job still at Ithaca College that wasn't
16   due to be done till the end of the year, $731,000 just on that
17   job alone, right?
18   A     Um-hum.
19   Q     Corning, $459,000.  $202,000 for Ganette Health Services
20   (ph.).  $290,000 for East Tower College.  Do you see these jobs
21   going down?
22   A     Yes.  John Franzese ran those.
23   Q     Okay.  $259,000 for a steam vault repair at Cornell.
24   A     Yes.
25   Q     Again, running right through the fall, right?  And you go
```

1  onto the second page, I haven't touched the Trinity Church yet,

2  which is another $200 grand.  So you've got well over $1 million

3  worth of contracts in play that Ace Masonry has to perform.  Am

4  I right on that?

5  A    Most of those were done before that happened.

6  Q    Okay.  In the fall of -- if we look at the Ace Masonry

7  records provided pursuant to the subpoena, in the fall of 2011,

8  you had well over $1 million worth of work on the books that you

9  were in the process of performing?

10  A    No.

11  Q    All right.

12  A    They were done.

13  Q    They were all done?

14  A    They were closed out.

15  Q    Let's talk about the obvious one that wasn't done, okay,

16  because we look at the finish dates on this and they all run

17  through December and November, all right, the record speaks for

18  itself.  But let's talk about the Trinity Church, all right,

19  you're familiar with that project?

20  A    Yes.

21  Q    Do you know how big it was?

22  A    I don't recall exact numbers, no.

23  Q    And would you agree with me that according to this

24  document, it's still ongoing.  It's a $200,000 project.

25  A    Yeah, I believe that's pretty close.

1  Q    In fact, Bella is doing it now, right?

2  A    Yes, sir.

3  Q    Okay.  So you've got these contracts in play that you have

4  to honor with the customers, whether it be a customer or a prime

5  contractor, if it's a subcontract.  And you are not calling or

6  walking over to the union halls to say, hey, I need some people?

7  A    It's not my job to do that.

8  Q    My question was you didn't do it, which even though you're

9  employed by Ace, right?

10  A    It's not my job to do it.

11  Q    So your answer is you didn't do it, am I correct?

12  A    Yes.

13  Q    And when --

14  **(Power interruption/off the record.)**

15      JUDGE CARTER:  We're back on.  We had our first brief

16  power outage.  And we are back up and running.  So, Mr. Furlong?

17  If we're up again.

18      MR. FURLONG:  We're up again.  Thank you, Your Honor.

19  We're on the record, right?  Thanks very much.

20  BY MR. FURLONG:

21  Q    So, Mr. Bellavigna, when you directed your superintendents

22  to make some hiring decisions and to bring some people on, and

23  they were unable to do that, did you fire any of those

24  superintendents?

25  A    No.

1    Q    In fact, the next real exposure you had to them everybody

2    had moved over to your father-in-law or your father's business,

3    Bella Masonry.

4    A    No, that happened way before then.  They worked together

5    finishing out jobs.

6    Q    Okay.  Now specifically I want to talk to you about the

7    Ithaca Town Hall project.  Ace Masonry got fired from that job?

8    A    Yes.

9    Q    Okay.  And did it get fired because of an allegation by

10   the prime contractor that it couldn't perform?

11   A    Yes.

12   Q    All right.  And would you agree with me if I look at the

13   Bella payroll records and the Ace payroll records, basically, it

14   was all Ace people that just worked for Bella and did perform?

15   A    Could you repeat that question?

16   Q    Sure.  If we look at the Bella payroll records which you

17   have in front of you and look at the people who worked for Bella

18   performing that job, they were all Ace employees prior to

19   becoming Bella employees.  Take a look.

20   A    Yes.

21   Q    All right.  And they were all available to work for Ace

22   Masonry at the time Ace was performing the project for the

23   Ithaca town board building?

24   A    It looks that way.

25   Q    Okay.  So why didn't you assign them to work that project

1  so that you could get it done, as Bella did?

2  A    Because they left.

3  Q    No.  Prior to them leaving, prior to the conclusion by the

4  prime contractor that there was non-performance, all those

5  people, and there was maybe four, five, six of them, were all

6  Ace employees.  This is a critical contract for you.  Why did

7  you fail to assign them to finish that project if there were

8  manpower problems?

9  A    I don't know the, the time frame.  I can't remember the

10  time frame.  But if there was other projects that were going

11  and --

12  Q    I thought you wound down those other projects.

13  A    What's that?  I did.

14  Q    I thought you wound down the other projects.

15  A    I don't know the date of the, the roofing job.  I guess I

16  don't know the dates and when all that stuff shook out, but they

17  all decided they were going to stay at Ace and finish the jobs

18  that I had on task.  And they did.

19  Q    And did they finish the Ithaca Town Hall project?

20  A    No, because we ran out of time and money.

21  Q    Okay.  What do you mean you ran out of money?

22  A    I'm saying they ran out of money because they weren't

23  getting the benefits paid and they decided to leave.

24  Q    Okay.  But the company, itself, was fired by the prime

25  contractor for failure to perform, allegedly failure to perform,

1    isn't that correct?

2    A    Yeah.

3    Q    And you're saying, yes, we did fail to perform.  We didn't

4    have the manpower to do it.  That's your statement.  Is it not

5    your statement?

6    A    Yes.

7    Q    All right.  And, again, and I'll leave this in a moment,

8    but --

9    A    Pardon?

10   Q    And I will leave this in a moment.  But the same people

11   that worked for Ace when it couldn't perform went over to Bella,

12   a non-union company, and now Bella could perform with the same

13   troops, including the same superintendent, Mr. Bell.  Is that

14   not the case, looking at the payroll records?

15   A    Yes.

16   Q    All right.  And it is your testimony that having known Mr.

17   Marsh for many years as a business representative and knowing

18   Mr. Stringer as a business representative, and having worked in

19   the field with Mr. Marsh, having been a trustee on the Laborers'

20   Funds, you were unaware that the unions are a source of labor,

21   if you're short of manpower?

22   A    They sent a letter out saying --

23   Q    I'm not asking about that.  My question is you were

24   unaware that they were a source of labor?

25   A    No, I wasn't unaware of the source of labor.  I know there

1    is a source of labor.

2    Q    Okay.  Did they put up any picket lines against your

3    company?

4    A    No.

5    Q    Okay.  Did the Laborers or the Masons ever withdraw their

6    members?  Did you have people quit and say I'm not working for

7    you because the union told me to?

8    A    I can't remember exact time, but they were brought up on

9    charges for working us.

10   Q    My question is and we're going to get an answer on this,

11   did anybody quit your employment or quit their employ at Ace

12   Masonry because you understood that the union pulled them away

13   and said you cannot work there?

14   A    I believe that's what the case was.

15   Q    Okay.  You did.  Who quit?  Who quit Ace Masonry as a

16   result of effort or pressures by the union?  Name the names?

17   A    Derek Hager, Randy Bell, the whole list of them.

18   Q    Okay.  So they got back into the good graces of the union

19   by going to work for a non-union company, Bella Masonry?

20   A    I have no idea.

21   Q    Okay.  Let me talk -- let's switch gears here for a

22   minute.  You indicated that you took your son down to the Vestal

23   job on a couple of occasions to show him how to set the job up

24   and things like that.  Do you recall that testimony?

25   A    I said I met him there.

1    Q    All right.  Whether you went with him or not, you met him

2    there, right?  Okay.  And this would be Robby, your son?

3    A    Robert.

4    Q    Robert, okay.  And this was when you were employed by Ace

5    Masonry and he was employed by who, Bella?

6    A    Yes.

7    Q    Right.  And at that time that you are employed by Ace

8    Masonry, Ace Masonry and Bella are competitors in the same

9    market, are they not?

10   A    If you want to look at it that way, yes.

11   Q    Were they both doing masonry work?

12   A    No.

13   Q    Okay.  Was Ace Masonry doing masonry work?

14   A    Not at the time.

15   Q    Okay.  In the fall of --

16   **(Power interruption/off the record.)**

17        JUDGE CARTER:  We're up again.

18        MR. FURLONG:  Up again?  Thank you very much.

19   BY MR. FURLONG:

20   Q    Mr. Bellavigna, I'm looking at GC-2.  And I want to talk

21   about some of the Ace Masonry jobs and ask you if they were

22   masonry jobs.  I'm looking at the fall of 2011.  Do you see that

23   towards the bottom of the first page, going onto the second

24   page?

25   A    Which job are you talking about?

1  Q    I'm going to ask you generally, all right.  There's

2  several dozen jobs on this exhibit.  Am I correct?

3  A    Yes.

4  Q    Point out a single job that was not a masonry job.

5  A    East Tower.

6  Q    Okay.  What else?

7  A    There is a damper replacement.  A lot of these jobs, I

8  didn't run, so --

9  Q    You say the damper replacement was not an Ace Masonry job?

10  A    No.

11  Q    No, it was an Ace Masonry but didn't involve masonry work?

12  A    You said is there any masonry on these.

13  Q    Yeah.

14  A    Not whether it was Ace Masonry's work.

15  Q    Tell me what jobs were not mason jobs on this exhibit.

16  You've named two.  That leaves about 80 others.

17  A    Yeah.

18      MR. JAMESON:  Do you want him to go through the whole list

19  or just --

20      MR. FURLONG:  No, just take a look at the list, because I

21  want to be able to -- I think I have a contention that Ace

22  Masonry's masonry work and Bella's masonry work weren't the

23  same.  They're not in the same market.

24      MR. JAMESON:  But just so the record is clear, do you

25  want him to go through the whole exhibit or just a period of

1    time?

2    BY MR. FURLONG:

3    Q    Tell you what, go from August, any start date from August

4    2011 forward.

5    A    You're talking about end dates or start dates?

6    Q    Take your pick.  It doesn't matter.  Either one.

7    A    Actually, without reviewing the scope of work, I can't

8    really honestly say.

9    Q    What jobs -- without reviewing the scope of work, I can

10   accept that.  What jobs did you have any involvement with on

11   this list, going from August on?

12   A    It would be Constrisky (ph.) --

13   Q    That was a big job, wasn't it?

14   A    Not masonry.

15   Q    Pardon me?

16   A    Not masonry.  It was a dugout.  The steam vaults.  That

17   was a concrete repair job.

18   Q    What jobs did you have involvement with?

19   A    That's the one I'm talking about.  There is three of them

20   that I can honestly say that I had involvement with.

21   Q    Okay.  And you're a masonry superintendent or project

22   coordinator for the masonry division of Ace Masonry, correct?

23   A    Yes.

24   Q    Fair to say that those involved masonry work, the jobs you

25   worked on?

1    **(Power interruption/off the record.)**

2         JUDGE CARTER:  Okay, we're up.

3    BY MR. FURLONG:

4    Q    So, Mr. Bellavigna, back to the jobs in the fall.

5    A    Yes.

6    Q    I want you to tell me about the masonry work being

7    performed by Ace Masonry which you have knowledge of.

8    A    Yes.  And I have to clarify one thing is that with the

9    turmoil in the company, I relied on my project, junior project

10   managers to do a lot of this day to day stuff.

11   Q    So you really don't know?  As you sit here now, you really

12   -- it's a mystery to you as to what work was being done by Ace

13   Masonry in the fall 2011.

14   A    Actually, for 2011?

15   Q    Yeah.  You just don't know?

16   A    No, I do know.

17   Q    Okay.  Tell --

18   A    I have general knowledge of the whole what was happening,

19   but the day to day stuff, my junior project manager and senior

20   project manager did it.

21   Q    Okay.

22   A    Because I had other things on my plate.

23   Q    I'm trying to establish whether or not the same markets

24   were being approached by Bella Masonry as Ace Masonry was in,

25   all right?

```
 1   A      True.
 2   Q      I'm going to come back and we're going to keep following
 3   this until we get an answer one way or another.  Back to the Ace
 4   Masonry work that was ongoing in the fall 2011, let's take the
 5   Trinity Church, what did that involve?
 6   A      Roofing and masonry.
 7   Q      Okay.  And what was the nature of the masonry?
 8   A      Masonry restoration.
 9   Q      Okay.  And is that something, masonry restoration, that
10   Ace Masonry normally hired bricklayers and laborers and
11   carpenters to perform?
12   A      Yes.
13   Q      All right.  And did that contract eventually get let out
14   or in some fashion transferred over to Bella Masonry?
15   A      Yes.
16   Q      And is it an ongoing job now?
17   A      Yes.
18   Q      And are you familiar with it?
19   A      With the project, yes, I am familiar with the project.
20   Q      All right.  And are you utilizing or is Bella Masonry
21   utilizing the same crafts that Ace Masonry would have utilized,
22   had it worked on that project?
23   A      Utilize the same crafts.
24   Q      Yes.
25   A      What do you mean by that?
```

1  Q     Laborers, masons, perhaps carpenters, you tell me.  You

2  are the project manager.

3  A     Yes.

4  Q     And in addition to the Trinity Church, what other masonry

5  jobs are you familiar with that were ongoing in the fall of 2011

6  being performed by Ace Masonry?

7  A     The ones that I just listed.

8  Q     Okay.  You were full-time at the end of December --

9  A     Yes.

10  Q     -- at Ace Masonry, getting paid $30 an hour, am I correct?

11  A     I believe the pay is right, yeah, could have been more, I

12  don't know.

13  Q     And by the way, while we're on that, you're also getting

14  paid $30 an hour to the penny by Bella Masonry, am I correct on

15  that?

16  A     What's that?

17  Q     You're getting paid $30 an hour, according to the Bella

18  Masonry payroll records.

19  A     I, I don't know.

20  Q     You don't know what you're getting paid, okay.

21  A     Yeah, I don't know the specific dollar amount, no.

22  Q     All right.  Let's approach it from a different direction.

23  In the fall of 2011, Bella Masonry, excuse me, Ace Masonry was

24  performing some masonry projects that involved traditional

25  masonry work that Ace traditionally bid on and performed, am I

1  correct?

2  A    Yes.

3  Q    And that included work to be performed by carpenters,

4  laborers, and masons.  Am I correct on that?

5  A    Carpenters had no involvement in masonry.

6  Q    Okay.  Let's talk about the masons and the laborers, work

7  traditionally performed by laborers and masons was being

8  performed by Ace Masonry in the fall of 2011, is that correct,

9  Mr. Bellavigna?

10  A    Yes.

11  Q    Now as we get to jobs such as the Trinity Church being

12  performed by Bella, Ithaca Town Hall first being performed by

13  Ace then Bella, okay.  Vestal, we can talk about that.  These

14  are jobs that Ace certainly could have performed, would have

15  performed, and would have used masons and laborers had they

16  performed them?

17  A    No, not Vestal.

18  Q    Really?  What was being done at Vestal that --

19  A    Ace didn't have involvement with Vestal.

20  Q    I'm not asking you if they did.  What was the nature of

21  the job at Vestal?

22  A    It was masonry.

23  Q    Okay.  And did you have guys like Derek Hager and Dick

24  Tracy working down there at the Vestal job?

25  A    No, I did not.  Ace.

1  Q    Okay.  Ace did not have them working down there?

2  A    No.

3  Q    Did Bella Masonry have it working down there?

4  A    According to the records, yes.

5  Q    Well, according to your personal knowledge, did they work

6  down there?

7  A    Yes.

8  Q    And in fact, you went down there as a masonry

9  superintendent to show your son how to set up a job on at least

10  a couple of occasions, isn't that your testimony?

11  A    I didn't go down there in the masonry superintendent, no.

12  Q    All right.  Did you go down there with your son or meet

13  your son down there to show him how to do this job?

14  A    Yes, I did.

15  Q    And did you explain how to do the job as something that

16  you've learned and the skills that you've gained over 30 years

17  of working as a mason in the masonry industry?

18  A    Yes.

19  Q    And what was the nature of the work being done at Vestal?

20  A    Masonry work.

21  Q    Masonry work?

22  A    Yes.

23  Q    Okay.  Masonry work that Ace Masonry, forgetting whose

24  name is on the contract, Ace Masonry was capable of performing?

25  A    At that time, they weren't capable.  They were closing

1  their doors.

2  Q    Let's say four months earlier from that time, Mr.

3  Bellavigna.

4  A    Yep.

5  Q    Was the nature of the job at Vestal the type of work that

6  Ace Masonry performed as was customary with its business, yes or

7  no?

8  A    Yes.

9  Q    All right.  In fact, the types of tools and other

10  equipment utilized by the workers was mixers, scaffolds, the

11  type of stuff that Ace Masonry owned.  Am I correct on that?

12  A    Yes.

13  Q    In fact, that stuff even made its way onto the Am I

14  correct on that job site, did it not?

15  A    I believe he rented out there, yes.

16  Q    Okay.  So back, I want to circle back.  In the fall of

17  2011, you go down with your son who is working for a competitor

18  contractor and explain to him how to run this job.  Isn't that

19  your testimony?

20  A    I didn't say that Bella was my competitor.  I never said

21  that.

22  Q    Well, let's explore that for a bit.  Okay.  Why would you

23  say they're not your competitor?

24  A    What's that?

25  Q    Why were they not your competitor?  Tell me why?

1    A    Because I don't believe they are.

2    Q    Tell me.  Give me the reasons.  How do you reach that

3    conclusion?  That's a conclusion.  Give me the facts that lead

4    you to that conclusion.

5    A    Ace is closing their doors.

6    Q    Ace is still in existence as we sit here now, correct?

7    A    They're not doing business, yes.

8    Q    Okay.

9    A    They --

10    Q    So Ace --

11    A    -- in business.

12    Q    -- in the fall of 2011 had ongoing projects.  We can argue

13    about whether it was over $1 million.  Several hundred thousand

14    dollars ongoing in September.  Back to the competitor issue.

15    You, as high ranking official in Ace and now at Bella employ, it

16    is your testimony that they were not competitors, right?

17    A    I don't see me being a competitor against a non-union

18    company, if I'm in Ace's shoes right now.

19    Q    Okay.  And they weren't bidding for the same markets or

20    performing work in the same markets, is that your testimony?

21    A    Union versus non-union.  It is totally different.

22    Q    Forgetting union versus non-union, okay, forgetting that

23    for a moment.

24    A    That is the difference.

25    Q    Okay.  Well, what's the different?

1   A     I said that is the difference.

2   Q     Okay.  The only difference is one was signed, one wasn't

3   signed.

4   A     And the dollar value.

5   Q     Okay.  And the dollar value for what?

6   A     Ace can't compete in it.

7   Q     And the dollar value of what, Mr. Bellavigna?

8   A     Hum?

9   Q     The dollar value of what?  The projects?  The cost of

10  mixers?  The dollar value of what?

11  A     No, the dollar value of the manpower.  You can't compete.

12  Q     What do you mean you can't compete, non-union can't

13  compete with the union?

14  A     No, the union can't compete with a non-union.

15  Q     Explain that to me.  Why?  What do you mean?

16  A     It costs too much.

17  Q     The union costs too much?

18  A     Yes.  A union employee, when you get into those types of

19  projects and you're bidding against somebody that's non-union,

20  they always beat you.  So it's not like competition.

21  Q     So in other words, if a union contractor wants to compete

22  in the marketplace for something like Vestal, it's got to be

23  non-union.  It's got to somehow get out of its contract in order

24  to complete for that work?

25  A     I haven't been able to beat them, ever.

1   Q     Okay.  So your testimony now as a senior project
2   coordinator over at Ace is if you wanted to get this work, you
3   basically had to get rid of the union contract and use the same
4   workers but not be bound by the union contract?
5   A     No.  You asked me the question what's the difference in
6   the two companies.  And I'm telling you --
7   Q     Lower labor costs for the non-union?
8   A     Yeah.
9   Q     Okay.
10  A     So it's not my competition.
11  Q     Okay.  Now before we move onto the next topic, Ace
12  performed work for at least 10 years in both the public and the
13  private markets, am I correct?
14  A     Yes.
15  Q     And when it was operating in the private markets,
16  non-prevailing wage rate, it was competing against non-union
17  companies for those jobs.  Am I correct?
18  A     No.
19  Q     Really?  Non-union contractors don't bid for work?
20  A     Not in the marketplace that I was in.
21  Q     Okay.  It'll complete for private jobs?
22  A     I didn't bid that many private jobs.  Ithaca College is
23  probably one of my, you know, I would say it was Ace's biggest
24  client that was private out there.
25  Q     Let's switch gears for a moment.  Take a look at GC-27,

1  please.  You see it?

2  A    Yeah.  Do you want me to leaf through it or what do you

3  want me to do?

4  Q    Yeah.  Bring your attention to what's on Page 2 of 7, the

5  bottom of the page.  You see a picture of your son, Rob?

6  A    Yes.

7  Q    And then as we continue onto the next page, you see the

8  description of his job?

9  A    Of what?

10  Q    You see a description of his job and what he's doing for

11  Bella.  Do you see that?

12  A    Yes.

13  Q    Okay.  Now you certainly have the utmost respect for your

14  dad's integrity and truthfulness if you were to put something

15  out there on a website, do you not?

16  A    Now say that one more time?

17  Q    Sure.  You have the respect for Henry Bellavigna's

18  integrity and truthfulness if he put something out on a webpage

19  or a website?

20  A    Yes, I have all the integrity for my father, but I don't

21  believe he put this in the website.

22  Q    We'll get to that, okay, and you'll have -- your counsel

23  can ask you some questions.  Let's take a look at the

24  description of your son's experience in October of 2011.  He

25  helped run a face-paced general construction job called Schuyler

1    Human Services in 2007, 4 years earlier, right?  Where he

2    learned from his grandfather, your dad, at a young age how to

3    read drawings.  You would agree with me that that's true?  Your

4    son does know how to read drawings or it wouldn't appear on the

5    website.  Do you agree with me?

6    A    He is learning how to read drawings, yes.

7    Q    And it also says he learned how to estimate bid prices for

8    extras on the job.  Do you see that part?

9    A    Yep.

10   Q    Okay.  And you would agree with me that that's accurate or

11   it wouldn't have appeared on the Bella Masonry website.  Do you

12   agree with me?

13   A    Yes.

14   Q    Yes, okay.  And now we look at the overseas project

15   manager.  He oversees project management.  That's what's

16   represented for your son with respect to his vice president's

17   position as a safety coordinator and project coordinator for

18   Bella.  You see that?

19   A    Yep.

20   Q    And I have no reason to doubt it.  I'm sure you don't,

21   either, do you?

22   A    No.

23   Q    Okay.  And he's overseas project management, safety, and

24   job schedule.  Do you see that?  Okay.

25   A    Yes.

1   Q    Now we go down here a little bit further down and it talks

2   about Rob has worked on projects in the past with commercial

3   buildings.  True or not true?

4   A    Say it -- where are you seeing, oh, okay.

5   Q    Do you see where I'm talking about?

6   A    Yes.  I'm reading it.

7   Q    So did your son work --

8   A    I'm not done reading it, yet.  Thank you.

9   Q    Take your time.  Read the whole thing.

10  A    I am.

11  Q    All done, Mr. Bellavigna?

12  A    No, I'm just clarifying some stuff here.

13  Q    Okay.  Okay, now what's your question?

14  A    Sure.  It says that Rob has worked on projects in the

15  past, obviously before October 2011, including commercial

16  buildings.  Do you see that?

17  A    Yes.

18  Q    Would you agree with me that that's true or it wouldn't

19  have been on this website?

20  A    I'm trying to remember.  No, not back then, he wasn't, so

21  that's not right.

22  Q    That's not true, okay.  How about schools, it says he

23  worked on schools.  True or not?

24  A    It's taken out of context a little bit there.

25  Q    Did he work on schools, Mr. Bellavigna?

1   A      I don't recall.

2   Q      You don't recall.  He's your son, right?  Do you recall

3   that?  Mr. Bellavigna, is Rob your son?

4   A      Yes.

5   Q      Okay.  And did he work in the same company as you, at Ace

6   Masonry?

7   A      Yes.

8   Q      Okay.  And you can't recall whether or not he worked on

9   schools or some route?

10  A      At the time period through those, I don't really recall.

11  Q      Okay.  Let's move on.  How about water plants.  It says he

12  worked on water plants, fairly unique.  Did your son working at

13  Ace Masonry with you work on water plants?

14  A      I don't recall.

15  Q      Okay.  How about housing projects, represented on your

16  dad's website or Bella's website, does he work on housing

17  projects or maybe your dad was wrong on that?

18  A      I, I don't recall.

19  Q      You don't recall?

20  A      No.

21  Q      Okay.  How about municipal buildings, it says he worked on

22  municipal buildings.  Do you recall whether your son, Rob, while

23  working with you at Ace, for your wife's company, do you recall

24  whether he worked on municipal buildings, Mr. Bellavigna?

25  A      I don't recall all those.

1   Q     Okay.

2   A     I'd have to look at a list and go down through, and look

3   at his payroll history, and figure it all out.

4   Q     It's just as you sit here now, it's just no recollection

5   of whether he did or didn't?

6   A     No.

7   Q     How about it says here he performed conceptual estimates

8   for owners and architects.  Certainly, that would be the case or

9   it wouldn't appear on the website.  Isn't that the case, Mr.

10  Bellavigna?

11  A     He's worked on them, yeah.

12  Q     Okay.  And then he's responsible for project cost

13  estimates, the project schedules, and the pricing of bids.

14  Accurate?

15  A     He's worked on them, yes.

16  Q     Okay.  So even putting aside the stuff that you can't

17  remember as to whether or not your son has experience as

18  represented on this website, okay, he has quite a bit of

19  experience as a mason, including running jobs, including doing

20  all aspects of scheduling on jobs, isn't that the case?

21  A     He's being taught, yes.

22  Q     Okay.  And you still had to go down to Vestal, New York,

23  and teach him how to set up a job while he was working for Bella

24  Masonry?

25  A     Yes.

1  Q    Was there anything particularly complex about the Vestal

2  job that somebody with your son's experience was unable to

3  perform or to address?

4  A    Yeah, there was a phasing of how to bring it out.  And it

5  was -- it's an odd-shaped building.

6  Q    Odd-shaped building, okay.

7  A    And with the way they were doing the backfill and

8  everything, he needed my advice.

9  Q    And you went down there on several days and met him down

10 there.  That was your testimony.  Not just --

11 A    I believe twice, yes, but it could be more, but I believe

12 it was twice.

13 Q    Okay.  And with his experience with everything, he still

14 needed the advice.  Now your dad, at that time, was working for

15 Bella Masonry.  In fact, he owned it, correct?

16 A    At which time now?

17 Q    The fall of 2011, when you worked for Ace.  Did your dad

18 work for Bella Masonry?

19 A    Yes.

20 Q    Okay.  And your dad has roughly 55 years of experience in

21 the masonry business, does he not?

22 A    Yes.

23 Q    Fair to say Henry Bellavigna knows every aspect, including

24 setting jobs up, correct?

25 A    Yes.

```
 1   Q     Okay.  Do you know why your son didn't go to his
 2   grandfather, your dad, employed by Bella, while he was a Bella
 3   employee, to get this type of instruction, why they had to go to
 4   an outside consultant?
 5   A     Yes, I do.
 6   Q     Okay.  Tell us.
 7   A     My dad has a bad leg and it was like a mountain goat in
 8   there.  He had to crawl through all the ditches and mud.
 9   Q     I see.  So your dad's inability to get around was the
10   reason.  And you stepped up to the plate and agreed to crawl
11   through the mud and everything with your son?
12   A     Yes, sir.
13   Q     Okay.  Good.  By the way, you didn't get paid for that,
14   right?  You did this consulting free of charge while you were
15   getting paid by Ace Masonry?
16   A     Do it all the time.
17   Q     Okay.  Well, I think you testified actually you do
18   consulting for architects and customers.  Do you recall that
19   testimony?
20   A     Yes.
21   Q     What sort of consulting do you do for competitors of Ace
22   Masonry?  I want you to name other masonry firms where while you
23   were employed by Ace, you went out to their job sites and helped
24   them set up jobs.  And I want jobs, too.
25   A     I really don't do competitors.
```

1  Q    Yeah, okay.  Now, counsel had asked you about the

2  Chesapeake Athens job, do you recall that?

3  A    Yes.

4  Q    Okay.  I think you testified that you went down to that

5  project and met some employees down there?

6  A    Yes.

7  Q    And at that time were you on the Ace payroll or the Bella

8  payroll?

9  A    I believe I was on Ace.

10  Q    You were on Ace's payroll.

11  A    Yes.

12  Q    Okay.  And was that a Bella job or an Ace job?

13  A    That was a Bella job.

14  Q    Okay.  So you went down there while you were on the Ace

15  payroll for Bella Construction?

16  A    Same situation.  I went down to consult with my son.

17  Q    Just to help out, things like that?

18  A    Yep.

19  Q    Okay.  Did you lay any block while you were down there

20  with the others?

21  A    I don't believe I laid any block that I can recall.  But I

22  do know that they were shorthanded one day, and I went down

23  there and helped them.  I ran the forklift.

24  Q    So you actually performed some work on the job in addition

25  to consulting.  You ran the forklift for Bella.

```
 1   A      Yep.

 2   Q      While you were getting paid by Ace?

 3   A      Yep.

 4   Q      Okay.  Now was your son running that job?

 5   A      Yes.

 6   Q      Weren't there superintendents there with much more

 7   experience, such as Derek Hager and others?  Rich Tracy.

 8   A      Yeah.

 9   Q      Okay.  But you needed to consult with your son in order to

10   have him what, run the job?

11   A      Yeah.

12   Q      Okay.  And while you were down there, you helped run --

13   you ran the backhoe or you ran the forklift or whatever the

14   machine as.

15   A      Forklift.

16   Q      Okay.  Was there any sort of subcontract arrangement

17   between the Bella company and the Ace company to allow for your

18   services to be used in that fashion?

19   A      To do what?

20   Q      Shared, allow your services to be used in that fashion.

21   You were getting paid by Ace.  Was this during the week, by the

22   way, or during the weekend?

23   A      I believe it was during the week.

24   Q      Okay.  So you took time off from your Ace job to go down

25   and help Bella, while you were getting paid by Ace?
```

1    A    I went down there to consult with my son.

2    Q    Okay.  Back to the question.  You were getting paid by Ace

3    for that work?

4    A    Yes.

5    Q    And was there any sort of a contractual arrangement

6    between the two firms to allow your services to be used down

7    there?

8    A    No.

9    Q    Let me talk for a minute about, I'm going back to the

10    Ithaca town board project, all right.  Do you recall a meeting

11    that you had in the Ace offices with a couple of your

12    superintendents about four or five months before that job began?

13    The superintendents would have been Dick Tracy and Derek Hager,

14    going over prints for that project.

15    A    For which job?

16    Q    Ithaca Town Hall project.

17    A    No.

18    Q    Okay.  Did you ever go over prints with Mr. Tracy and Mr.

19    Hager in the office with respect to that job?

20    A    I don't believe so.  Randy is the one that ran it.  I

21    don't recall it, if I did.

22    Q    Did you ever have a discussion with Mr. Tracy that if he

23    wanted to get his 40 hours in working for Ace, he could go work

24    for Bella?  Do you recall any discussion like that?

25    A    Say that again.

1    Q    Sure.  Did you ever have any discussion with Dick Tracy in

2    which he came in and says I'm running out of work, I need 40

3    hours, and you said I can send you over to Bella Construction if

4    you want to work there, go to the Ithaca Town Hall project?  Do

5    you recall a discussion with Mr. Tracy like that?

6    A    I remember having a discussion with a few of them about if

7    they wanted to go to work, they should see Henry.

8    Q    Okay.  Did you send Mr. Tracy, while you were an Ace

9    employee, did you tell him if he wanted to get 40 hours in, he

10   could go over to the Ithaca Town Hall project and get his time

11   in?

12   A    I don't remember that conversation, no.

13   Q    You don't remember that conversation.

14   A    No.

15   Q    Okay.  Do you remember a meeting at which your father,

16   Henry, was present in the Ace offices and Derek Hager, Dick

17   Tracy, couple of other guys were there, and you said, look,

18   we're winding down Ace and if you guys want to stay working,

19   Henry's starting a company, he'll hire you?  Do you recall that

20   meeting?

21   A    I don't remember Henry being in the office, no, I don't

22   remember it.

23   Q    Let's get back to the meeting question.  Do you remember

24   having a meeting discussing with your key superintendents and

25   others that Ace was winding down and that Henry was starting a

1   company, and they may want to go work for Henry?

2   A    I also included --

3   Q    My question is do you remember that meeting?

4   A    Repeat the question.

5   Q    Sure.  Do you remember a meeting held in the Ace offices

6   while you were an Ace employee --

7   A    Yes.

8   Q    Indicating if people wanted to continue working, they'd

9   have to go work for -- could work for Henry's new company, Bella

10  Masonry.  Do you remember saying that to people?

11  A    The could part, yes.

12  Q    Okay.  What part was that?

13  A    You said it.

14  Q    You tell me.  I'm the lawyer, you're the witness.  What

15  exactly did you say?

16  A    That they could work for him.

17  Q    And what, well, how did that come up?

18  A    They asked about it.

19  Q    What did they say?  Who said what?

20  A    I can't remember specific conversations.  We had

21  conversations, multiple conversations.

22  Q    Who called this meeting?

23  A    It's not just one meeting.  We're talking about meetings

24  that lasted for almost four months.

25  Q    Okay.  Who called the meeting at which you and your

1  superintendents sat down and you suggested that if they wanted
2  to continue working, they could go speak to Henry about working
3  at Henry's company?  Who called that meeting?
4  A    I don't recall.
5  Q    Okay.
6  A    I mean most of the meetings were either asked for by the
7  superintendents because they needed to regroup or I had my
8  monthly one.
9  Q    All right.  You do recall a meeting, though --
10 A    Yes.
11 Q    -- where you spoke about what you viewed as a distressed
12 Ace Masonry and a new company your dad started, and suggested
13 they go speak to Henry about working there.  Do you recall that
14 meeting?
15 A    I suggested to them to find a new home.
16 Q    Okay.  And did you mention anything about Henry's new
17 company?
18 A    Yeah, I did.  I said he's starting a company.
19 Q    Okay.  And, in fact, Henry was at that meeting, but you
20 did the talking.  Isn't that the case?
21 A    I don't recall Henry being there.
22 Q    Okay.  What sort of talking did you do?  Obviously, you
23 did some.  You said what to them?
24 A    Like I said, I don't remember specific conversations.  I
25 could tell you generally what was talked about.

1  Q    Tell me generally, what did you say?

2  A    That Ace is winding down.  You guys need to start looking

3  out for yourselves.  Either try to go find a home with another

4  contractor and they asked me, well, what's Henry doing, we

5  understand he's starting a company.  And then it was rumored all

6  over the place.  I mean it's not like we just -- I brought them

7  into that room and said Henry is starting a business.  If it

8  happened that way --

9  Q    I'm not asking about that.  Did you make representations

10  that Henry may have job openings, and if they wanted a job, they

11  can go speak to Henry?  Is that what you told them?

12  A    I don't believe I said it like that, no.

13  Q    Okay.  Tell me exactly how you said it.

14  A    I don't know.

15  Q    Let's get this down the best of your recollection.

16  A    I'm not going to tell you because I don't know exactly how

17  I said it.

18  Q    Now Ace Masonry at the time of late summer, early fall,

19  there's a lot of masonry contractors in this area, union,

20  non-union, you name them, right, probably 15 in Tompkins County

21  alone, am I correct?

22  A    No.

23  Q    Ten?

24  A    No.

25  Q    All right, 15 in the surrounding counties.

1  A    Masonry contractors?

2  Q    Yes, masonry contractors.

3  A    In the Twin Tiers, there might be six of them.

4  Q    Okay.  Did you name any of the six masonry contractors?

5  Hey, so and so is hiring, you can go look for a job there.  Did

6  you mention other contractors other than Bella?

7  A    Yeah, I did.

8  Q    Did you?  Which ones did you mention?

9  A    Welliver McGuire, because those guys have talked about

10  Welliver.

11  Q    And what else?

12  A    That was the only one that I said they've got a lot of

13  work, you should make a call to Duane (ph.).

14  Q    Okay.  And you did mention Henry's new company, right?

15  A    Pardon?

16  Q    And you did mention Henry's new company.

17  A    They mentioned it.  And I said, yes, he is starting a new

18  company.

19  Q    Okay.

20       MR. FURLONG:  Can I have five minutes?

21       JUDGE CARTER:  Okay.

22  **(Whereupon, a brief recess was taken.)**

23       JUDGE CARTER:  Let's go back on.  Ready for additional

24  questions.

25       MR. FURLONG:  Thank you, Your Honor.

1    BY MR. FURLONG:

2    Q    Mr. Bellavigna, when we broke, I think in response to my

3    last question, you indicated that there's probably only six

4    masonry contractors in the whole southern tier, do you recall

5    that?

6    A    Yes.

7    Q    All right.  Are you familiar with a firm called Streeter

8    (ph.)?

9    A    Yes, I am.

10   Q    Do they do masonry work?

11   A    They are not a masonry contractor, no.

12   Q    Do they do masonry work?

13   A    I don't know that.

14   Q    You don't know, okay.  Ryecon, are you familiar with a

15   company called Ryecon?

16   A    No.

17   Q    Never heard of them?

18   A    No.

19   Q    No, okay.  Welliver McGuire, you testified about, right?

20   A    Yeah.

21   Q    They do masonry work.  How about Southern Tier, did you

22   ever hear of Southern Tier?

23   A    I didn't know they were still in business.

24   Q    Have you heard of Southern Tier?

25   A    Yes.

1    Q    Okay.  And if they were in business, do you know if they

2    do masonry work?

3    A    Yes.

4    Q    How about Alliance, did you ever hear of Alliance?

5    A    Yes.

6    Q    They do masonry work?

7    A    Yes.

8    Q    How about Dave Traver, a former partner at Ace, is he in

9    business for himself now?

10   A    Yes.

11   Q    Traver Masonry?

12   A    I don't believe it's Traver Masonry, but --

13   Q    Is he in business as a contractor?

14   A    He is a contractor, yes.

15   Q    Doing masonry work?

16   A    I don't know.  I don't work for him.

17   Q    Okay.  I'm not asking you if you worked for him.

18   A    I don't know.

19   Q    You don't know if Mr. Traver does masonry work, your

20   former partner?

21   A    Yeah, I assume he does, yes.

22   Q    Okay.  Minery, M-I-N-E-R-Y, ever hear of a firm called

23   Minery?

24   A    Yes.

25   Q    They do masonry work?

1   A    Yes.

2   Q    Pike Construction, ever hear of Pike Construction?

3   A    Yes, I have.

4   Q    Okay.  And they are a Rochester based company?

5   A    I don't know.

6   Q    Okay, you don't know where they are from.  Do they do

7   masonry work down in this area?

8   A    I have no idea.

9   Q    Okay.  Pike Construction, does it ring a bell with respect

10  to the Vestal job?

11  A    Yeah.

12  Q    How does it ring a bell?

13  A    They are the CM.

14  Q    They were the construction manager on that job?

15  A    I believe so, yes.

16  Q    Was there construction -- was there masonry work done on

17  that job?

18  A    Yes.

19  Q    By Bella?

20  A    Yes.

21  Q    Okay.  LeChase, did you ever hear of LeChase, big general

22  contractor out of Rochester?

23  A    Yep.

24  Q    Okay.  And do they do masonry work down in this area?

25  A    Slight, yeah.

1    Q    How about Value, you ever hear of Value?

2    A    Nope.

3    Q    Never heard of Value Contracting?

4    A    No.

5    Q    How about Lupini, you ever hear of Lupini?

6    A    Yep.

7    Q    They do masonry work?

8    A    Restoration.

9    Q    Masonry restoration.

10   A    Um-hum.

11   Q    And Ace did masonry restoration, too?

12   A    Um-hum.

13        JUDGE CARTER:  Is that yes?

14        THE WITNESS:  Yes.

15   BY MR. FURLONG:

16   Q    And Bella Construction does it as well?

17   A    Yes.

18   Q    How about R.E. Kelly, ever hear of R.E. Kelly?

19   A    Yes.

20   Q    They do masonry work?

21   A    They're a restoration contractor.

22   Q    They do masonry work?  Masonry restoration?

23   A    Yes.

24   Q    Same as Bella and Ace did?

25   A    Yes.

1  Q    How about Castler (ph.), you ever hear of Castler?

2  A    Yes, sir.

3  Q    Do they do masonry work in this area?

4  A    Yes.

5  Q    How about Ithaca Stone Setting, you ever hear of them?

6  A    Yes.

7  Q    Do they do masonry work in this area?

8  A    They do stone work, yes.

9  Q    Okay.  Stone work such as Ace and Bella would do, correct?

10  A    Yes.

11  Q    How about Slocum Masonry (ph.), you ever hear of them?

12  A    No.

13  Q    Never heard of them, okay.  So would you agree with me

14  that your statement that there's probably only six masonry

15  contractors in the southern tier that do this type of work?

16  A    I'm saying there's six masonry contractors of the same

17  stature as Ace.

18  Q    Putting aside stature and all that sort of thing, when you

19  had this meeting with your key people, your superintendents and

20  others, okay, we're winding down, you did mention that Henry was

21  starting a company, all right?  Did you mention anything

22  about --

23  A    No, I did not.

24  Q    -- checking work out at --

25  A    Don't put words in my mouth.

1  Q    -- Mancini, or Traver, or Alliance, or any of those

2  others?

3  A    No, did not say that.  Rephrase it.

4  Q    At one point during the questioning from the general

5  counsel, she asked you if you ever got paid by Bella or Ace for

6  work done for the other company.  And your response was, and I

7  think I got it down exactly, was I think it happened once.

8  There was an error in the paychecks, but they got it

9  straightened out.  Do you recall that?

10  A    No.

11  Q    You don't recall responding --

12  A    No, I didn't say -- I don't believe it was that way.

13  Q    Okay.  Tell us did you ever get paid for one company while

14  performing duties for another company?

15  A    When I went to work for Bella, the controller printed off

16  a check for the last week meaning the following week from the --

17  Q    The controller who?

18  A    Jalinda.

19  Q    I didn't ask her name.  The controller for what company?

20  A    Ace printed off a check --

21  Q    An extra paycheck for Ace?

22  A    Yes.  And I turned it back in.  So when you first look at

23  the check register, there is negatives in there back, in the

24  back alleys.

25  Q    Okay.

1  A    I just wanted to make that point.

2  Q    Okay.  And by the way, that would have been in December of

3  2011?

4  A    I think she paid me the week of the 26th when she should

5  have only done it to the 9th or something like that.

6  Q    Okay.  But your employment from Ace over to Bella was

7  seamless to the extent there was no gap or anything like that,

8  right?  You stopped working at Bella -- at Ace one day and the

9  next workday were employed by Bella Masonry, is that correct?

10  A    It happens all the time, yes.

11  Q    I didn't ask how often it happens.  Is that what happened

12  with you?

13  A    Yes.

14  Q    And if I look at payroll records that actually have been

15  introduced here, your compensation at least with the hourly rate

16  was the same, $30 an hour for Ace, $30 an hour for Bella.  Isn't

17  that correct?

18  A    I don't believe it is, but I can double check on that.

19  Q    What are you getting paid now per hour working for Bella?

20  A    I'm not sure right now.  I'd have to look at it.

21  Q    Are you hourly or are you salaried?

22  A    They pay me by the hour.

23  Q    Okay.  And you don't know what you're getting paid?

24  A    Not in my business.

25  Q    Okay.  And do you know what you got paid at Ace Masonry?

1  A     The wage exactly, I don't remember what the wage it.

2  Q     Okay.  You had negotiations with your father with respect

3  to possibly going to work for his masonry company.  Remember

4  that, those discussions?

5  A     Yep.

6  Q     Okay.  And when did those negotiations begin?

7  A     I don't recall the exact date.  I don't remember an exact

8  date.

9  Q     Okay.  Putting aside the exact date, was it sometime in

10  the fall of 2011?

11  A     Yes.

12  Q     Okay.  And did you put a wage or salary proposal and

13  benefit proposal on the table with your father, with respect to

14  what you expected to get paid?

15  A     Yes.

16  Q     And is it your testimony here, today, you can't recall

17  what you were demanding to get paid?

18  A     Because I'm not getting it yet, but --

19  Q     My question is, back to my question, you don't recall now

20  what your demands were to the Bella company with respect to your

21  compensation?

22  A     Yeah, I wanted $60,000 a year.

23  Q     Okay.  In salary or hourly?

24  A     Break it down by the hour, that's how he pays me, by the

25  hour on $60 grand a year.

1    Q    Okay.  You want to be able to max out at $60 or at least

2    get a minimum $60,000 a year, correct?

3    A    Yes.

4    Q    And you were getting that when you were at the Ace company

5    at $30 an hour, were you not?

6    A    I assume.  I'd have to look back at it, but --

7    Q    Okay.

8         MR. FURLONG:  Can we go off the record for one minute?

9         JUDGE CARTER:  Okay.  Off the record.

10   **(Discussion off the record.)**

11   BY MR. FURLONG:

12   Q    Mr. Bellavigna, would you take a look at General Counsel's

13   Exhibit 3 and General Counsel's Exhibit 26?  On both documents,

14   I would ask that you locate your name.

15   A    What's the other one?  Okay, what would you like me to

16   look at?

17   Q    Okay.  If you take a look at GC-3?

18   A    Yep.

19   Q    All right.  Ace payroll records.  Can you locate your

20   name, Robert P., field supervisor, project coordinator?

21   A    Yep.

22   Q    Okay.  And it has a rate of pay there of $30 an hour,

23   right?

24   A    Yep.

25   Q    Does that help refresh your recollection as to what you

1   were getting paid?

2   A    Yep.

3   Q    Any reason to doubt that the Ace payroll records put in by

4   Mr. Bailey are not accurate?

5   A    I assume they're accurate.

6   Q    Okay.  Now let's take a look at GC Exhibit 26.  If you go

7   to Page 8 of 25 --

8   A    That one came apart there.  Okay, I'm there.

9   Q    All right.  Do you see where it says pay rate for Robert

10  P. Bellavigna?

11  A    Yep.

12  Q    Tell us what it says.

13  A    $30 an hour.

14  Q    Same as you were making at Ace, right?

15  A    Yep.

16  Q    Does that help refresh your recollection as to how you

17  were getting paid the exact same at Bella as you were at Ace?

18  A    Yep.

19  Q    Now when you were negotiating with Mr. Henry Bellavigna,

20  your dad, with respect to possibly going to work for his

21  company, remember your testimony?

22  A    Um-hum.

23  Q    Were you also sending out resumes to some of these others

24  that I just mentioned, Ryecon, Streeter, Traver, Pike, LeChase,

25  some of these other masonry contractors?

1    A    Actually, to the Edger and ACP.

2    Q    Okay.  You sent resumes in to them?

3    A    Actually, I had interviews with both of them.

4    Q    Okay.  So when during the break here, if we subpoena them

5    back, they'll be able to testify about having interviews and so

6    forth?

7    A    Yes.

8    Q    Okay.  And when did those interviews take place?

9    A    Actually, I believe I interviewed with Edger before,

10   before any of this even took place, before Henry even was in

11   business.  I knew things weren't looking good and I wanted to

12   see where the marketplace --

13   Q    July, August, May?  When did you interview with Edger?

14   A    I don't recall.  You can ask --

15   Q    Okay.  And what other company did you interview with?  And

16   by the way, is Edger, because I didn't list them on this list,

17   are they a masonry contract, would we add this to our list of

18   area masonry contractors?

19   A    They do masonry.

20   Q    Okay.  They operate in this area?

21   A    Yeah.

22   Q    Okay.  And you don't recall when you interviewed with

23   them?

24   A    That's the one I worked on.  No, I don't recall the exact

25   date, no.

1  Q    Okay.  Did you have one interview, multiple interviews?

2  A    Just one interview with Dan Lambs (ph.).

3  Q    Okay.  And did you have a salary demand for them?

4  A    No.  I just talked about the marketplace and, you know,

5  what they had out there and where they were going with their

6  masonry company.

7  Q    Okay.  Did you submit a resume?

8  A    Pardon?

9  Q    Did you submit a resume?

10  A    It wasn't necessary.  Dan knew me.  He knew my --

11  Q    Okay.  You had a meeting with Mr. Williams?

12  A    Yes, I did.

13  Q    And you discussed where the market is going and things

14  like that?

15  A    And if there was a place here for me.

16  Q    Okay.  But you didn't make a salary demand or wage demand,

17  or anything like that?

18  A    No, I did not.

19  Q    Okay.  And when was that meeting?  Your testimony is you

20  can't recall.

21  A    I do not recall.

22  Q    Okay.  Did you follow-up on that meeting or did you just

23  basically close the deal with your dad?

24  A    No.  He pretty much told me -- Dan and I talked, and when

25  I asked him if there was a place there for me, he said no.

1    Q    Okay.  So that option was closed, right?  What other

2    places did you look for a job?

3    A    That would have been with Aaron Maltrip (ph.), at

4    Architectural Concrete Plus (ph.).

5    Q    Okay.  Do they do masonry work?

6    A    No, they do concrete work.

7    Q    Okay.  And concrete work such as Ace did?

8    A    Concrete.  Ace doesn't do concrete.

9    Q    Okay.  So that employer was outside your area of expertise

10   with respect to being a mason?

11   A    Not at all.

12   Q    Okay.  And did you actually meet in their offices and

13   submit a resume or anything like that?

14   A    Didn't need to.

15   Q    Okay.  Did you meet in their offices?

16   A    We talked multiple times.  I don't think we ever did meet

17   in the office, come to think of it.

18   Q    Either your office or their office?

19   A    No.

20   Q    Did you make any applications online?

21   A    No.

22   Q    Salary demands to them?

23   A    I asked.  We talked about it.

24   Q    Okay.  And what did you tell them?

25   A    Pardon?

1    Q    What did you tell them?  I want to know how vigorous,

2    other than Bella Masonry, I want to know who vigorous your job

3    search was.  What did you tell them with respect to your salary

4    demands?  If they were sitting there, what do you think they

5    would testify to?  What did they hear?

6    A    You know, we talked about the same money, about $60 grand

7    a year is what I need.

8    Q    Okay.  And what was the response?

9    A    Pardon?

10    Q    What was the response?

11    A    You're going to have to go somewhere else.

12    Q    Okay.  And when did you have this meeting?

13    A    There was multiple meetings.  The nearest one I had was

14    probably four weeks ago.

15    Q    From now?

16    A    Yes.

17    Q    How about prior to September of 2011?

18    A    I don't recall the date on that.

19    Q    As you sit here now under oath, are you prepared to say

20    that you made job applications to that contractor prior to July

21    or prior to September of 2011?

22    A    Say that one more time.

23    Q    Sure.  I'll say it one more time.  Prior to September of

24    2011, is it your testimony here now that you made job

25    applications to that contractor that you just mentioned?

```
1    A    I didn't fill out any job application.
2    Q    Did you meet with them about your job prospects prior to
3    September of 2011?
4    A    And I don't know the specific date.
5    Q    Forgetting the specific date.  Give me a month.  When did
6    you first talk to them about meeting?
7    A    I don't know.
8    Q    You don't know?
9    A    No.
10   Q    Okay.  But you have been speaking to them in the last four
11   weeks or so?
12   A    Yes, I have.
13   Q    So you can't testify with any certainty that you ever
14   spoke to them before you signed on with Bella Masonry?
15   A    Say that one more time.
16   Q    You can't testify with any certainty that you explored job
17   prospects with that firm before you signed on with Henry at
18   Bella Masonry?
19   A    Yeah, you can call the owner up and ask him.
20   Q    No, I'm asking you.  You're on the witness stand right
21   now.  Do you recall with any certainty having made a job
22   application or sought employment at that contractor?
23   A    Yes.  I talked to that contractor before Henry.
24   Q    Okay.  And when was that, you don't recall?
25   A    Like I said, there was a couple of meetings with those
```

1  guys.

2  Q    In person?

3  A    In person.

4  Q    To discuss your job prospects?

5  A    Yes, because there's multiple owners there and I had that

6  meeting with them.

7  Q    Okay.  And that took place before September 2011?

8  A    The one with Aaron took place before September.  Bobby was

9  involved in the last couple.

10  Q    Okay.  And it didn't pan out?

11  A    No, I still have a job offer in there.

12  Q    Now in response to questions put to you by the general

13  counsel, she asked you if you had an explanation as to why your

14  picture and the description of your skills would appear on an

15  October 2011 website for Bella, when you hadn't yet been hired.

16  Do you recall that testimony?

17  A    Yeah, well --

18  Q    Do you recall that question?  And do you recall your

19  response being words to the effect, well, we knew I was going to

20  go with Bella and so he probably put it on there?

21  A    I said I was in negotiations.

22  Q    Probably put it on there because they knew I was going to

23  be going over to Bella.  Do you recall that testimony?

24  A    Yes.

25  Q    Okay.  And so pretty much in September of 2011, you knew

1    you were going over with the new company, right?

2    A    Before when?

3    Q    Or I should say at least as of September 2011, you knew

4    you were going over to the new company?

5    A    I don't remember any specific dates, so I'm not going to

6    agree to that.

7    Q    Okay.  Mr. Bellavigna, there were some questions put to

8    you by the general counsel concerning the collective bargaining

9    agreement and in particular with the Bricklayers.  Do you recall

10    those questions?

11    A    Refresh my memory.

12    Q    Sure.  She asked you if you understood that Ace Masonry

13    had a collective bargaining agreement with the Masons.

14    A    I knew they had one in 2002, yes.

15    Q    You knew they had one in 2002, okay.  Since 2002, you've

16    been a union member up until very recently, isn't that correct?

17    A    Yes.

18    Q    And you got a paycheck every week with respect to your

19    services for the Ace Masonry company?

20    A    Yes.

21    Q    And would you agree with me that the pay stub that you

22    received every week showed union dues deductions?

23    A    I don't get a pay stub.  I do direct deposit, so I don't

24    really look at it.

25    Q    Well, even with direct deposit, anybody who has direct

1    deposit gets, still gets an accounting of their check being

2    deposited with deductions.

3    A    I know what you're talking about, but I don't see it.  My

4    wife handles my money and that's what happens.

5    Q    Okay.  So your testimony as you sit here now is that you

6    have no knowledge of paying union dues for the last 12 months --

7    12 years?

8    A    No.  I'm not saying that.

9    Q    Okay, tell us.

10   A    You're asking me about a pay stub.  I never see the pay

11   stub is all I'm saying.

12   Q    Tell us, to your knowledge, were you paying union dues for

13   the last 12 years?

14   A    I wasn't.

15   Q    Were the union dues being deducted out of your check?

16   A    Yes.

17   Q    All right.  And do you know or would you agree with me

18   that dues are only deducted out of the check when there is a

19   collective bargaining agreement that permits the deduction of

20   those dues?

21   A    I don't know that.

22   Q    Okay.  How about contributions to the health and welfare

23   and to the pension and to the annuity of the Masons' trust

24   funds.  You are well aware that you were making contributions

25   each and every paycheck to those trust funds, were you not?

 1   A     Yes.

 2   Q     All right.  And, in fact, the Masons who were employed by

 3   Ace Masonry were making the same contributions out of their

 4   checks to those trust funds, correct?

 5   A     Yes.

 6   Q     All right.  And you were a trustee for several funds for

 7   the Laborers, were you not?

 8   A     Yes.

 9   Q     Including their pension, their health and welfare, their

10   testimony fund, right?

11   A     Yes.

12   Q     And you were a trustee from roughly 2007 through 2011,

13   correct?

14   A     Yes.

15   Q     And attended trust fund meetings and had some working

16   knowledge about Taft-Hartley trust funds?

17   A     I think I made one meeting in that amount of years, two

18   meetings maybe.

19   Q     These meetings were held quarterly.

20   A     Yeah.

21   Q     Mr. Bellavigna, is your testimony that you never attended

22   these meetings other than one or two in four years?

23   A     Yes, sir.

24   Q     Okay.  Now are you aware of the fact that trust fund

25   contributions on your behalf, putting aside the employees, can

1  only be made pursuant to a collective bargaining agreement?  Are

2  you aware of that?

3  A    I don't know the rules, no.

4  Q    Okay.  So whether it be as a superintendent or a 30-year

5  member of the Bricklayers, or as a trust fund trustee for

6  another local, you're not aware of the fact that those

7  contributions are made on behalf of union employees pursuant to

8  a union contract?

9  A    Yes, I do understand that.

10  Q    Okay.  Tell me more about it.  How do you understand it?

11  A    Just that they are deducted out of the, or they're in the

12  check.

13  Q    Okay.  Well, let's approach this from a different

14  direction.  When you went to work for Bella, did your checks

15  show those same deductions as they did with Ace?

16  A    It's a different company.

17  Q    Did they show the same deductions?  That's my question.

18  A    I don't get my paycheck, so --

19  Q    Okay.  So as you sit here now, you don't know whether or

20  not Bella is actually paying your health and welfare, your

21  pension, and your annuity.  That's your testimony?

22  A    I'm saying I don't believe they do, no.

23  Q    Okay.  And you don't believe they take out union dues,

24  correct?

25  A    Right.

1  Q    All right.  So if it was being done at Ace and not Bella,

2  what's the difference between the two companies, to your

3  knowledge?

4  A    One is union and one is non-union.

5  Q    Which one was union?

6  A    Ace.

7  Q    And which one is non-union?

8  A    Bella.

9  Q    And that's your understanding, correct?

10 A    Yes.

11 Q    All right.  And that would be your understanding with

12 respect to the deduction of benefits and submission of benefits,

13 and deduction of dues all the way up to the time that you left

14 in December of 2011, correct?

15 A    I don't know.  I'm not comfortable answering those

16 questions.

17 Q    You're not comfortable because you don't understand it?

18 A    Because I don't understand it, yes.  It's something I

19 don't understand.

20 Q    Up until the time that you left Ace Masonry in December of

21 2011, was the Ace Masonry company making contributions on your

22 behalf to the health and welfare, the pension, the annuity, and

23 the other --

24 A    Yes.

25 Q    Okay.  And were they also making union dues deductions and

1  sending it to the union?

2  A    Yes.

3  Q    All right.  And after the day that you began at Bella,

4  those deductions ceased with respect to Bella's paycheck to you,

5  am I correct?

6  A    Yes.

7  Q    And do you understand, given your experience both as a

8  trustee, union member for 30 years, working with trades, that

9  collective bargaining agreements are the contracts that

10  compelled those deductions and remittances?  Isn't that your

11  understanding?

12  A    Yes.

13  Q    All right.  Now with respect to your 12 years at Ace

14  Masonry, did you ever know that contractor to make payments to

15  vendors, subcontractors, or any other institutional interests

16  where the contractor, where Ace did not believe it had an

17  obligation to make those deductions or payments?

18  A    I'm not in the accounting end.  I couldn't tell you.

19  Q    But you are married to the president of the company, so

20  let's approach it from that direction.  Did you ever know Ace to

21  make payments when it did not believe it had a contractual

22  obligation to pay?

23  A    I'll say again I don't deal with that part of the business

24  and I don't know.

25  Q    Knowing your wife the way you know her -- how long have

1    you been married?

2    A    We don't bring work home.

3    Q    How long have you been married?

4    A    We don't bring work home.

5    Q    How long have you been married?

6    A    Twenty some years.

7    Q    Okay.  And you never discussed --

8    A    I don't know.

9    Q    Did you ever discuss the finances or how the company was

10   working with your wife?

11   A    No.

12   Q    Okay.  You did testify that you knew the company was

13   distressed and that's why you held the meeting with all the

14   different superintendents, remember?

15   A    Yes.

16   Q    Okay.  And you didn't learn that from your wife, did you?

17   A    I guess if you put it that way, yeah, we did.

18   Q    Okay.  So you had discussions regarding the financial

19   situation with your wife, right?  Do you want to revisit your

20   answer to me three questions ago that you never discussed the

21   finances of the company with your spouse that you were married

22   to for a couple of decades?

23   A    It's a total different -- you're putting it in a different

24   aspect in my mind, so I can't really answer that.

25   Q    You can't answer that.  So to your knowledge, maybe Ace

1    Masonry did give away money that it didn't owe, just made

2    payments that it didn't have any contractual obligation.  It may

3    have done that, that's what your testimony is?

4    A    I have no idea what they did in accounts payable and

5    receivable.

6    Q    Supplies and anybody else?

7    A    I don't know.

8    Q    Okay.

9    A    I didn't handle it.  I don't know.

10    Q    You testified about these meetings that you had with

11    superintendent while you were at Ace.  Do you recall that?

12    A    Yes.

13    Q    And as I wrote it down was you said that you ran the

14    meetings with the superintendents.  Do you recall that

15    testimony?

16    A    Yes.

17    Q    All right.  And why did you run the meetings?  I mean who

18    are you, what gave you the title or authority to do that?

19    A    As a project coordinator.

20    Q    Okay.  So tell me was that within the scope of your job

21    duties at Ace?

22    A    Along with John Franzese at the end, yes.

23    Q    Okay.  Franzese didn't join until what, 2010?

24    A    I don't remember the exact date, somewhere --

25    Q    He was in charge basically of the millwork and the

1   carpentry work, right?

2   A    The general trades part of the business.

3   Q    The masonry part, you were still the man.  You were still

4   the superintendent dealing with Derek Hager, and Dick Tracy, and

5   these guys, right?

6   A    Yes.

7   Q    That didn't change?

8   A    No.

9   Q    And you still held meetings with these guys, right?

10  A    With everybody.

11  Q    Okay.

12  A    The carpenters, millwrights --

13  Q    But you stated in response to the question from the

14  general counsel that you ran the meetings.  That was true, you

15  did run the meetings, right?

16  A    Yeah.

17  Q    Okay.  And if there were problems from the superintendents

18  or anything else, they had to come to you and express it at that

19  meeting so you could deal with it and instruct them, right?

20  A    Yes.

21  Q    All right.  And let's set the stage here.  You walked into

22  the Ace company, at that time, you had over 20 years of masonry

23  experience, right?

24  A    Say that again.

25  Q    Yeah.  When you walked in, in 2002, to the Ace company,

1    when your wife started it, that time you had over 20 years of
2    masonry experience.  Am I correct on that?
3    A    Sure.
4    Q    Sure.  You had been a project manager for Welliver
5    McGuire, right?
6    A    Yes.
7    Q    Okay.  And you had been a masonry security interview for
8    Welliver McGuire for many years, right?
9    A    Yes.
10   Q    And before that you were a foreman for McGuire and Bennett
11   for many years.
12   A    Yep.
13   Q    Ten years, right?  And you were a masonry superintendent
14   for four years with the same firm, right?  This has been your
15   life.
16   A    Yes.
17   Q    You know the industry.
18   A    Yes.
19   Q    Right?  Your wife on the other hand, up until the time she
20   started this company in 2002, had zero masonry experience, isn't
21   that the case?
22   A    No.  I mean she's got general knowledge of it.  You marry
23   a mason, you know masonry.
24   Q    So you guys discuss the masonry work but not the financial
25   aspect of it?

1    A    Hum?

2    Q    You guys discussed the masonry work, how to lay block, but

3    never the books or anything like that?

4    A    No, I made her help me on weekends.

5    Q    Yeah, okay.  In terms of her masonry experience, we can

6    agree, very limited.

7    A    Yes.

8    Q    Okay.  But you go in with several decades, at least 2, and

9    now it's over 3, and Henry, your father, goes in, in 2002, with

10   over 50 years or at that time 40 years of masonry experience,

11   right?

12   A    I'm not sure when he started.  I don't believe it was

13   2002.  I can't remember that.

14   Q    Let's say it was 2004.  I think I did misspeak.  Let's say

15   he came in 2004.  You're still talking maybe 40 years, 40 plus

16   years of masonry experience, right?

17   A    Um-hum.

18   Q    Am I correct?

19        JUDGE CARTER:  That was a yes?

20        THE WITNESS:  Yes.

21   BY MR. FURLONG:

22   Q    Okay.  So you add his 50 years and your 30 years, between

23   the 2 of you, you had 80 years of masonry experience in the

24   superintendent meetings that you're holding with your staff come

25   2011, right?

1  A     He's not in there.

2  Q     Okay.  Take him out of the equation, it still leaves 30,

3  right?  Okay.  Your wife is sitting in these meetings and she's

4  basically -- she's not sitting in the meetings?

5  A     Only when she needed to be.

6  Q     Okay.  So if it was a meeting with the superintendents to

7  discuss scheduling, work, all that sort of stuff, you conducted

8  it and handled the problems, right?  That was your role in the

9  company.

10  A     You got it.

11  Q     All right.  Now with respect to Bella Masonry, you meet

12  with Randy Bell, your superintendent, to discuss work, do you

13  not?

14  A     Yes.

15  Q     And I'm assuming the same types of issues come up with Mr.

16  Bell as came up with the superintendents when you were with Ace

17  Masonry, right?  Scheduling issues, manpower issues, whatever

18  they may --

19  A     We don't have a roundtable meeting at Bella.

20  Q     I'm not asking you the form of the meeting.  But when you

21  discuss job site issues, the same issues come up, right?  This

22  is what you've been doing for 30 years.

23  A     Yes.

24  Q     Am I correct on that?

25  A     Yes.

1  Q    There was a time when your wife took a leave of absence

2  from Ace Masonry, correct?

3  A    Yes.

4  Q    And that was roughly what, July or August of 2011?

5  A    I don't believe it was that early.  I can't remember.

6  Q    To the best of your recollection.

7  A    I'm going to say probably September, October, I believe,

8  somewhere around there.

9  Q    A little bit later, okay.

10  A    Huh?

11  Q    Just about the time that Bella Masonry began its

12  operations in September?

13  A    I, I'm not very good with time, so I can't really say, no.

14  Q    You don't know?

15  A    I don't remember, no.  It was a bad time in my life, too.

16  Q    I can commiserate with that and I appreciate that, all

17  right, but for the moment, if we can put that aside, when she

18  left the business, you hired a controller.

19  A    Yep.

20  Q    Jalinda Ashmall, correct?

21  A    Yes.

22  Q    And she in essence stepped into the shoes of your wife

23  performing those duties.  Am I correct on that?

24  A    Not all her duties, but the accounting, yes.

25  Q    The bookkeeping and so on.  She runs a business, a

1  bookkeeping business, right?

2  A     Yes.

3  Q     And so she came in and kept the accounts as Lisa

4  Bellavigna had been doing prior to her departure, right?

5  A     Um-hum.

6  Q     Now as to those duties performed by Lisa Bellavigna that

7  were not picked up by Jalinda Ashmall, who performed those

8  duties?  Or were they parceled out to different people?

9  A      Well, I mean we all stepped in and went above and beyond

10  what we were supposed to do, you know, as a good person would do

11  in that way.  And I might be wrong, it was a very short period

12  of time that she was out, long enough to where I had to sign a

13  couple of checks without her being there or taking them to her

14  to review those and have her sign them.

15  Q     All right.  So my question once again is other than what

16  Jalinda Ashmall did in terms of stepping into the shoes of Lisa

17  when she departed, who picked up the remainder of your wife's

18  duties?

19  A     It was shared.

20  Q     Between who?

21  A     Everybody.

22  Q     Did Henry step up to the plate?

23  A     Whatever needed to be done, Missy did, Henry did, John

24  did, the junior project engineer stepped up.

25  Q     And you did.

1   A     Yes, and I did, yes.

2   Q     Everybody chipped in, right?

3   A     Everybody, including the field people.

4   Q     Just a couple of more questions, Mr. Bellavigna.   The

5   website that we've been discussing throughout the questioning,

6   take a look at GC-27.

7   A     Um-hum.

8   Q     Are you familiar with a Bella Masonry brochure, written

9   paper brochure that reads the same as this website?

10  A     So this is actually, you printed this, this is the web --

11  Q     This is obviously printed off a website.   Putting this

12  aside, a brochure --

13  A     No, no, I --

14  Q     -- produced by Henry Bellavigna.   Are you familiar with a

15  brochure produced by Henry Bellavigna that reads the same as

16  this website?

17  A     My question to you was this is the website?   I've never

18  seen it, so you're saying this was printed --

19  Q     I want you to make the assumption that what you have in

20  front of you as GC-27 was the website as of 10/26/11.   With that

21  assumption in mind --

22  A     Yep.

23  Q     Taking a look at it --

24  A     Yep.

25  Q     -- was there a brochure for Bella Masonry?

1  A    Yes, there was.

2  Q    A written brochure with Bella Masonry?

3  A    Yes.

4  Q    That read the same as this?

5  A    No.  It doesn't have a lot of this information in it.

6  Q    Such as?

7  A    Well, I know it doesn't have all these employees in it.

8  Q    The brochure doesn't?

9  A    The brochure does not have those employees in it.

10  Q    Does it have the letter from the president?

11  A    It's got a letter from the president.  I don't know if

12  it's identical or not.  I'd have to get it in front of me, I

13  guess.

14  Q    Okay.  So the pictures of the employees from you to Mr.

15  Hager, to your son, to Melissa, none of that stuff appears in

16  the brochure, right?  Is that your testimony?

17  A    I don't know if the pictures are the same, but there is a

18  picture of my father.

19  Q    How about you?

20  A    I don't know if there's pictures of these jobs.  I'm not

21  sure.  I don't remember seeing those.  I don't do a lot of the

22  marketing like that with Bella, as I did with Ace, so I don't

23  use it as a tool, so --

24  Q    Okay.  So as you sit here now and take your time, I don't

25  want you to feel rushed.  As you sit here now, as you look at

1  this, your testimony is your belief that there is material

2  differences between this website download printed out and the

3  Bella Masonry brochure that has been produced by Henry?

4  A    Yes.

5  Q    Now getting back to Ace Masonry, did they have a brochure

6  in which they listed their clientele, and their jobs, and their

7  references with pictures of the employees?

8  A    Yes.

9  Q    Okay.  So their brochure differed from the Bella brochure,

10 is that your testimony?

11 A    Differed?

12 Q    Yeah.  One had pictures, one didn't.  One had clients, one

13 different, is that your testimony, if you recall?

14 A    Are we on Bella or Ace now?

15 Q    I'm asking you, comparing the two brochures, not the

16 website, the two brochures.

17 A    Okay.

18 Q    You testified there was an Ace brochure, right?

19 A    Yes.

20 Q    Who produced the Ace brochure?

21 A    I don't know who produced it.

22 Q    You don't know if it was your wife, Henry, Melissa?

23 A    I believe it was a group of people.

24 Q    Okay.  With your familiarity of the Ace brochure, did it

25 look like the Bella Masonry website with the exception of Bella

1    Masonry being listed in the place of Ace, if you know?

2    A    They're very similar.

3         MR. BAILEY:  I'm just trying to be clear because he's

4    looking at the webpage.  Are you asking about the brochures?

5         MR. FURLONG:  You know what, I'm going to withdraw the

6    whole line of questioning.  Feel free to ask him --

7         MR. BAILEY:  No, no, I think he's confusing the two.

8    BY MR. FURLONG:

9    Q    All right.  Let me ask you this, forget Ace for a minute.

10   Is there a Bella Masonry brochure that you hand to prospective

11   customers?  A written --

12   A    I haven't done that, no.

13   Q    Are you aware of a --

14   A    There is, yes, there is.

15   Q    What is it?  Is it folded in?  Is it a multipage document?

16   What does it look like?

17   A    It's blue.  I don't know if it's multi-folded or not.  I

18   really haven't had to handle it.

19   Q    Okay.  And with your knowledge of that brochure, is it

20   your testimony that it differs from the website, assuming this

21   is an accurate picture of the website --

22   A    Yes.

23   Q    It differs from the website to the extent the pictures of

24   the employees aren't on there, with the possible exception of

25   Henry and some others?

1   A    I don't know even know if that's the same picture.  It's

2   awful dark.  And I don't know if it's the same picture.  I don't

3   know if there is some of these other pictures on there with the

4   client list.  I don't know if it's identical.  I really haven't

5   had the time to study it.  So I haven't, I haven't used it as a

6   tool as if I were -- as if I did with Ace.  Henry has been

7   handling that.

8   Q    Okay.  Thank you, Mr. Bellavigna.

9   A    No problem.

10       JUDGE CARTER:  Mr. Jameson?

11                    **FURTHER DIRECT EXAMINATION**

12  BY MR. JAMESON:

13  Q    Mr. Bellavigna, did I hear correctly in I believe the

14  testimony, response to the question that Mr. Furlong asked you

15  that you weren't sure if you were Bob.Bellavigna@gmail.com,

16  address work, email address?

17  A    If it worked?

18  Q    Yes, if it was working?

19  A    I don't use it, so I don't know.  I mean I just don't use

20  it.

21  Q    When you answered that question, I thought the answer, so

22  it is correct, you weren't sure, you're not sure?

23  A    Yep.

24  Q    I emailed you and you heard your phone ding in the middle

25  of your answer?

```
 1   A      It might have, I didn't --
 2   Q      And your eyes kind of lit up.  And then when you went to
 3   turn you phone off, you checked my email before you shut your
 4   phone off?
 5   A      No.
 6   Q      Can you turn your phone back on and I'll email you again.
 7   We'll make sure it works.
 8   A      No, that's fine, I believe you.
 9   Q      Okay.  So you believe your email address does work?
10   A      It says it right on the phone.
11   Q      Why didn't you -- you had a conversation with some of
12   these workers about looking for other work because Ace was going
13   down the tubes, my words not necessarily yours, and they asked,
14   to your testimony, they asked about perhaps going with Henry.
15   If John Franzese was your contemporary, why didn't you offer
16   maybe to John that he could go with Henry?
17   A      I'm trying to remember when John left.  I think he might
18   have left before that happened.
19   Q      Well, we have GC --
20   A      I don't remember.  I'd have to look at it.
21   Q      And he left 9/28/11.
22   A      Who did?
23   Q      Franzese, John G.
24   A      Yeah, I -- 9/28/11 is his last day, so those guys were
25   there long after he left, right?
```

1  Q    Right.  But I thought you said that you had -- you were

2  talking to the other people, it was well-known that Ace was not

3  doing well, that Ace might not stay in business, that there were

4  rumors.

5  A    Pardon?

6  Q    That there were rumors, your words, rumors that Ace was

7  not doing well, that everyone knew about it.

8  A    Yes.

9  Q    And you talked to people within Ace.

10  A    I kept all my employees up to date of where we were and

11  what we're trying to do to solve it.

12  Q    Your employees?

13  A    Pardon?

14  Q    Your employees?  I thought they were Lisa's employees.

15  A    They are Lisa's employees.

16  Q    Because you and Lisa don't talk business at the kitchen

17  table.

18  A    We are -- we use we a lot in our lot because we're a team.

19  So you'll have to excuse me, but I've always been a team player

20  in the business.  And when -- I'm a team player, so we use those

21  types of words all the time.

22  Q    Team player is great.  Married for 20 years, you better be

23  a team, otherwise it wouldn't last.  If you're a team player,

24  you're married for 20-some odd years, how come you're not

25  talking business at the kitchen table?

 1  A    I never have.  My father never did and I never have done

 2  it.

 3        MR. JAMESON:  All right.  Nothing further.

 4        JUDGE CARTER:  Any cross?

 5        MR. BAILEY:  A couple of moments, Judge, please?

 6        JUDGE CARTER:  We can go off the record a minute.

 7  **(Whereupon, a brief recess was taken.)**

 8        JUDGE CARTER:  We're back on the record and ready for Mr.

 9  Bailey.

10        MR. BAILEY:  Yes, briefly, Your Honor.

11                       **CROSS-EXAMINATION**

12  BY MR. BAILEY:

13  Q    Bob, opposing counsel had asked you earlier on, much

14  earlier on about how your job differs at Bella as compared to

15  Ace.  And I think you actually asked if she wanted you to

16  explain that and she said no and cut you off.  So if you can

17  elaborate on the differences at your job with Bella compared to

18  Ace.

19  A    For Ace, starting I had to deal with estimating, not only

20  estimating but help assist some of the estimators run down

21  prices and stuff like that, trying to get quotes in the door,

22  did some middles for projects, scheduling, reviewed change

23  orders, compared them to the scope of work to make sure they are

24  real change orders.  Also, with Ace, there was we had a field

25  guy, not a field guy, but an in-house mechanic.  It was my job

1    to make sure that he had equipment prepared and ready to go to

2    all the sites and that it was safe to use.  I assisted the

3    safety director in reviews, if he had questions about maybe not

4    a safety director's expertise of scaffolding, hydro, you know,

5    things that he would have questions on that he wasn't sure

6    about, I would help him do that.

7         So office-wise, that was my kind of duties in the office

8    that I do not do, I mean I help, well, let's just stick to Ace

9    first.  So those are my duties basically in the office as far as

10   what really I have to do, my job duties were besides specific

11   project management duties.  I mean the specific project

12   management duties with Bella and Ace are fairly similar.  But as

13   far as the other work in the office, I don't do that at Bella.

14   You know, I'm a second count for Henry.  It's been the practice

15   that I've known since I was an apprentice and actually worked in

16   the office for McGuire and Bennett.  Sometimes they would ask

17   you to review numbers for a bid.  It always took three people to

18   check a bid before it went out the door.  And that same person

19   would read the cover letter that was going out.  For Ace, I did

20   that.  For Bella, I do that.  But I really don't do the take-

21   offs or that type of thing.

22        So I don't have a lot of the duties that I had at Ace with

23   Bella.  It's like half.  The office stuff is a lot less at that

24   level.

25   Q    All right.  Opposing counsel asked you some questions with

1   respect to exhibit, it's been marked as GC-2.

2   A     Yep.

3   Q     And I think there was contention by opposing counsel that

4   at or around the time that Ace was wrapping up/winding down,

5   there was still $1 million worth of business on the table.  Do

6   you remember him talking about that?

7   A     Yes, I do.

8   Q     And do you agree with that?

9   A     No, I don't.

10  Q     And why don't you agree with that?

11  A     Because most of the projects were closed out.  There was

12  basically punch list work to do.  So the majority of the work,

13  even though you've got $1 million worth of work, there was only

14  $10,000 of it left to do.

15  Q     Okay.

16  A     You know what I'm saying?  So that's what I was trying to

17  say.  You've got $1 million there, I mean it still not work.

18  Q     So just so I'm clear, as we look at GC-2 and we reference

19  some of the projects that opposing counsel referenced, I note

20  dollar value is under the heading original contract, correct?

21  A     Yes.

22  Q     And so what does that mean?

23  A     That means that's what the original contract was worth.

24  Q     And so if you're at the punch list stage in the project,

25  what does that typically mean with respect to the value of the

1   contract?

2   A     We pray to god it's only six percent or less.

3   Q     And so the dollar value at that punch list stage would be

4   dramatically less than this original contract amount?

5   A     It would be, you know, six percent under.

6   Q     You hope?

7   A     Yes.

8   Q     Bob, now I want to direct your attention to what's been

9   marked as GC-27.  It's the October website printout from Bella.

10  A     Um-hum.

11  Q     And if we look to the clientele page, which I believe is 2

12  of 4, there is a reference there to Morris Industrial Corp., do

13  you see that?

14  A     Yes, I do.

15  Q     And I think when you were being questioned about that, you

16  referenced Welliver.  Are my notes incorrect?  I believe they

17  asked if it was an Ace client and you had actually indicated, I

18  think your words were it was a Welliver client.

19  A     I guess I'm lost on that one.

20  Q     Okay.  Let's look at this clientele list.

21  A     Yes.

22  Q     Before working for Ace, did you work for any of these

23  people or were they clients of your former employers?

24  A     Yes.

25  Q     And can you tell me which clients and which former

1  employers?

2  A    So just to clarify, Welliver McGuire, and McGuire and

3  Bennett are one in the same.  They just changed their name.  And

4  I worked for them for the first portion of my career.  And I'm

5  going to say that, so I'm going to say that Welliver McGuire and

6  McGuire and Bennett, the only ones that aren't on this are Best

7  Buy, Barnes and Noble, Gateway Plaza, St. Lawrence University,

8  Mount Airy Casino and Resort, Taga Downs (ph.), and Schuyler

9  County offices are the only jobs that aren't the same.

10 Q    What do you mean?

11 A    Meaning weren't Welliver McGuire clients while I was

12 there.

13 Q    Who else did you work for other than Welliver McGuire and

14 McGuire and Bennett before Ace?

15 A    I didn't.  I graduated from high school and went right

16 into McGuire and Bennett.

17 Q    Okay.  I also, well, I want to shift gears a little bit

18 and reference something else you said.  I tried to write it down

19 here and get a quote.  When talking about Lisa and how her role

20 changed, I think you said she was sick at the time.

21 A    Yes.

22 Q    What did you mean by that?

23 A    She had a breakdown.

24 Q    Okay.  And tell me what that consisted of and how it

25 impacted her role with Ace.

1   A     Basically, she couldn't function.

2   Q     Was she going to work?

3   A     No.  No.

4   Q     You mentioned along the same lines, well, before I go

5   there, about, and I know you're not good with dates, nor am I,

6   about how long a period of time did that last?

7   A     I'm going to say probably three or four weeks where she

8   literally couldn't function.  I mean she was distraught.  She'd

9   just lay there and cry for hours.

10  Q     And do you know why that came about?

11  A     Just the stress in the company and losing it.

12  Q     Along the same lines, you were talking earlier about other

13  people picking up her duties.  And you listed yourself, Missy,

14  John, you said junior project engineers.  Did you mean junior

15  project managers?

16  A     Yes.

17  Q     Okay.  You also said field people and Henry.

18  A     Yes.  Some of the guys from the field came in and helped

19  us.

20  Q     And can you just elaborate on what that is?

21  A     Yeah, they would come in and help with some middles, you

22  know, Dick Tracy is pretty handy.  I mean he understands

23  paperwork pretty good and he's good on a computer.  And he would

24  come in and fill in, you know, he's the one basically we used a

25  lot as an office help with the, you know, if we really needed

1    them, any one of them would come in and help assist.

2    Q    And can you just give me another example or two of how

3    some of these people that I just listed picked up some of Lisa's

4    duties.

5    A    It would be more of a review on the change orders.  John

6    would pull the contracts, where Lisa would go back through the

7    contracts and check for change orders, go through pay aps, make

8    sure they were posted right with the change orders, and all that

9    stuff.  So some of the junior project engineers and John would

10   do that part.  Lisa would take the pay out and make sure that it

11   got posted right as far as the change orders coming into the

12   project, that the change orders were there.  She signed them.  I

13   don't think there was too many change orders or contracts, even

14   though she was sick, that ever not got reviewed by her even if

15   we held them for a couple of weeks until she got better.  But,

16   but he stepped up into that role and so did the kids.

17   Q    He?

18   A    John Franzese and the kids.  I call them kids.  They were

19   junior project engineers.  They stepped up and started doing

20   that part as with the pay aps and everything, which is, it's a

21   lot of work when you're doing that volume of work.  And that

22   helped Jalinda get focused on the books because she couldn't do

23   that and do the pay aps, and all that stuff.  So it really took

24   a lot of pressure off of her until she --

25   Q    Off Jalinda?

1    A    Jalinda, until she got rolling and understood how

2    everything worked.  It took her a while to get used to the

3    software program.  And when she got used to that, and who

4    actually did the inputting, and how they inputted it, it took

5    her a while to do that.  So everybody just stepped in and filled

6    in the gaps.

7    Q    I want to shift gears again and just I think ask you one

8    more question.  There was a great deal of conversation about

9    Randy Bell and the other supers leaving about the same time,

10   leaving Ace about the same time.

11   A    Yes.

12   Q    Do you remember that?

13   A    Yes.

14   Q    Were you shocked that they left?

15   A    No, no, I wasn't shocked.  I mean we had conversations for

16   months on end.  They're my friends.  They're not just my

17   workers.  So they stayed till the bitter end.  They said we're

18   here, we're going to do whatever we've got to do to help you

19   finish these projects out.  They weren't concerned about the

20   unions or weren't concerned about anything.  They just knew I

21   needed help.  I'd helped them with their careers and I paid them

22   very well, so they're loyal.  They stayed to the bitter end, to

23   where they knew that they had to go somewhere else.  And I

24   believe, you know, it was a pretty rough time, at the time.  Not

25   only was I dealing with trying to close things down and step up

1  into some of Lisa's roles, the bank had foreclosed on

2  everything, and I had to deal with that because Lisa wasn't able

3  to do it.  So there was a lot of my time trying to deal with

4  lawyers, and bankers, and a ton of other stuff that was going on

5  at the time.  So there's a little -- there's a lot of confusion,

6  you know.  I don't think anybody was thinking about, at the

7  time, of alter egos or anything like that at the time.  I mean

8  it was just -- it was really a lot of emotion.  These guys

9  worked for me from Day 1.  Some of them started with me.  And it

10  was like a big family.

11      So did some things get crossed over?  Yeah, I mean you can

12  hear it in the testimony.  Some of it did get crossed over.  But

13  like I said, the guys and girls all stepped up to help Lisa and

14  I get through this.  And it's -- I'm sad that they had to go

15  through all this, too.

16      MR. BAILEY:  Judge, I'll reserve the right to recall Bob

17  during my case.

18      JUDGE CARTER:  Okay.

19      MR. BAILEY:  That's all I have for now.

20      JUDGE CARTER:  Any redirect?

21      MS. KLUYTENAAR:  I have none.

22      MR. FURLONG:  I do, briefly.

23      JUDGE CARTER:  Okay.

24                    **REDIRECT EXAMINATION**

25  BY MR. FURLONG:

1  Q    Mr. Bellavigna, you indicated that Ace began to wind down

2  and then just about the same time it wound down, Bella formed

3  and began to perform work, right?  With the same office manager,

4  Henry, you, and the workers, the key superintendents, right?

5  A    I wasn't there.

6  Q    You weren't there, well, we can talk about that.  You

7  already did.  But with respect to formation of Bella, I think

8  you would agree that as the wind down came with Ace, the

9  inception of Bella occurred and it then began to perform jobs,

10 some of which were Bella -- were Ace jobs, Ithaca Town Hall,

11 Trumansburg, Vestal, we can argue about that, so certainly

12 Trinity Church, right?  Am I correct on that?

13 A    No.

14 Q    All right.  Now why didn't Ace, if you know, just continue

15 to perform the work that it had, such as Trinity Church,

16 infusion of $200,000 into its coffers, why did it wind down?

17 Henry was there.  He could continue to bid work.  You're there,

18 30 years in the industry.  Skilled workforce.  Why didn't Ace

19 continue on performing the work it had done for 12 years?

20 A    I don't see your question.  Why didn't?

21 Q    Yeah, why didn't it.

22 A    The place was closing down.  I got a bank recalled my

23 note, you know, I can't go into or she can't enter into a

24 contract at that point.

25 Q    You entered into the Trinity contract late in fall of

1  2011.

2  A     I should say a contract --

3  Q     A $200,000 job.

4  A     Self-performing it, I should say.

5  Q     Yeah, $200,000 job late in the fall, together with some

6  other jobs that were still ongoing, right?  So the question

7  remains, and I'm putting it to you --

8  A     Yep.

9  Q     Why not continue Ace with Dick Tracy, Derek Hager, you,

10  Henry, and anyone else who would stick around?  You were

11  experienced.  You had what you needed to perform these jobs.

12  And, in fact, had people bidding and getting these jobs, such as

13  Trinity Church.  Why did you wind down?

14  A     It wasn't my call.

15  Q     Do you know why you wound down?

16  A     What's that?

17  Q     Do you know why you wound down?

18  A     Yeah, it was the only thing we could do.

19  Q     Why not perform the work?  Let's take a look at the

20  Trinity job.

21  A     Okay.

22  Q     $200,000 in the fall of 2011.

23  A     Yeah.

24  Q     Okay?

25  A     Yeah.  How do you perform that with no manpower.

1  Q    Okay.  So the reason you didn't do the Trinity job was

2  lack of manpower.

3  A    That's what I've been saying for the last two hours, yes.

4  Q    Okay.  All right, we've been through that.  So, basically,

5  what you're saying is it didn't have to do with anything other

6  than the unions would not provide you with the manpower

7  necessary to do the job?

8  A    I wouldn't necessarily pin it on the unions.  But they

9  sent out a letter which scared the union people away.  They

10  didn't want to take that liability.

11  Q    Okay.  If I were to tell you that there was testimony here

12  from some of your key superintendents that in fact it didn't

13  scare them away --

14       MR. BAILEY:  No, you can -- ask your question.

15       MR. FURLONG:  I'll withdraw that.

16  BY MR. FURLONG:

17  Q    Is it your suggestion that the letter sent by the

18  Bricklayers Trust Fund?

19  A    I don't know who it was sent by, but --

20  Q    Okay.  It scared your workers away from continuing to work

21  for Ace and you had no manpower.  That's why Ace had to close

22  its doors?

23  A    No, that's not what I'm saying.

24  Q    All right.  So you tell me why did Ace, a multi-million

25  dollar company through more than a decade, why did it have to

1    close its doors and in essence ship its remaining personnel to

2    Bella?

3    A    The reason why we closed is because we lost a couple of

4    big jobs.  We lost a lot of money on them.  And the bank called

5    the note.

6    Q    Okay.  And you would agree with me that the loss of money,

7    particular on the Odessa job, really set this company back?

8    A    I would say Monroe County set it back more than anything.

9    Q    Okay.  The project labor agreement up at the jail, I'm

10   sorry, the crime center job up in Monroe County?

11   A    Yes.

12   Q    All right.  That and the Odessa job were money losers for

13   the company?

14   A    It was a big part of it.

15   Q    And the millwork on the Odessa job, you lost your shirt on

16   that as Ace, didn't you?

17   A    Millwork, I don't believe, had much to do with it.

18   Q    Okay.  Did you lose money on the Odessa job?

19   A    I would have to go back.  I believe so, yes.

20   Q    And you lost money on the Monroe County crime center job,

21   or whatever it was called?

22   A    Yes.

23   Q    All right.  And those jobs really put you in the hole and

24   you needed out from those union contracts, didn't you?

25   A    I needed out from what?

1  Q    The union contracts.  You testified earlier a union

2  contractor can't compete with a non-union contractor due to

3  labor costs.

4  A    I don't know where you're going with this.

5  Q    Well, what I'm doing is refreshing your recollection as to

6  your earlier testimony that the non-union contractor can pay

7  less for the same labor and you can't compete as a union

8  contractor.  You testified about that earlier that you can't

9  compete in certain markets.

10  A    Yeah, you're talking about a rate job and now you're

11  talking about non-union.

12  Q    I'm talking about all jobs, private work, public work, you

13  name it that a non-union -- your testimony, when I questioned

14  you earlier, was that a non-union contractor, because they can

15  pay less on private work --

16  A    Yes, on private work.

17  Q    Okay.  And that that was handcuffing you with your union

18  contracts for Ace Masonry.  That was your testimony.

19  A    We were talking about a specific job.

20  Q    I'm talking about private work in general.

21  A    Yes.

22  Q    All right.  And that was a problem --

23  A    Monroe County isn't a private job.

24  Q    I understand that.  And that, generally speaking, we never

25  even mentioned Monroe County till a minute ago.  Generally

1  speaking, when I questioned you earlier, it was that you

2  couldn't compete and never got those jobs because you were

3  competing against people with lower labor costs.  That was your

4  testimony.

5  A    With a job similar to Vestal Hills, yes.

6  Q    Okay.  And so one of the problems that you saw and that

7  you and Henry saw was if you didn't get away from these union

8  contracts, you were going to go deeper into the hole than you

9  were already in.  And that's true, is it not?

10 A    No.

11 Q    Okay.  Union contracts that had a higher labor cost didn't

12 have an effect on your company, is that your testimony?

13 A    What jobs are you talking about now?

14 Q    I'm not talking about specific jobs.  I'm talking about

15 whether you operate across the board with union rates and

16 benefits or you operate without union rates and benefits.  Which

17 is more advantageous to a company?

18 A    I don't own either company, so I'm not going to answer

19 that.

20 Q    Okay.  Well, you'll answer it if --

21      MR. FURLONG:  Can I get an answer, Judge?

22      JUDGE CARTER:  He's entitled to an answer to his question.

23      THE WITNESS:  What's that?

24      JUDGE CARTER:  He's entitled to an answer to his question.

25 It's a proper question.

1        THE WITNESS:  Ask the question again, then.

2   BY MR. FURLONG:

3   Q    Sure.  Your testimony when I questioned you last time was

4   that you couldn't compete against a non-union company because

5   they didn't have the contractual, collectively bargained

6   obligations that you had at Ace.  Do you recall that testimony?

7   A    Yes, I do.

8   Q    In certain markets, certain private markets, you said.

9   A    Yes.

10  Q    We didn't talk about specific jobs.

11  A    Well, you were bouncing around, so --

12  Q    All right, we didn't talk about specific jobs at that

13  point.  Do you recall?

14  A    Yes.

15  Q    All right.  And you've been in the business long enough to

16  know that that non-union contractor could basically pay whatever

17  he could get his labor for and compete at those rates compared

18  to the collectively bargained rates.  And you saw that as a

19  problem.  That's what you said during your testimony.

20  A    I don't remember saying that it was a problem.

21  Q    Okay.  With respect to the condition of the company, Ace

22  company, in 2011, you'd agree with me that it was distressed

23  financially?

24  A    Yeah.

25  Q    And it was distressed because it had entered into some

1  large contracts where it lost a decent amount of money.

2  A    Yes.

3  Q    All right.  And now you had an opportunity, Ace had an

4  opportunity to basically take its same key people, its same

5  office staff and operate with lower labor costs, and that's what

6  you saw as a way to get out of the hole.

7  A    No.

8  Q    Okay.  It had nothing to do with it.

9  A    No.

10  Q    Nothing at all, right?

11  A    No.

12  Q    Okay.

13      MR. FURLONG:  No further questions.

14      MR. JAMESON:  Nothing further.

15      MR. BAILEY:  Nothing for me, Your Honor.

16      JUDGE CARTER:  All right.  Mr. Bellavigna, you have

17  completed your testimony.  There is a chance you might be

18  recalled by Respondents for further testimony later on.  At this

19  point in time, you're free to go.  Just don't discuss your

20  testimony with any other possible witness.

21      THE WITNESS:  Okay.

22      JUDGE CARTER:  Thank you.

23  **(Witness excused.)**

24      JUDGE CARTER:  All right, it's 4:20.  I don't know if you

25  have another witness present or where do we stand?

1      MR. LEHMANN:  We do.  General counsel calls Scott

2  Stringer.

3  (Whereupon,

4                        **SCOTT STRINGER,**

5  was called as a witness by and on behalf of the General Counsel

6  and, after having been duly sworn, was examined and testified as

7  follows:)

8      JUDGE CARTER:  Be seated.

9  **(Pause.)**

10      JUDGE CARTER:  So state your full name, please.

11      THE WITNESS:  Scott Gerald Stringer.

12      JUDGE CARTER:  You may inquire.

13      MR. LEHMANN:  Thank you.

14                     **DIRECT EXAMINATION**

15  BY MR. LEHMANN:

16  Q    Are you employed?

17  A    Yes, I am.

18  Q    And where are you --

19  A    With the Bricklayers and Allied Craft Workers, Local 3.  I

20  am the vice president.

21  Q    And how long have you been the vice president?

22  A    Six years.

23  Q    Okay.  And before the vice president?

24  A    I worked with my tools out in the field as a foreman and

25  as just a craft worker working for companies.

1  Q     Okay.  And as the vice president, what are your job

2  duties?

3  A     Oh, boy.  There is a host of them.  My most important job,

4  first and foremost, is to expand market share and provide

5  opportunities for our members to work in.  That's number one.

6  The list goes on from there.  I am to service the membership

7  with any issues they may have.  We try to help our contractors

8  with any problems they may have, because that's part of

9  expanding the market share and providing opportunities for the

10  members.  I'm involved in training, seeking out and finding

11  candidates for apprenticeship, interviewing apprentices.  I

12  serve as a trustee on Taft-Hartley funds.

13  Q     Do any --

14  A     Sometimes -- pardon?

15  Q     Do any negotiations?

16  A     Oh, yes.  Yeah, we just finished a contract.  Yeah, we

17  negotiate contracts, collective bargaining agreements.  We go to

18  the jobs periodically.  And as far as servicing our contractors,

19  we try to meet with all our contractors at least once a quarter,

20  you know, just to keep the lines of communication open, see if

21  there is anything we can help them with.  We have a structural

22  engineer on staff that we can use to problem solve any issues

23  these contractors may have.  We also have the market recovery

24  program that we like our contractors to take advantage of.

25  Q     What is Local 3's jurisdiction?

1    A      It is the better part of upstate New York, everything to

2    the west of Syracuse, basically.  If you drew a line north and

3    south, the western side of Syracuse.  It's pretty much

4    everything to the west.

5    Q      Okay.

6    A      Including Rochester, Jamestown, Buffalo, Corning, Elmira.

7    Q      How about Binghamton?

8    A      Yes, Binghamton.

9    Q      How many members are in Local 3?

10   A      It depends on the workload.  That fluctuates, of course.

11   Between 22 and 2,500, at any given time.  That's including

12   retirees, active members, and apprentices.

13   Q      Does Local 3 provide manpower to contractors?

14   A      Yes.

15   Q      Are you familiar with Ace Masonry?

16   A      Yes, I am.

17   Q      And how are you familiar with Ace?

18   A      Well, the first time I met Ace Masonry, I actually came up

19   and applied for a job.  I was in between things in Binghamton

20   and I was trying slow down in that area.  That's when the office

21   was in another location.  I believe that was when they first

22   started out.  That was my first introduction to them.  And I

23   didn't begin to have a real relationship with Ace Masonry, Lisa

24   and Bob, until approximately 2006, when I took office.

25   Q      Okay.

```
1   A     I never worked for them.  Never worked with them.

2   Q     What geographical area does Ace cover?

3   A     A big one.  I know they go down into northern

4   Pennsylvania, they go up into the Adirondack Mountains, all of

5   our jurisdiction.  So it's a very large jurisdiction that

6   they'll cover.

7   Q     Okay.  And does the Bricklayers have a collective

8   bargaining agreement that covers this jurisdiction?

9   A     Yes, we do.

10  Q     Now I'm going to show you General Counsel Exhibit 7.

11  A     Yes.

12  Q     Is this the collective bargaining agreement?

13  A     This is our collective bargaining agreement.

14  Q     Okay.  And I'm going to also show you GC-8.

15  A     Yes.

16  Q     Do you recognize that document?

17  A     Yes, I do.

18  Q     Were you present when Lisa signed this form?

19  A     Yes, I was.

20  Q     And how did this come about?

21  A     We had our new contracts done.  And then once we

22  negotiated and settled, then we have it printed up in these

23  booklets.  Then we go around to all our contractors and ask them

24  to sign it, so we have an updated CBA on file.  And that's what

25  I did at this time here with this contract.
```

1    Q    Okay.  And where did she sign this?

2    A    At the Cecil Malone address.

3    Q    Okay.  And did Ace start off complying with the terms of

4    that contract?

5    A    Yes, they had since their inception.

6    Q    How did they comply with the terms of that contract?

7    A    Used BAC members to perform the masonry work.  They made

8    all the fund contributions according to the terms of the CBA.

9    They followed pretty much all the terms and conditions of it.

10   Q    How about the wages?

11   A    Yes.  Yep, they followed all the wage increases.

12   Q    They make health and welfare fund contributions?

13   A    Yes.

14   Q    Did they remit union dues?

15   A    Yes.

16   Q    Does the collective bargaining agreement address how a

17   signatory can withdraw or terminate from the contract?

18   A    Yes, it does.

19   Q    Okay.  Do you know where it is?

20   A    I believe it's in the beginning.  It's a decertification

21   process, I believe, 60 days before the end of the CBA.

22   Q    Second page?

23   A    Yeah, that's around there, yeah.  Okay.  Article 2,

24   Section 2.

25   Q    Okay.  And did Ace ever send Local 3 written notice that

1    it was withdrawing from the contract?

2    A    No, it did not.

3    Q    Now did you sign onto this contract?

4    A    Yes, I did.

5    Q    Who did the union negotiate with?

6    A    There was several contractors present.  But the primary

7    negotiators were the contractor association representatives from

8    three different contractor associations.

9    Q    And are those employer associations?

10    A    Yes, employer associations.

11    Q    And can you describe employer associations?

12    A    Employer associations are similar to union officers.  They

13    represent the employers, so they provide all kinds of programs

14    for the contractors.  They petition Albany and lobby Albany for

15    work, for money for funding for work.  They provide safety

16    trainings for their contractors, benefit programs, because they

17    also represent non-union contractors as well, these

18    associations.  So they provide a whole bunch of services.  They

19    provide blueprints, electronically and hard copies, just a host

20    of services.  They provide health insurance.  Any of the

21    contractors' insurance needs can be met through an association.

22    Any training need, pretty much.  They have different seminars

23    for contractors to educate them and update them on new laws.

24    Just a host of things to service the contractors.

25    Q    Okay.  And do you know who Lisa Bellavigna is?

1    A      Yes, I do.

2    Q      And who is she?

3    A      She is the president of Ace Masonry.

4    Q      And did you have any contact with Lisa when dealing with

5    Ace?

6    A      Yes, frequently.  Yes.

7    Q      Okay.  Can you explain or describe your contact with Lisa?

8    A      Like I said earlier, I would like to see all our

9    contractors at least once a quarter.  That didn't always happen,

10   but I could say for sure that I saw Lisa at least three times

11   each year in the past six years, if not more.  I think it's safe

12   to say three times a year for each year.

13   Q      Now do you know her husband, Robert Bellavigna?

14   A      Yes.

15   Q      And who is he?

16   A      He is the person who controls the operations in the field

17   for Ace Masonry.

18   Q      Explain what that is/means?

19   A      He runs all the superintendents out in the field and he

20   has control over whatever goes on out in the field for all the

21   projects for Ace Masonry.

22   Q      Did you have any contact with him?

23   A      Yes.  Actually, I probably dealt with him, if not an

24   equivalent amount of times to meeting Lisa, more than that.  So

25   more than three times a year, I would probably talk to Bob or go

1    to the office and meet with him.

2    Q    Okay.  And what would you talk to Bob about?

3    A    A host of things.  I kept pushing Ace to try to use the

4    market recovery program.  They never really utilized the program

5    that much.  We have a residential rate that's a 30 percent

6    reduced rate from the prevailing rate.  So I met with them a

7    couple of times to try to get them to use those things.  And

8    before the economic crash in 2008, right about probably

9    beginning at 2007, work just took off for us, so we've been

10   buried.  We've had to bring people in from other states to man

11   all our projects.  And one of the big things I would try to meet

12   with the contractors about was the upcoming amount of labor they

13   would need.  Because it was quite a tedious process to get these

14   guys to come from other states and stay here for whatever term

15   we needed them for.  So I tried to get a forecast.  I'd go

16   around to all the contractors and try to get a ballpark idea of

17   how many people I was going to need in a season.

18   Q    What's market recovery?

19   A    Market recovery is a program, because we realize the

20   non-union contractors operate off prevailing rate jobs at a

21   lower rate and sometimes don't even provide any benefits

22   whatsoever to their workers.  So market recovery is a fund.

23   Every hour one of our member's works, currently $1.20 per hour

24   goes into this fund.  We put anywhere from $1.2 to $1.7 million

25   into this fund per year.  And like if Ace Masonry was going to

1  go up against a Bella Masonry on a particular project, say that

2  pipe job in Vestal that they did, we would help Ace be

3  competitive there by subsidizing their bid.  We could buy the

4  entire benefit package, if we had to, or more to help them be

5  competitive to take it.

6        And we don't just give it to contractors.  We'll target a

7  contractor.  It's actually used as a targeting program.  So

8  we'll identify a contractor that's a threat to our market share.

9  And every time we find out through a source, we have a lot of

10  sources.  We use suppliers and contractor association people.

11  Whatever that contractor goes to bid, then we target that job.

12  Q    Did Ace ever ask for manpower?

13  A    Yes.

14  Q    How often?

15  A    I mean on a regular basis.  They've grown -- they grew a

16  lot since I took office.  They turned into a big masonry

17  contractor.

18  Q    Okay.

19  A    How often would they call me for men?

20  Q    Yes.

21  A    Whew, on a regular basis, I would imagine I heard from

22  somebody from the Ace organization at least every two months

23  wanting more people or wanting people with a certain skill

24  level.

25  Q    And who usually would be calling?

1   A      Oftentimes, it was the superintendents.  But, then again,

2   Bob would call me on occasions, too, for manpower.  So any of

3   the guys, Derek Hager, Steve Rollins, Dick Tracy, or Bob

4   Bellavigna.

5   Q      And does a contractor need to have a relationship with the

6   union to ask for manpower?

7   A      The relationship?  Do they need to have --

8   Q      A bargaining relationship?

9   A      Collective bargaining, yes.

10  Q      Now you have described the market recovery fund.  Did Ace

11  ever take advantage of that?

12  A      Only in one form that I'm aware of.  And that was as we

13  had that tremendous workload these last four years and we

14  brought those people in, we would use the money in the market

15  recovery fund to pay for their hotel rooms, because our

16  contractors didn't bid the jobs thinking they would have to pay

17  for hotel rooms.  So we used this fund to pay for the hotel

18  rooms for these traveling members for our contractors.  That is

19  the only -- I believe that's the only way they took advantage of

20  the program.

21  Q      Okay.  And they used it only that one time?

22  A      No, they used it throughout a time period.  What we would

23  do, our contractors would pay for the rooms.  They would turn

24  the bill in to us and then we would reimburse them.

25  Q      Okay.  And do you remember what that time period was?

1    A    Oh, you're digging now.  It was at least a two-year
2    period, maybe longer that I think we brought travelers in for
3    Ace.  I'll say from 2007 to 2009, approximately.
4    Q    Nothing since 2009?
5    A    There may have been.  It's all reported by that document,
6    but I just don't, I don't recollect the exact dates.
7    Q    Okay.  Do you know who Henry Bellavigna is?
8    A    Yes, I do.
9    Q    And how much contact did you have with him at Ace?
10   A    Very little.  He might flash by once in a while and I
11   might see him.  Other than that, I've never spoken with Henry.
12   Q    Now does the union have contractors submit remittance
13   forms?
14   A    Yes.
15   Q    Okay.
16   A    All our contractors.
17   Q    And what's the process for that?
18   A    Well, for example, a contractor works our members in July.
19   The benefits aren't due till the 15th of August.  So the funds
20   office will send these remittance forms out to our contractors.
21   And when July is completed and they have all the totals of the
22   hours, then they fill out the remittance form and send that back
23   to the funds office with a check by the 15th of the month, by
24   the 15th of the following month.
25   Q    And did Ace submit these forms?

1    A    Yes.

2    Q    During the life of that contract?

3    A    No.  It started -- there started to be a disruption in the

4    submittal of those forms late spring, early summer of 2011.

5         MR. BAILEY:  I'm sorry.  I missed that period of time.

6         THE WITNESS:  Late spring or early summer of 2011.

7         MR. BAILEY:  Thank you.

8    BY MR. LEHMANN:

9    Q    Now are you referring to the checks that were submitted?

10   Is that what you're referring to?

11   A    Yes, I'm sorry.

12   Q    There was a disruption?

13   A    Yeah, yeah.  That was the disruption, because they weren't

14   coming with checks and the payments weren't staying current.

15   Q    And when approximately did that start?

16   A    The best I can remember, late spring or early summer, I

17   believe.  With the understanding that our subcontractors, we

18   understand that they get caught up in a season and get behind.

19   Our subcontractors work for a general contractor.  And usually

20   it can take as many as 90 or 120 days to get a requisition our

21   subcontractor turns in to a general contractor.  So we'll give

22   them a little cushion.  The benefits are due by the 15th of the

23   following months, but we work with our contractors because it's

24   just the sensible thing to do.

25   Q    Are you familiar with Bella Masonry?

1  A    Yes, I am.

2  Q    And when did you become first aware of the formation of

3  Bella?

4  A    It was before the holidays of 2011.  I'm going to say mid

5  to late October or early November, approximately.

6  Q    Okay.  How did you find out about Bella?

7  A    Somebody called me.  I got a phone call that made me aware

8  of it.  I believe it might have been Dick Tracy that called me.

9  One of the guys called me and told me about it.

10  Q    Okay.  Did you do anything when you heard about Bella?

11  A    Yeah, I got right on the computer and looked it up.

12  Q    Okay.  And what did you find?

13  A    I found Bella's website.

14  Q    Did you print that out?  Did you print the website out?

15  A    Yes, I did, immediately, yeah.

16  Q    Is that what -- let me show you 27.

17  A    I got it.

18  Q    General Counsel's Exhibit 27?

19  A    Yes, this is -- this is it.

20  Q    Okay.

21  A    I was shocked to see it, actually.

22  Q    Now what if anything did you do when you learned of

23  Bella's formation?

24  A    One of the first things I did was contact my president,

25  Gene Caccamise, in Rochester.  That's his office up there.  And

1    I informed him that I thought we had a problem with Ace.  And

2    that I discovered this website.  And that I thought he should

3    come down to Ithaca and we should make an appointment to meet

4    with Bob over this.

5    Q    Okay.  And did you make an appointment with Bob?

6    A    Yes, I did.

7    Q    And did you meet with Bob?

8    A    Yes.

9    Q    And do you remember when you met with Bob?

10   A    It wasn't long after I discovered this.  And it was still

11   before the holiday, so it was -- I would say it was in November,

12   before Thanksgiving.

13   Q    Okay.  And when you said Bob, who are you referring to?

14   A    Oh, Bob Bellavigna, Lisa's husband.

15   Q    And where did this meeting take place?

16   A    At Cecil Malone Drive, in the conference room.

17   Q    And who was present?

18   A    Just Bob.

19   Q    Who else?

20   A    Oh, Gene Caccamise, myself, and Steve Harding.

21   Q    And what was said?

22   A    Well, we took the copy of this with us.  And we just

23   wanted to know what the intentions were of Ace Masonry, because

24   of course we were aware of its arrears on the funds.  And when

25   something like this develops, there's all kinds of rumors flying

1    around.  So we went to meet with Bob to get some clarity.  And

2    we questioned him as to what exactly the intentions of Ace were

3    and what was the idea of starting up a non-union company with

4    all the same people.

5    Q    So to the best of your recollection, what was said?  What

6    did you say?  What did he say?  What was said?

7    A    Well, Gene did most of the talking.  I know we put this

8    right out on the table and wanted to know what was going on with

9    Bella Masonry, the formation of Bella Masonry with our members.

10   Q    And what if anything was his response?

11        JUDGE CARTER:  Well, just to clarify the record, the

12   reference was to putting the copy of the website printout on the

13   table for I guess Bob to see that and respond to it.  Next

14   question.

15   BY MR. LEHMANN:

16   Q    And what if anything was Bob's response?

17   A    It was not a very productive meeting.  I don't think Bob

18   was happy to see us.  We just went in there to ask questions and

19   to find out what direction things were going in.  And he was

20   very nervous and evasive to the questions we did ask him.  And

21   only gave us like kind of half answers.

22   Q    Okay.

23   A    One of the major responses he had to our requests about

24   what was going on was that he felt he couldn't be competitive in

25   certain markets so he was going to form this company, use Bella

1   to help him get out of the hole that he had gotten into with

2   Ace.

3   Q    Did he say what markets he was referring to?

4        MR. BAILEY:  Judge, it's certainly after the fact, but

5   I'll object to the last question.  It calls for hearsay.

6        JUDGE CARTER:  I guess you're predicating it on a theory

7   that it is not an admission by a party opponent?

8        MR. BAILEY:  Yes, that the admission came from Bob, not

9   from Lisa and/or Henry.

10       JUDGE CARTER:  I think that's the way -- it's a point of

11  dispute.  Obviously, there has been a record that's been

12  developed about whether he's an agent or a supervisor within the

13  meaning of the Act.  So you can argue that when the time comes,

14  but we'll allow the testimony for now.  So overruled.

15  BY MR. LEHMANN:

16  Q    Did he say what areas he was referring to?

17  A    I think he meant the private side of the construction

18  industry, the non-prevailing rate stuff, I guess.  No, like I

19  said, he wasn't very clear about anything.  We kept asking,

20  trying to ask the same questions over and over again in a

21  different manner.  And he was just very evasive.  I don't think

22  he really wanted to meet with us and explain what was going on

23  to us.

24  Q    Okay.  Did you offer him anything, at this meeting?

25  A    Yeah, we offered him, if he said -- he said he was not

 1    competitive in certain markets.  We told him we had the

 2    residential rate, which is a greatly reduced rate.  And I

 3    believe Gene told him he could use the residential rate and

 4    market recovery to reduce his costs, if he had to, to get back

 5    on his feet, get his feet back under him, so to speak.

 6    Q    Do you recall anything else?

 7    A    No.  It wasn't a long meeting.  Mainly, we just kept

 8    asking the same questions over and over again, and didn't get a

 9    very clear answer on what their exact intentions were.

10    Q    How did the meeting end?

11    A    It wasn't in -- there wasn't any bad words or harsh words

12    said.  We just realized that it became obviously what his

13    intentions were, so we just ended the meeting and left, discuss

14    what had gone on after this.

15    Q    Was there ever any indication that Bobby couldn't speak on

16    behalf of Bella?

17    A    No.  No, he did speak on behalf of Bella.

18    Q    Okay.  How about any indication that he couldn't speak on

19    behalf of Ace?

20    A    No.  He was speaking on behalf of Ace.

21    Q    Did you speak to Henry on that day?

22    A    No.  I saw Henry.  Henry walked by.  The conference room

23    was open.  But, no, like I said, I'd never spoken to Henry.

24    Q    Now you mentioned residential rate.

25    A    Yes.

1   Q    Can you explain what that is?

2   A    It's a reduced rate.  We have a plastering contractor out

3   of Syracuse that's utilized it a couple of times.  It's a

4   reduced rate.  Most of the reduction is in the benefits and the

5   dues.  There is a slight reduction in the pay.  We try to keep

6   the largest portion of the reduction in the benefit plan because

7   our guys like to take home the same sized check every week, so

8   in order to be competitive in any certain market, we have that

9   to our availability and to our contractors' availability.  All

10  they have to do is request to use it.

11  Q    Okay.  You still have Bella's or GC-27 in front of you?

12  A    Yep.

13  Q    I'll have you refer to 2 of 4, please, take a look at

14  those pictures.

15  A    Yes.

16  Q    Do you recognize these pictures?

17  A    I don't recognize the first one.  I believe the second one

18  down is Ithaca College.

19  Q    How about the third one?

20  A    I believe that's a building at Cornell.  It's not very

21  good pictures on any.  The fourth one I don't recognize.  And

22  the one on the bottom I believe is the Schuyler County office

23  building.

24  Q    And do you know what these pictures are of?

25  A    Yeah, they're pictures of Ace projects.

1   Q    And how do you know that?

2   A    Well, I can't say with certainty about 1 and 4, but I do

3   know 2, 3, and 5 are.  But these same pictures were on that Ace

4   website as well.

5   Q    Okay.  Do you know these projects, personally?

6   A    Yes.  The one at Ithaca College, not the Cornell one.  And

7   the Schuyler County office building, I drove by it, but that

8   project went so fast.  I never stopped on it.  I saw it as it

9   was under construction.

10   Q    Do you typically visit projects?

11   A    Yes.  How often?

12   Q    Every one or --

13   A    No, not every one.  We try to get to every project at

14   least once a month.  I have Steve Harvey as a field

15   representative that works in the area with me.  So we try to get

16   to each project at least once a month, but that's not always the

17   case.  And during the summer season, we get pretty busy.

18   Q    Okay.  Are you familiar with the project at Vestal Hills?

19   A    Yes.

20   Q    And where is Vestal Hills project?

21   A    It's right in between Vestal and Binghamton, on Route 434.

22   Q    Okay.  And did you visit that site?

23   A    Yes, on a couple of occasions.

24   Q    All right.  And when you visited that site, what did you

25   see?

1   A      I saw Derek Hager and Dick Tracy laying block.  The Ace,

2   all the Ace equipment as there, the forklift, the mixer, the

3   scaffolding, planks, right down to the butt boards and mud

4   steins.  It just looked like an Ace job, to me.

5        MR. LEHMANN:  This might be a good time to --

6        JUDGE CARTER:  Yeah, we have our curfew, so to speak.

7        THE WITNESS:  Oh, they're going to throw us out again?

8        JUDGE CARTER:  So if we can take a pause.  Let me ask two

9   quick questions so I don't lose the point.  The residential

10  rate, when is that available to contractors?

11       THE WITNESS:  When is it?

12       JUDGE CARTER:  Yeah, when can they receive it or apply for

13  it?

14       THE WITNESS:  All they have to do is call me up.  Yeah,

15  it's just a phone call away.

16       JUDGE CARTER:  But does it apply to certain projects or

17  it's just a matter of a phone call saying we need this rate for

18  this particular project?

19       THE WITNESS:  Well, they have to show that they're in

20  competition with our non-union competitors, yeah, because we're

21  not just going to lower the rate just for the sake of lowering

22  the rate.  Because, usually, when a project is getting prepared

23  to bid, you know who is going to bid it, because all the

24  contractors are calling around for prices on supplies and stuff.

25  So there's a lot of different avenues where you get tips to who

1    is bidding on a project.  So usually when a contractor notifies

2    us they want to utilize that program, we kind of make a few

3    phone calls and start checking around and investigating to make

4    sure that they're up against a targeted contractor or a

5    contractor that they could not be competitive with unless they

6    had that.

7         JUDGE CARTER:  All right.  And the other question I had

8    was the Vestal Hills job, how did you have that on your list of

9    places to stop by?

10        THE WITNESS:  Actually, the field representative, Steve

11   Harvey, found it.

12        JUDGE CARTER:  But found it as a job that was --

13        THE WITNESS:  He was just driving by and he found it

14   somehow.  And I hooked up with him one day.  He just drove by.

15   He didn't stop.  I drove down with him one day and we went down

16   to check the job out.

17        JUDGE CARTER:  All right.  We'll pause there and we'll

18   pick it up tomorrow with further questions.

19        MR. FURLONG:  Can I ask just two questions on that, it'll

20   clarify it for Harvey.  Two questions.

21        JUDGE CARTER:  Okay.

22        MR. FURLONG:  Where does Steve Harvey live?

23        THE WITNESS:  In Binghamton.

24        MR. FURLONG:  Is Vestal next to Binghamton?

25        THE WITNESS:  Yeah, he lives not far from there.  He lives

1   within five miles.

2        MR. FURLONG:  So your understanding that he saw this job

3   on his way from his house back up in Ithaca?

4        THE WITNESS:  Yeah, because that's the way he goes to the

5   training center.

6        MR. FURLONG:  Thank you.

7        MR. LEHMANN:  I do have more questions.

8        JUDGE CARTER:  All right.  I understand.

9        MR. FURLONG:  Sorry for hogging your time.

10       JUDGE CARTER:  We'll pause here and we'll pick it up at

11  8:30 tomorrow.

12       **(Whereupon, at 4:55 p.m., the hearing in the above-entitled**

13  **matter adjourned, to reconvene on Friday, August 3, 2012, at**

14  **8:30 a.m.)**

15

1

<u>C E R T I F I C A T E</u>

This is to certify that the attached proceedings done before the
NATIONAL LABOR RELATIONS BOARD REGION FOUR

In the Matter of:

**ACE MASONRY,INC., d/b/a  ACE UNLIMITED, AND BELLA
MASONRY,LLC, alter egos,**

        Respondent,
And

**INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS,
LOCAL NO. 3,**

        Charging Party,
And

**LABORERS INTERNATIONAL UNION,
LOCAL NO.785,**

        Union Involved,

And

**NORTHEAST REGIONAL COUNCIL OF CARPENTERS,**

        Union Involved.

Case No.  3-CA-073540, 3-CA-074523, 3-CA-073549, 3-CA-074531,
          3-CA-079606

Date:     August 2, 2012

Place:    Ithaca, New York

Were held as therein appears, and that this is the original
transcript thereof for the files of the Board.


        _____
        Official Reporter


        BURKE COURT REPORTING, LLC
        1044 Route 23 North, Suite 316
        Wayne, New Jersey  07470
        (973) 692-0660

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

In the Matter of:

**ACE MASONRY,INC., d/b/a ACE UNLIMITED, AND BELLA MASONRY,LLC, alter egos,**   **Case Nos.** 3-CA-073540
3-CA-074523

Respondent,

And

**INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS, LOCAL NO. 3,**    3-CA-073549

Charging Party,

And

**LABORERS INTERNATIONAL UNION, LOCAL NO.785,**    3-CA-074531

Union Involved,

And    3-CA-079606

**NORTHEAST REGIONAL COUNCIL OF CARPENTERS,**

Union Involved.

The above-entitled matter came on for hearing pursuant to

Notice, before **GEOFFREY L.J. CARTER**, Administrative Law Judge,

at Ithaca City Hall, 108 East Green Street, 2nd Floor Conference

Room, Ithaca, New York, on Friday, August 3, 2012, at 8:30 a.m.

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 316
Wayne, New Jersey 07470
(973) 692-0660

<u>A P P E A R A N C E S</u>

```
 1    On Behalf of the General Counsel:
 2
 3         GREG LEHMANN, ESQ
 4         BRIE KLUYTENAAR, ESQ
 5         National Labor Relations Board
 6         Leo W. O'Brien Federal Building
 7         11A Clinton Avenue, Room 342
 8         Albany, NY  12207
 9
10
11    On Behalf of the Charging Party:
12
13         RICHARD D. FURLONG, ESQ
14         Lipsitz, Green, Scime, Cambria, LLP
15         42 Delaware Avenue,
16         Buffalo, NY  14202
17
18         CURTISS T. JAMESON, ESQ
19         Kroll Heineman
20         Metro Corporate Campus I
21         99 Wood Avenue South, Suite 307
22         Iselin, NJ 08830
23
24    On Behalf of the Respondents:
25
26         JASON B. BAILEY, ESQ
27         Sheats & Bailey, PLLC
28         P.O. Box 820,
29         9650 Brewerton, NY 13029
30
```

1
2

# <u>I N D E X</u>

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---------|--------|-------|----------|---------|-----------|
| SCOTT STRINGER | 1006 1011 | 1017 | 1032 1033 | 1034 | -- |
| EUGENE CACCAMISE | 1036 | 1040 | -- | -- | -- |
| CHARLES SMITH | 1043 1058 | 1059 | -- | -- | -- |
| DAVID MARSH | 1061 1107 | 1126 | 1126 | -- | -- |

3
4

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 316
Wayne, New Jersey  07470
(973) 692-0660

1                          **E X H I B I T S**

| EXHIBIT NUMBER | IDENTIFIED | RECEIVED |
|---|---|---|
| GENERAL COUNSEL'S | | |
| GC-10 | (previous ID) | 1051 |
| GC-16 | (previous ID) | 1099 |
| GC-17 | (previous ID) | 1101 |
| GC-20 | (previous ID) | 1058 |
| GC-41 | 1010 | 1010 |
| GC-42 | 1048 | 1049 |
| GC-43 | 1051 | 1052 |
| GC-44 | 1064 | 1065 |
| GC-45 to GC-47 | 1071 | 1073 |
| GC-48 | 1074 | 1075 |
| GC-49 | 1075 | 1076 |
| GC-50 | 1077 | 1080 |
| GC-51 | 1088 | 1089 |
| GC-52 | 1089 | 1090 |
| GC-53 | 1091 | 1092 |
| CHARGING PARTY'S | | |
| CP-7 | 1116 | 1118 |
| CP-8 | 1119 | (not offered) |
| CP-9 | 1123 | 1124 |

2

```
1                 P R O C E E D I N G S
2                              (Time Noted:  8:44 a.m.)
3         ADMINISTRATIVE LAW JUDGE CARTER:  On the record.
4         Recalling the case of Ace Masonry, Incorporated, doing
5    business as Ace Unlimited and Bella Masonry, LLC, alleged alter
6    egos.  This is a matter before the National Labor Relations
7    Board.  Case numbers are as follows, 3-CA-73540, 74523, 73549,
8    74531, and 79606.  Administrative Law Judge Geoff Carter
9    presiding.
10        Let's go ahead and take the appearances.
11        MS. KLUYTENAAR:  Brie Kluytenaar for the acting general
12   counsel.
13        MR. LEHMANN:  Greg Lehmann for the acting general counsel.
14        MR. FURLONG:  Richard Furlong for Bricklayers Local 3,
15   Laborers Local 785.
16        MR. JAMESON:  Curtiss Jameson for Charging Party,
17   Carpenters.
18        MR. BAILEY:  Jason Bailey for the Employers.
19        JUDGE CARTER:  All right, welcome back, everyone.  Let's
20   see where we left off.  I guess a couple of minor details.  So
21   we've put together a resumption date of September 11, 2012, and
22   I guess we'll hear from the Agency about the location.  And I'll
23   assume, assume we're going to start in the morning of that day.
24   And we'll see what facility we're using and that'll determine
25   whether it's going to be 8:30, or 9:00, or 9:30.  So we'll
```

1   resolve that later today, perhaps.

2        MR. LEHMANN:  I'll send around an email to everyone.

3        JUDGE CARTER:  Okay.

4        MR. LEHMANN:  On the hearing location.

5        JUDGE CARTER:  All right, because obviously this space may

6   or may not be available, but we'll pin that down.  And we left

7   off with Mr. Stringer's testimony that we were still in the

8   direct examination of acting general counsel.  So let's pick up

9   with that.

10       MR. LEHMANN:  Good morning.

11       THE WITNESS:  Good morning.

12       JUDGE CARTER:  And Mr. Stringer, just remember you're

13   still under oath from yesterday.

14       THE WITNESS:  Yes, sir.

15  (Whereupon,

16                        **SCOTT STRINGER,**

17  was recalled as a witness by and on behalf of the General

18  Counsel and, after having been previously duly sworn, was

19  examined and testified as follows:)

20                      **DIRECT EXAMINATION**

21  BY MR. LEHMANN:

22  Q    Do you know what vehicle Robert, Lisa's husband, drives?

23  Do you know what vehicle he drives?

24  A    Yeah, I used to.  Yeah.

25  Q    Okay.  You recognized --

```
 1   A      Back in the fall of 2011.

 2   Q      Okay.  And what vehicle is that?

 3   A      It was, oh, he drove several vehicles, but I think the

 4   primary one was a white pickup.  I'm not sure if it was a Chevy

 5   or GMC.  I've seen him in a Hummer.  I've seen him in a lot of

 6   different vehicles, but primarily the white pickup.

 7   Q      And how close is the Ace facility in relation to your

 8   local office?

 9   A      Within 400 or 500 yards.

10   Q      That's the Cecil Malone facility?

11   A      Yeah.  It's right behind the union hall.

12   Q      And was he driving the same vehicle from September through

13   December of 2011?

14   A      I believe so.

15   Q      Was there a sign on the truck, to your knowledge?

16   A      Yeah, it was an Ace Masonry truck.

17   Q      Did it ever change?

18   A      Yes, it did.

19   Q      And what did it change to?

20   A      Bella.

21   Q      Do you remember when it changed to Bella?

22   A      It was late, late in 2011 or early in 2012.

23   Q      Okay.  Now after the meeting with Robert Bellavigna, what

24   if anything did you do?

25   A      After the final meeting?
```

1  Q     After the November meeting.

2  A     Well, Gene and I got together with David Marsh, the

3  Laborers business agent, and after all the information we

4  collected up to that point and with the results of the meeting

5  with Bob, we sought counsel with Richard Furlong.

6  Q     Okay.  And why did you, all right, strike that.  Was a

7  letter ever sent to Bella Masonry and Ace Masonry?

8  A     Yes, an information request.

9  Q     Okay.  I'm going to refer you to General Counsel

10 Exhibit 21.

11 A     Okay, got it.

12 Q     Is that the letter you wrote?

13 A     Yes, this looks like the letter.

14 Q     Okay.  For the information request?

15 A     Yes.

16 Q     Can you tell us the reasons why the information request

17 was sent?

18 A     To find out what was going on with the new formation of

19 Bella and this apparent transition from Ace to Bella, because we

20 didn't get any answers in the meeting with Bob, ones we went

21 there to get.

22 Q     And when you say this looks like the letter, you're

23 referring to which one or both of them?

24 A     The request.

25 Q     What date?

1  A     February 14th.

2  Q     And how about on Page 3 of that packet there?

3  A     That's the one we sent later -- oh, no.  We got both

4  letters in the same packet.

5  Q     Well, you recognize both of them?

6  A     Yeah.

7  Q     Okay.

8  A     Yeah, we sent two request letters eventually, when it was

9  all said and done.

10  Q     All right.  And was there any response from either Ace

11  Masonry or Bella Masonry?

12  A     No.  We got a response from their attorney.

13  Q     Okay.  And I'm going to show you that same packet.  Is

14  there a letter in that packet from Mr. Bailey?  I don't know

15  what page it's on.  I don't have it in front of me.

16  A     Yes.

17  Q     Was any information provided pursuant to the information

18  request?

19  A     Yeah, we got a letter from Mr. Bailey.

20  Q     Okay.

21  A     On behalf of Bella Masonry.

22  Q     All right.  In addition to the letter, was any information

23  provided?

24  A     No.

25  Q     Now you had mentioned before that a new collective

1   bargaining agreement was negotiated?

2   A     Yes.

3   Q     And did you participate in those negotiations?

4   A     Yes, I did.

5   Q     Did you sign the collective bargaining agreement?

6   A     Yes, I did.

7   **(General Counsel Exhibit 41 marked for identification.)**

8   BY MR. LEHMANN:

9   Q     I'm showing you what's been marked as GC-41.

10  A     Yes.

11  Q     Do you recognize this document?

12  A     I do.

13  Q     And what is it?

14  A     This is our current collective bargaining agreement.

15  Q     And I'll refer you to Page 32.  Is your signature on this

16  page?

17  A     Yes, it is, third one down.

18        MR. LEHMANN:  Okay.  I'd offer, at this time, GC-41.

19        MR. FURLONG:  No objection.

20        MR. JAMESON:  No objection.

21        MR. BAILEY:  No objection, Your Honor.

22        JUDGE CARTER:  Exhibit 41 for acting general counsel

23  admitted without objection.

24  **(General Counsel Exhibit 41 received into evidence.)**

25        MR. LEHMANN:  Nothing further.

1    JUDGE CARTER:  Okay.  Mr. Furlong?

2    MR. FURLONG:  Thank you.

3                **FURTHER DIRECT EXAMINATION**

4    BY MR. FURLONG:

5    Q    Mr. Stringer, you now Bob Bellavigna, who testified

6    yesterday, do you not?

7    A    Yes, I know him.

8    Q    Where do you know Mr. Bellavigna from?

9    A    From Ace Masonry.

10   Q    Okay.  Have you ever had occasion to contact or deal with

11   Mr. Bellavigna with respect to grievances or other matters

12   involving union members represented by the Bricklayers?

13   A    Yes.  On one occasion, there was an altercation on a

14   project at Cornell University.

15   Q    Can you tell us about that?

16   A    It was between two members, one Caucasian, one African

17   American.  It was racially motivated.  And it turned into a big

18   problem.

19   Q    Okay.  And with respect to the nature of the problem, did

20   that give rise to you having to contact Mr. Bellavigna?

21   A    Yes, absolutely.

22   Q    And were any meetings held to resolve this issue?

23   A    Yes, there was.  There was multiple meetings, as a matter

24   of fact.

25   Q    Where were the meetings held?

```
1   A     A couple of them were at Cornell, but there was a couple
2   at Ace Masonry's office on Cecil Malone Drive.
3   Q     Was there a resolution of the issue?
4   A     Yes, eventually there was.
5   Q     Okay.  Taking a look at GC-13, if you have that in front
6   of you?  It's part of this pile.
7   A     Oh, okay.  Okay, got it.
8   Q     Okay.  Go to the last page.
9   A     Okay.
10  Q     Do you recognize this document?  It appears to be dated
11  November 15, 2011.  It's actually a two-page document, at least
12  the copy that I have on the back as well.
13  A     Yeah, yeah, they're big documents and a small paper.
14  Q     Do you recognize these as fringe benefit fund remittance
15  forms of the Bricklayers?
16  A     Yes, I do.
17  Q     Okay.  And I see that there is listed on there about
18  midway down the page, welfare fund, apprentice fund, Local 42
19  dues.  Incidentally, I thought this was Bricklayers Local 3.
20  Why am I reading Local 42?
21  A     It is.  The funds haven't changed their names officially.
22  Q     Okay.  So that dues money went to Local 3?
23  A     Yes, it did.
24  Q     You got a local annuity, a dues assessment.  Would that be
25  union dues?
```

1   A    Yes.

2   Q    Take us just through these figures, not the specific

3   figures listed on this report, but how does a contractor assess

4   these figures and come up with the amounts due?

5   A    The amounts due are calculated by the amount of hours a

6   member worked for that contractor in any given month.  So at the

7   end of the month, Joe works 160 hours.  They take 160 hours,

8   plug it into all these amounts here and that's how you come up

9   with the calculation, 160 hours times each individual amount.

10  Q    Okay.  At the top right-hand corner of the document, it

11  says report month.  Would that mean that for October 2011, the

12  individual listed on the back of this form, which was Robert A.

13  Bellavigna, worked the number of hours listed on the form in

14  October?

15  A    Yes, that's what it would mean.

16  Q    Okay.  And do non-union contractors send these remittance

17  forms to the trust fund offices?

18  A    No, they cannot.  And we couldn't accept them anyway

19  because it's illegal.

20  Q    Okay.  You spoke about a meeting held with Gene Caccamise.

21  Who is Gene Caccamise?

22  A    The president of Local 3.

23  Q    Okay.  And Steve Harvey.  Who is Steve Harvey?

24  A    Steve Harvey is a field representative for me, down here

25  in the Southern Tier.

1   Q     You mean the Bricklayers?

2   A     Bricklayers Local 3, yes.

3   Q     Okay.  Yourself and Bob Bellavigna, do you recall that

4   testimony?

5   A     Yes.

6   Q     Was there anyone else present for either Ace or Bella

7   other than Bob Bellavigna?

8   A     No, it was just the four of us in the room.

9   Q     Okay.  Did Bob Bellavigna -- and this meeting took place

10  when?

11  A     We were before the holidays again of 2011, so I'm going to

12  say sometime in November, early November, before Thanksgiving of

13  2011.

14  Q     Mr. Bellavigna ever tell you that he was not authorized to

15  speak for Bella Masonry?

16  A     No, he did not.

17  Q     And, in fact, did he speak for Bella Masonry in that

18  meeting?

19  A     Yes, he did.

20  Q     You spoke briefly about the market recovery program, do

21  you recall that?

22  A     Yes.

23  Q     Okay.  Is that otherwise called the target program in the

24  parlance of the trade?

25  A     Yes, there are several different terms for it.  It's also

1  called the Elgin (ph.) program.  There's different

2  terminologies.

3  Q    And are these programs made available by Bricklayers Local

4  3 to non-union contractors or are they excluded from it?

5  A    No.  No, they are not.

6  Q    Has Ace Masonry ever notified you or the Bricklayers that

7  it was withdrawing from any multi-employer group?

8  A    No.

9  Q    Have they ever notified you or the Bricklayers, or any

10 other agent of the Bricklayers, that they were terminating their

11 agreements with Bricklayers Local 3?

12 A    No.

13 Q    Okay.  You ever have occasion to go to lunch with Bob

14 Bellavigna?

15 A    Yeah, on multiple occasions.

16 Q    And would those multiple occasions have occurred over the

17 last couple of years?

18 A    Yes, they would have.

19 Q    And you indicated your office and Ace Masonry's office was

20 in close proximity?

21 A    Yes.

22 Q    You said a few hundred yards, okay.  How often would you

23 take Bob Bellavigna to lunch or meet him for lunch?

24 A    Oh, over the last six years, my term, I guess it would be

25 safe to say half a dozen times, maybe once a year.

1  Q    And did he ever take the position during those lunch

2  outings that he was not bound or Ace Masonry was not bound by

3  the collective bargaining agreement?

4  A    No, he did not.

5  Q    Your collective bargaining agreements, do they include

6  provisions for wages and benefits increases over certain periods

7  of time?

8  A    Yes, every year.

9  Q    And when those wages and benefit increases kicked in, did

10  Ace Masonry honor those increases?

11  A    Yes, they did.

12  Q    Are you aware whether or not Mr. Bellavigna or Ms.

13  Bellavigna, Lisa Bellavigna, or any other Bellavigna

14  representative ever held out Ace Masonry as a union contractor?

15  A    Yes, they always did.

16  Q    Any specific examples you can think of?  Did you ever go

17  to job site, pre-jobs, or anything where there was an Ace

18  representative there?

19  A    Oh, yes.  Yes.

20  Q    Did they hold themselves out at pre-jobs as a union

21  contractor?

22  A    Yes, they did.

23  Q    There are several clients in the area that you can only

24  work for if you're a union contractor.

25  Q    Who would they be?

1  A    Corning Glass and all their facilities, and the endowed

2  side of Cornell University.

3  Q    Okay.  And the endowed side being the private side of

4  Cornell?

5  A    Yes.

6  Q    Okay.  And have they worked at Corning Glass?

7  A    Yes, they have.

8  Q    Ace Masonry.

9  A    Yes.

10  Q    And have they worked at Cornell University?

11  A    Yes.

12  Q    Thank you, Mr. Stringer.

13      MR. JAMESON:  No questions, Your Honor.

14      JUDGE CARTER:  Mr. Bailey?

15      MR. BAILEY:  Yeah, just a couple of minutes, Your Honor,

16  so I can go through my notes?

17      JUDGE CARTER:  Sure, go off the record.

18  **(Discussion off the record.)**

19      JUDGE CARTER:  Okay, we're back on.  Cross-examination?

20      MR. BAILEY:  Thanks, Judge.

21                       **CROSS-EXAMINATION**

22  BY MR. BAILEY:

23  Q    How you doing, sir?

24  A    Good.  Yourself?

25  Q    Not too bad.  As you know, my name is Jason Bailey.  I

1  represent Ace and Bella.

2  A    Yes.

3  Q    Other than the last few days here and engaging in casual

4  conversation, you and I have never met, correct?

5  A    Never.

6  Q    I want to ask you a few questions about some of the things

7  you said on direct.  And I tried to write down a few quotes, but

8  if you think I misquoted you, please tell me.  You said one of

9  your roles as VP of the Local 3 is to expand market share and to

10  provide opportunities for membership.

11  A    Yes, it is.

12  Q    And what does that mean?

13  A    That means I am responsible for organizing in every sense

14  of the word.  Actually, our constitution outlines that as my

15  number one priority.

16  Q    But I guess when you say expand market share, what does

17  that mean?

18  A    Well, provide more work opportunities for our contractors

19  in any way that I possibly can, and to organize more

20  contractors, so the members have more options available to them,

21  more people to work for more employers.

22  Q    And when you say more opportunities, you mean for union

23  opportunities, more opportunities for union employees?

24  A    Yes, that's what I mean.

25  Q    And when you say organized contractors, you mean make them

1   union contractors or to help them become union contractors?

2   A     Yes.  Like recently we've signed a few contractors who

3   have just decided to become contractors.  They've never been a

4   union or a non-union contractor.  They just decided to go into

5   business.

6   Q     Oh, so you help develop companies?

7   A     Yes.

8   Q     Help start them up and of course then they are union

9   contractors?

10  A     Yes.

11  Q     Who else with your union has those responsibilities to

12  expand market share and provide opportunities for membership?

13  A     Basically, Local 3 is broken down into three areas,

14  Buffalo, Rochester, then the Southern Tier.  There is a primary

15  officer in each one of those three areas that is responsible for

16  that.

17  Q     And are you the primary officer for Southern Tier?

18  A     Yes, I am.

19  Q     And so within your office, are you the only one

20  responsible for expanding market share?

21  A     No, I'm not.  It's the primary officer's ultimate

22  responsibility, but everybody under the primary officer also

23  shares in those duties.

24  Q     They have some sort of role in that?

25  A     Yes.

1  Q     Okay.  And the people in, I'm sorry, Rochester and you

2  said Buffalo?

3  A     Buffalo, yes.

4  Q     Now are they VPs as well for --

5  A     Actually, our president is located in Rochester and then

6  we have a vice president in Buffalo as well.

7  Q     Okay.  So the VP in Buffalo, are you on equal ground, if

8  you will?  I mean neither one of you are superior to the other?

9  A     No, there is no order.

10  Q     Okay.

11  A     We're not like a first vice chair and a second vice chair.

12  We're just both vice presidents.

13  Q     Okay.  But you both essentially answer to the president,

14  Gene, in Rochester?

15  A     Yes.

16  Q     And so does Gene help in trying to expand market share in

17  the Southern Tier?

18  A     Yes, on occasion.  But primarily it's Rick Williamson is

19  the vice president in Buffalo.  Primarily, our areas are, for

20  the majority of the percentage, our responsibilities.

21  Q     Each vice president's responsibilities?

22  A     Yes.

23  Q     Okay.  You never called -- let me back up.  You found out

24  about Bella in I think you said October/November, before the

25  holidays of 2011.

1   A    Yes.

2   Q    You never called Henry, did you?

3   A    No, I did not.

4   Q    You never wrote Henry a letter asking him to become a

5   union contractor, did you?

6   A    No, I did not.

7   Q    You also, and again I'm going to try to use a quote here,

8   but please tell me if I misquoted you.

9   A    Okay.

10  Q    When talking about market recovery, I think you said an

11  employer, once an employer is found to be a threat, actually, I

12  wrote down -- an employer is a threat, he'll be targeted.  Did

13  you say something like that?

14  A    Yes, I did.

15  Q    Bella is considered a threat, correct?

16  A    Currently, yes.

17  Q    And so Bella is being targeted?

18  A    Yes.

19  Q    Did you know that Ace was going under?

20  A    In late summer and early fall, I mean the rumor wagon had

21  already began.  I was not sure of it, no.

22  Q    And the rumor wagon, what do you mean by that?

23  A    It started when I received calls from general contractors.

24  Most of our contractors are subcontractors.  They work under a

25  general contract.  If a subcontractor does not pay its benefits

1  on a prevailing rate job, the general contractor is therefore

2  responsible for them.  So, oftentimes, they will check with me

3  to determine if the subcontractor is current or not, just to

4  protect themselves.  It's kind of a self-protection.

5  Q     And so general contractors reached out to you?

6  A     Yes, a couple of them.

7  Q     With respect to Bella?

8  A     Yes.

9  Q     Or, I'm sorry, with respect to Ace?

10  A     Yes.

11  Q     And I think you testified earlier on direct that you

12  became aware that Ace stopped sending in money to the unions

13  with respect to their employees.

14  A     Yes.  And the time period is vague.  I know Sandra

15  Vorhees, who is our fund manager for the Ithaca area, had

16  mentioned something to me.  But like I said, sometimes our

17  general contractors are slow to pay ourselves.  So you really

18  don't sound the alarm if they get a couple of months behind on a

19  normal basis, because all of our contractors fall behind at one

20  point or another.

21  Q     So you give them a couple of months before you sound the

22  alarm?

23  A     Well, it's actually not my duties to sound the alarm, it's

24  the fund office's.

25  Q     But, typically, you know that the custom and practice is

1   to give the contractors a couple of months?

2   A    Yes.

3   Q    And I'm sorry if you've already answered this, but do you

4   know when, I think you called it the rumor mill, when you

5   started first hearing about that?

6   A    Late summer, early fall.  So we'll say maybe the end of

7   August, September-ish.

8   Q    Okay.

9   A    Something like that.

10  Q    Okay.  Let me have you look at R-1.  Actually, I want to

11  keep this.  This is all a part of that.  Sir, have you ever seen

12  this letter before?

13  A    Yes, I have.  I saw it after it was mailed out.

14  Q    Okay.  And what's the date on that letter?

15  A    October 8.

16  Q    And essentially you're telling Ace employees by way of

17  this letter that if they continue to work --

18       MR. FURLONG:  Objection, foundation.  You said he saw it

19  after it was mailed out.  There's no tie between Mr. Stringer

20  and the letter.

21       JUDGE CARTER:  Sustained as to form.

22  BY MR. BAILEY:

23  Q    Have you read this letter?

24  A    Yes, I have.

25  Q    Are you familiar with the contents?

1   A     Yes, I am.

2   Q     Were you familiar with it when it was sent out?

3   A     No, I was not.

4   Q     Were you aware that it was sent out?

5   A     I was aware because ERISA makes you keep a collection

6  policy in place for your fund offices.  It's the law.  You have

7  to have a collection policy.  And I know that this is part of

8  the process, sending a letter of notification to the employer

9  that they're in arrears is part of that collection procedure.

10  It's one of the steps.  To the content, I was not aware of the

11  content.

12  Q    Is it also a part of the collection procedures to threaten

13  charges against union employees, if they continue to work for an

14  employer who hasn't paid his dues?

15  A    No, that's not part of the collection policy.

16  Q    That it, okay.

17  A    Yeah.

18  Q    Do you know how much Ace owes in back dues and benefits?

19  A    Exactly I don't because they owe money down here and they

20  also owe benefits in Rochester, as well.

21  Q    Do you have a general idea what you think that number is?

22  A    No.  Sandra Vorhees that runs the fund office has a copy

23  of the audit.  I do not know the exact number.

24  Q    Well, again, I'm not asking for an exact.  Do you have a

25  ballpark in your mind?

1  A     I've been told that it was six digits.

2  Q     Okay.  So at least over $100,000?

3  A     Yes.

4  Q     Have you or anyone from your office or an agent of your

5  office other than your attorney, of course --

6  A     Right.

7  Q     Looked into Ace's assets?

8  A     Not to my knowledge.  We hired an auditor, the fund

9  office, the trustees --

10  Q     Sure.

11  A     Hired an auditor to go and audit the books, but --

12  Q     But not actually looking into what they owe by way of

13  assets.

14        MR. LEHMANN:  Objection, Your Honor.  Relevance.

15        MR. FURLONG:  Yeah, I would join that objection.

16        JUDGE CARTER:  Response to relevance?

17        MR. BAILEY:  Judge, I think it provides a motivating

18  factor to try to find, if they say that they've looked into

19  Ace's assets and they find nothing, but certainly provides

20  motivation for them to try to make the link between Ace and

21  Bella.

22        MR. FURLONG:  What does that have to do from a legal

23  perspective on an alter ego case.

24        UNIDENTIFIED SPEAKER:  Sorry, I have documents here for

25  the Judge.  So I'm not sure that I'm supposed to sign for it.

1     JUDGE CARTER:  Let's go off the record for a second.

2     **(Discussion off the record.)**

3     JUDGE CARTER:  All right, we're back on, and just briefly,

4     a delivery person brought some subpoena materials for Mr.

5     Furlong, so that was the basis of the interruption, but not a

6     problem.  So we left off with the relevance objection to the

7     question about the union's interest, if you will, about Ace's

8     assets or at least a question about that.

9         As I understand it, the reason for that question is it is

10    going to some type of union bias for pursuing Bella because Ace

11    presumably was short on cash, if you will.  So that's the theory

12    for it.  So it is part of their defense.  We'll see, you know,

13    I'm not going to spend all day on that, but --

14    MR. BAILEY:  Of course.

15    JUDGE CARTER:  We'll see if that goes anywhere.  So

16    objection is overruled.  You can inquire.

17    MR. FURLONG:  Can I just briefly be heard on that?

18    JUDGE CARTER:  Okay.

19    MR. FURLONG:  Maybe you can reconsider.  I mean the issue

20    in any alter ego case is the employer motivation, not the union

21    motivation.  There is no case law out there that speaks to union

22    motivation.  So I'm not sure if this line of questioning

23    possibly has any legal relevance to your inquiry.

24    JUDGE CARTER:  Well, it goes to credibility or at least it

25    might.  Now we'll see if it turns up something, but they said

1   that would be of some relevance.  Credibility is always an

2   issue, so we'll see if that gets anywhere.  But you may inquire.

3   Overruled.

4   BY MR. BAILEY:

5   Q    Just my last question.  Did -- were you or anyone in your

6   office or representative of your union --

7   A    Right.

8   Q    Aware that Ace had little to no assets at the close of

9   2011?

10  A    To the close of --

11       MR. FURLONG:  Objection.  Once again, it assumes a fact

12  not in evidence.  That Ace hasn't shown any lack of assets and

13  it's assuming a fact in the question.  I mean you can ask did

14  you know what their assets were, but you say were you aware of

15  they had little to no assets, it assumes a fact not yet in

16  evidence.  It's an improperly phrased question.

17       JUDGE CARTER:  I'm trying to recall what the Bellavignas

18  testified to.  I guess that's a fair point.  Sustained as to

19  form.

20  BY MR. BAILEY:

21  Q    Were you aware of Ace's assets at the close of 2011?

22  A    No, not exactly.  There was no way that I could be.

23  Q    Not exact.  Were you aware of their general financial

24  status?

25  A    I knew they were in trouble, but there's no way for me to

1   calculate, you know, they owned a lot of equipment.

2   Q    Sure.

3   A    There was no way to calculate whether the value of all the

4   equipment countered the amount of debt, you know, I don't have

5   access to those records.

6   Q    Sure.  You said you interacted with both Bob and Lisa on a

7   regular basis.

8   A    Yes.  Or, well, not always at the same time.

9   Q    Sure, sure.  But you had meetings with Lisa.  I think you

10  said you tried getting there once a quarter but safe to say at

11  least three times a year to meet with Lisa?

12  A    Yes.

13  Q    Correct?

14  A    Was Lisa the signatory?

15  A    Yes, she was.

16  Q    And you knew her to be the president of Ace?

17  A    Yes, I do.

18  Q    And so you sought out Lisa for what purpose?

19  A    She was the signing agent for the previous contract.

20  Q    But why did you have to go visit with her once a quarter

21  or at least three times a year?

22  A    Just to maintain a relationship with our contractors.

23  It's a practice that we use.

24  Q    And you understood Lisa to be running at least the

25  business portion of Ace, correct?

1    A    Correct.

2    Q    Did Lisa ever complain to you about the union not

3    promoting Ace in any way?

4    A    Not to my recollection, no.

5    Q    Wasn't there a point in time where the union, where your

6    union -- let me back up.  Did your union publish some sort of

7    pamphlet throughout the year or at some point in time?

8    A    Oh, we have a newsletter that we print out to the

9    membership.

10    Q    And how often is that published?

11    A    Oh, we try to do that two or three times a year.

12    Q    Did you ever feature Ace in one of those?

13        MR. FURLONG:  Objection, relevance.

14        JUDGE CARTER:  What's the relevance of that?

15        MR. BAILEY:  Judge, I think it goes to his interaction

16    with Lisa and how it came about.  And also the fact that the

17    union specifically sought out Ace and recognized Henry, Bob,

18    Lisa, and then there's Bob and Lisa's son, Robert, as three

19    generations of union contractors.  And so there is certainly no

20    anti-union sentiment on the part of my clients.

21        MR. FURLONG:  I'll withdraw my objection.  Go ahead, he

22    can answer the question.

23        JUDGE CARTER:  Okay.  Objection withdrawn.

24        THE WITNESS:  Yes.  We did publish a newsletter featuring

25    Ace and their staff at Ace Masonry.

1  BY MR. BAILEY:

2  Q     Do you remember why?

3  A     Well, our contractors are just like the members.  We put

4  the members' pictures in there, too, and they all like to see

5  their pictures in there.  So we try to get all our contractors

6  so one doesn't feel slighted that they didn't make the

7  newsletter.  So we actually go down through a list and try to

8  feature all our contractors at one point or another.

9  Q     I want to go back to where I started with your quote about

10  expanding market share and providing opportunities for

11  membership.  Have you ever sent -- have you ever directed union

12  employees to projects that you knew were non-union?

13  A     Yes, on occasion.

14  Q     How does that develop market share?

15       MR. LEHMANN:  Objection to relevance.

16       JUDGE CARTER:  Go ahead and state your response to

17  relevancy.

18       MR. BAILEY:  Judge, I think they clearly have an issue

19  with Bella because it's a non-union contractor and they target

20  non-union contractors.  However, we have the VP of one of the

21  unions where directing union employees to non-union projects.  I

22  think it is very relevant.

23       MR. FURLONG:  I think Mr. Bailey misunderstands the theory

24  of the case.  We're, quote, targeting Bella because we take the

25  position it's a union contract operating without applying the

1  CBA, but it's a union contractor.  So I think he misunderstands

2  the theory of the case.

3     MR. BAILEY:  I don't think so, Judge, because if Bella was

4  a union contractor, I don't think they'd be targeted.

5     JUDGE CARTER:  Let's put it this way, how does that

6  address the question of whether or not Bella is an alter ego of

7  Ace?

8     MR. BAILEY:  I'm sorry, Your Honor.

9     JUDGE CARTER:  I guess I'm not clear on how your question

10  gets to the issue of whether or not --

11     MR. BAILEY:  Well, Judge, I still think it goes to what I

12  was talking about earlier with motive and why Bella is being

13  targeted here.  And in one instance they are being targeted

14  because they're a non-union contractor and they're a threat to

15  market share; however, we have instances of the VP sending union

16  employees to work on non-union projects.  And it also ties into

17  my earlier line of questioning with respect to a lack of Ace

18  assets.  The reason they're going after Bella is because they

19  think Ace has no assets and Bella does, and that Bella is a

20  non-union contractor.

21     MR. FURLONG:  Can I be heard then?

22     JUDGE CARTER:  Sure.

23     MR. FURLONG:  Right.  I mean if you adopt that theory,

24  then you might as well take Section 7 and throw it completely

25  out the window.  Any union organizing drive, quote/unquote,

1   targets non-union contractors because of their status as being

2   non-union.  So, again, we get back to the issue it is the

3   contractor's motivation that's involved in an 8(a)(1)/8(a)(5)

4   case, not the union's motivation.  There's no affirmative

5   defense that the union has a bad motivation in an 8(a)(5) case.

6   So I'm not sure that I understand the theory of counsel's case

7   or its argument.  This is an 8(a)(1)/8(a)(5) case.

8       JUDGE CARTER:  I think your last question gets a little

9   far afield, so sustained.

10      MR. BAILEY:  That's all I have for you, sir.  Thank you.

11      JUDGE CARTER:  Any redirect?

12                   **REDIRECT EXAMINATION**

13  BY MR. LEHMANN:

14  Q    Do you know who was running the show or the field portion?

15  A    Yes, I do.

16  Q    And who was that?

17  A    Bob Bellavigna.

18  Q    And were you aware of Ace jobs at Trinity Episcopal Church

19  for $168,000, were you aware of that?

20  A    Not even.

21  Q    Or strike that, $198,000?

22  A    Not until we discovered it.  It had already been started

23  once we discovered it.

24  Q    Okay.  How about the Vestal Hills job?

25  A    We knew about that one.

1  Q    Before it started?

2  A    Right at about start time.

3  Q    Okay.  And what is right about start time?

4  A    It was in the fall.  God, I can't recall my first visit

5  there.  I'm going to say sometime in October, maybe early

6  October.

7       MR. LEHMANN:  Nothing further.

8                    **FURTHER REDIRECT EXAMINATION**

9  BY MR. FURLONG:

10 Q    Briefly, Mr. Stringer, counsel raised a couple of

11 questions or posed a couple of questions with respect to a

12 newsletter by the union.  Do you recall those questions?

13 A    Yes, I do.

14 Q    At the time of the Ace company and the Bellavignas were

15 featured in that newsletter, was Bella in existence?

16 A    No, it was not.

17 Q    Does the union have any practice of putting non-union

18 contractors in its newsletter?

19 A    No, we do not.

20 Q    Counsel also asked you some questions when you heard about

21 Bella did you approach Henry Bellavigna about becoming a union

22 contractor, do you recall that?

23 A    Yes, I do.

24 Q    Direct your attention to GC-21, please.

25 A    Okay.

1  Q    Go to the January 24, 2012, letter from Mr. Bailey to you

2  and Mr. Marty.

3  A    That's in the back, isn't it?  Got it.

4  Q    Okay.  Take a moment to review the letter, if you would.

5  Do you recall receiving this letter?

6  A    Yes, I do.

7  Q    See where it says way down Bella Masonry is in no way tied

8  to Ace Masonry?

9  A    Yes, I do.

10 Q    And then later on, next sentence, additionally, Bella

11 Masonry has no intention of becoming signatory with your union.

12 Do you see that?

13 A    Yes, I do.

14 Q    Were you left with any doubt where Henry Bellavigna or

15 Bella Masonry stood when their lawyer wrote you this letter?

16 A    No, I was not.

17 Q    Nothing further.  Thank you, Mr. Stringer.

18     MR. JAMESON:  No questions, Your Honor.

19     MR. BAILEY:  Just very quickly.

20                    **RECROSS-EXAMINATION**

21 BY MR. BAILEY:

22 Q    I'm sorry, what was the date on that letter?  Sorry.

23 A    January 24th, wasn't it?

24 Q    I think it was close.

25     MR. FURLONG:  It was, exactly.

1    JUDGE CARTER:  It's in the record.

2  BY MR. BAILEY:

3  Q    That's fine, we got it.  So end of January, you got this

4  letter from me?

5  A    Yes.

6  Q    You learned about Bella, you said, in the October/November

7  2011 time period, correct?

8  A    Yes.

9  Q    And between October 2011 until you received my letter, you

10  never called Henry and asked him to become union, did you?

11  A    No, I did not.

12  Q    Thank you, sir.

13    JUDGE CARTER:  All right.  Mr. Stringer, you've completed

14  your testimony.  You're welcome to stay or go.  The same rules

15  apply.  You don't discuss your testimony with any other possible

16  witness.

17    THE WITNESS:  Okay.

18    JUDGE CARTER:  Thank you.

19  **(Witness excused.)**

20    JUDGE CARTER:  Do you have another witness present?

21    MR. LEHMANN:  Can I have a minute?

22    JUDGE CARTER:  Okay.  Go off the record.

23  **(Whereupon, a brief recess was taken.)**

24    JUDGE CARTER:  We are back on the record and the Agency

25  has another witness?

1    MR. LEHMANN:  Yes, Your Honor.  The Agency calls Eugene

2  Caccamise.

3    JUDGE CARTER:  Okay.  Stand, please, and raise your right

4  hand.

5  (Whereupon,

6                    **EUGENE CACCAMISE,**

7  was called as a witness by and on behalf of the General Counsel

8  and, after having been duly sworn, was examined and testified as

9  follows:)

10    JUDGE CARTER:  You may be seated.  And if you could state

11  your full name and spell your last name, please.

12    THE WITNESS:  My name is Eugene Caccamise, and that's C-A-

13  C-C-A-M-I-S-E.

14    JUDGE CARTER:  And you may inquire.

15    MR. LEHMANN:  Thank you.

16                    **DIRECT EXAMINATION**

17  BY MR. LEHMANN:

18  Q    Are you currently employed?

19  A    Yes, currently.  I run through elections in a few days, so

20  right now I've got a job.

21  Q    And where is that, sir?

22  A    Well, I'm president of the Bricklayers Union for 24

23  counties, so my office is in Pittsburgh, New York, which is a

24  suburb of Rochester.  I have offices in Ithaca and one in

25  Buffalo.

```
 1   Q     Can you briefly describe your job duties?
 2   A     I run the union, the day to day business of Local 3 for
 3   the Bricklayers and Allied Craft Workers.
 4   Q     Now are you familiar with Ace Masonry?
 5   A     Yes, I am.
 6   Q     How so?
 7   A     They're one of our signatory contractors.
 8   Q     Okay.  And do you know who Robert Bellavigna is?
 9   A     Yes, I do.
10   Q     Lisa's husband?
11   A     Yes.  He's also a member, and his son, and his father.
12   Q     Now have you heard of Bella Masonry?
13   A     Yes, I have.
14   Q     And when was the first you became aware of the formation
15   of Bella?
16   A     Scott Stringer, who is my vice president that runs the
17   Ithaca chapter, gave me a call and says you've got to see this,
18   we've got Bella is going into business.  So I made arrangements
19   to come down and we took a look at the website.  And I said,
20   well, we need to go talk with Bob, and sit down and find out
21   what direction Ace is going in.
22   Q     And just so that the record is clear, when you said Bob,
23   you mean Robert, Lisa's husband?
24   A     Robert Bellavigna, yes.
25   Q     And did you in fact have that meeting?
```

1  A    Yes, we did.

2  Q    Do you remember when that meeting was?

3  A    Around Thanksgiving.  I can't nail a date down, but it was

4  in November, so it was the latter part of November.

5  Q    And where did this meeting take place?

6  A    At Ace's office right here in Ithaca.

7  Q    Who was present at this meeting?

8  A    I walked in with Scott Stringer, Steve Harvey, and then of

9  course myself.  We were directed to go into the conference room

10  and where Robert Bellavigna entered and sat down with us.

11  Q    Okay.  So it was just the four of you present?

12  A    That's it.

13  Q    Okay.  And what was said during this meeting?  How did the

14  meeting start?

15  A    We asked him about Bella.  And Bob did mention the fact

16  that there was another company being started, and he wasn't,

17  wasn't hiding that factor, you know, that he says I can't make

18  it with Ace.  I'm having a hard time, you know, there's doors

19  that can't open for us because I'm a union contractor.  And he

20  wanted to get into the residential market.  And he said certain

21  doors wouldn't open.  There was a big project that was going on

22  in Ithaca here that he wanted to get involved with and he

23  mentioned that.  I told him that we had a residential agreement,

24  you don't use it, but we could help you there.  And, you know,

25  with Ace, you didn't have to go through this, you know, we could

1   do that for you and we offered him some ideas and help.

2   Q    What does he -- what if anything did he say in response to

3   the help?

4   A    Well, Bob was a very nervous man that day.  I mean in this

5   business you listen to people and talk to them all day long.

6   You know who is sitting -- when people are nervous and jittery.

7   And Bob was shaking.  He was turning red.  He was sweating.  He

8   was very uncomfortable with us.  And I knew right away he really

9   wanted this to end as far as the conversation.

10        MR. BAILEY:  Objection, Your Honor.  Calls for

11   speculation.

12        MR. FURLONG:  It's his impression.

13        JUDGE CARTER:  He's telling a story.  But that won't carry

14   weight as whether he was in fact looking for it to end.

15        THE WITNESS:  But the bottom line is we offered to help.

16   He just said that I would like -- previously, he says being a

17   union contractor won't open the doors that I need to open up and

18   I have to make a living.

19   BY MR. LEHMANN:

20   Q    Okay.  And you offered -- did you discuss anything about

21   market recovery?

22   A    Yes.  We offered them market recovery and the private

23   work, because that's residential work.  And we told him we could

24   help you and make sure that you take over the market.  You could

25   do that with Ace.

1   Q     Okay.

2   A     So we left it open, basically, a lot of small talk in

3   between.  But at the end of the day, we walked out of there

4   knowing that it wasn't going to help, we couldn't help him.

5          MR. LEHMANN:  Nothing further.

6          JUDGE CARTER:  Mr. Furlong?

7          MR. FURLONG:  Nothing further.

8          MR. JAMESON:  Nothing, Your Honor.

9          JUDGE CARTER:  Mr. Bailey?

10                        **CROSS-EXAMINATION**

11  BY MR. BAILEY:

12  Q     This market recovery program, approximately how much money

13  is in that on an annual basis?

14  A     I wouldn't know that.  I mean I'm not in charge of it.

15  You could find that out through my secretary/treasurer that

16  actually runs it.  I don't know the day to day business of the

17  finances.

18  Q     If I said it was in the neighborhood of $1.2 to $1.7

19  million a year, would that sound about right?

20  A     Yeah, if you were looking for a ballpark figure, I'd say

21  that.

22  Q     Okay.  And is that used to target threats to unions?

23         MR. FURLONG:  Objection.  You know what, I'll withdraw it.

24  Let the witness answer the question.

25         THE WITNESS:  The bottom line is the market recovery helps

1   our union contractors be more competitive.  And it's not

2   threatening, it's just helping them get their numbers low.

3   BY MR. BAILEY:

4   Q    But is it used in situations where a union contractor is

5   going to be betting against a non-union contractor and that

6   non-union contractor is a threat to the union in some way?

7   A    In that respect, yes.  There has to be a non-union

8   contractor on the bidding list for that to be used.

9   Q    Okay.  So for Ace, in order for Ace to be able to take

10  advantage of this, it would only be used in situations where

11  it's bidding against a known, non-union contractor that's deemed

12  a threat, correct?

13  A    Just a non-union contract doesn't mean a threat.  If

14  you're using the threat as saying that he's going to be

15  competition at a lower rate, then that's a threat.

16  Q    But it would only -- Ace would only be able to take

17  advantage of this program in situations where it's known to be

18  betting against non-union contractors, correct?

19  A    Correct.

20  Q    And do you know approximately how many union masonry

21  contractors there are in the Southern Tier, ballpark?

22  A    Well, there's probably about 20 in the Southern Tier.  And

23  that's ballpark.

24  Q    Of course.  And again ballpark, what would be the total

25  revenue for all of those companies on an annual basis?

1    MR. FURLONG:  Objection.  No foundation whatsoever.

2    THE WITNESS:  I have no idea.

3    JUDGE CARTER:  The witness does not have information to

4    answer that question, so let's move on.  Overruled.

5    MR. BAILEY:  I have nothing further then, Your Honor.

6    JUDGE CARTER:  Okay.  Any redirect?

7    MR. LEHMANN:  No.

8    JUDGE CARTER:  All right.  Mr. Caccamise, you have

9    finished your testimony.  So the guidance at this point, you're

10   free to go, just don't talk about what you testified about with

11   another witness or possible witness.

12   THE WITNESS:  Okay.

13   JUDGE CARTER:  Thank you.

14   THE WITNESS:  That's it?  Thank you.

15   MR. LEHMANN:  Thank you.

16   **(Witness excused.)**

17   JUDGE CARTER:  Do you have another witness present?

18   MS. KLUYTENAAR:  Yes.

19   JUDGE CARTER:  Okay, we'll go off for a second and you can

20   bring him in -- oh, here.

21   MS. KLUYTENAAR:  Right here, yep.

22   JUDGE CARTER:  Are we still on?  Who are you calling?

23   MS. KLUYTENAAR:  General counsel calls Chuck Smith.

24   JUDGE CARTER:  If you could raise your right hand, please?

25   (Whereupon,

1   **CHARLES SMITH,**

2   was called as a witness by and on behalf of the General Counsel

3   and, after having been duly sworn, was examined and testified as

4   follows:)

5       JUDGE CARTER:  Please be seated.  And state your full

6   name, please.

7       THE WITNESS:  Charles Smith.

8       JUDGE CARTER:  You may inquire.

9       MS. KLUYTENAAR:  Thank you.

10                      **DIRECT EXAMINATION**

11  BY MS. KLUYTENAAR:

12  Q    Good morning, Mr. Smith.

13  A    Good morning.

14  Q    Are you currently employed?

15  A    I am.

16  Q    By who?

17  A    By the Northeast Regional Council of Carpenters.

18  Q    And what is your job title?

19  A    My job title is council representative.

20  Q    And how long have you held that position?

21  A    A little over two years.

22  Q    And prior to that what position did you hold?

23  A    I was a carpenter.

24  Q    Working in the field?

25  A    Yes.

1   Q    And could you briefly describe your job duties as a

2   council representative?

3   A    Briefly, it is to -- briefly, it would be to represent the

4   members' collective bargaining agreement.

5   Q    Okay.  What geographic area does the Northeast Regional

6   Council of Carpenters cover?

7   A    It covers the state of New York, state of New Jersey,

8   excluding the five boroughs in New York City.

9   Q    Okay.  And approximately how many members in the Northeast

10  Regional Council?

11  A    30,000.

12  Q    And is the council -- I'm just going to refer to the

13  Northeast Regional Council of Carpenters as the council for

14  short.  Is the council divided into locals?

15  A    Yes.

16  Q    How many?

17  A    Now, I believe there's 12.

18  Q    And is that done by geographic area?

19  A    Yes.

20  Q    And which area do you mainly work in?

21  A    It would be Local 277.

22  Q    Okay.  What area does that cover?

23  A    That's from the Broome County to St. Lawrence, Herkimer to

24  Yates, 21 counties all together.

25  Q    Approximately, how many members in Local 277?

1   A      Approximately, 2,700.

2   Q      And what craft does the council represent?

3   A      Carpenters and joiners.

4   Q      And does the council operate a hiring hall?

5   A      Yes.

6   Q      Is it an exclusive or a non-exclusive hall?

7   A      It's non-exclusive to the point we don't refuse anybody.

8   It has a seven day rule.  On the eighth day, you have to belong

9   to the -- you have to join up with the Carpenters or you have to

10  leave the job.

11  Q      Okay.  Do employers have to be signatories to the

12  collective bargaining agreement to get labor from the hiring

13  hall?

14  A      Absolutely.

15  Q      How long has the Northeast Regional Council been in

16  existence?

17  A      We came in existence April 5th of 2011.

18  Q      Okay.  Was there a predecessor to the Northeast Regional

19  Council?

20  A      Yes.

21  Q      Who was that?

22  A      Empire State and New Jersey -- Empire State Regional

23  Council of Carpenters and New Jersey Regional Council of

24  Carpenters.

25  Q      Okay.  And what geographic area did the Empire State

1   Regional Council cover?

2   A     New York state.

3   Q     And what geographic area did the New Jersey Regional

4   Council cover?

5   A     New York state -- New Jersey, the state of New Jersey.

6   Q     Okay.  And how did the Northeast Regional Council of

7   Carpenters come about?

8   A     Well, they merged the Empire State Regional Council of

9   Carpenters with the New Jersey Regional Council of Carpenters.

10   Q     Okay.  And when did that merger occur?

11   A     April 5th.

12   Q     Of what year?

13   A     2011.

14   Q     Okay.  And just to go back for a second to the New Jersey

15   Regional Council of Carpenters, what craft do they represent?

16   A     Carpenters and joiners.

17   Q     And what craft did the Empire State Regional Council?

18   A     Carpenters and joiners.

19   Q     Okay.  Are you familiar with Ace Masonry?

20   A     I am.

21   Q     How?

22   A     I worked for them 2009 and I've since then had a couple of

23   discussions with them over the phone.

24   Q     Okay.  When you referred to your work with them in 2009,

25   was that as a carpenter?

1   A     Yes.

2   Q     Okay.  And have you had any interaction with Ace in your

3   role as council representative?

4   A     I have.

5   Q     Are you familiar with Bob Bellavigna?

6   A     Yes.

7   Q     How so?

8   A     I've talked to Bob.  I've seen Bob on the job when I

9   worked for them in 2009.  And then I've talked to Bob on the

10  phone on several different occasions.

11  Q     Okay.  Is that in your capacity as council representative?

12  A     It is.

13  Q     Okay.  And are you familiar with Lisa Bellavigna?

14  A     No.

15  Q     Okay.  Do you know who Lisa is?

16  A     I know who she is, yes.

17  Q     Okay.  How do you know who she is?

18  A     Oh, I know Lisa, I've talked with her on the phone.  And

19  then at one time in 2009, when I worked for Ace, we had a

20  scaffold course, certification that we had down in the office,

21  and I met Lisa briefly at that time just in passing.

22  Q     Okay.  Have you dealt with Lisa in your role as council

23  representative?

24  A     Never.

25  Q     Okay.  Familiar with Henry Bellavigna?

1   A      I know who he is.

2   Q      Okay.  How?

3   A      Pretty much the same aspect.  I've seen him on the job as

4   well in 2009, in passing.

5   Q      Okay.  Have you had any interaction with Henry in your

6   role as council representative?

7   A      No.

8   Q      Okay.  Who is your -- who is your primary contact at Ace

9   Masonry as a council representative?

10  A      I've only ever talked with Bob.

11  Q      Bob.  Are you referring to Bob Bellavigna?

12  A      P., I believe, yes.

13  Q      Okay.  Was Ace a union contractor?

14  A      Yes.

15  Q      Okay.  I would like to show you what's been marked as

16  General Counsel's Exhibit 42.

17  A      Can I have my glasses, sir?

18         JUDGE CARTER:  We can accommodate that.

19         THE WITNESS:  Thank you.

20         MS. KLUYTENAAR:  We only have one copy of this at the

21  moment.

22  **(General Counsel Exhibit 42 marked for identification.)**

23  BY MS. KLUYTENAAR:

24  Q      Okay.  Do you recognize that document, Mr. Smith?

25  A      I do.

1   Q    What is it?

2   A    It's a collective bargaining agreement, 2001 to 2006.

3   Q    Okay.  And was Ace a signatory to that agreement?

4   A    Yes.

5   Q    Did they sign onto an agreement?

6   A    Yes.

7   Q    Okay.

8        MS. KLUYTENAAR:  I would offer GC-42.

9        MR. FURLONG:  No objection.

10       MR. JAMESON:  No objection.

11       MR. BAILEY:  None, Your Honor.

12       JUDGE CARTER:  Exhibit 42 for acting general counsel will

13  be admitted without objection.

14  **(Employer Exhibit 42 received into evidence.)**

15  BY MS. KLUYTENAAR:

16  Q    I'd like to actually direct your attention to GC-10, which

17  has already been marked for identification.  See if you can pull

18  it out of that pile.

19       MR. JAMESON:  Like a big bingo, you reach in, you pull a

20  ticket out.

21       THE WITNESS:  Thank you, sir.  It's being pulled.

22  BY MS. KLUYTENAAR:

23  Q    And, actually, I'm sorry to do this, but if you would

24  reach back in and get GC-11, as well?  Thanks.  Okay.  Looking

25  at GC-10, Mr. Smith, do you recognize that document?

1   A      I do.

2   Q      What is it?

3   A      This is the collective bargaining agreement, 2006 to 2011.

4   Q      Okay.  And the Carpenters collective bargaining agreement,

5   correct?

6   A      Yes.

7   Q      And is this the agreement that was in effect when you

8   assumed the position as council representative?

9   A      It is.

10  Q      Okay.  Noting on the front page, the agreement states it

11  is between the Empire State Regional Council of Carpenters,

12  Local 281.

13  A      Yes.

14  Q      Can you explain what Local 281 is or was?

15  A      It was a -- you'll have to elaborate a little more.  It

16  was a Local 281, okay, consists of Local 603, 532, 700, and

17  Local 281 were merged to create Local 281.

18  Q      Okay.  And I think the locals you just referred to were

19  the locals actually listed on the previous agreement that we

20  just marked as GC-42, right?

21  A      Yes.

22  Q      So Local 281, did that consist of the counties that are

23  listed right beneath it there on the front page?

24  A      It does.

25  Q      Okay.  And are those counties now included in the

1   jurisdiction of Local 277 of the Northeast Regional Council?

2   A    Yes, they do.

3   Q    Okay.

4        MS. KLUYTENAAR:  I would offer GC-10.

5        MR. FURLONG:  No objection.

6        MR. JAMESON:  No objection.

7        MR. BAILEY:  None, Your Honor.

8        JUDGE CARTER:  Exhibit 10 for acting general counsel

9   admitted without objection.

10   **(General Counsel Exhibit 10 received into evidence.)**

11   BY MS. KLUYTENAAR:

12   Q    One more.  Looking at what's been marked as General

13   Counsel's 43, do you recognize that document, Mr. Smith?

14   **(General Counsel Exhibit 43 marked for identification.)**

15        THE WITNESS:  I do.

16   BY MS. KLUYTENAAR:

17   Q    What is it?

18   A    It's the collective bargaining agreement from June 2011 to

19   May 2016, the Northeast Regional Council of Carpenters.

20   Q    Okay.  And does this agreement cover the same jurisdiction

21   or same geographic area as the prior agreement?

22   A    Yes.

23   Q    And more?

24   A    Yes.

25   Q    Okay.

1    MS. KLUYTENAAR:  I would offer GC-43.

2    MR. FURLONG:  No objection.

3    MR. JAMESON:  No objection.

4    MR. BAILEY:  None, Your Honor.

5    JUDGE CARTER:  Exhibit 43 for acting general counsel

6    admitted without objection.

7    **(General Counsel Exhibit 143 received into evidence.)**

8    BY MS. KLUYTENAAR:

9    Q    Okay.  This agreement, and I'm talking about GC-43, the

10   current agreement, contains wages and benefits terms, correct?

11   A    Yes.

12   Q    Okay.  To your knowledge, did Ace comply with the terms of

13   this agreement through the fall of 2011?

14   A    They complied with it up to the point where they no longer

15   paid the benefits.

16   Q    Okay.  Well, okay.  And what's your understanding of when

17   that period is?

18   A    I am not exactly certain as to when the benefits first

19   were not being paid.

20   Q    Okay.  Sometime in the fall of 2011?

21   A    No, it was, I would say, in the early part, possibly later

22   part of 2010, early part of 2011.

23   Q    Okay.  It was your understanding that there was sort of an

24   on and off payment and non-payment of the benefits through that

25   period?

1    A    To my understanding, yes.

2    Q    Are you aware of whether Ace Masonry submitted remittance

3    forms for the fringe benefit contributions?

4    A    I believe periodically.

5    Q    Okay.  And they paid -- are you aware of whether they paid

6    the union wage rate?

7    A    Yes, they paid the correct wage.

8    Q    And did there come a time where they stopped following the

9    terms of the collective bargaining agreement?

10   A    Yes, when they stopped paying the benefits in.

11   Q    Okay.  And how did you learn about that?

12   A    Actually, I first became aware of it, some members had

13   called and brought it to my attention that their benefits hadn't

14   been paid and their healthcare was coming -- was in jeopardy.

15   Q    Okay.  Did there come a time when you received notice from

16   the Empire State Regional Carpenters funds office that Ace as

17   delinquent?

18   A    At one time, I was called and asked, I was asked to call

19   about a confession of judgment for them.

20   Q    Okay.  But did there come a time when you received notice

21   that Ace was delinquent in its funds contributions?

22   A    No.  Personally, I guess I'm kind of confused.  When it

23   first took off and at first I had called Bob a couple of times,

24   so my first acknowledgement was through the members.  I don't

25   remember exactly what date I was contacted by the funds as to

1   when it was delinquent.

2   Q    Okay.  Let me rephrase my question.

3   A    All right.

4   Q    Perhaps it is a little confusing.  So I think you said

5   that the first, the first time you learned about some sort of

6   delinquency on Ace's behalf was through members, correct?

7   A    Yes.

8   Q    And then did you receive any sort of contact or

9   communication from the funds office about Ace paying the

10  benefits?

11  A    I had called them and talked to them about that, to that

12  effect.

13  Q    When you say them?

14  A    I called the funds office.

15  Q    Okay.  And what did they say?

16  A    Well, there was -- they had tried to attempt to make

17  different arrangements with them.

18  Q    Okay.  And to your knowledge, what was the status of the

19  fund contributions?

20  A    To my knowledge, the only I know about is the confession

21  of judgment and to the fact that he was behind in payments.

22  Q    Okay.  When you say he, who are you referring to?

23  A    Bob -- Ace, I'm sorry.

24  Q    Okay.  So when you learned that Ace was behind in

25  payments, what did you do?

1   A      I called Ace up.

2   Q      Okay.  And who did you speak with?

3   A      I spoke with Bob.

4   Q      Okay.  What did Bob say?

5   A      There was a couple of different occasions I talked to Bob

6   about this.  It's the first occasion, the first conversation I

7   had with Bob, he was waiting for -- at Ace/Bob, he was waiting

8   for some money from some entity that he had done business with.

9   And at that time, he was going to catch up with the funds, the

10  benefits.

11  Q      Okay.

12  A      At a later date, I was told --

13  Q      Let me just stop you for one moment there.

14  A      Okay.

15  Q      When was that approximately, if you recall, the first

16  conversation?

17  A      This would have been -- it would have to have been in the

18  spring of 2011.  It was in 2011.  I'm not certain.

19  Q      Go ahead.  And then did you have a subsequent

20  conversation?

21  A      Then there was an additional call, there was an additional

22  call.  I called and inquired about the benefits again.

23  Q      And who did you speak with?

24  A      I asked for Bob.

25  Q      Okay.

```
 1    A     I spoke to Bob.  At that time, there was the possibility
 2    of somebody or mutual partnership, somebody looking to buy into
 3    it.  He was hoping that somebody was going to buy into the
 4    company and then he would be able to catch up on the benefits.
 5    Q     Okay.  And did you have any subsequent conversations about
 6    the fund contributions?
 7    A     And another time then later on, that's when I got a call
 8    from the funds department asking Bob about the confession of
 9    judgment and would I give him a call.
10    Q     Okay.  And did you give him a call?
11    A     I did.
12    Q     And what did that conversation --
13    A     At that time I talked, again I asked, I talked to Bob.  He
14    said -- he didn't elaborate, but there was something in the
15    confession of judgment that his attorney wasn't comfortable
16    with, but they would take a look at it and he would get that, he
17    would get that resolved.
18    Q     Okay.  Let me direct your attention to GC-18.  Is that the
19    confession of judgment that you're referring to, if you know?
20    A     Yes.
21    Q     Okay.  Why didn't you call and speak with Lisa about the
22    funds contributions?
23    A     Well, I had only ever talked with Bob.  I assumed that he
24    was in charge.
25    Q     Okay.  Calling your attention back to General Counsel's
```

1    Exhibit 43, the current collective bargaining agreement.

2    A    Yes.

3    Q    Is there a provision in that agreement for the parties,

4    setting forth the procedure for the parties to withdraw from the

5    agreement?

6    A    There is.

7    Q    Okay.  What's the procedure?

8    A    A letter to be submitted withdrawing from the collective

9    bargaining agreement, 60 to 90 days prior to the expiration of

10   the contract.

11   Q    Okay.  And is that -- is there a similar provision

12   contained in the prior collective bargaining agreement --

13   A    There is.

14   Q    -- that expired in 2011?

15   A    Yes.

16   Q    Did the union ever receive any notice from Ace that it was

17   withdrawing from the collective bargaining agreement?

18   A    No.

19   Q    If you would look at General Counsel's Exhibit 20?

20   Q    Do you recognize this document, Mr. Smith?

21   A    I do.

22   Q    What is it?

23   A    It's the audit results.

24   Q    Okay.  And who was it sent to?

25   A    It was sent to Ace Masonry.

1    Q    From where?

2    A    From the Empire State Carpenters funds.

3         MS. KLUYTENAAR:  Okay.  I would offer GC-20.

4         MR. FURLONG:  No objection.

5         MR. JAMESON:  No objection.

6         MR. BAILEY:  No objection, Your Honor.

7         JUDGE CARTER:  Exhibit 20 for acting general counsel is

8    admitted without objection.

9    **(General Counsel Exhibit 20 received into evidence.)**

10        MS. KLUYTENAAR:  I have nothing further.

11        JUDGE CARTER:  Okay.  Mr. Furlong?

12        MR. FURLONG:  Nothing for this witness.

13        JUDGE CARTER:  Mr. Jameson?

14        MR. JAMESON:  Yes.

15                    **FURTHER DIRECT EXAMINATION**

16   BY MR. JAMESON:

17   Q    Mr. Smith, when you would speak with Ace, you would speak

18   with Robert P. Bellavigna, correct?

19   A    Yes, sir.

20   Q    Did you ever speak with Henry?

21   A    Never.

22   Q    Did you ever speak with Robert A. Bellavigna?

23   A    No.

24   Q    And I believe you testified you didn't really -- you

25   didn't speak at all with Lisa, correct?

1   A    Only when I called and asked for Bob.  I would address

2   myself and ask who I was speaking with.

3   Q    Okay.  Did Lisa ask who is calling?  Did you identify

4   yourself?

5   A    Yes, sir.

6   Q    Okay.  Did she ever say, hey, why do you need Bob?

7   A    Never.

8   Q    Talk to me?

9   A    Never.

10  Q    Okay.  When you would speak with Bob, Robert P., did he

11  ever say, hey, you really need to talk with Lisa about some of

12  these items?

13  A    No.

14  Q    Okay.

15       MR. JAMESON:  Nothing further.

16       JUDGE CARTER:  Mr. Bailey?

17       MR. BAILEY:  Real quick, Judge.

18                    **CROSS-EXAMINATION**

19  BY MR. BAILEY:

20  Q    I'm sorry.  When did you first learn of Bella?

21  A    When I first learned of Bella?  I believe I first learned

22  of Bella's existence --

23       MR. JAMESON:  Your Honor, I think I'll put in objection.

24       MS. KLUYTENAAR:  Yeah, I'll join you.

25       MR. JAMESON:  It's innocuous, but it goes beyond the scope

1    of direct.  We didn't ask this witness about Bella.

2         MS. KLUYTENAAR:  Well, I think it assumes a fact in

3    evidence.  I don't think he testified that he learned about

4    Bella.

5    BY MR. JAMESON:

6    Q    Okay.  Did you ever learn of Bella?

7    A    I did learn of Bella.

8    Q    When did you learn of Bella?

9    A    In 2011.

10   Q    Approximately when, sir?

11   A    That I can't answer.  I don't remember.

12   Q    Spring, summer, fall, winter?

13   A    Sometime in, I would say it was probably in the summer.

14   Q    The summer of 2011.

15   A    Yes.

16   Q    Did you ever call Bella -- strike that.  Did you ever call

17   Henry while at Bella and ask him to become the signatory to your

18   union?

19   A    No, sir.

20        MR. BAILEY:  Nothing further.

21        JUDGE CARTER:  Okay.  Any redirect?

22        MS. KLUYTENAAR:  No.

23        JUDGE CARTER:  All right, Mr. Smith, you've completed your

24   testimony.  So the guidance will still apply.  You're welcome to

25   stay or leave.  Just don't discuss your testimony with any other

1  possible witness.

2       THE WITNESS:  Okay, thank you.

3       JUDGE CARTER:  Thank you.

4  **(Witness excused.)**

5       JUDGE CARTER:  Do you have another witness?

6       MS. KLUYTENAAR:  I think we have our last witness.

7       JUDGE CARTER:  Okay.

8       MS. KLUYTENAAR:  Well, I don't know.

9       MR. LEHMANN:  Can I have three minutes?

10      JUDGE CARTER:  Okay.  We can go off the record.

11  **(Whereupon, a brief recess was taken.)**

12      JUDGE CARTER:  We are back on the record.  You have

13  another witness?

14      MR. LEHMANN:  General counsel calls David Marsh.

15      JUDGE CARTER:  Raise your right hand, please.

16  (Whereupon,

17                    **DAVID MARSH,**

18  was called as a witness by and on behalf of the General Counsel

19  and, after having been duly sworn, was examined and testified as

20  follows:)

21      JUDGE CARTER:  Please be seated.  State your full name,

22  please.

23      THE WITNESS:  David Phillip Marsh.

24      JUDGE CARTER:  You may inquire.

25                    **DIRECT EXAMINATION**

```
 1   BY MR. LEHMANN:

 2   Q    Good morning, Mr. Marsh.

 3   A    Good morning.

 4   Q    Are you currently employed?

 5   A    Yes.

 6   Q    And where?

 7   A    Laborers Local 785.

 8   Q    What is your job title?

 9   A    Business manager.

10   Q    And how long have you held this position?

11   A    With Local 785, since April 1, 2008.

12   Q    Okay.  And prior to 785, were you -- where were you

13   employed?

14   A    Laborers Local 589.

15   Q    And what was your position with Local 589?

16   A    Business manager.

17   Q    And how long did you hold that position?

18   A    Since September of 2002.

19   Q    And could you briefly describe your job duties as a

20   business manager for 785?

21   A    As briefly as possible.  Business manager is essentially

22   the CEO of the union.  The best way I can describe it quickly is

23   you touch everything, all communications, all financials.  Also,

24   by default, you are a trustee on the respective trust funds

25   related to that union.  I am responsible for all my staff, my
```

1   field agents, my training staff, my apprenticeship staff.  My

2   primary goals are to service the members and our contractors who

3   we're in partnership with as best as possible.  And marketing,

4   organizing, all those are directed through my desk as business

5   manager down to my respective employees.

6   Q    Okay.  And do you administer collective bargaining

7   agreements?

8   A    I am the chief negotiator for our building collective

9   bargaining agreement, our heavy and highway collective

10  bargaining agreement, our tunnel collective bargaining

11  agreement, and also I serve as the president of the Tappen's

12  (ph.) Courtland Building Construction Trades Council and I am

13  the lead negotiator for the agreement between the building

14  trades, as in the Town Square and Building Trades Council, and

15  Cornell University.

16  Q    What is Local 785's jurisdiction?

17  A    We cover 8 1/2 counties.  We cover Steuben County, Chemung

18  County, Schuyler County, Tompkins County, Tioga County,

19  Courtland County, Broome County, Chenango County, and the

20  southern half of Delaware County.

21  Q    Can you name some of the primary cities within those

22  counties?

23  A    Sure.  Going west to east, Cornell, Bath, Corning, Elmira,

24  Watkins Glen, Ithaca, Courtland, Binghamton, Waverly, Owego,

25  Deposit, Hancock.

1    Q    Okay.  How many members are in Local 785?

2    A    With retirees and apprentices, 1,000 members.

3    Q    Okay.  And does 785 send members to contractors?

4    A    Yes.  We have a dispatching system to our hiring hall.

5    Q    And how long has 785 been in existence?

6    A    The charter is dated March 31, 2008.

7    Q    And how did it come about, 785?

8    A    785 was a 3-way merger between existing locals in the

9    Southern Tier.  Those locals were Local 7, Binghamton, New York;

10   Local 1350, Elmira/Corning, New York; and Local 589, Ithaca, New

11   York.

12   Q    Did members participate in the merger?

13   A    Yes.

14   Q    How did they participate?

15   A    Each of the locals prior to the merger voted in two

16   consecutive meetings, the executive board and the membership, to

17   merge the locals to form 785.

18   Q    And did there come a time when there was an announcement

19   made about the merger?

20   A    Yes.  There was a letter from our general president

21   notifying that the merger had been approved through both our

22   executive board's membership and I believe it had to go through

23   certain channel at International as well.

24   **(General Counsel Exhibit 44 marked for identification.)**

25   BY MR. LEHMANN:

1  Q    I'm showing you what's been marked as GC-44.  Do you

2  recognize this letter?

3  A    Yes, I do.

4  Q    And what is it?

5  A    This is the notification that went out to all of the

6  members of these three locals, Local 7, Local 589, and Local

7  1358, notifying them of the new provisional Local 785, Ithaca,

8  New York.

9  Q    Okay.  Now on the third page, can you identify that?

10  A    Yes.  It is the provisional charter.

11    MR. LEHMANN:  Okay.  I'd offer GC-44.

12    MR. FURLONG:  No objection.

13    MR. JAMESON:  No objection.

14    MR. BAILEY:  None, Your Honor.

15    JUDGE CARTER:  Exhibit 44 for acting general counsel

16  admitted without objection.

17  **(General Counsel Exhibit 44 received into evidence.)**

18  BY MR. LEHMANN:

19  Q    Now you're familiar with Robert Bellavigna?

20  A    Yes, I am.

21  Q    Lisa's husband?

22  A    Yes.

23  Q    And was he a trustee at any point?

24  A    Yes, he was.

25  Q    Okay.  When was he a trustee?

1   A     I think it was February of 2007 until October 3, 2011.

2   Q     And you are familiar with Ace Masonry?

3   A     Yes.

4   Q     And how are you familiar with Ace Masonry?

5   A     At the time Ace Masonry was formed in 2002 or at least

6   when they approached the Laborers Union, I already knew Bob and

7   Lisa.  And at that time I was not yet the business manager.  I

8   was working for Local 589 as the president and I was extremely

9   excited.  I had worked with Bob in the field, Bob, and I'm

10  referring to Robert Bellavigna.  I know him as Bob or Bobby, so

11  I'll probably call him Bob throughout my testimony.  I've known

12  Bob and Lisa for a number of years.  And I was excited to have a

13  new contractor that I knew would be successful in the Ithaca

14  area.  So I was looking forward to working with him.  So I knew

15  them from their inception and worked with them from time to time

16  as a partner with that company.

17  Q     Throughout those years, what was the geographical area

18  that Ace covered?

19  A     Again, knowing the company well, they started out

20  primarily in the Ithaca, Tompkins County, and surrounding

21  counties.  And as they expanded, they expanded out into all of

22  the Southern Tier and later on into some of the northern

23  markets, Syracuse, Rochester, and elsewhere.

24  Q     And does the Laborers have a collective bargaining

25  agreement that covers this geographic area?

1   A     Yes, we do.

2   Q     Now prior to the merger in March of 2008, what locals were

3   a part of these collective bargaining agreements?

4   A     Say that again?  I'm sorry.

5   Q     What locals are involved in the collective bargaining

6   agreements prior to March of 2008?

7   A     Oh, okay.  Well, the ones that I know that -- that I know,

8   that Ace was signed to, is that the question?

9   Q     Yes.

10  A     Okay.  For the Laborers, it was the Local 1358 collective

11  bargaining agreement, the Local 7 collective bargaining

12  agreement, and obviously the Local 589 collective bargaining

13  agreement.

14  Q     And what area does Local 7 cover?

15  A     Binghamton, New York area.  But I can give you counties,

16  if you want.

17  Q     I don't think there is a need for that.  Local 1358?

18  A     Elmira/Corning region.

19  Q     And Local 589?

20  A     Ithaca region.

21  Q     Now I'm going to show you what's been marked as General

22  Counsel Exhibit 4.

23  A     Okay.

24  Q     Do you recognize this?

25  A     I do.

1    Q    And did Ace sign onto this contract?

2    A    They did.

3    Q    Did Ace comply with the terms in this contract?

4    A    Yes.

5    Q    How did they comply with the terms?

6    A    By, well, they called the hall for union labor.  They only

7    utilized, I should say union laborers, and they only used union

8    laborers on their projects for laborers work.  They honored the

9    annual increases and wages and benefits.  They, if they, and I

10   don't know if they did during this time period, if they wanted

11   to bring somebody into our union, they asked to do that.  And we

12   would honor that because the collective bargaining requires that

13   they be union members to work for a signatory contractor.

14   Again, not being -- it being that many years ago, I'm not sure

15   there were, but if there was issues with overtime or shift

16   differential, they were honored as well.

17   Q    And I'm going to show you GC-5.

18   A    Okay.

19   Q    Do you recognize that contract?

20   A    I do.

21   Q    And was Ace a signatory on that contract?

22   A    Yes.

23   Q    And did Ace comply with the terms of that contract?

24   A    I was not the representative of Local 1358 at the time, so

25   I really can't testify to particulars.  But my understanding is

```
 1   that they acted as a union contractor when working in that area
 2   as well from my communications with either Ronnie Sprague or Tom
 3   Norconk, the business managers of that local.
 4   Q    Okay.  And on GC, I'm showing you GC-6.
 5   A    Okay.
 6   Q    Do you recognize that document?
 7   A    I do.
 8   Q    And what is it?
 9   A    This is the Local 7, Bantam, New York, Laborers collective
10   bargaining agreement.
11   Q    Okay.  And you were -- now were you, at the time of that
12   collective bargaining agreement, responsible for Local 7?
13   A    I was not.
14   Q    Okay.  But are you aware of whether or not Ace complied
15   with the terms of that contract?
16   A    Again, business managers, especially locals that are only
17   a few counties apart, speak often and I didn't hear of any
18   compliance issues with this agreement.  Our members were working
19   -- in fact, actually, I'll back up on my testimony a little bit.
20   My members, most of the laborers working for Ace at this time
21   period, early on in the company, were Ithaca laborers and we
22   were receiving reciprocal benefits on their behalf based on both
23   the Elmira and Binghamton 1358 and 7 collective bargaining
24   agreements.  So I can speak to that.  So I believe they were
25   complying, to the best of my knowledge, and that's the only
```

1 confirmation I really have besides conversations with business

2 managers that they were, that they signed, and that they were

3 acting as a union contractor.

4 Q    Okay.  And does the contracts address how signatories can

5 withdraw or terminate from the collective bargaining agreement?

6 A    Yes, I have looked at each of these contracts and they do

7 have -- I'll just look and see what they call it because

8 sometimes the verbiage is a little different.  Usually, it's

9 called -- let me see.  Usually, it's a termination clause or

10 something of that nature, but just to make sure, okay, in the

11 1358 agreement, this is the 2001 to 2006, Article 27, duration

12 and termination.  And that's GC-5.  GC-6 --

13 Q    And that was, just so the record is clear, on Page 11.

14 A    I believe it's going to be Article 10.  Let me see here,

15 it's listed as something else.

16 Q    Which contract are you looking for?

17 A    I'm just looking at the Binghamton agreement, which I'm

18 not overly familiar with.  Okay, it's probably on Page 4.  Okay,

19 I have -- I'm not sure which article.  On Page 4 of GC-6, I have

20 Section 4, duration, reopening, and termination.

21 Q    Okay.  And did Ace at any time send either Local 785 or

22 any of the other locals written notice that they were

23 withdrawing from the contracts?

24 A    No.

25 Q    Did there come a time when successor contracts were

1  negotiated with these locals?

2  A    There was.

3  **(General Counsel Exhibits 45 to 47 marked for identification.)**

4  BY MR. LEHMANN:

5  Q    Now I'm showing you General Counsel Exhibit 45, 46, and

6  47.  Starting with 45, can you identify it, please?

7  A    Yes, I can.  This is the Local 589 building construction

8  collective bargaining agreement from May 1, 2006, through

9  April 30, 2011.

10  Q    Okay.  And 46?

11  A    Yes, this is the Local 7 collective bargaining agreement

12  for the building industry, 2006 to 2011.  I did say Local 7,

13  right?

14  Q    And 47?

15  A    47 is the Local 1358 building industry collective

16  bargaining agreement from 2006 through 2011.

17  Q    Okay.  Same areas that you had testified before?

18  A    Yes.

19  Q    589, Ithaca.  And does the union have signatory pages from

20  Ace on these contracts?

21  A    I do not have them on file.

22  Q    Do you know if during 2006/2001, whether Ace was a union

23  contractor?

24  A    Yes.

25  Q    Were they holding themselves out as a union contractor?

1  A     Yes, they were.

2  Q     Okay.  And how were they doing so?

3  A     Some of the same reasons I have already testified to.

4  They were using union labor.  They would, from time to time,

5  actually install people that they wanted to hire into the

6  unions.  And, well, ask if we would allow them to be members,

7  because they wanted them as employees.  They recognized the

8  terms and conditions of the agreements.  And they paid the

9  respective annual increases, and wages and benefits, submitted

10  benefits and payments related to those requirements under the

11  collective bargaining agreement.

12  Q     And did they perform jobs only union contractors could

13  perform?

14  A     They did, primarily at Corning Glass and Cornell

15  University.

16  Q     Did they also submit remittance forms?

17  A     They did.

18  Q     During this period of time, 2006 through 2011?

19  A     Yes.

20  Q     Did they remit -- is there a union dues provision in here?

21  A     There is.

22  Q     Okay.  And did they remit union dues?

23  A     They did.

24      MR. LEHMANN:  I'd offer GC-45, 46, and 47.

25      MR. FURLONG:  No objection.

1    MR. JAMESON:  No objection.

2    MR. BAILEY:  Your Honor, it depends on I guess what they

3  are being offered for.  Without a signature page, without any

4  sort of signature page from Ace, I certain have objection as to

5  them being evidence that Ace is signatory to these agreements.

6    JUDGE CARTER:  We have circumstantial evidence that Ace is

7  signatory without the signature page.  So your objection will go

8  to the weight of the documents for that purpose.  Objection

9  overruled.

10    MR. BAILEY:  Very well, Your Honor.

11    JUDGE CARTER:  So Exhibits 45, 46, and 47 for acting

12  general counsel will be admitted over objection.

13  **(General Counsel Exhibits 45 to 47 received into evidence.)**

14  BY MR. LEHMANN:

15  Q    Hopefully, you didn't put them away yet.

16  A    Oh, they're right here.

17  Q    Were any of these contracts extended?

18  A    Yes, they were.

19  Q    Which ones of 45, 46, and 47, which ones were extended?

20  A    47 and 45.

21  Q    Okay.  And what, what was GC-47 extended to?

22  A    47 was extended to June 30, 2011.

23  Q    Okay.  And 45?

24  A    June 30, 2011.

25  Q    Did you send or did the union send notifications to union

1   contractors of the extension?

2   A    We did.

3   Q    Including Ace Masonry?

4   A    Yes, all signatory contractors.

5        MR. LEHMANN:  One moment off the record?

6        JUDGE CARTER:  Okay, we can go off for a second.

7   **(Discussion off the record.)**

8        JUDGE CARTER:  We're back on.

9   **(General Counsel Exhibit 48 marked for identification.)**

10  BY MR. LEHMANN:

11  Q    I'm showing you what's been marked as GC-48.  Do you

12  recognize this document?

13  A    Yes.

14  Q    What is it?

15  A    This is notice to our signatory contractors, payroll

16  department, of the extension of the existing 2011 wages and

17  benefits rates through the end of June 30, 2011.

18  Q    And was this letter sent to Ace?

19  A    It was.

20  Q    How do you know?

21  A    We have a list serve with all our signatory contractors on

22  it and that automatically prints off all of our signatory

23  contractors' addresses.

24  Q    Okay.

25       MR. LEHMANN:  I'd offer GC-48.

1    MR. FURLONG:  No objection.

2    MR. JAMESON:  No objection.

3    MR. BAILEY:  No, objection, Your Honor.

4    JUDGE CARTER:  Exhibit 48 for acting general counsel

5    admitted without objection.

6    **(General Counsel Exhibit 48 received into evidence.)**

7    BY MR. LEHMANN:

8    Q    Did there come a time when, when the union notified

9    contractors that Local 785 was going to negotiate a new

10   contract?

11   A    There was.

12   Q    And did you send a letter to Ace Masonry?

13   A    We did.

14   **(General Counsel Exhibit 49 marked for identification.)**

15   BY MR. LEHMANN:

16   Q    I'm showing you what's been marked as GC-49.  Do you

17   recognize this document?

18   A    I do.

19   Q    And what is this document?

20   A    This is notice to all of our signatory contractors that we

21   are going to be entering building contract negotiations in 2011.

22   This notice serves per our collective bargaining agreements as

23   notice prior to negotiations.  And we -- our goal as a local and

24   we believe to the benefit of all of our signatory contractors

25   was to have one collective bargaining agreement at this point

1 for 785.  So this also elaborates on the fact that we will be

2 bargaining with that one association, which is actually as you

3 can see, STACC and CAST.  They are technically two associations

4 which will be merged into one.  But the same people, same

5 contractors.  The goal is to have one collective bargaining

6 agreement.  So this letter explains that as well.

7 Q    And did Ace Masonry ever respond to this letter?

8 A    I did not receive a response from Ace Masonry.

9 Q    Was there ever an indication that they objected to that?

10 A    No.

11    MR. LEHMANN:  I'd offer GC-49.

12    MR. FURLONG:  No objection.

13    MR. JAMESON:  No objection.

14    MR. BAILEY:  None.

15    JUDGE CARTER:  Hearing no objection, Exhibit 48 for acting

16 general counsel admitted without objection.

17 **(General Counsel Exhibit 49 received into evidence.)**

18 BY MR. LEHMANN:

19 Q    Was there in fact a new contract negotiated between the

20 employer associations and 785?

21 A    Yes.

22 Q    And did you have -- did you play a role in those

23 negotiations?

24 A    I was the lead negotiator for Local 785.

25 Q    And did you sign the contract?

1  A     I did.

2  **(General Counsel Exhibit 50 marked for identification.)**

3  BY MR. LEHMANN:

4  Q     I'm showing you what's been marked as GC-50.  Do you

5  recognize this document?

6  A     I do.

7  Q     And what is it?

8  A     This is the Local 785 building construction collective

9  bargaining agreement effective July 1, 2011, through June 30,

10  2013.

11  Q     Okay.  And did you sign this contract?

12  A     I did.

13  Q     What if anything terms are new to this contract?

14  A     I'm going to actually -- there is going to be more than a

15  few, so if it's okay I'll flip through the contract and just

16  tell you best of my --

17  Q     That's fine, sure.

18  A     And let me just elaborate real quickly on this.  This is

19  combining three contracts -- this was combining three contracts

20  into one, so there was a number of changes.

21  Q     Let me direct your attention, have you heard of the ASP?

22  A     Yes.

23  Q     What's ASP?

24  A     Administrative and safety program.

25  Q     Okay.  And what is that?

1  A      For CAST and STACC, it is their administrative and safety

2  program.  They are the contractor associations.  And there is a

3  contribution that is required by all signatory contractors in

4  this collective bargaining agreement that's called ASP.

5  Q      Okay.  And I want to direct your attention to Page 15.

6  A      Okay.

7  Q      And does ASP stand for administration and safety program?

8  A      Yes.

9  Q      Okay.  Now does the Laborers ask contractors to submit

10 monthly remittance reports?

11 A      Yes, we do.  It's required in the collective bargaining

12 agreement that for the, I guess that's correct, the prior month,

13 the next month they submit wages and dues -- I'm sorry,

14 benefits, fringe benefits and dues by the 15th of that month.

15 Q      Okay.  Did Ace submit monthly reports?

16 A      They did.

17 Q      In 2011?

18 A      Yes, they did.  In 2011, and I can speak to the Ithaca

19 region of 785, we have 3 different fund offices.  In the Ithaca

20 region, the Ithaca fund office, known as 589 funds, I believe

21 they submitted January and February with payment.  The balance

22 of remittance forms were without payment.

23 Q      Okay.  I'm going to direct your attention to GC-14.  Do

24 you recognize 14, GC-14?

25 A      I do.

1   Q      And are these the remittance forms?

2   A      Yes.  These are the remittance forms for the 589 fund

3   office on 622 W. State Street, Ithaca, New York, Ithaca region

4   of Local 785.

5   Q      Okay.  And I want to direct your attention to the second

6   page, for the payroll period August 2011.

7   A      Okay.

8   Q      And looking all the way down at the bottom of the page

9   where it says employer association contribution, there is a

10  cross-out, and above that there is ASP.  Is that the same ASP

11  that we have been -- that we were discussing on Page 15 of

12  GC-50?

13  A      Yes.  We, as a trustee of this fund, the signatory

14  contractors were notified -- signatory contractors were notified

15  that they were required per the collective bargaining agreement

16  effective July 1, 2011, on to pay the ASP fund.  That

17  association fee on our forms in the past was known as the

18  construction industry or construction industry fund.  In this

19  case, on this form, that was crossed off and ASP was wrote in.

20  And the contribution for the Ithaca region of 785 was 22-cents

21  per hour.

22  Q      Okay.  And turning to the first page, the January 2011,

23  looking at the bottom of the page where it says construction

24  industry?

25  A      Yes.

1   Q    Would that explain why the ASP is not on the January form?

2   A    Yes, it would.  And as you can see, the fee was 25-cents

3   on that form.

4        MR. LEHMANN:  I'd offer GC-50.  I don't know if I -- have

5   I offered 50?

6        JUDGE CARTER:  You have not yet.

7        MR. FURLONG:  Let me make sure.  50 is the letter?

8        MR. LEHMANN:  No.

9        MS. KLUYTENAAR:  No, 50 is the current agreement.

10       MR. LEHMANN:  It's the contract.

11       MR. FURLONG:  No objection.

12       MR. JAMESON:  No objection.

13       MR. BAILEY:  No, objection, Your Honor.

14       JUDGE CARTER:  Exhibit 50 for acting general counsel

15  admitted without objection.

16  **(General Counsel Exhibit 50 received into evidence.)**

17       MR. LEHMANN:  Your Honor, may I take five minutes?

18       JUDGE CARTER:  Okay.  We can go off the record.

19  **(Whereupon, a brief recess was taken.)**

20       JUDGE CARTER:  Let's go back on.  We're back on the

21  record.

22       MR. LEHMANN:  Thank you.

23  BY MR. LEHMANN:

24  Q    Now directing your attention to GC-50, the collective

25  bargaining agreement with CAST and STACC, who is CAST and STACC?

1  A     CAST is the -- Association of the Southern Tier.  STACC is

2  the Southern Tier Association of Construction Contractors, Inc.

3  They are both -- they are contractor associations.  The reason

4  they are both listed is CAST covers part of the jurisdiction of

5  785, STACC covers the balance of it.  So, again, their intent as

6  association is to merge these two, together, so they'll have

7  similar geographic jurisdiction.  So they are contractor

8  associations.

9  Q     Okay.  And what is their purpose?

10  A     They represent contractors in collective bargaining,

11  signatory contractors in collective bargaining.  The association

12  is a forum where contractors can utilize their resources to

13  market the industry, promote the industry, again use their

14  resources collectively by blueprints and other services.  They

15  have a broad range of services available.  Actually, now it's

16  not blueprints anymore.  They actually send them out

17  electronically.  But rather than a contractor, each contractor

18  that's bidding a project having to buy those documents, they buy

19  them and then if you're a member you get access to those for

20  free.  So they have a multitude of services they provide for

21  contractors.  But for the union's, from the union's perspective,

22  the associations are who we bargain with.  And those bargaining

23  agreements are recognized in the industry by our signatory

24  contractors and by the Department of Labor for posting

25  prevailing rate.

1   Q    Now I'm going to bring your attention to Ace Masonry.  How

2   much contact within the last three years did you have with Lisa?

3   A    I actually worked with Lisa on a few HR issues, the more

4   complicated issues.  I also worked with Lisa on the Skilled

5   Trades Diversity Council.

6   Q    Over some of those HR issues?

7   A    Well, we had a major issue with a discrimination issue at

8   Cornell University between two bricklayers, one being Caucasian

9   and one being a person of color.  And the concern from both the

10  perspective of Laborers, and all unions, and Ace was that this

11  could somehow reflect poorly on Ace Masonry and their ability to

12  work at Cornell University.  So we brought in Cornell, the

13  parties involved, the unions, and Lisa helped us, you know, kind

14  of -- we actually met at Ace Masonry's office and in their

15  conference room, and worked through this to ensure that they

16  would not have a negative impact on Ace Masonry's ability to

17  work at Cornell.  It was very important that that got resolved.

18  So that was the biggest issue.

19       Sometimes, I would talk to Lisa about forklift pay,

20  somebody not getting proper pay.  Sometimes, I would speak with

21  Robert Bellavigna about that.  But, also, I mentioned the

22  Skilled Trades Diversity Council.  I'm the chair of that.  And

23  that organization was formed to increase diversity in the

24  trades.  It's a partnership between the building trades

25  contractors and Cornell University.  And Lisa agreed graciously

1  to sit on that committee.  And we really appreciated that
2  because there are a lot of woman-owned enterprises in the
3  construction industry.  And so she was kind of our poster child
4  in that regard, too.  So that was primarily my interactions with
5  Lisa was those areas.
6  Q    Okay.  You mentioned a forklift pay issue?
7  A    Yeah.
8  Q    What was that about?
9  A    A laborers named Frank Lupo was operating a forklift for
10  Ace Masonry at a Dryden, New York, project.  And in our
11  collective bargaining agreement, they are required to get an
12  initial $1 an hour for that responsibility.  And Frank had a
13  difference of opinion on how many hours he should be paid for
14  operating that machine versus what Ace Masonry was paying him.
15  So I started with the job superintendent and then I talked to
16  Robert Bellavigna, and eventually Lisa, as well, about that
17  issue, because Frank wouldn't take no for an answer.  And I know
18  Lisa knows what I'm talking about.
19  Q    Okay.  And how was that resolved?
20  A    It got resolved, honestly, I think once Lisa got involved,
21  that's when it got resolved, if I remember correctly.  This is
22  probably at least more like four or five years ago.
23  Q    Okay.  Why did you go to Robert?  You said you went from
24  the superintendent, to Robert, to Lisa.  Why did you go to
25  Robert?

1  A    That was my pretty thorough understanding of how Ace

2  Masonry operated.  And that being that in my preferred way of

3  dealing with issues was that I would go to the superintendent on

4  the project first, try to resolve it at the project.  People in

5  positions like Robert Bellavigna and Lisa Bellavigna are

6  extremely busy with their day to day operations.  And so if I

7  could resolve something at the project, that was better for

8  everybody involved.  Again, understanding Ace Masonry structure

9  as well as I did, I knew that was what they had structured the

10  company, how they had structured the company, and that the

11  superintendents had authority to correct things.  So I would go

12  to the superintendents first.

13       If that -- if I didn't get satisfaction at that level,

14  then I would go to Robert Bellavigna, who was responsible for

15  all manpower, all supervision, per my understanding, and try to

16  get resolution there.  If that didn't resolve it, then I would

17  move up to Lisa, as president.

18  Q    And are you familiar with job order contracting?

19  A    I am.

20  Q    What's job order contracting?

21  A    Let me start with the reason I am familiar with job order

22  contracting was or is because it was a brand new concept by

23  Cornell University.  I'm sure it's utilized elsewhere.  I am

24  familiar with it at Cornell University because it was a subject

25  of our 2010 collective bargaining -- collective bargaining --

1  collective bargaining the 2010 agreement.  Let me say that

2  again.  I am familiar with the Cornell job order contracting

3  because it was a new concept that was introduced during

4  collective bargaining, during our collective bargaining with

5  Cornell and the Building Trades Council, between Cornell and the

6  Building Trades Council.

7       So we had pretty substantial and lengthy discussions about

8  job order contracting because from my perspective, representing

9  the unions, I needed to understand what this concept of

10  contracting would mean for my collective bargaining unit.

11  Q    Okay.  And does job order contracting require union labor?

12  A    At Cornell University, it does.

13  Q    And who does job order contracting at Cornell?

14  A    As in?

15  Q    What contractor?

16  A    Well, there is a state side to Cornell and there is an

17  endowed private side to Cornell.  Our collective bargaining

18  agreement requires that the endowed side of Cornell utilize

19  union labor for seven trades.

20  Q    Okay.

21  A    So it depends on which side of the campus you're asking me

22  about.

23  Q    All right.  And so for the private or the endowed side,

24  did Ace perform work for that side?

25  A    They did.

1  Q     Okay.  And I'm going to refer you to General Counsel

2  Exhibit 2.  It should be right at the bottom.  And turning to

3  the third page, Job 11-33 JOC, McGraw Hall.  What does JOC stand

4  for?

5  A     Job order contracting.

6  Q     And are you familiar with McGraw Hall?

7  A     I am.

8  Q     Okay.  How are you familiar with that?

9  A     It's one of the oldest -- one of the older anyway, one of

10 the original buildings at Cornell University in almost

11 continuous need of some type of repair.

12 Q     Okay.

13 A     And it is on the endowed side of the campus.

14 Q     Okay.  So this is -- performing a job, performing Job

15 11-33 requires union labor?

16 A     Yes, under job order contracting on the endowed side of

17 Cornell, union labor is required for seven crafts.

18 Q     All right.  And of the seven crafts, do three of the seven

19 crafts involve the Laborers, the Bricklayers, and the

20 Carpenters?

21 A     They do.

22 Q     What are the other four crafts?

23 A     Sheet Metal Workers, the Painters, the Electricians or

24 IBEW, and the UA Plumbers and Pipefitters.

25 Q     Now I know there was testimony before about Robert

 1    Bellavigna being a trustee.  What was he a trustee for?

 2    A    Which funds?

 3    Q    Which funds.

 4    A    Okay.  He sat on the 589 funds, the pension fund, the

 5    health and welfare fund, the training fund, and the -- which one

 6    am I missing, defined contribution fund.

 7    Q    Okay.

 8    A    Also known as annuity.

 9    Q    All right.  And what was his, what was his role on the

10    funds as a trustee?  Was he for the employer?

11    A    Yes, he was appointed as an employer trustee.

12    Q    Okay.  And who can serve as an employer trustee?

13    A    Either the head of the employers' association or an

14    employer in the industry.

15    Q    Okay.  And --

16    A    I shouldn't say either, both the head of the association

17    and --

18    Q    All right.  When you said the employer, well, strike that.

19    I take it Robert wasn't the head of the employer association?

20    A    No.

21    Q    Okay.  And the other two, those are employers who are

22    signatories to the contract?

23    A    The trust agreement says they have to be signatory

24    contributing employers.

25    Q    Are you a union trustee?

1   A     I am.

2   Q     Is there a governing document to the trust fund?

3   A     Each trust fund has a trust document, but it is the

4   governing document.

5   Q     Okay.

6         MS. KLUYTENAAR:  51.

7   **(General Counsel Exhibit 51 marked for identification.)**

8         MR. LEHMANN:  Can we have just one minute, please?

9         JUDGE CARTER:  Off the record.

10  **(Discussion off the record.)**

11        JUDGE CARTER:  Back on.

12  BY MR. LEHMANN:

13  Q     I'm showing you what's been marked as GC-51.  Do you

14  recognize this document?

15  A     I do.

16  Q     And what is it?

17  A     It's a restated agreement and declaration of trust of the

18  Laborers Local 589 welfare fund.

19  Q     Okay.  And what is that?

20  A     This is the trust fund document, the governing document

21  for the 589 health and welfare fund.

22  BY MR. LEHMANN:

23  Q     Okay.  I'm going to show you what's been marked as GC --

24        MS. KLUYTENAAR:  37.

25  BY MR. LEHMANN:

1   Q     37.

2   A     Okay.

3   Q     And what is 37?

4   A     This is the appointment of Robert Bellavigna to the

5   Laborers Local 589 welfare fund.

6   Q     Okay.  And is GC-51 the governing document for the

7   appointments and the acceptance of the welfare fund that Mr.

8   Bellavigna signed?

9   A     It is.

10          MR. LEHMANN:  I'd offer GC-51.

11          MR. FURLONG:  No objection.

12          MR. JAMESON:  No objection.

13          MR. BAILEY:  None, Your Honor.

14          JUDGE CARTER:  Exhibit 51 for general counsel admitted

15  without objection.

16  **(General Counsel Exhibit 51 received into evidence.)**

17  BY MR. LEHMANN:

18  Q     Was there a name change to the training fund for 589?

19  A     There was.

20  Q     Okay.  And was there a separate amendment to that?

21  A     There was.

22  **(General Counsel Exhibit 52 marked for identification.)**

23  BY MR. LEHMANN:

24  Q     I'm showing you what's been marked as GC-52.  Do you

25  recognize this document?

1    A      I do.

2    Q      And what is it?

3    A      This is the amendment to change the Laborers Local 589

4    training fund to rename it the Laborers Local 785 training and

5    apprenticeship fund.

6    Q      Okay.

7           MR. LEHMANN:  I'd offer GC-52.

8           MR. FURLONG:  No objection.

9           MR. JAMESON:  No objection.

10          MR. BAILEY:  None.

11          JUDGE CARTER:  Exhibit 52 for general counsel admitted

12   without objection.

13   **(General Counsel Exhibit 52 received into evidence.)**

14   BY MR. LEHMANN:

15   Q      Now did the funds for Local 7 and 1358, did they still

16   exist, training funds?

17   A      They did.

18   Q      And did there come a time when there was a shared services

19   agreement with the three locals and their funds?

20   A      Yes.  A goal of being able to have all of our

21   apprenticeship testimony and training, excuse me, training in

22   one location to reach that goal.  And prior to merging those

23   three funds, those three funds being the 785 training fund, the

24   1358 training fund, and the 7 training fund, required a shared

25   service agreement to purchase a property in Waverly, New York,

1    which is going to serve as the 785 training facility for

2    apprenticeship and journeymen continuing training.

3    Q    And was Robert a trustee, at this time?

4    A    He was.

5    **(General Counsel Exhibit 53 marked for identification.)**

6    BY MR. LEHMANN:

7    Q    I'm showing you what's been marked as GC-53.  Do you

8    recognize this document?

9    A    I do.

10   Q    And what is it?

11   A    This is resolution by each of the board of trustees of the

12   7, 1350, and 785 training funds to jointly purchase a property

13   that will serve as the 785 training facility in Waverly, New

14   York.

15   Q    Okay.  And did Robert Bellavigna sign this form?

16   A    Robert Bellavigna, myself, Marty O'Hara, and Doug Carman

17   signed on behalf of the 785 training apprenticeship fund.

18   Q    And just so that the record reflects, who are the other --

19   who is Mr. Carman?

20   A    Doug Carman is a union trustee.

21   Q    Okay.  Mr. O'Hara?

22   A    A union trustee.

23       MR. LEHMANN:  I'd offer GC-53.

24       MR. FURLONG:  No objection.

25       MR. JAMESON:  No objection.

1    MR. BAILEY:  None.

2    JUDGE CARTER:  Exhibit 53 for acting general counsel

3  admitted without objection.

4  **(General Counsel Exhibit 53 received into evidence.)**

5  BY MR. LEHMANN:

6  Q    Did there come a time when you asked Robert to resign --

7  A    I did.

8  Q    -- as a trustee?

9  A    I did.

10  Q    Okay.  And how did that come about?

11  A    Start with Bob's appointment.  When George David Weaver

12  asked if I had any objections to Bob -- or I should say Robert

13  Bellavigna serving as a trustee, I told him, no, that would be

14  great.  I thought Bob would make a wonderful trustee just

15  because I had known him.  I knew he cared about his employees.

16  I knew he cared about the industry, all factors in making good

17  decisions as a trustee whether you're on the labor or management

18  side of the table.  So Bob helped me out over the years serving

19  as a trustee.  I mean when I say that, he made prudent

20  decisions, but he, you know, was a trustee that understood what

21  we were trying to accomplish.

22    With that said, there came a point when a board of

23  trustees has to act regarding contractor benefit delinquencies.

24  And for Bob to continue to sit on the 589 funds, while being a

25  management -- the management, part of the management team at Ace

1    Masonry was a serious conflict that I felt it would be prudent

2    for him to step down as a trustee.  And, in fact, we were -- the

3    delinquencies were at the point where it necessitated us to take

4    legal action against Ace Masonry.  So for those reasons, I

5    approached Bob and, and we had that discussion.

6    Q    When did you approach Bob?

7    A    October 3, 2011.  And we discussed that and other issues

8    regarding the status of Ace Masonry.  And I recommended he go

9    ahead and resign from the funds.  And he agreed and said, yes,

10   I've been thinking I probably should.

11   Q    Okay.  And he signed a resignation form?

12   A    He did.

13        MS. KLUYTENAAR:  39.

14   BY MR. LEHMANN:

15   Q    I'm going to direct your attention to GC-39.

16   A    39 you said, right?  Okay.

17   Q    And is this the resignation form he signed?

18   A    It is.

19   Q    Now was there -- are you aware of an audit being performed

20   on Ace Masonry's books?

21   A    Yes.  The board of -- actually, the 7 board of trustees,

22   the 1358 board of trustees, and the 589 board of trustees

23   requested that an audit of payroll records for, for determining

24   benefit delinquencies was ordered.

25   Q    Okay.  And was there a report that was issued?

1    A    Yes.

2    Q    Do you know who performed the audit?

3    A    Joe McCarthy and Associates, I believe it is.

4    Q    Okay.  And did the union receive these reports?

5    A    We did.

6    Q    Are you familiar with Henry Bellavigna?

7    A    I am.

8    Q    What was your -- did you have any contact with him

9    throughout the last three years?

10    A    Well, a little further back and in the last three years,

11    yes.

12    Q    Okay.  What was your primary contact with Mr. Bellavigna,

13    Henry?

14    A    The first time I met Henry was when he was, and, Henry, I

15    apologize if I get your title wrong at the time, but he was, I

16    believe, the general superintendent of the masonry division of

17    McGuire and Bennett.  And I worked for McGuire and Bennett.  So

18    that goes back, I guess that's almost 25 years ago now, but

19    didn't know Henry well at the time.  Then in 2006, I believe,

20    Henry called -- it was in 2006 that Henry had called me.  So I

21    knew Henry a little bit.  He called me and asked me if it would

22    be okay if Ace hired Ray Bellows and put him in the Laborers

23    Union, Laborers, at that time, Local 589 as a journeyman.  And

24    he became a member in 2006.

25         A little later on, Henry called me regarding another

1  possible laborers for the local that he would like to hire to

2  work for Ace Masonry, Bill Coston, Jr., and that's C-O-S-T-O-N.

3  And actually asked me if he could put Bill in the local as an

4  apprentice.  And Bill has since -- he did come into the Laborers

5  Union as an apprentice.

6  Q    When?

7  A    Working for Ace Masonry until sometime in 2011.  That was

8  2007, I'm sorry.  In 2007, he entered an apprenticeship program,

9  completed his program, and continued to work for Ace Masonry as

10  a journeyman.  And then in, and I'm not sure exactly, I know it

11  was the first, I'm pretty sure it was the first year of the

12  Odessa-Montour project.  I'm in the Odessa-Montour district and

13  I was going to, I think it was a football game or a soccer game

14  or something at the school, and I saw Henry at the project, and

15  just stopped to chat for a few minutes, at which time, he

16  identified that he was the project manager of the Odessa-Montour

17  Schools project.

18      That's about it.  I mean certainly I saw Henry in the

19  office from time to time when I would go there to see primarily

20  Robert Bellavigna, but that was about the extent of my

21  conversation with Henry.

22  Q    And when he identified himself as the project manager at

23  Odessa-Montour, what does the project manager do?

24  A    Project managers, the duties certainly can vary, but again

25  knowing the extensive nature of Henry's experience, I would only

1  be assuming to know what exactly his duties were.  But I'll talk

2  in general sense what my understanding of a project manager is.

3  And that is that they oversee the entire project on behalf of

4  the contractor they are employed by.  They direct and coordinate

5  the various contractors on the project.  You're going to have a

6  general contractor who happened to be Ace in this case on the

7  project and then subcontractors or sometimes in the case of the

8  schools it would be a prime contractor like electrical,

9  plumbing, and pipefitting work, HVAC work, they are prime

10  contractors requiring a project manager to coordinate the

11  efforts of all those various contractors so you have a

12  relatively smooth project, everybody is cooperating.

13      But Henry on that particular day was putting the fence

14  back up because somebody hadn't put it back up and people were

15  walking through the construction site on the way over to the

16  football game.  So your duties vary.  You know, he's watching

17  out for Ace Masonry's interest ultimately at the end of the day

18  because they are the general contractor.  He, I believe, placed,

19  well, maybe I shouldn't say, I'm not positive.  But I believe

20  where Bill Coston, Jr., started was at Odessa Schools.

21  Q    Throughout the past couple of years that at least since

22  2006, 2007, did Ace ever make any request for manpower?

23  A    Yes.

24  Q    Okay.  From the union?

25  A    Yes.

1  Q    And how often did they request manpower?

2  A    Ace would require manpower from the local union when they

3  had more workload than normal, because they did have a pretty

4  steady circle of employees who stayed right with them, work

5  steady for them for years, and they would move from project to

6  project.  So it would be -- it wouldn't be substantial, but it

7  might be as often as six times a year they would call for labor.

8  And it might only be a couple of times a year because they try

9  to keep their core people working.  But they did call from time

10 to time.

11 Q    And do you know generally who would make the request from

12 Ace?

13 A    Either the project superintendents or Robert Bellavigna.

14 Q    How do you know that?

15 A    Because I talked to them about it.

16 Q    He'd call you directly?

17 A    He'd call me and we'd talk about because, you know, Robert

18 Bellavigna was a hands-on guy.  He would want to know who was

19 available and whether he knew them, what skills they had.  Some

20 people in similar positions in companies do that.  Some just say

21 just call the hall and get some help, and we'll see how they

22 are.  So that wasn't Bob's style.  Bob's style was he wanted to

23 know what he was getting up front before we dispatched a

24 laborer.

25 Q    Okay.  And you had testified earlier that Ace submitted

1  union dues to the Laborers.

2  A    They did.

3  Q    Did they also submit union dues in the fall of 2011 to the

4  Laborers?

5  A    Actually, they did.  They did not pay the benefits, but

6  they did pay the union dues.

7  Q    I'm going to refer you to GC exhibit -- GC-16 and 17.

8  A    Oh, sorry, I'm supposed to be looking for them?  I'm

9  somewhere else, I guess.

10 Q    Okay, you have 16 and 17?

11 A    I do.

12 Q    In front of you?

13 A    Um-hum.

14 Q    Starting with GC-16, do you recognize this document?

15 A    Yes, I do.

16 Q    Okay.  And what is it?

17 A    This is the dues payment to the 1358 fund office;

18 although, it's not addressed correctly.  It says Laborers Local

19 1358 on the top.

20 Q    Okay.

21 A    It's the old address.

22 Q    Okay.  And Ace submitted the remittance forms to 1358,

23 Local 1358?

24 A    They did.

25 Q    Dues?

1  A    Yes.

2  Q    Okay.  And this document is kept in the regular course of

3  business?

4  A    It is.

5       MR. LEHMANN:  I'd offer 16.

6       MR. FURLONG:  No objection.

7       MR. JAMESON:  No objection.

8       MR. BAILEY:  No objection.

9       JUDGE CARTER:  All right.  Exhibit 16 admitted without

10  objection for general counsel.

11  **(General Counsel Exhibit 16 received into evidence.)**

12  BY MR. LEHMANN:

13  Q    And turning to GC-17, do you recognize this document?

14  A    I do.

15  Q    And what is it?

16       MR. LEHMANN:  First, I'd like the record to reflect this

17  is a four-page document.

18       JUDGE CARTER:  The record will so reflect.

19       THE WITNESS:  I do recognize this.  I've seen this before.

20  BY MR. LEHMANN:

21  Q    Okay.  And what is that?

22  A    This is the dues payments to the Ithaca office.  As soon

23  as this came in, this was brought to my attention.

24  Q    Okay.  And --

25  A    I'm sorry.  It was paid to the Laborers Local 589 fund

1  office.

2  Q    All right.  And Page 2, is that a check from Lisa

3  Bellavigna?

4  A    The check, itself, says Ace Masonry and signed by Lisa B.

5  Bellavigna.

6  Q    Okay.  And then staying with right underneath the check,

7  there is a vendor, 1663 marked.

8  A    Okay.

9  Q    And then an I-N-V date.  Do you know what that reference

10  is to, 2/28/11, 4/1/11, 5/1/11, 6/10/11?

11  A    Under invoice number on mine, is that what you're

12  referring to, under that column, invoice number?  Oh, I see,

13  okay, I see the column you're looking at now, yes.  That would

14  be a reference to the particular time period, the end of the

15  time period that these dues would be relevant for.  So 2/28/11

16  would have been dues payable through February 28, '11, and etc.

17  down through 4/11, 5/11, 6/11, 7/11.

18  Q    Okay.  And on the third page in the same general area that

19  8/12/11 and 9/12/11, that's for the July and August dues?

20  A    Yep.

21       MR. LEHMANN:  I'd offer GC-17.

22       MR. FURLONG:  No objection.

23       MR. JAMESON:  No objection.

24       MR. BAILEY:  None, Your Honor.

25       JUDGE CARTER:  Exhibit 17 for general counsel admitted

1   without objection.

2   **(General Counsel Exhibit 17 received into evidence.)**

3   BY MR. LEHMANN:

4   Q     Are you familiar with Bella Masonry?

5   A     I know about them.

6   Q     And when did you first learn of the formation of Bella?

7   A     The first time I realized there was a company running

8   around Ithaca, New York, with a sign saying Bella on them was

9   when I saw what I recognized as Ace Masonry vehicles, trucks,

10  and Ace Masonry employees and management driving trucks with

11  Bella signs on them.

12  Q     Okay.  Let's stay -- how did you recognize the trucks?

13  A     Because they're an Ithaca contractor, two blocks from my

14  office.  I'd see their trucks on a regular basis.

15  Q     Okay.  And what manager did you see driving a Bella truck?

16  A     Well, I know I saw Henry driving a Bella truck.

17  Q     Okay.

18  A     I think I saw Bob, but I'm not sure.

19  Q     Okay.  Any field employees?

20  A     Yes.  Randy Bell and -- now I'm drawing a blank.  Randy

21  and -- I'll think of it.

22  Q     Okay.  Well, let's talk about Randy Bell.  Who is Randy

23  Bell?

24  A     Randy, I've known Randy for a number of years from working

25  with him in the field.  He is a bricklayer by trade.  He is a

1  little bit specialized in the fact that -- within the

2  Bricklayers Local because he did, well, I'm sure he can lay

3  block and brick, but his specialty was restoration work,

4  caulking.  He actually worked for a number of years for Lupini,

5  who does pretty much strictly that type of masonry construction.

6      So Randy and I worked together when he worked for Lupini,

7  for a general contractor, so I knew him well prior to him going

8  to work for Ace Masonry.  And I think he primarily performed

9  similar type of work for Ace Masonry, that's my understanding.

10     MR. LEHMANN:  At this time, Your Honor, I'd propose a

11  stipulation with Mr. Bailey regarding the information request,

12  GC-21, that the request was made by the Bricklayers and the

13  Laborers.  The same response, your letter dated January 24th,

14  applies to Bricklayers as it applies to the Laborers.  That was

15  the same response, you'd stipulate to that?

16     MR. BAILEY:  I guess I don't understand what you're

17  asking.

18     MR. LEHMANN:  There's nothing different, no information

19  was provided other than your response, the letter dated

20  January 24th.  There was -- I'd like a stipulation that --

21     MR. BAILEY:  That I would respond the same way to what?

22     MR. LEHMANN:  That you responded the same way to, that has

23  already been testified with the Bricklayers applies to the

24  Laborers.

25     MR. BAILEY:  That my letter will respond to the Laborers

1   as well?

2        MR. LEHMANN:  As well.

3        MR. BAILEY:  Yes, I will.

4        MR. FURLONG:  It did.  I think that's a stipulations it

5   did.

6        MR. LEHMANN:  That the letter you sent on January 24th did

7   respond to both the Bricklayers --

8        MR. BAILEY:  Who is the letter addressed to?

9        MR. LEHMANN:  GC-24, I believe it's both Bricklayers --

10       JUDGE CARTER:  21?

11       MR. BAILEY:  21 or 24?

12       MR. LEHMANN:  Or 21, GC-21.

13       MR. FURLONG:  I think general counsel, because we

14   consulted, I'm just looking to shorten it.  Did there come a

15   time when you met with Furlong, did you have him send out a

16   letter, did you get a response, the same thing we went through

17   with Mr. Stringer.  And then the response back from Mr. Bailey

18   was to both unions.  I represented, represent both unions.  Just

19   trying to shorten it, that's all.

20       MR. BAILEY:  Well, yeah.  I mean the letter says who it is

21   to.  So I don't know that you need my stipulation.  It's

22   admitted into evidence and it says exactly who it is addressed

23   to.

24       MR. LEHMANN:  Okay.

25       MR. BAILEY:  I guess I don't understand.

1    JUDGE CARTER:  All right.  So I guess the message is that

2    you're not getting a stipulation, but you have the records in

3    evidence.  So it's really your call as to whether you want to

4    take testimony from this witness about that issue.

5    BY MR. LEHMANN:

6    Q    Okay.

7    A    I remember now.

8    Q    The employee?

9    A    Yes.

10   Q    Go ahead.

11   A    A lot of information.  The other who I recognized as an

12   Ace employee that I saw driving in the general Ithaca vicinity

13   with a Bella sign on, maybe it was his personal truck, I don't

14   know, was Derek Hager.

15   Q    Okay.

16   A    Again, in that particular instance, I'm not sure whether

17   it was an Ace truck or not, but I distinctly remember seeing

18   Derek and seeing a Bella sign, which this is when I'm

19   discovering who are these guys.  I mean that's part of my job is

20   somebody comes into town, you look into who is in town doing

21   construction work.  That's part of my job.  So that's what I

22   recollect about that.

23   Q    Did there come a time when you asked Mr. Furlong to send a

24   letter on behalf of the Laborers seeking information about Ace

25   Masonry and Bella Masonry?

```
 1  A    Yes.

 2  Q    Okay.  And please refer to General Counsel's Exhibit 21.

 3  A    Okay.

 4  Q    The January -- could you please find the January 13th?

 5  A    Oh, this one says February.  Oh, you've got to flip to the

 6  January?

 7  Q    I think it's in the back.

 8  A    Okay.

 9       JUDGE CARTER:  Well, are you looking for Mr. Bailey's

10  letter or are you looking for the initial report?

11       MR. LEHMANN:  The initial letter.

12       JUDGE CARTER:  That's Page 3.

13       THE WITNESS:  Okay.  I've got it.

14  BY MR. LEHMANN:

15  Q    Is this the letter that Mr. Furlong sent on behalf of the

16  Laborers and Bricklayers?

17  A    Yes.

18  Q    And was there any response to that letter, to your

19  knowledge?

20  A    From?

21  Q    From either Ace Masonry or Bella Masonry?

22  A    No.

23  Q    No information was provided?

24  A    Not from the contractors.  There was a response.

25  Q    Okay.  What was the response?
```

1  A     The response was from Jason Bailey, their attorney.

2  Q     Okay.  And the response is in the packet GC-21.

3  A     And I remember it quite well, because I think, well, this

4  is what I remember about it.  It was essentially that we are not

5  going to, if I recall, and I can look at it in here, but I

6  remember this pretty well that we're not going to respond to

7  that information request, I believe was what the email said.

8  Q     Okay.  Please find the January 24, 2012, letter from Mr.

9  Bailey.

10  A     Yep.

11  Q     And is that the letter you're referring to?

12  A     Yes.

13  Q     And you received a copy of that letter?

14  A     I did.

15      MR. LEHMANN:  Can I have two minutes, Your Honor?  I think

16  I'm done.

17      JUDGE CARTER:  Okay.  Go off the record.

18  **(Discussion off the record.)**

19      JUDGE CARTER:  We're back on.

20      MR. LEHMANN:  Did I offer General Counsel Exhibit 54, the

21  audit report?

22      JUDGE CARTER:  No, that has not been --

23      MR. LEHMANN:  Okay.  Strike that.  Nothing further.

24      JUDGE CARTER:  Okay.  Let me ask if folks want to push

25  through and complete the witness?

1   MR. JAMESON:  Yes.

2   JUDGE CARTER:  Rather than taking a break?

3   MR. JAMESON:  Yeah.

4   JUDGE CARTER:  Okay, let's do that.  Mr. Furlong?

5   MR. FURLONG:  Thank you, Judge.

6                    **FURTHER DIRECT EXAMINATION**

7   BY MR. FURLONG:

8   Q    Mr. Marsh, you testified about a meeting that you had with

9   Bob Bellavigna on October 3, 2011.  Do you recall your

10  testimony?

11  A    I do.

12  Q    And just to kind of fast-forward it, you had that meeting

13  over at the Ace Masonry offices on Cecil Malone Drive?

14  A    Yes, in the conference room at that office, yes.

15  Q    Was it only you and Bob, or were there others present?

16  A    Just Robert Bellavigna and I.

17  Q    And as of October 3, 2011, as of this meeting, did Mr.

18  Bellavigna say anything about his plans with respect to Ace

19  Masonry and/or Bella Masonry?

20  A    We did discuss the status of Ace Masonry.  And Bob

21  responded that they were winding the company down, that it just

22  wasn't possible financially to survive, that Lisa was sick of

23  the industry, sick and tired, didn't want anything more to do

24  with construction or at least being a construction contractor.

25  And then I asked him what was next, what's next for Robert

1  Bellavigna.  And we had other conversation, too, but that

2  question was important to me.  And the answer was I don't know,

3  I'm not sure, I'll figure it out.

4  Q    Did he say anything about Henry, Bella Masonry, anything

5  like that?

6  A    No.

7  Q    Did he mention, at that time, that he had been down to a

8  Vestal job for Bella, a job in Vestal with respect to going down

9  and meeting his son there, and everything like that?

10  A    He did not.  I do want to add something about what was

11  discussed, though.

12  Q    Go ahead.

13  A    Okay.  We also talked about the benefit delinquencies.

14  And he told me that he was hopeful, he was hopeful that once the

15  obligations to the creditors were met, if they could meet them,

16  that the benefits would be paid on the crafts people that worked

17  for him, the laborers, the carpenters, the bricklayers.  He was

18  hopeful that that still may happen, that may have all -- that

19  when they wound down Ace that there would be enough resources

20  left to make those benefit payments happen.

21  Q    And did he, during that meeting, attribute the financial

22  distress of Ace in any way, shape, or form to the Laborers Union

23  refusing to provide him with any personnel?

24  A    No.

25  Q    Did he mention anything about the Bricklayers being the

1   cause of the company's demise --

2   A      No.

3   Q      -- with respect to manpower?

4   A      No.

5   Q      Did he mention anything about the Carpenters being the

6   cause of the company's demise with respect to manpower?

7   A      No, but he did mention the Carpenters.  He was a little

8   frustrated with them.  And I think that was a reflection they

9   were the first ones to send legal notices regarding the lack of

10  payments for benefits.  They were the first ones that sent

11  notice, so he grumbled about that, but nothing about the lack of

12  labor.

13  Q      And again getting back to that discussion and Bella

14  Masonry, did he mention anything about Bella Masonry taking --

15  did he mention anything about Bella Masonry, period?

16  A      Absolutely not.  Like I say, I did not -- this was at

17  least two weeks before that I saw Bella signs running around

18  town.  And I did not know, never even thought of the name of

19  Bella before I saw those signs.

20  Q      Are you familiar with an outfit called Sorensen Gross

21  Construction Services?

22  A      I am.

23  Q      Would you tell us where you gained your familiarity with

24  that firm?

25  A      They're a large, very large contractor out of Michigan,

```
 1    the state of Michigan, and they started out in the auto industry
 2    as a union contractor.  They have since created other divisions,
 3    some of which are non-union, including Sorensen Gross
 4    Construction Services.  And they operate in New York State
 5    non-union, even though back home they operate union.  They had a
 6    job order contract with the state of New York at Cornell
 7    University.
 8    Q    All right.  And with respect to that job order contract
 9    with the state of New York, and I'm assuming the state side of
10    Cornell, right?  And actually just to make this record clear,
11    let me pull back from that.  Are there certain schools under the
12    umbrella of Cornell University that are actually State Union of
13    New York colleges and schools?
14    A    There are.
15    Q    And what would they include?
16    A    Oh, boy.  I'll do my best.
17    Q    Give us some examples.  We talked about --
18    A    The School of Industrial Labor Relations is a state SUNY
19    funded college, SUNY and whatever their funding.  But it's a
20    state funded college.
21    Q    How about the Vet School?
22    A    Yes.
23    Q    How about the Hotel and Restaurant Industry School?
24    A    I think all that is actually endowed.  Maybe a portion of
25    it is state, and that's why it can be a little confusing at
```

1  Cornell, at times, because there are some places where there's
2  cross over.  But some of the schools, like the Vet School that
3  you mentioned, the AG (ph.) school, the ILR, it's understood
4  they are 100 percent state.
5  Q    Just again, I just want to get the background.
6  A    Right, and then there's other portions --
7  Q    Because we've spoken about this, Bellavigna spoke about
8  it.
9  A    Right.
10 Q    We think of Cornell University as a private university.
11 Indeed, it's both public and private.
12 A    They refer to it at Cornell as a land grant college.
13 Q    Okay.  So getting back to Sorensen Gross Construction
14 Services, did you have any occasion to deal with that firm or
15 know about that firm performing work at Cornell University under
16 the job ordering contract program?
17 A    I did
18 Q    And when was that?
19 A    August of 2011.
20 Q    And in August of 2011, did Ace Masonry have any
21 interaction with work being done by Sorensen Gross Construction
22 Services?
23 A    As far as I know, no, prior to the Warren Hall project.
24 Q    All right.  Tell us about the Warren Hall project leading
25 up that.

```
 1   A     Okay.  One of Cornell's project managers for Warren Hall,
 2   a state project, had requested, at that time, I believe it was
 3   just one union carpenter and one union laborer to work on that
 4   project.  He wanted those particular individuals because he was
 5   familiar with their work and they were working for him on an
 6   endowed project the week before.  So they received their first
 7   paycheck --
 8   Q     They being?
 9   A     They being a union laborer, Joe Harris, and a union
10   carpenter, which I don't, don't recall his name.  And the
11   representative for the Carpenters Union, Chuck Smith, and I get
12   a call because they're putting all of their benefits in our
13   Laborers and Carpenters check.  So that alarms our members.
14   They know that's not the way it is supposed to work.  And
15   they're asking questions about what's going on.
16   Q     I'll stop you there.  The phrase putting the benefits in
17   the check, do you mean as opposed to sending the benefits to the
18   Taft-Hartley funds, as would be required in the collective
19   bargaining agreement?
20   A     Right.  I'll back up.
21   Q     Explain that for the record, please.
22   A     Sure.  On a state project in New York State, you have to
23   pay the prevailing wage.  The minimum a contractor can pay under
24   prevailing wage is the posted union hourly rate.
25   Q     Which would include both wages and benefits?
```

1  A      No.  That's just wages.  Now if you choose, you can do one

2  of two things or actually three, really.  You can have a -- you

3  can pay the balance of it as benefits or you can pay the balance

4  of it in the paycheck, or a mix thereof.  But you can never pay

5  less than the posted hourly rate that the union posts with the

6  Department of Labor in New York State.  So they know what the

7  hourly rate is supposed to be, my members and the Carpenters'

8  members.  And they see that they're getting instead of $20 some

9  an hour, they're getting $35 or so in their check, then they say

10  wait a second, what's going on.  So what that contractor was

11  doing was trying to pay the entire package in the paycheck.

12  Q      Okay.  And they bring this -- let's just talk about Mr.

13  Harris, who brings this to your attention, putting aside for a

14  moment the carpenter.  What did you do once you received notice

15  of this?

16  A      Well, the first thing that happened is Chuck and I talked,

17  because we had to figure out what's going on here.  And,

18  actually, Chuck was the first one to the site, so he had some of

19  the recognizance done, Chuck Smith, the representative for the

20  Carpenters.  And then I talked to Joe Harris, my member, about

21  the situation.  And what happened next was we, you know, because

22  at this point I'm trying to assess who are these guys, will they

23  sign with the, with the unions, as well as Chuck is doing the

24  same thing.  And, you know, how did my guys get there.  How did

25  they get there?

1    So we figure all this out.  We figure that they were

2  dispatched there essentially through Cornell, that Sorensen

3  Gross Construction Services is doing job order contracting at

4  Cornell through the state, not Cornell hired, through the state,

5  and that there is a mix-up here and we've got to get it

6  straightened out.  So I and Chuck reach out to Sorensen Gross

7  Construction Services, do a little research, find out they are a

8  union contractor, and figure, okay, this is easy to resolve,

9  we'll just ask them to sign our local collective bargaining

10  agreements, they can pay the benefits on our guys, and we're

11  good.  They refused to do so.

12    So the construction manager from Cornell gets involved at

13  this point because we tell him, hey, we're not going to be able

14  to work this out.  We've got to pull our guys off the job.  We

15  can't work this out with this contractor.  They're going to have

16  to get their help somewhere else.  And he says, no, no, no, I --

17    MR. BAILEY:  Judge, I'm sorry, I'm sure there is a point

18  to all this.  Is there a quicker way to get there?

19    THE WITNESS:  We're almost there.

20    MR. FURLONG:  Well, no, this is good.  This is actual good

21  background.  He's going to talk about Ace in a moment.

22    THE WITNESS:  Right.

23    MR. FURLONG:  All right, but go ahead.  Can we continue,

24  Judge?

25    JUDGE CARTER:  The objection is overruled.  But let's link

1    it up.

2        THE WITNESS:  Okay.  I'm moving there.  So with that said,

3    we had to find a way to resolve it.  Cornell gets involved.  And

4    they try to help the process.  And, again, there is a refusal by

5    the contractor to sign, so they asked me can we have someone

6    else pick up the payroll, can Ace Masonry pick up the payroll

7    for this laborer and carpenter, and it turned into more than

8    that, so that you have a signatory contractor who can pay the

9    benefits in on these laborers and carpenters.  I agreed to it

10   and to the best of my understanding, Chuck Smith for the

11   Carpenters agreed to it as well.

12   BY MR. FURLONG:

13   Q    And how about Ace Masonry, did they agree to it?

14   A    Most indeed, because they submitted the benefit payment

15   reports and they paid the laborers.  It turned out to be we

16   ended up with five laborers on that project.  So I ended up

17   dispatching additional four laborers to that project.  This is

18   in August and going into September of 2011.

19   Q    Okay.  And those five laborers, putting aside any other

20   craft, those five laborers were there from beginning in August

21   and then continuing to September.

22   A    Yes.

23   Q    Were then taken off the payroll of Sorensen and put on the

24   payroll of Ace, who directly employed them.

25   A    Right.  And that's done under a -- I don't understand as

1 well as contractors do, but I know there is a percentage that

2 Ace would get for running that payroll through.  So this was

3 good for my signatory contractor, Ace Masonry, and it enabled my

4 members and the members of the Carpenters to get employment on

5 that project.  It made Cornell happy, because they got the

6 people they wanted.  So that's how that got resolved.

7     MR. FURLONG:  Your Honor, I've asked this a million times

8 and I am as disorganized as I appear.  We're at Charging

9 Party 7?

10     JUDGE CARTER:  That's right.

11 **(Charging Party Exhibit 7 marked for identification.)**

12     MR. FURLONG:  Before I move to the witness, Your Honor,

13 this is a two-page document.  It's actually a one-page document.

14 We've got the original and certainly we'll allow Mr. Bailey to

15 compare it to the original.  For copying purposes, it was --

16     JUDGE CARTER:  Okay.

17 BY MR. FURLONG:

18 Q    Mr. Marsh, before you sits a document marked for

19 identification as Charging Party 7.  You testified in response

20 to questions by Mr. Lehmann that you have a position with the

21 Skilled Trades Diversity Council.  Do you recall that testimony?

22 A    Yes.

23 Q    And again just briefly, what is the Skilled Trades

24 Diversity Council?

25 A    The Skilled Trades Diversity Council was formed in 2004.

1    It's a collaboration between the Tappen's Courtland Building

2    Trades Council, Cornell University, other construction owners in

3    the area, and contractors, to incentivize and increase women and

4    minorities entering the construction crafts.

5    Q    In particular, would that be the unionized construction

6    crafts?

7    A    Yes.

8    Q    Through their apprentice programs?

9    A    Yes.

10   Q    Okay.  Now getting back to Charging Party 7, and for the

11   record, the original is a three-part, fold-in flyer that is

12   depicted in the actual exhibits as a two-page flyer, front and

13   back.  Do you recognize this flyer?

14   A    Yes, I've seen it before, yes.

15   Q    Okay.  And is this flyer kept in the normal course of

16   business by the Skilled Trades Diversity Council?

17   A    Yes.  It's one of our promotional flyers.

18   Q    And is the Skilled Trades Diversity Council actually

19   housed in the Laborers' Union offices?

20   A    Our administrative activities are, yes.

21        MR. FURLONG:  All right.  I move that this be received

22   into evidence.

23        MR. JAMESON:  No objection.

24        MR. LEHMANN:  No objection.

25        MR. BAILEY:  None.

1       JUDGE CARTER:  Charging Party 7 admitted without

2   objection.

3   **(Charging Party Exhibit 7 received into evidence.)**

4   BY MR. FURLONG:

5   Q     Mr. Marsh, I see on the second page of the document, in

6   the middle of the document, there is a statement by Lisa

7   Bellavigna, owner/president of Ace Masonry.  Do you see that?

8   A     Yes.

9   Q     Okay.  Take a moment to review it, if you would.  Do you

10  have any knowledge as to how this statement, which purports to

11  be from Lisa Bellavigna, found its way into the flyer that was

12  put together by the Skilled Trades Diversity Council?

13  A     Lisa was, the way I recollect it, a board member of the

14  Skilled Trades Diversity Council.  And like I say in my previous

15  testimony, we kind of use her as one of our poster child's, a

16  woman-owned construction company, who happened to be a local

17  contractor.  And that, together, was a perfect fit.  And so Lisa

18  volunteered to be involved with us.  And Charade Kittle, my

19  office manager for Local 785, and Lisa, I believe, discussed and

20  agreed to put this in the flyer.  That's the way I remember it.

21  Q     Now getting down to the statement under Lisa's name, Ace

22  is signatory with the Bricklayers, Laborers, and Carpenters

23  Unions, is well-known for their exceptional quality.  Any reason

24  to believe -- oh, by the way, let me back up.  What was the date

25  of this flyer, do you know?  I don't need the specific date.  Do

1   you know the year?

2   A    I, I don't.  I don't remember.  I would guess that it was

3   probably in '05 or '06, or something like that.

4   Q    Well, if you go to the third paragraph of Lisa's

5   statement, would you agree with me it had to have been after

6   '07?

7   A    Oh, yeah, okay.  Yep.

8   Q    Are there any emails that may refresh your recollection as

9   between Charade Kittle and Lisa Bellavigna with respect to the

10  date of this flyer?

11  A    I'm sure there was.  I think Lisa and Charade communicated

12  on a regular basis.

13       MR. FURLONG:  I'm just going to mark this Charging Party

14  8, for purposes of refreshing the witness' recollection.

15  **(Charging Party Exhibit 8 marked for identification.)**

16       MR. FURLONG:  I don't have objection to it going in, but

17  it's really just for the purpose.

18  BY MR. FURLONG:

19  Q    Mr. Marsh, the document marked Charging Party Exhibit 8 is

20  a string of emails.  And I direct your attention to the middle

21  one from Lisa Bellavigna to Charade Kittle.  Does that help

22  refresh your recollection as to the date that this flyer was

23  produced, certainly the year?

24  A    I haven't read the document.

25  Q    Take your time.

1    **(Pause.)**

2    BY MR. FURLONG:

3    Q    Just looking at the date of the email --

4    A    Yes.

5    Q    I'm sorry.

6    A    Yes, this is helpful.

7    Q    Does that refresh your recollection with respect to the

8    year that the flyer was produced?

9    A    Well, this email is July 20 -- wait a minute, that's not

10   right.  June 24, 2009.  So I would say probably shortly

11   thereafter.

12   Q    Okay.  Safe to say that the flyer was produced in 2009?

13   A    I would imagine.  Knowing Charade, the way she pushes, it

14   was done shortly thereafter.

15   Q    Okay.  Fair enough.  Now getting back to the document

16   that's actually been received into evidence, which is Charging

17   Party's 7, where it states that Ace is signatory with the

18   Bricklayers, Laborers, and Carpenters Unions, you see that part?

19   Any reason to dispute or contest what Ms. Bellavigna was stating

20   in terms of her relationship with the three trades?

21   A    No, that it was -- that was well-known in the industry

22   that they were utilizing those three trades.  And, in fact, in

23   2009, a substantial uptick in the number of carpenters employed

24   at Ace, different than prior to that.  They were evolving, at

25   that point, into a little bit different structure.

 1    JUDGE CARTER:  And just for the record, I removed Charging

 2  Party Exhibit 8 from the witness before he gave that response.

 3    MR. FURLONG:  Okay.  Thank you.

 4  BY MR. FURLONG:

 5  Q    Would you take a look at Charging Party's 51, which is the

 6  trust document for Local 589's welfare fund?

 7    MR. BAILEY:  You mean the GC-51?

 8    MR. FURLONG:  Oh, GC-51.  My apologies.

 9    THE WITNESS:  Okay.

10  BY MR. FURLONG:

11  Q    Are you familiar with the -- I think you actually

12  testified you are familiar with the trust document.

13  A    Yes.

14  Q    By virtue of your position, right?

15  A    Um-hum.

16  Q    And as business manager, you are a trustee on the fund?

17  A    I am.

18  Q    Right.  I'd simply like to direct your attention to

19  Article 3, which is on Page 6.

20  A    Okay.

21  Q    All right.  In Section 3.1, it talks about those people or

22  those, yeah, those people who are eligible to serve as trustees.

23  Do you see the second sentence?  It says three employer trustees

24  shall be appointed by the employers.  It doesn't say three

25  trustees.  It says three employer trustees.  Do you see that?

1    A    Yes.

2    Q    What does that mean to you with respect to this trust

3    document?

4    A    It means that there are two sides to a board of trustees.

5    There is a management side of the board of trustees and there is

6    the union side of the board of trustees.  Therefore, making sure

7    that the interest of both parties, and we are bound through a

8    collective bargaining agreement, are at the table making

9    decisions on trust agreements, or I should say trust funds.

10   Q    Well, let me address this question to you.  You testified

11   in response to questions by Mr. Lehmann that only employers who

12   were signatory to the collective bargaining agreement could

13   serve as a trustee.  Do you recall that --

14   A    Yes.

15   Q    -- question and answer.  Now it says three employer

16   trustees shall be appointed.  Now if you go to Section 1.1,

17   which is on Page 2 of the trust document, does it define the

18   term employer?

19   A    Yes.

20   Q    And in subparagraphs A, B, C, and D, does it require that

21   the term employer only be applied to those employers who have

22   agreed to be bound by the collective bargaining agreement?

23   A    Yes, that's what I interpret that language to say,

24   absolutely.

25   Q    And this was one of the trust funds that Mr. Bellavigna

1   was a trustee on until October 3, 2011?

2   A    Yes, it is.  And I would refuse, even if they didn't say

3   that, for someone who is not a signatory contractor to sit in on

4   the funds anyways.  I don't think it would ever happen.  That

5   just doesn't make sense.  They would have to be a signatory

6   contractor.  But as you pointed out, it's in the document as

7   well.

8        MR. LEHMANN:  Your Honor, I'm just wondering if now might

9   be a good time to --

10       MR. FURLONG:  I'm finished -- two minutes and I'm going to

11  rest with this witness.

12       JUDGE CARTER:  Okay.

13  **(Charging Party Exhibit 9 marked for identification.)**

14  BY MR. FURLONG:

15  Q    Mr. Marsh, I've handed you a four-page document marked for

16  identification as Charging Party 9.  Take a moment to review

17  that document and I'm going to ask you if you recognize it.

18  A    I do recognize these documents.

19  Q    And from where do you recognize the documents?

20  A    I've seen them before.  They have been on my desk, because

21  these are the results of the audits, the audit of Ace Masonry.

22  One, well, three of these pages are the results of the audit on

23  behalf of the 789/589 funds and one other page is the result of

24  the audit on behalf of the 7 funds.  And there is another audit

25  that was performed on behalf of 1358 funds, which is not in this

1   packet.

2   Q    By the way, we'll be happy to provide that.  We just

3   haven't been able to locate that audit.

4   A    Oh, okay, you don't --

5   Q    If we have them, we'll provide them.

6   A    I've got it in my folder, but --

7   Q    Okay.  We're going to break for lunch in a minute, or

8   else, I don't know, but we'll provide them, okay.  In any event,

9   you recognize these as some McCarthy numbers that were sent over

10  to your funds?

11  A    Yes.

12     MR. FURLONG:  I move that they be received into evidence.

13     MR. LEHMANN:  No objection.

14     MR. JAMESON:  No objection.

15     MR. BAILEY:  No objection, Your Honor.

16     JUDGE CARTER:  Charging Party 9 is admitted without

17  objection.

18  **(Charging Party Exhibit 9 received into evidence.)**

19  BY MR. FURLONG:

20  Q    And Mr. Marsh, I notice that there appears to be a cutoff

21  on July 1, 2011.  There were a couple of audits, payroll periods

22  that covered, and I'm going for the first three pages of the

23  document, January -- I'm sorry, one is January 1, 2009, to

24  January 31, 2011.  That's on the third page, right?

25  A    Um-hum.

1  Q    Then we go February 1, 2011, to June 30th.  I'm on the

2  second page.  Am I correct on that?

3  A    Say that again?

4  Q    Yeah, on the second page, the audit covers the period

5  February 1, 2011, to June 30, 2011?

6  A    Yes.

7  Q    And then there is a July 1, 2011, through November 30,

8  2011, the first page, right?

9  A    I see that.

10 Q    Now we're speaking 589.  Do you have any reason to know

11 why Mr. McCarthy would have a cutoff date of June 30, 2011, and

12 then begin a new set of calculations for July 1, 2011?

13 A    Yes, because the contribution rates increased July 1,

14 2011.

15 Q    And would that have been with your 2011 to 2013 collective

16 bargaining agreement?

17 A    Yes, the building collective bargaining agreement.

18 Q    Okay.  And as business manager of Local 785, did you ever

19 receive any notification from either Lisa Bellavigna or Bob

20 Bellavigna that they would not open their books for the period

21 July 1, 2011, through November 30, 2011?

22 A    No.

23 Q    Thank you very much, Mr. Marsh.

24      MR. JAMESON:  No questions for me, Your Honor.

25      MR. BAILEY:  Very brief.

1    JUDGE CARTER:  Okay.

2                    **CROSS-EXAMINATION**

3    BY MR. BAILEY:

4    Q    I think you said you met with Bob, I think you gave a very

5    exact date, October 3, 2011?

6    A    Yes.

7    Q    And at that time you had no idea of Bella's existence?

8    A    I did not.

9    Q    And then you didn't learn of Bella until a couple of weeks

10   later?

11   A    Within a few weeks, yeah.

12   Q    So sometime by the 1st of November, is that safe?

13   A    Maybe sooner.  I, you know, it kind of blew me away when I

14   saw, when I realized who that was.

15   Q    Sure.  Once you found out about Bella, did you or anyone

16   from your office contact Henry and ask him to become signatory?

17   A    No, I didn't.  And I'll tell you why.

18   Q    That's okay.

19       MR. BAILEY:  Thank you, Judge.

20       JUDGE CARTER:  Any redirect?

21                   **REDIRECT EXAMINATION**

22   BY MR. LEHMANN:

23   Q    Tell us why?

24   A    I was very angry and astonished that this was happening.

25   When I looked at the website, other than the name, I saw Ace

1    Masonry.  And I saw, well, everybody but Lisa Bellavigna, it was

2    all people that were still working for Ace, at that time, on

3    that website.  I felt really deceived.  And I had just sat down

4    with Bob, who I had known for years and considered to be a

5    friend, and I suppose I should still because I'm a forgiving

6    guy, that he as evidence has now shown had known at the time

7    that Bella was going to be formalized.  And when I asked him as

8    a personal friend, in my opinion, what the future held, he

9    danced around the issue and wasn't straightforward with me.  Now

10   I know why.  So I was upset.  And I didn't reach out to him.

11   But, believe me, behind the scenes, we were hard at work

12   figuring out what we were going to do about Bella.

13        MR. JAMESON:  Nothing further.

14        MR. FURLONG:  Nothing further.

15        JUDGE CARTER:  All right.

16        MR. BAILEY:  Nothing, Judge.

17        JUDGE CARTER:  Mr. Marsh, you have completed your

18   testimony.  You are free to go.  Just don't discuss your

19   testimony with any other possible witness.

20        THE WITNESS:  Okay.

21        JUDGE CARTER:  Thank you.

22   **(Witness excused.)**

23        JUDGE CARTER:  Any further witnesses for the Agency?

24        MR. LEHMANN:  Not at this time, but can we go to lunch --

25   can I take five minutes?

1    JUDGE CARTER:  Okay.  Go off the record.

2    **(Discussion off the record.)**

3    JUDGE CARTER:  All right, we're back on the record.  And

4    for the acting general counsel, do you have another witness?

5    MR. LEHMANN:  We do not, Your Honor.  At this time, the

6    acting general counsel rests subject to any rebuttal witnesses.

7    JUDGE CARTER:  Okay.  All right, so at this point we'll go

8    ahead and adjourn and resume at the date we specified, which

9    will be September 11th, in the morning.  We'll wait for the AGC

10    to notify all the parties and myself about the location and the

11    time that's available for that location.

12    MR. LEHMANN:  Certainly.

13    JUDGE CARTER:  But we'll assume it is going to be the

14    morning of the 11th of September.  But anything further from

15    anyone else before we go off?

16    MR. BAILEY:  Judge, I'd like to obviously reserve my

17    opportunity to make any sort of oral motions the morning that

18    either September 11th or upon completion of the Charging Party's

19    case.

20    JUDGE CARTER:  Okay.  That will be fine.

21    MR. BAILEY:  Thank you, Judge.

22    JUDGE CARTER:  All right, so with that we'll go ahead and

23    go off the record, and resume Monday, 11th of September.

24    **(Whereupon, at 1:10 p.m., the hearing in the above-entitled**

25    **matter adjourned, to reconvene on Monday, September 11, 2012.)**

26

1

### C E R T I F I C A T E

This is to certify that the attached proceedings done before the NATIONAL LABOR RELATIONS BOARD REGION FOUR

In the Matter of:

**ACE MASONRY,INC., d/b/a  ACE UNLIMITED, AND BELLA MASONRY,LLC, alter egos,**

    Respondent,

And

**INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS, LOCAL NO. 3,**

    Charging Party,

And

**LABORERS INTERNATIONAL UNION, LOCAL NO.785,**

    Union Involved,

And

**NORTHEAST REGIONAL COUNCIL OF CARPENTERS,**

    Union Involved.

Case No.   3-CA-073540, 3-CA-074523, 3-CA-073549, 3-CA-074531,
    3-CA-079606

Date:     August 3, 2012

Place:    Ithaca, New York

Were held as therein appears, and that this is the original transcript thereof for the files of the Board.

    _____
    Official Reporter

BURKE COURT REPORTING, LLC
1044 Route 23 North, Suite 316
Wayne, New Jersey  07470
(973) 692-0660